## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL A. LIBERTY; BRITTANY LIBERTY;<br>PAUL HESS; RICHARD LIBERTY;<br>GEORGE MARCUS, ESQ.;<br>MOZIDO INVESCO, LLC;<br>FAMILY MOBILE, LLC; BRTMDO, LLC<br>BRENTWOOD FINANCIAL, LLC; and,<br>TL HOLDINGS GROUP, LLC<br><br>Defendants,<br><br>and<br><br>XANADU PARTNERS, LLC<br><br>Relief Defendant | Case No.<br><br>JURY TRIAL DEMANDED<br><br>INJUNCTIVE RELIEF<br>SOUGHT |

## COMPLAINT

Plaintiff United States Securities and Exchange Commission (the "Commission" or "SEC") alleges the following against Defendants Michael A. Liberty; Brittany Abbass Liberty ("Abbass"); Paul Hess; Richard Liberty; George Marcus, Esq.; Mozido Invesco, LLC; Family Mobile, LLC; BRTMDO, LLC; Brentwood Financial, LLC; TL Holdings Group, LLC; and Relief Defendant Xanadu Partners, LLC, and hereby demands a jury trial and seeks monetary and injunctive relief:

## <u>SUMMARY OF THE ACTION</u>

1.      Michael Liberty ("Liberty") and his accomplices engaged in a long-running

fraudulent scheme using multiple fraudulent securities offerings.  They tricked investors into believing that they were funding fast-growing startup companies. They were not.  Liberty and his accomplices lied to those investors about the financial prospects of the startups, the use of their investment dollars, Liberty's involvement with the startups, and the nature of the investments offered.  Through these lies, Liberty and his accomplices enriched themselves at the expense of both the investors and the startup companies. Through their scheme, Liberty and his accomplices raised more than $55 million from hundreds of investors, misappropriating most of it to fund Liberty's lifestyle, including chartered flights, a dairy cow farm, and the funding of a movie production.

2.     Defendants' fraudulent scheme centered on MDO, a financial technology company (then known as Mozido LLC), and later on Mozido, Inc., which bought all of MDO's assets.  Liberty claimed to be the founder of MDO and served as a *de facto* officer of MDO and Mozido, Inc.  From 2010 to 2017, Liberty and his associates used shell companies (for example, a company Liberty named "Mozido Invesco") to raise money from hundreds of investors, who purchased securities in the form of promissory notes issued by the shell companies without active business operations.  Liberty and his associates represented that these notes provided a vehicle for investment in MDO.

3.     To facilitate his frauds, Liberty enlisted his attorney George Marcus and his then-girlfriend and bookkeeper Brittany Abbass.  He recruited his cousin Rick Liberty and Rick's friend Paul Hess to promote and sell the securities Liberty fraudulently offered.  And he used four shell companies to issue securities and one shell company to purchase and distribute securities as an underwriter.

2

4.     To sell the promissory notes issued by his shell companies, Liberty and his associates misled investors by falsely representing that:  (1) the investors' money was going to MDO to develop its technology and expand its markets; (2) Liberty's shell companies owned interests in MDO or had the authority to sell them; (3) MDO's value was high and its financial situation was very strong; (4) Liberty had invested tens of millions of dollars of his own money into MDO; and (5) Liberty was financially able to honor the personal guarantees he provided to investors along with the promissory notes.  In fact, (1) Liberty took the investors' money for himself; (2) some of his shell companies did not own ownership units in MDO, and others held ownership units that they were prohibited from selling; (3) MDO struggled financially, defaulted on its debt, and was at times valued at less than 10% of what Liberty and his associates represented to investors; (4) Liberty, at the time he was touting his large investment in the company, had really invested less than $5 million of his own money; and (5) Liberty was in debt and had previously defaulted on personal guarantees to multiple investors.  In order to facilitate his fraud scheme, Liberty hid his fundraising from MDO and failed to register the securities issued by his shell companies as required by Section 5 of the Securities Act.  In addition, Liberty's shell companies filed Form Ds with the SEC that contained material misrepresentations and omissions which reinforced Defendants' false statements and furthered their fraudulent scheme.

5.     Beginning in 2015, Liberty and his associates conducted an additional unregistered offering of securities relating to a healthcare information technology company called DaVincian Healthcare.  Liberty and his associates raised $6 million in that unregistered securities offering.

6.      By engaging in the conduct alleged in this Complaint:

a.   Liberty; Abbass; Hess; Richard Liberty; Marcus; BRTMDO, LLC; Brentwood Financial, LLC; Family Mobile, LLC; and Mozido Invesco, LLC engaged in (or, in the alternative except as to Liberty, aided and abetted) a fraudulent scheme through a series of fraudulent acts, statements, and material omissions; employed devices, schemes, and artifices to defraud investors; and, engaged in acts, transactions, practices, and courses of businesses which operated as a fraud, in violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §78(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] and Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §77q(a)];

b.   Liberty; Abbass; Hess; Richard Liberty; Marcus; BRTMDO, LLC; Brentwood Financial, LLC; Family Mobile, LLC; Mozido Invesco, LLC; and TL Holdings Group, LLC engaged in (or, in the alternative except as to the entities, aided and abetted) the unregistered offer and sale of securities in violation of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §77e(a) and 77e(c)];

c.   Hess and Rick Liberty induced and attempted to induce the purchase and sale of securities without being registered as a broker or dealer or being associated with a registered broker or dealer, in violation of Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

7.      Based on these violations, the Commission seeks:

a.   entry of appropriate permanent injunctions, including an injunction prohibiting Defendants from further violations of the relevant provisions of the federal securities laws and an injunction prohibiting Liberty, Abbass, Rick Liberty, Hess, and Marcus from directly or indirectly, including, but not limited to, through any entity owned or controlled by them

4

individually or collectively, participating in the issuance, purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent them from purchasing or selling securities for their own respective personal accounts;

  b. disgorgement of Defendants' ill-gotten gains, plus pre-judgment interest;

  c. disgorgement by the Relief Defendant of all unjust enrichment and ill-gotten gain received from Defendants, plus pre-judgment interest; and,

  d. imposition of civil penalties.

## JURISDICTION AND VENUE

 8. The Commission seeks permanent injunctions and disgorgement pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)].  The Commission seeks the imposition of civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

 9. The Court has jurisdiction over this action pursuant to Sections 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(d), 77v(a)] and Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), 78aa].

 10. Venue is proper in this District because the acts, transactions, or courses of business constituting the alleged violations occurred, in whole or in part, in the District of Maine, and because Defendants have transacted business in Maine.  Marcus is a resident of Maine and practices law from his law firm in Maine.  Mozido Invesco and Xanadu Partners were both organized under Maine law and operated from Maine.  Liberty resided in Maine for a period of

the fraudulent scheme, and the proceeds of the scheme flowed through the IOLTA account of the

Maine law firm Marcus Clegg and other bank accounts in Maine.  In addition, the securities

described herein were offered and sold to residents of Maine.

11.     In connection with the conduct described in this Complaint, Defendants directly

or indirectly made use of the mails or the means or instruments of transportation or

communication in interstate commerce.

12.     Defendants' conduct involved fraud, deceit, or deliberate or reckless disregard of

regulatory requirements, and resulted in substantial loss, or significant risk of substantial loss, to

other persons.

13.     Unless enjoined, Defendants will continue to engage in the securities law

violations alleged herein, or in similar conduct that would violate the federal securities laws.

## DEFENDANTS

14.     **Michael A. Liberty** ("Liberty"), age 57, resides in Windermere, Florida.  Liberty

is a businessman who has formed numerous real estate, technology, and holding companies,

including BRTMDO; Brentwood Financial; and Family Mobile.  He claims to be the founder of

MDO.  Until 2017, he served as the Chairman of Global Strategic Initiatives for Mozido, Inc.  In

November 2016, Liberty pled guilty to making illegal political contributions and was sentenced

to four months in prison and fined $100,000.

15.     **Brittany Liberty** ("Abbass"), age 37, resides in Windermere, Florida.  She

married Michael Liberty in 2016.  Abbass is the co-manager and bookkeeper for many of

Liberty's companies.  She is the manager for BRTMDO, Brentwood Financial, Family Mobile,

and Mozido Invesco.

16.    **Paul Hess**, age 62, resides in Quincy, Massachusetts and owns Braintree Hill Ventures, LLC.  Hess promoted MDO and other Liberty-affiliated companies and raised money from investors for Liberty.  For most of his career until 2010, Hess was an investment adviser representative and was associated with a registered broker-dealer.

17.    **Richard Liberty** ("Rick Liberty"), age 64, resides in Cape Coral, Florida, and is Michael Liberty's cousin.  Rick Liberty promoted MDO and other Liberty-affiliated companies and raised money from and communicated with investors for Liberty.  Previously, Rick Liberty acted as an investment adviser representative for Liberty Investment Advisors.  In 1988, Rick Liberty settled a cease-and-desist action brought by the State of Maine which alleged that he improperly sold unregistered securities.  In 2006, he entered a consent decree ordering him to pay $1,500 to the State of Maine for operating as an unlicensed investment adviser representative.

18.    **George Marcus, Esq.**, age 66, resides in Cumberland Foreside, Maine.  He is a lawyer and is a partner at a Portland, Maine law firm called Marcus Clegg & Mistretta, P.A. ("Marcus Clegg").  Marcus and Marcus Clegg have represented Liberty and Liberty-affiliated entities from at least 2010 until the present.  Marcus obtained money (in the form of legal fees) from the Defendants' fraudulent misrepresentations and omissions in the course of the securities offerings described below.

19.    **Mozido Invesco, LLC** ("Mozido Invesco") is a limited liability company, organized under the laws of Maine, with a principal place of business in Portland, Maine.  Soon after Mozido Invesco was formed in August 2010, Michael Liberty took control of it.

20.     **Family Mobile, LLC** is a limited liability company, organized under the laws of Delaware, with a principal place of business in Orlando, Florida.  Liberty originally formed Family Mobile under the laws of Florida in January 2011.

21.     **BRTMDO Investments, LLC** (a/k/a Brentwood Investments, LLC) is a limited liability company, organized under the laws of Delaware, with a principal place of business in Florida.  Liberty originally formed BRTMDO as Brentwood Investments, LLC in 2009 under the laws of Florida.  BRTMDO was converted to a Delaware company in July 2015 at the same time it changed its name from Brentwood Investments to BRTMDO.

22.     **Brentwood Financial, LLC** is a limited liability company, organized under the laws of Delaware, with a principal place of business in Orlando, Florida.  Liberty originally formed Brentwood Financial under the laws of Florida in November 2011.

23.     **TL Holdings Group, LLC** is a limited liability company, organized under the laws of Delaware, with a principal place of business in Windermere, Florida.  Liberty created TL Holdings as an investment vehicle selling an indirect interest in DaVincian Healthcare, Inc.

## RELIEF DEFENDANT

24.     **Xanadu Partners, LLC** is a limited liability company, organized under the laws of Maine, with a principal place of business in Portland, Maine.  Liberty formed Xanadu Partners in October 2007.  Xanadu received most of the money raised from Mozido Invesco investors.

## RELATED ENTITIES

25.     **MDO, LLC** (f/k/a Mozido, LLC) is a limited liability company, organized under the laws of Delaware with a principal place of business in Austin, Texas.  MDO was formed in

April 2008 as "Mobile Financial Services, LLC."  MDO operated under the names "Affinity Global Services, LLC" from 2008 to 2009 and "Mozido, LLC" from 2009 to 2015.  In March 2015, it became "MDO, LLC." In November 2013, MDO sold its assets to Mozido, Inc.

26.     **Mozido, Inc.** is a corporation, organized under the laws of Delaware, with its principal place of business in Austin, Texas.  Mozido, Inc. was formed in 2013.  It acquired substantially all of MDO's assets in November 2013.

