**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, : | |
| : | CIVIL ACTION |
| Plaintiff : | |
| : | Case No.: 2:18-139-JBL |
| v. : | |
| : | |
| MICHAEL A. LIBERTY, et.al. : | |
| Defendants : | |
| : | |
| and : | |
| : | |
| XANADU PARTNERS, LLC, : | |
| : | |
| Relief Defendant : | |
| : | |

**MOTION AND INCORPORATED MEMORANDUM OF LAW OF DEFENDANT**
**GEORGE J. MARCUS FOR JUDGMENT ON THE PLEADINGS**

NOW COMES the Defendant, George J. Marcus, and, for the reasons stated herein, moves under Fed. R. Civ. P. 12( c) for Judgment on the Pleadings dismissing with prejudice all of the Complaint's [ECF No. 1] claims against him.

**INTRODUCTION**

Alleging securities fraud claims against Mr. Marcus, a highly respected lawyer, in an overreaching effort to squeeze his client, the hodgepodge Complaint fundamentally asserts five fraud predicates, spanning some eight years.  First, that investors in entities affiliated with Defendant Liberty ("Affiliates") were falsely led to believe that the invested funds would be re-invested by the Affiliates into the operating company, Mozido, LLC (which later became MDO, LLC and ultimately the parent company of Mozido, Inc.).  Second, that these investors were deceived about the "valuation" of Mozido, Inc. when they purchased convertible notes of the

Affiliates.  Third, that the Affiliates had no right, upon conversion of investor notes into equity interests in the parent company, Mozido, LLC (later becoming MDO, LLC), to deliver these equity interests.  Fourth, that while investors obtained rights to acquire these equity interests, they were not told that MDO, LLC had divested its assets, become "saddled" with debt, and was essentially worthless.  Finally, it is alleged that Mr. Marcus knew about and facilitated these deceptions.

All these alleged frauds are fiction, entirely refuted by the documentary record to which the SEC extensively refers in the Complaint, but the contents of which are never revealed to the Court.  We do so here,[1] solving the mystery of the SEC's failure to disclose the contents of these documents. Without exception or ambiguity, the documentary record entirely refutes the Complaint's allegations, leaving a disturbing lack of candor by the SEC as the only permissible conclusion.

After constructing its fictitious platform of fraud, the Complaint builds upon it by drawing inferences that are either contradicted by the documentary record, conclusory, illogical or facially incorrect—often all four.  The documentary record, not the Complaint's untruthful distortion of it, shows the actual facts that Mr. Marcus "knew."  These facts show that Mr. Marcus neither made, participated in, nor knew of any fraudulent misrepresentation or conduct by anyone.  Consistent with its pattern of deception, the SEC fails to disclose what it fully understood the documentary record revealed: in these securities offerings, Mr. Liberty was

---

[1] The Court may take judicial notice of these and the other documents attached as Exhibits to this Memorandum. *See, e.g., Clorox Co. P.R. v. Proctor & Gamble Comm. Co.*, 228 F. 3d 24, 32 (1st Cir. 2000) (on dismissal court can consider "entirety of a document integral to or explicitly relied upon in the complaint, even though not attached to the complaint"(citation omitted)); *Fudge v. Penthouse Intern., Ltd.*, 840 F. 2d 1012, 1015 (1st Cir. 1988) ("'when plaintiff fails to introduce a pertinent document as part of his pleading, defendant may introduce the exhibit as part of his motion attacking the pleading'" (citation omitted)); *Haley v. City of Boston*, 657 F. 3d 39, 46 (1st Cir. 2011) (on review of dismissal court can consider information from documents incorporated by reference in complaint, public record matters and judicially noticeable facts).

represented by securities counsel other than his corporate counsel, Mr. Marcus.  Mr. Marcus, as corporate counsel, owed duties only to his client and to no investor.

The documentary record compels dismissal of the Complaint, with prejudice. The Court should also impose appropriate sanctions upon the SEC for its lack of candor, including an order requiring the SEC to pay Mr. Marcus' legal fees, and a referral of the SEC's conduct to the appropriate Bar regulatory authorities.

## PROCEDURAL BACKGROUND

The SEC filed the Complaint on March 30, 2018. [ECF No. 1], having begun its investigation by May of 2012 (*see* Ex. 7 (00212) and issuing subpoenas in February 2016 (s*ee* Ex. 13) (p. 00748) [2] and April 2016.  *See* Ex. 14 (00750-00755).  Mr. Marcus filed his Answer on June 18, 2018.  [ECF No. 19]. By order dated August 12, 2020 [ECF No. 81], upon Mr. Marcus's request and over the SEC's objection, the Court lifted its previously imposed stay of proceedings to permit the filing of this Motion. Below, the reasons for the SEC's objection will become painfully clear.

## <u>LEGAL STANDARDS</u>

A Fed. R. Civ. P. 12(c) motion is "treated much like a Rule 12(b)(6) motion to dismiss." *Perez-Acevedo v. Rivero-Cubano*, 520 F. 3d 26, 29 (1st Cir. 2008).  This includes evaluation of documents relied on or referred to in the Complaint and other judicially noticeable documents. *See, e.g., Clorox Co. P.R. v. Proctor & Gamble Comm. Co.*, 228 F. 3d 24, 32 (1st Cir. 2000). The facial plausibility test requires the plaintiff to allege "'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Unitil Corp. v. Utility Workers Union*, 2017 WL 5068344, at * 4 (D. Me. Nov. 2, 2017) (quoting

---

[2] *See, e.g., In re Am. Funds Sec. Litig.*, 556 F. Supp. 2d 1100, 1105 (C.D. Cal. June 5, 2008) (judicial notice of "various news articles" in support of limitations defense").

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  Culpable inferences from well-pleaded facts must be weighed against non-culpable inferences.  *See Iqbal*, 556 U.S. at 680.

Introducing the case as about "a long-running fraudulent scheme" (Cplt. ¶ 1), the Complaint expressly alleges "fraud" or "fraudulent scheme" at least 24 times before the Claims section.  The first two claims are expressly labeled "fraud" claims.  Sounding in fraud, the Complaint and all claims against Mr. Marcus must satisfy not only Rule 8(a)(2)'s plausibility test, but Rule 9(b)'s heightened factual pleading requirements.  *See Foisie v. Worcester Polytechnic Institute*, 967 F. 3d 27, 49 (1st Cir. 2020) (Rule 9(b) applies not only to expressly labeled "fraud" claims "but also to related claims" that 'effectively charge fraud.'" (quoting *Mulder v. Kohl's Dept. Stores, Inc.*, 865 F. 3d 17, 21-22 (1st Cir. 2017)).

The First Circuit's Rule 9(b) test is particularly stringent in securities cases.  *See, e.g.*, *New England Data Services, Inc. v. Becher*, 829 F. 2d 286, 288, 289 (1st Cir. 1987) ("in the securities context, and in general, this Circuit has strictly applied Rule 9(b)"); *Greebel v. FTP Software, Inc.*, 194 F. 3d 185, 193 (1st Cir. 1999) (same).  The First Circuit's formulations of scienter - the intent "'to deceive, manipulate or defraud'" (*SEC v. Ficken*,  546 F. 3d 45,  47 (1st Cir. 2008) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 and n. 12 (1976)) - have varied over time.  But the First Circuit has always, both before and after the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4, required any securities complaint to make a strong factual showing of scienter. Conclusory "Defendant knew" allegations do not suffice.  *See, e.g.,* *Greenstone v. Cambex*, 975 F. 2d 22, 25 (1st Cir. 1992), *superceded by statute* ("'plaintiffs must plead facts that give[ ] rise to a 'strong inference' of fraudulent intent.'" (quoting *Wexner v. First Manhattan Co.*, 902 F. 2d 169, 172 (2d Cir. 1990)).  SEC Complaints must meet this strict scienter test.  *See, e.g., Ficken*, 546 F. 3d at 47-48 ("In this circuit, proving scienter requires 'a

showing of either conscious intent to defraud or a 'high degree of recklessness'" (citations omitted));  *SEC v. Fife*, 311 F. 3d 1, 9 (1st Cir. 2002) ("Recklessness is 'a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that an actor must have been aware of it'"(quoting *Greebel*, 194 F. 3d at 198)).  *See also SEC v. Durgarian*, 477 F. Supp. 2d 342, 353 (D. Mass. 2007) (facts must support "'strong inference'" of scienter (quoting *In re Stone & Webster, Inc. Sec. Litig.*, 414 F. 3d 187, 204 (1st Cir. 2005)); *SEC v. Druffner*, 353 F. Supp. 2d 141, 149-50 (D. Mass. 2005) (facts must generate scienter inference "'that is 'both reasonable and strong'" (quoting *Greebel*, 194 F. 3d at 195-96)).  Requiring a strong factual showing of scienter fulfills Rule 9(b)'s purpose: "to preclude the use of a groundless fraud claim as pretext for discovering a wrong").  *See Becher*, 829 F. 2d at 289.  Although in *SEC v. Tambone*, 550 F. 3d 106, 119 (1st Cir. 2008), *withdrawn*, 573 F.3d 54 (1st Cir. 2009), *reinstated in part and remanded*, 597 F. 3d 2010 (1st Cir. 2010), the First Circuit found that "[t]he SEC need only allege scienter generally," the court then stated, contradictorily – and in line with substantial long-standing Circuit precedent  requiring a strong scienter showing – that "we evaluate 'the complaint in its entirety' to determine 'whether *all* the facts, taken collectively,' meet the scienter standard."  *Id.* at 120 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)) (emphasis by *Tellabs*).  Such canvassing would be unnecessary if conclusory "Defendant knew" allegations, such as this Complaint's, sufficed.  *See Iqbal*, 556 U.S. at 686-87 (intent allegations cannot be conclusory).

