# EXHIBIT 3

# BRENTWOOD FINANCIAL, LLC CONVERTIBLE PROMISSORY NOTE, NOTE PURCHASE AGREEMENT AND GUARANTY OF MICHAEL A. LIBERTY

**THIS NOTE AND THE SECURITIES ISSUABLE UPON THE CONVERSION HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY U.S. STATE SECURITIES LAWS, AND, UNLESS SO REGISTERED, MAY BE OFFERED OR SOLD, DIRECTLY OR INDIRECTLY, IN THE UNITED STATES OR TO U.S. PERSONS IN ACCORDANCE WITH THE PROVISIONS OF THE SECURITIES ACT, OR PURSUANT TO AN AVAILABLE EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND IN EACH CASE ONLY IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAW.**

## BRENTWOOD FINANCIAL, LLC

## CONVERTIBLE PROMISSORY NOTE

$250,000                                                September 11, 2012

FOR VALUE RECEIVED, **BRENTWOOD FINANCIAL, LLC**, a Florida limited liability company (the "**Issuer**"), with its principal executive office located at 5373 Isleworth CC Drive Windermere, FL 34786 (the "**Principal Office**"), promises to pay to the order of Marie Weigl, successors, assigns or designees (the "**Purchaser**"), located at 164 Clapboard Ridge Road Greenwich, CT 06830, in lawful money of the United States of America the principal sum of Two Hundred and Fifty Thousand Dollars ($250,000), or such lesser amount as shall equal the outstanding principal amount hereof, together with interest from the date of this Note on the unpaid principal balance at a rate equal to 4% per annum, simple interest, computed on the basis of a 360 day year consisting of twelve 30-day months (the "**Interest**"). All unpaid principal, together with all unpaid and accrued Interest and other amounts payable hereunder, shall be due and payable on the earlier of: (i) the close of business on the date which is exactly three years after the date of this Convertible Promissory Note, or (ii) when, upon or after the occurrence of an Event of Default (as defined below), such amounts become due and payable to the Purchaser in accordance with the terms hereof (the earliest of such dates being hereinafter referred to as the "**Maturity Date**"). This Convertible Promissory Note (this "**Note**") is the "Note" issued pursuant to the Note Purchase Agreement, dated as of near or even date herewith (as amended, modified or supplemented, the "Note Purchase Agreement") by and among the Issuer and Purchaser.

The following is a statement of the rights of the Purchaser and the conditions to which this Note is subject, and to which the Purchaser, by the acceptance of this Note, agrees:

1. **Definitions.** As used in this Note, the following capitalized terms have the following meanings:

(a) "**Board of Directors**" means the board of directors of the Issuer, as more fully described in the Operating Agreement.

(b) "**Business Day**" means any day other than a Saturday, a Sunday or a day on which banking institutions in New York, New York are authorized or obligated to close.

(c) [reserved]

(d) "**Event of Default**" has the meaning given in <u>Section 4</u> hereof.

(e) "**Interest**" has the meaning given in the introductory paragraph hereof.

(f) "**Maturity Date**" has the meaning given in the introductory paragraph hereof.

(g) "**MI**" means Mozido Investments, LLC, a Florida limited liability company.

(g) "**Obligations**" means and includes all loans, advances, debts, liabilities and obligations, howsoever arising, owed by the Issuer to the Purchaser of every kind and description (whether or not evidenced by any note or instrument and whether or not for the payment of money), now existing or hereafter arising under or pursuant to the terms of this Note, including, all interest, fees, charges, expenses, attorneys' fees and costs and accountants' fees and costs chargeable to and payable by the Issuer hereunder and thereunder, in each case, whether direct or indirect, absolute or contingent, due or to become due, and whether or not arising after the commencement of a proceeding under Title 11 of the United States Code (11 U. S. C. Section 101 *et seq.*), as amended from time to time (including post-petition interest) and whether or not allowed or allowable as a claim in any such proceeding.

(h) "**Operating Agreement**" means that certain Liability Company Operating Agreement of Issuer in existence as of the date hereof, as the same may be amended, restated, supplemented or otherwise modified from time to time.

(i) "**Person**" means and includes an individual, a partnership, a corporation (including a business trust), a joint stock company, a limited liability company, an unincorporated association, a joint venture or other entity or a governmental authority.

(j) "**Preferred Units**" or "**Units**" means Preferred Units of Mozido, LLC issued under and pursuant to the Limited Liability Company Agreement of Mozido, LLC dated August 27, 2012, as amended from time to time.

(k) "**Securities Act**" means the Securities Act of 1933, as amended.

(l) "**Subsidiary**" means, as to any Person, any corporation, partnership, limited liability company or other entity of which more than fifty percent (50%) of the outstanding capital stock or other ownership interests having ordinary voting power to elect a majority of the board of directors or other managers of such corporation, partnership, limited liability company or other entity is at the time, directly or indirectly, owned by such Person (irrespective of whether, at the

2

time, capital stock or other ownership interests of any other class or classes of such corporation or other entity shall have or might have voting power by reason of the happening of any contingency).

(m) "**Transaction Documents**" means this Note, the Note Purchase Agreement, and each related agreement, document and instrument executed in connection herewith or therewith from time to time.

Additional capitalized terms used herein and not otherwise defined herein shall have the meanings given to such terms in the Note Purchase Agreement.

2. **Interest**. Interest shall accrue under this Note at the rate set forth herein, and shall be payable on the Maturity Date.

3. **Events of Default**. The occurrence of any of the following shall constitute an "**Event of Default**" under this Note and the other Transaction Documents:

(a) *Failure to Pay*. The Issuer shall fail to pay (i) when due any principal payment within five days of due date hereunder or (ii) any interest or other payment required under the terms of this Note on the date due and such payment under this subclause (ii) shall not have been made within five days of the due date; or

(b) *Representations and Warranties*. Any representation or warranty made in this Note or in connection with this Note, any of the other Transaction Documents, or the Obligations, shall prove to have been false or misleading when made (or, if applicable, when reaffirmed) in any material respect; or

(c) *Covenants*. The Issuer fails to timely and properly observe, keep or perform, any term, covenant, agreement or condition in this Note or in any of the other Transaction Documents; or

(d) *Validity of Transaction Documents*. The Issuer, or any other Person shall challenge the validity and binding effect of any provision of any of the Transaction Documents or shall state its intention to make such a challenge of any of the Transaction Documents or any of the Transaction Documents shall for any reason (except to the extent permitted by its express terms) cease to be effective or to create a valid and perfected security interest in any of the collateral purported to be covered thereby; or

(e) *Inability to Pay Debts*. The Issuer admits in writing its present inability generally to pay its debts as they mature or shall make any assignment for the benefit of any of its creditors; or

(f) *Judgments*. The entry of a final judgment for the payment of money involving more than $250,000 against the Issuer, and the failure by the Issuer to discharge the same, or cause it to be discharged, within thirty (30) days from the date of the order, decree or process under which or pursuant to which such judgment was entered; or

