# EXHIBIT 5

# MOZIDO INVESCO, LLC
# OFFERING CIRCULAR
# RESCISSION OFFER

# Exhibit J

Offering Circular Number _____          Name of Offeree _____

---

## OFFERING CIRCULAR

---

# MOZIDO INVESCO, LLC

**Rescission Offer**

**$6,430,000 Principal Amount**

**Convertible Promissory Notes**

---

**See "Risk Factors" beginning on page 20 to read about certain factors you
should consider before accepting or rejecting this rescission offer.**

---

THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE
SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES
COMMISSION NOR HAS THE COMMISSION OR ANY STATE SECURITIES
COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF
THIS OFFERING CIRCULAR OR THE RESCISSION OFFER.
ANY REPRESENTATION TO THE CONTRARY
IS A CRIMINAL OFFENSE.

June 13, 2011

{M0276460.9 }

THE SECURITIES SUBJECT TO THE RESCISSION OFFER HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE. THE RESCISSION OFFER MADE IN THIS OFFERING CIRCULAR IS BEING MADE IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND SUCH LAWS OR IN A TRANSACTION EXEMPT FROM SUCH REGISTRATION OR OTHERWISE IN COMPLIANCE WITH THE SECURITIES ACT AND SUCH LAWS, INCLUDING WITHOUT LIMITATION THE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT SET FORTH IN SECTION 4(2) THEREOF.

THIS OFFERING CIRCULAR CONSTITUTES AN OFFER ONLY TO THE PERSON WHOSE NAME APPEARS IN THE SPACE PROVIDED ON THE COVER PAGE HEREOF. DELIVERY OF THIS OFFERING CIRCULAR OR ANY OTHER DOCUMENTS OR INFORMATION FURNISHED TO AN OFFEREE TO ANYONE OTHER THAN THE PERSON NAMED ON THE COVER PAGE IS UNAUTHORIZED AND ANY REPRODUCTION THEREOF, IN WHOLE OR IN PART, OR ANY DIVULGENCE OF THE CONTENTS THEREOF, IN WHOLE OR IN PART, WITHOUT THE PRIOR WRITTEN CONSENT OF THE COMPANY IS PROHIBITED.

THE OFFEREE, BY ACCEPTING DELIVERY OF THIS OFFERING CIRCULAR, ACKNOWLEDGES AND AGREES THAT HE, SHE OR IT WILL KEEP ALL OF THE INFORMATION SET FORTH IN THIS OFFERING CIRCULAR CONFIDENTIAL AND NOT COPY OR DISCLOSE SUCH INFORMATION.

THIS OFFERING CIRCULAR DOES NOT CONSTITUTE AN OFFER OR SOLICITATION IN ANY STATE OR OTHER JURISDICTION IN WHICH SUCH AN OFFER OR SOLICITATION IS NOT AUTHORIZED OR IS UNLAWFUL.

OFFEREES ARE NOT TO CONSTRUE THE CONTENTS OF THIS OFFERING CIRCULAR AS LEGAL, TAX OR INVESTMENT ADVICE. EACH OFFEREE SHOULD SEEK HIS OWN LEGAL, TAX AND INVESTMENT ADVICE FROM QUALIFIED PROFESSIONALS PRIOR TO MAKING A DECISION TO ACCEPT OR REJECT THE RESCISSION OFFER.

CERTAIN STATEMENTS MADE IN THIS OFFERING CIRCULAR MAY BE CONSIDERED TO BE FORWARD-LOOKING STATEMENTS. SUCH FORWARD-LOOKING STATEMENTS REPRESENT THE EXPECTATIONS OR BELIEFS OF THE MANAGEMENT OF THE COMPANY CONCERNING FUTURE EVENTS AND INCLUDE, WITHOUT LIMITATION, STATEMENTS CONTAINING THE WORDS "BELIEVES," "ANTICIPATES," "EXPECTS" AND WORDS OF SIMILAR MEANING OR IMPORT. SUCH FORWARD-LOOKING STATEMENTS RELATE TO FUTURE EVENTS AND THE FUTURE FINANCIAL PERFORMANCE OF THE COMPANY AND THE INDUSTRY IN WHICH IT IS INVOLVED AND INVOLVE KNOWN AND UNKNOWN RISKS, UNCERTAINTIES AND OTHER IMPORTANT FACTORS WHICH COULD CAUSE ACTUAL RESULTS, PERFORMANCE OR ACHIEVEMENTS EXPRESSED OR IMPLIED BY SUCH FORWARD-LOOKING STATEMENTS TO DIFFER MATERIALLY FROM THE

{M0276460.8}2

RESULTS PREDICTED IN THIS OFFERING CIRCULAR. INVESTORS SHOULD CONSIDER THE VARIOUS FACTORS IDENTIFIED IN THE "RISK FACTORS" SECTIONS OF THIS OFFERING CIRCULAR AND ELSEWHERE IN THIS OFFERING CIRCULAR THAT COULD CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY FROM THE RESULTS PREDICTED IN THE FORWARD-LOOKING STATEMENTS.

NO DEALER, SALESMAN OR OTHER PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION ON BEHALF OF THE COMPANY RELATED TO THIS RESCISSION OFFER OTHER THAN AS SET FORTH IN THIS OFFERING CIRCULAR.

# THE COMPANY

Mozido Invesco, LLC is a Maine limited liability company. Our principal office is located at 28 Woodside Lane, Freeport, Maine 04032. Our only business is to own approximately 15% of the common units issued by Mozido Investments, LLC, a Florida limited liability company, the only business of which is to own approximately 78% of the membership units issued by Affinity Holding, LLC, a Delaware limited liability company. Affinity Holding, LLC's only business is to own 100% of the membership units issued by Mozido, LLC, a Delaware limited liability company. Through its interest in Affinity Holding, Mozido Investments indirectly owns approximately 51% of the membership units issued by Mozido, LLC, calculated on a fully diluted basis, giving effect to the exercise or conversion of all securities convertible into or exercisable for such membership units.

# MOZIDO, LLC

## Business

Mozido, LLC is a provider of low-cost, white-labeled mobile financial services (mFS) focused consumers globally that either (i) do not have access to traditional financial services such as bank accounts and credit cards or (ii) have a bank account but are disenfranchised by formal financial institutions and rely heavily on alternative financial services. These consumers typically do not have the ability to meet minimums, including credit scores, required for opening accounts, do not reside within reasonable proximity to bank branches and ATM networks and/or do not trust financial institutions.

Electronic wallets (eWallets) are being developed around the world as an integral component to mobile banking (mBanking) and mFS programs. mBanking is becoming popular in the developed world as brand-name banks such as Bank of America, Chase and WaMu offer smartphone applications that are extensions of the web portals their customers currently use. eWallets are embedded in these applications and are linked to the customer's bank account so that they may make mobile purchases directly from their phones. These mBanking programs are used to drive customer retention as opposed to generating revenue for banks.

An mFS program, on the other hand, uses eWallets to drive transactional revenue for mobile financial services not readily available to the underbanked, thereby expanding the clients' market. Mozido believes that mFS programs are best suited for the underbanked consumer demographic, which typically pays high fees for money transfer, check cashing and bill payment. When given time for adoption, mFS programs have experienced success in several developing economies.