## STATEMENT OF FACTS

I.   **The Mozido Scheme**

A.  **MDO**

27.     MDO was a financial technology company focused on offering retail and business customers a "mobile wallet" (a way for customers to use their mobile phone to pay for products and transfer money).  MDO was started in 2008 as a subsidiary of Affinity Holding, LLC.

28.     Liberty served on MDO's Board of Directors until February 2011.  Later, he served as the Chairman of Global Strategic Initiatives for MDO, and then for Mozido, Inc.  At various times, Liberty also took other titles, including Vice-Chairman.  These were lucrative arrangements for Liberty; he billed MDO hundreds of thousands of dollars for travel and entertainment expenses he purportedly had incurred for MDO's business purposes.

29.     By 2010, MDO needed cash:  it was not producing revenue and had lost its largest investor.

30.     In August 2010, a new investor, Mobile Tech Investments, LLC ("Mobile Tech"), invested $2.5 million in MDO, in exchange for a 15.6% share of the company (based upon a total

valuation of $13.5 million, as approved by MDO's Board of Directors). A portion of MDO's remaining equity was owned by Affinity Holding, which in turn was owned by various persons and entities including Mozido Investments (a Liberty-controlled shell entity) and BRTMDO. Liberty controlled Mozido Investments through his entity BRTMDO.

31.     At the time of the investment, MDO executed an "Amended and Restated Limited Liability Company Agreement" ("Amended Operating Agreement"). Liberty agreed to MDO's Amended Operating Agreement and personally signed on behalf of Mozido Investments, BRTMDO, and himself. Marcus was the lawyer who negotiated with Mobile Tech over the amendments to MDO's Operating Agreement.

32.     As conditions for its infusion of capital into MDO, the Amended Operating Agreement granted Mobile Tech a variety of protections, including preemptive rights (the right to acquire newly issued MDO equity), tag-along rights (the right to require a purchaser of MDO equity to purchase from Mobile Tech at the purchaser's proposed terms) and the right of first refusal (the right to acquire MDO equity from a seller at the terms proposed by the purchaser).

33.     In particular, the Amended Operating Agreement granted Mobile Tech a "Right of First Offer" in equity interests of Mozido Investments and BRTMDO. Under this provision, Liberty was required to notify Mobile Tech prior to any issuance or transfer of equity interests in Mozido Investments or BRTMDO. Mobile Tech then had an option to purchase the equity interests itself or to require the proposed purchaser to purchase interests in MDO equities from Mobile Tech. The Amended Operating Agreement expressly provided that any transfer or issuance that violated these provisions would be "wholly void."

**B. Liberty Enlists Hess to Market and Sell Securities**

34.     Concurrent with the Mobile Tech negotiations, Liberty recruited Hess to promote

MDO and to identify investors.  Hess began working as a self-described "consultant," "strategic

advisor," or "partner" of MDO, promoting MDO to potential investors, and maintaining regular

contact with them.  Liberty directed Hess to tout MDO, but actually had him sell securities

issued by the shell companies that Liberty controlled.  In exchange, Liberty (through his entities)

paid Hess a 5% commission on the money he raised.

35.     Prior to December 31, 2010, Hess was a representative at an investment advisory

firm.  But all of his selling described in this Complaint was done outside his engagement with

that investment advisory firm, contrary to the firm's policies.  After that date, Hess was not

licensed or working for a registered broker-dealer.

36.     Hess received a 5% commission from his fundraising.  Hess sent Abbass

spreadsheets detailing what he had raised and what he was owed.  He also emailed her (e.g., on

September 9, 2010) to confirm how much money had been received from his solicitations and to

request payments of his commission or "referral bonus."

37.     By law, Hess was not permitted to raise funds outside the supervision of the

brokerage with which he was affiliated (a prohibited practice known as "selling away").  Nor

was he permitted to receive commissions or otherwise act as an unregistered broker-dealer.  Yet,

throughout the relevant time period, Hess did all of these things:  selling away, receiving

improper commissions, and acting as an unregistered broker-dealer.

38.     To hide his misconduct and his unlawful receipt of 5% commissions for every

sale, Hess repeatedly told investors he was not receiving commissions.  For example, on October

11

5, 2010, Hess wrote to potential investors and falsely stated that, "[t]his is not registered with an investment bank or broker-dealer, and there are no fees or commission paid."  On November 26, 2010, Hess lied to another potential investor, stating, "I receive no commission or comp on any money raised (no investment bank or broker involved)…"

### C.  The Mozido Invesco Securities Offering:  August 2010-May 2012

39.     The first securities offering in the Defendants' fraudulent scheme was the Mozido Invesco promissory note offering ("Mozido Invesco Offering").  The Mozido Invesco Offering ran from August 2010 through May 2012, and raised approximately $18.2 million.

40.     Mozido Invesco was formed on August 26, 2010.  Marcus provided legal assistance to form Mozido Invesco.  Abbass arranged for the creation of a Mozido Invesco bank account into which investors could wire in their investments, and told Hess to direct investor money to that account.

41.     On or about August 26, 2010, Liberty caused BRTMDO to transfer 120 Mozido Investment membership units to Mozido Invesco.  Because Liberty failed to notify Mobile Tech in advance of the transfer, the transfer was void pursuant to MDO's operating agreement.

42.     The Mozido Invesco Offering consisted of securities that were styled as "convertible promissory notes."  By their terms, the promissory notes promised 5% interest and matured in December 2015.  They included a right to convert the note into membership units of Mozido Investments at a price of $55,000 per unit.  These convertible promissory notes constitute securities under federal securities law.  To entice investors, Liberty personally guaranteed the convertible promissory notes offered by Mozido Invesco.

43.     Marcus drafted the original Mozido Invesco promissory notes, note purchase agreements, and Liberty's personal guarantee, which he knew misrepresented material facts and made material omissions.

44.     In a classic bait-and-switch, in seeking investors for their fraudulent offering, Liberty and Hess touted the merits of investing in MDO to potential investors.  But they actually sold investors promissory notes issued by Liberty's shell company, Mozido Invesco, even though Mozido Invesco was expressly barred from selling interests without prior notice to and a lack of objection from Mobile Tech, under the terms of the Amended Operating Agreement that Liberty had signed.

45.     In touting the Mozido Invesco Offering, Liberty and Hess (with Marcus' assistance) repeatedly lied about and/or concealed critical facts about the investment:

- First, they misrepresented the financial position and business prospects of MDO, representing to potential investors that the MDO was valued at many multiples of what they knew the company had valued itself.

- Second, they misrepresented what the investment proceeds would be used for, repeatedly touting the effect the investments would have on product development, product launches, and lucrative business deals.  In fact, Liberty diverted most of the money for his personal use.

- Third, they misrepresented and/or concealed critical facts about the conversion feature of the promissory notes, including that any attempted transfers of interest in Mozido Investments were void under the terms of an MDO Operating

Agreement that Liberty had signed.

- Fourth, they misrepresented and concealed critical facts about Liberty's role in the investments and relationship with MDO and the Mozido Invesco investors, including that: (a) Liberty's personal financial guarantee was of limited value given that Liberty was struggling financially, and (b) that Liberty's financial interests were not aligned with those of the investors and that Liberty was actively working to dilute their investments.

Defendants' misrepresentations and material omissions are detailed further below.

46.    ***Valuations of MDO:***  Hess and Liberty (with Marcus' assistance) knowingly made repeated misrepresentations and omitted material information to investors and potential investors about the valuations of MDO during the Mozido Invesco Offering.  For instance:

a. On September 14, 2010, Hess (with Liberty's and Marcus' knowledge) told prospective investors that the "shares" of Mozido Investments were valued at $55 million and that the "private round of money raising (pretty much all by me)" put the value of MDO "closer to $85 million – still very much a bargain…."  These valuations were fictitious.  Both Marcus and Liberty knew that MDO's Board of Directors had valued the company at no more than $16 million at that time.

b. In August 2010, after reviewing MDO's financial statements, Hess and Liberty agreed not to send them or the numbers to investors.  They were too negative.  Hess told Liberty that he would work to generate something that looked better and "somewhat 'official.'"

c. On November 26, 2010, Hess told investors that MDO was "arguably worth a solid

14

$1bill[ion]+" and that the investment "opportunity exists for my friends only!"  This

statement was baseless; MDO valuations never approached $1 billion in this time

period.

d.  Also on November 26, Hess told an investor that MDO "has no commercial

debt…and is allowing me to raise capital at a valuation that is substantially lower than

any measure of true market value would suggest…"  Not so.  MDO, in fact, had

considerable debt, knew nothing of Hess's solicitation efforts, and was not "allowing"

him to do anything.

47.     ***Use of Investment Proceeds:***  During the Mozido Invesco Offering, Liberty and

Hess repeatedly misrepresented to investors that their money was going to go directly to MDO to

be used for MDO's development and deployment of new products and to maintain a cash-rich

balance sheet.  They fraudulently represented that these new products would quickly generate

millions, if not billions, of dollars of revenue.  For example:

a.  On October 6, 2010, Hess emailed a potential investor that "Mozido Invesco LLC

was set up specifically … for this special final-yard opportunity to help [MDO] over

the goal line and off the launching pad."

b.  Later, Hess (with Liberty's approval) told an investor that "we do have plenty of cash

well into the first quarter" and that more was coming.  He then stated that the money

from the Mozido Invesco Offering "will enable us to power the Wal-Mart deal

immediately from day one…."

c.  On November 26, 2010, Hess solicited another potential investor by telling him that

the cash was needed by MDO "to kick off several upcoming deployments."

d.  On February 14, 2011, Hess falsely told investors, "[f]olks, we are about to become cash-flow positive…" and that his fundraising was needed only "so that we have plenty of working capital and a flush balance sheet while we are negotiating with customers/partners and putting money out for new deployments."

e.  On July 22, 2011, Hess falsely stated that MDO was raising additional money from existing investors to "keep our coffers loaded with cash."

Each of these representations was false, misleading, and omitted necessary material facts. MDO's "coffers" were not loaded with cash and the money from Mozido Invesco investors was not used to fill them. Nor did most of the investor money reach MDO to deploy new products or to further new deals with other companies.

48.  In fact, Liberty, Abbass, and Hess pocketed the bulk of the money raised from investors in the Mozido Invesco Offering, approximately 90% of the $18.2 million raised:

a.  Abbass and others transferred approximately $16 million of the $18.2 raised in the Mozido Invesco Offering to the Xanadu Partners bank account (which Liberty and Abbass used as their personal bank account) to fund Liberty's other businesses; purchase Mozido Invesco (with Liberty and Abbass becoming the new Mozido Invesco managers); pay creditors; pay disgorgement Liberty owed to the SEC from the prior *Keystone* case (described below); settle lawsuits and pay judgments against him; fund a movie Abbass was producing; and, to pay for gas, groceries, a dairy cow farm, interior decorating, chartered flights, and hundreds of thousands of dollars in credit card bills. (Liberty did not maintain a bank account in his own name. Instead, he used the bank accounts of the companies he

16

controlled and the client funds (IOLTA) account at Marcus' law firm for his

personal expenses); and,

b. Liberty and Abbass paid Hess more than $890,000 in commissions,

approximately 5% of the money Hess raised for the Mozido Invesco Offering.

49.    *Authorization to Sell Units:*  Liberty and Marcus intentionally concealed that

both their transfer of 120 Mozido Investments units to Mozido Invesco and any subsequent

transfer of those units to the Mozido Invesco investors were void under MDO's Amended

Operating Agreement.  In fact, the Mozido Invesco Offering Documents included an express

false representation that the transfer was not in violation of any other agreement.  In addition, in

multiple periods, Mozido Invesco had oversold the number of units it actually held.