## ARGUMENT

I.   **EXAMINATION OF DOCUMENTS REFERRED TO IN THE COMPLAINT
     CONTRADICT THE ALLEGATIONS OF THE COMPLAINT AND REFUTE**

**ANY CLAIM OF FRAUD**

**A.  Investors Were Not Misled About Use of Invested Funds**

The allegation that investors were misled about how their invested funds would be used (*see, e.g.*, Cplt. ¶¶ 1, 4, 44, 45(b), 47, 48, 77(b), 84, 108), fails dramatically once the content of documents to which the SEC refers is revealed.  Nowhere alleging that Mr. Marcus himself actually communicated with any investor about the use of proceeds, or in any way actually "misled" any investor about such use, the Complaint refers to the investment documents, and some investor funds deposited in Mr. Marcus' IOLTA account.  Cplt. ¶¶ 10, 48(a), 77(b), 108. [3] The actual investment documents, and the content of Mr. Marcus' IOLTA account, tell a dramatically different story from that told in the Complaint, starkly revealing the SEC's lack of candor.  First, the transaction documents show that investors voluntarily executed documents saying that the funds invested could be used as the Affiliate ("Issuer") chose; no provision states or implies "funds must go to Mozido." *See* Exs. 1 (Sec.2(c) (p. 00013) (note proceeds "will be used for working capital and for general purposes of the Issuer"), Sec. 5(a) (p. 00018) (Issuer will use note proceeds "solely to fund the general working capital needs of the Issuer"); 2 (Sec. 2(c), p. 00040) (note proceeds "will be used for working capital and for general purposes of the Issuer"), Sec. 5(a) (p. 00044) (Issuer will use note proceeds "solely to fund the general working capital needs of the issuer");  3 (Sec. 2(c), p. 00066) (note proceeds "will be used for such purposes as the Issuer determines to be appropriate, including for working capital and general purposes of the Issuer"), Sec. 5(a) (p.00071) (Issuer will use note proceeds "for any purpose

---

[3] The court can take notice of docket entries in another proceeding formerly pending before it, *Endicott, et al. v. Marcus, et al.*, Case No. 2:18-cv-00331-JDL, in which the Plaintiffs were investors in the Liberty Affiliate Brentwood Investments, LLC and expressly based their complaint [ECF No. 1]  on the SEC's Complaint here.  They affirmed that they had never spoken with or communicated with Mr. Marcus about anything, let alone their investments in Brentwood.  *See* Ex. 20.

deemed appropriate by the Issuer"); 4 (Sec. 2(c) (p. 00096) (note proceeds "will be used for such purposes as the Issuer determines to be appropriate, including for working capital and for general purposes of the Issuer"), Sec. 5(a) (p. 00101) (Issuer will use note proceeds "for any purpose determined appropriate by the Issuer").  Every one of the documents contained integration clauses, by which each investor disclaimed reliance on "any and all prior agreements…understandings and communications between the parties, whether written or oral." *See* Exs. 1 (Sec. 8(g) (p. 00022); 2 (Sec. 8(g) (p. 00048); 3 (Sec. 8(g) (p. 00075); 4 (Sec. 8(g) (p. 00105). Finally, the Brentwood documents expressly included a disclaimer of reliance on Mr. Marcus and his law firm.  *See* Ex. 11 (Sec. 4.5 (p. 00735). *See also* Ex. 7 (Sec. 7.05 (p. 00253-55) (Brownstein Hyatt, as "counsel for Family Mobile, Invesco and Mozido," gave no advice to noteholder).  The Complaint nowhere factually asserts that Mr. Marcus actually communicated, orally or in writing, with any investor about use of invested funds, and the documents actually presented to and signed by investors entirely refute any suggestion of misrepresentation—by anyone.  *See Broder v. Cablevision Systems Corp.*, 418 F. 3d 187, 196-97 (2d Cir. 2005) (affirming contract claim dismissal where actual contract language differed from complaint's description). Mr. Marcus was entitled to believe that the investors meant what they expressly and unequivocally agreed to in these documents, in writing.

Further undermining the assertion that Mr. Marcus knew about misallocation of investment proceeds (Cplt. ¶ 108), are his firm's IOLTA records.  The Complaint points to these records, conclusorily (and falsely) alleging that investment funds were deposited in the IOLTA and then dissipated to fund Mr. Liberty's "lifestyle." Cplt. ¶¶ 1, 48(a), 77(b), 108, 114. The SEC had received these records in its investigation (*see* Ex. 8 (00270-00431)), but apparently never read them—or maybe they did.  These records tell a vastly different story from that the SEC

tells: $19,388,720.24 of investment proceeds came into the IOLTA from the investors and $22,616,576.61 were disbursed from the IOLTA.  *See* Ex. 8 (00268-00270**)**.

The SEC, in a dramatic breach of its duty of candor, created untruthful fraud allegations based on documents the SEC either never read, or read and tried to hide.[4]  So much for the Complaint's central "bait and switch" theory (Cplt. ¶¶ 44, 82, 95, 97) of misdirected investor funds.  So much for SEC candor.

### B.  Investors Were Not Misled About Valuations

The foregoing lack of candor is only the beginning of the Complaint's deceptions. It goes on to assert that investors were induced to invest in Mozido – albeit indirectly - by false representations about Mozido's value made through the Liberty Affiliates' grant of a "conversion option," *i.e.*, the grant of an option to each investor to acquire Mozido securities.  *See, e.g.,* Cplt. ¶¶ 46, 46(a), 50(b), 50(e), 62(c), 65, 66, 68(b), 86, 90, 106, 107, 107(a), 107(c), 107(d), 107(e), 107(f), 118, 129, 129(e), 129(g), 130.  According to the SEC, setting the "conversion" price, *i.e.* the option strike price, while saying nothing else about the value of the securities subject to option, permits an inference about the value of those securities.  This time, we have SEC lack of candor augmented by feigned ignorance.

 Again the actual documents tell a vastly different story from the one the Complaint tells. Each investor's form of investment was a loan to a Liberty Affiliate.  This loan, in every case, was documented by a written promissory note, with the Liberty Affiliate borrower promising repayment, with stated interest, at the end of the 3 - year term.  As an "equity kicker," *i.e.*, an inducement to the investor to make the loan, the promissory notes provided a "conversion

---

[4] Since the investment proceeds came into the IOLTA  for Mr. Marcus's client, with no written or oral restriction on their disposition, Mr. Marcus was required to disburse those proceeds as his client directed.  *See* M.R. P.C. § 1.15(b)(2)(iv).  *See also Maine Board of Bar Overseers Ethics Ops.* 116, 127 (lawyer must follow client instructions to disburse funds from IOLTA.

option."  At the end of the loan term, any investor could  voluntarily elect either to get the

principal back, plus interest, or to use that money to purchase Mozido securities at a fixed price

for these securities (the "strike price"), set three years earlier, at the time the note was issued.

The conversion strike prices, to be paid three years after execution of the notes if the conversion

option were exercised, were specified, with the Brentwood Investments conversion strike price

determined by using a Mozido valuation of $100,000,000.  Other convertible promissory notes

issued by the Liberty Affiliates set other, fixed, conversion strike prices. *See* Exs. 1 (Sec. 5(a) (p.

00005-00006), 2 (Sec. 5(a) (p. 00032); 3 (Sec. 5(a) (p. 00058-00059), 4 (Sec. 5(a) (p. 00087-

00088). Like any option, the conversion option was a one- way street favoring the investor.  He

or she could take the securities deal if Mozido securities were worth more than the conversion

strike price at the time of conversion, or could say "no thanks; I'd like my money repaid, with

interest."  At the same time, the Liberty Affiliate was required to accept the conversion strike

price for the securities, even if at the time, their value greatly exceeded the conversion price.  A

classic option; a one-way street favoring the investor, the option holder.

What is important here is not education of the SEC about how options work, but the

inescapable conclusion that no logical inference about the present value of an asset can be made

by the grant of an option to purchase the asset at a given price three years later.  Here is a simple

example:  Suppose a real estate investor is granted the option to buy a parcel of real estate, three

years later, at an option strike price of $100,000.  That tells the investor absolutely nothing about

the value of the real estate either at the time of the grant of the option or at the time of its

required exercise—three years later (or at any other time for that matter). The only conclusions

that logically can be drawn from the grant of the option are that (i) *if* at the time of permitted

exercise, the real estate is worth more than the option strike price, the option is "in the money"

and likely to be exercised; alternatively, (ii) *if* it is worth less than the option strike price, the option will not be exercised. The option grantee gets a contractual right to buy property or walk away with no penalty, depending on his or her view of the value of the property subject to option at the time for exercise. No conclusion can be drawn regarding the value of the asset subject to option from the contractual rights of the optionee and the obligations of the optionor. The grant of an option to buy, without any express representation on valuation of the asset subject thereto (here, no such representation is alleged), is neither an explicit nor implied representation as to what the value of the subject asset is or will be if the optionee chooses to buy—or not.

Here, the conversion option "strike price" at issue works the same way as the hypothetical real estate option described above. It set the price that an investor would pay, three years later, for acquisition of Mozido securities, if the investor so chose.  There is no representation in any investment document that Mr. Marcus is alleged to have seen, or might conceivably have come across, concerning either the present or future value of the Mozido securities.  The investor was under no obligation to exercise the option and could choose to retain all note repayment proceeds.  As with the real estate option example, in the absence of an express representation of value, no logic or business reasoning permits an inference as to the value of the securities subject to option.

In short, Mr. Marcus worked with loan documents (Cplt. ¶¶ 43, 99) that granted investors a conversion option, as an "equity kicker" at maturity of their loans, in addition to their right to repayment with interest.  These documents made no representations about value, at the time of execution or later, and it is impossible to make any inferences about value from the option strike price. Yet another example of the SEC's lack of candor; this time exacerbated by twisted logic.

Making matters worse, as discussed in more detail below, is the SEC's chicanery concerning the documents evidencing the ***actual***, not inferred, valuation of Mozido securities by "a large institutional investor" (Cplt. ¶¶ 120-121), Wellington Management Company, the world's largest equity investment advisor (www.virtus.com/investment-partners/wellington-management-company-llp).  As usual, the SEC refers (Cplt. ¶¶ 120-121) to these documents (Exs. 9, 10) but fails to disclose their actual content.  That content shows that contemporaneous with the convertible note sales to investors, in which an ***option*** was granted to invest in Mozido securities three years later at a fixed price, Wellington was making ***actual, present*** purchases of Mozido securities based upon agreed valuations of Mozido itself ranging from $250 million to $2.25 billion.  *See* Exs. 9 (00433-00436; 00496-00500; 00518), Ex. 21 (00863-00865; 00915; 00917). So much for the SEC's "valuation deception."

### C.  The Allegations of Improperly Transferred Interests are Factually Wrong.

The foregoing deceptions on their own warrant dismissal of the Complaint and imposition of sanctions.  But there is more. The Complaint alleges that the Liberty Affiliates transferred to investors interests in Mozido that the Liberty Affiliates could not validly transfer or did not possess. *See* Cplt. ¶¶ 49, 85.  Again, the documents underlying these claims show otherwise.   The conclusory allegation that "Liberty and Marcus intentionally concealed" that transfers of Mozido Investment units to Mozido Invesco and then to investors were void under Mozido's Amended Operating Agreement (Cplt. ¶ 49) is simply wrong. The August 26, 2010 transfer of units to Mozido Invesco (Cplt. ¶ 41), alleged by the SEC to be in violation of the Mozido, LLC Operating Agreement, actually occurred before the Operating Agreement was amended to restrict transfers of this type.  That amendment was contained in the August 27, 2010 version of the Mozido, LLC Operating Agreement, which was not in effect when the subject

transfers were made. *See* Exs. 15 ( 00757-00758) and 16 (*passim*). Contrary to the SEC's allegations (made either in ignorance or with an intent to deceive), the transfers were neither prohibited nor invalid. Unsurprisingly no allegation appears in the Complaint that any investor's ownership interest in any Mozido units was ever challenged by anyone.