(g)    *Suspension of Business.*   The Issuer suspends or terminates its business operations or liquidates, dissolves or terminates its existence; or

(h)    *Voluntary Bankruptcy or Insolvency Proceedings.*   The Issuer (i) applies for or consents to the appointment of a receiver, trustee, liquidator or custodian of itself or of all or a substantial part of its property, (ii) be unable, or admit in writing its present inability, to pay its debts generally as they mature, (iii) make a general assignment for the benefit of its or any of its creditors, (iv) be dissolved or liquidated, (v) become insolvent (as such term may be defined or interpreted under any applicable statute) as determined by a court of competent jurisdiction, (vi) commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or consent to any such relief or to the appointment of or taking possession of its property by any official in an involuntary case or other proceeding commenced against it, or (vii) take any action for the purpose of effecting any of the foregoing; or

(i)    *Involuntary Bankruptcy or Insolvency Proceedings.*   Proceedings for the appointment of a receiver, trustee, liquidator or custodian of the Issuer or of all or a substantial part of the property thereof, or an involuntary case or other proceedings seeking liquidation, reorganization or other relief with respect to the Issuer or the debts thereof under any bankruptcy, insolvency or other similar law now or hereafter in effect shall be commenced and an order for relief entered or such proceeding shall not be dismissed or discharged within 30 days of commencement; or

4.   **Rights of Purchaser upon Default**. Upon the occurrence or existence of any Event of Default and at any time thereafter during the continuance of such Event of Default, the Purchaser may, by written notice to the Issuer, declare all outstanding Obligations payable by the Issuer hereunder to be immediately due and payable without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived. Upon the occurrence or existence of any Event of Default immediately and without notice, all outstanding Obligations payable by the Issuer hereunder shall automatically become immediately due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived. In addition to the foregoing remedies, upon the occurrence or existence of any Event of Default, the Purchaser may exercise any other right, power or remedy granted to it by the Transaction Documents or otherwise permitted to it by law, either by suit in equity or by action at law, or both.

5.   **Conversion Rights**. The Purchaser shall have the right to convert this Note and accrued and unpaid Interest due under this Note into Units, as set forth in this Section 5 below.

(a)    *Conversion into Preferred Units.* The Purchaser shall have the right, from and after the date of the issuance of this Note and then at any time until the Maturity Date, to convert any outstanding and unpaid principal portion of this Note, and any accrued but unpaid Interest on such portion, at the election of the Purchaser (the date of such conversion being a "**Conversion Date**") into Preferred Units at the Conversion Price (as hereinafter defined). Upon delivery to the Issuer of a completed Notice of Conversion, a form of which is attached hereto, the Issuer shall issue and deliver to the Purchaser within five (5) business days from the Conversion Date (such day being the "**Delivery Date**") that number of Units for the portion of the Note and any accrued but unpaid

4

Interest on such portion converted in accordance with the following sentence. The number of Units to be issued upon each conversion of this Note shall be determined by dividing that portion of the principal of the Note to be converted and any accrued but unpaid Interest on such portion, by the Conversion Price. The "**Conversion Price**" shall initially be $ .062 per unit, and shall be subject to adjustment as provided hereafter in this Section 5.

(b)   *Manner of Conversion.*  This Note may be converted by the Purchaser by presentment of this Note, accompanied by written notice stating that Purchaser elects to convert all or a portion of the principal amount thereof, and any accrued but unpaid Interest on such portion, and stating the name or names, together with addresses, in which the Preferred Units are to be issued. Each conversion shall be deemed to have been effected immediately prior to the close of business on the date on which this Note shall have been so surrendered to Issuer; and at such time the rights of the Purchaser as to that portion of this Note so converted shall cease, and the person in whose name or names the Units shall be issuable upon such conversion shall be deemed to have become the holder or holders of record thereof. If this Note is converted in part only, upon conversion of such part hereof, the Issuer shall execute and deliver to the Purchaser upon surrender of this Note a new Note in the aggregate principal amount equal to the then unconverted portion of the principal amount of this Note plus any accrued but unpaid and unconverted Interest and in all other respects identical to this Note.

(c)   *Distributions, Splits, Combinations, Reclassifications.*  In the event that MI shall hereafter (i) make a distribution of Preferred Units with respect to the Preferred Units, (ii) subdivide its outstanding Preferred Units into a greater amount of Preferred Units, as applicable, or (iii) combine its outstanding Preferred Units into a smaller amount of Preferred Units, as applicable, the Conversion Price in effect immediately prior to such action shall be adjusted so that the Purchaser shall be entitled to receive the amount of Preferred Units that it would have owned immediately following such action had this Note or any remaining portion hereof been converted in full immediately prior thereto. All adjustments made pursuant to this subsection 5(c) shall become effective immediately after the earlier of the record date or the payment date in the case of a distribution and shall become effective immediately after the effective date in the case of a subdivision or combination.

(d)   *Recapitalizations, Reorganizations, etc.*  In the event of any recapitalization, reorganization, consolidation or merger of the Issuer with or into another Person or the sale, transfer or other disposition of all or substantially all of the assets of the Issuer and its Subsidiaries (viewed as a whole) to another Person, this Note shall thereafter be convertible into the kind and amount of limited liability company interests or other securities or property that a holder of the number of Units deliverable upon conversion of this Note would have been entitled upon such recapitalization, reorganization, consolidation, merger or sale; and, in such case, appropriate adjustment (as determined in good faith by the Board of Directors of Issuer) shall be made in the application of the provisions set forth in this Section 5 with respect to the rights and interests thereafter of the Purchaser, to the end that the provisions set forth in this Section 5 shall thereafter be applicable, as nearly as reasonably may be, in relation to any limited liability company interests or other securities or property thereafter deliverable upon conversion of this Note.

(e)   *De Minimis Adjustments.*  No adjustment to the Conversion Price shall be made if such adjustment would result in a change in the Conversion Price of less than $.01.  Any adjustment of less than $.01 that is not made shall be carried forward and shall be made at the time of and together with any subsequent adjustment that, on a cumulative basis, amounts to an adjustment of $.01 or more in the Conversion Price.

(f)   *No Impairment.*  The Issuer shall not, by amendment of its governing documents or through any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed hereunder by the Issuer, but shall at all times in good faith assist in the carrying out of all the provisions of this Section 6 and in the taking of all such action as may be necessary or appropriate in order to protect the conversion rights of the Purchaser against impairment.

(g)   *Certificate as to Adjustments.*  Upon the occurrence of each adjustment or readjustment of the Conversion Price pursuant to this Section 5, the Issuer at its expense shall promptly compute such adjustment or readjustment in accordance with the terms and prepare and furnish to the Purchaser a certificate setting forth such adjustment or readjustment and showing in detail the facts upon which such adjustment or readjustment is based.  The Issuer shall, upon the written request at any time of the Purchaser, furnish or cause to be furnished to the Purchaser a like certificate setting forth (i) such adjustments and readjustments, (ii) the Conversion Price at that time in effect, and (iii) the number of Units and the amount, if any, of other property that at that time would be received upon the conversion of this Note.