Mozido's mFS platform is provided to clients exclusively on a white-labeled basis, in which Mozido develops customized eWallets that are branded as the clients' own products. Mozido-powered eWallets provide the ability to perform transactions including cash deposits and withdrawals, mobile money transfers, point-of-sale retail purchases, mobile air-time purchases, mobile bill payments, direct payroll deposits, loans and others. The eWallet

functionality can be accessed by the consumer on any type of mobile phone, as well as through the Internet and interactive voice response. Mozido's clients benefit from the ability to provide fee-generating services to customers via remote channels, while customers benefit from lower transaction fees and the convenience of remote payment ability as an alternative to time-consuming, in-person financial transactions such as check cashing, paying bills at a bank and purchasing air time at a kiosk.

Mozido's eWallet solution is built on a robust, highly-scalable technology platform that has been commercially operational since 2007. We believe that Mozido was the first company to launch an eWallet in the United States, the first company to perform an international mobile-to-cash money transfer and the first company to launch a prepaid phone with an eWallet on a nationwide basis. Mozido is currently partnered with an international money transfer company and is in contract negotiations with financial institutions, mobile network operators and retailers. According to a 2010 report from McKinsey & Company, mobile financial services "underbanked" demographic could represent an $8 billion revenue opportunity by 2012. We believe that Mozido has the technology platform and human capital in place to capture a significant portion of this market.

Mozido believes that its eWallet offering is unique in that it has the technology platform in place to interface with any type of cell phone. Therefore, all consumers have the ability to use Mozido's full suite of mFS, irrespective of their cell phone technology or geographic location. There are four primary alternatives for mobile phone integration with Mozido's eWallet:

_Unstructured Supplementary Services Data (USSD) Technology_: To access the eWallet, a consumer dials a preprogrammed phone number on his mobile phone. The phone number acts as a USSD command and is routed back to the mobile network operator, which in turn interprets the command and sends a rudimentary eWallet menu screen with mFS options back to the mobile device. The consumer executes a transaction by interfacing directly with the mobile network operator through the simple menu that appears on the mobile phone. This integration requires Mozido to have a partnership with the wireless carrier. However, a data plan is not required, and eWallets can be accessed via USSD regardless of the type or quality of phone.

_Mobile Browser_: The consumer uses the web browser on the mobile phone to login to Mozido's online portal. The consumer can then access his eWallet account and execute any available mFS transaction. This scenario requires the consumer to have a data plan and the ability to access the mobile web on his device. The usability varies with the quality of the phone and therefore mobile browser (for example, Safari on iPhone is highly usable, while the browser on a pre-paid, "candy bar" phone is less so). Mozido does not require a partnership with the wireless carrier in this integration method.

_Smartphone Application_: Consumers with an iPhone, Blackberry, Droid or comparable smartphone download the electronic wallet application via their respective carrier or device-specific application store. This arrangement does not require Mozido to have a partnership with the carrier. Additionally, the user interface is maximized given the full-color screens, QWERTY keyboards and in some cases touch-screen capability.

*SIM Toolkit*: The eWallet application is embedded in the mobile phone SIM card. This integration requires Mozido to have a partnership with the wireless carrier, as the carrier is the party responsible for the distribution of the SIM card to the consumer. The carrier has the ability to deliver the new SIM card via mail, in a retail store or over-the-air. A data plan is not required in this scenario, and an eWallet application can be loaded onto any SIM Card regardless of the type or quality of mobile phone.

Mozido currently operates with normalized monthly corporate overhead expenses of approximately $400,000. These operating costs support fourteen employees across a variety of functions, including executive management, finance and administration, operations, business development, product and software development, and technology and infrastructure.

Mozido is a Delaware limited liability company, and its principal executive office is located at 1950 Stemmons Freeway, Suite 6040, Dallas, Texas 75207.

## Recent Developments

### *Executed Contracts*

Mozido has recently executed a number of contracts to provide its eWallet applications and mFS to consumers, including:

- A five-year exclusive contract with Jamaica Co-operative Credit Union League Limited, to provide fully functional eWallet services covering 17 countries in the Caribbean.

- A five-year exclusive memorandum of understanding with FirstCaribbean International Bank to provide fully functional eWallet services to customers in countries served by the bank.

- An agreement with UniRush, LLC, a provider of prepaid debit cards with more than 3,500,000 members. Under this agreement, Mozido will be providing financial services thru an eWallet attached to the debit card. In addition, Mozido believes that additional services, such as "mobile top-up" or "prepaid refill," exclusive content sales and advertising, may generate significant additional revenue.

- A memorandum of understanding with Scotiabank to provide eWallet services throughout several countries in Central America.

- A memorandum of understanding with Coca-Cola FEMSA, S.A. de C.V., the largest Coca-Cola bottler in Latin America, to help replace cash payments for deliveries and solve key logistical problems in Costa Rica.

- A memorandum of understanding with Canadian Tire Corporation, Limited, a Toronto-based retailer with more than 1,200 retail and gasoline outlets across Canada, to bring its own branded eWallets to millions of users in Canada.

- A memorandum of understanding with Cafe Maravilloso to provide full eWallet services in the Caribbean and Central America, in which large consumer products companies are expected to entice their retail convenience stores or "pulperias" to prepay for their purchases over Mozido's platform by offering deep discounts, product giveaways and the ability to provide eWallets to their customers.

### Additional Contract Negotiations

Mozido is in advanced stages of contract negotiations with multiple additional parties and expects to execute additional agreements in advance of completing the proposed multi-tenant platform update described below.

### Multi-Tenant Platform Update

Mozido currently operates on a silo platform environment, in which each new client operates on a dedicated cluster of servers. Mozido is currently developing a multi-tenant platform that will support multiple clients in a secure, efficient manner using shared servers. Mozido expects that the sharing of servers will substantially reduce its implementation costs for each client.

### Money Transmitter Licenses

Mozido is in the process of applying for money transmitter licenses, both domestically and abroad. Mozido is currently partnered with an international money transfer company, and is able to offer money transfer services in the interim under this arrangement. Mozido's expectation is that, once it receives its money transmitter licenses it will be able to perform money transfers at a fraction of the current cost and therefore significantly enhance its margins.

## Financial Information

Mozido's audited financial statements for the fiscal years ended June 30, 2010 and June 30, 2009, and its unaudited financial statements for the most recent fiscal period available, will be delivered to recipients of this Offering Circular as soon as practicable.

## THE RESCISSION OFFER

## Background

Between September 2010 and May 2011, we issued convertible promissory notes in the aggregate principal amount of $8,035,000 to 80 purchasers. The principal balance of the notes, together with interest that accrues at the noncompounded rate of 5% per annum, is due and payable in a single balloon payment on the earlier of July 31, 2015 or the occurrence of certain events of default (as set forth in the notes).

Each holder of a note may elect, in his or her sole discretion and at any time before the maturity date of the notes, to convert any outstanding and unpaid principal portion of such holder's note, and any accrued but unpaid interest on such portion, into common units of Mozido Investments, LLC owned by our company. The number of Mozido Investments units to be issued upon each conversion of a note is determined by dividing that portion of the principal of the note to be converted and any accrued but unpaid interest on such portion, by the conversion price. The conversion price is initially $55,000 per common unit. The conversion price, however, is subject to equitable adjustment in the event of certain events such as the payment of certain dividends on the common units, certain distributions to the holders of common units and certain splits or combinations of the common units.

If the holders of all of the promissory notes convert the entire principal balance of the notes into common units, not including accrued interest, the holders would own approximately 14.6% of the outstanding equity interests of Mozido Investments LLC, representing indirect ownership of approximately 78% of the equity of Mozido, LLC (approximately 51% of such equity, calculated on a fully diluted basis, giving effect to the exercise or conversion of all securities convertible into or exercisable for such equity or the equity or its parent companies).