50.    *Liberty's Alignment with Investors:*  Hess and Liberty falsely told potential

investors that, because they were invested through Liberty's entity, Mozido Investments, Liberty

shared their interest in protecting Mozido Investments from dilution (that is, a reduction in

ownership percentage of the company, and thus, reduction in value).  For example:

a. On September 14, 2010, Hess falsely wrote to investors, "Michael would not just

dilute his own personal holdings"; "remember MICHAEL LIBERTY, PAUL HESS,

AND…ARE ALL ALIGNED WITH THE EXACT SAME interests as all of you!!"

b. But on January 19, 2011, Liberty formed a new entity, Family Mobile, LLC, to loan

money to MDO.  Liberty caused Xanadu to transfer a relatively small amount of

money to MDO in the name of Family Mobile.  In exchange, Family Mobile

participated in a promissory note with a right to convert the note into preferred units

of MDO (at a valuation of $13.5 million, far lower than what Liberty's investors had

been told).   Later that year, Liberty caused Family Mobile to make additional loans to MDO (via Xanadu), because MDO still had not generated any meaningful revenue. Family Mobile's loans to MDO significantly diluted the investments of the Mozido Invesco investors.  Worse yet, some of the loan money had originally come from the Mozido Invesco investors.  In other words, Mozido Invesco investors were diluted with their own money.

c.   On June 16, 2011, Hess (with Liberty's knowledge) told potential investors that "since Michael Liberty is controlling owner and decides upon any new investments into [MDO], we are totally protected since in the event of dilution, he is diluted as well - in the exact same percentage …."

d.   On July 22, 2011, during a conference call in which he solicited additional investment from investors, Liberty discussed the potential for dilution from employee stock options while omitting to mention how he had and intended to continue diluting those investors.

e.   In December 2011, Hess asked Liberty if he could tell investors that Liberty was able to invest in MDO at lower valuations (i.e., at a lower price per membership unit). Liberty told Hess to hide the lower valuations from investors, saying he wanted to "surprise" investors later with news that he was going to reduce their effective purchase price.  He instructed Hess to tell investors that Liberty "continually sweetened the pot" and that he was a "tremendous partner" and "so loyal to his team." But Liberty never did disclose MDO's lower valuations to investors or "sweeten the pot."

18

f.   On September 4, 2012, Marcus wrote to an investor's representative, "it is clearly in

Mike's and everyone's interest to make sure that further equity raises … would not be

dilutive on a value basis," and that there was "a commonality of interest with Mike

and every other investor."

Each of these statements was misleading, and omitted material information, as Liberty, and

Marcus knew at the time.  In fact, Liberty had used the Mozido Invesco investors' own money to

dilute their interests in MDO.  Liberty and Hess continued to promote Mozido Invesco, offer

Mozido Invesco notes, raise money from existing and new investors, and update investors on

their investment, without disclosing investors the dilution or that MDO's actual valuation was

10% of what they were paying.

51.   **Personal Investment:**  When soliciting investors, Liberty claimed he had invested

tens of millions of dollars of his own money in MDO.  As Liberty well knew, such information is

material to investors, particularly investors in newly established companies.  Liberty

intentionally misrepresented that he had invested a considerable amount of his own money.  For

example:

a.   In May 2011, Liberty told a potential investor in an MDO-related investment that he

had personally invested more than $40 million in MDO.

b.   At about that same time, Liberty told another investor that he had personally invested

more than $45 million in MDO.

c.   On February 26, 2012, Hess, based on what Liberty had told him, told an investor that

Liberty had "personally invested over $26 million in cash into [MDO]."

Each of these statements were intentionally false and misleading, as Liberty had not personally

invested anywhere near those amounts of money in MDO.

52.     **_Personal Guarantee:_**  Liberty and Hess intentionally misrepresented that Liberty could cover his guarantee of their investment if Mozido Invesco could not.  For instance:

  a.   On June 13, 2011, Hess emailed investors that Liberty "is easily able to cover this obligation if he were ever called upon to do so."

  b.   Liberty and Hess repeatedly misled investors to believe that Liberty, independent of his stake in MDO, had a personal net worth well over a $100 million.  For example, in February 2012, Hess told a potential investor that Liberty's personal cash flow was "well over $1 million per month" and he estimated that Liberty's net worth was over $200 million "if you don't count [MDO]."

These representations were knowingly false and fraudulently concealed, for example:  (a) Liberty's 2009 sworn financial statements submitted to the SEC in connection with Liberty's previous fraud case (described below) which showed a net worth loss of $29 million; (b) Liberty had borrowed of hundreds of thousands of dollars from a creditor, and had pledged that monies raised through the Mozido Invesco Offering would be used to repay that creditor; (c) Liberty defaulted (in May 2010) on more than $1.3 million in loans to a group of Mozido Investments investors; and (d) Liberty had been sued by several creditors for failing to pay his debts.  In 2011, Liberty admitted to the CEO of his real estate companies that he had "no money at all." Marcus and Abbass knew about Liberty's financial problems.

53.     **_Prior SEC Fraud Action_:** In a 2006 civil case (the "*Keystone* case"), the SEC charged Liberty with violating the anti-fraud provisions of the federal securities laws.  Liberty settled that matter in 2010, consenting to a judgment in a settlement agreement that prohibited

him from denying the allegations of the complaint, at risk of re-opening the case.  During the

Mozido Invesco Offering, Liberty and Marcus did not disclose the prior fraud case or the

settlement in any document or discussion about the Mozido Invesco Offering.  When investors

found out about the *Keystone* case, both Liberty and Marcus (at Liberty's direction and on his

behalf) denied the allegations. On June 26, 2012, Marcus wrote to an investor regarding

Liberty's "past issue with the SEC" and asserted that the SEC's allegations were "entirely false."

54.     In selling the Mozido Invesco promissory notes, the Defendants disregarded the

requirements of federal securities law for a public offering of securities.  Mozido Invesco did not

create or use an offering memorandum, prospectus, or package of business or financial materials

to provide to offerees.  Hess and Liberty provided information to potential investors residing in

multiple states either telephonically or by email, but failed altogether to provide purchasers with

the detailed business and financial information required to be eligible for an exemption under

Regulation D of the Securities Act from the registration requirements of the Securities Act.

Using the means of interstate commerce, Liberty and Hess solicited and sold to hundreds of

potential Mozido Invesco Offering investors by email, phone, and during in-person meetings.

Offerees were located in various states and countries.  Hess knew some offerees from college or

from the investment advisory firm where he worked; offerees included his former clients there.

Most of the offerees had no prior direct relationship with Hess, and almost none of the offerees

had any prior connection to Liberty, Abbass, MDO, or Mozido Invesco.  The Mozido Invesco

Offering was a public offering of securities, but no registration statement was filed or in effect

for the Mozido Invesco Offering and no exemptions from registration or safe harbor provisions

applied.  Defendants made the Mozido Invesco Offering by general solicitation.  Nor did Mozido

Investments, Affinity Holding, or MDO register their respective securities.

55.     Throughout the Mozido Invesco offering, Hess collected a 5% commission on his sales of the promissory notes.  Hess well understood that his sales of Mozido Invesco securities were illegal, both because the offering was unregistered and he was not registered as a securities broker or dealer.  In order to prevent investors and regulators from detecting his illegal activities, Hess routinely lied to investors and prospective investors, falsely claiming that he was not receiving commissions.  To further disguise his role in the sale of Invesco Mozido securities, in 2011, Hess arranged with Liberty and Abbass to fabricate a "contract" under which Hess would receive a referral fee for selling MDO products.  The contract was backdated to March 1, 2010.  In reality, as Hess, Abbass, Marcus, and Liberty well understood, Hess was unable to generate revenue for MDO; he was in fact paid a 5% commission for selling Mozido Invesco promissory notes.

56.     Hess, Liberty, and Marcus were concerned that there were too many investors participating in the Mozido Invesco Offering because the number approached or exceeded regulatory limits.  In an attempt to circumvent those regulatory requirements, Hess and Liberty directed investors to pool together in limited liability companies to invest in Mozido Invesco.  Hess also encouraged some investors to pool their money (within limited liability companies) in order to acquire the units that cost $55,000 each.  Through these machinations, Defendants concealed more than 100 investors who had participated in the Mozido Invesco Offering through limited liability companies established specifically to invest in MDO, and falsely reported that there were only 92 investors participating in the Mozido Invesco Offering.

57.     By withholding most of the proceeds of the Mozido Invesco Offering from MDO

(contrary to what investors had been told MDO was worth), Liberty caused a slowdown in the development of MDO and its products.

### D.  The First Rescission Offer

58.     The second securities offering in the Defendants' fraudulent scheme was a rescission offer that ran from June 13, 2011 through July 13, 2011 (the "First Rescission Offer"). Marcus (and other counsel) reviewed and approved the First Rescission Offer.  Liberty, Hess, and Marcus offered the First Rescission Offer knowing the Mozido Invesco Offering had been in violation of various securities laws and in an effort to avoid possible regulatory scrutiny of the Mozido Invesco Offering.  On its face, the First Rescission Offer allowed investors to rescind their investments (i.e., get back the money they had invested in Mozido Invesco).  The purpose of the First Rescission Offer was not to raise additional funds from investors.  Instead, the Defendants intended that investors would *reject* the offer (i.e. hold onto their Mozido Invesco promissory notes) and ratify their prior investment.

59.     On June 13, 2011, Liberty caused Mozido Invesco to offer rescission to some, but not all, Mozido Invesco investors.  The sixty-six investors who directly received the First Rescission Offer held, in total, $6,430,000 in Mozido Invesco promissory notes.

60.     The First Rescission Offer constituted a public offering of securities under the federal securities laws, but was not registered and did not comply with various provisions of those laws.  Offerees included unaccredited and unsophisticated investors.  Offerees were located in various states.  Defendants made the First Rescission Offer by general solicitation, and the business and financial information provided with the Rescission Offer was insufficient to qualify

for the safe harbor provisions of Regulation D of the Securities Act.

61.     Hess emailed the First Rescission Offer to 66 investors located in multiple states and dissuaded those investors from asking for their money back by, among other things, underscoring Liberty had personally guaranteed their Mozido Invesco Offering notes.  Hess misrepresented that investors were "in a unique position of safety since your investment is personally guaranteed by founder Michael Liberty and he is easily able to cover this obligation if he were ever called upon to do so."   Ultimately, no investor accepted the First Rescission Offer.

62.     To dissuade investors from accepting the rescission offer, however, the Defendants deceived the investors about the valuation of MDO, and about the payments to Hess for solicitations of investors.  The First Rescission Offer contained multiple material misrepresentations about the Mozido Invesco Offering, MDO's valuation, Mozido Invesco's use of the investors' investment money, and MDO's financial situation.  The First Rescission Offer falsely represented that:

    a.  Mozido Invesco owned 150 units of Mozido Investments.  It didn't.  It owned only 120 units.  The Mozido Invesco Offering had been fraudulently oversold and this lie was designed to conceal the oversubscription.

    b.  Mozido Investments was the majority owner of MDO.  It wasn't.  Mozido Investments was not the majority owner of MDO.

    c.  MDO was valued at approximately $108 million (if one were to calculate from the information provided in the Rescission Offer).  It wasn't.  MDO's Board of Directors valued the company at no more than $13.5 million at that time.  The Rescission Offer did not disclose MDO's self-valuation or that Mozido Invesco

24

investors were overpaying for rights to convert into Mozido Investments.

d.  Mozido Invesco had made "consulting payments to an individual who had assisted us in identifying prospective investors and effecting certain of these offers and sales" and that "we do not believe that these payments constituted commissions or other compensation for engaging in securities transactions." It had, but these payments were falsely characterized. Liberty had paid Hess a 5% commission on Hess's sales of Mozido Invesco securities. Liberty directed Abbass to wire money from Mozido Invesco's account to Hess. And Liberty, Abbass, Hess, and Marcus knew Hess received the 5% commission to sell securities.

e.  Mozido Invesco had "not retained, nor do we intend to retain, any person to make solicitations or recommendations in connection with the rescission offer." It had. Liberty had directed Hess to send out the rescission offer and they agreed to encourage investors to reject it.