Similarly the SEC claims, again referring to, but not disclosing the contents of, the relevant documents, that neither Brentwood Financial nor BRTMDO had any ability to "deliver MDO preferred membership units to investors." Cplt. ¶ 109.  Identifying no Rule 9(b) facts, this allegation further ignores (and conceals) the truth: the Mozido, LLC Amended and Restated Operating Agreement, pursuant to which the subject preferred membership units were created, contains **no** restriction or regulation on transfer of these preferred membership units and never did.  To the contrary, the transfer of two different classes of membership interests, Class A and Class B membership units, are regulated.  *See* Exs. 15 (Art. VI, 00775-00779), 16.  That the SEC failed to understand the difference is implausible.

The icing on the deception cake is the SEC's failure to disclose the contents (Cplt. ¶¶ 120-21) of the Securities Purchase Agreement between Mozido, LLC and Wellington Management Company, and the schedules thereto (Ex. 9), discussed more fully below.  Suffice it here to note that this content shows that the Brentwood entities did have lawful ownership rights in and to Mozido preferred membership units sufficient to fund their obligation to satisfy all investor conversion options.

### D.  Allegations that the Wellington Deal Cheated Investors Are False and Absurd.

Alleging that "[i]n late 2013, a large institutional investor agreed to invest in MDO's core business, but not in its existing corporate form" (Cplt. ¶ 120), the Complaint goes on, not just implausibly but incredibly, to describe this transaction as a fraud on investors.  Cplt. ¶ 121.

First, the "large institutional investor" was Wellington Management Company (*see* Ex. 9), the largest private investment company in the world "with over $1 trillion in client assets under management" and an "investment advisor to more than 2,150 institutions located in over 65 countries" (www.virtus.com/investment-partners/wellington-management-company-llp). Wellington wanted to invest "in MDO's core business." Cplt. ¶ 120. That allegation itself shows Mozido's value proposition was both real and hugely attractive. Crucially it also shows that Mr. Marcus, who was actively involved in documenting the Wellington transaction (*see* Ex. 9 (00485-00486; 00502-00507), along with major national law firms, [5] had exactly no reason to believe anything was amiss. Concealing the facts contained in these documents, the Complaint gets things badly wrong. The documents show that in November of 2013, Wellington invested in Mozido at a valuation of Mozido of $250 million; in 2014, it increased its investment in Mozido at an increased Mozido valuation of $2.25 billion. *See* Exs. 9 (00433-00436; 00496-00500; 00518) and 21 (00863-00865; 00915; 00917). Mr. Marcus' s name is all over these documents. *See* Exs. 9 (00485-00486), 21 (00905-00906). These are the numbers Mr. Marcus knew, at the same time that convertible note investors were granted an option to buy Mozido securities at a price dramatically lower than the valuation attributed by Wellington—no novice in the valuation of equity securities. This alone shows the SEC's theory of "valuation fraud" is nonsense.

The Complaint's duplicity about the Wellington investment gets still worse. Alleging "Defendants did not inform investors that MDO [formerly Mozido, Inc.] had restructured and was now a non-operating company saddled with debts and totally dependent on Mozido" (Cplt. ¶ 121), the SEC must have hoped the Court would never read the documents on which these allegations are based, because the documents tell a radically different story. In the restructuring

---

[5] Including Mintz, Levin, Cohn, Glovsky & Popeo of Boston (*See* Ex. 9 (00485-86) and Wilson, Sonsini, Goodrich and Rosati of San Francisco and New York. *See* Ex. 9 (00485-86; 00502-07)

done to accommodate the Wellington Investment (*see* Cplt. ¶ 120), the operating assets and liabilities of Mozido, LLC, the entity then operating the Mozido business, were transferred to a new Delaware corporation, Mozido, Inc. It was not a gift.  In exchange, Mozido, LLC received (1) 100% of the common stock of Mozido, Inc.—the new operating company, (2) the agreement of Mozido, Inc. to assume all operating debts; (3) $15 million in cash and (4) a commitment of Wellington to purchase not less than $70,000,000 in new preferred shares in Mozido, Inc.  *See* Exs. 9 and 10, *passim*.  Contrary to the SEC's allegations, MDO (then Mozido, LLC) was not "saddled" (Cplt. ¶ 121) with anything, unless receiving a substantial new equity investment, at a spectacular valuation, determined by the world's leading investment firm, is being "saddled." *See* Exs., 9, 10.  Of course, the SEC knows better than to characterize this sophisticated and exceedingly valuable investment transaction undertaken by Wellington and Mozido, LLC as a fraud. Its efforts to deceive the Court in this way are inexcusable.

## II.     EVEN IF THE COMPLAINT ALLEGED A FRAUD, IT ALLEGES NO FRAUD BY DEFENDANT MARCUS

If the foregoing were not enough to warrant judgment for Mr. Marcus on the pleadings and appropriate sanctions, the following provides further reasons.

### A.  The Complaint is Dismissable Shotgun Complaint

This "Where's Waldo" Complaint refers 61 times in total to "Defendants," usually without any definite antecedents permitting Mr. Marcus to know whether he is included.  *See, e.g.,* Cplt. ¶¶ 2, 4, 18, 39, 54, 56, 58, 60, 62, 68, 69, 70, 71, 76, 78, 86, 89, 93, 94, 108, 121, 122, 127, 128, 129, 129(b), 129(e), 133. Many allegations refer to multiple named defendants without specifying who exactly said or did what.  [6]  References to "associates" (Cplt. ¶¶ 2, 4, 5, 95, 104,

---

[6] Only 22 allegations make allegations specific to Mr. Marcus.  (Cplt. ¶¶ 18, 31, 40, 43, 50(f), 53, 58, 66, 88, 99, 100, 103, 107(a), 107(d), 107(f), 112, 113, 115, 118, 129(a), 129(e), 129(f)).

105, 111) and "accomplices" (Cplt. ¶¶ 1, 91) are similarly undifferentiated.  For example, Paragraph 56 begins by identifying Hess, Liberty and Marcus, then focuses only on actions by Hess and Liberty, then concludes with a general "Defendants" reference.  It is not a defendant's job to try to figure out which allegations pertain to him and which to others.  The need to do so shows Rule 9(b) is unmet. *See Becher*, 829 F. 2d at 289 (core purposes of Rule 9(b) include "to place defendants on notice and enable them to prepare meaningful responses").

The Complaint should be dismissed outright as a "shotgun pleading." [7] "'Shotgun' pleadings" impermissibly "'incorporate every antecedent allegation by reference to each subsequent claim for relief.'" *SEC v. Morris*, 2012 WL 6822346, at * 6 (E.D. Mo. Sept. 21, 2012) (quoting *SEC v. Fraser*, 2009 WL 2450508, at * 14 (D. Ariz. Aug. 11, 2009).  That is exactly what the Complaint does here.  All claims against Mr. Marcus (which do not differentiate between the various subsections of the cited statutes) and the throw-in "alternative" aiding and abetting claims, are predicated on *all* the undifferentiated, immediately preceding Complaint allegations. [8]  All the preceding allegations of the substantive legal claims are incorporated in each following claim.  *See* Cplt. ¶¶ 134, 139, 143.

No specific factual allegations are tied specifically to Mr. Marcus or any other Defendant, and then matched up with the corresponding element of a specific legal claim against that individual defendant.  *See SEC v. Smith*, 2015 WL 4067095, at * 6, n. 5 (D. N.H. July 2, 2015)

---

[7] Mr. Marcus's Answer [ECF No. 19] reflects the Complaint's ambiguity, compelling denials "insofar as the allegations pertain to Mr. Marcus." *See* Answer, ¶¶ 1-7, 11-13, 39, 45-46, 48, 50, 52-56, 58, 60, 62-63, 68 -72, 76, 78, 86, 88 -91, 93-95, 99-100, 105-109, 111-119, 121-123, 126-129; Second Affirmative Defense: "The Commission's Complaint fails because allegations of the Complaint are not stated with sufficient particularity.  For instance, the Commission's use of the terms 'defendants,' 'associates,' and 'accomplices' throughout the Complaint fail to specify which defendants the Commission alleges are involved in each allegation;" Seventeenth Affirmative Defense: Complaint's allegations "are uncertain and ambiguous."

[8] The Complaint's "Statement of Fact" allegations mentioning Mr. Marcus, usually with other Defendants,  are at ¶¶ 31, 40, 43, 45, 46, 46(a), 49, 50(f), 53, 55, 56, 58, 62(d), 66, 68(b), 71, 72, 86, 88, 99, 100, 103, 106, 107, 107(a), 107(c), 107(d), 107(f), 108, 109, 109(a), 111(a), 112, 113, 114, 114(b), 114(c), 115, 116, 117, 118, 119, 126, 127, 129, 129(a), 129(e), 129(f), 129(g).

(criticizing complaint like SEC's here and citing *SEC v. Patel*, 2009 WL 3151143, at * 2 (D. N. H. Sept. 30, 2009), as having "cautioned" SEC about 'shotgun pleading'").  Some Courts have permitted the repleading of a shotgun Complaint, [9] but dismissal with prejudice is proper here. First, shotgun Complaints necessarily fail Rule 9(b)'s particularity test.  *See, e.g., Fraser*, 2009 WL 2450508, at * 14-15; *SEC v. Mercury Interactive*, 2008 WL 4544443, at * 8 (N.D. Cal. Sept. 30, 2008); *Patel*, 2009 WL 2015794, at * 1-2.  Second, the SEC is properly held to strict compliance with the First Circuit's stringent Rule 9(b) test. *See, e.g., SEC v. Fisher*, 2008 WL 2062699, at * 4 (N.D. Ill. May 13, 2008) (SEC's "veritable army of trained attorneys"); *SEC v. Arthur Young & Co.*, 584 F. 2d 1018, 1022-23 (D.C. Cir. 1978) (SEC's  resources and subpoena power "to conduct investigations").  Third, the SEC began investigating this case no later than May 2012 (*see* Ex. 7 (00212), and was investigating in 2016 when it subpoenaed a former Mozido director "for information about Mozido and its dealings with Liberty" (Ex. 13 (00748) and subpoenaed the Liberty affiliates' accounting firm.  *See* Ex. 14.  The SEC had abundant time, and access to extensive pre-suit discovery, to frame intelligible allegations—if any could be honestly made--linking specific supposed facts to the elements of the claims against Mr. Marcus.  A securities fraud complaint, particularly one grounded in misrepresentation of the factual record, is not a vehicle to go looking for a case. *See Becher*, 829 F. 2d at 288-89. Fourth, the SEC has been repeatedly warned that its shotgun pleadings are impermissible.  *See, e.g., Fraser*, 2009 WL 2450508, at * 13 (citing *Mercury Interactive*, 2008 WL 4544443, at * 8); *Patel*, 2009 WL 2015794, at * 1-2); *SEC v. Smith*, 2015 WL 4067095, at * 6, n. 5; *SEC v. Seethruequity, LLC*, 2019 WL 1998027, at * 3 (S.D.N.Y. Apr. 26, 2019).