(h)   *Notices of Record Date.*  In the event of any taking by the Issuer of a record of the holders of any class of securities for the purpose of determining the holders thereof who are entitled to receive any distribution, any Convertible Securities or any right to subscribe for, purchase or otherwise acquire any limited liability company interests or any other securities or property, or to receive any other right, the Issuer shall mail to the Purchaser, at least twenty (20) days prior to the date specified therein, a notice specifying the date on which any such record is to be taken for the purpose of such distribution or rights, and the amount and character of such distribution or rights.

6.   **No Right of Redemption.**  This Note may not be redeemed or prepaid prior to the Maturity Date without the prior written consent of Purchaser, which may be granted or refused in the Purchaser's sole discretion.

7.   **Successors and Assigns.**  Subject to the restrictions on transfer described in Section 10 below, the rights and obligations of the Issuer and the Purchaser shall be binding upon and benefit the successors, assigns, heirs, administrators and transferees of the parties.

8.   **Waiver and Amendment.**  Any provision of this Note may be amended, waived or modified upon the written consent of the Issuer and the Purchaser.

9.   **Transfer of this Note or Securities Issuable on Conversion Hereof.**  Purchaser may assign this Note and its interests and obligations hereunder, as well as any securities into which this Note may be converted, with the prior written consent of the Issuer, which consent will not be

6

unreasonably withheld. With respect to any offer, sale or other disposition of this Note or securities into which such Note may be converted, the Purchaser will give written notice to the Issuer prior thereto, describing briefly the manner thereof, together with representations to the Issuer, to the effect that such offer, sale or other disposition may be effected without registration or qualification under any federal or state law then in effect. Each Note thus transferred and each certificate representing the securities thus transferred shall bear a legend as to the applicable restrictions on transferability in order to ensure compliance with the Securities Act, unless in the opinion of counsel for the Issuer such legend is not required in order to ensure compliance with the Securities Act. The Issuer may issue stop transfer instructions to its transfer agent in connection with such restrictions. Subject to the foregoing, transfers of this Note shall be registered upon registration books maintained for such purpose by or on behalf of the Issuer. Prior to presentation of this Note for registration of transfer, the Issuer shall treat the registered holder hereof as the owner and holder of this Note for the purpose of receiving all payments of principal and interest hereon and for all other purposes whatsoever.

10. **Assignment by the Issuer.** Neither this Note nor any of the rights, interests or obligations hereunder may be assigned, by operation of law or otherwise, in whole or in part, by the Issuer without the prior written consent of the Purchaser.

11. **Notices.** All notices, requests, demands, consents, instructions or other communications required or permitted hereunder shall in writing and faxed, mailed or delivered to each party at the respective addresses of the parties set forth in the Note Purchase Agreement, or at such other address, e-mail address or facsimile number as each party shall have furnished to the other party in writing. All such notices and communications will be deemed effectively given the earlier of (i) when received, (ii) when delivered personally, (iii) one Business Day after being delivered by facsimile (with receipt of appropriate confirmation), (iv) one Business Day after being deposited with an overnight courier service of recognized standing or (v) four days after being deposited in the U.S. mail, first class with postage prepaid.

12. **Usury.** In the event any interest is paid on this Note which is deemed to be in excess of the then legal maximum rate, then that portion of the interest payment representing an amount in excess of the then legal maximum rate shall be deemed a payment of principal and applied against the principal of this Note.

13. **Waivers.** The Issuer hereby waives notice of acceptance, default, presentment or demand for payment, protest or notice of nonpayment or dishonor and all other notices or demands relative to this instrument.

14. **Governing Law.** This Note and all actions arising out of or in connection with this Note shall be governed by and construed in accordance with the laws of the State of Florida, without regard to the conflicts of law provisions of the State of Florida or of any other state.

15. **WAIVER OF JURY TRIAL.** EACH PARTY HERETO IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF THIS NOTE OR ANY OTHER TRANSACTION DOCUMENT OR THE

TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS NOTE AND THE OTHER TRANSACTION DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

16. **Time Is of the Essence**.   Time is of the essence of this Note, and of each provision hereof.

17. **Characterization as Indebtedness**.   It is the express intent of the Obligors and the Purchaser that, prior to conversion of this Note as contemplated in Section 5 above, the obligations of the Issuer hereunder shall constitute indebtedness for borrowed money, and not equity.   In furtherance of the foregoing, each of the Obligors and the Purchaser shall reflect their rights and obligations hereunder in their books and records as indebtedness for borrowed money, and not as equity.

*[Signature Page Follows]*

8

The Issuer has caused this Note to be issued as of the date first written above.

**BRENTWOOD FINANCIAL, LLC**
a Florida limited liability company

By: _____
Name:   Michael A. Liberty
Title:   Manager

[SIGNATURE PAGE TO SECURED CONVERTIBLE PROMISSORY NOTE]

9

## NOTICE OF CONVERSION

(To be executed by the Purchaser in order to convert the Note)

The undersigned hereby elects to convert $_____ of the Principal and accrued but unpaid Interest with respect to the Note issued by BRENTWOOD FINANCIAL, LLC on or about September ___, 2012, into Preferred Units of MOZIDO, LLC according to the conditions set forth in such Note, as of the date written below.

Date of Conversion: _____

Conversion Price: $_____ per Common Unit

Units To Be Delivered: _____

Signature: _____

Print Name: _____

Address: _____
_____
_____

10

# BRENTWOOD FINANCIAL, LLC

# NOTE PURCHASE AGREEMENT

This **NOTE PURCHASE AGREEMENT**, dated as of September 11, 2012 (this "**Agreement**"), is entered into by and among **BRENTWOOD FINANCIAL, LLC**, a Florida limited liability company (the "**Issuer**"), with its principal executive office at 5373 Isleworth CC Drive Windermere, FL 34786 (the "**Principal Office**"), and Marie Weigl and or nominee ("**Purchaser**"), located at 164 Clapboard Ridge Road Greenwich, CT 06830.

## RECITALS

Purchaser is willing to purchase from the Issuer, and the Issuer is willing to sell to Purchaser, on the terms and conditions set forth herein, a Convertible Promissory Note, in the form of Exhibit A hereto, in the original principal amount of Two Hundred and Fifty Thousand Dollars ($250,000), or so much thereof as has been advanced (the "**Note**").

## AGREEMENT

NOW THEREFORE, in consideration of the foregoing, and the representations, warranties, and conditions set forth below, the parties hereto, intending to be legally bound, hereby agree as follows:

1. **Definitions.** In addition to the other terms defined herein, the following terms used herein shall have the meanings herein specified:

"**Affiliate**" shall mean, as to any Person, any other Person that directly, or indirectly through one or more intermediaries, Controls, is Controlled by, or is under common Control with, such Person. For the purposes of this definition, "Control" shall mean the power, directly or indirectly, either to (i) vote 5% or more of the securities having ordinary voting power for the election of directors (or persons performing similar functions) of a Person or (ii) direct or cause the direction of the management and policies of a Person, whether through the ability to exercise voting power, by control or otherwise. The terms "Control", "Controlled by", and "under common Control with" have the meanings correlative thereto.