**The Rescission Offer and the Price Offered**

We hereby offer, upon the terms and conditions set forth in this Offering Circular, to rescind the sales of the promissory notes described above by repurchasing such notes in the aggregate principal amount of $6,430,000 from 66 purchasers who are or were residents of Colorado, Connecticut, Florida, Maine, Massachusetts, Michigan, New York, North Carolina, Pennsylvania, Oklahoma, Utah, Vermont and Wisconsin, in each case for an amount equal to the original principal amount of the note, together with interest calculated from the date on which such note was issued through the date that the rescission offer expires or such earlier date as the rescission offer is accepted, at the interest rate mandated by the state of residence of each offeree, as set forth below. At this time, we are not offering to repurchase additional notes in the aggregate principal amount of $1,375,000 from 12 purchasers who are or were residents of California and New Hampshire, or notes in the aggregate principal amount of $230,000 from two purchasers who are not resident in the United States. Federal law does not provide a specific rate to be used in the calculation of the consideration to be received in connection with the repurchases of securities by an issuer in a rescission offer. The legal rates of interest for the repurchase of the notes are as follows:

| State | Interest Rate | State | Interest Rate |
|---|---|---|---|
| Colorado | 8% | New York* | 6% |
| Connecticut | 6% | North Carolina | 8% |
| Florida | 6% | Oklahoma | 6% |
| Maine | 6% | Pennsylvania | 6% |
| Massachusetts | 6% | Utah | 12% |
| Michigan | 6% | Vermont | 12% |
| | | Wisconsin | 6% |

\* New York law does not provide a specific interest rate. For purposes of the rescission offer, we are applying the rate of interest of Maine (our principal place of business) to calculate the consideration to be received by New York residents who may be entitled to rescission rights.

**Reasons for Offer**

We did not register the offering and sale of the promissory notes under federal or state securities laws. The exemptions from the registration requirements on which we relied in certain states do not permit us to issue additional notes to additional investors in those states. We therefore recently engaged additional legal counsel to help us determine how we could continue to offer and sell additional notes.

At the time we issued our outstanding notes, we believed in good faith that the offering and sale of the notes was exempt from these registration requirements. After discussing the offering with our new counsel, however, we have been unable to confirm that the offers and sales complied in all respects with these laws. In certain states, for example, even though the numbers of investors purchasing notes were within the limits mandated by the exemptions on which we relied, the numbers of offers we made may have exceeded related limitations. In addition, we made consulting payments to an individual who had assisted us in identifying prospective investors and effecting certain of these offers and sales. This individual was not registered as a broker-dealer under federal law. Although we do not believe that these payments constituted commissions or other compensation for engaging in securities transactions, it is possible that securities regulators could view the matter differently. For these reasons, we cannot be sure that the issuances of the notes did not violate the Securities Act of 1933, as amended, and/or the state securities laws of California, Colorado, Connecticut, Florida, Maine, Massachusetts, Michigan, New Hampshire, New York, North Carolina, Oklahoma, Pennsylvania, Utah, Vermont and Wisconsin.

The rescission offer is intended to address these federal and state securities laws compliance issues by allowing the holders of the notes covered by the rescission offer to rescind the underlying securities transactions and sell those notes back to us. We believe that addressing these compliance issues will allow us to recommence offering additional notes to investors under Rule 506 of Regulation D under the Securities Act and under state registration exemptions that depend on compliance with Rule 506.

If the rescission offer is accepted by all offerees, we will be required to make an aggregate payment to the offerees of approximately $6,700,000, which includes estimated interest for an average holding period of five months at an average statutory rate of 8% per annum.

We believe that the rescission offer is fair and appropriate under the circumstances and will reduce the potential of future claims and liabilities arising out of any failure to meet the registration requirements of federal and state laws in connection with the original offering of the notes. As such, we believe that the rescission offer is in the best interests of our company and our

members and the offerees. However, neither we nor any of our officers, managers or members is making any recommendations to any offeree with respect to the rescission offer. Each offeree is urged to read this Offering Circular carefully and to make an independent evaluation with respect to the terms of the rescission offer.

**Acceptance, Rejection or Failure to Affirmatively Accept the Rescission Offer**

We are delivering this Offering Circular to each offeree by electronic mail to such offeree's email address as last shown on our records. We will also mail paper copies of the Offering Circular to offerees, at their address as last shown on our records, as necessary to ensure that all offerees receive the rescission offer. We will deliver the financial information referred to on page 7 of this Offering Circular to all offerees as soon as practicable. We are not responsible for the failure of any offeree not residing at such respective address to receive the rescission offer or such financial information in a timely manner. The rescission offer will expire, as to each offeree, at 5:00 p.m., Eastern Daylight Time, 30 days after receipt of the Offering Circular and such financial information by such offeree.

An offeree may accept or reject the rescission offer by completing and signing the election form included with this Offering Circular and returning it by fax or email no later than the expiration date to:

Mozido Invesco, LLC
c/o Paul E. Hess
45 Braintree Hill Office Park
Suite 304
Braintree, MA 02184
E: paulehess@gmail.com
F: 781-843-9174

Offerees should then return the originals by mail or by courier that address.

An offeree may *accept* the rescission offer by selecting "Option 1" on his or her election form. An offeree may *reject* the rescission offer by selecting "Option 2" on his or her election form.

We request that each offeree complete his or her election form, indicating whether the offeree accepts the rescission offer with respect to such offeree's note or whether the offeree rejects the rescission offer. Offerees who wish to accept the rescission offer must return with the election form the note or notes to be repurchased by us for cancellation.

ANY OFFEREE WHO ACCEPTS THE RESCISSION OFFER WILL FORFEIT SUCH OFFEREE'S NOTE AND ALL RIGHTS THEREUNDER. IF PERSONS DESIRING TO ACCEPT THE RESCISSION OFFER INTEND TO MAKE USE OF THE MAIL TO RETURN THEIR NOTES, INSURED REGISTERED MAIL, RETURN RECEIPT REQUESTED, IS RECOMMENDED.

Within fifteen days after the expiration date, we will pay for any note as to which the rescission offer has been validly accepted.

If an offeree fails to validly accept the rescission offer, or if an offeree affirmatively rejects the offer by so indicating on the attached election form, such offeree will retain ownership of such offeree's promissory note and will not receive any cash for the note in connection with the rescission offer. Such an offeree's rights will continue to be governed by the terms of the note and by the related note purchase agreement executed by such offeree in connection with his or her purchase of the note.

**Solicitation**

We have not retained, nor do we intend to retain, any person to make solicitations or recommendations in connection with the rescission offer.

**Effect of Rescission Offer**

As described above, at the time we issued our outstanding notes, we believed in good faith that the offering and sale of the notes was exempt from registration requirements under federal and state law. After discussing the offering with our new counsel, however, we have been unable to confirm that the offers and sales complied in all respects with these laws. It is unclear whether the rescission offer will terminate our liability, if any, for failure to register or qualify the issuance of the notes under either federal or state securities laws. Accordingly, should the rescission offer be rejected by any or all offerees, we may continue to be contingently liable under the Securities Act and applicable state securities laws for the purchase price of the notes, up to an aggregate amount of approximately $6,700,000, which includes estimated interest for an average holding period of five months at an average statutory rate of 8% per annum. However, unless the notes are converted into common units of Mozido Investments, LLC, we will be required to repay the offerees the entire original principal balance of the notes, together with interest at the rate of 5% per annum, upon the maturity of the notes or upon an earlier default. An offeree who fails to accept, or affirmatively rejects, the rescission offer will, therefore, retain the right to be repaid his or her entire investment, together with interest, in accordance with the terms of the notes.