63.  The First Rescission Offer also omitted material information, which made the Offer misleading, including that:

a.  the Mozido Invesco Offering violated MDO's Operating Agreement, under which the Mozido Invesco conversion provisions, which purported to transfer interests in Mozido Investments, were wholly void.

b.  Liberty had used and continued to use the proceeds from the sales of Mozido Invesco promissory notes for his personal benefit, notwithstanding Hess' and Liberty's previous representations that investors' money would go directly to

25

MDO to develop MDO's technology and markets.

c.  the financial statements and other financial information for MDO, Mozido

Investments, and Mozido Invesco (not included within the First Rescission Offer),

contradicted the representations made by Hess and Liberty concerning MDO's

business prospects and financial situation.

### E.  The Mozido Invesco Offering Misrepresentations Continue After the First Rescission Offer

64.     After making the First Rescission Offer on June 13, 2011, Liberty and Hess

continued to offer Mozido Invesco securities, and communicated with existing investors in order

to sustain their ongoing fraud.  These communications included various misrepresentations and

omissions of the same kind Liberty and Hess had previously employed:

65.     *Valuations of MDO:*  On August 27, 2011, Hess wrote an update to investors,

which included the following falsehoods:

a.  "On paper, the company is valued at about $100 million which is about the

level at which we should all calculate we are invested. Perhaps use $110

million to be conservative and to take into account future dilution that could

come from employee stock options and warrants. The actual value is a far

different matter/ but we are certainly worth a lot of dough."

b.  "The Mozido 'burn' rate is just $400k per month for operations/payroll/

overhead/ while the money brought in via Mozido Invesco (we heroes) is

paying for deployments until we iron out the… other deals which will pay for

themselves."

    c.   "In terms of cash flow and liquidity/ we are well out of harm's way and as you well know/ I never felt we were in any danger of running out of money anyway. It helps to have a founder with deep pockets and high income…."

66.    These representations were false, as Liberty knew and Hess knew or should have known.  MDO was not generating meaningful revenue and did not have positive cash flow. During the summer of 2011, MDO required a constant stream of funding to pay for payroll, vendors, product development, and other expenses.  On July 22, 2011, MDO's CFO emailed Liberty and wrote that he estimated MDO would run out of cash by the last week in August.  As of August 2011, MDO's valuation, as determined by its Board of Directors, was $13 million, and was falling.  On September 1, 2011, a MDO board member wrote to Marcus and Liberty stating that Mobile Tech accepted that the next round of MDO financing would be at an even lower valuation:  $8 million.  Marcus responded that it was "good to hear."

67.    ***Use of Investment Proceeds:***  Liberty and Hess continued to misrepresent how Mozido Invesco Offering investment money would be used:

    a.   On June 16, 2011, Hess falsely told potential investors that MDO had "PLENTY OF MONEY BUT ARE RAISING EQUITY DOLLARS TO AVOID ANY DEBT.  We now have none.  This is very unusual (UNHEARD OF?) and makes us very strong."

    b.   On July 21, 2011, Hess told investors that "[w]e are extending this private Mozido-Invesco offer but for existing (and pre-approved) investors only…With another million or so, [MDO] has a healthy cash position to blast ahead on deployments, which planning for the new cash flow to begin cascading in this fall…[MDO] is in great shape!  No debt, no venture capital, and no investment bank to bother us!"

These representations were false.  In actuality, investors' money was not going to any MDO technology deployment and little of the investors' money went indirectly to MDO; MDO was deep in debt and Liberty was pocketing most of the money from the Mozido Invesco Offering.

68.     ***Liberty's Alignment with Investors:***  Defendants misrepresented that Liberty would protect them from dilution and fraudulently concealed that investors' money was being used to dilute their own investments.

a.  On August 8, 2011, Mobile Tech and Family Mobile (directed by Liberty), acquired a $2 million convertible promissory note issued by MDO, convertible to MDO securities based on a valuation of the MDO of $13 million.  The Family Mobile money actually came from Xanadu, which, in turn, came from Mozido Invesco investors.  In other words, Mozido Invesco investors were diluted with their own money.

b.  In August 2011, investors grew concerned about dilution and sought anti-dilution protection.  Hess and Liberty had initially told investors that they were investing at a $85 million valuation of MDO, but now investors were being told they were, due to dilution, invested at over a $100 million valuation of MDO (that is, they held less of an indirect stake in MDO).  In response, Liberty (with Marcus' assistance) promised investors that he would prevent them from being diluted beyond a valuation of MDO of approximately $115 million, and, if necessary, give them interests from Family Mobile to limit their dilution to that valuation.  But Liberty, Marcus, and Hess concealed that Liberty had only invested in MDO at levels below $15 million and that investors were buying at artificially inflated valuations.

28

    c.   Hess promoted this anti-dilution protection as genuine.  On October 2, 2011, Hess

touted Liberty's purported protections to investors, "Liberty is being tremendously

generous here and is showing that he was not kidding when he told me he was going

to take care of my investors….Exceptionally fair treatment for us investors!"

The "anti-dilution protection" and concurrent misleading statements helped generate millions in

additional investment in the Mozido Invesco Offering in the fall of 2011.  From the First

Rescission Offer in June 2013 through December 2012, Liberty and Hess sold more than $7.2

million of Mozido Invesco notes.

### F.  The Second Rescission Offer

69.      The third securities offering in the Defendants' fraudulent scheme ran from

January 9, 2012 through February 2012, and again offered Mozido Invesco investors the chance

to rescind their purchase of Mozido Invesco units and get back their investment with accrued

interest (the "Second Rescission Offer").

70.      The Second Rescission Offer constituted a public offering of securities under the

federal securities laws, but was not registered and did not comply with various provisions of

those laws.  Offerees included unaccredited and unsophisticated investors.  Offerees were located

in various states and countries.  Defendants made the Second Rescission Offer by general

solicitation, and the business and financial information provided with the Second Rescission

Offer was insufficient to qualify for the safe harbor provisions of Regulation D of the Securities

Act.

71.      Liberty, Abbass, Hess, and Marcus, knowing that they had violated the securities

laws, had caused Mozido Invesco to offer the Second Rescission Offer in an attempt to, once again, avoid regulatory consequences from their Mozido Invesco Offering.  The Second Rescission Offer was an attempt to keep the money that they had raised.  And, once again, Defendants made multiple misrepresentations and fraudulent omissions to keep investors from accepting the Second Rescission Offer and asking for their money back.

72.     From September through December 2011, Liberty, Abbass, and Marcus worked to edit, finalize, and approve the Second Rescission Offer.  Abbass was the principal point of contact for the law firms and Hess and Marcus for their input.

73.     On December 28, 2011, after Liberty had hired new counsel to assist with the Second Rescission Offer, Hess wrote to Liberty, "…I think we want your [new] securities attorneys to know the whole story…they need to know everything so they can protect us."  Hess then strategized how best to re-characterize the Mozido Invesco offering in an attempt to make their conduct appear compliant with the securities laws.  Hess said he didn't mind being re-cast as an "employee" to hide his receipt of commissions.  Hess also was concerned that Mozido Invesco the pooling of investors into limited liability companies set up for the sole purpose of investing in Mozido Invesco, could "become a big problem," particularly because many of the investors were not accredited and many "family members and friends of the managers [were] in the deal."

74.     On January 7, 2012, Hess emailed Mozido Invesco investors to tell them the rescission offer was coming.  Hess lied that his "role with [MDO] is as a consultant and member of the Board of Advisors so I am interested in helping the company in any way I can to get us ready for prime time."  Hess again omitted that he was receiving commissions.  Hess lobbied

investors to reject the Second Rescission Offer and pressured them to declare that they were accredited, "[i]f you check off that you are not an accredited investor … your investment will be returned with interest."

75.     On January 9, 2012, Abbass emailed the Second Rescission Offer to approximately 95 investors located in various states.  She did not send it directly to the more than 100 Mozido Invesco investors pooled together into limited liability companies at Hess' and Liberty's direction and which included unaccredited investors.  Those investors were included within the Second Rescission Offer, but only received the Offer indirectly to conceal the unaccredited investors and improper nature of the arrangement.  Investors were told that rescission was offered because Mozido Invesco was unable to confirm that the previous offers and sales fully complied with the securities laws.  After Abbass had sent investors the Second Rescission Offer, Hess reached out to the Mozido Invesco investors to convince them to reject the rescission.  Ultimately, investors who received the Second Rescission Offer rejected rescission.

76.     In order to get investors to reject the Second Rescission Offer and continue to hold their Mozido Invesco promissory notes, Defendants made various misrepresentations and omissions of the same kind Liberty and Hess had previously employed:

77.     ***Use of Investment Proceeds:***  Liberty and Abbass continued to misrepresent how Mozido Invesco Offering investment money had been or would be used.  For example:

a.  In a January 9, 2012 email, Abbass (signing as "Manager") asked, "that you please act on this request as soon as possible so we are able to close this offering and prepare [MDO] for some important potential upcoming business events.  By completing this

rescission offer, we will be able to close the offering and move forward to new

things!"

    b.   Abbass generated a misleading version of the Mozido Invesco balance sheet to attach

to the Second Rescission Offer.  Mozido Invesco's actual balance sheet reflected

Liberty and Abbass' use of the investors' money for their own benefit and reflected

that Mozido Invesco had "loaned" more than $14 million to Xanadu, Marcus Clegg's

IOLTA, and BRTMDO.  In actuality, these so-called "loans" were not memorialized,

had no payment terms, and carried no interest.  To hide the destination of the

investors' money, Abbass' revision deleted these "loan" entries and fraudulently re-

labelled them as an investment in Mozido Investments.

78.    ***Form Ds:***  No Form D ("Notice of Exempt Offering of Securities") had been filed

with the SEC for the Mozido Invesco Offering or the First Rescission Offer.  But on January 11,

2012, Mozido Invesco filed with the SEC a Form D (signed by Liberty) about the Second

Rescission Offer.  On February 3, 2012, Mozido Invesco filed an amended Form D ("Form

D/A"), signed by Abbass, with the SEC.  Defendants also included misrepresentations and

fraudulent omissions in the Forms D and D/A:

    a.   The Form D falsely stated that the offering did not include any unaccredited

investors.

    b.   The Form D also failed to list Hess as a promoter, as the Form required.

    c.   The Form D/A repeated the misrepresentations of the Form D.

    d.   The Form D/A also stated that only 91 investors had invested in the Second

Rescission Offer, when in fact there were approximately 200 Mozido Invesco

32

investors including those participating through pooled investment vehicles. Liberty and Abbass knew the Forms D and D/A contained material misrepresentations and omissions, but filed them with the SEC anyway.  Hess knew as well, and at Liberty's direction deflected investors' questions about the Form Ds.

### G.  The Mozido Invesco Offering Misrepresentations Continue After the Second Rescission Offer

79.     After the Second Rescission Offer, Liberty, Hess, and Abbass continued their efforts to sell Mozido Invesco promissory notes.  From February 1, 2012 through May 16, 2012, Mozido Invesco, Liberty, Abbass, and Hess intentionally sold at least $1.8 million of Mozido Invesco notes to individuals and to limited liability companies with unaccredited investors. Mozido Invesco, Hess, and Liberty did not provide investors with the business and financial information sufficient to qualify for the safe harbor provisions of Regulation D of the Securities Act.

80.     In early March, Liberty falsely told Hess that MDO was worth "over $100 billion."  Hess jumped on this information and told investors and potential investors of this (fictional) valuation.  He also told that they would receive back their initial investment in June 2012.  Hess and Liberty held conference calls with investors for Liberty to similarly pitch potential investors.