---

[9] *See, e.g., S.E.C. v. Fraser*, 2009 WL 2450508, at * 16 (D. Ariz. Aug. 11, 2009); *U.S. ex rel Cunningham v. Millenium Laboratories of California, Inc.*, 713 F. 3d 662, 664 n. 2 (1st Cir. 2013) (shotgun pleading in Rule 12(b)(1) context; "a pleading deficiency is usually addressed by motion for a more definite statement").

**B**. **The Complaint Alleges No Scienter as to Mr. Marcus**

Scienter allegations of knowing and intentional wrongdoing satisfying Rule 9(b) are required for the SEC's Section 10b and Rule 10b-5(b) misstatement/omission claims (*Flannery v. S.E.C.*, 810 F. 3d 1, 9 (1st Cir. 2015)); scheme liability claims under Rule 10b-5(a), (c) (*SEC v. Kabra*, 2020 WL 1550555, at * 3 (D. Mass. Apr. 1, 2020)) and Section 17(a)(1) (*Flannery,* 810 F. 3d at 9); and the aiding and abetting claims. *See Mansor v. JP Morgan Chase Bank, N.A.*, 183 F. Supp. 3d 250, 264 (D. Mass. 2016) ("'aiding and abetting claim requires allegations of facts that give rise to a strong inference of actual knowledge'" (quoting *In re Agape Litig.*, 773 F.Supp. 2d, 298, 308 (E.D. N.Y. 2011) (further citations omitted)). *See also Tambone*, 550 F. 3d at 144 (aiding and abetting requires "knowing" participation; silence or omission can show knowledge if "consciously intended" to further principal violation).

Analyzing the Complaint "in its entirety" (*Tambone*, 550 F. 3d at 120) turns up no scienter allegations satisfying Rule 9(b) as to Mr. Marcus, compelling dismissal of all the scienter-required claims.  The Complaint nowhere alleges that Mr. Marcus had the required "'conscious intent to defraud or a high degree of recklessness'" (*SEC v. Telexfree, Inc.*, 301 F. Supp. 3d 266, 270 (D. Mass. 2018)), so extreme that it is "a lesser form of intent."  *Greebel*, 194 F. 3d at 188.   Conspicuously absent are factual allegations of any admissions, documents showing Mr. Marcus was aware of any wrongdoing, and Mr. Marcus's participation in communications reflecting knowledge of any deception. The vast majority of the Complaint's allegations of supposedly material deceptive statements and conduct misstate the true documentary record, and focus entirely on the other defendants, acting without any alleged involvement or knowledge whatsoever by Mr. Marcus.  *See, e.g.,* Cplt. ¶¶ 34, 35-38, 41, 44, 47,

48, 50, 51, 54, 55, 59, 61, 64, 65, 67, 74, 75, 77, 78, 79, 80-85, 89, 92, 95, 96, 97, 98, 104, 108(a)-(d), 110, 128, 130, 131.

### 1.   The Actual Facts, In Contrast to Conclusory Allegations, Show No Scienter

The Complaint alleges the transactions were deceptive (*see, e.g.,* Cplt. ¶¶ 43, 62, 63, 71, 86, 90, 99), but the documents show only conventional legal terms, agreed to by Accredited Investors, revealing no "scienter" whatsoever.  *See, e.g.,* Exs 1-4.   The indisputable economic truth that the conversion option strike price was *not* a representation of Mozido's value, and the actual IOLTA arithmetic showing all investor monies were transferred to Mozido, conclusively contradict any claim or inference of Mr. Marcus's scienter.  Far from showing scienter, the massive Wellington investment (Cplt. ¶ 120) showed Mr. Marcus had every reason to believe the investment program was entirely proper.  Alleging a few instances in which Mr. Marcus personally communicated with investor representatives or their lawyers (*see, e.g.,* Cplt. ¶¶ 53, 107(d), 112, 113, 129(e)) the Complaint nowhere shows that Mr. Marcus's statements were incorrect, or that he sought or promoted investments, handled sales, told investors how funds would be used, made any representations about Mozido's underlying valuation, or did anything but legitimate legal work for the issuers.

The Complaint's allegations about "other counsel" involved in the First Rescission Offer (Cplt. ¶ 58), and Mr. Liberty's hiring of "new securities counsel" (Cplt. ¶ 73) (*see also* Exs. 5 (00121) ("[a]fter discussing the offering with our new counsel; 6 (p. 00151) (same);) further negative any scienter inferences.  Mr. Marcus was not securities counsel.  *See also* Exs. 6 (00170) (Lowndes, Drosdick firm), 7 (Secs. 7.05, 7.07 (p. 00255) (Brownstein Hyatt firm).  No allegations say these "other counsel" alerted Mr. Marcus to any problems.  Mr. Hess's writing to Mr. Liberty that his "[new] securities attorneys" needed "to know the whole story," including

facts about the number of investors and lack of Accredited Investor status (Cplt. ¶ 73), is not alleged to have gone to Mr. Marcus. Finally, in clanging contrast to the SEC's scurrilous allegation of knowing deception by Mr. Marcus (Cplt. ¶¶ 116-118)), the document to which the SEC selectively refers reveals Mr. Marcus's complete lack of scienter. The omitted text underscores the SEC's extraordinary lack of candor:

> I have advised Michael [Liberty] on the corporate side – i.e. his entities and the documentation, while Brownstein Hyatt, a major law firm in Denver, has advised Michael on the securities side. The Brownstein firm and I are satisfied that what Michael is doing is entirely legal. At my instigation, we had a conference call among myself, Jeff Knetsch of Brownstein, and Layne Deutscher and his partner [Mozido counsel] to answer questions and be sure the Mozido legal counsel was up to speed on how Michael [Liberty] was raising funds…the upshot of this conference is that while there might be some debate about 'best practices' – there always is – Michael's fundraising program has been blessed by competent securities counsel and is in compliance with the law. (Ex. 12 (00742)).

## 2. Conclusory Allegations as to Mr. Marcus do not Show Scienter

The Complaint's generalized, conclusory and vague allegations naming Mr. Marcus show not scienter but at most "guilt by association."[10] No particularized facts show the Rule 9(b)-required specific hows, whats, wheres, and whens (*see Dumont v. Riely Foods Co.*, 934 F. 3d 35, 38 (1st Cir. 2019)) of the alleged actions. "Marcus too" and "Marcus knew" guilt-by-association allegations fail to show a conscious intent to defraud or recklessness so extreme as to be "a lesser form of intent." *Greebel*, 194 F. 3d at 188.

First, the direct "Marcus knew" allegations are few and conclusory, beggaring Rule 9(b). *See, e.g.,* Cplt. ¶¶ 43, 46(a), 52, 58, 62(d), 71, 99, 100, 107(c), 107(d), 107(f), 108, 111(a), 129(g). Failing Rule 9(b), these naked "Mr. Marcus knew" allegations are all contradicted by the documentary record,

---

[10] In light of the page limits, this Memorandum cannot dissect every allegation mentioning Mr. Marcus in light of the required legal claim elements but will proceed using examples of the uniformly deficient allegations.

Second, the conclusory allusions to Mr. Marcus's "assistance," that he "read, reviewed, approved" certain things, omitting any reference to what was read or reviewed or approved, when and in what context, and other vague references to certain actions, fail Rule 9(b) and support no inference of scienter.  *See, e.g.,* Cplt. ¶¶ 45, 46, 58, 68(b), 72, 86, 103, 109(a), 111(a), 114(b), 126, 127.  *See, e.g., SEC v. Fraser*, 2009 WL 2450508 at * 8 (dismissal for failure to allege facts of defendant's involvement in reviewing and discussing SEC filings); *SEC v. Berry*, 580 F. Supp. 2d 911, 922 (N.D. Cal. 2008) ( insufficient allegations that defendant "reviewed" and "discussed" various filings).

Third, the allegations concerning investor money into Mr. Marcus's firm's IOLTA (*see* Cplt. ¶¶ 10, 48(a), 77(b), (108) show the opposite of scienter for the reasons described above. The "commingling" to which the Complaint darkly refers is mandated. (Maine Bar R. 6(c)(1)).

### 3.  No Allegations Show any Motive to Deceive

Analyzing motive is probative in determining the sufficiency of scienter allegations.  *See In re Cabletron Sys. Inc.*, 311 F. 3d 11, 39 (1ˢᵗ Cir. 2002).  Scouring the Complaint for  facts showing any motive Mr. Marcus might have had to sacrifice his excellent professional reputation by knowingly deceiving anyone or acting with "a high degree of recklessness" (*Ficken*, 546 F. 3d at 47) turns up nothing.  No facts plead in the Complaint show or even imply that Mr. Marcus was himself an investor in any offering, or had any stake whatsoever in any of the offerings, the sale of any of the  notes, or any Issuer.  To the contrary, the Complaint (inaccurately, *see* Ex. 8) alleges "most" of the funds raised "went to fund Liberty's lifestyle" (Cplt. ¶ 1) and to benefit other defendants.  *See* Cplt. ¶¶ 4, 24, 36, 45, 48, 63(b), 67, 91, 95, 98, 108(c), 114, 121.

The SEC's allegations that "Marcus obtained money (in the form of legal fees) from the Defendants' fraudulent misrepresentations and omissions" (*see* Cplt. ¶ 18) and received a

"personal benefit" from Brentwood Offering proceeds (Cplt. ¶ 114) are utterly conclusory.  No

pleaded facts link payment of any legal fees or other benefits to Mr. Marcus, directly or

indirectly, as consideration for services promoting any fraud.  No facts show Mr. Marcus had any

intent to defraud anyone so that he could receive legal fees for doing so or that his legal fees

were contingent on any offering.  Just as "personal financial gain may weigh heavily in favor of

a scienter inference" (*Tellabs*, 551 U.S. at 325), the utter absence of any plausible allegation of

such gain weighs heavily against any such inference.  *Cf. SEC v. Wey*, 246 F. Supp. 3d 894, 910,

923 (defendant lawyer's practice depended on fraud scheme, without which his "legal practice

would have ceased to exist").