"**Indebtedness**" of any Person shall mean, without duplication (i) all obligations of such Person for borrowed money, (ii) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (iii) all obligations of such Person in respect of the deferred purchase price of property or services (other than trade payables incurred in the ordinary course of business; provided, that trade payables overdue by more than 120 days shall be included in this definition except to the extent that any of such trade payables are being disputed in good faith and by appropriate measures), (iv) all obligations of such Person under any conditional sale or other title retention agreement(s) relating to property acquired by such Person, (v) all capital lease obligations of such Person, (vi) all obligations, contingent or otherwise, of such Person in respect of letters of credit, acceptances or similar extensions of credit, (vii) all guarantees of such Person of the type of

Indebtedness described in clauses (i) through (vi) above, (viii) all Indebtedness of a third party secured by any lien or security interest on property owned by such Person, whether or not such Indebtedness has been assumed by such Person, and (ix) all obligations of such Person, contingent or otherwise, to purchase, redeem, retire or otherwise acquire for value any capital stock or other equity interests of such Person. The Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture in which such Person is a general partner or a joint venturer, except to the extent that the terms of such Indebtedness provide that such Person is not liable therefor.

(a) **"Transaction Documents"** means the Note Purchase Agreement, the Note, and each related agreement, document and instrument executed in connection herewith or therewith from time to time.

Capitalized terms not otherwise defined herein shall have the meaning set forth in the form of Note (as defined below) attached hereto as Exhibit A.

2. **The Note**.

(a)   Issuance of the Note.  At the Closing (as defined below) the Issuer agrees to issue and sell to Purchaser, and, subject to all of the terms and conditions hereof, Purchaser agrees to purchase, the Note.

(b)   Delivery.  The sale and purchase of the Note shall take place at a closing (the "**Closing**") to be held at such place and time as the Issuer and Purchaser may determine (the "**Closing Date**"). At the Closing, the Issuer will deliver the Note to the Purchaser, against receipt by the Issuer of the purchase price of Two Hundred and Fifty Thousand Dollars ($250,000) (the "**Purchase Price**").

(c)   Use of Proceeds. The proceeds of the sale and issuance of the Note will be used for such purposes as the Issuer determines to be appropriate, including for working capital and for general purposes of the Issuer.

(d)   Payments. The Issuer will make all cash payments due under the Note in immediately available funds by 2:00 P.M. (prevailing Eastern Time) on the date such payment is due in such manner as Purchaser may direct in writing from time to time.

3. **Representations and Warranties of the Issuer**.  The Issuer represents and warrants to Purchaser that:

(a)   Due Organization, Qualification, etc. The Issuer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Florida. The Issuer (i) has the power and authority to own, lease and operate its properties and carry on its business as now conducted and to execute, deliver and perform its obligations under this Agreement and each of the other Transaction Documents to which it is a party; and (ii) is duly qualified, licensed to do business and in good standing in each jurisdiction in which it is required by law to qualify or become licensed to do business.  The Issuer has caused to be delivered to Purchaser correct and complete copies of its Organization Documents (as defined below), which documents reflect all amendments

- 2 -

made thereto at any time prior to the Closing Date. The Issuer is not in default under or in violation of any provision of its Organizational Documents.

(b)  Authority. The execution, delivery and performance by the Issuer of each of the Transaction Documents to which it is a party, and the consummation of the transactions contemplated thereby (i) are within the power of the Issuer and (ii) have been duly authorized by all necessary company action on the part of the Issuer.

(c)  Enforceability. Each Transaction Document executed, or to be executed, by the Issuer has been, or will be, duly executed and delivered by each Issuer and constitutes a legal, valid and binding obligation of the Issuer, enforceable against the Issuer in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

(d)  Non-Contravention.  The execution and delivery by the Issuer of the Transaction Documents to which it is a party and the performance and consummation of the transactions contemplated thereby do not and will not: (i) violate the Issuer's certificate of formation or operating agreement (collectively, the "**Organizational Documents**") or any judgment, order, writ, decree, statute, rule or regulation applicable to the Issuer; (ii) violate any provision of, or result in the breach or the acceleration of, or entitle any other Person to accelerate (whether after the giving of notice or lapse of time or both), any mortgage, indenture, agreement, instrument or contract to which the Issuer is a party or by which it is bound; or (iii) result in the creation or imposition of any lien upon any property, asset or revenue of the Issuer or the suspension, revocation, impairment, forfeiture, or nonrenewal of any material permit, license, authorization or approval applicable to the Issuer, its business or operations, or any of its assets or properties.

(e)  Approvals. Except as set forth in the Organizational Documents, no consent, approval, order or authorization of, or registration, declaration or filing with, any governmental authority or other Person (including, without limitation, the stockholders or other equity holders of any Person) is required in connection with the execution, delivery and performance of the Transaction Documents executed by the Issuer and the performance and consummation of the transactions contemplated thereby.

(f)  Compliance with Laws. The Issuer and each of its directors and officers have complied with and are in compliance, in all material respects, with all laws, statutes, rules, regulations, judgments, or orders which are applicable to it and its business, and within the last two (2) years, no claims have been filed against any such Persons alleging any such violations and no such Person has received any written notice of any such violations.

(g)  Litigation. There is no pending or, to the best knowledge of the Issuer, threatened action, suit, proceeding or investigation before any court, governmental agency or body, or arbitrator having jurisdiction over the Issuer, or any of their Affiliates, that could affect the execution by the Issuer or the performance by the Issuer of its obligations under the Transaction Documents. Except as set forth on Schedule 3(i) attached hereto, there is no pending, or to the best of knowledge of the Issuer, basis for a threatened action, suit, proceeding or investigation before any court,

governmental agency or body, or arbitrator having jurisdiction over the Issuer or any of their respective Affiliates.

(h)   Stop Transfer.  The Note and the securities into which the Note is convertible (collectively, the "Securities"), when issued, will be restricted securities.  The Issuer will not issue any stop transfer order or other order impending the sale, resale or delivery of any of the Securities, except as may be required by any applicable federal or state securities laws and unless contemporaneous notice of such instruction is given to Purchaser.

(i)   No Integrated Offering.  Neither the Issuer nor any of its Affiliates, nor any Person acting on their behalf, has directly or indirectly made any offers or sales of any security or solicited any offers to buy any security under circumstances that would cause the offer of the Securities pursuant to this Agreement to be integrated with prior offerings by the Issuer for purposes of the Securities Act or any applicable stockholder approval provisions.  The Issuer will not take any action or steps that would cause the offer or issuance of the Securities to be integrated with other offerings.  The Issuer will not conduct any offering other than the transactions contemplated hereby that will be integrated with the offer or issuance of the Securities.