In addition, it is possible that offerees may continue to have rights under common law or fraud in the state in which the potential securities violation with respect to such offeree's note occurred. We believe that an offeree's acceptance of the rescission offer will preclude such offeree from later seeking similar relief under general theories of estoppel, and we are unaware of any federal or state case law to the contrary. However, each offeree is urged to consult with an attorney regarding all of such offeree's legal rights and remedies before deciding whether or not to accept the rescission offer.

At this time, we are not extending the rescission offer to 12 purchasers of notes who are or were residents of California and New Hampshire or to two purchasers who are not resident in the United States. The rescission offer will not affect the rights of such holders to seek rescission at a later date.

Regardless of whether offerees accept the rescission offer, we believe that any remedies an offeree may have after the rescission offer expires would not be greater than an amount the offeree would receive in the rescission offer.

Below is a discussion of our contingent liability as a result of potential securities laws violations resulting from the issuance of the notes covered by the rescission offer on a state-by-state basis. Each state has different laws with respect to rights under common law and fraud and the following discussion of state law does not relate to the antifraud provisions of applicable securities laws or rights under common law or equity.

### *Colorado*

We did not register the issuance of the notes that are subject to the rescission offer under the registration requirements of Section 11-51-301 of the Colorado Securities Act, nor did we take affirmative steps to ensure the availability to us of any exemption from registration provided in Section 11-51-307 or Section 11-51-308 of such Act. Under Colorado law, an issuer is civilly liable to a purchaser of its securities sold in violation of the registration or qualification requirements of the Colorado Securities Act. The purchaser may sue to recover the consideration paid for such securities, together with interest at 8% per year from the date of payment, costs and reasonable attorneys' fees, less the amount of any income received on the securities, or for damages if the purchaser no longer owns the securities, at any time prior to the two year anniversary of the date of the contract for sale of such securities.

However, we may terminate the rights of the purchasers to seek additional remedies under the Colorado Securities Act by making a written rescission offer, before suit, to refund the consideration paid together with interest at 8% from the date of payment, less the amount of any income received on the securities. If the purchaser owns the securities and fails to accept such offer within 30 days of its receipt, that purchaser will no longer have any right of rescission under Colorado law. If the purchaser receives such offer at a time when the purchaser does not own the securities, that purchaser will no longer have any right of rescission under Colorado law unless the purchaser rejects the offer in writing within 30 days of its receipt.

We believe the rescission offer complies in all material respects with the rescission offer requirements of the Colorado Securities Act.

### *Connecticut*

We did not register the issuance of the notes that are subject to the rescission offer under the registration requirements of Section 36b-16 of the Connecticut Uniform Securities Act, nor did we take affirmative steps to ensure the availability to us of any exemption from registration provided in Section Sec. 36b-21 of such Act. Under Connecticut law, an issuer is civilly liable to a purchaser of its securities sold in violation of the registration or qualification requirements of the Connecticut Uniform Securities Act. The purchaser may sue either at law or in equity to recover the consideration paid for such securities, together with interest at 8% per year from the date of payment, costs and reasonable attorneys' fees, less the amount of any income received on

the securities, or for damages if the purchaser no longer owns the securities, at any time prior to the two year anniversary of the date of the contract of sale.

However, we may terminate the rights of the purchasers to seek additional remedies under the Connecticut Uniform Securities Act by making a written rescission offer, before suit, to refund the consideration paid together with interest at 6% from the date of payment, less the amount of any income received on the securities. If the purchaser owns the securities and fails to accept such offer within thirty days of its receipt, that purchaser will no longer have any right of rescission under Connecticut law. If the purchaser receives such offer at a time when the purchaser does not own the securities, that purchaser will no longer have any right of rescission under Connecticut law unless the purchaser rejects the offer in writing within 30 days of its receipt.

We believe the rescission offer complies in all material respects with the rescission offer requirements of the Connecticut Uniform Securities Act.

### *Florida*

We did not register the issuance of the notes that are subject to the rescission offer under the registration requirements of Section 517.07 of the Florida Securities and Investor Protection Act, nor did we take affirmative steps to ensure the availability to us of any exemption from registration provided in Section 517.051 or Section 517.061 of such Act. Under Florida law, an issuer is civilly liable to a purchaser of its securities sold in violation of the registration or qualification requirements of the Florida Securities and Investor Protection Act. The purchaser may sue either at law or in equity to recover the consideration paid for such securities, together with interest at 6% per year from the date of payment, costs and reasonable attorneys' fees, less the amount of any income received on the securities, or for damages if the purchaser no longer owns the securities, at any time prior to the earlier of (i) the five year anniversary of the violation of the Florida Securities and Investor Protection Act or (ii) the two year anniversary of the date on which the person bringing the action of such violation knew or reasonably should have known of such violation.

However, we may terminate the rights of the purchasers to seek additional remedies under the Florida Securities and Investor Protection Act by making a written rescission offer, before suit, to refund the consideration paid together with interest at 6% from the date of payment, less the amount of any income received on the securities. If the purchaser owns the securities and fails to accept such offer within thirty days of its receipt, that purchaser will no longer have any right of rescission under Florida law.

We believe the rescission offer complies in all material respects with the rescission offer requirements of the Florida Securities and Investor Protection Act.

*Maine*

We did not register the issuance of the notes that are subject to the rescission offer under the registration requirements of Section 16301 of the Maine Uniform Securities Act, nor did we take affirmative steps to ensure the availability to us of any exemption from registration provided in Section 16201 or Section 16202 of such Act. Under Maine law, an issuer is civilly liable to a purchaser of its securities sold in violation of the registration or qualification requirements of the Maine Uniform Securities Act. The purchaser may sue either at law or in equity to recover the consideration paid for such securities, together with interest at 6% per year from the date of payment, costs and reasonable attorneys' fees, less the amount of any income received on the securities, or for damages if the purchaser no longer owns the securities, at any time prior to the two year anniversary of the discovery by the person bringing the action of a violation of the Maine Uniform Securities Act.

However, we may terminate the rights of the purchasers to seek additional remedies under the Maine Uniform Securities Act by making a written rescission offer, before suit, to refund the consideration paid together with interest at 6% per year from the date of payment, less the amount of any income received on the securities. If the purchaser owns the securities and fails to accept such offer within 30 days of its receipt, that purchaser will no longer have any right of rescission under Maine law.

We believe the rescission offer complies in all material respects with the rescission offer requirements of the Maine Uniform Securities Act.

*Massachusetts*

We did not register the issuance of the notes that are subject to the rescission offer under the registration requirements of Section 301 of the Massachusetts Uniform Securities Act, nor did we take affirmative steps to ensure the availability to us of any exemption from registration provided in Section 402 of such Act. Under Massachusetts law, an issuer is civilly liable to a purchaser of its securities sold in violation of the registration or qualification requirements of the Massachusetts Uniform Securities Act. The purchaser may sue either at law or in equity to recover the consideration paid for such securities, together with interest at 6% per year from the date of payment, costs and reasonable attorneys' fees, less the amount of any income received on the securities, or for damages if the purchaser no longer owns the securities, at any time prior to the four year anniversary of the discovery by the person bringing the action of a violation of the Massachusetts Uniform Securities Act.