81.     Many investors responded, including one who asked whether the "institutional round brings us money back like you have been talking about?  Selling shares is actually selling and not getting diluted, correct?"  Hess responded, "That is the plan…to sell 10% of the shares at a valuation of $2 billion to raise $200 million."  He later emailed the investor, "You ought to

consider another $100k man – there is no risk and we about to get a huge pop."  As Hess knew or should have known, MDO had never been valued at $2 billion and no institutional investor ever expressed interest in investing at that valuation.  Nor was there any plan or proposal before the Board of MDO to pay money or shares to Mozido Invesco investors, who were not recorded as holding any valid interest in MDO.

82.     In order to foster the false impression that Hess was working on behalf of MDO, Hess portrayed himself as a "Partner/Advisor" to MDO, and used the MDO logo in the signature of his emails.  But Hess had no affiliation with MDO.  To prevent investors or MDO from discovering the ongoing "bait and switch," at Liberty's direction, Hess told investors not to contact anyone at MDO.

83.     *Valuations of MDO:*  Liberty and Hess knowingly made repeated misrepresentations and omitted material information to investors and potential investors about the valuations of MDO during the continuation of the Mozido Invesco Offering.  For instance:

a.  On March 13, 2012, Hess emailed current investors, "our plan is to raise at least $100 million (and up to $200 million) through several strategic institutional investors" and as a result "the resulting company valuations should be many multiples … of where we started [$85 million]….this is a serious value increase – details to be delivered shortly….If you wish to 'top off' your investment contact me right away…"

b.  Also on March 13, 2012, Hess emailed an investor, stating, "[MDO] is in great shape – no debt with all kinds of new business and about to do an up round geared toward a valuation of 10 to 20x.  We also expect to pay investors their principal back in June.  Biggest no brainer in the history of the universe."

34

   c. Hess emailed another investor that day, claiming that investors would be able to give back five to ten percent of their shares to get back all of their investment "meaning that the value has gone up 10-20 x and you are playing with house money."

In reality, MDO was struggling financially. On March 21, 2012, Abbass sent Hess a copy of MDO's draft FY 2011 financial statements. Those statements showed that, at the end of 2011, MDO had less than $68,000 in cash and only $2 million in total assets. MDO's operations were losing millions of dollars per year, while MDO's long-term debt exceeded $8 million. MDO's internal valuation had fallen to $8 million.

   84. *Use of Investment Proceeds:* In mid-March 2012, investors asked Hess, "What percentage of the money raise in Mozido-Invesco LLC actually went to [MDO] for company expenses/operations?" Hess, after asking for the information from Liberty, falsely responded, "The money raised in Mozido Invesco was nearly all used for [MDO]…." Hess explained that Liberty had loaned his holding companies "a good amount of money;" had reimbursed himself "a small amount" for loan to those companies; and paid Hess his "fees/salary." But, Hess concluded, "Of the $18+ million he raised …something like $15 million+ went to [MDO]."

   85. *Authorization to Sell Units:* During and after the Second Rescission Offer, Liberty intentionally concealed that:

   a. the original purported transfer of MDO interests to Mozido Invesco had been "wholly void" under the terms of the MDO Amended Operating Agreement that Liberty had signed in August 2010.

   b. on February 8, 2012, Liberty had signed an agreement involving MDO, Mobile Tech, and Liberty's company Family Mobile that expressly restricted Liberty's transfer of

any of Family Mobile's interests in MDO.

c.   under a separate contemporaneous agreement, Family Mobile loaned MDO $3

million in a deal that gave Family Mobile rights to obtain additional membership

units in MDO, at a price that equated to a value (for the whole of MDO) of

approximately $10 million.

### H. The Exchange Offer

86.   The fourth securities offering in the Defendants' fraudulent scheme was the Family Mobile-Mozido Invesco Exchange Offer ("Exchange Offer").  In May and June 2012, Liberty, Hess, Abbass, and Marcus engineered a trade whereby Mozido Invesco exchanged their Mozido Invesco promissory notes (for which Liberty had personally guaranteed the principal and 5% interest payments) for non-voting ownership units in MDO.  In connection with the Exchange Offer, Liberty, Hess, Abbass and Marcus falsely represented that MDO was valued at over $108 million dollars, thereby tricking the investors into accepting securities that were, at best, worth a fraction of the face value of the Mozido Invesco promissory notes.  By steering the investors into non-voting shares, the Defendants prevented the investors from having direct dealing with MDO, and from learning the actual state of MDO's finances and business prospects.

87.   In connection with the Exchange Offer, Family Mobile operated as an underwriter of MDO's securities, as defined by Section 2(a)(11) of the Securities Act.  That is, Family Mobile purchased MDO securities for the purpose of distributing those securities and offered and distributed those securities. The Exchange Offer was not registered as required under the federal securities laws and did not qualify for any exemption from the registration requirements.  Both

Liberty and Hess knew that the Exchange Offer was sent to unaccredited investors.

88.     Marcus had never informed his client, the MDO board, that Liberty had violated the Amended Operating Agreement.  Instead, to obtain the non-voting shares of MDO, on or about May 2012, Liberty and Marcus persuaded the MDO board to authorize the conversion of Family Mobile's interests in MDO into MDO non-voting Class B membership units.

89.     On May 16, 2012, at Liberty's direction, Abbass emailed the Exchange Offer documentation to the investors.  Soon after, at Liberty's direction, Hess followed-up with the investors with instructions on how to complete the Exchange Offer documentation.  In order to get investors to accept the Exchange Offer, Defendants made various misrepresentations and omissions of the same kind Liberty and Hess had previously employed.  For example:

90.     **_Valuation of MDO and its Class B Shares:_**  The Exchange Offer documents represented that the "fair market value" of the MDO non-voting Class B membership units the investor would receive through the Exchange Offer equated to the promissory note's principal plus accrued interest.  The MDO valuation underlying this representation was equivalent to a $108 million.  This was false because the $108 million valuation was more than six times higher than MDO's Board of Directors own valuation of the company at that time.

91.     The Exchange Offer was highly favorable for Liberty and Family Mobile, and a huge loss of value for the Mozido Invesco investors.  Mozido Invesco investors traded a total of $18.6 million in Mozido Invesco promissory notes for MDO shares that Family Mobile had acquired for approximately $1.9 million.  As an example, one investor had bought $1,540,000 in Mozido Invesco convertible promissory notes.  At the time of the Exchange Offer, that note had generated interest and was worth $1,580,200 cash (with a personal guarantee from Liberty).

37

When that investor executed the Exchange Offer, he received only $130,000 worth of MDO non-voting shares, as recorded in MDO's books and records.  Liberty and his accomplices ensured, however, that the Mozido Invesco investors, and now Class B members, did not receive MDO's financial records detailing this lower value.  As such, Liberty and his accomplices concealed the diversion into their own pockets of more than $16 million raised in the Mozido Invesco Offering.

92.     On May 29, 2012, Hess provided guidance to investors on how the non-accredited investors should proceed, "[i]f someone is not accredited, they may need to keep their current status in the LLC or under someone else's name.  All such non-accredited creditors already have a note that is convertible to Mozido common shares, and the LLC manager or individual holding those shares can still hold everything on behalf of them, including having the ability to distribute any cash distributions…."

### I.   The Brentwood Offering:  August 2012 – February 2014

93.     The fifth securities offering in Defendants' fraudulent scheme was an offering of promissory notes issued by Liberty's entities, Brentwood Financial and, later, BRTMDO (the "Brentwood Offering").  This offering ran from approximately August 2012 through November 2013 (with notes issued by Brentwood Financial) and from October 2012 through February 2014 (with notes issued by BRTMDO).

94.     The Brentwood Offering constituted a public offering of securities under the federal securities laws, but was not registered and did not comply with various provisions of those laws.  Offerees included unaccredited and unsophisticated investors.  Offerees were located in various states and countries.  Defendants made the Brentwood Offering by general

solicitation.  The business, financial, and "bad actor" events information provided with the Brentwood Offering was insufficient to qualify for the safe harbor provisions of Regulation D of the Securities Act.

95.     Like the Mozido Invesco Offering, the Brentwood Offering was a "bait and switch."  Liberty, working with the same associates and a new salesperson, his cousin Rick Liberty, portrayed himself as working on behalf of MDO and for MDO's benefit.  They claimed they were raising money for MDO's development and that the Brentwood Offering was a vehicle for investing in and supporting MDO.  But it was a lie.  Liberty was raising money for himself, while MDO remained starved for cash.  The Brentwood Offering enabled Liberty to falsely represent the valuation of MDO and, thereby, collect proceeds from investors far in excess of the actual value of the investors' putative interest in MDO.

96.     To persuade investors to purchase promissory notes, Liberty portrayed himself as the founder of MDO, actively involved in MDO, and in control of MDO's strategic decisions.  As part of this charade, Liberty enlisted the help of an MDO employee who had previously worked for Liberty.  On August 1, 2012, Liberty directed the employee to send various internal MDO documents to potential investors, including a confidential "Investment Overview" and an organizational chart that listed Liberty as MDO's Vice-Chairman.  The MDO employee used his MDO email address to send the investment materials and contracts.

97.     But Liberty was not raising money for MDO.  As with the Mozido Invesco Offering, Liberty baited investors with MDO, then switched them to an investment in his own companies.  For example, in September 2012 Brentwood Financial issued convertible promissory notes totaling $5.25 million to four investors.  Had they invested directly in MDO at

the $25 million valuation the MDO board had set at the time, they would have owned 17% of MDO. Instead, Liberty diverted them to Brentwood Financial, and they would have possessed less than 6% of MDO (if Brentwood Financial had, at that time, actually owned MDO units for investors to receive upon conversion, which it did not).

98.     At Liberty's direction. Rick Liberty began soliciting investors around August 10, 2012. Rick Liberty promoted the investments, identified and solicited investors, answered their questions, provided them with MDO's proprietary business information, advised others on making pitches to investors, drafted agreements and got them executed. Liberty and Abbass paid Rick Liberty in the form of "loans." These "loans," totaling more than $115,000, were not reduced to writing, did not have specified terms, and were not "issued" with the expectation of repayment.

99.     During August 2012, Marcus, at Liberty's request, drafted investment contracts and convertible promissory notes using BRTMDO as the issuer. The BRTMDO promissory notes were convertible into MDO preferred membership units, even though, at that time, BRTMDO did not possess rights to those units, which Liberty and Marcus knew but fraudulently omitted from their offering documents and communications. On August 15, 2012, Marcus sent drafts of the notes to potential investors.

100.    To support one of Rick Liberty's solicitations for the Brentwood Offering, on August 30, 2012, Abbass intentionally created a false Brentwood Financial balance sheet and emailed it to Marcus, located in another state. The balance sheet stated Brentwood Financial possessed "Investments" in MDO. The balance sheet was intentionally false: Brentwood Financial had no MDO preferred membership units either directly from MDO or from another

40

source.  A day later, Marcus forwarded the false balance sheet to potential investors in Maine.
Liberty also forwarded the false balance sheet to Rick Liberty to use in solicitations.  Liberty and
Marcus knew and Rick Liberty knew or should have known the balance sheet was false.

101.    In September 2012, Liberty caused Brentwood Financial to issue three-year
promissory notes paying 4% interest at maturity and immediately convertible into preferred
membership units of MDO.  Liberty personally guaranteed the notes.  Liberty and each investor
executed a note purchase agreement as part of the sales transaction.   At least seven investors
bought Brentwood Financial notes totaling more than $6 million.

102.    On October 4, 2012, BRTMDO began issuing three-year promissory notes,
paying 4% interest, and convertible into MDO preferred membership units.  Liberty personally
guaranteed the promissory notes, and executed the notes and the note purchase agreements for
BRTMDO.  From October 2012 through February 2014, BRTMDO issued more than 80 notes
totaling more than $26 million to persons and pooled investment vehicles.  The convertible
promissory notes of the Brentwood Offering constituted securities under the federal securities
laws.