A lawyer's incentive to get paid for work, and maintain a client relationship, does not

establish scienter.  *See In re DNTW Charted Accountants Sec. Litig.*, 96 F. Supp. 3d 155, 164

(S.D.N.Y.2015) ("generalized economic interest in professional fees is insufficient to establish

an accounting firm's motive to commit fraud" (quoting *In re Philip Serv. Corp. Sec. Litig.,* 383

F.Supp.2d 463, 470 (S.D.N.Y.2004));  *Affco Investments, LLC v. KPMG, LLP*, 2009 WL

3248052, at * 5 (S.D. Tex. Sep. 28, 2009) ( "allegation of motive to perpetrate fraud based upon

a desire to receive professional fees is insufficient" to show scienter). [11]

## B.  The Complaint Alleges No Actionable Misstatements or Omissions

A misstatement/omission claim under Section 10(b) and Rule 10b-5 requires the SEC

plausibly to allege facts satisfying Rule 9(b) showing that Mr. Marcus "(1) made a material

misrepresentation or a material omission as to which he had a duty to speak…(2) with scienter;

---

[11] Mr. Marcus's utter lack of scienter, and the fundamental fact that he participated in no fraud whatsoever, demonstrate the SEC's request for injunctive relief (Cplt. ¶¶ 7(a), 138, 142, 146) is baseless.  *See, e.g., SEC v. Sargent*, 329 F. 3d 34, 39 (1ˢᵗ Cir. 2003). Nothing shows any violation, let alone any reason to think Mr. Marcus, with a long unblemished history of professional excellence and high ethical standards, would commit one in the future.

(3) in connection with the purchase or sale of securities' in interstate commerce." *SEC v. Wall*, 2020 WL 1539919, at * 6 (D. Maine March 31, 2020) (recommended decision) (quoting *SEC v. Cole*, 2015 WL 5737275, at * 5 (S.D.N.Y. Sept. 19, 2015)).  All misstatement/omission claims against Mr. Marcus fail for lack of scienter and because the documents show these claims are false.

### 1.   Alleged Core Misstatements/Omissions Misrepresented Nothing

No allegation shows Mr. Marcus telling any investor anything about how invested funds would be used.  The "valuation" misstatement/omission claims (*see, e.g.,* Cplt. ¶¶ 68(b), 107(d)) are based on the sophomorically incorrect assertion that a conversion option/strike price establishes the present value of the optioned asset. Mr. Marcus's allegedly misleading statement about a "commonality of interest" in "further equity raises" not being "dilutive on a value basis" to an "investor's representative" (Cplt. ¶ 50(f)) stated only the truism that value dilution differs enormously from percentage dilution.  Omitting that Mr. Marcus was writing to an investor's lawyer, this allegation also omits crucial text: "…there is no anti-dilution protection for sales of equity at a later date…To be sure, if further equity has to be raised, it will be dilutive on a percentage basis…" *See* Ex. 18. Concerning the alleged "no commissions were paid" deception (Cplt. ¶¶ 34, 36, 37, 38, 48(b), 55, 62(d), 73, 74), no allegation shows Mr. Marcus ever communicating with any investor about that issue.  The June 13, 2012 Exchange Offer disclosed the issue anyway.  *See* Cplt. ¶ 62(d); Ex. 5 (00121).

### 2.   No Misrepresentations or Omissions by Mr. Marcus in Offerings.

Asserting that Mr. Marcus wrote at an unidentified time to an unidentified investor to say that the SEC's prior allegations against Mr. Liberty were "entirely false" (Cplt. ¶ 53), the Complaint makes no allegation that Mr. Marcus was wrong, that the opinion was not "honestly believed

when made" (*Fait v. Regions Fin. Corp.*, 655 F. 3d 105, 112 (2d Cir. 2011) or that it could be

material to an Accredited Investor who agreed to rely on her own due diligence and own advisors

(*see* Exs. 1 (Sec. 4(d) (p. 00017), Sec. 4(k) (p. 00018); 2 (Sec. 4(b) (p. 00044), 3 (Sec. 4(b)-(n)

(p. 00070-00071), 4 (Sec. 4(c), (d), (g), (k), (l), (m), (n) (00099-00101)) and could research the

matter with one Google click. That opinion was "'fairly align[ed] with the information in [Mr.

Marcus's] possession at the time.'" *SEC v. Mahabub*, 343 F. Supp. 3d 1022, 1045 (D. Colo.

2018) (quoting *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575

U.S.175, 189 (2015). *See* Ex. 17 (00848) (no admission of liability)

Mr. Marcus's "good to hear" response to an unidentified MDO board member that

"Mobile Tech accepted that the next round of MDO's financing would be at an even lower

valuation: "$8 Million" (Cplt. ¶ 66) shows only that Mr. Marcus was glad to hear that MDO

would be getting more funding.  Nothing connects this immaterial remark to any

misstatement/omission liability, and certainly not to any investor concerning the purchase or sale

of securities.  *See* 15 U.S.C. § 78j(b); 15 C.F. R. § 240.10b-5.  Paragraph 106 alleges "[i]n

touting the Brentwood Offering, Liberty, Marcus and Rick Liberty frequently lied about or

concealed critical facts," followed by supposed examples in the next paragraph.  The two

examples concerning Mr. Marcus (Cplt. ¶¶ 107(d), (f)) allege unfounded "valuation deceptions."

Mr. Marcus's supposed "describ[ing]" of Mozido's financial condition (Cplt. ¶ 129(a)) -

to whom and in what form the Complaint nowhere says – appears to be a purely internal

communication, reflecting no disclosure duty or any other basis for liability.  No facts

establishing any disclosure duty are pleaded for Mr. Marcus's alleged nondisclosure of

"Mozido's defaults and precarious financial condition," or "other financial information" (Cplt. ¶

129(e).  Mr. Marcus, an attorney, having retained outside securities lawyers to advise his clients

with respect to the offerings in question, was ethically bound ***not*** to disclose facts about his client to anyone. Besides, no allegations provide context or show any untruth here.

The allegation that Mr. Marcus "perpetuated Defendants' prior lies about valuation when he misled investors about the 'triple liquidation preference'" (Cplt ¶ 129(e)) lacks any Rule 9(b) "who, what, when, where" facts. No allegation shows Mr. Marcus's comments about the "triple liquidation preference" were not entirely consistent with the definition of the term in the Mozido Operating agreement.  In fact, they were, as examination of the document shows. *See* Ex. 15 (00795; 00809-00817).

Conclusorily alleging Mr. Marcus also "knew how investors' money was being used, but misled investors into believing the money was being used for MDO" (Cplt. ¶ 108), the Complaint nowhere shows Mr. Marcus communicating with any investor about how funds raised were used.  *See* Ex. 19 (two Brentwood Offering investors affirm complete lack of knowledge of or communications with Mr. Marcus).  Mr. Marcus knew from the IOLTA record (Ex. 8) that more money went out to Mozido from the IOLTA account than came in from investors.

Alleging Mr. Marcus "hid" a lawsuit against Mr. Liberty by an MDO board member (Cplt. ¶ 111(a), the Complaint nowhere alleges facts to show Mr. Marcus had a duty to inform anyone about a lawsuit against his client. *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (Section 10(b) Rule 10b-5 "do not create an affirmative duty to disclose any and all material information.  Disclosure is required under these provisions only when necessary to make…statements made, in light of the circumstances under which they were made, not misleading" (additional cites omitted)).  The Complaint does not say from whom this fact was supposedly withheld, whether any investor asked about it, whether there was anything about the lawsuit that was material, or any particulars of the supposed concealment. *See Durgarian*, 477 F.

Supp. 2d at 350 (D. Mass. 2007) (duty to disclose is required for omission claim).  Lawsuits are matters of public record, and all investors expressly affirmed they relied solely on their own due diligence.  *See* Exs. 1 (Sec. 4(d) (p. 00017), Sec. 4(k) (p. 00018), 2 (Sec. 4(b) (p. 00044), 3 (Sec. 4(b)-(n) (00070-00071), 4 (Sec. 4(c), (d), (g), (k), (l), (m), (n) ( 00099-000101)).

The allegation that Mr. Marcus misled "investors and their legal counsel" about the meaning of the triple liquidation preference" (Cplt. ¶ 112) refers to a September 10, 2012 email (Ex. 19), but identifies no error or misstatement made by Mr. Marcus and  no respect in which the  definition of the "triple liquidation preference" in applicable documents varies from what Mr. Marcus described.  The allegation that Mr. Marcus falsely stated that the liquidation preference "provid[ed] for a payout of three-times the investor's purchase price for Brentwood Offering Promissory Notes, plus a pro rata share of additional available funds" is just wrong. Mr. Marcus made no such statement, as the actual document shows.  He referred the investor's legal counsel, to whom he was writing, to the "operating agreement for Mozido," correctly stating: "w[]hat it means is that when Mozido is sold, all of the issued and outstanding preferred units get 3 times the face amount of the preferred units (note, not 3 times the amount of the convertible note), and then they share in the remaining upside, on a pro rata basis." *See* Ex. 19. Mr. Marcus' description is consistent with the applicable documents.  *See* Ex. 15 (00795; 00809-00817).

Alleging Mr. Marcus said Mr. Liberty was a "victim" of the SEC (Cplt. ¶ 113), the Complaint again fails Rule 9(b), identifying nothing untrue in the statement, any facts showing that opinion was not honestly held or was contradicted by facts Mr. Marcus then possessed.

The allegation that Mr. Marcus, with Liberty and Abbass, "hid Liberty and Abbass's misappropriation of the investors' money through false statements and omissions in the Form Ds

filed with the SEC" (Cplt. ¶ 114) states no claim against Mr. Marcus. No facts show how the "hiding" was done. The IOLTA record shows no misappropriation. No Rule 9(b)-satisfying facts – no facts at all - show what constituted Mr. Marcus's "work" on the Form Ds and Form D/As, all of which were signed by Defendant Abbass. *See* Cplt. ¶¶ 114(a)-(c). *See also* Cplt. ¶ 78 (Liberty and Abbass signed previous Forms D/A, no allegation of any role of Mr. Marcus).

Alleging that "Defendants did not tell investors that $15 MM of investment proceeds from the institutional investors [Wellington] were used by Mozido to settle a threatened lawsuit" (Cplt. ¶ 121), the Complaint specifies no particular Defendant, states no facts showing Mr. Marcus had any disclosure duty about this and no facts showing such use of the investment proceeds was imprudent or disadvantageous.  Wellington knowingly made these investment proceeds available to settle the lawsuit as part of its overall investment in Mozido. Ex. 9 (00512). The plausible inference is not deception but that Wellington believed such use to be prudent.