(j)   No General Solicitation: Private Placement.  Neither the Issuer, the Guarantor nor, to its knowledge, any Person acting on behalf of the Issuer has engaged in any form of general solicitation or general advertising (within the meaning of Regulation D under the Securities Act) in connection with the offer or sale of the Securities.  Assuming the accuracy of the Purchaser's representations and warranties set forth in Section 4(b), no registration under the Securities Act is required for the offer and sale of the Securities by the Issuer to the Purchaser under the Transaction Documents.

(k)   Acknowledgement Regarding Purchaser's Purchase of the Securities.  The Issuer acknowledges and agrees that the Purchaser is acting solely in the capacity of an arm's length purchaser with respect to this Agreement, the Transaction Documents and the transactions contemplated hereby and thereby.  The Issuer further acknowledges that the Purchaser is not acting as a financial advisor or fiduciary of the Issuer (or in any similar capacity) with respect to the Agreement, the other Transaction Documents and the transactions contemplated hereby and thereby and any advice given by the Purchaser or any of their respective representative or agents in connection with this Agreement, the other Transaction Documents and the transactions contemplated hereby and thereby is merely incidental to Purchaser's purchase of the Securities.  The Issuer further represents to the Purchaser that the Issuer's decision to enter into this Agreement has been based solely on the independent evaluation by the Issuer and its representatives.

(l)   Investment Company.  the Issuer is not an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

(m)   Solvency.  Based on the financial condition of the Issuer as of the Closing Date (and assuming that the Closing shall have occurred), (i) the Issuer's saleable value of its assets exceeds the amount that will be required to be paid on or in respect of the Issuer's existing debts and other liabilities (including known contingent liabilities) as they mature, (ii) the Issuer's assets do not constitute unreasonably small capital to carry on its business for the current fiscal year as now

- 4 -

conducted and as proposed to be conducted including its capital needs taking into account the particular capital requirements of the business conducted by the Issuer, and projected capital requirements and capital availability thereof, and (iii) the current cash flow of the Issuer, together with the proceeds the Issuer would receive, were it to liquidate all of its assets, after taking into account all anticipated uses of the cash, would be sufficient to pay all amounts on or in respect of its debt when such amounts are required to be paid. The Issuer will not incur debts beyond its ability to pay such debts as they mature (taking into account the timing and amounts of cash to be payable on or in respect of its debt).

(n)    Regulatory Permits.    The Issuer possesses all material certificates, authorizations and permits issued by the appropriate federal, state or foreign regulatory authorities necessary to conduct its business, and the Issuer has received any notice of proceedings relating to the revocation or modification of any such certificate, authorization or permit.

(o)    Tax Status.    The Issuer has made and filed through the date hereof (and has valid extensions for applicable period thereafter) all federal and state income and all other tax returns, reports, and declarations required by any jurisdiction to which it is subject and (unless and only to the extent that the Issuer has set aside on its books provisions reasonably adequate for the payment of all unpaid and unreported taxes) has paid all taxes and other governmental assessments and charges that are material in amount, shown or determined to be due on such returns, reports and declarations, except those being contested in good faith and has set aside on its books provision reasonably adequate for the payment of all taxes for periods subsequent to the periods to which such returns, reports or declarations apply. There are no unpaid taxes claimed to be due by the taxing authority of any jurisdiction, and the managers and officers of the Issuer know of no basis for any such claim.

(p)    Assets.    The Issuer has good and marketable title to, or a valid leasehold interest in, the properties and assets used by it or located on its premises, free and clear of all liens and encumbrances. The Issuer neither owns, nor has ever owned, any real property, and the Issuer is not a party to any agreement or option to purchase any real property or interest therein.

(q)    Disclosure.    All information furnished to the Purchaser or the Purchaser's counsel by or on behalf of the Obligors in connection with the transactions contemplated hereby or thereby, when taken as a whole, does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements herein or therein not misleading. There is no fact of which the Issuer is aware that has not been disclosed to the Purchaser and that is or could reasonably be expected to have a Material Adverse Effect.

4. **Representations and Warranties of Purchaser**.  The Purchaser represents and warrants to the Issuer upon the acquisition of the Note as follows:

(a)    Binding Obligation. The Purchaser has full legal capacity, power and authority to execute and deliver this Agreement and to perform the Purchaser's obligations hereunder. Each of this Agreement and the Note issued to the Purchaser is a valid and binding obligation of the Purchaser, enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

(b)   Securities Law Compliance. The Purchaser has been advised that the Securities have not been registered under the Securities Act, or any state securities laws and, therefore, cannot be resold unless they are registered under the Securities Act and applicable state securities laws or unless an exemption from such registration requirements is available. The Purchaser is aware that the Issuer is under no obligation to effect any such registration with respect to the Securities or to file for or comply with any exemption from registration. The Purchaser is purchasing the Securities for the Purchaser's own account for investment, not as a nominee or agent, and not with a view to, or for resale in connection with, the distribution thereof.

(c)   The Purchaser acknowledges that it can bear the economic risk and complete loss of its investment in the Securities and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of the investment contemplated hereby.

(d)   The Purchaser has had an opportunity to receive all information related to the Company requested by it and to ask questions of and receive answers from the Company regarding the Company, its business and the terms and conditions of the offering of the Securities. Neither such inquiries nor any other due diligence investigation conducted by the Purchaser shall modify, limit or otherwise affect the Purchaser's right to rely on the Issuer's representations and warranties contained in this Agreement.

(e)   The Purchaser understands that the Securities are characterized as "restricted securities" under the U.S. federal securities laws inasmuch as they are being acquired from the Company in a transaction not involving a public offering and that under such laws and applicable regulations such securities may be resold without registration under the 1933 Act only in certain limited circumstances.

(f)   It is understood that, except as provided below, certificates and other documents evidencing the Securities may bear the following or any similar legend:

(a)"THE UNITS REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED. THESE UNITS MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF (1) COMPLIANCE WITH THE TERMS OF THE OPERATING AGREEMENT OF THE ISSUER OF THE UNITS AND (2) AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH SECURITIES ACT OR ANY APPLICABLE STATE SECURITIES LAW OR AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED."

(b) If required by the authorities of any state in connection with the issuance of sale of the Securities, the legend required by such state authority.

(g)   Accredited Purchaser. The Purchaser is an accredited Purchaser as defined in Rule 501(a) of Regulation D, as amended, under the 1933 Act.

- 6 -

(h)     The Purchaser did not learn of the investment in the Securities as a result of any general solicitation or general advertising.

(i)     No Person will have, as a result of the transactions contemplated by the Transaction Documents, any valid right, interest or claim against or upon the Issuer, or any Affiliate of the Issuer for any commission, fee or other compensation pursuant to any agreement, arrangement or understanding entered into by or on behalf of such Purchaser.

(j)     The Purchaser understands that the Securities are being offered and sold in reliance upon specific exemptions from the registration requirements of the 1933 Act, the rules and regulations promulgated thereunder and state securities laws and that the Company is relying upon the truth and accuracy of, and the Purchaser's compliance with, the representations, warranties, agreements, acknowledgments and understandings of the Purchaser set forth herein in order to determine the availability of such exemptions and the eligibility of the Purchaser to acquire the Securities.