However, we may terminate the rights of the purchasers to seek additional remedies under the Massachusetts Uniform Securities Act by making a written rescission offer, before suit, to refund the consideration paid together with interest at 6% per year from the date of payment, less the amount of any income received on the securities. If the purchaser owns the securities and fails to accept such offer within 30 days of its receipt, that purchaser will no longer have any right of rescission under Massachusetts law. If the purchaser receives such offer at a time when the purchaser does not own the securities, that purchaser will no longer have any right

of rescission under Massachusetts law unless the purchaser rejects the offer in writing within 30 days of its receipt.

We believe the rescission offer complies in all material respects with the rescission offer requirements of the Massachusetts Uniform Securities Act.

### Michigan

We did not register the issuance of the notes that are subject to the rescission offer under the registration requirements of Section 451.2301 of the Michigan Uniform Securities Act, nor did we take affirmative steps to ensure the availability to us of any exemption from registration provided in Section 451.2201 or Section 451.2202 of such Act. Under Michigan law, an issuer is civilly liable to a purchaser of its securities sold in violation of the registration or qualification requirements of the Michigan Uniform Securities Act. The purchaser may sue either at law or in equity to recover the consideration paid for such securities, together with interest at 6% per year from the date of payment, costs and reasonable attorneys' fees, less the amount of any income received on the securities, or for damages if the purchaser no longer owns the securities, at any time prior to the two year anniversary of the contract of sale.

However, we may terminate the rights of the purchasers to seek additional remedies under the Michigan Uniform Securities Act by making a written rescission offer, before suit, to refund the consideration paid together with interest at 6% per year from the date of payment, less the amount of any income received on the securities. If the purchaser owns the securities and fails to accept such offer within 30 days of its receipt, that purchaser will no longer have any right of rescission under Michigan law. If the purchaser receives such offer at a time when the purchaser does not own the securities, that purchaser will no longer have any right of rescission under Michigan law unless the purchaser rejects the offer in writing within 30 days of its receipt. The rescission offer shall not be made until 45 days after the date of sale of the securities and acceptance or rejection of the offer will not be binding until 48 hours after receipt by the issuer.

The issuer must provide the purchaser with documents making full written disclosure about the financial and business condition of the issuer and the financial and business risks associated with the retention of the securities, concurrently with the written rescission offer. The rescission offer must recite the applicable provisions of the Michigan Uniform Securities Act and will not be valid unless the issuer substantiates in the disclosure documents that it has the ability to fund the offering.

We believe that this rescission offer complies in all material respects with the rescission offer requirements of the Michigan Uniform Securities Act.

### New York

Under New York law, there is no requirement to register or qualify securities, and there is no provision for rescission offers. Accordingly, the rescission offer is being made with respect to individuals who purchased notes in New York, pursuant only to federal rights of rescission. The acceptance or non-acceptance of the rescission offer by these offerees will have no effect under

New York law. We were required to apply for an exemption from the broker-dealer registration and securities issuance requirements with the State of New York to issue the notes. Because of our failure to apply for an exemption, purchasers of notes in New York have three years to seek a remedy for our failure to register. We believe the rescission offer will foreclose any other remedy purchasers have under New York law for our failure to apply for an exemption and we are not aware of any statutory rights of action purchasers may have under New York law because of our failure to apply for an exemption.

### North Carolina

We did not register the issuance of the notes that are subject to the rescission offer under the registration requirements of Section 78A:24 of the North Carolina Securities Act, nor did we take affirmative steps to ensure the availability to us of any exemption from registration provided in Section 78A:16 or Section 78A:17 of such Act. Under North Carolina law, an issuer is civilly liable to a purchaser of its securities sold in violation of the registration or qualification requirements of the North Carolina Securities Act. The purchaser may sue either at law or in equity to recover the consideration paid for such securities, together with interest at 8% per year from the date of payment, costs and reasonable attorneys' fees, less the amount of any income received on the securities, or for damages if the purchaser no longer owns the securities, at any time prior to the two year anniversary of the contract of sale.

However, we may terminate the rights of the purchasers to seek additional remedies under the North Carolina Securities Act by making a written rescission offer, before suit, stating the respect in which liability under the registration or qualification requirements may have arisen, fairly advising the purchaser of his or her rights and offering to refund the consideration paid with interest at 8% per year from the date of payment, less the amount of any income received on the securities. If the purchaser fails to accept the rescission offer within 30 days of its receipt, that purchaser will no longer have any right of rescission under North Carolina law.

We believe the rescission offer complies in all material respects with the rescission offer requirements of the North Carolina Securities Act.

### Oklahoma

We did not register the issuance of the notes that are subject to the rescission offer under the registration requirements of Section 1-301 of the Oklahoma Uniform Securities Act, nor did we take affirmative steps to ensure the availability to us of any exemption from registration provided in Section 1-201 or Section 1-202 of such Act. Under Oklahoma law, an issuer is civilly liable to a purchaser of its securities sold in violation of the registration or qualification requirements of the Oklahoma Uniform Securities Act. The purchaser may sue either at law or in equity to recover the consideration paid for such securities, together with interest at 6% per year from the date of payment, costs and reasonable attorneys' fees, less the amount of any income received on the securities, or for damages if the purchaser no longer owns the securities, at any time prior to the one year anniversary of the violation of the Oklahoma Uniform Securities Act.

However, we may terminate the rights of the purchasers to seek additional remedies under the Oklahoma Uniform Securities Act by making a written rescission offer, before suit, to refund the consideration paid together with interest at 6% per year from the date of payment, less the amount of any income received on the securities. If the purchaser owns the securities and fails to accept such offer within 30 days of its receipt, that purchaser will no longer have any right of rescission under Oklahoma law.

We believe the rescission offer complies in all material respects with the rescission offer requirements of the Oklahoma Uniform Securities Act.

*Pennsylvania*

We did not register the issuance of the notes that are subject to the rescission offer under the registration requirements of Section 201 of the Pennsylvania Securities Act of 1972, nor did we take affirmative steps to ensure the availability to us of any exemption from registration provided in Section 202 or Section 203 of such Act. Under Pennsylvania law, an issuer is civilly liable to a purchaser of its securities sold in violation of the registration or qualification requirements of the Pennsylvania Securities Act. The purchaser may sue either at law or in equity to recover the consideration paid for such securities with interest at 6% per year from the date of payment, less the amount of any income or distributions received on the securities, or for damages if the purchaser no longer owns the securities, at any time prior to the earliest of (1) the two year anniversary of the noncompliance with the registration requirements, (2) the one year anniversary of receiving actual knowledge of the noncompliance or (3) the one year anniversary of when the noncompliance should have been reasonably discovered.

However, we may terminate the rights of the purchasers to seek additional remedies under the Pennsylvania Securities Act by making a written rescission offer, before suit, where the offer:

- states the respect in which liability under the registration or qualification requirements may have arisen and fairly advises the purchaser of his or her rights;

- offers to repurchase the securities for cash, payable on delivery of the securities, equal to the consideration paid, plus interest at 6% per year from the date of payment, less the amount of any income or distributions, in cash or in kind, received thereon or, if the purchaser no longer owns the securities, offers to pay the purchaser an amount in cash equal to the amount that would be recoverable upon a tender, less the value of the securities when the purchaser disposed of them, plus interest at 6% per year from the date of disposition; and

- states that the offer may be accepted by the purchaser at any time within a specified period of not less than 30 days after the date of its receipt by the purchaser or such shorter period as the commission may by rule prescribe.

{M0276460.9 } 17

If the purchaser fails to accept such offer in writing within the specified time period of not less than 30 days after the date of its receipt, that purchaser will no longer have any right of rescission under Pennsylvania law.