103.    Together, Liberty and Marcus created the structure of the Brentwood Offering and
communicated about it with investors.  Marcus drafted the original investment documents.
Abbass served as co-manager of both Brentwood Financial and BRTMDO (with Liberty),
performed the bookkeeping, and provided support for the Offering.

104.    Liberty, Hess, and Rick Liberty solicited investors via email, phone calls, and in-
person meetings, without an offering memorandum, prospectus, or other standardized document.
They generally failed to provide MDO's or the issuer's financial information.  They instead used

MDO's confidential slide presentations to give an aura of legitimacy to the Brentwood Offering and to excite investors about MDO.  Liberty and his associates deceived investors into believing it was a MDO-sanctioned securities offering when in fact it was not, and they made the same kinds of misrepresentations about the value of the offered securities and the use of the proceeds that they had made in the Brentwood Offering.

105.    Purchasers of the Brentwood Offering's securities included scores of unaccredited investors, who invested through in the pooled investment vehicles created for the Mozido Invesco Offering.  In addition, Liberty and his associates directed that new limited liability companies be formed for the specific and sole purpose of investing in the Brentwood Offering.

106.    In touting the Brentwood Offering, Liberty, Marcus, and Rick Liberty frequently lied about or concealed critical facts about the investment, including about the current valuation of MDO, the use of the proceeds of the Brentwood Offering, their lack of authorization to sell units, Liberty's personal investment, Liberty's defaults on loans, and the meaning of what was referred to as the "triple liquidation preference." For example:

107.    *Valuations of MDO:*  Liberty, Rick Liberty, and Marcus made repeated misrepresentations to investors and potential investors about the value and valuations of MDO during the Brentwood Offering.  For instance:

a.    Beginning in August 2012, Liberty indicated to potential investors that MDO was valued at least at $100 million.  Marcus drafted BRTMDO notes that expressly stated that the "initial conversion price is based upon a valuation of MDO of One Hundred Million Dollars ($100,000,000) as of the date of this Note."

b.    On August 28, 2012, Liberty solicited investors with notes which had "conversion

rights at a $100m valuation" of MDO.  After a prospective investor received MDO's

investor memorandum, he asked Liberty (as MDO's "Vice-Chairman"), "What are

you valuing the company at for this round of financing" and why the presentation

showed a $50 million round of fund-raising.  Liberty answered that the $50 million

was, "for if and when we send it to institutional investors, planned for sometime end

of year or first quarter."  He further answered that the financing round's conversion

right was based on a $100 million valuation of MDO.  Liberty then further pushed for

an investment touting the "triple liquidation preference"  and his personal guarantee.

c.  These representations as to MDO's valuation were false and misleading.  During

August, MDO's board members had discussed MDO's valuation, and decided it

should be $25 million.  Liberty and Marcus participated in those discussions.  In early

September, as Liberty, Abbass, Rick Liberty, and Marcus knew, MDO's board

determined that its valuation was $25 million.

d.  On September 10, 2012, Marcus wrote to legal counsel for two other investors to

explain the proposed offer.  Though he knew the company had valued itself at $25

million, he falsely wrote about, "today's valuation of [MDO], which determines the

pricing at issuance of the note.  That value was set at $100,000,000."

e.  On December 28, 2012, an investor requested confirmation "that all other investors

are getting the same $0.062 per unit conversion right, where the valuation of [MDO]

is $100 million?"  Rick Liberty (copying Liberty) falsely answered "yes," even

though he and Liberty knew that Liberty's entities invested directly in MDO at a $25

million valuation and paid $0.019 per unit price, and that other investors received

lower valuations and conversion prices.

f.  On February 8, 2013, Marcus wrote an email for Liberty to send to an investor, which Liberty forwarded that day.  Marcus wrote that the $3 million BRTMDO convertible promissory note carried a conversion price based on "a $100,000,000 valuation of [MDO] today."  Marcus also knowingly misrepresented that the $3 million note, if converted, would give the investor "approximately 3%" of MDO.

108.   *Use of Investment Proceeds:*  Defendants intentionally made misrepresentations and fraudulent omissions about the use of the proceeds of the Brentwood Offering.  For example:

a.  In the summer of 2012 and again in the spring of 2013, Liberty fraudulently told an investor group that their money was going to MDO, saying that the money would be used to develop new ventures in international markets, and that MDO was going to use the Brentwood Offering proceeds to "light up" these new markets.

b.  In December 2012, Liberty told an investor that his bridge loan through a Liberty shell company would fund MDO operations until it was cash flow positive. In reality, Liberty knew the proceeds of that loan would not go to MDO or fund operations.

c.  After that call, the investor was concerned about being diluted by subsequent investors.  He emailed Liberty and Rick Liberty for confirmation that MDO had "no further need for Michael [Liberty] to raise additional money?"  Rick Liberty answered "correct."  This was false:  MDO needed more money, yet Liberty did not stop raising additional money, putatively for MDO, that he used for his own benefit.

d.  Hess solicited many investors to buy BRTMDO promissory notes that had previously invested through Mozido Invesco.  In soliciting investors for BRTMDO, he made the

same misrepresentations that the proceeds of the offering were going to MDO for its business development.

Liberty, Abbass, and Marcus knew how the investors' money was being used, but misled investors into believing the money was being used for MDO.  In order to conceal the disposition of the proceeds of the Brentwood Offering, Liberty arranged for investors to send their money to Marcus Clegg's IOLTA account, where it was commingled with other money received by Marcus' law firm.  This allowed Liberty not to hold the proceeds of the offerings in identifiable bank accounts in the name of the issuing entities or Liberty.

109.    ***Ownership of and Authorization to Sell Units***:  Liberty, Hess, Rick Liberty, Marcus, and Abbass misled investors into believing that Brentwood Financial and BRTMDO possessed and could legally deliver MDO preferred membership units to investors:

a.  Emails approved by Marcus and Liberty that were sent to investors on August 30, 2012, falsely claimed Brentwood Financial owned "stock."  It didn't.  Brentwood Financial did not own any MDO "stock" at that time, or any membership units, as Liberty Marcus, and Abbass knew.

b.  Brentwood Financial and BRTMDO began issuing promissory notes immediately convertible into MDO's preferred membership units before they had any ownership of or right to purchase preferred MDO units.

c.  In Note Purchase Agreements, Brentwood Financial and BRTMDO falsely warranted that the offering was not in contravention of other agreements or contracts.  In fact, the offering violated multiple agreements or contracts, including the MDO notes eventually issued to BRTMDO and Brentwood Financial, as well as the MDO

45

Amended Operating Agreement, which precluded assignment or resale.

110.   ***Personal Investment:***  During the Brentwood Offering, Liberty and Rick Liberty intentionally misrepresented Liberty's investment in MDO.  Liberty told Rick Liberty that he had personally invested $50 million to $60+ million in MDO.  Liberty directed Rick Liberty to tell investors that he had personally invested so many millions in MDO.  Rick Liberty knew these figures were false and misleading.  Liberty and Rick Liberty, however, intentionally repeated them in solicitations of investors.  For example:

a. On March 21, 2013 and on April 2, 2013, Rick Liberty knowingly misrepresented to potential investors that Liberty had funded over $50 million personally in MDO.

b. In May 2013, Liberty told an investor group that he had personally invested tens of millions of dollars of his own money in MDO (claiming upwards of $70 million).

c. On May 14, 2013, Rick Liberty solicited multiple potential investors, using a promotional document that stated that Liberty "has invested over $57 million personally [in MDO] with no venture capital relationships…"  Rick Liberty repeatedly used that promotional piece and directed others to send it to their contacts.  Later he "updated" the piece to increase Liberty's supposed personal investment to $60 million.

d. On July 30, 2013, Rick Liberty emailed a potential investor and attached the proposed investment documents.  In his email, he reiterated that after Liberty had invested "over $60 million of his personal investment, [MDO] is exploding…"  Rick Liberty forwarded his email to Liberty, who responded, "[t]remendous."

e. On July 30, 2013, Liberty wrote to an investor to pitch them on additional investment.

46

He wrote, "I've invested $62m of my own cash in past 5 yrs."

    f.    On September 15, 2013, Rick Liberty sent a promotional document to a potential investor, copying Liberty, which claimed Liberty had personally invested $60 million.

    g.    On October 12, 2013, Rick Liberty emailed potential investors that Liberty had funded $1.2 million per month for the past two years.

These and similar material representations were false, as Liberty, Rick Liberty and Hess well knew.  Liberty personally invested less than $5 million in MDO.  In fact, on August 14, 2013, Liberty wrote in confidence to Rick Liberty and Hess, "I have never said I personally alone invested 60m.  I've always said I with my family and friends invested $60+ into the company."

    111.    ***Personal Guarantee:***  In personally guaranteeing the Brentwood Offering promissory notes, Liberty failed to disclose his consistent defaults on other investors' loans, the ongoing litigation by other investors to secure repayment, and the judgments against him for defaulting on loans and failing to honor his personal guarantees to investors and creditors. Instead, he and his associates misled investors into believing that he had the ability, liquidity, and willingness to personally repay BRTMDO's promissory notes.  For example:

    a.    Liberty, Marcus, and Rick Liberty hid a lawsuit brought against Liberty by a MDO board member for failing to honor a personal guarantee on a MDO-related loan. Liberty, Marcus, and Rick Liberty knew that the default and the resulting litigation would negatively impact their fundraising efforts.  They knew that at least one potential investor had balked because of the litigation, so they concealed it from potential investors (and members of the MDO board).

47

b.  On May 6, 2013, Liberty was sued by a creditor for defaulting on a $1.9 million loan. Liberty did not disclose the suit in connection with the Brentwood Offering when he was personally guaranteeing the loans.

c.  On May 15, 2013, Liberty told an investor group who had inquired, that (net of debt) his companies' real estate holdings alone were worth between $100 and $150 million, and that he was debt free.  Liberty fraudulently omitted the financial troubles that caused him to default regularly on debt throughout 2010-2013.

112.  ***"Triple Liquidation Preference":***  Marcus and Liberty misled investors about the meaning of the "triple liquidation preference" of the preferred membership units, an important selling point in the Brentwood Offering.  Liberty repeatedly touted the "3x liquidation preference," which Marcus described to investors and their legal counsel as providing significant benefits in the event that MDO was sold or offered publicly, including in a September 10, 2012 email.  Specifically, Marcus described this feature as providing for a payout of three-times the investors' purchase price for Brentwood Offering promissory notes, plus a pro rata share of additional available funds.  Under the terms of the relevant documents, however, instead of an investor getting three times their investment or more, the preference payment would be less than the purchase price of those notes.  This difference was material to investors.

113.  ***Role in Prior SEC Fraud Action:***  In 2013, Liberty again denied the allegations in the SEC's prior *Keystone* complaint.  Later in 2013, Marcus told an investor that Liberty was a "victim" of the SEC.  Liberty's and Marcus' denials violated Liberty's prior settlement agreement with the SEC and were materially misleading.

114.  ***Form Ds:***  Liberty, Abbass, and Marcus hid Liberty and Abbass'

misappropriation of the investors' money through false statements and omissions in the Form Ds filed with the SEC.

   a.  On January 4, 2013, Brentwood Financial and BRTMDO filed Form Ds with the SEC.  Abbass approved and signed each of the Form Ds as the manager.  The Form Ds falsely declared that none of the proceeds of the offering was or would be used for payments to Liberty or Abbass.  They also stated that all the investors were accredited.

   b.  On November 22, 2013, Brentwood Financial and BRTMDO amended their Form Ds (Form D/A).  Abbass signed the Form D/As, after working with Marcus and Liberty to complete them.  The Form D/As repeated that Liberty and Abbass received no money from the proceeds of the investment and that all the investors were accredited.

   c.  On January 24, 2014, BRTMDO filed a second amended Form D, again signed by Abbass, who again had worked with Marcus to complete it.  This Form D/A contained the same false statements as the previously amended Form D.