The few misrepresentation/omission allegations specifically mentioning Mr. Marcus concerning the Brentwood Exchange Offer all fail to support any Section 10(b) or Rule 10b-5 claim.  Referring to an apparently internal April 8, 2016 communication in which Mr. Marcus supposedly described Mozido's financial straits (Cplt. ¶ 129(a)), the Complaint does not say to whom this description was provided, the form or manner of its communication, or in any way link it to the purchase or sale of any securities.  Moreover, the documentary record shows that the Brownstein, Hyatt firm was then representing Mozido concerning all securities matters, not Mr. Marcus, who had a duty as attorney not to make disclosures to anyone. Claiming that Mr. Marcus did not inform "the manager of an investment group" about "Mozido's defaults and precarious financial condition or provide any other financial information" (Cplt. ¶ 129(e)), the

Complaint provides no specifics, and nothing showing Mr. Marcus had any duty to say anything. *See Matrixx*, 563 U.S. at 44.

The allegation that Mr. Marcus did not "tell investors that MDO had defaulted on a large loan," that "investors' holdings were significantly diluted" and that Mozido's preferred shareholders had "a nearly $1 Billion liquidation preference" (Cplt. ¶ 129(f)) provides no specifics, for example, no allegations of any facts creating any disclosure duty for Mr. Marcus.

### 3.  Mr. Marcus Is Not Liable for Statements He Neither Made nor Controlled.

To the extent the Complaint seeks to hold Mr. Marcus liable for misstatements he did not personally make or over which he exercised no ultimate control (*see, e.g.,* Cplt. ¶¶ 68(b), 100, 107(f), 114(b), (c)), the Complaint fails to state a Section 10(b) or Rule 10b-5(b) claim.  No facts are alleged showing that Mr. Marcus, acting as corporate counsel, had or purported to exercise "ultimate authority" (or any authority) over any of the documents provided or statements made to investors or the SEC by the investment's promoters.  *See Lorenzo v. SEC*, __ U.S. __, 139 S. Ct. 1094, 1098-99 (2019) (discussing *Janus Cap. Group, Inc., v. First Deriv. Traders*, 564 U.S. 135, 142, 143, 145 (2011): "'*maker* of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it'" (emphasis by *Lorenzo* court)). [12] Drafting (allegedly) transaction documents (*see, e.g.,* Cplt. ¶¶ 43, 99, 103) or emails for use by another (*see, e.g.,* Cplt. ¶ 107(f)) or forwarding documents over which others exercised ultimate authority (*see, e.g.,* Cplt. ¶¶ 99, 100) without any intent to deceive, is insufficient for Rule 10b-5(b) liability.  *See Janus*, 564 U.S. at 145 (investment adviser who

---

[12] Some cases have questioned whether the *Janus* rule applies in SEC civil enforcement actions.  *See, e.g., SEC v. Garber*, 959 F. Supp. 2d 374, 381 n. 50 (S.D.N.Y. 2013).  Others have found it does.  *See, e.g., SEC v. Kelly*, 817 F. Supp. 2d 340, 343 (S.D.N.Y. 2011) (SEC conceded *Janus* rule applied to Rule 10b-5(b) misstatement claim). *See generally SEC v. Benger*, 931 F. Supp. 2d 908, 911 n. 1 (N.D. Ill. 2013) ("at oral argument the SEC represented that it was not taking the position that *Janus* does not apply to the SEC). Tellingly, the Supreme Court's *Lorenzo* scheme liability ruling turned on the *Janus* rule's protection of the defendant from misstatement liability in an SEC case.

"participat[ed] in the drafting of a false statement" "made" by another not liable under Rule 10b-5(b)).

### 4.  No Facts Show Mr. Marcus Owed any Disclosure Duty to any Investor

Mr. Marcus was allegedly corporate counsel for the issuer in all the alleged offerings. *See, e.g.,* Cplt. ¶¶ 3, 18, 40, 43, 58, 66, 72, 86, 99, 126. [13]  Other law firms (Downdes Londrick; Brownstein Hyatt) acted as securities counsel.  As such, Mr. Marcus owed duties of confidentiality (*see* MRPC 1.6) and zealous representation (*see* MRPC 1.3) to Mr. Liberty and Mr. Liberty's companies.  These duties are entirely inconsistent with the Complaint's underlying premise that Mr. Marcus had some general duty to disclose facts to his client's counterparties, the investors.  No allegation shows that Mr. Marcus had any communications of any kind with investors except for the few times they or their lawyers contacted him.  Rather, the Complaint proceeds on the absurd theory that the attorney for a securities issuer, who has no relationship with any investor, and has never even spoken with an investor about any potential investment, nevertheless has an unlimited affirmative duty to "tell all." That is not the law.  *See Matrixx,* 563 U.S. at 44.  The Complaint's allegations of supposed omissions and concealments by Mr. Marcus (*see* Cplt. ¶¶ 43, 49, 68(b), 99, 103, 106, 111(a), 114, 129(f)) fail to allege facts showing that Mr. Marcus owed a duty to make disclosures to the allegedly deceived investors.  *See Tambone*, 597 F. 3d at 447 (parties to market transaction owe each other no disclosure duty absent fiduciary or agent relationship, prior dealings, or special "trust and confidence" circumstances).

### C.  The Complaint's Section 17(a)(2) Claim Fails

---

[13] The allegation that the MDO Board was Mr. Marcus's client (*see* Cplt. ¶ 88) is factually unsupported and internally contradictory, also stating "on or about May 2012, Liberty and Marcus persuaded the MDO board to authorize the conversion of Family Mobile's interests in MDO…." Family Mobile was a Liberty company.  *See* Cplt. ¶¶ 20, 68(a).

To the extent the Complaint alleges a Section 17(a)(2) claim – it does not expressly say so - it fails Rule 9(b).  The SEC must factually allege  that Mr. Marcus received "money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."  15 U.S.C. § 77q(a)(2).  Mr. Marcus must have received such money himself.  *See S.E.C. v. DiMaria*, 207 F. Supp. 2d 343, 358 (S.D.N.Y. 2016).

Only two allegations about "receipt of money or property" are possibly relevant for a Section 17(a)(2) claim. First, that Mr.  Marcus "obtained money (in the form of legal fees) from the Defendants' fraudulent misrepresentations and omissions in the course of the securities offerings." Cplt. ¶ 18. Second, that Mr. Marcus, with Defendants Liberty, Abbass, Hess, and Rick Liberty received a "personal benefit" from Mr. Liberty's alleged misappropriation of "most of the $31.4 Million raised through [the] Brentwood Offering."  Cplt. ¶ 114.  Both allegations are purely conclusory.  As the scienter discussion above demonstrates, no facts show that Mr. Marcus ever personally received, directly or indirectly, investment proceeds paid to his client, or in what amount. [14]  The answer is "None." [15] No facts appear about Mr. Marcus's "compensation and how any false statement may have benefited him."  *Wey*, 246 F. Supp. 3d at 915.  *See also DiMaria*, 207 F. Supp. 3d at 358 (dismissing Section 17(a) claim where "the SEC does not allege any chain of events, however attenuated, that concludes with [the defendant] receiving money or property as a result of the alleged scheme").

### D.  The Complaint's Scheme Liability Claims Fail

---

[14] The only possible allegation about "receipt" of funds concerns money paid into Mr. Marcus' firm IOLTA account. This account, of course, holds money for clients to which Mr. Marcus has no personal entitlement.

[15] Accordingly, the Complaint states no claim for "disgorgement." Disgorgement is a form of restitution for an unjust enrichment , requiring a securities law violator to repay to the government the net profits realized through the violation. *See, Liu v. SEC*, __U.S. __, 140 S. Ct. 1936, 1940-41 (2020). Here the SEC alleges not a penny of profits Mr. Marcus realized from any wrongdoing.

Repeatedly invoking "scheme" liability (*see, e.g.,* Cplt. ¶¶ 1, 2, 4, 6(a), 10, 39, 58, 69, 86, 93, 116, 118, 123, 124, 135, 136, 140), the Complaint nonetheless sets forth no viable claim of "scheme liability" under Rule 10b-5(a), (c) or under Section 17(a), (c).  First, the shotgun complaint warrants dismissal of the scheme liability claim.  *See SEC v. Patel*, 2009 WL 3141143, at * 5 ("shotgun pleading" where relevant count "does not, itself, describe any scheme at all…leaving it to the reader to deduce the outlines of the specific unlawful scheme charged").  The scheme liability further fails for lack of specific facts alchemizing Mr. Marcus's corporate legal work into substantial participation in violative "devices, schemes or artifices" or "courses of business."  Nothing shows any "inherently deceptive conduct" by Mr. Marcus, the touchstone of scheme liability.  *In re AT&G/DirecTV Now Sec. Litig.*, 2020 WL 4909718, at * 17 (S.D.N.Y. Aug. 18, 2020) (citation omitted).

## 1. No Scienter, Deceptive Device or Course of Business, or Substantial Participation

As shown above, the Complaint shows no scienter, dooming the scheme claims under Rule 10b-5(a), (c) and Section 17(a)(1).  Nor does any negligence-based scheme liability claim (Section 17(a)(3)) survive.  The Complaint alleges no "deceptive device" Mr. Marcus used "for the purpose of defrauding investors."  *See SEC v. Esposito,* 2017 WL 388800, at * 6 (D. Mass. Jan. 17, 2017).  Nor does it allege that Mr. Marcus "'substantially participated' in the alleged scheme and acted with scienter."  *Bio-Defense*, 2019 WL 7578525, at * 21 (quoting *Durgarian*, 477 F. Supp. 2d at 353).

Laying the vast majority of the allegedly wrongful conduct at other Defendants' doors (*see, e.g.,* Cplt. ¶¶ 24, 34-38, 44, 47, 50-52, 54-55, 61, 64, 66, 67, 74-75,79-85, 89, 92, 95-98, 100-101, 104, 107(b),( e), 108(a)-(d), 110(a)-(g), 125, 128, 129(c)-(d), 130-131, 148-150) the

Complaint fails plausibly to allege Mr. Marcus was a "substantial participant" in any of the allegedly wrongful conduct of others for scheme liability (or any other) purposes.

The involvement of numerous sophisticated securities lawyers, left out of the Complaint, shows Mr. Marcus had no reason to think any "scheme" was afoot or that he was somehow part of one. *See* Exs. 6 (00152) (Second Rescission Offer handled by Lowndes, Drosdick), 7 (Exchange Offer, Secs. 7.05, 7.07 (00255) (handled by Brownstein Hyatt); Ex. 9 (p. 00507) (Wellington transaction opinion letter by Wilson, Sonsini, Goodrich & Rosati as counsel for Mozido, Inc.); Ex. 12 (00742) (Brownstein Hyatt and Mozido's counsel found fundraising program "in compliance with law").