(k)     The Purchaser understands that nothing in the Agreement or any other materials presented to the Purchaser in connection with the purchase and sale of the Securities constitutes legal, tax or investment advice. The Purchaser has consulted such legal, tax and investment advisors as it, in its sole discretion, has deemed necessary or appropriate in connection with its purchase of the Securities.

(l)     The Purchaser understands that its investment in the Securities involves a significant degree of risk, including a risk of total loss of the Purchaser's investment, and the Purchaser has full cognizance of and understands all of the risk factors related to the Purchaser's purchase of the Securities. The Purchaser understands that the value of the Securities can fluctuate and that no representation is being made as to the future value of the Securities.

(m)     The Purchaser understands that no United States federal or state agency or any other government or governmental agency has passed upon or made any recommendation or endorsement of the Securities.

(n)     The Purchaser has such knowledge and experience in financial and business matters that the Purchaser is capable of evaluating the merits and risks of such investment, is able to incur a complete loss of such investment and is able to bear the economic risk of such investment for an indefinite period of time. The Purchaser is an "accredited Purchaser" as such term is defined in Rule 501 of Regulation D under the Securities Act.

5.   **Covenants of the Issuer**.  The Issuer, jointly and severally, hereby covenants that from and after the date of this Agreement and so long as any of the obligations under the Note are outstanding:

(a)     _Use of Proceeds_.  The Issuer will use the proceeds of the sale of the Note for any purpose determined appropriate by the Issuer. No portion of the proceeds of the sale of the Note shall be used by the Issuer to purchase or carry "margin stock", as such term is defined in Regulation

- 7 -

U of the Board of Governors of the Federal Reserve, or otherwise in violation of such Regulation U or other applicable law. The Obligors will supply to the Purchaser such additional information and documents that the Purchaser may reasonably request with respect to the use of proceeds and will permit the Purchaser to have access to any and all records and information and personnel as the Purchaser deems necessary to verify such use of proceeds.

(b)  Mergers, Acquisitions, Transfers of Assets, Etc.  The Issuer will not, nor will it permit any Subsidiary to, merge into or consolidate into any other Person, or permit any other Person to merge into or consolidate with it, or sell, lease, transfer or otherwise dispose of (in a single transaction or a series of transactions) all or substantially all of its assets (in each case, whether now owned or hereafter acquired) or any of the membership interests or other equity of any of its Subsidiaries (in each case, whether now owned or hereafter acquired) or wind up, liquidate or dissolve (including any declaration of bankruptcy), or create, incur or suffer to exist any liens, security interests or other encumbrances on any of its assets (other than in favor of the Purchaser), or enter into any other recapitalization, joint venture or business combination, or sell, transfer or acquire any assets

(c)  Organizational Documents.  The Issuer will not amend, modify or restate, or permit the amendment, modification or restatement of, its Organizational Documents.

(d)  Board of Directors and Management, the Issuer will not, nor will it permit any Subsidiary to, cause or permit:

(i)  the number of members of its Board of Directors to be increased or decreased, or create or permit to exist any committees having authority delegated by the Board of Directors;

(ii)  any change in the officers of the Issuer, including the addition or removal of any office or officer; or

(e)  Notice of Events of Default.  The Issuer shall immediately provide written notice to the Purchaser of the occurrence of any Event of Default, or any event or condition which, with the passage of time or giving of notice or both, would constitute an Event of Default.

(f)  Reporting.  The Obligors shall cause to be prepared and delivered the following to the Purchaser:

(i)  As soon as available and in any event no later than sixty (60) days after the end of each fiscal year of the Issuer, unaudited financial statements for the Issuer (which shall be prepared in accordance with generally accepted accounting principles, other than the omission of footnotes and normal year end adjustments), including a balance sheet and statements of income and cash flows showing the cash distributed in such fiscal year and the balance of each of the Issuer's member's capital account at the end of such fiscal year and the manner of its calculation. If requested by the Purchaser, the Obligors shall cause such financial statements to be audited by an accounting firm reasonably acceptable to the Purchaser.

- 8 -

(ii)    As soon as available and in any event no later than thirty (30) days after the end of each fiscal quarter of the Issuer, unaudited financial statements for the Issuer (which shall be prepared in accordance with generally accepted accounting principles, other than the omission of footnotes and normal year end adjustments), including a balance sheet and statements of income and cash flows showing the cash distributed in such fiscal quarter and the balance of each of the Issuer's member's capital account at the end of such fiscal quarter and the manner of its calculation.

In addition, the Issuer shall, promptly following the Purchaser's request, provide the Purchaser with such records, reports and other information that the Purchaser may resononably request from time to time.

6.  **Conditions to Closing by the Purchaser**. The Purchaser's obligations at the Closing are subject to the fulfillment, on or prior to the Closing Date, of all of the following conditions, any of which may be waived in whole or in part by the Purchaser in its sole discretion:

(a)    Representations and Warranties. The representations and warranties made by the Obligors in Section 3 hereof shall be true and correct on the Closing Date.

(b)    Governmental Approvals and Filings.  Except for any notices required or permitted to be filed after the Closing Date with certain federal and state securities commissions, the Obligors shall have obtained all governmental approvals required in connection with the lawful sale and issuance of the Note.

(c)    Legal Requirements. At the Closing, the sale and issuance by the Issuer, and the purchase by the Purchaser, of the Note shall be legally permitted by all laws and regulations to which the Purchaser or either of the Obligors are subject.

(d)    Proceedings and Documents. All corporate and other proceedings in connection with the transactions contemplated at the Closing and all documents and instruments incident to such transactions shall be reasonably satisfactory in form and substance to the Purchaser, and the Obligors shall provide a legal opinion of counsel as to the due authorization of this Agreement and the other Transaction Documents.

(e)    Transaction Documents.  The Purchaser shall have received executed copies of this Agreement and the other Transaction Documents.

7.  **Conditions to Obligations of the Issuer**. The Issuer's obligation to issue and sell the Note at the Closing is subject to the fulfillment, on or prior to the Closing Date, of the following conditions, any of which may be waived in whole or in part by the Issuer:

(a)    Representations and Warranties. The representations and warranties made by the Purchaser in Section 4 hereof shall be true and correct.

(b)    Governmental Approvals and Filings.  Except for any notices required or permitted to be filed after the Closing Date with certain federal and state securities commissions, the Issuer shall have obtained all governmental approvals required in connection with the lawful sale and issuance of the Note.

– 9 –

(c)    Legal Requirements.  At the Closing, the sale and issuance by the Issuer, and the purchase by the Purchaser, of the Note shall be legally permitted by all laws and regulations to which the Purchaser or the Issuer are subject.

(d)    Purchase Price.  The Purchaser shall have delivered to Issuer the Purchase Price in respect of the Note being purchased when and as the Purchaser is required to pay the Purchase Price hereunder.