We believe the rescission offer complies in all material respects with the rescission offer requirements of the Pennsylvania Securities Act.

### Utah

We did not register the issuance of the notes that are subject to the rescission offer under the registration requirements of Section 61-1-7 of the Utah Uniform Securities Act, nor did we take affirmative steps to ensure the availability to us of any exemption from registration provided in Section 61-1-14 of such Act. Under Utah law, an issuer is civilly liable to a purchaser of its securities sold in violation of the registration or qualification requirements of the Utah Uniform Securities Act. The purchaser may sue either at law or in equity to recover up to three times the consideration paid for such securities, together with interest at 12% per year from the date of payment, costs and reasonable attorneys' fees, less the amount of any income received on the securities, or for damages if the purchaser no longer owns the securities, at any time prior to the earlier of (i) the five year anniversary of the violation of the Utah Uniform Securities Act or (ii) the two year anniversary of the discovery by the person bringing the action of such violation.

However, we may terminate the rights of the purchasers to seek additional remedies under the Utah Uniform Securities Act by making a written rescission offer, before suit, to refund the consideration paid together with interest at 12% per year from the date of payment, less the amount of any income received on the securities. If the purchaser owns the securities and fails to accept such offer within 30 days of its receipt, that purchaser will no longer have any right of rescission under Utah law. If the purchaser receives such offer at a time when the purchaser does not own the securities, that purchaser will no longer have any right of rescission under Utah law unless the purchaser rejects the offer in writing within 30 days of its receipt.

We believe the rescission offer complies in all material respects with the rescission offer requirements of the Utah Uniform Securities Act.

### Vermont

We did not register the issuance of the notes that are subject to the rescission offer under the registration requirements of Section 5301 of the Vermont Uniform Securities Act, nor did we take affirmative steps to ensure the availability to us of any exemption from registration provided in Section 5201 or Section 5202 of such Act. Under Vermont law, an issuer is civilly liable to a purchaser of its securities sold in violation of the registration or qualification requirements of the Vermont Uniform Securities Act. The purchaser may sue either at law or in equity to recover the consideration paid for such securities, together with interest at 12% per year from the date of payment, costs and reasonable attorneys' fees, less the amount of any income received on the securities, or for damages if the purchaser no longer owns the securities, at any time prior to the one year anniversary of the purchase of the securities by the person bringing the action of a violation of the Vermont Uniform Securities Act.

However, we may terminate the rights of the purchasers to seek additional remedies under the Vermont Uniform Securities Act by making a written rescission offer, before suit, to refund the consideration paid together with interest at 12% per year from the date of payment, less the amount of any income received on the securities. If the purchaser owns the securities and fails to accept such offer within 30 days of its receipt, that purchaser will no longer have any right of rescission under Vermont law.

We believe the rescission offer complies in all material respects with the rescission offer requirements of the Vermont Uniform Securities Act.

### *Wyoming*

We did not register the issuance of the notes that are subject to the rescission offer under the registration requirements of Section 17-4-107 of the Wyoming Uniform Securities Act, nor did we take affirmative steps to ensure the availability to us of any exemption from registration provided in Section 17-4-114 of such Act. Under Wyoming law, an issuer is civilly liable to a purchaser of its securities sold in violation of the registration or qualification requirements of the Wyoming Uniform Securities Act. The purchaser may sue either at law or in equity to recover the consideration paid for such securities, together with interest at 6% per year from the date of payment, costs and reasonable attorneys' fees, less the amount of any income received on the securities, or for damages if the purchaser no longer owns the securities, at any time prior to the two year anniversary of the contract of sale between the issuer and the person bringing the action of a violation of the Wyoming Uniform Securities Act.

However, we may terminate the rights of the purchasers to seek additional remedies under the Wyoming Uniform Securities Act by making a written rescission offer, before suit, to refund the consideration paid together with interest at 6% per year from the date of payment, less the amount of any income received on the securities. If the purchaser owns the securities and fails to accept such offer within 30 days of its receipt, that purchaser will no longer have any right of rescission under Wyoming law. If the purchaser receives such offer at a time when the purchaser does not own the securities, that purchaser will no longer have any right of rescission under Wyoming law unless the purchaser rejects the offer in writing within 30 days of its receipt.

We believe the rescission offer complies in all material respects with the rescission offer requirements of the Wyoming Uniform Securities Act.

### Financing the Rescission Offer

The rescission offer will be funded directly or indirectly by Michael Liberty, our manager and the controlling member of our parent company. Mr. Liberty has committed to provide, or to arrange for the financing of, any amounts required to complete the rescission offer. In no event will cash invested by purchasers of any promissory notes (whether before the date of this Offering Circular or afterward) be used to repurchase any promissory notes from offerees accepting this offer. Even if all offerees accept the offer, therefore, we do not believe that our results of operations, cash balances or financial condition will be adversely affected in any

material respect. The rescission offer will not be funded by Mozido, LLC, and the rescission offer will not affect Mozido's results of operations, cash balances or financial condition.

**Tax Consequences of the Rescission Offer**

For United States federal income tax purposes, the rescission offer is intended to constitute a return of the original purchase price of the note, which would be nontaxable, plus the payment of interest, which would be taxable to offerees as ordinary income. However, we have not received a ruling from the Internal Revenue Service to that effect.

STATEMENTS IN THIS OFFERING CIRCULAR DO NOT CONSTITUTE TAX ADVICE AND OFFEREES SHOULD SEEK, AND MUST RELY UPON, THE ADVICE OF THEIR OWN TAX ADVISORS, WITH SPECIFIC REFERENCE TO THEIR OWN SITUATIONS, WITH RESPECT TO THE POTENTIAL FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE RESCISSION OFFER.

### *IRS Circular 230 Notice*

Offerees are hereby notified, in compliance with requirements imposed by the IRS, that the discussion of tax matters contained in this Offering Circular (i) was written in connection with the making of the rescission offer and (ii) is not intended or written to be used, and cannot be used, for the purpose of avoiding tax related penalties under federal, state or local tax law.

## RISK FACTORS

**Risks Related to the Rescission Offer**

Offerees should carefully consider the risks described below, together with all of the other information included in this Offering Circular, before making a decision to accept or reject the rescission offer.

### *We may continue to have potential liability even after the rescission offer is made.*

Our offers and sales of the promissory notes during the period from September 2010 and May 2011 may not have complied with the Securities Act of 1933 because these securities transactions were not registered under federal and state securities laws and we may not have had valid exemptions from the registration requirements under these laws. In order to address these issues, we are making the rescission offer to the holders of certain notes. However, the Securities Act does not provide that a rescission offer will extinguish a holder's right to rescind the purchase of a note that was not registered or exempt from the registration requirements under the Securities Act. Consequently, should any recipients of the rescission offer reject the offer, expressly or impliedly, we may remain liable under the Securities Act for the payment of the notes that are subject to the rescission offer.

Moreover, we are not extending the rescission offer to 12 purchasers of notes who are or were residents of California or New Hampshire or to two purchasers who are not resident in the United States. Under the laws of such states, no rescission is effective unless the offer has been approved as to form by the California Commissioner of Corporations or the New Hampshire Bureau of Securities Regulation, respectively. Although we may elect to extend the rescission offer to such purchasers at a later date, after making the appropriate filings with such states, there can be no assurance that we will do so. The rescission offer, therefore, will not affect the rights of such holders to seek rescission at a later date.