Abbass knew these representations were false.  Liberty had received and misappropriated most of the $31.4 million raised through Brentwood Offering for the personal benefit of Liberty, Abbass, Hess, Rick Liberty, and Marcus personal benefit.

**J.  Liberty's Scheme is Discovered, But Not Stopped**

   115.  After selling units for months in violation of MDO's Amended Operating Agreement and the non-assignment provision of MDO notes, Liberty, Marcus, and others sought to legitimize the sales.  Between December 2012 and January 2013, Marcus drafted an MDO

board resolution that would grant BRTMDO permission to transfer interests in preferred membership units of MDO to third parties.

116.    But by January 3, 2013, MDO's Executive Chairman had started to discover Liberty's scheme.  He wrote to a fellow board member, copying Liberty and Marcus, explaining Liberty's scheme (as he then knew it) and accused Liberty of "inadequate disclosure, for certain to the Board and quite possibly to the potential investors."  He made clear that, at the MDO board meetings, there had been "no mention of raising money at $100mm and arbitraging it into Michael's own pocket on the way to [MDO].  I am quite certain that the current Board would absolutely reject this concept- I would … and I've certainly never seen anything like it in my business career."  He also stated that he would not permit Liberty's scheme to continue, and would not execute documents that had been presented to him.  He instructed his MDO staff not to do so either.

117.    MDO's Executive Chairman told Marcus and Liberty that their failure to disclose Liberty's default of his personal guarantee given to an MDO investor and fellow Board member (and a litigation related to it) was misleading.  On January 6, 2013, the Executive Chairman warned Marcus, "For Michael to be out on his own, talking with investors and representing the value of his [personal] guarantee, while at the same time not disclosing that he is being sued by a DIRECTOR for the failure of that guarantee is beyond major…Were all the facts out, Michael could get in real trouble for that.  On top of this, I only sat in one investment meeting with Michael [and an investor] and he made many, let me put it this way, misrepresentations."  Later, the Executive Chairman elaborated, "Michael has been totally out of control on the fundraising. He consciously withheld numbers … and made other misrepresentations in his pitch while I was

50

there."

118.    Marcus tried to defend Liberty and the scheme.  On January 6, 2013, he wrote that Liberty had only raised funds "from investors in his circle of friends."  Marcus also claimed that the investors were "universally accredited, sophisticated and fully aware of the existence of a spread."  The "spread" referred to the difference between what an investor directly investing in MDO (like Liberty) would pay and what an investor investing through BRTMDO or Brentwood Financial would pay for the same equity.  Marcus falsely claimed that all BRTMDO and Brentwood Financial investors had been told that Liberty acquired MDO units at a $25 million valuation and sold it to them at a $100 million valuation.  Marcus lied:  the Mozido Invesco and Brentwood Offerings had included unaccredited and unsophisticated investors, most of whom were strangers to Liberty, and who did not know of the spread.  Liberty, Abbass, Marcus, Rick Liberty, and Hess suppressed MDO's actual valuations.

119.    MDO's Board rejected Marcus' proposed board resolution.  Liberty, Marcus, and Abbass did not again petition the MDO board for permission to transfer interests in MDO units.  Despite this clear decision not to give Liberty authority to pledge, transfer, or sell units, BRTMDO (and Brentwood Financial) continued to sell in violation of the agreements, and contrary to their representation that the offerings was not in violation of other agreements.

### K.  MDO Sells Its Assets and Ceases Operations

120.    In late 2013, a large institutional investor agreed to invest in MDO's core business, but not in its existing corporate form.  So MDO sold its assets to a newly formed corporation, Mozido, Inc. ("Mozido"), receiving common stock in Mozido in exchange.  MDO

then ceased operations, and functioned only to hold Mozido stock and pay liabilities.

121.    The asset sale significantly weakened MDO's position in the Mozido enterprise. MDO sat below the institutional investor for liquidation purposes (i.e., the institutional investor could recoup its investment before anyone holding MDO stock could).  MDO retained considerable liabilities, including the debt issued to Brentwood Financial and BRTMDO.  But unless Mozido paid dividends, distributed future profits, or had a liquidity event (that is, an event that converts the ownership equity in a company into cash), MDO could not repay its debts. Defendants did not inform investors that MDO had restructured and was now a non-operating company saddled with debts and totally dependent on Mozido.  Nor did Defendants tell investors that $15 million of investment proceeds from the institutional investor were used by Mozido to settle a threatened lawsuit by insiders and investors against Liberty and his entities for "a series of fraudulent omissions and misrepresentations and breaches of duties" and "egregious acts of corporate malfeasance including…: (1) solicitation of investors through fraudulent omissions and misrepresentations…"

122.    Throughout 2014 and 2015, Mozido continued losing money and borrowing more (including from Liberty-controlled entities).  Eventually Mozido borrowed money by pledging all of Mozido's remaining assets as collateral.   Even so, the Defendants did not provide accurate information about Mozido's financial situation to MDO Class B investors, or Brentwood Financial or BRTMDO note holders.

## L.  The Brentwood Exchange Offer in 2016

123.    The sixth securities offering in Defendant's scheme involved another exchange

offer (the "Brentwood Exchange Offer"), offered to Brentwood Financial and BRTMDO noteholders.

124.    By fall 2015, Liberty's scheme was unraveling.  The three-year notes issued by Brentwood Financial and BRTMDO had begun to come due.  Mozido had not had a liquidity event and continued to lose money.  Brentwood Financial and BRTMDO did not have the more than $30 million to repay the notes; nor did Liberty have that amount of cash.  Liberty got some investors to agree to extend their notes, but most matured without repayment.  Pursuant to the terms of the Brentwood Financial and BRTMDO promissory notes, investors lost their conversion rights when the notes matured.

125.    Liberty needed Brentwood noteholders to agree to the Exchange Offer.  He would have been unable to pay noteholders who might want their principal and interest back.  On July 27, 2016, Rick Liberty wrote to a broker to thank him for his "efforts to help Michael Liberty with his dire short term liquidity needs."  Rick Liberty wrote that "on going business and personal funding needs have depleted Michael's cash reserves to zero creating a scramble to collect on notes receivable and to defer payments.  Any funds coming in during past few months have immediately gone out with the cash balances being nil at best."

126.    So, in 2016, Liberty, Marcus, Abbass, Rick Liberty, and Hess conducted another exchange offer:  Brentwood Financial and BRTMDO noteholders could exchange their notes– expired or not–for preferred units of MDO.

127.    The Defendants did not register the Brentwood Exchange Offer, nor did they provide investors with any offering memorandum, prospectus, financial statements, or standardized document.  On April 27, 2016, Liberty, Abbass, and Marcus caused Liberty's tax

53

accountant to email solicitations of the Brentwood Exchange Offer to investors, for which the tax accountant received remuneration.  The email notice provided no substantive information to investors about Brentwood Financial, BRTMDO, MDO, or Mozido.  The Brentwood Exchange Offer constituted a public offering of securities under the federal securities laws, but was not registered and did not comply with various provisions of those laws.  Offerees included unaccredited and unsophisticated investors.  Offerees were located in various states and countries.  Defendants made the Brentwood Exchange Offer by general solicitation.  The business, financial, and "bad actor" events information provided with the Brentwood Offering was insufficient to qualify for the safe harbor provisions of Regulation D of the Securities Act.

128.    Liberty directed Hess, Rick Liberty, and others to persuade investors to accept the Brentwood Exchange Offer.  Hess received compensation for soliciting the Brentwood Exchange Offer.  These communication included various misrepresentations and omissions of the same kind Defendants had previously employed:

129.    ***Valuations and Financial Condition of Mozido:***  Defendants intentionally misrepresented the valuation and financial state of Mozido.  Liberty, Marcus, Abbass, and Rick Liberty actively concealed Mozido's dire financial situation, though they were well aware of it: For example:

a.    In a February 2016 email, Liberty described the current situation with Mozido Inc. as "these Armageddon times."  Then, on April 8, 2016, Marcus described how Mozido had only one week to pay off a creditor, avoid a default, and "avoid the draconian outcome of loss of Mozido's stake" in the only revenue-generating part of its business.  Despite these problems, Mozido's grave financial condition was not

disclosed to investors.

b. On or about, April 15, 2016, Mozido defaulted on $45 million of loans.  Mozido's
only revenue-generating subsidiary had been pledged as collateral to that creditor.
The creditor demanded a comprehensive restructuring plan.  That plan resulted in
MDO owning significantly less than 10% of Mozido, another fact Defendants
concealed from investors.

c. At that time, Rick Liberty was helping Liberty and Mozido find new investors.  He
received Mozido's financial statements and knew that it had defaulted on more than
$45 million in loans.  He disclosed none of this in his solicitations.

d. On April 20, 2016, Hess emailed investors an update of "important developments at
Mozido over the past six months."  Hess fraudulently omitted information about
Mozido's financial crisis, but promised note holders that a "conversion opportunity"
to Mozido common units was coming "shortly."  Hess lied that because of "strict
non-disclosure rules and an existing 'quiet period'" he could not provide more
information.

e. On May 9, 2016, the manager of an investor group emailed Marcus that investors
were asking questions about the valuation of the Preferred Units, so they could decide
whether to convert.  He told Marcus that without 2016 financial statements or
guidance, investors would not be able to make an informed decision whether to
convert.  Despite this request, Marcus did not tell them of Mozido's defaults and
precarious financial condition or provide any other financial information.  In addition,
on May 10, Marcus perpetuated Defendants' prior lies about valuation when he

misled investors about the "triple liquidation preference" of the MDO membership units.

f. In May 2016, Marcus omitted to tell investors that MDO had defaulted on a large loan and its creditor could seize and sell MDO's stock of Mozido to satisfy the debt. And he concealed that the investors' holdings were significantly diluted and Mozido's preferred shareholders possessed a nearly $1 billion liquidation preference (that is, that the preferred shareholders were entitled to be paid the first $1 billion of value, before other shareholders received anything).

g. On June 9, 2016, Rick Liberty sent a term sheet approved by Liberty to a broker to use to solicit investors to buy promissory notes convertible into preferred membership units of MDO at a valuation of Mozido of $500 million. Liberty, Marcus, and Rick Liberty all knew that the nearly $1 billion liquidation preference for Mozido's preferred shareholders (meaning those shareholders would receive the first $1 billion obtained by the company in a liquidation event) meant that the Mozido units would be a huge loss to Brentwood investors who exchanged, even if Mozido could truly be valued at $500 million. But they fraudulently omitted that fact in their communications with investors.

130. *Future Liquidity Events:* During the Brentwood Exchange Offer, Liberty and Hess made multiple misrepresentations concerning potential "liquidity events" that would (supposedly) be lucrative for note holders. For example:

a. Hess told BRTMDO investors that the Brentwood Exchange Offer was likely "being done in anticipation of an upcoming liquidity event that is expected within the next

few months, and this liquidity offer could in fact happen pretty soon."

b. On April 30, 2016, Liberty gave Hess and another BRTMDO promoter updated (and false) information to tell to investors to convince them to accept the Brentwood Exchange Offer.  As a result, Hess made a series of fraudulent misrepresentations to investors, including that "Things could not be going much better" for Mozido and that Liberty expected "worldwide profitability in July"; that Mozido was "in a great position" to raise money for a "long overdue 'initial liquidity event' … in the 5-7 billion dollar range" and that that event might occur that summer; that Liberty had described that Mozido's valuation within the next 24-36 months would rise "to high double and even possible triple billion dollar valuations;" that investors needed to convert their notes to participate in the liquidity event; and that conversion would "clean up the Mozido capitalization table" and allow Liberty to more easily raise additional funds, because the Brentwood Offering promissory notes were "the only piece of the entire Mozido capital stack that receive interest."

c. On May 6, 2016, Hess again fraudulently touted to investors a "big liquidity event expected within 60-90 days" and that "this whole game could be over in the next 12 months."  Five days later he told investors that, unless they accepted the exchange offer, they would "hold up a big potential liquidity event."

d. Even as late as December 27, 2016, Hess was trying to manipulate investors to accept the Brentwood Exchange Offer through false statements fed to him by Liberty.  Hess falsely told two investors, "I talked to Liberty last Friday and he says the Mozido funding and resulting liquidity offer is still in process and we expect a liquidity

opportunity to be available sometime in the first quarter of 2017."