The Supreme Court's most recent scheme liability case, *Lorenzo v. SEC*, __ U.S. __, 139 S. Ct. 1094 (2019), shows why any scheme liability claim fails here. *Lorenzo* presented a difficult case. Under *Janus* misstatement/omission liability was precluded because the defendant was not the "maker" of the two false emails he disseminated. But the *Lorenzo* defendant had admitted to committing fraud (*id.* at 1101, 1109), and adherence to precedent that precluded scheme liability based on misstatements/omissions would have permitted an admitted fraudster to escape liability. Concluding that sending knowingly fraudulent emails sufficed for scheme liability, the Court found that "using false representations to induce the purchase of securities would seem a paradigmatic example of securities fraud." *Id.* at 1103.[16]

---

[16] Any argument that *Lorenzo* greatly expanded the scope of scheme liability by blurring the line between "conduct" and "misstatement/omission" liability is premature if not incorrect. The Court recognized that applying the scheme liability provisions "may present difficult problems of scope in in borderline cases" and that "[p]urpose, precedent and circumstance could lead to narrowing their reach in other contexts" but "we see nothing borderline about this case." *Lorenzo v. S.E.C.*, __ U.S. __, 139 S. Ct. 1094, 1101 (2019). *See, e.g., S.E.C. v. Ustian*, 2019 WL 7486835, at * 39-40 (N.D. Ill. Dec. 13, 2019) (responding to SEC's argument that *Lorenzo* "changes the calculus and removes the requirement that the SEC prove conduct separate and apart from misstatements for scheme liability to attach" by "question[ing] whether *Lorenzo* warrants an expansive reading to allow scheme liability solely on the making of false or misleading statements, as the SEC advocates," and "declin[ing] to make a definitive ruling on the required showing for scheme liability after *Lorenzo* at this time").

Starkly different from the *Lorenzo* defendant, Mr. Marcus sought to ensure the fundraising program complied with the law. *See* Ex. 12 (00742). Nothing factually shows Mr. Marcus perpetrated any fraud, disseminated any false statements to anyone, or that he knew about any such false statements, used or knew about any other deceptive "device," participated in any "scheme," employed any "artifice" or that he did so with the required scienter. *Cf. Malouf v. S.E.C.*, 933 F. 3d 1248, 1261(10th Cir. 2019) (following *Lorenzo* and finding scheme liability where defendant himself created the fraud and failed to correct misstatements perpetrating that fraud).

### 2. Mr. Marcus Created No False Appearance of Fact or Acted with Deceptive Purpose and Effect

For scheme liability, the alleged conduct must have "had the principal purpose and effect of creating a false appearance of fact in furtherance of the scheme.'" *Patel*, 2009 WL 3151143, at * 9 (quoting *S.E.C. v. Berry*, 580 F. Supp. 2d 911, 923 (N.D. Cal. 2008) (further citation omitted) (emphasis by *Patel* court). Further, "'[i]t is not enough that a transaction in which the defendant was involved had a deceptive purpose and effect; the defendant's own conduct contributing to the transaction or overall scheme must have had a deceptive purpose and effect.'" *Patel*, 2009 WL 3151143, at * 9 (quoting *Berry*, 580 F. Supp. 2d at 923) (further citation omitted) (emphasis by *Patel* court)). Such conduct must be "inherently deceptive when performed." *SEC v. Kelly*, 817 F. Supp. 2d 340, 344 (S.D.N.Y. 2011). No allegations show anything that Mr. Marcus did or said had a "deceptive purpose or effect." The documents on which the SEC relies establish the exact opposite. Subsequent actions or statements by another defendant that may have turned Mr. Marcus's work or statements to deceptive purpose or effect does not create scheme liability for Mr. Marcus. *See Kelly*, 817 F. Supp. 2d at 344.

Anyway, here the investments were real, the Issuers were real, and Mozido was real, with a prestigious Board, institutional investors, employees and real business. *See, e.g.,* Exs. 5-7. The Complaint nowhere alleges anything different. Every investor got what they bargained for - convertible notes with the right to convert to equity. No allegations show Mr. Marcus had anything whatsoever to do with any Issuer's failure to repay unconverted promissory notes, or the lack of value in any notes converted to equity. *See In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 2006 WL 6892915, at * 4, n. 14 (S.D. Tex. Feb. 2, 2007) (citing *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 505 (S.D.N.Y. 2005) for no scheme liability where transactions "not shams and did not depend on any fictions").

### E. The Complaint's Aiding and Abetting Claims Fail

Relying on conclusory "Marcus knew" allegations (*see, e.g.,* Cplt. ¶¶ 43, 45, 46(a), 50, 52, 58, 62(d), 71, 99, 100, 107(c), 107(d), 107(f), 108, 109(a), 111(a), 129(g)), the Complaint alleges no facts showing the required "strong inference of actual knowledge" (*Mansor*, 183 F. Supp. 3d at 264) that the scienter element of aiding and abetting liability requires, either of the underlying violations alleged against the other defendants or that his legal work was facilitating any violations. No particularized facts show Mr. Marcus "knowingly or recklessly provide[d] substantial assistance" (15 U.S.C. § 78t(e)) "in the achievement of the primary violation." *SEC v. DiBella*, 587 F. 3d 533, 566 (2d Cir. 2009). As the documentary record shows, see *infra,* Mr. Marcus produced entirely proper legal documentation executed by self-declared Accredited Investors with no facts showing Mr. Marcus had any duty to investigate or disbelieve those affirmations. Mr. Marcus disbursed investor proceeds exactly as the executed documents permitted and his duties required.

The allegations that Mr. Marcus provided "assistance" are utterly conclusory with no facts at all showing just what that "assistance" was, when it occurred, and how it helped to perpetrate the alleged wrongdoing by others. *See, e.g.,* Cplt. ¶¶ 40, 46, 68(b). These claims fall far short of Rule 9(b)'s required specific facts. To the extent that the "assistance" involved preparation of transaction documents, we have already shown that those documents made no false or misleading statements whatsoever.  To the extent the SEC alleges that Mr. Marcus provided "substantial assistance" to other defendants who committed primary violations by not disclosing information to investors,  "silence or omission" as a basis for the knowledge element of aiding and abetting liability requires facts showing such silence or omission was contrary to some duty, and "consciously intended" to further the principal violation.  *Tambone*, 550 F. 3d at 144.  No such facts appear in the Complaint.

Infrequent communications with investors or their attorneys (*see, e.g.,* Exs. 18, 19) is not "substantial assistance" but simply lawyering. *See Zazzali v. Hirschler, Fleischler, P.C.*, 482 B.R. 495, 519 (D. Del. 2012) (dismissing aiding and abetting claim where defendant lawyer only "provided legal services that were common in the industry") *Chem-Age Industries, Inc. v. Glover*, 652 N.W. 2d 756, 774-75 (SD 2002) ("substantial assistance" requires lawyer to "actively participate" in fiduciary duty breach").

### F.  The Complaint's Section 5(a), (c) Claim Fails

The Complaint fails to allege with the required Rule 9(b) particularity that Mr. Marcus "directly or indirectly sold or offered to sell" unregistered securities. 15 U.S.C. § 77e(a), (c). The Complaint itself shows Mr. Marcus completely uninvolved in the promotion or sales of the securities. *See, e.g.,* Cplt. ¶¶ 34, 38, 44, 47, 50-51, 54, 55, 59, 61, 64, 67, 74-75, 77, 78-85, 87, 89, 92, 95, 96-98, 104, 108(a)-(d), 110, 128, 130-131.  Those allegations terminate any argument

that Mr. Marcus was a "necessary participant" and "substantial factor" in those sales. *SEC v. Murphy*, 626 F. 2d 633, 649-652 (9th Cir. 1980) ("no court using the 'necessary participant' test has found liable a defendant whose acts were not a substantial factor in the sales transaction"). So does the heavy involvement of other lawyers for the Issuers. *See* Cplt. ¶¶ 58, 73; Exs. 6 (00152) (Lowndes, Drosdick); 7 (Secs. 7.05, 7.07 (00255) (Brownstein Hyatt); 12 (00742) (Brownstein Hyatt). As Ex.12 (00743-00744) shows, Mr. Marcus had to be told by someone else about the marketing activities.  No facts show Mr. Marcus "conceived of and planned the scheme by which the unregistered securities were offered or sold." *S.E.C. v. Friendly Power Co.*, 49 F. Supp. 2d 1363, 1371 (S.D. Fla. 1999). No facts show Mr. Marcus was responsible for securities law compliance  or the offerings, charged with analyzing the necessity of or filing  Registration Statements, or seeking an exemptions from that requirement, or otherwise involved in issues concerning the decision to offer and implement sales of unregistered securities, or to whom and how to market such securities.   Allegations about Mr. Marcus's supposed "work" on the November 22, 2013 and January 24, 2014 Forms D/A, signed by others, are entirely conclusory (*see* Cplt. ¶¶ 114(b)(c)) and Mr. Marcus is not alleged to have had even such vague involvement in the January 11, 2012 and February 3, 2012 Forms D/A.  *See* Cplt. ¶ 78.

The Complaint's own allegations about, and the documents illustrating, the roles of other counsel show Mr. Marcus was neither a substantial factor nor necessary participant and the rigorous "participant liability" test is unmet.  *See SEC v. Jammin Java Corp.*, 2016 WL 6595133, at * 16 (C.D. Cal. July 18, 2016).  (importance of careful use of necessary participant and substantial factor test "'so as not to subject defendants with a de minimis or insubstantial role in a securities scheme to strict liability'" (quoting *SEC v. CMKM Diamonds, Inc.*, 729 F. 3d 1248, 1257 (9th Cir. 2013)).

### III.   MOST OF THE CLAIMS ARE UNTIMELY

**A.  Claims Based on First Four Offerings Are Untimely, Barred by the Statute of Limitations.**

The SEC must plead facts showing its securities fraud claims are timely.  *See Young v. Lepone*, 305 F. 3d 1, 8 (1ˢᵗ Cir. 2002). The SEC's claims based on the first four securities offerings alleged, Mozido Invesco (Cplt. ¶¶ 39-57 ("August 2010-May 2012")), First Rescission (Cplt. ¶¶ 58-68 ("June 13, 2011- July 13, 2011)), Second Rescission (¶¶ 69-85 ("January 9, 2012 – February 2012")), and Exchange (Cplt. ¶¶ 86-92 ("May and June 2012")), and all claimed injunctive relief, disgorgement and civil penalties must be dismissed because all allegations concerning those first four securities offerings are barred by the five-year statute of limitations. 28 U.S.C. § 2462.  That limitation period begins when the claim first accrued.  *See Kokesh v. SEC*, __ U.S. __, 137 S. Ct. 1635, 1639 (2017); *Gabelli v. SEC*, 568 U.S. 442, 448 - 454 (2013). *See also S.E.C. v. Bio Defense Corp.*, 2019 WL 7578525, at * 10-11 (D. Mass. Sept. 6, 2019) ("Applying…*Kokesh* …no doubt that both the injunction and officer/director bars sought here are penalties and subject to the five-year limitations period.").  A claim accrues on the date the alleged violation occurs.  *See Gabelli*, 558 U.S. at 449-453.  No "discovery rule" can extend the accrual date in an SEC enforcement action. *See Gabelli*, 568 U.S. at 451.