(e)    Proceedings and Documents. All corporate and other proceedings in connection with the transactions contemplated at the Closing and all documents and instruments incident to such transactions shall be reasonably satisfactory in form and substance to the Issuer, and the Purchaser shall provide a legal opinion of counsel as to the due authorization of this Agreement and the other Transaction Documents

(f)    Transaction Documents.  The Issuer shall have received executed copies of this Agreement and the other Transaction Documents.

8.  **Miscellaneous.**

(a)    Waivers and Amendments. Any provision of this Agreement may be amended, waived or modified only upon the written consent of the Obligors and the Purchaser.

(b)    Governing Law; Jurisdiction.

(i)    This Agreement and all actions arising out of or in connection with this Agreement shall be governed by and construed in accordance with the laws of the State of Florida, without regard to the conflicts of law provisions of the State of Florida or of any other state.

(ii)    Each party to this Agreement irrevocably consents to the service of process in the manner provided for notices in Section 8(h). Nothing in this Agreement or in any other Transaction Document will affect the right of any party hereto to serve process in any other manner permitted by law.

(c)    Survival.  The representations, warranties, covenants and agreements made herein shall survive the execution and delivery of this Agreement.

(d)    Successors and Assigns.  The rights and obligations of the Obligors and the Purchaser shall be binding upon and benefit the respective successors, assigns, heirs, administrators and transferees of such parties.

(e)    Registration, Transfer and Replacement of the Note. The Issuer will keep, at its Principal Office, books for the registration and registration of transfer of the Note.  Prior to presentation of the Note for registration of transfer, the Issuer shall treat the Person in whose name such Note is registered as the owner and holder of such Note for all purposes whatsoever, whether or not such Note shall be overdue, and the Issuer shall not be affected by notice to the contrary. Subject to any restrictions on or conditions to transfer set forth in the Note, the holder of the Note, at his/her/its option, may in person or by duly authorized attorney surrender the same for exchange at

- 10 -

the Principal Office, and promptly thereafter and at the Issuer's expense, except as provided below, receive in exchange therefor one or more new Note(s), which shall be for the same principal amount as the then unpaid principal amount of the Note so surrendered and shall be dated the date to which interest shall have been paid on the Note so surrendered or, if no interest shall have yet been so paid, dated the date of the Note so surrendered, and registered in the name of such Person or Persons as shall have been designated in writing by such holder or its attorney. Upon receipt by the Issuer of evidence reasonably satisfactory to it of the ownership of and the loss, theft, destruction or mutilation of the Note and (i) in the case of loss, theft or destruction, of indemnity reasonably satisfactory to it; or (ii) in the case of mutilation, upon surrender thereof, the Issuer, at its expense, will execute and deliver in lieu thereof a new Note executed in the same manner as the Note being replaced, and in the case of a lost, stolen or destroyed Note, in the same principal amount as the unpaid principal amount of such Note and dated the date to which interest shall have been paid on such Note or, if no interest shall have yet been so paid, dated the date of such Note.

(f)     <u>Assignment by the Issuer</u>. The rights, interests and obligations hereunder may not be assigned, by operation of law or otherwise, in whole or in part, by the Issuer without the prior written consent of the Purchaser. Purchaser may assign its interests and obligations hereunder.

(g)     <u>Entire Agreement</u>. This Agreement, together with the other Transaction Documents, constitutes and contains the entire agreement among the Obligors and the Purchaser and supersedes any and all prior agreements, negotiations, correspondence, understandings and communications between the parties, whether written or oral, respecting the subject matter hereof.

(h)     <u>Notices</u>. All notices, requests, demands, consents, instructions or other communications required or permitted hereunder shall be in writing and faxed, mailed or delivered to each party as follows: (i) if to the Purchaser, at the Purchaser's address or facsimile number set forth on the signature page below or at such other address as the Purchaser shall have furnished the Issuer in writing, or (ii) if to the Issuer, at the Principal Office, or at such other address or facsimile number as the Issuer shall have furnished to the Purchaser in writing. All such notices and communications will be deemed effectively given the earlier of (i) when received, (ii) when delivered personally, (iii) one Business Day after being delivered by facsimile (with receipt of appropriate confirmation), (iv) one Business Day after being deposited with an overnight courier service of recognized standing or (v) four days after being deposited in the U.S. mail, first class with postage prepaid.

(i)     <u>Expenses</u>. Each party shall pay the fees and expenses of its respective counsel with respect to the negotiation, execution, delivery, performance and enforcement of the Agreement and the Transaction Documents.

(j)     <u>Further Assurances</u>. Upon the reasonable request of the Purchaser or any Obligor, the Purchaser or the Obligor, as the case may be, agrees to take any and all actions, including, without limitation, the execution of certificates, documents or instruments, necessary or appropriate to give effect to the transactions contemplated by this Agreement

(k)     <u>Remedies</u>. In addition to the remedies set forth in the Note, upon the occurrence or existence of any Event of Default, the Purchaser may exercise any other right, power or remedy granted to it by the Transaction Documents or otherwise permitted to it by law, either by suit

in equity or by action at law, or both.  The Issuer acknowledges that violation of any one or more of the terms of this Agreement or any other Transaction Document would immeasurably and irreparably damage the Purchaser, and, accordingly, the Issuer agrees that for any violation or threatened violation of any of such terms, the Purchaser shall, in addition to any other rights and remedies available to it, at law or otherwise (including, without limitation, the recovery of damages from the Obligors), be entitled to specific performance and an injunction to be issued by any court of competent jurisdiction enjoining and restraining the Obligors, or either of them, from committing any violation or threatened violation of the terms hereof.

(l)   Waivers.  No waiver, termination or discharge of this Agreement, or any of the terms or provisions hereof, shall be binding upon either party hereto unless set forth in writing and signed by the party to be bound thereby. Any waiver of any term or condition shall not be construed as a waiver of any subsequent breach or a subsequent waiver of the same term or condition, or a waiver of any term or condition of this Agreement. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

(m)   Severability of this Agreement. If any provision of this Agreement shall be judicially determined to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

(n)   Titles and Subtitles.  The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

(o)   Counterparts. This Agreement may be executed in any number of counterparts (including by way of electronic transmission), each of which shall be an original, but all of which together shall be deemed to constitute one instrument.

(p)   Time Is of the Essence.  Time is of the essence of this Agreement, and of each provision hereof.

(q)   **WAIVER OF JURY TRIAL.**  EACH PARTY HERETO IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF THIS AGREEMENT OR ANY OTHER TRANSACTION DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER TRANSACTION DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

- 12 -

*[Signature page follows]*

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the date and year first written above.