*An offeree's federal right of rescission may not survive if such offeree affirmatively rejects or fails to accept the rescission offer.*

If an offeree affirmatively rejects or fails to accept the rescission offer, it is unclear whether or not the offeree will have a right of rescission under federal securities laws after the expiration of the rescission offer. The staff of the Securities and Exchange Commission is of the opinion that a person's right of rescission created under the Securities Act of 1933 may survive the rescission offer. However, federal courts in the past have ruled that a person who rejects or fails to accept a rescission offer is precluded from later seeking similar relief.

*We cannot predict whether the amounts offerees would receive in the rescission offer would be greater than the fair market value of Company's securities.*

The amount an offeree would receive in the rescission offer is fixed and is not tied to the fair market value of the Mozido Investments common units into which the notes are convertible at the time the rescission offer closes. As a result, if an offeree accepts the rescission offer, such offeree may receive less than the fair market value of the notes being tendered for rescission.

**Risks Related to the Notes and Mozido, LLC**

*Mozido, LLC is an early-stage company and is subject to all of the risks of inherent with new business enterprises. Mozido expects to incur significant losses through June 30, 2012, and its profitability thereafter is uncertain.*

Mozido was originally organized in April 2008, and thus has an extremely limited history. Accordingly, Mozido is subject to all of the risks inherent in the establishment of a new business enterprise. The time required by Mozido to reach profitability is highly uncertain and there can be no assurance that Mozido will be able to achieve profitability at all or on a sustained basis. Mozido expects its operations to be cash flow positive by the fall of 2011, but that it will incur significant losses through the fiscal year ending June 30, 2012. Although Mozido projects that it will earn significant income in the fiscal years ending June 30, 2013 and thereafter, there can be no assurance that losses will not continue. The successful implementation and development of Mozido's business and operations in the future depends upon numerous factors, including, among others, the ability of its founders to attract the necessary capital, to build the management team capable of carrying out the proposed implementation and development of Mozido's business, to win market acceptance and to capture market share for products and services and to generate the sales revenues and levels of profitability that management believes is

necessary for success. There can be no assurance that the objectives established by Mozido's founders with respect to the proposed implementation and development of Mozido's business and operations in the future will in fact be met, that Mozido will establish or maintain market acceptance or market share or become profitable, or that the levels of revenues, profitability and cash flows established by management will in fact be attained. As implementation of any business plan continues over time, there are inevitably changes in direction and strategy that will be adopted by management based upon actual experience in operating a business. Thus, there can be no assurance that the actual manner in which the business of Mozido is conducted and the results of Mozido's operations will not vary significantly from management's current intentions.

**_Mozido may not be successful in developing and commercializing its products and services._**

In order for the holders of our promissory notes to realize returns from their investment beyond interest at the rate of 5% per annum on the principal amount from time to time outstanding under the notes, Mozido, Affinity Holding, Mozido Investments or our company must ultimately undertake an initial public offering or be acquired. This process will depend on the performance of Mozido as well as many other factors over which neither we nor Mozido we will have any control, such as general conditions in the financial markets, fluctuations in demand in the securities markets for initial public offerings and investor interest in companies in Mozido's industry. To date, neither regulatory nor market acceptance of Mozido's planned products and services has been established. There can be no assurance that such acceptance will be achieved or, if achieved, can be maintained. There also can be no assurance that Mozido will be able to compete effectively in its target markets. In short, Mozido may develop much more slowly than planned or it may fail.

**_Mozido is subject to numerous regulatory risks and licensing requirements._**

The banking, financial and money transfer industries are highly regulated, both domestically and abroad. For example, Mozido will be required to comply with the federal Bank Secrecy Act of 1970 and the USA PATRIOT Act, as well as other domestic and foreign laws that govern the global and national financial systems, safeguard banking security and prevent money laundering and tax evasion. Compliance with such regulations may be both expensive and cumbersome. Any failure by Mozido to comply fully with applicable regulations may subject Mozido to liabilities and could have a material adverse effect on Mozido's business.

In addition, Mozido is in the process of applying for money transmitter licenses, both domestically and abroad. Mozido is currently partnered with an international money transfer company, and is able to offer money transfer services in the interim under this arrangement. Mozido's expectation is that, once it receives its money transmitter licenses it will be able to perform money transfers at a fraction of the current cost and therefore significantly enhance its margins. There can be no assurance, however, that Mozido will be granted the money transmitter licenses or other licenses it requires. Nor can there be any assurance that Mozido's relationship with the international money transfer company will continue, on terms favorable to Mozido or at all. The failure of Mozido to obtain the license required or to affiliate with one or more international money transfer companies on reasonable terms could substantially delay the

implementation of Mozido's business plan and could have a material adverse effect on Mozido's business.

*Mozido will require additional financing, and that financing will dilute the interests of note holders in Mozido's equity.*

Mozido will need to seek and secure significant additional financing in the near future. No party is obligated to provide financing to Mozido and there can be no assurance that any such additional funding will be available to Mozido or, if available, that it will be on reasonable terms. In the event that Mozido is able to secure additional capital, such additional financing may result in significant dilution to its equity holders, including Mozido Investments, LLC, thereby reducing the percentage of Mozido's equity represented by the Mozido Investments common units into which the promissory notes are convertible, and may be on terms unfavorable to Mozido. Mozido's future capital requirements will depend on many factors, including its ability to generate cash flow from operations, its ability to develop, manufacture and market its planned products and services successfully, the feasibility of its technology, competition, and market developments.

*Equity-based incentives may further dilute the interest of note holders in Mozido's equity.*

In order to motivate and compensate officers, employees, managers, advisers, consultants and others who are in a position to contribute significantly to Mozido, Mozido may make grants of its common units, preferred units or other equity. Any such grants will cause further dilution to its equity holders, including Mozido Investments, LLC, thereby reducing the percentage of Mozido's equity represented by the Mozido Investments common units into which the promissory notes are convertible.

*Holders of Notes are minority investors with no ability to control our company, Mozido or any other entity.*

The notes are not convertible into any equity interest in our company, and therefore holders who convert their notes will have no control over our company. The notes are convertible into common units issued by Mozido Investments. Because our company owns only approximately15% of such common units, however, holders who convert their notes will be minority investors in Mozido Investments and, indirectly, in both Affinity Holding and Mozido. Mozido Investments' operating agreement provides that its managers and the holders of a majority of its equity interests control over substantially all decisions affecting Mozido Investments and its business. The operating agreements of Mozido and Affinity Holding both provide that the boards of directors of those companies, and the holders of certain preferred membership units in those companies, have control over substantially all decisions affecting those companies and their respective businesses. Accordingly, each holder of a note should assume that he or she will be a minority investor with no ability to control any of those companies, including Mozido.

*The markets in which Mozido will participate are highly competitive, fragmented and decentralized, and its competitors may have greater technical and financial resources than Mozido does.*

The markets for mobile financial services and technologies are highly competitive, fragmented and decentralized. Mozido is and will continue to be subject to significant competition from a variety of sources, including both existing competitors and new companies to the market. Many of these competitors and potential competitors have or will have substantially greater technical, financial, and marketing resources than those available to Mozido. Mozido's ability to compete successfully will depend in large part upon its ability to attract customers and develop and maintain relationships with such customers. There can be no assurance that Mozido will be able to compete successfully.