In fact, Mozido was losing money; its financial professionals were not projecting it to be profitable in July 2016, and Mozido did not have enough money to fund its operations or even pay for an audit and had just defaulted on $45 million in loans.  Mozido's valuation was not in the billions.  There was no planned liquidity event and Mozido's creditors were discussing seizing Mozido's most valuable asset, forcing Mozido into bankruptcy, and/or restructuring Mozido.  BRTMDO investors were not the only investors in the Mozido, Inc. capitalization structure accruing interest.  Nor did BRTMDO investors materially affect Mozido's ability to raise money.  Mozido was performing poorly, and Liberty, MDO, BRTMDO, and Brentwood Financial were under investigation by the Securities and Exchange Commission.

131.    In January 2017, Mozido effectively promised to sell its last remaining revenue-generating business unit to repay its creditors.  But Liberty continued to mislead investors during a March 2017 conference call, omitting Mozido's dire situation and its sale.

## II.    The TL Holdings Unregistered Securities Offering

132.    Liberty helped form DaVincian Healthcare, Inc. in 2014.  DaVincian Healthcare was owned in part by DaVincian Holdings, LLC, which was owned in part by TL Holdings Group.  Following the same model he has used in the MDO-related securities offerings, Liberty engaged in another unregistered securities offering.

133.    Beginning in April 2015, TL Holdings offered three-year promissory notes convertible into preferred units of DaVincian Holdings.  The notes paid 4% interest at maturity.  Liberty was one of the managers of TL Holdings.  TL Holdings did not register its offering, but

TL Holdings, Liberty, and Hess offered them publicly.  Liberty directed Hess to solicit investors

for the TL Holdings' securities.  In selling the TL Holdings notes, the Defendants disregarded

the requirements of federal securities law for a public offering of securities.  TL Holdings did not

create or use an offering memorandum, prospectus, or package of business or financial materials

to provide to offerees.  Hess and Liberty provided information to potential investors either orally

or by email, but failed altogether to provide purchasers with the detailed financial and business

information.   Neither Hess nor Liberty furnished to each purchaser a description in writing of

the SEC's prior *Keystone* case, a "bad actor" event, a reasonable time before selling TL Holdings

securities.

### FIRST CLAIM

**Fraud in the Purchase or Sale of Securities in**
**Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**

**(Michael A. Liberty; Brittany Liberty; Paul Hess; Richard Liberty; George Marcus, Esq.;**
**BRTMDO, LLC; Brentwood Financial, LLC; Family Mobile, LLC; Mozido Invesco, LLC)**

134.    The Commission repeats and incorporates by reference the allegations in

paragraphs 1 through 133 above, as if set forth fully herein.

135.    As detailed above, Defendants Michael A. Liberty; Brittany Liberty; Paul Hess;

Richard Liberty; George Marcus, Esq.; BRTMDO, LLC; Brentwood Financial, LLC; Family

Mobile, LLC; and Mozido Invesco, LLC engaged in a fraudulent scheme through a series of

fraudulent acts, statements, and material omissions through which investors were tricked into

believing that they were funding fast-growing startup companies and induced to buy securities

offered in multiple fraudulent securities offerings.

136.    By engaging in the conduct above, these Defendants, directly or indirectly, acting intentionally, knowingly, or recklessly, by the use of means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities: (a) have employed or are employing devices, schemes, or artifices to defraud; (b) have made or are making untrue statements of material fact or have omitted or are omitting to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) have engaged or are engaging in acts, practices, or courses of business which operate as a fraud or deceit upon certain persons, or, in the alternative, aided and abetted these violations.

137.    The conduct of these Defendants involved fraud, deceit, manipulation, and/or deliberate or reckless disregard of regulatory requirements and directly or indirectly resulted in losses to other persons.

138.    As a result, Defendants Michael A. Liberty; Brittany Liberty; Paul Hess; Richard Liberty; George Marcus, Esq.; BRTMDO, LLC; Brentwood Financial, LLC; Family Mobile, LLC; and Mozido Invesco, LLC have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. §78(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], or, in the alternative, Brittany Liberty, Hess, Rick Liberty, Marcus,  BRTMDO, Brentwood Financial, Family Mobile, and Mozido Invesco aided and abetted these violations.

## SECOND CLAIM

### Fraud in the Offer or Sale of Securities in
### Violation of Section 17(a) of the Securities Act

**(Michael A. Liberty; Brittany Liberty; Paul Hess; Richard Liberty; George Marcus, Esq.; BRTMDO, LLC; Brentwood Financial, LLC; Family Mobile, LLC; Mozido Invesco, LLC)**

139.    The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 138 above, as if set forth fully herein.

140.    Defendants Michael A. Liberty; Brittany Liberty; Paul Hess; Richard Liberty; George Marcus, Esq.; BRTMDO, LLC; Brentwood Financial, LLC; Family Mobile, LLC; and Mozido Invesco, LLC, directly or indirectly, acting intentionally, knowingly, recklessly, or negligently, in the offer or sale of securities by the use of means or instrumentalities of interstate commerce or of the mails: (a) have employed or are employing devices, schemes, or artifices to defraud; (b) have obtained or are obtaining money or property by means of untrue statements of material fact or omissions to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) have engaged or are engaging in transactions, practices, or courses of business which operate as a fraud or deceit upon purchasers of the securities or, in the alternative, aided and abetted these violations.

141.    The conduct of these Defendants involved fraud, deceit, manipulation, and/or deliberate or reckless disregard of regulatory requirements and directly or indirectly resulted in losses to other persons.

142.    As a result, Defendants Michael A. Liberty; Brittany Liberty; Paul Hess; Richard Liberty; George Marcus, Esq.; BRTMDO, LLC; Brentwood Financial, LLC; Family Mobile, LLC; and Mozido Invesco, LLC have violated and, unless enjoined, will continue to violate

61

Section 17(a) of the Securities Act [15 U.S.C. §77q(a)], or, in the alternative, Brittany Liberty, Hess, Rick Liberty, Marcus,  BRTMDO, Brentwood Financial, Family Mobile, and Mozido Invesco aided and abetted these violations.

### THIRD CLAIM

**Unregistered Offer and Sale of Securities**
**In Violation of Sections 5(a) and 5(c) of the Securities Act**

**(All Defendants)**

143.    The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 142 above, as if set forth fully herein.

144.    The convertible promissory notes and membership units in limited liability companies offered by Defendants are "securities" within the meaning of Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)].  No registration statements have been filed with the Commission or have been in effect with respect to any of the offerings alleged herein.

145.    Defendants Michael A. Liberty; Brittany Liberty; Paul Hess; Richard Liberty; George Marcus, Esq.; BRTMDO, LLC; Brentwood Financial, LLC; Family Mobile, LLC; Mozido Invesco, LLC; and TL Holdings Group, LLC, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.  They sold securities to hundreds of investors and collectively obtained proceeds of at least $55 million.

146.    By engaging in the conduct set forth above, Defendants Michael A. Liberty;

Brittany Liberty; Paul Hess; Richard Liberty; George Marcus, Esq.; BRTMDO, LLC; Brentwood

Financial, LLC; Family Mobile, LLC; Mozido Invesco, LLC; and TL Holdings Group, LLC,

violated and, unless enjoined, will continue to violate Sections 5(a) and 5(c) of the Securities Act

[15 U.S.C. §77e(a) and 77e(c)], or, in the alternative, Liberty, Brittany Liberty, Hess, Rick

Liberty, and Marcus aided and abetted these violations.

**FOURTH CLAIM**

**Acting as an Unregistered Broker-Dealer
in Violation of Section 15(a) of the Exchange Act**

**(Paul Hess and Richard Liberty)**

147.     The Commission repeats and incorporates by reference the allegations in

paragraphs 1 through 146 above as if set forth fully herein.

148.     By engaging in the conduct above, Hess and Richard Liberty, directly or

indirectly, singly or in concert with others, made use of the mails or means or instrumentalities of

interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or

sale of, securities, without being registered as a broker or dealer or associated with a registered

broker or dealer in accordance with Section 15(a) of the Exchange Act [15 U.S.C. §78o(a)].

149.     As part of, and in furtherance of the violative conduct, Hess and Richard Liberty

regularly promoted securities to investors and advised investors about the merits of investing in

those securities.  They also directly or indirectly received compensation based on their successful

promotion efforts that resulted in purchases or sales of securities.

150.      As a result, Hess and Richard Liberty, acting directly or indirectly, and singly or

in concert with others, violated, and unless enjoined, will continue to violate Section 15(a) of the

Exchange Act [15 U.S.C. §78o(a)].

## FIFTH CLAIM

### Other Equitable Relief, Including
### Unjust Enrichment and Constructive Trust

### (Relief Defendant Xanadu Partners, LLC)

151.    The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 150 above as if set forth fully herein.

152.    Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)] states: "In any action or proceeding brought or instituted by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors."

153.    Relief Defendant Xanadu Partners, LLC, has received investor funds derived from the unlawful acts or practices of the Defendants under circumstances dictating that, in equity and good conscience, they should not be allowed to retain such funds.

154.    Further, specific property acquired by Relief Defendant Xanadu Partners, LLC is traceable to Defendants' wrongful acts and there is no reason in equity why Relief Defendant should be entitled to retain that property.

155.    As a result, Relief Defendant Xanadu Partners, LLC is liable for unjust enrichment and should be required to return its ill-gotten gains, in an amount to be determined by the Court.  The Court should also impose a constructive trust on property in the possession of the Relief Defendant that is traceable to Defendants' wrongful acts.

## PRAYER FOR RELIEF

WHEREFORE, the Commission requests that this Court:

A.      Enter permanent injunctions, including an injunction restraining Defendants and each of their agents, servants, employees and attorneys and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from directly or indirectly engaging in the conduct described above, or in conduct of similar purport and effect, in violation of Exchange Act Section 10(b) [15 U.S.C. §78(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; Securities Act Sections 5(a), 5(c), 17(a) [15 U.S.C. §77e(a),77e(c), §77q(a)]; and, for Hess and Rick Liberty, Exchange Act Section 15(a) [15 U.S.C. §78o(a)]; and an injunction  prohibiting Liberty, Abbass, Hess, Rick Liberty, and Marcus from directly or indirectly, including, but not limited to, through any entity owned or controlled by them individually or collectively, participating in the issuance, purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent them from purchasing or selling securities for their own respective personal accounts;

B.      Require Defendants and Relief Defendant to disgorge their ill-gotten gains, plus pre-judgment interest, with said monies to be distributed in accordance with a plan of distribution to be ordered by the Court;

C.      Require Defendants to pay an appropriate civil monetary penalty pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)];

D.      Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and,

E.      Award such other and further relief as the Court deems just and proper.

Respectfully submitted,

SECURITIES AND EXCHANGE COMMISSION
By its attorneys,

/s/ Marc Jones
Marc J. Jones (Mass. Bar No. 645910)
  Senior Trial Counsel
Peter Bryan Moores (Mass. Bar No. 658033)
  Senior Enforcement Counsel
Kevin B. Currid (Mass. Bar No. 644413)
  Assistant Regional Director
Martin F. Healey (Mass. Bar No. 227550)
  Regional Trial Counsel

33 Arch Street, 24th Floor
Boston, MA  02110
(617) 573-8947 (Jones direct)
jonesmarc@sec.gov (Jones email)

DATED: March 30, 2018