The Complaint plainly shows that the limitations period for all claims based on the first four offerings had expired even before Mr. Marcus executed a Tolling Agreement on November 27, 2017 (Ex. 22 ).[17]  Mozido Invesco Offering claims had to be brought by May 2017.  First Rescission Offer claims had to be filed by July 13, 2016.  Second Rescission Offer claims had to be filed by February 2017.  Exchange Offer claims expired after June 2017.  The Tolling

---

[17] The Court may take judicial notice of that Tolling Agreement. *See Rios-Campbell v. U.S. Dep't of Commerce*, 927 F. 3d 21, 25, n. 2 (1ˢᵗ Cir. 2019).

Agreement, which extended the limitations period for 120 days from November 27, 2017, preserved then existing limitations defenses and revived no then untimely claims. *See* Ex. 22.

**B. Claims Based on Fifth Offering Must Be Limited to Predicates Within Limitations Period.**

The Complaint alleges two stages for the fifth offering, the Brentwood Offering (Cplt. ¶ 93): "August 2012 through November 2013" (with Brentwood Financial notes) and "October 2012 through February 2014" (with BRTMDO notes). Cplt. ¶ 94. Most events alleged here occurred outside the limitations period that had expired before execution of the Tolling Agreement, and are therefore not timely predicates for any claim, requiring dismissal. *See* Cplt. ¶¶ 99 ("August 2012" and "August 15, 2012"); 100 ("August 30, 2012); 107(a) ("beginning in August 2012"); 107(c) ("August [2012]"); 107(d) ("September 10, 2012"); 109(a) ("August 30, 2012"); 112 ("September 12, 2012"). [18] Claims based on this offering must be limited to only the few alleged predicate events concerning that offering that appear timely. *See* Cplt. ¶¶ 107(f) ("February 28, 2013" email for Liberty to send to investor about "conversion price" and "valuation"), 113 ("later in 2013" statement that Liberty was "victim "of SEC"), 114(b) ("November 22, 2013" unspecified "work" on Forms D/A), 114(c) ("January 24, 2014" unspecified "work" on Form D/A). As discussed above, none of these allegations sufficiently allege any fraud or other violation of law anyway. [19]

---

[18] Generalized allegations without any dates concerning Mr. Marcus (*see, e.g.,* Cplt. ¶ 103, 108, 111(a), 113) fail Rule 9(b) for that reason alone. *See Dumont v. Riely Foods Corp.*, 934 F.3d 35, 38 (1st Cir. 2019) (Rule 9(b) requires particularized facts of "who, what, where and *when*" (emphasis added)).

[19] The allegations in Section J (¶¶ 115-119) of the Complaint refer to acts in December 2012 and January 2013. While not untimely, as to Mr. Marcus these allegations pertain only to internal MDO communications that provide no basis for any liability. Section K ¶¶ (120-122), concerning events in 2013, 2014 and 2015, nowhere mentions Mr. Marcus. Section L (¶¶ 123-131) mentions Mr. Marcus a few times, but none of the claims state any basis for liability. *See* Cplt. ¶¶ 126 (conclusory reference to involvement in exchange offer); 127 (conclusory reference to causing tax accountant to email solicitations); 129(a) (apparently internal communication with no recipient identified and no connection to any investor); 129(e) (communication with investment group manager about "valuation"); 129(f) (conclusory omission claim with no identification whatsoever of circumstances or of any disclosure duty of Mr. Marcus); 129(g) (conclusory "Marcus knew" allegation about preferred shareholder liquidation preference). The allegations in Section II of the Complaint (¶¶ 132-133) are timely but nowhere even

### C.       Dismissal is Proper on Statute of Limitations Grounds

All three primary claims against Mr. Marcus and corresponding tag-along aiding and abetting claims are based upon every event and transaction recited in the Complaint.  To the extent those events and transactions are time-barred, the legal claims and associated remedies either necessarily fail, or must be limited to a basis in events and transactions within the five-year limitations period before November 27, 2017.  *See Alvarez-Mauras v. Banco Popular of Puerto Rico*, 919 F. 3d 617, 628  (1ˢᵗ Cir. 2019) ("motion to dismiss may be granted on the basis of … the statute of limitations, as long as 'the facts establishing the defense [are] clear 'on the face of the pleadings'" (quoting *Blackstone Realty LLC v. FDIC*, 244 F. 3d 193, 197 (1ˢᵗ Cir. 2001) (further citation omitted).  The SEC has long been on notice of the limitations defense. *See* Answer [ECF No. 19] (Twelfth Affirmative Defense of "statutes of limitations and other statutory time limitations, including laches").

### C.  Tolling Doctrines Do Not Revive the Untimely Claims

None of the tolling doctrines - equitable tolling; fraudulent concealment; equitable estoppel; continuing violations doctrine; single integrated offering doctrine – save the untimely claims. First, such exceptions run counter to the important purposes of statutes of limitation and are available only in rare circumstances, not alleged here.  *See Gabelli*, 568 U.S. at 454 ("the cases in which 'a statute of limitations may be suspended by causes not mentioned in the statute itself…are very limited in character, and are to be admitted with great caution'" (quoting *Amy v. Watertown (No. 2)*, 130 U.S. 320, 324 (1889)).

---

mention Mr. Marcus or show any connection between the alleged TL Holdings Offering and the six Offerings on which the SEC purports to base its claims.

Second, the Complaint contains not one fact approaching, let alone any facts satisfying, the demanding burden of pleading the availability of tolling. *See Wood v. Carpenter*, 101 U.S. (11 Otto) 135, 143 (1879) ("The circumstances of the discovery must be fully stated and proved, and the delay which has occurred must be shown to be consistent with the requisite diligence."); *Tissiera v. Doe*, 2019 WL 175123, at * 2 (N.D.N.Y. Jan. 11, 2019) (equitable tolling allegations must satisfy Rule 9(b)); *Pinney Dock & Transp. Co. v. Penn Cent. Corp.*, 838 F. 3d 1445, 1465 (6th Cir.), *cert. denied*, 488 U.S. 880 (1988) (fraudulent concealment requires "'stringent rules of pleading and evidence'") (citation omitted).

As discussed above, the SEC was investigating by May 2012 (*see* Ex. 7 (p. 00212)), had long had Mr. Liberty in its sights (*see* Cplt. ¶¶ 52-53, Ex. 17) and issued subpoenae in February 2016. Ex. 7 (p.00212). No allegation shows the SEC was prevented from timely bringing its claims. Alleging no "extraordinary circumstances" (*Menominee Indian Tribe of Wisconsin v. U.S.*, __ U.S,__, 136 S. Ct. 750, 756 (2016)) blocking its ability timely to file its claims, the SEC provides no basis for any extension of the five-year limitations bar. *See Gonzalez v. U.S.*, 284 F. 3d 281, 291 (1st Cir. 2002) ("Tolling is 'appropriate only when the circumstances that cause a plaintiff to miss a filing deadline are out of its hands.'" (quoting *Salois v. Dime Sav. Bank, FSB*, 128 F. 3d 20. 25 (1st Cir. 1997)).

The "continuing violation doctrine" is inapplicable to extend the limitations period, *See Quality Cleaning Products R.C., Inc. v. SCA Tissue North America, LLC*, 794 F. 3d 200, 205-06 (1st Cir. 2015) ("[c]ourts have largely, if not exclusively, held that the application of the continuing violation doctrine is cabined to certain civil rights or tort actions). *Cf. SEC v. Fiore*, 2019 WL 4688538, at * 14 (S.D.N.Y. Sept. 25, 2019) ("[c]ourts within the Second Circuit have reached 'diametrically opposite conclusions' regarding whether the continuing violations

doctrine applies in securities fraud cases"). Further, the SEC alleges each of the six discrete securities offerings were independently actionable wrongs, negating the premise of the continuing violations doctrine.  *Martin v. Nannie and the Newborns, Inc.*, 3 F. 3d 1410, 1415 n. 6 (10th Cir. 1993).

Finally, the "single integrated offering" doctrine cannot extend the limitations period. *See, e.g., Caviness v. Derand Resources Corp.*, 983 F. 2d 1295, 1301 (4th Cir. 1993) (rejecting entirely inapposite "theory of integration" to extend limitations period for claims under Securities Act § 12(2) subject to three-year statute of repose);  *Schlueter v. Cozad*, 674 F. Supp. 1351, 1354-55 (C.D. Ill. 1987) ("integration doctrine" inapplicable to save untimely claims).

## <u>CONCLUSION</u>

Baselessly alleging dishonesty by Mr. Marcus, the Complaint, instead, shows only dishonesty by the SEC. The documentary record upon which the SEC relies shows nothing more than Mr. Marcus competently discharging his duties, and complying with his ethical obligations, as an attorney. The SEC's efforts to demonstrate fraud by reference to documents, knowing, but not revealing to the Court, that the actual contents of the same flatly contradict its allegations, is unacceptable.  The Court should not tolerate it, should dismiss the Complaint as to Mr. Marcus in its entirety, with prejudice, and should impose sanctions, including attorneys' fees and referral to appropriate Bar disciplinary authorities.

Dated:   September 3, 2020

/s/ Stephen G. Grygiel
Stephen G. Grygiel (ME Bar 003427)
Grygiel Law, LLC
301 Warren Ave., #405
Baltimore, MD 21230
407-505-9463
410-617-8945 (fax)
stephengrygiel22@gmail.com

## <u>CERTIFICATE OF SERVICE</u>

I, Stephen G. Grygiel, hereby certify that on this 3rd day of September, 2020, I caused the foregoing ***Motion And Incorporated Memorandum Of Law Of Defendant George J. Marcus For Judgment on the Pleadings*** to be served by electronic mail to all counsel of record for all parties.

Dated: September 3, 2020                    /s/ Stephen G. Grygiel
                                            Stephen G. Grygiel, Esq.


                                            *Counsel for Defendant George J. Marcus*