**ISSUER:**

**BRENTWOOD FINANCIAL, LLC**
a Florida limited liability company

By: _____

Name:

Title:


**PURCHASER:**


**Marie Weigl**

_____



Address for Notices:



[SIGNATURE PAGE TO NOTE PURCHASE AGREEMENT]

## EXHIBIT A

### FORM OF NOTE

[Attach when finalized]

### GUARANTY OF MICHAEL A. LIBERTY

FOR VALUE RECEIVED, and to induce Marie Weigl ("Lender"), to make loans to Brentwood Financial, LLC a Florida limited liability company (together with its successors and assigns, "Borrower"), the undersigned, for Ten Dollars ($10.00) paid and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, agrees as follows:

### 1.      CHARACTER OF OBLIGATION.

The undersigned hereby unconditionally guarantees the full payment and performance by Borrower of any such loans and/or advances, whether or not evidenced by promissory notes, any obligations for letters of credit or agreements with respect thereto, any drafts or any obligations for acceptances or agreements with respect thereto, including all interest and other charges stated therein, any other loans, promissory notes, advances or overadvances, including all interest and other charges stated therein, all obligations of Borrower under any security agreement, instrument of lien, security deed or other security device in favor of Lender, and all other obligations of Borrower to Lender however and whenever incurred or evidenced, whether direct or indirect, absolute or contingent, or due or to become due (hereafter the "Obligations").  This is a guaranty of payment rather than of collection; this is also a continuing guaranty and all liabilities to which this guaranty applies, or may apply, under the terms hereof shall be presumed to have been created in reliance hereon.  The obligation of the undersigned hereunder is primary and unconditional and shall be enforceable before, concurrently or after any claim or demand is made or suit is filed against Borrower or any other guarantor or surety, and before, concurrently or after any proceeding by Lender against any security, and shall be effective regardless of the solvency or insolvency of Borrower at any time, the extension or modification of the Obligations by operation of law, or the subsequent reorganization, merger or consolidation of Borrower, or any other change in its composition, nature, personnel or location.  The obligation hereunder may be considered by Lender either as a guaranty or agreement of surety.  Payment of any sum or sums due to Lender hereunder will be made by the undersigned immediately upon demand by Lender.  If claim is ever made upon Lender for repayment or recovery of any amount or amounts received by Lender in payment of any of the Obligations and Lender repays all or part of said amount by reason of (a) any judgment, decree or order of any court or administrative body having jurisdiction over Lender or any of its property, or (b) any settlement or compromise of any such claim effected by Lender with any such claimant (including Borrower), then in such event the undersigned agrees that any such judgment, decree, order, settlement or compromise shall be binding upon the undersigned, notwithstanding any revocation hereof or the cancellation of any note or other instrument evidencing any of the Obligations, and the undersigned shall be and remain obligated to Lender hereunder for the amount so repaid or recovered to the same extent as if such amount had never originally been received by Lender.  The undersigned agrees that the books and records of Lender showing the account between Lender and Borrower shall be admissible in evidence in any action or proceeding, shall be binding upon the undersigned for the purpose of establishing the items therein set forth, and shall constitute prima facie proof thereof, except that the monthly statements rendered to Borrower by Lender shall, to the extent to which no objection is made within thirty (30) days after date thereof, constitute an account stated between Lender and Borrower binding upon the undersigned.  The undersigned agrees to pay all costs of Lender of collection of any sum or sums due hereunder, and, if collected by or through an attorney, reasonable attorneys' fees together with all other legal and court expenses.  The undersigned hereby transfers and conveys to Lender any and all of his balances, credits, deposits, accounts, items and monies now or hereafter in possession or control of, or otherwise with Lender, and Lender is hereby given a security interest upon and in all property of the undersigned of every kind and description now or hereafter in the possession or control of Lender for any

03151880.04
01601620.1

reason, including all dividends and distributions or other rights in connection therewith. The undersigned agrees that his obligation hereunder shall not be discharged or impaired in any respect by reason of any failure by Lender to perfect, or continue perfection of, any lien or security interest in any security or any delay by Lender in perfecting any such lien or security interest.

2.    **CONSENT AND WAIVER.**

The undersigned waives notice of acceptance hereof, creation of any of the Obligations, or nonpayment or default by Borrower under any of the Obligations or any agreement now or hereafter existing between Borrower and Lender, presentment, demand, notice of dishonor, protest and any other notices whatever. The undersigned, without affecting his liability hereunder, consents to and waives notice of all changes of terms of the Obligations, the withdrawal or extension of credit or time to pay, the release of the whole or any part of the Obligations, renewal, indulgence, settlement, compromise or failure to exercise due diligence in collection, the acceptance or release of security, extension of the time to pay for any period or periods whether or not longer than the original period, or any surrender, substitution or release of any other person directly or indirectly liable for any of the Obligations or any collateral security given by Borrower.  The undersigned agrees that he shall not exercise any right of subrogation, reimbursement or indemnity whatsoever or any right of recourse to or with respect to any assets or property of Borrower or to any collateral for the Obligations, except following indefeasible payment in full of the Obligations.   The undersigned also consents to and waives notice of any arrangements or settlements made in or out of court in the event of receivership, liquidation, readjustment, any proceeding under Title 11 of the United States Code (entitled "Bankruptcy") as amended, or assignment for the benefit of creditors of Borrower, and anything whatever whether or not herein specified which may be done or waived by or between Lender and Borrower, or Borrower and any other person whose claim against Borrower has been or shall be assigned or transferred to Lender.  The undersigned agrees that if any notification of intended disposition of collateral or of any other act by Lender is required by law and a specific time period is not stated therein, such notification, if mailed by first class mail at least five (5) days before such disposition or act, postage prepaid, addressed to the undersigned either at the address shown below or at any other address of the undersigned appearing on the records of Lender, shall be deemed reasonably and properly given. Lender may, without notice of any kind, sell, assign or transfer any or all of the Obligations and in such event each and every immediate and successive assignee, transferee or holder of any of the Obligations shall have the right to enforce this Guaranty, by suit or otherwise for the benefit of such assignee, transferee or holder, as fully as if such assignee, transferee or holder were herein by name specifically given such rights, powers and benefits; Lender shall have an unimpaired right prior and superior to that of any such assignee, transferee or holder to enforce this Guaranty for the benefit of Lender as to such of the Obligations as is not sold, assigned or transferred. THE UNDERSIGNED HEREBY WAIVES ANY AND ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED HEREON.

3.    **CONSTRUCTION.**

This Guaranty shall be governed by and construed and enforced in accordance with the laws of the State of Florida. Wherever possible, each provision of this Guaranty shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Guaranty shall be prohibited by or invalid under applicable law, said provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Guaranty. This Guaranty does not supersede any other guaranty or other agreement executed by the undersigned, or any other guaranty in favor of Lender.

4.    **BENEFIT.**

This Guaranty shall bind the undersigned, his and their heirs, personal representatives and assigns (but only to the extent that they have received assets from the undersigned or the undersigned's estate (whether by gift, bequest, devise, or otherwise)) and the rights and privileges of Lender hereunder shall inure to the benefit of its successors and assigns, and this Guaranty shall be effective with respect to loans or advances made by Lender's successors and assigns to Borrower.

5.    **DURATION.**

This Guaranty shall continue in full force and effect until all of the Obligations have been indefeasibly fully repaid to Lender in their entirety.

Signed and sealed this 11th day of , 2012.

Name:  Michael A. Liberty

Address:

_____

_____