*Mozido will be subject to risks relating to international operations.*

Mozido plans to offer products and services internationally as well as domestically. Certain components of Mozido's proposed offerings may be developed overseas. International sales and operations involve a number of additional risks including the impact of possible recessionary environments outside of the United States, longer sales cycles, unexpected changes in regulatory requirements, reduced protection for intellectual property rights in some countries, tariffs and other trade barriers, foreign currency exchange rate fluctuations, difficulties in staffing and managing foreign relations, the burdens of complying with a variety of foreign laws, potentially adverse tax consequences and political and economic instability. To the extent that Mozido's international sales or operations expand, Mozido expects that an increasing portion of its revenues may be denominated in foreign currencies, subjecting Mozido to fluctuations in foreign currency exchange rates. Mozido does not currently engage in foreign currency hedging transactions. However, in the event that Mozido expands its international sales or operations, exposures to gains and losses on foreign currency transactions may increase. Mozido may choose to limit such exposure by the purchase of forward exchange contracts or other hedging strategies. There can be no assurance that any currency exchange strategy would be successful in avoiding exchange-related losses. There can be no assurance that the foregoing factors will not have a material adverse effect on Mozido's future international revenue, if any, and, consequently, on Mozido's business, operating results and financial condition. Mozido attempts to mitigate risks related to receivables collections and currency fluctuations by generally requiring project fees to be paid prior to the delivery of services and for transaction-based fees to be paid electronically and automatically at the instant an eWallet transaction takes place.

*Mozido's success will depend on the retention of its senior management and on its ability to attract and retain other key personnel.*

Mozido's success will depend largely on the skills, experience and performance of its senior management. Mozido's senior management consists of only three officers, its chief executive officer, who has held that position for less than one year, its chief operating officer, who has held that position for four years, and its chief financial officer, who has held that position for four years. The loss of any member of Mozido's senior management could have a material adverse effect on its business. Mozido does not maintain a key man insurance policy

covering any senior management or any other key employees. In addition, in the event that any of Mozido's officers is terminated without cause, the officer will be entitled to receive severance payments equal to up to six months' salary and certain benefits. In the event Mozido is required to make these severance payments to those officers, it could have a material adverse effect on Mozido's results of operations for the fiscal period in which such payments are made.

Mozido currently has fourteen full-time employees in its Dallas, Texas headquarters, who perform a variety of functions, including executive management, finance and administration, operations, business development, product and software development, and technology and infrastructure. The loss of many of these employees may have a material adverse effect on Mozido's business and could substantially delay the implementation of Mozido's business plan. There can be no assurance that Mozido will be able to retain the services of these employees, or of any future employees. Mozido also relies on additional part-time employees and contractors in the United States and in other countries. Moreover, in order to implement its business plan and to remain competitive, Mozido will need to attract and retain additional personnel. Thus, Mozido's success will in significant part depend upon the efforts of personnel not yet identified and upon its ability to attract and retain highly skilled technical, managerial and sales and marketing personnel. Mozido faces significant competition for such personnel from other companies. There can be no assurance that Mozido will be able to attract and retain necessary personnel. The failure to hire and retain such personnel could materially and adversely affect Mozido's prospects.

### *Mozido may not be able to protect its intellectual property rights adequately.*

Mozido's success depends, in significant part, on its ability to protect its proprietary technology and operate without infringing on the proprietary rights of others in the United States and other countries. There can be no assurance that any of Mozido's proprietary rights have been or will be adequately safeguarded, or that they will not be challenged by third parties, resulting in a material adverse impact on Mozido's business, prospects, financial condition and results of operations. Mozido's intellectual property includes registered and common law trademarks, trade secrets and other proprietary rights. Although Mozido has applied for patent protection for certain key elements of its technology, there can be no assurance that Mozido will be able to obtain any patents or that third parties will not be able to circumvent any patents Mozido may receive by developing products or services with similar functionality to Mozido's proposed products and services. Nor can there be any assurance that, if challenged, any patents Mozido may be issued will be found to be valid or enforceable, or that the patents of others will not have an adverse effect on Mozido's ability to do business. Mozido may not have the resources to obtain patent protection in the United States or in other countries in which it intends to operate, to defend any challenges to its patents by third parties or to prosecute challenges of any third parties Mozido believes to be infringing its intellectual property. Nor can there be any assurance that Mozido's competitors will not independently develop technology or products that are substantially similar or superior to Mozido's, or that they will not design their products around any patents that may be issued to Mozido.

IM0276460 9 125

*The promissory notes are illiquid securities, and offerees who do not accept the rescission offer must be prepared to hold their notes, and the Mozido Investments common units into which the notes are convertible, for an indefinite period of time.*

The notes (and the Mozido Investments common units receivable upon conversion of the notes) are not and will not be registered under the Securities Act of 1933 or applicable state or foreign securities laws and may not be resold unless they are subsequently registered or an exemption from registration is available. Moreover, there is no public or other market for the notes or the common units into which they are convertible, nor can there be any assurance that such a market is likely to develop. Offerees who do not accept the rescission offer may thus be required to retain their investment in notes for an indefinite period of time.

*As Mozido grows, it will be subject to growth related risks.*

Mozido's future success will depend in part on its ability to manage growth, if any. To compete effectively and manage future growth, if any, Mozido will be required to continue to implement and improve its operational, financial and management systems, procedures and controls on a timely basis, and to expand, train, manage and motivate its workforce. There can be no assurance that Mozido's personnel, systems, procedures and controls will be adequate to support Mozido's future operations or that it will be able to implement those that will be adequate. The failure to implement new and improved operational, financial and management systems or to expand, train, motivate and manage employees could have a material adverse effect on Mozido's business, operating results and financial condition. There can be no assurance that Mozido will continue to grow or, if it does, that Mozido will manage the growth successfully.

---

ALL RECIPIENTS OF THIS OFFERING CIRCULAR ARE URGED TO COMPLETE THE ELECTION FORM ATTACHED AS THE LAST PAGE OF THIS OFFERING CIRCULAR, AND RETURN IT IMMEDIATELY AS DESCRIBED ON PAGE 10.

# ELECTION FORM

### Election to Accept or Reject Rescission Offer of

### MOZIDO INVESCO, LLC

Mozido Invesco, LLC
c/o Paul E. Hess
45 Braintree Hill Office Park
Suite 304
Braintree, MA 02184
E: paulehess@gmail.com
F: 781-843-9174

Ladies and Gentlemen:

I hereby acknowledge receipt of the rescission offer made by the Offering Circular dated June 11, 2011 from Mozido Invesco, LLC, a Maine limited liability company, containing the company's offer of rescission with respect to certain Convertible Promissory Notes purchased by me from the company. Subject to the terms and conditions of the Offering Circular:

*(Please circle one Option)*

#### Option 1

[ ]   I hereby ACCEPT said offer of rescission and tender herewith the convertible note purchased by me from the company. Please forward a check payable to me at my address as set forth below.

#### Option 2

[ ]   For good and valuable consideration, the receipt of which is hereby acknowledged, I hereby REJECT said offer of rescission and I hereby release and discharge the company and its present and former officers, managers, affiliates, employees and agents from and against any and all claims, demands, actions and suits which I may have against any of the foregoing under federal or state statutory or common law arising from the offer and sale to me of the note.

**This election form must be completed and returned to the company at the address set forth above not later than 5:00 p.m. Eastern Daylight Time 30 days after receipt of the Offering Circular and the financial information described on page 7 of the Offering Circular by the offeree. Failure to return this acceptance form on or prior to the expiration date will constitute a rejection of the rescission offer, including a termination of any rights the offeree may have under applicable state securities laws.**

_____                    _____
Signature                                           Typed or Printed Name of Offeree

_____                    _____
Address                                             Date

_____                    _____
Telephone number                                    Email address