# EXHIBIT 7

# CONFIDENTIAL OFFERING MEMORANDUM

# EXCHANGE OFFER

# MOZIDO, LLC CLASS B

# MEMBERSHIP UNITS

# FOR

# MOZIDO INVESCO, LLC

# CONVERTIBLE PROMISSORY NOTES

# Exhibit P

---

**CONFIDENTIAL OFFERING MEMORANDUM**

---

## EXCHANGE OFFER

## MOZIDO, LLC
## CLASS B MEMBERSHIP UNITS

## FOR

## MOZIDO INVESCO, LLC
## CONVERTIBLE PROMISSORY NOTES

---

**See "Risk Factors" beginning on page 26 to read about certain factors you should consider before accepting or rejecting this exchange offer.**

---

THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION NOR HAS THE COMMISSION OR ANY STATE SECURITIES COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THIS CONFIDENTIAL OFFERING MEMORANDUM OR THE RESCISSION OFFER. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

May 16, 2012

THE SECURITIES SUBJECT TO THE EXCHANGE OFFER HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE. THE EXCHANGE OFFER MADE IN THIS CONFIDENTIAL OFFERING MEMORANDUM IS BEING MADE IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND SUCH STATE LAWS OR IN A TRANSACTION EXEMPT FROM SUCH REGISTRATION OR OTHERWISE IN COMPLIANCE WITH THE SECURITIES ACT AND SUCH STATE LAWS, INCLUDING WITHOUT LIMITATION THE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT SET FORTH IN SECTION 4(2) THEREOF AND RULE 506 OF REGULATION D PROMULGATED UNDER THE SECURITIES ACT.

THIS CONFIDENTIAL OFFERING MEMORANDUM CONSTITUTES AN OFFER OF EXCHANGE ONLY TO THE PERSON WHOSE NAME APPEARS IN THE SPACE PROVIDED ON THE COVER PAGE HEREOF. DELIVERY OF THIS CONFIDENTIAL OFFERING MEMORANDUM OR ANY OTHER DOCUMENTS OR INFORMATION FURNISHED TO AN OFFEREE TO ANYONE OTHER THAN THE PERSON NAMED ON THE COVER PAGE IS UNAUTHORIZED AND ANY REPRODUCTION THEREOF, IN WHOLE OR IN PART, OR ANY DIVULGENCE OF THE CONTENTS THEREOF, IN WHOLE OR IN PART, WITHOUT THE PRIOR WRITTEN CONSENT OF THE COMPANY IS PROHIBITED.

THE OFFEREE, BY ACCEPTING DELIVERY OF THIS CONFIDENTIAL OFFERING MEMORANDUM, ACKNOWLEDGES AND AGREES THAT HE, SHE OR IT WILL KEEP ALL OF THE INFORMATION SET FORTH IN THIS CONFIDENTIAL OFFERING MEMORANDUM CONFIDENTIAL AND NOT COPY OR DISCLOSE SUCH INFORMATION.

THIS CONFIDENTIAL OFFERING MEMORANDUM DOES NOT CONSTITUTE AN OFFER OR SOLICITATION IN ANY STATE OR OTHER JURISDICTION IN WHICH SUCH AN OFFER OR SOLICITATION IS NOT AUTHORIZED OR IS UNLAWFUL.

THE COMPANY RESERVES THE RIGHT TO (I) REJECT, IN WHOLE OR IN PART, ANY OFFER TO EXCHANGE NOTES FOR UNITS ON THE TERMS SET FORTH IN THIS CONFIDENTIAL OFFERING MEMORANDUM, (II) EXCHANGE AND CLOSE ON THE EXCHANGE OF LESS THAN THE MAXIMUM NUMBER OF UNITS OFFERED HEREBY AND (III) TERMINATE THE EXCHANGE OFFER AT ANY TIME.

OFFEREES ARE NOT TO CONSTRUE THE CONTENTS OF THIS CONFIDENTIAL OFFERING MEMORANDUM AS LEGAL, TAX OR INVESTMENT ADVICE. EACH OFFEREE SHOULD SEEK HIS OWN LEGAL, TAX AND INVESTMENT ADVICE FROM QUALIFIED PROFESSIONALS PRIOR TO MAKING A DECISION TO ACCEPT OR REJECT THE EXCHANGE OFFER.

ADDITIONAL INFORMATION IS AVAILABLE TO EACH PROSPECTIVE INVESTOR, UPON REQUEST TO THE COMPANY. PROSPECTIVE INVESTORS MA NOT RELY ON

ANY INFORMATION IN CONNECTION WITH THE EXCHANGE OFFER OTHER THAN THAT INCLUDED IN THIS CONFIDENTIAL OFFERING MEMORANDUM OR IN DOCUMENTS FURNISHED BY THE COMPANY UPON REQUEST. NO DEALER, SALESMAN OR ANY OTHER PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION WITH RESPECT TO THE SECURITIES OF THE COMPANY NOT CONTAINED IN THIS CONFIDENTIAL OFFERING MEMORANDUM OR DELIVERED HEREWITH CONCERNING THE EXCHANGE OFFER OR THE COMPANY. ANY PREDICTIONS, PROJECTIONS AND REPRESENTATIONS, WRITTEN OR ORAL, THAT DO NOT CONFORM TO THOSE INCLUDED IN THIS MEMORANDUM OR IN OTHER DOCUMENTS DELIVERED OR PROVIDED BY THE COMPANY ARE NOT PERMITTED AND MUST NOT BE RELIED UPON BY ANY PROSPECTIVE INVESTOR.

NEITHER THE DELIVERY OF THIS MEMORANDUM NOR ANY EXCHANGE MADE HEREUNDER SHALL UNDER ANY CIRCUMSTANCE CREATE ANY IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE AFFAIRS OF THE COMPANY SINCE THE DATE INDICATED HEREIN OR THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AS OF ANY DATE SUBSEQUENT TO TH DATE HEREOF. THE COMPANY HAS USED ITS BEST EFFORTS TO OBTAIN AND PROVIDE ACCURATE INFORMATION FOR THIS MEMORANDUM, BUT NO WARRANTY, REPRESENTATION OR GUARANTY IS MADE OR SHOULD BE INFERRED WITH RESPECT TO THE ECONOMIC BENEFIT THAT MAY ACCRUE TO AN INVESTOR FROM ACQUIRING AN INTEREST IN THE COMPANY PURSUANT TO THE EXCHANGE OFFER.

POTENTIAL INVESTORS ARE ADVISED TO READ THIS MEMORANDUM CAREFULLY AND TO RETAIN IT FOR FUTURE REFERENCE. AN INVESTMENT IN THE COMPANY ENTAILS RISKS THAT SHOULD BE REVIEWED CAREFULLY PRIOR TO MAKING AN INVESTMENT DECISION. THERE CAN BE NO ASSURANCE THAT THE BUSINESS OBJECTIVES OF THE COMPANY WILL BE REALIZED. SEE "RISK FACTORS."

ANY ECONOMIC, MARKET AND INDUSTRY INFORMATION CONTAINED HEREIN HAS BEEN OBTAINED FROM PUBLISHED SOURCES OR PREPARED BY OTHER PARTIES. WHILE SUCH SOURCES ARE BELIEVED TO BE RELIABLE, NEITHER THE COMPANY, ITS MANAGEMENT NOR ANY OTHER PERSON ASSUME ANY RESPONSIBILITY FOR THE ACCURACY OF SUCH INFORMATION.

THE COMPANY WILL PROVIDE TO EACH PROSPECTIVE INVESTOR, PRIOR TO THE EXCHANGE OF UNITS, THE OPPORTUNITY TO ASK QUESTIONS OF AND RECEIVE ANSWERS FROM THE COMPANY CONCERNING THE TERMS AND CONDITIONS OF THE EXCHANGE OFFER AND TO OBTAIN ANY ADDITIONAL INFORMATION NECESSARY TO VERIFY THE ACCURACY OF THE INFORMATION CONTAINED IN THIS MEMORANDUM OR FOR ANY OTHER PURPOSE RELEVANT TO A PROSPECTIVE INVESTMENT IN THE SECURITIES OFFERED HEREBY. HOWEVER, THE COMPANY MAY CHOOSE NOT TO SUPPLY SUCH ADDITIONAL INFORMATION IF THE COMPANY DOES NOT POSSESS IT AND CANNOT OBTAIN IT WITH REASONABLE EFFORT AND EXPENSE.

EACH PERSON MAKING AN INVESTMENT IN THE SECURITIES OFFERED PURSUANT TO THE EXCHANGE OFFER WILL BE DEEMED TO HAVE ACKNOWLEDGED THAT (I) SUCH PERSON HAS BEEN AFFORDED AN OPPORTUNITY TO REQUEST AND TO REVIEW, AND HAS RECEIVED AND REVIEWED, ALL ADDITIONAL INFORMATION CONSIDERED BY SUCH PERSON TO BE NECESSARY TO VERIFY THE ACCURACY OF OR TO SUPPLEMENT THE INFORMATION HEREIN, AND (II) THE COMPANY HAS NOT AUTHORIZED ANY PERSON TO MAKE ANY REPRESENTATION CONCERNING THE UNITS OR THE COMPANY AND, IF GIVEN OR MADE, SUCH PURPORTED REPRESENTATION OR WARRANTY HAS NOT BEEN RELIED UPON.

CERTAIN STATEMENTS MADE IN THIS CONFIDENTIAL OFFERING MEMORANDUM MAY BE CONSIDERED TO BE FORWARD-LOOKING STATEMENTS. SUCH FORWARD-LOOKING STATEMENTS REPRESENT THE EXPECTATIONS OR BELIEFS OF THE MANAGEMENT OF THE COMPANY CONCERNING FUTURE EVENTS AND INCLUDE, WITHOUT LIMITATION, STATEMENTS CONTAINING THE WORDS "BELIEVES," "ANTICIPATES," "EXPECTS" AND WORDS OF SIMILAR MEANING OR IMPORT. SUCH FORWARD-LOOKING STATEMENTS RELATE TO FUTURE EVENTS AND THE FUTURE FINANCIAL PERFORMANCE OF THE COMPANY AND THE INDUSTRY IN WHICH IT IS INVOLVED AND INVOLVE KNOWN AND UNKNOWN RISKS, UNCERTAINTIES AND OTHER IMPORTANT FACTORS WHICH COULD CAUSE ACTUAL RESULTS, PERFORMANCE OR ACHIEVEMENTS EXPRESSED OR IMPLIED BY SUCH FORWARD-LOOKING STATEMENTS TO DIFFER MATERIALLY FROM THE RESULTS PREDICTED IN THIS CONFIDENTIAL OFFERING MEMORANDUM. INVESTORS SHOULD CONSIDER THE VARIOUS FACTORS IDENTIFIED IN THE "RISK FACTORS" SECTIONS OF THIS CONFIDENTIAL OFFERING MEMORANDUM AND ELSEWHERE IN THIS CONFIDENTIAL OFFERING MEMORANDUM THAT COULD CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY FROM THE RESULTS PREDICTED IN THE FORWARD-LOOKING STATEMENTS.

# TABLE OF CONTENTS

| | Page |
|---|---|
| THE EXCHANGE OFFER | 1 |
| MOZIDO, LLC | 4 |
| FINANCIAL INFORMATION | 5 |
| MOZIDO CURRENT OWNERSHIP STRUCTURE | 6 |
| MANAGEMENT | 7 |
| RELATED PARTY TRANSACTIONS | 11 |
| SUMMARY OF COMPANY AGREEMENT | 12 |
| CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS | |
| 21 | |
| RISK FACTORS | 26 |
| LITIGATION | |
| 35 | |
| SUITABILITY STANDARDS | 35 |

EXHIBIT A  Audited Financial Statements of Mozido, LLC
EXHIBIT B  Unaudited Financial Statements of Mozido Invesco, LLC
EXHIBIT C  Unaudited Financial Statements of Mozido Investments, LLC
ANNEX A  Limited Liability Company Agreement
ANNEX B  Note Exchange and Subscription Agreement

## THE EXCHANGE OFFER

Family Mobile, LLC, a Delaware limited liability company ("Family Mobile"), is offering Class B Membership Units ("Class B Units") that it will acquire from Mozido, LLC ("Mozido" or the "Company") in exchange for $18,170,057 aggregate principal amount of Convertible Promissory Notes (the "Notes") issued by Mozido Invesco, LLC ("Invesco"), together with interest accrued on such notes at the rate of 5% per annum from the date of issuance to the date of exchange (the "Exchange Offer").

The Notes were issued from May 2010 through May, 2012. The principal amount of the Notes together with accrued and unpaid interest thereon are convertible at any time prior to maturity at the option of the holder thereof into units of equity interest of Mozido Investments, LLC ("Investments").

If all of the Notes were converted into equity interests of Investments, not including accrued interest, the holders would own approximately 330.36 units, representing approximately 33.036% of the outstanding equity interests of Investments (on a fully diluted basis). Investments indirectly owns 15,069,918 units of Mozido. The Noteholders have 0.33036 x 15,069,918 units, or rights to 4,978,498 units, representing an approximate 0.71% indirect interest in Mozido (on a fully diluted basis).

As explained below, Noteholders also have rights to approximately 11.51% of equity interest of Family Mobile LLC ("Family Mobile"), representing aggregate, indirect ownership (on a fully diluted basis) of approximately 7.43% of the equity interests of Mozido. If all the Notes were converted and the Family Mobile equity interest issued to the Noteholders, the Noteholders would own an approximate 12.22% indirect interest in Mozido (on a fully diluted basis). A Noteholder will receive in the Exchange Offer direct ownership in Mozido of the same percentage interest in Mozido that he, she or it would hold indirectly upon conversion of his, her or its Note and receipt of the Family Mobile equity interests.

In the Exchange Offer the sum of (a) the principal amount of each Note and (b) accrued and unpaid interest thereon through May 18, 2012 would be exchanged for Class B Units at a conversion rate of 6.26 Class B Units per dollar of principal and accrued interest (the "Exchange Rate"). The next two paragraphs explain how the Exchange Rate was determined.

As of the date of this Offering Memorandum Family Mobile owns 455,413,965 units of Mozido (calculated on a fully diluted basis, giving effect to the exercise or conversion of all securities convertible into or exercisable for such equity or the equity or its parent companies), and the Noteholders have rights to 11.51% of these, or 52,418,154 units. In accordance with the operating agreement of Family Mobile, once the aggregate principal amount of Notes issued by Invesco equals or exceeds $15,000,000, Michael A. Liberty is obligated to transfer additional units of Family Mobile to Invesco, so as to increase the direct and/or indirect ownership of Mozido for the benefit of the Noteholders, in the event that he or any affiliate of his makes an investment in Mozido at a valuation of less than $108,000,000. In such event, the transfer of additional units is to be made in such amount that the total amount invested pursuant to the Notes is not less than the number derived by multiplying the percentage of the equity of Mozido

1

directly or indirectly held by the Noteholders (after taking into account the additional units of Family Mobile, LLC to be transferred by Mr. Liberty) times $108,000,000. This Family Mobile provision has been triggered because the aggregate principal amount of Notes is $18,170,057, and Mr. Liberty or his affiliates have made further investments at a valuation less than $108,000,000.

The aggregate principal amount of Notes (exclusive of interest) of $18,170,057 must equal the product of (i) X (where X = the Invesco percent ownership of Mozido) x (ii) $108,000,000. $18,170,057 = X times $108,000,000. Solving for X results in X = .16824. Accordingly, the Noteholders, in order to maintain parity at $108,000,000 valuation are entitled to receive least 16.824% of Mozido. 16.824% of Mozido units = .16824 x 705,239,402 = 118,649,468 units.

Through the conversion right in the Notes and the 11.51% of Family Mobile economic units to which Noteholders are now entitled, Noteholders are entitled to receive indirect ownership of a total of 118,649,468 units in exchange for the principal amount of the Notes. If the Exchange Offer is fully subscribed, $18,932,352 of principal and interest on the Notes will be exchanged for 118,649,468 Class B Units, and each dollar of that amount would be entitled in the Exchange Offer to 6.26 Class B Units (118,649,468/18,932,352).

### Process for Acceptance of Exchange Offer

The Exchange Offer will remain open for 30 days after the date of this Confidential Offering Memorandum, subject to extension by Family Mobile for up to 90 days ("Closing Date"). To accept the Exchange Offer, please go to this website and you will be prompted to complete the necessary information and give your electronic signatures:

https://rightsignature.com/forms/Note-Exchange-and-ce3901/token/7529b5a274a

**You will then need to send your original Note to Family Mobile at this address:**

  Family Mobile, LLC
  5373 Isleworth CC Drive
  Windermere FL 34786
  Attention: Brittany Abbass

Alternatively, you can send the completed and signed Exchange Agreement, Note Assignment and Joinder to the Mozido Limited Liability Company Agreement each attached to this Confidential Offering Memorandum along with your Note to the above address. Subject to receipt of a signed Exchange Agreement, a signed Note Assignment, a signed Limited Liability Company Agreement Joinder and the original Note, within three business days after the closing of the Exchange Offer ("Exchange Date"), Family Mobile will issue the Class B Units issuable to each Noteholder.

  **Please use an overnight courier services such as FedEx or UPS so that a lost package can be traced.**

No fractional units of Class B Units will be issued upon exchange of the Notes. In lieu of any fractional Class B Units to which a Noteholder would otherwise be entitled, the Noteholder will receive a number of class B Units rounded up to the next whole number.

On the Exchange Date, each holder of record of Notes shall be deemed to be the holder of record of the Class B Units issuable to such Noteholder in the Exchange Offer, notwithstanding that such Notes shall not have been surrendered at the office of the Company, that notice from the Company shall not have been received by any holder of record of the Notes, or that certificates evidencing such Class B Units shall not then be actually delivered to such holder. All original Notes that are required to be delivered for exchange, from and after the Exchange Date shall be deemed to have been transferred to Family Mobile and exchanged for the applicable Class B Units for all purposes, notwithstanding the failure of the holder or holders thereof to surrender such original Notes on or prior to such date. No Exchange will be consummated and Family Mobile will return all original Notes to the Noteholders if the Exchange Date has not occurred on or before September 17, 2012 (the "Termination Date").

We have not retained, nor do we intend to retain, any person to make solicitations or recommendations in connection with the Exchange Offer.

<u>Conditions of the Exchange Offer</u>

The Exchange Offer is subject to the following conditions, each of which can be waived by either Family Mobile and a Noteholder:

- No statute, rule, regulation, executive order, decree, ruling or injunction shall have been enacted, entered, promulgated or endorsed by any court or governmental authority of competent jurisdiction or any self-regulatory organization having authority over the matters contemplated hereby which restricts or prohibits the consummation of any of the transactions contemplated by the Exchange Offer; and
- There shall be no injunction, restraining order or decree of any nature of any court or governmental authority of competent jurisdiction that is in effect that restrains or prohibits the consummation of the transactions contemplated by the Exchange Offer.

In addition, the Exchange Offer is subject to the following conditions, each of which can be waived by Family Mobile:

- Noteholders of at least 75% of the aggregate principal amount of the Notes shall have agreed to the Exchange Offer; and
- Mobile Tech Investments, LLC and each holder of Class A or preferred membership units of Affinity Holdings, LLC shall each have waived or declined its right of first refusal and tag-along rights under Mozido's Amended and Restated Limited Liability Company Agreement dated as of August 27, 2010 (the "Company Agreement") with respect to the Exchange Offer.

## MOZIDO, LLC

Mozido is a limited liability company formed under the laws of Delaware on April 7, 2008 and headquartered in Dallas, Texas. Mozido provides cloud based, white labeled multichannel transaction services. Mozido mobile wallets provide companies and consumers with the ability to perform a wide variety of complex financial transactions including cash deposits and withdrawals, mobile money transfers, mobile point-of-sale retail purchases, mobile air-time purchases, mobile bill payments, direct payroll deposits, loans, loyalty & rewards and digital gift card services – all on a white labeled basis, and delivered to some 90% of the world's population.  Mozido is one of the world's first companies using cloud based technologies for mobile payments to offer a full suite of services on a global basis.

Mozido's mobile wallet solution is built on a robust, highly scalable cloud based technology platform.  Mozido believes it was the first company to launch a mobile wallet in the United States, the first company to perform an international mobile-to-cash money transfer and the first company to launch on a nationwide basis a prepaid phone with a mobile wallet.  Mozido is currently under contract or has partnered with global financial institutions, mobile network operators, major consumer package goods companies and leading international retailers, allowing Mozido to create vast, inclusive ecosystems to expand its mobile financial services business to all corners of the world.

Mozido provides a unique mobile advertising strategy for clients by leveraging the inherent value of its suite of mobile financial service offerings.  Mozido offers consumers and companies the ability to receive a free or significantly discounted suite of mobile financial services to those consumers who opt-in to receive targeted mobile advertisements including special offers and promotions.  Mozido is able to offer these attractively priced mobile financial services due to the significant advertising revenue earned in the delivery of targeted mobile advertisements.  This unique approach is an extreme differentiator for Mozido, as traditional financial service providers (established money transfer agents, mobile airtime top-up providers, bill pay aggregators, etc.) lack the functionality and ability to provide targeted real time marketing and mobile financial services to clients in a highly personalized way via their mobile phone.

Additionally, Mozido is currently implementing a business to business mobile financial services application for a major global consumer packaging goods company that addresses a very common, yet significant business issue by enhancing the electronic payment process for the sale of goods to merchants. Mozido has an exclusive worldwide contract with Tata Consultancy Services to deploy its class loyalty and rewards program which operates over the Mozido Mobile Wallet platform.  Mozido also enjoys a worldwide relationship with MoneyGram International, Inc., providing Mozido access to over 256,000 locations in 192 countries for cash-in and cash-out capabilities and dollar logistics solutions.

The size of the unbanked market both in the U.S. and globally is defined by the nearly two billion unbanked customers who have mobile phones  Large product pools within Mozido's core business exist already, including Remittances at $440 billion, Prepaid Mobile Top Up at $200 billion and Mobile Bill Pay over $200 billion. The unbanked segment has been traditionally underserved with the above-mentioned services, with high (even predatory) pricing which yields a high margin of approximately 20-25% to suppliers. These essential services are very costly for the unbanked, and are delivered through an unfriendly distribution network.  11

Mozido's broad product offerings include remittances, mobile phone top-ups, and bill payments,. Mozido's strategy is to reach worldwide scale by effectively aggregating large volumes of unbanked customers and serving them through a global infrastructure -- including cash in/out -- initially through the MoneyGram relationship but in the near future supplemented by a wide network of distribution points (agents) generated through Mozido's business to business activity discussed below. This business to business network allows Mozido to compete and win primarily by facilitating more efficient transactions in a global market representing approximately $800 billion in total revenue.

Mozido is creating and executing business opportunities by developing regional ecosystems, which aggregate key transaction pools among major participants. At the outset, Mozido intends to develop ecosystems in these markets: Mexico, Canada, Middle East/UAE, India, United States, South America, Central America, and Caribbean. The majority of these ecosystem launches will enjoy the benefit of Mozido's strategic partnerships with BePensa Inc. and Femsa and their significant global market share of distribution and agent locations. Femsa is the largest public bottler and distributor of Coca-Cola products in the world in terms of sales volume, and BePensa is the second largest.

Mozido's first ecosystem will be launched in Mexico. It recently executed a multi-billion dollar Business-to-Business Payment Network Joint Venture Agreement that will be anchored by Bepensa. With Bepensa, Mozido has aggregated several of the region's top consumer product goods companies that have the potential to bring over approximately 100,000 retail merchants to the ecosystem. Mozido is negotiating to secure two globally recognized banks with a large presence in the region that will serve as its repository partners to facilitate the local presence needed to execute deposits and global monetary requirements.

Mozido's business to business payment network is designed to create value by improving the efficiency of transactions by eliminating dollar logistics from the ecosystem, currently over 50% of all transactions are executed with cash payments. Since Bepensa and Mozido's partner consumer product goods' delivery drivers currently lose up to three hours daily with cash logistics time delays, Mozido's platform has the ability to save its partners billions in delivery/execution costs and dramatically improve the servicing of customer accounts.

## FINANCIAL INFORMATION

Mozido's audited financial statements for the fiscal years ended December 31, 2010 and 2011 and for the period from inception to December 31, 2011 are attached as Exhibit A. Unaudited financial statements for Invesco for the period from Jan 1, 2011 to January 5, 2012 are attached as Exhibit B. Unaudited financial statements for Investments for the period from Jan 1, 2011 to December 31, 2011 are attached as Exhibit C. Please see the third paragraph under "Risk Factors" for a description of certain asserted defaults under $5,000,000 of loans to Mozido.

Rule 12(c) Motion 00182

## MOZIDO CURRENT OWNERSHIP STRUCTURE

Affinity Holdings, LLC currently owns 100% of Mozido.  The following chart illustrates the current equity ownership of Mozido on a fully diluted basis:

| Name | Preferred Units | Class A Units | Class B Units | Percentage of All Units |
|------|-----------------|---------------|---------------|-------------------------|
| Family Mobile, LLC | 455,413,965 | | | 64.58% |
| Mobile Tech Investments, LLC | 224,943,062 | | | 31.90% |
| Mozido Investments, LLC | | 15,069,918 | | 2.14% |
| Al Fawares Group | | 4,985,098 | | 0.71% |
| Mobile Media Group | | 854,161 | | 0.12% |
| Michael Liberty | | 239,897 | | 0.03% |
| Option Pool(1) | | | 3,733,241 | 0.53% |
| Total | 680,357,027 | 21,149,074 | 3,733,241 | 100.00% |

(1) Shares reserved for options, none have been granted.

# MANAGEMENT

***Richard Braddock – Executive Chairman of the Board.*** Mr. Braddock, 69, joined the Board of the Company in December 2011. He began his business career in 1965, spending a number of years in product management at General Foods. He joined Citicorp in 1973, was elected to the board of directors of the company in 1985 and was elected president and chief operating officer of Citicorp and its principal subsidiary, Citibank, N.A., in January 1990. Mr. Braddock resigned from Citicorp in November, 1992, and subsequently served as chief executive officer of Medco Containment Services, Inc. from January 1993 until its acquisition by Merck & Co., Inc. in 1993, and then spent a year as a principal at the venture capital firm Clayton, Dubilier & Rice, Inc. He served as chairman (non-executive) of True North Communications Inc. from December, 1997 to January of 1999. He served as chairman and chief executive officer of priceline.com from August of 1998 to April 2004. Mr. Braddock served as chairman of the board of the venture capital firm MidOcean Partners, from April of 2003 until December 2007, and also became chairman of the board of FreshDirect in 2005 and served as chairman of the board and chief executive officer of Fresh Direct from March of 2008 to March 2011.

Mr. Braddock currently serves on the board of directors of Eastman Kodak Company (lead director), The Aspen Institute, the Lincoln Center for the Performing Arts, Cristo Rey Network, and several private companies. He is a member of The Council on Foreign Relations, an independent, non-partisan membership organization, think tank and publisher.

***Michael A. Liberty – Vice-Chairman, Founder.*** Michael A. Liberty, 51, has served as a Director since April 2008. Mr. Liberty has served as a business executive for more than 30 years in multiple industries that include real estate, manufacturing, retail merchandising, telecommunications, and entertainment. In 1985, Mr. Liberty was nominated by President Ronald Reagan as one of the Outstanding Young Men of America.

In 1996, Mr. Liberty co-founded Cambridge Associates Holdings Corporation, a Massachusetts-based private equity firm. As chief executive officer of this company, he led numerous management/leveraged buyouts in the consumer products, textile and food products industries. In this capacity, Mr. Liberty also was instrumental in developing and creating multiple brands as well as structuring a number of top-level supplier relationships with large U.S. retailers, including Wal-Mart, on behalf of investee companies.

In 1997, Mr. Liberty became an angel investor in a mobile paging company called Intelligent Information Incorporated, prior to going public as I3 Mobile (IIIM, Nasdaq). In 1998, Mr. Liberty founded Mobile Media Group, Inc., a mobile content company formed to aggregate and re-purpose entertainment content for distribution and syndication to mobile networks, including I3 Mobile's carrier customers.

Mr. Liberty founded Mozido in April 2008 when he saw a clear need for a global mobile financial ecosystem upon which secure financial transactions could be processed.

On June 9, 2010, the United States District Court for the Eastern District of Pennsylvania entered a Final Judgment as to Michael Liberty in an action brought in 2006 by the United States Securities and Exchange Commission (the "SEC") in which the SEC alleged that Mr. Liberty

had engaged in violations of the federal securities laws. Mr. Liberty settled the action by consent without admitting or denying the allegations in the SEC's complaint (except as to jurisdiction). As a result of the settlement, Mr. Liberty was enjoined from violating various provisions of the federal securities laws including Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder, Section 17(a) of the Securities Act of 1933 and Sections 206(1) and 206(2) of the Investment Advisers Act of 1940. As part of the settlement, Mr. Liberty also agreed to pay disgorgement and pre-judgment interest.

***Philip H. Geier – Director.*** Mr. Geier, 76, has served as a director since November 2011. He is a dedicated communications industry leader who helped define the modern advertising holding company and championed the client-centric business model. His distinguished career started with McCann-Erickson in 1958 where he became regional director of McCann-Europe and then vice chairman-international. He was named vice chairman of the parent company, Interpublic, in 1975, then president and chief operating officer two years later, and finally named chairman and chief executive officer in 1982. He retired from this position at the end of December 2000 and currently serves as chairman emeritus. Over the 20 year period of Geier's leadership, Interpublic grew from revenues of $500M and 8,000 employees to a truly global enterprise with 650 offices in 127 countries, with revenues of $5.6B and 50,000 employees.

In February 2001, Mr. Geier formed The Geier Group LLC to provide consulting/advisory services in marketing, communications and venture capital. Additionally, he continues to serve as director on the boards of AEA Investors Inc. and Fiduciary Trust International Inc. and is a senior advisor at Lazard Frères & Co. LLC. He recently retired as director from the boards of Alcon Laboratories, Inc., Foot Locker Inc. and Mettler-Toledo International, Inc.

***Peter W. Smith – Director.*** Mr. Smith, 72, is the Managing Member of DigaComm, L.L.C., a Chicago-based private investment firm focused on healthcare, energy, digital and patent transactions. Since 1998, DigaComm has led or participated in fifteen venture capital investments, involving capital of $500 million. From 1979 to 1998, Mr. Smith served as president of Peter W. Smith & Company, a firm that led twenty buyout and add-on transactions with combined revenue of $800 million. Previously, from 1969 to 1978, Mr. Smith served as senior office of Field Enterprises, Inc., a diversified communications company held by the Marshall Field family, comprised of ten business units.

***Jeffrey A. Howard – Director.*** Mr. Howard is the Executive Managing Director at CompuCredit Holdings Corporation, where he is responsible for the company's merger and acquisition activities, partnership opportunities, strategy development and oversight of the company's credit card and auto finance operations. During his tenure, CompuCredit has acquired over $6 billion in assets and numerous businesses resulting in platform expansion both domestically and internationally. Prior to joining CompuCredit in 2001, Mr. Howard was a Director at SunTrust Equitable Securities, a division of SunTrust Bank, where he spent time in mergers and acquisitions advisory as well as the Corporate and Investment Banking unit. Mr. Howard has an MBA from the Goizueta School of Business at Emory University and a BS from the Georgia Institute of Technology. Mr. Howard is a manager of Mobile Tech Investments, LLC which is controlled by CompuCredit. Mobile Tech is a lender to Mozido.

***Gregory J. Corona – President, Chief Executive Officer and Director.*** Mr. Corona, 57, has served as the President and Chief Executive Officer of Mozido since April, 2011. He has extensive experience in the financial services and private equity industries and has served as a Chief Executive Officer and Chief Operating Officer of various middle market companies. Mr. Corona has served as a Director of several public and private companies including positions as a Director of a public company providing various financial services to the underserved consumer markets, a public bank holding company and several technology companies. He has served as President and Chief Executive Officer of Mozido, LLC since April, 2011 and has been a partner in Malibu IQ, a technology investment firm since November, 2011. From 2001 to May, 2007, Mr. Corona was one of the original partners of Paladin General Holdings, LLC, the general partner of a private equity firm with over $950 million under management and from May, 2007 to October, 2010, the Chairman and Chief Executive Officer of its portfolio of transportation companies. He is also a Director of two privately-owned companies.

Mr. Corona received his Bachelors Degree in Finance from Michigan State University, his Masters Degree in Business Administration from the University of Detroit, has completed executive education programs at the Harvard Business School and the National Association of Corporate Directors where he received the Certificate of Director Education.

***Diane Sánchez – Director and President, Head of Global Operations.*** Ms. Sánchez, 57, has served as a director and as president and head of global operations for Mozido since August 2011. Ms. Sanchez is recognized for her contribution in the Americas region setting up operations for some of the leading global corporations in the IT and telecommunications industry where she has held management positions for some of the world market leaders in information and communications technology. She has played a key role in leading their entry into emerged markets, where she has cultivated relationships with key corporate decision makers who are succeeding in implementing global converged solutions in USA, Europe and Latin America for their consumer, enterprise and multinational corporate customers. Most recently from 2005 to August 2011, she served as president and chief executive officer of Telefónica USA where she managed the company's operations in the United States and in Puerto Rico and had global responsibility for United States-based multinational corporations. Before joining Telefónica in 2005, Ms. Sanchez served as president, of Terremark, NAP of the Americas, leading a consortium of public and private corporations in establishing Miami as the fifth communications and intellectual property hub in the world. From 1998 to 2001, she served as president and chief executive officer of Global Crossing Latin America, where she was responsible for launching Global Crossing's operation in the sub-regions of South America, Mexico, Central America and Caribbean. From 1992 to 1996, Ms. Sánchez served as vice president, sales and operations for South America, Central America and Caribbean for Alcatel – Lucent. From 1996 to 1998, she held key leadership positions with AT & T in managing the engineering and operations in the United States. She was also responsible for the startup operations in Mexico for AT&T with Alestra where she served as the regional sales director for the Pacific and Central Regions of Mexico.

***Ira Levy – Executive Vice President and Chief Financial Officer.*** Mr. Levy, 54, has served as executive vice president and chief financial officer of Mozido since April 2008. From 2002 to April 2008, Mr. Levy served as the former vice president of finance and as treasurer for MetroPCS, a leader in pre-paid cell phone services, where he raised over $2 billion for the

company and led the company through a successful initial public offering.  Mr. Levy has over 22 years of progressive executive experience in the wireless telecommunications industry with specific startup and development expertise from roles with a variety of high-growth companies including Verizon Wireless.  Via his leadership roles, Mr. Levy is well-versed in all financial and operational functions including capital structuring, business and strategic planning, merger and acquisition, external and managerial financial reporting, internal control structure and revenue assurance. Mr. Levy is a subject matter in operating real time bill payment processing systems and building bill payment ecosystems.

Mr. Levy holds a BSBA in Finance from the University of Florida and a MS in Accountancy from the University of Houston.

***Monica Woo – Executive Vice President and Global Chief Marketing & Strategy Officer.*** Monica Woo has served the Company as Executive Vice President and Global Chief Marketing & Strategy Officer since February 2012. Before joining Mozido, she served as Chief Marketing & Strategy Officer at FreshDirect Holdings, from 2009 to 2011, and, more recently, as the Chief Marketing Officer of the approximately $23 Billion Sears Brand, from August 2011 through January 2012. She is recognized for her successful track record in driving profitable growth of on-line retail and financial services brands in U.S. and Latin America, as well as transforming mature global consumer packaged goods brands for profitable growth. From 2004 through 2008, Ms. Woo was promoted twice at 1800-flowers.com, where her last position was president of the company's flagship Consumer Floral Division. During her tenure at 1800-flowers.com, Ms. Woo grew the brand's sales by 5 times, despite a declining floral category, and delivered record operating profit growth. As a senior e-commerce operating executive, Ms.Woo successfully created and launched Citigroup's first on-line retail bank in the U.S. and Deutsche Bank's on-line retail investment bank in Brazil. With broad and deep consumer packaged goods leadership experience, Ms. Woo was the Senior Vice President, Marketing Europe at Diageo PLC, and the President of Bacardi Global Brands. Ms. Woo is truly a global executive as she has lived and worked on four different continents.

***Umesh Biradar – Director of Delivery.***  Mr. Biradar has served as director of delivery since March 2012.  He has over 23 years of hands-on technology experience in supporting large scale managed hosting, network and security operations. Mr. Biradar has provided technical leadership and analytical skills within various organizations including VeriSign and Savvis and has extensive expertise in executing large global enterprise IT projects with proven results in identifying business goals, envisioning solutions, developing strategy, estimating resources, and delivering complex solutions.

Mr. Biradar's technical skills also include expertise in cloud and utility hosting, internet and telecom, internet root DNS Infrastructure, Internet startups, online Infrastructure PKI/Payment, Telco SS7, defense/aerospace, internet/telco infrastructure, PaaS/IaaS.

***Randy Lund – Senior Director Technology and Infrastructure.***  Mr. Lund has served as senior director technology and infrastructure since April 2008.  He has over 15 years of experience in systems implementations and operations where he has managed teams successfully designing, deploying, and operating best of breed, world-class solutions.  Prior to joining Mozido, Mr. Lund held IT management and leadership positions within Novell Networks (from 1995 to 1998),

ExxonMobil (from 1998 to 2000), and Accenture (from 2000 to 2006), where he participated in several telecommunications and network consulting activities for Tier 1 Mobile Network Operators in the United States and Europe. From 2006 to 2008 Mr. Lund was the manager of technology for the Trumpet Mobile product launch for RadioShack. Mr. Lund received his BS from Brigham Young University, Provo, Utah.

*Felipe Fernandes – Senior Director Product Development.* Mr. Fernandes has served as senior director product development since April 2008. He brings over seven years experience in both telecommunications and the financial services industry. As an original member of the Mozido team, Mr. Fernandes has been responsible for product design, partner integration and program deployments in the US, Latin America and Asia. Prior to joining Mozido, Mr. Fernandes spent over two years at Accenture where he consulted for the world's largest mobile operators. Mr. Fernandes has a Bachelors degree in Computer Systems Engineering from Boston University where he graduated Cum Laude.

## RELATED PARTY TRANSACTIONS

Family Mobile, an affiliate of Mozido in which Michael A. Liberty has an approximate direct and indirect interest of 55.5%, has made four unsecured loans to Mozido, totaling in the aggregate $7,735,000. Each of these loans bears interest at the rate of 8% per annum and matures 10 years from the date of the loan. The principal and accrued and unpaid interest on each loan is convertible, at the option of the holder, into Preferred Units of Mozido. If all of these loans were converted into Preferred Units of Mozido, Family Mobile would own approximately 65% of the outstanding equity in Mozido, on a fully diluted, as-converted and as-exercised basis. In connection with the Exchange Offer Mozido and Family Mobile have agreed that in lieu of the conversion provision in the loans, a portion of these loans will be exchanged for a combination of Class B Units sufficient to close the Exchange Offer and a contractual right to a three-times return on the number of Class B Units received in the event of liquidation.

Mozido, Affinity Holding, LLC, Mobile Tech Investments, LLC, Investments, Family Mobile and Michael Liberty are party to a commissions letter pursuant to which Investments will receive 1,285,264 Class A Membership Units of Mozido if Mozido enters into an agreement to provide Wal-Mart Stores, Inc. with mobile financial services under terms that provide material profitability to Mozido. The commissions letter also provides that if Mozido has not yet entered into an agreement with respect to Wal-Mart, but Mozido has entered into customer contracts with other specified retailers and other businesses in sufficient numbers and that provide material profitability to Mozido, Mozido will issue 852,130 Class A Membership Units to Investments and 433,134 Class A Membership Units to Mobile Tech. The commissions letter further provides that Mozido may, at the sole discretion of its compensation committee, pay cash payments to each of Mobile Tech and Mr. Liberty of 2.5% of the net revenue received by Mozido each calendar quarter pursuant to any agreement with a specified retailer or other business. Mr. Liberty may also receive compensation from Mozido, in the sole and absolute discretion of the compensation committee, for raising additional capital for Mozido and for efforts to consummate customer contracts that are not eligible for payment of Class A Membership Units.

## SUMMARY OF COMPANY AGREEMENT

### General

The Company is a Delaware limited liability company subject to the Delaware Limited Liability Company Act (the "Act") and is managed by a board of directors (the "Board"). The Company was formed in April, 2008. The Company has perpetual life unless terminated in accordance with the Company Agreement. The Company Agreement governs the rights and obligations of the members of the Company, which will include Noteholders who agree to exchange their Notes for Class B Units pursuant to the Exchange Offer and who are accepted by the Company as members. Such Noteholders will be required to execute a joinder to the Company Agreement and agree to be bound by all of its terms and provisions that are applicable to Class B Members.

The following discussion summarizes certain portions of the Company Agreement, but this description is only summary and all statements made below and elsewhere in this Memorandum are qualified in their entirety by reference to the Company Agreement itself, the form of which is attached hereto as Annex A. The simplified definitions that follow are designed to facilitate an understanding of the certain voting and transfer rights and restrictions, and the definitions are qualified in their entirety by reference to the Company Agreement.

"Consolidated Economic Ownership" means a person's rights to the percentage ownership in the Company on a fully diluted, as-converted and as-exercised basis (taking into account outstanding rights to acquire or to sell Membership Units), plus the amount determined by multiplying (a) such person's interesting Affinity Holding Company, LLC ("Affinity") on a fully diluted, as-converted and as-exercised basis (taking into account rights to acquire or sell membership units in Affinity) by (b) Affinity's fully diluted, as-converted and as-exercised interest in the Company. The calculation is intended to have the effect of disregarding Affinity in order to determine the ultimate interest in the Company held by each holder of (or right to hold) membership units of Affinity.

"Consolidated Preferred Ownership" means a person's right to the percentage ownership interest in the Preferred Units of the company on a fully diluted, as-converted and as-exercised basis (taking into account outstanding rights to acquire and sell Preferred Units), plus the amount determined by multiplying (a) such person's interest in the preferred membership units of Affinity on a fully diluted, as-converted and as-exercised basis (taking into account outstanding rights to acquire or sell preferred membership units of Affinity) by (b) Affinity's fully diluted, as-converted and as-exercised interest in the Company. The calculation is intended to have the effect of disregarding Affinity in order to determine the ultimate preferred interest in the Company held by each holder or (or right to hold) preferred membership units of Affinity.

### Management of the Company

The management, operation and control of the Company and all of its business affairs rests with the Board, except as expressly provided otherwise in the Company Agreement and as set forth below. The Board consists of seven directors, four of whom are appointed by Michael A. Liberty, two of whom are appointed by Mobile Tech Investments, LLC, and one of whom is

appointed by Al Fawares. The person or Member having the right to appoint a Director has the right to remove and replace such Director. Holders of Class B Units have no voting rights and no rights to participate in the management of the Company.

## Meetings and Voting Rights

Holders of Class B Units will have no right to receive notice of or attend meetings of voting Members or to vote on any matters subject to the vote of Members. Only Class A Members have voting rights. Additionally, at any time that Preferred Units or preferred membership interests in Affinity Holding, LLC are issued and outstanding, certain actions will require the consent of the persons or persons whose Consolidated Preferred Ownership in the Company represents at least a majority of the aggregate Consolidated Preferred Ownership in the Company. Such actions include amendment of the Company's articles of organization, amendment of the Company Agreement, the consolidation or merger of the Company, the sale, transfer or other disposal of a material portion of the assets of the Company, the acquisition of any material assets, the creation or sufferance of liens and other encumbrances on the Company's assets, the liquidation and dissolution of the Company, including any declaration of bankruptcy, the payment by the Company to a Member or any member, officer, director or manager or other affiliate of a Member, except as listed in the Company Agreement, including any sale or lease of property or assets to or purchase lease or other acquisition of assets from, such person, any change in the officers of the Company, the issuance of any Membership Units or other equity interests in the Company, incurrence of debt by the Company, the Company entering into any material contract, any compensation arrangement with any employee, officer, agent or Member or affiliate of such person, any transaction providing for severance or change of control benefits, providing for payment of $200,000 or more in aggregate compensation in any 12-month period, any change in the size of the Board or creation of any Board committee having delegated authority, the declaration and making of distributions, and investing in other entities.

## Distributions and Allocations

The following paragraphs summarize the distributions and allocations to which the Class B Members of the Company are entitled under the Company Agreement. The simplified definitions that follow are designed to facilitate an understanding of the Company's distributions and allocations. This description is only a summary and is qualified in its entirety by reference to the Company Agreement attached hereto as Annex A.

"Capital Account" means as to each Member, the capital account established and maintained for such Member and will reflect such Member's capital contributions and deemed capital contributions to the Company, and any allocations and distributions made pursuant to the Company Agreement, and will be adjusted in accordance with Section 704 of the Internal Revenue Code of 1986, as amended (the "Code") and the principals set forth in Sections 1.704-1(b) and 1.704-2 of the Treasury Regulations.

"Preference Account" means, with respect to each Preferred Member, as of any date, an amount equal to such Preferred Member's Preference Amount, less any distributions made to such Preferred Member prior to such date.

"Preference Amount" means, with respect to each Preferred Member, an amount equal to three times such Preferred Member's cumulative capital contributions.

"Preferred Return" means, with respect to each Preferred Member, an amount equal to 8% per annum, simple interest, computed on the basis of a 360-day year (consisting of 12 equal 30-day months), for the actual number of days in the period for which the Preferred Return Account is being determined, calculated on the average aggregate daily balance of such Preferred Member's Preferred Contribution Account during such period.

"Preferred Return Account" means, with respect to each Preferred Member, as of any particulate date, the cumulative amount of such Preferred Member's Preferred Return, less any distributions made to such Preferred Member as a non-liquidating distribution or as repayment of debt to such Preferred Member as a creditor of the Company

(a)   Distributions for Taxes.   As soon as reasonably possible after the end of each taxable year of the Company, the Board will authorize the distribution to each Member of an amount equal to the product of the maximum U.S. federal income tax rate for such year, multiplied by the anticipated allocation of Profit to such Member, to the extent that it reflects cumulative taxable net income after taking into account any and all prior (or carried-over) losses allocated under the Company Agreement and is permitted by all lending agreements to which the Company is a party.   Additionally, distributions to cover taxes may not be made if at any time the determination not to make distributions is made by the vote or consent of more than 50% of the Directors then on the Board ("Board Majority Vote").

(b)   Other Non-Liquidating Distributions.   Distributions of cash and other property shall be made to the Members at such time or times and in the amounts as determined by the Board Majority Vote, in the following order of priority:

(i)   first, to Preferred Members pro rata and to the extent of and in proportion to the outstanding balances on their respective Preferred Return Accounts as of such date;

(ii)   second, to the Preferred Members pro rata to the extent of an in proportion to the outstanding balances on their respective Preference Accounts as of such date; and

(iii)   thereafter, to each Member in proportion to the number of Membership Units, including Preferred Units, then owned by such Member.

(c)   Liquidating Distributions.   In the event of liquidation, dissolution or winding up of the Company, or any sale of all or substantial portion of its assets, or any sale by the Members of all or substantially all of the Membership Units (whether by sale, merger, consolidation or otherwise) and after payment of all costs and expenses related thereof, the Board or a liquidator or liquidating committee appointed by the unanimous approval of the Board, the proceeds from the liquidation transactions will be distributed in the following order of priority:

(i)   to satisfy all liabilities to creditors of the Company, on a pro rata basis, including Members who are creditors (other than due to distributions to Members) and to

establish such reserves as may be reasonably necessary to provide for contingent or other liabilities;

> (ii)     to the Preferred Members, pro rata to the extent of, and in proportion to, the outstanding balances on their respective Preferred Return Accounts as of such date;

> (iii)    to the Preferred Members, pro rata to the extent of, and in proportion to, the outstanding balances on their respective Preference Accounts as of such date; and

> (iv)     thereafter, to each Member in proportion to the number of Units (including Preferred Units) then owned by such Member.

Notwithstanding anything to the contrary in the Company Agreement or any custom or rule of law, to the extent that the deficit, if any, in the Capital Account of any Member results from or is attributable to the deductions and losses of the Company (including non-cash items such as depreciation), or distribution of money pursuant to the Company Agreement to all Members pro rata based on their respective Membership Units, upon dissolution of the Company, such deficit will not be an asset of the Company and such Member will not be obligated to contribute such amount to the Company to bring the balance of such Member's Capital Account to zero.

The Company may make in-kind liquidating distributions, and, in such event, such assets will be valued at their Agreed Value (which generally means the fair market value of the property as determined in good faith by the Board and agreed to by Mobile Tech, and in the case of disagreement, as valued by a joint appraisal) distributed to Members entitled thereto in the same proportion as if the distribution were in cash.

> (b)     Allocations.

All Company profit or loss, or items of income, gain, loss and deduction, for each fiscal year of the Company will be allocated among the Members and will be credited or debited to their respective Capital Accounts to the maximum extent possible under applicable U.S. tax law and regulations that:

> (i)     as to allocation of profit and loss, or items of income, gain, loss or deduction, that can have economic effect, such allocations satisfy the economic equivalence test of Section 1.704-1(b)(2)(ii)(i) of the Treasury Regulations; and

> (ii)     as to allocation of profit and loss, or items of gain, loss or deduction that cannot have economic effect (including nonrecourse deductions), such allocations are made to the Members pro rata in proportion to their respective ownership of Membership Units unless otherwise required by Code Section 704(b) and the Treasury Regulations promulgated thereunder.

Notwithstanding anything to the contrary in the Company Agreement, all profit or loss for each fiscal year will be allocated among the Members as follows:

> (i)     first, profits will be allocated among the Preferred Units until the balance of the Capital Accounts associated with such Units are equal to the balances of the Preferred Return

Accounts and the Preferred Contribution Accounts associated with such Units, and thereafter, profits will be allocated to each Member, in proportion to the number of Membership Units, including Preferred Units, then owned by such Member; and

(ii)     losses will be allocated to the Members in proportion to the number of Class A and Class B Units then owned by such Members until the Capital Accounts associated with such Units are reduced to zero, and thereafter, losses will be allocated to the Preferred Units.

### Restrictions on Transferability of Units

No transfers or assignments by the Class A Members or Class B Members of all or any portion of their Class A or Class B Units will be effective except to the extent that they are made in accordance with the provisions of the Company Agreement.  The Class A and Class B Members may not sell, assign, transfer, encumber or hypothecate their Class A or Class B Units without the prior consent of both (a) Mobile Tech and (b) Class A Members other than Affinity, Preferred Members, and holders of Class A and preferred membership units in Affinity whose combined Consolidated Economic Ownership of the company (excluding Class B Units and Class B membership units of Affinity).

In the event of a sale or other transfer of Class A and Class B Units, the transferring Member will be responsible for compliance with all conditions of transfer required by the Company Agreement and applicable law, and for any expenses incurred by the Company for legal and/or accounting services in connection with the proposed transfer.  Any transferring Member will continue to be a Member with respect to the transferred Membership Units until the transferee is admitted as a Member, at which time the transferee will be admitted as a Member and will have the rights and powers and be subject to the restrictions and liabilities of a Member under this Agreement and applicable law, and will be liable for any unfulfilled obligations of the transferring Member as to the transferred Membership Units.  Any purported transfer of Units made in violation of the requirements of the Company Agreement will be deemed void.  No person may transfer any Units in violation of applicable federal and state securities laws, and no transfer will be effected unless the transferee has executed and delivered to the Company and the Members a joinder to the Company Agreement.  No transfer of Membership Units will be permitted if such transfer would cause a dissolution of the Company under Delaware law, or a termination of the Company for tax purposes.

### Rights of First Refusal

If any Class A or Class B Member desires to transfer any Class A or Class Units, such Class A or Class B Member shall obtain an offer for such transfer and provide notice of such proposed transfer to Mobile Tech, each other Class A Member (other than Affinity), each Preferred Member, and each holder of preferred or Class A membership units in Affinity ("Qualified Persons"). Each of these Qualified Persons will have the right to consent or withhold consent to, the proposed transfer, and transfer will require consent of Qualified Persons owning at least a majority of the aggregate Consolidated Economic Ownership of the Company.  The proposed transfer will be subject to rights of first refusal in favor of the Qualified Persons to purchase their pro rata share (based on their respective Consolidated Economic Ownership of the Company, excluding Class B Units and Class B membership units of Affinity) of the offered

Class A or Class B Units, on the same terms and conditions as in the proposed offer. The transferring Member may transfer to the proposed transferee any Class A or Class B Units not elected for purchase by the Qualifying Persons, subject to tag-along rights of Qualified Persons.

**Tag-Along Rights**

The Qualified Persons will have the right to require the proposed transferee of the Class A or Class B Units to purchase from such Qualified Person, for the same consideration (on a fully-diluted and as fully converted and fully exercise basis) and upon the same terms and conditions, up to a maximum number of Units equal to the product of (a) such Qualified Person's Consolidated Economic Ownership of the Company (excluding Class B Units and Class B membership units of Affinity) and included Units to be purchased upon exercise of the right of first refusal, times (b) the number of Units which remain subject to the offer. To the extent that a Qualified Person properly elects tag-along rights, the transferring Member's number of Class A or Class B Units proposed to be transferred will be correspondingly reduced. A Qualified Person electing tag-along rights will be required to make similar representations and warranties in a transfer effected with tag-along rights, but will not be obligated to pay any amount with respect to any liabilities arising from such representations and warranties in excess of its share of the total consideration paid by the transferee.

**Drag-Along Rights**

If Mobile Tech at any time has rights to own a number of Units and membership units of Affinity representing a least a majority of the aggregate Consolidated Economic Ownership of the Company and (a) intends to sell either (i) all of its Units or its membership units in Affinity or (ii) all or substantially all of the assets of the Company or of Affinity to an unaffiliated third party in an arms-length bona fide transaction, then Mobile, at its option, may require all but not less than all of the Members and all owners of Affinity to participate in the sale. Each Member will be required to waive any dissenters' rights that may apply. Any Member required to participate in the sale will be required to provide indemnities and representations and warranties approved by Mobile Tech with respect to the sale and effect the allocation and distribution of the aggregate consideration received in the sale as a liquidation event. The Members other than Mobile Tech may present alternatives to the proposed sale, but Mobile Tech will have only the obligation to consider such alternatives in good faith and may elect to proceed with the sale as proposed by Mobile Tech. In order to exercise its drag-along rights, Mobile Tech must provide the Members and members of Affinity notice of the proposed sale, including the name of the proposed transferee, the assets or Membership Units or membership units of Affinity, proposed to be sold, the terms and conditions, including price, and expected closing date. The proposed sale must be consummated within 120 days of the notice, or drag-along rights will no longer apply to such proposed sale.

**Involuntary Transfers**

In the event any Class A or Class B Units are involuntarily transferred in a bankruptcy proceeding, or as a result of garnishment, attachment or execution or to an individual's surviving spouse, child descendent, ancestor or other person upon death of the individual, then Mobile Tech and each Class A Member (other than Affinity, each Preferred Member, and each preferred

17

member and Class A holder in Affinity) will have the right to acquire its pro rata share of the involuntarily transferred Units, based on the acquiring Member's Consolidated Economic Ownership of the Company (excluding Class B Units and Class B membership units in Affinity, and Units and membership units of Affinity subject to the involuntary transfer). The purchase price for such Units will be an amount equal to the fair market value of such Units as determined in good faith by the purchasing person and the person to whom such Units were involuntarily transferred, and if such parties are unable to agree, by appraisal.

## Dissolution And Liquidation

The Company may be dissolved by the consent of the Members owning Class A Units (other than Affinity), Preferred Units, and Class A and preferred membership units in Affinity, that represents more than 50% of the aggregate Consolidated Economic Ownership of the Company (but for this purpose, only Units of the Company and membership units of Affinity actually owned are counted). The Company also may be dissolved by decree of judicial dissolution under the Act after expiration of any applicable appeal periods.

In the event of dissolution, the Company's affairs will be wound up as soon as reasonably practicable. A liquidator will supervise the liquidation and winding up and will either by the Board of Directors or a liquidating committee appointed with the unanimous approval of the Board. The liquidator will have authority to liquidate and wind up the Company's affairs and business and dispose of its property. Distributions in liquidation, dissolution and winding up of the Company, or any sale of all or a substantial portion of its assets, or any sale by the Members of all or substantially all of the Units (whether by sale of stocker, merger, consolidation or otherwise) and after payment of costs associated with such transactions, will be made as set forth above under "Distributions and Allocations." Within a reasonable time following completion of the liquidation of the Company, the liquidator will deliver to Mobile Tech and the Members a final statement of the assets and liabilities of the Company as of the date of complete liquidation and each party's pro rata portion of liquidation distributions.

## Indemnification

The Company will indemnify any person in any action, suit or proceeding by reason of the fact that the person is or was a Director, officer or employee of the Company or is or was a director, officer or employee of the Company serving at the request of the Company as a director, officer or employee or agent of another person, (the "Indemnitee"), against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by such person in connection with its defense of such action, suit or proceeding if the person acted in good faith and in the reasonable belief that such person's actions were in or not opposed to the best interests of the company, and with respect to any criminal action, suit or proceeding, had no reasonable cause to believe its conduct was unlawful, except to the extent that any such person (a) receives a financial benefit to which the person was not entitled, (b) approves a distribution to Members in violation of the Act, (c) violates any fiduciary duty owed to the Company or the Members or (d) knowingly and willingly violate applicable law or the Company Agreement. The Company will pay the actual and reasonable expenses incurred in investigating or defending a threatened or pending action, suit or proceeding, in advance of its final disposition if the Company, in its discretion, determines that

the person likely will satisfy the foregoing requirements and obtains an undertaking of such person to repay such amount if it is ultimately determined that the person is not entitled to indemnification. The Company has, itself or through Affinity, has purchased and maintains to the extent available on commercially reasonable terms and only to the extent and with coverage limits reasonably necessary to a company in a similar position as the Company insurance for each Indemnitee against liability arising out of or relating to such Indemnitee's status as a Director, officer, employee or agent of the Company.

### Nonexclusive Duties and Standard of Care

The Directors may engage in or posses an interest in other business ventures (unconnected with the Company) of every kind and description, independently or with others, and neither the Company nor the Members will have any right to such independent ventures of the Directors or any income or profits therefrom.

The Directors have the fiduciary duties to the Company and its Members that a director of a Delaware corporation have to his corporation and shareholders. Except to the extent that a Director (a) approves a distribution to Members in violation of the Act, (b) receives a financial benefit to which he or she was not entitled, (c) violates a fiduciary duty to the company or the members or (d) knowingly and willingly violates applicable law of the Company Agreement, no director has any liability to the Company or its Members as a result of the Director taking any action that the Director reasonably believed to be in or not opposed to the best interests of the Company and, with respect to any criminal action, had no reasonable cause to believe his or her conduct was unlawful.

### No Restraints with Respect to Competition or Business Opportunities

The Directors, officers, agents, affiliates and equity owners of Mobile Tech and each Member may be engaged, directly or through interests in other entities, in other activities that are and will be competitive with the Company, except that Investments, Brentwood Investments, LLC and Michael Liberty and their respective directors, officers, agents, affiliates and equity owners may not be engaged directly or through interests in other entities, in other activities that are or will be competitive with the Company. As long as the combined Consolidated Economic Ownership of the Company held by Investments, Brentwood Investments, LLC, Michael Liberty, and their respective directors, officers, agents affiliates and equity owners, in the aggregate, exceeds 5% of the Consolidated Economic Ownership of the Company, each of them will not compete, directly or indirectly, with the Company, or pursue or otherwise deal with any business opportunity that would reasonably be expected to compete with the Company.

### Applicable Law

The Company Agreement is to be construed and enforced in accordance with the laws of the State of Delaware.

### Reports and Records

The Company is required to keep and maintain at the Company's principal office all records required under the Act, including a list of names, addresses and Units held by each Member, copies of federal, state and local information and income tax returns for each of the Company's tax years, copies of the Company Agreement and certificate of formation, and the Company's minute book.   Mobile Tech may at its option at any time require the Company to have prepared, at the Company's expense, audited financial statements prepared by an accounting firm reasonably acceptable to Mobile Tech.

The Company must provide Mobile Tech and each Member the following financial statements within the time frames indicated, prepared in accordance with generally accepted accounting principles except for footnotes and normal year end adjustments:

(a)   No later than 60 days after the end of each fiscal year, unaudited financial statements, including a balance sheet and statements of income and cash flow showing cash distributed in such fiscal year and the balance of each Member's capital account as of year end;

(b)   No later than 30 days after the end of each fiscal quarter, unaudited financial statements for such quarter, including a balance sheet and statements of income and cash flow showing cash distributed in such fiscal quarter and the balance of each Member's capital account as of quarter end; and

(c)   No later than the 15th day of each calendar month, a rolling budget and forecast reports with respect to each of the next 12 months, and an analysis of actual results against forecasted and budget results with respect to the previous month, fiscal quarter-to-date and fiscal year-to-date.

Mobile Tech and each Member are entitled to full access, upon reasonable prior notice and during normal business hours, to all officers, employees, agents and accountants of the Company and to all books and records of the Company for inspection and copy. The Company will furnish Mobile Tech and each Member such information and data concerning the Company and its business as they may reasonably request. Mobile Tech and each Member will have the right to have discussions with the Company's internal and external auditors and counsel.

## Accounting and Fiscal Year

The Company intends to keep its books and records in accordance with the accrual method of accounting.  The fiscal year of the Company will be the calendar year.

## Liability of the Members to Third Parties

Members will not be personally liable for the debts of the Company beyond the amount of their capital contributions and their share of distributions from the Company.  In the event the Company is unable to meet its obligations, the Members, under applicable law, could be obligated under some circumstances to return any distributions (including return of Capital Contributions), generally for a period of up to three years thereafter.

## CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS

NOTICE PURSUANT TO IRS CIRCULAR 230

THE DISCUSSION HEREIN IS NOT INTENDED OR WRITTEN BY THE COMPANY OR ITS COUNSEL TO BE USED, AND CANNOT BE USED, BY ANY PERSON FOR THE PURPOSE OF AVOIDING TAX PENALTIES THAT MIGHT BE IMPOSED UNDER U.S. TAX LAWS. THIS DISCUSSION IS PROVIDED TO SUPPORT AN OFFERING OF UNITS IN THE COMPANY, AND ACCORDINGLY IS WRITTEN IN SUPPORT OF THE MARKETING OF THE UNITS IN THE COMPANY. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR CONCERNING THE POTENTIAL TAX CONSEQUENCES OF AN INVESTMENT IN THE COMPANY.

The following description is a summary of certain U.S. federal income tax considerations of an investment in the Company and does not address every potential tax consequence that may be applicable to Members subject to special rules. This summary is based on the provisions of the Internal Revenue Code of 1986, as amended (the "Code"), applicable Treasury regulations, Internal Revenue Service ("IRS") rulings and judicial decisions, as of the date of this Exchange Memorandum. No assurance can be given that future legislative, regulatory or administrative changes or court decisions will not significantly modify the statements made herein. Any such changes or decisions may be retroactive and thereby be applied to transactions entered into prior to the date of their enactment or release. No assurance can be given that the IRS will not challenge any of the positions taken by the Company and that such challenge, if any, will not be successful.

**Noteholders considering accepting the Exchange Offer should consult with their own tax advisors regarding other U.S. federal, state and local tax effects of the Exchange Offering and of investing in the Company.** Except as specifically noted, the following general discussion assumes that each Member is a U.S. resident individual subject to tax in the United States that holds its Units in the Company as a capital asset and is the initial holder of such Units.

### The Exchange Offering

The Exchange Offering should be a fully taxable event to the Noteholder for U.S. federal and state income tax purposes. The amount of gain or loss required to be recognized by a Noteholder on the Exchange Offering will generally be equal to the difference between (a) the fair market value of the Class B Units received by the Noteholder in the exchange, and (b) the Noteholder's adjusted tax basis in the Notes relinquished in the exchange. Pursuant to the Exchange Agreement, the parties will agree that the fair market value of each 6.26 Class B Units at the time of the Exchange Offering is equal to $1.00. No assurances can be given that such agreed-upon fair market value will be respected by applicable taxing authorities for income tax purposes. Generally, a Noteholder's tax basis in the Notes will be equal to the cost of the Notes to such Noteholder, increased by any accrued and unpaid interest previously included by the Noteholder in income.

Assuming the Note is held by the Noteholder as a capital asset, the gain or loss on the exchange should be characterized as a capital gain or loss, except to the extent any gain is attributable to accrued but unpaid interest not previously included in the Noteholder's income. In addition, the amount and character of the gain or loss on the exchange may be impacted by certain rules applicable to the interest component of an investment in property such as the Notes, including the original issue discount and market discount provisions of the Code, depending on the circumstances under which the Noteholder acquired the Note.

Any capital gain or loss generally should be long-term if the Noteholder's holding period for its Notes is more than 12 months at the time of exchange, and should be short-term if the Noteholder's holding period for its Notes is less than 12 months. The deductibility of capital loss is subject to significant limitations.

If the exchange is taxable, a Noteholder's tax basis in the Class B Units received on the exchange will generally be equal to the fair market value of the Class B Units at the time of the exchange.

**Partnership Status Of The Company**

Section 7704 of the Code provides that a "publicly traded partnership" shall be treated as a corporation for U.S. federal income tax purposes unless such partnership has met and continues to meet certain requirements regarding the types of gross income received by such partnership. Section 7704 defines "publicly traded partnership" as any partnership if interests in such partnership are traded on an established securities market or are readily tradable on a secondary market or the substantial equivalent thereof (any such partnership is referred to as a "publicly traded partnership"). In order to meet a safe harbor from the publicly traded partnership rules, certain transfers of Units, or interests therein, will be restricted.

Under Treasury regulations, a domestic limited liability company with more than one member will be classified as a partnership for federal income tax purposes, unless it makes an election to be treated as an association taxable as a corporation. The Company is a domestic limited liability company and has more than one member. Management has not made an election to be classified as an association taxable as a corporation. Based on the foregoing, management believes that the Company will continue to be treated as a partnership for federal income tax purposes and not as an association taxable as a corporation.

If the Company were classified as an association (or a publicly traded partnership) taxable as a corporation, the Company would pay U.S. federal income tax at corporate rates on its net income. Such tax would result in a reduction in the amount of cash available for distribution to Members. Distributions to the Members in general would be dividends to the extent of the earnings and profits of the Company, with distributions in excess thereof being treated first as a return of capital and thereafter as capital gain.

**Taxation Of Members On Income Of The Company**

Generally, entities classified as partnerships, like the Company, are not subject to U.S. federal income tax. Instead, each partner includes such partner's allocable share of the partnership's items of taxable income, gains, losses, deductions and credits in determining its taxable income, whether or not cash is actually distributed to such partner. Consequently, a Member may be allocated income from the Company although he has not received a cash distribution from the Company. The tax information filed by the Company may be audited by the IRS and states. Adjustments, if any, resulting from such an audit may require each Member to file an amended tax return and may possibly result in an audit of such tax return. Any audit of a Member's return could result in adjustments of non-Company as well as Company items.

Under Code Section 704(b), a partnership's tax allocations generally will be respected for U.S. federal income tax purposes if they have "substantial economic effect" or they are in accordance with the partners' interests in the partnership. If a partnership's allocations do not comply with Code Section 704(b), the IRS may reallocate partnership tax items in accordance with the interests of the partners in the partnership.

A Member must treat Company items in a manner consistent with the Company's treatment of those items, unless the Member notifies the IRS that such Member is asserting an inconsistent treatment in accordance with applicable Treasury regulations. Subject to timely receipt of information from the Company, the Managing Member anticipates providing to each Member their respective Schedule K-1 (Form 1065) within ninety days after the close of the Company's taxable year which is December 31st.

The ability to utilize any tax losses generated by the Company may be limited under the "at risk" limitations in Code Section 465, the passive activity loss limitations in Code Section 469 and other provisions of the Code. Furthermore, the ability to utilize certain specific items of deduction attributable to the investment activities of the Company (through its interests in the Company) may be limited by, among other things, the investment interest limitation in Code Section 163(d), and the 2% floor on miscellaneous itemized deductions (including investment expenses) in Code Section 67. The extent to which any of the foregoing provisions of the Code will be applicable will depend upon the nature of the Company's future operations and the tax situations of each of the taxable Members.

## Fees To Affiliates

As described under "Related Party Transactions" in this Memorandum, the Company will pay certain commissions to Michael A. Liberty, an affiliate of the Company, or entities affiliated with Mr. Liberty. The Company intends to treat any fees, expense reimbursements and other items payable to affiliates of the Company in the same manner as if such amounts were payable to unrelated parties. Such treatment may include currently deducting such amounts, or capitalizing and amortizing or depreciating such amounts. There can be no assurance that the IRS will not challenge the tax treatment of these items, possibly asserting that: (i) all or a portion of certain fees and expenses are in fact compensation for other services; (ii) such fees are not reasonable in amount; (iii) such fees and expenses must be recovered, if at all, over a longer period of time; or (iv) such fees constitute a distributive share of Company income. If such a challenge were successful, it could result in either: (a) the deferral or disallowance of the

deduction of the fees and expenses or (b) the recharacterization of such fees and expenses as a nondeductible and unamortizable item, such as a syndication expense that must be capitalized. In such event, the net income (or net loss) allocated to the Members would be increased (or reduced).

**Sale Or Transfer Of Member Units**

In the case of a sale of a Member's Units, a taxable Member will recognize gain or loss equal to the difference between: (i) the proceeds of such sale plus such Member's share of the Company's nonrecourse liabilities and (ii) such Member's tax basis in such Member's Units. Such gain or loss recognized on a sale of Units by a Member, who does not hold such Units as a "dealer" and who has held such Units for more than 12 months, will generally be long term capital gain or loss, as the case may be, except that the portion of the selling Member's gain allocable to (or amount realized, in excess of basis, attributable to) "inventory items" (including "dealer" property), "unrealized receivables," and "depreciation recapture" of the Company as defined in Code Section 751 will be treated as ordinary income.

**Liquidation Of The Company**

Upon liquidation of the Company, its property will be distributed in kind or sold and any gain or loss on any such sales will be allocated in accordance with the Company Agreement. See "SUMMARY OF COMPANY AGREEMENT – Dissolution and Liquidation" and "SUMMARY OF COMPANY AGREEMENT – Distributions and Allocations – (c) Liquidating Distributions."

**Tax Shelter Reporting Rules**

The Company may engage in transactions or make investments that would subject the Company, its Members that are obliged to file U.S. tax returns and/or its advisors to special rules requiring such transactions or investments by the Company, or investments in the Company, to be reported and/or otherwise disclosed to the IRS, including to the IRS's Office of Tax Shelter Analysis (for purposes of this section, referred to as the "Tax Shelter Rules"). A transaction may be subject to reporting or disclosure if it, among other things, results in the incurrence of a loss or losses exceeding certain thresholds (including foreign currency losses). Although the Company does not expect to engage in transactions solely or principally for the purpose of achieving a particular tax consequence, there can be no assurance that the Company will not engage in transactions that trigger the Tax Shelter Rules. In addition, a Member may have disclosure obligations with respect to its interest in the Company if the Member participates in a reportable transaction. Failure to comply with applicable disclosure obligations can result in the imposition of significant penalties. In addition, the penalties for underpayment of federal income tax are increased if the underpayment is attributable to the improper treatment on a federal income tax return of an item of income, gain, loss or deduction that is attributable to a reportable transaction.

NOTEHOLDERS CONSIDERING ACCEPTING THE EXCHANGE OFFER SHOULD CONSULT THEIR OWN TAX ADVISORS ABOUT THEIR OBLIGATION TO REPORT OR DISCLOSE TO THE IRS INFORMATION ABOUT THEIR INVESTMENT IN THE

COMPANY AND PARTICIPATION IN THE COMPANY'S INCOME, GAIN, LOSS OR DEDUCTION WITH RESPECT TO TRANSACTIONS OR INVESTMENTS SUBJECT TO THESE RULES.

## Possible Legislative Or Other Actions Affecting Tax Aspects

Noteholders considering accepting the Exchange Offer should recognize that the present U.S. federal income tax treatment of investments in the Company may be modified by legislative, judicial or administrative action at any time and that any such action may affect investments and commitments previously made. The rules dealing with federal income taxation are constantly under review by persons involved in the legislative process and by the IRS and the Treasury Department, resulting in revisions of regulations and revised interpretations of established concepts as well as statutory changes. Revisions in U.S. federal tax laws and interpretations thereof could adversely affect the tax aspects of an investment in the Company.

## State And Local Tax Consequences

Noteholders considering accepting the Exchange Offer should consider the state and local tax consequences of an investment in the Company. The Company or the Members, or both, may be subject to state and local taxes or filing requirements in various jurisdictions, including not only the states in which they are deemed to reside, but also the states in which the Company may be deemed to be doing business and/or in which the properties underlying the Company's investments are situated. Such taxes may include (but are not limited to) real property and income taxes.

## RISK FACTORS

**Offerees should carefully consider the risks described below, together with all of the other information included in this Confidential Offering Memorandum, before making a decision to accept or reject the Exchange Offer.**

*Mozido is an early-stage, development company and is subject to all of the risks inherent with new business enterprises. Mozido expects to incur significant losses through December 31, 2012, and its profitability thereafter is uncertain.*

Mozido was originally organized in April 2008, and thus may be considered a development stage company with a limited operating history. Accordingly, Mozido is subject to all of the risks inherent in the establishment of a new business enterprise. The time required by Mozido to reach profitability is highly uncertain and there can be no assurance that Mozido will be able to achieve profitability at all or on a sustained basis. Mozido expects its operations to be cash flow positive by the second quarter of 2013, but that it will incur significant losses through the fiscal year ending December 31, 2012. Although Mozido projects that it may earn income in the fiscal years ending December 31, 2013 and thereafter, there can be no assurance that losses will not continue. The successful implementation and development of Mozido's business and operations in the future depends upon numerous factors, including, among others, the ability of its founders to attract the necessary capital, to build the management team capable of carrying out the proposed implementation and development of Mozido's business, to win market acceptance and to capture market share for products and services and to generate the sales revenues and levels of profitability that management believes is necessary for success. There can be no assurance that the objectives established by Mozido's founders with respect to the proposed implementation and development of Mozido's business and operations in the future will in fact be met, that Mozido will establish or maintain market acceptance or market share or become profitable, or that the levels of revenues, profitability and cash flows established by management will in fact be attained. As implementation of any business plan continues over time, there are inevitably changes in direction and strategy that will be adopted by management based upon actual experience in operating a business. Thus, there can be no assurance that the actual manner in which the business of Mozido is conducted and the results of Mozido's operations will not vary significantly from management's current intentions.

*The Exchange Rate for the exchange of the Notes into Class B Units was determined arbitrarily.*

The Exchange Rate per Class B Unit was determined by Family Mobile based on the prior conversion rate of the Notes to provide equivalent direct ownership in Mozido relative to the indirect ownership the Noteholders would have upon conversion of all the Notes and receipt of their equity interest in Family Mobile. The conversion rate in the Notes of $55,000 per unit of Investments was determined arbitrarily and, thus, the Exchange Rate bears no relationship to Mozido's book or asset values, or to any other established criteria for valuing Class B Units. Because the Exchange Rate is not based upon any independent valuation, the Exchange Rate may not be indicative of the proceeds that a Class B Member would receive upon sale of Class B Units, liquidation of Mozido or otherwise.

**Mobile Tech Investments, LLC has notified Mozido that it is in default under $5,000,000 of loans.**

Mobile Tech Investments, LLC holds $5,000,000 of promissory notes issued by Mozido. In April, 2012, Mobile Tech notified Mozido that Mobile Tech was aware of certain breaches or defaults under the loans, including but not limited to payment of interest and the taking of certain actions by Mozido without obtaining Mobile Tech's consent as required by the loan documentation, such as entering into material agreements and the hiring of officers at Mozido. Mobile Tech has not declared a default or accelerated the loans; however, it has reserved its rights to all remedies available to it. Mozido and Mobile Tech are working to resolve outstanding issues. Family Mobile has participated in $2,235,000 of these loans.

**Third-Party economic, market and industry information relied upon by Mozido may not be reliable.**

Certain of the economic, market and industry information contained herein has been obtained from published sources and/or prepared by other parties. While such sources are believed to be reliable, none of the Company, its management or any other person assumes any responsibility for the accuracy of such information.

**Mozido may not be successful in developing and commercializing its products and services.**

In order for the members of Mozido to realize returns from their investment, Mozido or Affinity Holdings must ultimately undertake an initial public offering or be acquired. This process will depend on Mozido's performance as well as many other factors over which we will have no control, such as general conditions in the financial markets, fluctuations in demand in the securities markets for initial public offerings and investor interest in companies in Mozido's industry. To date, neither regulatory nor market acceptance of Mozido's planned products and services has been established. There can be no assurance that such acceptance will be achieved or, if achieved, can be maintained. There also can be no assurance that Mozido will be able to compete effectively in its target markets. In short, Mozido may develop much more slowly than planned or it may fail.

**Mozido is subject to numerous regulatory risks and licensing requirements.**

Banking, financial and money transfer industries are all highly regulated, both domestically and abroad. For example, Mozido will be required to comply with the federal Bank Secrecy Act of 1970 and the USA PATRIOT Act, as well as other domestic and foreign laws that govern global and national financial systems, safeguard banking security and prevent money laundering and tax evasion. Compliance with such regulations may be both expensive and cumbersome. Any failure by Mozido to comply fully with applicable regulations may subject Mozido to liabilities and could have a material adverse effect on Mozido's business.

In addition, Mozido is in the process of pursuing money transmitter licenses, both domestically and abroad. Mozido is currently partnered with an international money transfer company, and is able to offer limited money transfer services in the interim under this arrangement. Mozido's expectation is that, once it receives its money transmitter licenses it will be able to perform money transfers at a lower cost and therefore significantly enhance its margins. There can be no

Rule 12(c) Motion 00204

assurance, however, that Mozido will be granted the money transmitter licenses or other licenses it requires.  Nor can there be any assurance that Mozido's relationship with the international money transfer company will continue, on terms favorable to Mozido or at all.  The failure of Mozido to obtain the license required or to affiliate with one or more international money transfer companies on reasonable terms could substantially delay the implementation of Mozido's business plan and could have a material adverse effect on Mozido's business.

*Mozido will require additional capital which may dilute the interests of existing members, including members who acquired their Class B Units pursuant to the Exchange Offer.*

Mozido will need to seek and secure significant additional capital in the near future to implement its business plan.  Mozido has no established financing sources and no party is obligated to provide financing to Mozido.  Due to the volatility and uncertainty recently experienced in domestic and international financial markets, liquidity has tightened in financial markets.  Consequently there is greater uncertainty regarding our ability to access credit markets in order to obtain financing on reasonable terms or at all.  We cannot assure that that we will be able to develop sources of funding for future capital needs.

In the event that Mozido is able to secure additional capital, such additional financing may result in significant dilution to its equity holders, including holders who acquired their Class B Units pursuant to the Exchange Offer, and may be on terms unfavorable to Mozido.  Mozido's future capital requirements will depend on many factors, including its ability to generate cash flow from operations, its ability to develop, manufacture and market its planned products and services successfully, the feasibility of its technology, competition, and market developments.

Mozido will not obtain any additional capital from the Exchange Offer and will instead acquire indebtedness owed by Invesco and Investments.  The ability of Invesco and Investments to pay this debt will depend on the success of Mozido as the business of these entities consists of their respective ownership interests in Mozido.

*Equity-based incentives may further dilute the interest of Members in Mozido's equity.*

In order to motivate and compensate officers, employees, managers, advisers, consultants and others who are in a position to contribute significantly to Mozido, Mozido has made grants of Class B Units and may make grants of Class B Units, preferred units or other equity.  Any such grants will cause further dilution to its equity holders.

*No Assurance of Cash Distributions.*

Distributions of cash and other property shall be made to the Members at such time or times and in the amounts as determined by the Mozido Board.  There are many factors that can affect the amount, availability and timing of cash distributions to Members.  Cash available for distributions by Mozido to its Members is expected to be generated primarily from the sale of its Mobile Wallet financial services and from advertising.  The amount of cash available for distributions will be affected by many factors, such as the amount and timing of, Mozido's debt service requirements under loans if any, expenses of operations.  The timing of distributions and actual cash available for distributions may vary substantially from the Board's estimates of the amounts and timing of available cash.

Many of the factors that can affect the availability and timing of cash distributions to Members are beyond Mozido's control, and a change in any one factor could adversely affect Mozido and, thus, Mozido's ability to pay distributions. For instance:

- Cash available for distributions would be reduced if Mozido is required to use cash flow or other sources of cash for capital expenditures not previously reserved for;

- Cash available to make distributions by Mozido to its Members may decrease if the Company generates lower than expected cash flow are less than expected;

- Mozido has previously incurred substantial debt. Therefore, significant portions of Mozido's operating cash flow and cash on hand will be needed to make debt payments, and cash available for distributions will therefore decrease.

In addition, the Mozido Board may determine retain any portion of Mozido's cash flow from operations for working capital or other purposes. Mozido cannot assure Noteholders that sufficient cash will be available to pay distributions to Members.

### *Members may be liable for return of their distributions in certain circumstances.*

If Mozido is otherwise unable to meet its obligations, Members may be obligated to return cash distributions previously received by them, with interest, if such distributions are deemed to be a wrongful return of capital or payment to them under applicable law. In additional, a Member may be liable under applicable bankruptcy laws to return previous distributions made to such Member.

### *Noteholders who exchange their Notes for Class B Units pursuant to the Exchange Offer will become minority members in Mozido, with no ability to participate in the management of Mozido.*

Assuming all Class B Units offered in the Exchange Offer are issued pursuant to the Exchange Offer, the former Noteholders will own approximately 12.22% of the issued and outstanding equity interests in Mozido and will be minority investors in Mozido. The Class B Units are non-voting and members owning such units have no right to participate in the management of Mozido. Additionally the Company Agreement provides that the Board and the holders of the Preferred Units in Mozido have control over substantially all decisions affecting Mozido and its business. Accordingly, each Noteholder should assume that he, she or it will be a minority investor with no ability to participate in the management of Mozido.

### *The markets in which Mozido will participate are highly competitive, fragmented and decentralized, and its competitors may have greater technical and financial resources than Mozido does.*

The markets for mobile financial services and technologies are highly competitive, fragmented and decentralized. Mozido is and will continue to be subject to significant competition from a variety of sources, including both existing competitors and new companies to the market. Many of these competitors and potential competitors have or will have substantially greater technical, financial, and marketing resources than those available to Mozido. Mozido's

ability to compete successfully will depend in large part upon its ability to attract customers and develop and maintain relationships with such customers. There can be no assurance that Mozido will be able to compete successfully.

### *Mozido will be subject to risks relating to international operations.*

Mozido plans to offer products and services internationally as well as domestically. Certain components of Mozido's proposed offerings may be developed overseas. International sales and operations involve a number of additional risks including:

- the impact of possible recessionary environments outside of the United States;

- longer sales cycles;

- the burdens of complying with differing governmental laws, rules and policies, including tax laws, health and safety laws, and laws relating to the ability of foreign persons or corporations to remove profits earned from activities within the country to a person's or corporation's country of origin, as well as unexpected changes in laws and regulatory requirements;

- reduced protection for intellectual property rights in some countries;

- tariffs and other trade barriers;

- foreign currency exchange rate fluctuations;

- lack of uniform accounting standards (including availability of information prepared in accordance with U.S. tax laws);

- difficulties in staffing foreign operations;

- legal and logistical barriers to enforcing our contractual rights; and

- social, political and economic instability and changes in duplicating developments in or affecting a country where we propose to do business.

### *We may be subject to fluctuations in foreign currency exchange rates with respect to foreign operations, and to hedge against foreign exchange rates we may use derivative financial instruments, which may be costly and ineffective.*

To the extent that Mozido's international sales or operations expand, Mozido expects that an increasing portion of its revenues may be denominated in foreign currencies, subjecting Mozido to fluctuations in foreign currency exchange rates. Mozido does not currently engage in foreign currency hedging transactions. However, in the event that Mozido expands its international sales or operations, exposures to gains and losses on foreign currency transactions may increase. Mozido may choose to limit such exposure by the purchase of forward exchange contracts or other hedging strategies. There can be no assurance that any currency exchange strategy would be successful in avoiding exchange-related losses. There can be no assurance that the foregoing factors will not have a material adverse effect on Mozido's future international revenue, if any, and, consequently, on Mozido's business, operating results and financial

Rule 12(c) Motion 00207

condition. Mozido attempts to mitigate risks related to receivables collections and currency fluctuations by generally requiring project fees to be paid prior to the delivery of services and for transaction-based fees to be paid electronically and automatically at the instant a Mobile Wallet transaction takes place.

**_Mozido's success will depend on the retention of its senior management and on its ability to attract and retain other key personnel._**

Mozido's success will depend largely on the skills, experience and performance of its senior management. Mozido's senior management consists of only four officers, its Chief Executive Officer, its President and Head of Global Operations, its Chief Financial Officer and its Chief Marketing Officer. The loss of any member of Mozido's senior management could have a material adverse effect on its business. Mozido does not maintain key man insurance on any senior management or any other key employees. In addition, in the event that any of Mozido's officers is terminated without cause, the officer will be entitled to receive severance payments equal to up to six months' salary and certain benefits. In the event Mozido is required to make these severance payments to those officers, it could have a material adverse effect on Mozido's results of operations for the fiscal period in which such payments are made.

Mozido currently has 21 full-time employees in its Dallas, Texas headquarters, who perform a variety of functions, including executive management, finance and administration, operations, business development, product and software development, and technology and infrastructure. The loss of many of these employees may have a material adverse effect on Mozido's business and could substantially delay the implementation of Mozido's business plan. There can be no assurance that Mozido will be able to retain the services of these employees, or of any future employees. Mozido also relies on additional part-time employees and contractors in the United States and in other countries. Moreover, in order to implement its business plan and to remain competitive, Mozido will need to attract and retain additional personnel. Thus, Mozido's success will in significant part depend upon the efforts of personnel not yet identified and upon its ability to attract and retain highly skilled technical, managerial and sales and marketing personnel. Mozido faces significant competition for such personnel from other companies. There can be no assurance that Mozido will be able to attract and retain necessary personnel. The failure to hire and retain such personnel could materially and adversely affect Mozido's prospects.

**_Mozido may not be able to protect its intellectual property rights adequately._**

Mozido's success depends, in significant part, on its ability to protect its proprietary technology and operate without infringing on the proprietary rights of others in the United States and other countries. There can be no assurance that any of Mozido's proprietary rights have been or will be adequately safeguarded, or that they will not be challenged by third parties, resulting in a material adverse impact on Mozido's business, prospects, financial condition and results of operations. Mozido's intellectual property includes registered and common law trademarks, trade secrets and other proprietary rights. Although Mozido has applied for patent protection for certain key elements of its technology, there can be no assurance that Mozido will be able to obtain any patents or that third parties will not be able to circumvent any patents Mozido may receive by developing products or services with similar functionality to Mozido's proposed products and services. Nor can there be any assurance that, if challenged, any patents

31

Mozido may be issued will be found to be valid or enforceable, or that the patents of others will not have an adverse effect on Mozido's ability to do business. Mozido may not have the resources to obtain patent protection in the United States or in other countries in which it intends to operate, to defend any challenges to its patents by third parties or to prosecute challenges of any third parties Mozido believes to be infringing its intellectual property. Nor can there be any assurance that Mozido's competitors will not independently develop technology or products that are substantially similar or superior to Mozido's, or that they will not design their products around any patents that may be issued to Mozido.

### As Mozido grows, it will be subject to growth related risks.

Mozido's future success will depend in part on its ability to manage growth, if any. To compete effectively and manage future growth, if any, Mozido will be required to continue to implement and improve its operational, financial and management systems, procedures and controls on a timely basis, and to expand, train, manage and motivate its workforce. There can be no assurance that Mozido's personnel, systems, procedures and controls will be adequate to support Mozido's future operations or that it will be able to implement those that will be adequate. The failure to implement new and improved operational, financial and management systems or to expand, train, motivate and manage employees could have a material adverse effect on Mozido's business, operating results and financial condition. There can be no assurance that Mozido will continue to grow or, if it does, that Mozido will manage the growth successfully.

### Mozido has incurred substantial debt may incur additional debt in the future.

Mozido has incurred substantial debt and may incur additional debt, including debt under existing and future credit facilities, some of which may be secured, and all of which would have priority in liquidation over the equity interests in the Company. Terms of debt facilities may restrict our ability to transfer or sell assets, pay distributions, make certain investments, incur additional debt, create liens on our assets, consummate a merger, consolidation or sale of all or substantially all of our assets, enter into transactions with affiliates, engage in business other than our current business. Such indebtedness may prevent us from taking advantage of certain business opportunities that arise if we fail to meet certain ratios or other requirements. Restrictions imposed by creditors may restrict our ability to plan for or react to changing market conditions, meet capital needs, enter into acquisitions or otherwise execute our business strategy. We may not be able to generate sufficient cash flow to meet our debt service obligations, due to events beyond our control.

### The Notes are illiquid securities, and offerees who do not participate in the Exchange Offer must be prepared to hold their Notes, and the Investments common units into which the Notes are convertible, for an indefinite period of time.

The Notes (and the Investments common units issuable upon conversion of the Notes) are not and will not be registered under the Securities Act of 1933 or applicable state or foreign securities laws and may not be resold unless they are subsequently registered or an exemption from registration is available. Moreover, there is no public or other market for the Notes or the common units of Investments into which they are convertible, nor can there be any assurance that such a market is likely to develop. Offerees who do not accept the Exchange Offer may thus be required to retain their investment in the Notes for an indefinite period of time.

*Class B Units in Mozido currently have no established trading or other public market, and an active trading market may never develop.*

The Class B Units of Mozido are not and will not be registered under the Securities Act of 1933 or applicable state or foreign securities laws and may not be resold unless they are subsequently registered or an exemption from registration is available. The failure of a public market for the Class B Units affects the liquidity and value of the units and investors may not be able to sell their Class B Units readily, if at all, or at above the Conversion Rate. Mozido has no obligation to register the Class B Units for sale and does not intend to do so. Even if Mozido were to register the Class B Units for sale pursuant to an effective registration statement, there can be no assurance that any market for such units would develop, or if it does develop, that it will be liquid. If the Class B Units are traded, they may trade at a price below the Conversion Rate, depending on the market for similar securities, our operating performance and financial condition and other factors. Therefore, you will be required to bear the financial risk of your investment upon exchange of the Notes indefinitely.

*Class B Members of Mozido have no preemptive rights.*

There are no preemptive rights with respect to the Class B Units of Mozido. Mozido may issue, without Class B Member approval, one or more classes of preferred interests or additional shares of common interests in Mozido. Such issuances may reduce the value of the Class B Units acquired pursuant to the Exchange Offer. Mozido's Board of Directors may authorize the issuance of additional Class A Units or preferred interests.

*Rights of Creditors and Preferred Members in Liquidation.*

In the liquidation and winding up of Mozido, distributions will be paid first to satisfy all liabilities to creditors of Mozido, including liabilities to Members who are creditors, to establish such reserves as may be reasonably necessary to provide for contingent or other liabilities of the Company, then to holders of Preferred Units with respect to their preferred return accounts and preference accounts, and thereafter to all Class A, Class B and Preferred Members, in proportion to the number of their respective membership units in Mozido.

*You will be limited in your right to bring claims against Mozido's officers and directors.*

According to the Company Agreement, directors have the fiduciary duties to the Company and its members that a director of a corporation incorporated under Delaware law would have to the corporation and its owners. Except to the extent that a director receives a financial benefit to which such director was not entitled, votes for or assents to a distribution to members in violation of law, violates fiduciary duty to the Company or its members or knowingly or willingly violates applicable law or the Company Agreement, no director has any liability to Mozido, its members or any other person as a result of taking any action that the director reasonably believed to be in or not opposed to the best interests of Mozido and, with respect to a criminal action, had no reasonable cause to believe his conduct was unlawful. Under the terms of the Company Agreement, the Company is obligated to indemnify its officers and directors for losses they may incur by reason of their service in such capacities except as set forth above.

*Uninsured losses.*

There are types of losses, generally catastrophic in nature, such as losses due to wars, acts of terrorism, earthquakes, floods, hurricanes, pollution or environmental matters that may be uninsurable or not economical to insure, or may be insured subject to limitations, such as large deductibles, or co-payments.   Insurance risks associated with potential terrorists acts could sharply increase the premiums we pay for insurance coverage. Mozido cannot assure that it will have adequate insurance coverage for losses and that it will be able to fund uninsured losses.

*Dependence Upon Key Suppliers and Vendors.*

Mozido's primary software development is outsourced to a non-U.S. firm and Mozido owns all the source code. In the event of a disruption of service from this firm, an alternative service provider could require a material amount of time in transitioning these services to continue to be able to provide the work product. Mozido's technology platform is hosted in Canada, and Mozido is dependent upon a third party to maintain the equipment and functionality of this platform. Loss of this vendor could cause disruption to Mozido's business.

*The Company's status as a partnership for taxation purposes may be not be respected by the IRS.*

An investment in the Company involves material tax risks.   The Company has not obtained an opinion from counsel regarding the federal income tax issues relating to an investment in the Class B Units. However, any opinion would represent only counsel's best judgment, based upon representations and assumptions referred to in the opinion and conditioned upon the existence of certain facts.   Any such opinion would have no binding effect on the Internal Revenue Service or any court.   Therefore, Noteholders are urged to consult with their own tax advisers with respect to the federal, state and foreign tax considerations of an investment in the Class B Units.

*The Company's classification of Members as partners may be challenged by the IRS.*

Mozido is a limited liability company that is intended to be treated as a partnership for federal income tax purposes.   The determination of a Member's status as a partner for U.S. federal income tax purposes depends on a number of factors. Although the Company believes that an investment in the Company will be respected as an equity investment, there can be no assurance that the IRS will not successfully reclassify an investment in the Company pursuant to the Exchange Offer as a loan by the Member to the Company and determine that one or more Members should not be treated as a partner for federal income tax purposes.   Any such reclassification could result in: (a) a reallocation of items of income, gain, loss or deduction among the Members; (b) a change in the basis of partnership assets; and (c) treatment of distributions to Members as interest income, thereby reducing the anticipated tax benefits or increasing the income allocable to Members of the Company.

*The IRS may not respect the Company's allocation of income, gain, loss and deduction.*

The Company Agreement provides for the allocation of income, gain, loss and deduction among the Members of the Company.   The Company believes that all material allocations to the

Members of the Company will be respected for U.S. federal income tax purposes. The rules regarding partnership allocations are complex and no assurance can be given that the IRS will not successfully challenge the allocations in the Company Agreement and reallocate items of income, gain, loss or deduction in a manner which reduces the anticipated tax benefits or increases the income allocable to Members.

*Potential taxable gain on sale of a Member's Units.*

Upon the sale or other taxable disposition by a Member or all or a portion of his or its interest in the Company, such Member will realize taxable income to the extent that (for federal income tax purposes) the consideration received upon the sale of the interest exceeds the tax basis in the Member's interest in the Company. Such sale, however, may not result in cash proceeds sufficient to pay the tax obligations arising from such disposition.

*Members may be taxed on undistributed income.*

In any year in which the Company reports income in excess of expenses, the Members will be required to report their allocable share of such income on their respective income tax returns and pay tax on such income even though they may have received total cash distributions that are less than the amount of reportable income or event the resulting U.S. federal income tax.

*Members may be impacted by state and local income tax laws.*

The state in which a Member resides may impose an income tax obligation upon the Member's shares of the taxable income of the Company. Additionally, states in which the Company owns property generally impose state income taxes on each Member's share of the Company's taxable income considered allocable to such states. The Company may be required to withhold state taxes from distributions to Members in certain instances. Differences may exist between U.S. federal income tax laws and state and local income tax laws. Noteholders are urged to consult with their own tax advisers with respect to state and local income taxation.

## LITIGATION

The SEC is conducting a formal investigation entitled "Mozido Invesco, LLC," in which the Staff of the Division of Enforcement has requested certain information relating to Invesco and certain of its affiliates regarding the issuance by Invesco of certain of its convertible promissory notes. Invesco has informed Family Mobile and Mozido that Invesco does not believe that grounds exist for any enforcement action against it as a result of the investigation, but no assurance of such result can be given, as the investigation is in a preliminary stage.

Other than as set forth above, management of the Company is aware of no other current, pending or threatened litigation or proceedings involving the Company or Invesco.

## SUITABILITY STANDARDS

An investment in the Company is suitable only as a long-term investment for persons of substantial financial means who meet the suitability standards established by Board of Directors of the Company and who have no need for liquidity in this investment. The Units are subject to

substantial restrictions on transfer under the federal and applicable state securities laws and the Company Agreement and it will be difficult for Members to sell their Units.  See the Company Agreement in Annex A for a description of the transfer restrictions.

The Board of Directors of the Company has established suitability standards that require each Investor to be an "accredited investor," as defined in Regulation D, promulgated under the Securities Act.  All Investors will be required to represent in writing that they meet the suitability standards described herein.

Subscriptions for Exchange are subject to acceptance by the Company.  The Company will rely on the accuracy of each prospective Investor's representations as set forth in the Exchange Agreement attached to this Memorandum as Annex B when determining whether to accept a subscription from such Investor.

For purposes of Regulation D under the Securities Act, an "accredited investor" (without regard to any state suitability standards) is, in general, an Investor who meets one or more of the following requirements:

(i)      the Investor is a natural person who either (a) has a net worth, or joint net worth with the Investor's spouse, exceeding $1,000,000 at the time of purchase (excluding principal residence but including furnishings and vehicles); or (b) had an individual income in excess of $200,000 in each of the two most recent years, or joint income with that person's spouse in excess of $300,000 in each of those years, and who reasonably expects to reach the same income level in the current year;

(ii)      the Investor is an institutional investor, such as a bank, savings and loan, broker or dealer, insurance company, investment company, or a corporation, partnership, or a trust with total assets in excess of $5,000,000, or a trust that otherwise qualifies as an accredited investor as set forth in Regulation D; or

(iii)      the Investor is an entity in which all of the equity owners are accredited investors. In determining whether or not an Investor meets the suitability standards, the following definitions apply.  The term "net worth" means the excess of assets at fair market value, including home and personal property, over total liabilities, including mortgages and income taxes on unrealized appreciation of assets. The term "individual income" means adjusted gross income as reported for federal income tax purposes, less any income attributable to a spouse or to property owned by a spouse, increased by the following amounts (but not including any amount attributable to a spouse or to property owned by a spouse):  (i) the amount of any interest income received which is tax-exempt under section 103 of the Internal Revenue Code of 1986, as amended (the "Code"), (ii) the amount of losses claimed as a limited partner in a limited partnership (as reported on Schedule E of Form 1040), and (iii) any deduction claimed for depletion under section 611 et seq. of the Code.

In addition to the foregoing requirements, Units will be issued in exchange for Notes only to persons who represent, among other things, that:

(i)    they are acquiring Units for their own accounts, for investment only, and not with a view toward the resale or distribution thereof;

(ii)    they have been provided the opportunity to ask questions and receive answers concerning the terms and conditions of the offering and to obtain any additional information which the management of the Company possesses or can acquire without unreasonable effort or expense that is necessary to verify the accuracy of the information furnished in this Memorandum;

(iii)    they have the requisite knowledge and experience in business and financial matters to be capable of evaluating the merits and risks of investing in the Company;

(iv)    they are aware that their right to transfer, assign, or otherwise dispose of their interest in the Company is restricted by the Securities Act, by applicable state securities laws, and by the Company Agreement, and they will be required to bear the financial risks of this investment for an indefinite period of time; and

(v)    they have no need for liquidity in this investment and have no reason to anticipate any change in their personal circumstances, financial or otherwise, which might cause them to attempt to resell or otherwise transfer their Units.

The Company will not be responsible for assessing whether an investment in the Company is an appropriate or suitable investment for a prospective Investor given his or its particular financial circumstances.

The Company will not accept subscriptions for Exchange from Investors that are normally exempt from U.S. federal income tax, including, without limitation, charitable remainder trusts, employee benefit plans subject to Title I of ERISA and Section 4975 of the Code, other tax-exempt retirement plans, including IRAs and Keogh plans, as well as governmental plans, foreign plans and other employee benefit plans, accounts or arrangements that are not subject to the fiduciary provisions of ERISA or Section 4975 of the Code, non-profit organizations within the meaning of Section 501(c)(3) of the Code, and trusts or other entities supporting or holding the assets of any of the foregoing.

---

Rule 12(c) Motion 00214

Exhibit A

**Mozido, LLC and Subsidiary
(Development Stage Enterprise)**
Consolidated Financial Statements
Years ended December 31, 2011 and 2010
and for the period from April 7, 2008 (Inception) to
December 31, 2011

The report accompanying these financial statements was issued by BDO USA,
LLP, a Delaware limited liability partnership and the U.S. member of BDO
International Limited, a UK company limited by guarantee.    Rule 12(c) Motion 00215

**Independent Auditors' Report**                                                  3

**Consolidated Financial Statements**

  Balance Sheets                                                                   5

  Statements of Operations                                                         6

  Statements of Member's Deficit                                                   7

  Statements of Cash Flows                                                         8

  Notes to Financial Statements                                                 9-18

**Independent Auditors' Report**

The Board of Directors and Management
Mozido, LLC

We have audited the accompanying consolidated balance sheets of Mozido, LLC, and Subsidiary

(the "Company"), development stage enterprise, as of December 31, 2011 and 2010, and the

related consolidated statements of operations, member's deficit, and cash flows for the years

then ended and for the period from April 7, 2008 (Inception) to December 31, 2011.   These

financial statements are the responsibility of the Company's management.   Our responsibility is

to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the
United States of America.   Those standards require that we plan and perform the audit to
obtain reasonable assurance about whether the financial statements are free of material
misstatement.   An audit includes consideration of internal control over financial reporting as a
basis for designing audit procedures that are appropriate in the circumstances, but not for the
purpose of expressing an opinion on the effectiveness of the Company's internal control over
financial reporting.   Accordingly, we express no such opinion.   An audit also includes examining,
on a test basis, evidence supporting the amounts and disclosures in the financial statements,
assessing the accounting principles used and significant estimates made by management, as well
as evaluating the overall financial statement presentation.   We believe that our audits provide a
reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all
material respects, the financial position of Mozido, LLC and Subsidiary as of December 31, 2011
and 2010, and the results of its operations and its cash flows for the years then ended and for
the period from April 7, 2008 (Inception) to December 31, 2011 in conformity with accounting
principles generally accepted in the United States of America.

Dallas, Texas
April 10, 2012

| *December 31,* | | 2011 | | 2010 |
|---|---|---:|---|---:|
| **Assets** | | | | |
| **Current assets** | | | | |
| Cash and cash equivalents | $ | 67,929 | $ | 225,355 |
| Advances to an affiliate, net of allowance for uncollectible accounts of $616,766 in 2011 and 2010 | | - | | - |
| Prepaid expenses and other current assets | | 206,676 | | 274,111 |
| Total current assets | | 274,605 | | 499,466 |
| **Property and equipment, Net** | | 1,620,406 | | 1,091,428 |
| Total assets | $ | 1,895,011 | $ | 1,590,894 |
| **Liabilities and member's deficit** | | | | |
| **Current liabilities** | | | | |
| Accounts payable | $ | 424,076 | $ | 266,354 |
| Accrued expenses | | 773,896 | | 207,714 |
| Total current liabilities | | 1,197,972 | | 474,068 |
| Long-term notes payable | | 8,685,101 | | 2,500,000 |
| Commitments and contingencies | | | | |
| **Member's deficit** | | | | |
| Class A Membership units – voting, no par value, 100,000,000 units authorized, 24,420,022 issued and outstanding in 2011 and 2010 | | 527,587 | | 527,587 |
| Additional paid-in capital | | 11,347,141 | | 11,347,141 |

## Mozido, LLC and Subsidiary
### (Development Stage Enterprise)

**Consolidated Statements of Member's Deficit**

| | | |
|---|---:|---:|
| Accumulated deficit in the development stage | (19,609,506) | (13,257,902) |
| Total Mozido, LLC deficit | (7,734,778) | (1,383,174) |
| Non-controlling interest | (253,284) | - |
| Total member's deficit | (7,988,062) | (1,383,174) |
| Total liabilities and member's deficit | $ 1,895,011 | $ 1,590,894 |

*See accompanying notes to consolidated financial statements.*

| | For the year ended December 31, 2011 | For the year ended December 31, 2010 | April 7, 2008 (Inception) to December 31, 2011 |
|---|---:|---:|---:|
| Revenues | $ 75 | $ 52 | $ 127 |
| **Operating Expenses** | | | |
| Production and software maintenance | 1,917,368 | 521,565 | 3,660,571 |
| Salaries and wages | 1,735,721 | 1,213,151 | 6,563,460 |
| Depreciation and amortization | 839,231 | 808,141 | 2,561,488 |
| Other general and administrative | 1,690,671 | 1,635,420 | 6,086,592 |
| Total operating expenses | 6,182,991 | 4,178,277 | 18,872,111 |
| Operating loss | 6,182,916 | 4,178,225 | 18,871,984 |
| Interest expense | 421,972 | 69,444 | 990,806 |
| Net loss | 6,604,888 | 4,247,669 | 19,862,790 |

A-5

## Mozido, LLC and Subsidiary
### (Development Stage Enterprise)

**Consolidated Statements of Member's Deficit**

|  |  |  |  |  |
|---|---|---|---|---|
| Net loss attributable to non-controlling interest |  | (253,284) | - | (253,284) |
| Net loss attributable to Mozido, LLC | $ | 6,351,604  $ | 4,247,669  $ | 19,609,506 |

*See accompanying notes to consolidated financial statements.*

| | Class A | | Additional Paid-in Capital | Accumulated Deficit in the Development Stage | Total Mozido, LLC Deficit | Non-Controlling Interest |
|---|---|---|---|---|---|---|
| | Units | Cost | | | | |
| Balance, December 31, 2008 | 24,420,022  $ | 527,587  $ | 30,119  $ | (4,684,231)  $ | (4,126,525)  $ | - |
| Share based compensation expense | - | - | 96,567 | - | 96,567 | - |

A-6

## Mozido, LLC and Subsidiary
### (Development Stage Enterprise)

**Consolidated Statements of Member's Deficit**

| | | | | | | |
|---|---|---|---|---|---|---|
| Net loss | · | · | · | (4,326,002) | (4,326,002) | · |
| Balance, December 31, 2009 | 24,420,022 | 527,587 | 126,686 | (9,010,233) | (8,355,960) | · |
| Conversion of advances from Parent Company to paid-in capital | · | · | 11,220,455 | · | 11,220,455 | · |
| Net loss | · | · | · | (4,247,669) | (4,247,669) | · |
| Balance, December 31, 2010 | 24,420,022 | 527,587 | 11,347,141 | (13,257,902) | (1,383,174) | · |
| Net loss | · | · | · | (6,351,604) | (6,351,604) | (253,284) |
| Balance, December 31, 2011 | 24,420,022 $ | 527,587 $ | 11,347,141 $ | (19,609,506) $ | (7,734,778) | $ (253,284) |

*See accompanying notes to consolidated financial statements.*

A-7

| | | For the year ended December 31, 2011 | For the year ended December 31, 2010 | April 7, 2008 (inception) to December 31, 2011 |
|---|---|---|---|---|
| **Operating activities** | | | | |
| Net loss | | $ (6,604,888) $ | (4,247,669) | $ (19,862,790) |
| Adjustments to reconcile net loss to net cash used in operating activities | | | | |
| and amortization | Depreciation | 839,231 | 808,141 | 2,561,488 |
| compensation | Share-based | - | - | 126,686 |
| bad debts | Provision for | - | 110,034 | 616,766 |
| operating assets and | Changes in | | | |
| liabilities: | | | | |
| expenses and other | Prepaid | | ) | |
| current assets | | 67,435 | (210,198 | (206,676) |
| Accounts payable and accrued | | | | |
| expenses | | 723,904 | 75,911 | 1,197,972 |
| Net cash used in operating activities | | (4,974,318) | (3,463,781) | (15,566,554) |
| **Investing activities** | | | | |
| equipment | Purchase of property and | (1,368,209 ) | (531,863) | (3,654,307 ) |
| Advances received from (made to) | | | | |
| an affiliate | | - | (110,034 ) | (616,766) |
| Net cash used in investing activities | | (1,368,209) | (641,897) | (4,271,073) |
| **Financing activities** | | | | |
| Advances from Parent Company | | - | 1,627,000 | 3,920,455 |
| Proceeds from notes payable | | 6,185,101 | 2,500,000 | 15,985,101 |
| Net cash provided by financing activities | | 6,185,101 | 4,127,000 | 19,905,556 |
| Net increase (decrease) in cash and cash equivalents | | (157,426) | 21,322 | 67,929 |
| Cash and cash equivalents, beginning | | 225,355 | 204,033 | - |

# Mozido, LLC and Subsidiary
# (Development Stage Enterprise)

## Consolidated Statements of Cash Flows

|  |  |  |  |  |
|---|---|---|---|---|
| of period |  |  |  |  |
| Cash and cash equivalents, end of period | $ 67,929 | $ 225,355 | $ | 67,929 |
| Supplemental disclosure of non-cash information |  |  |  |  |
| Noncash investing and financing activities: |  |  |  |  |
| Reclassification of: |  |  |  |  |
| Advances from Parent Company to paid-in capital | $ - | $ 11,220,455 | | 11,220,455 |
| Notes payable to advances from Parent Company | $ - | - | | 7,300,000 |

*See accompanying notes to consolidated financial statements.*

## 1.    Organization and Operations

*Organization and nature of business*

Mozido, LLC (formerly Affinity Global Services, LLC ("AGS") from May 8, 2008 until November 6, 2009 and Mobile Financial Services, LLC from April 7, 2008 until May 8, 2008; "the Company") was formed on April 7, 2008 in the State of Delaware as Mobile Financial Services, LLC.  On May 27, 2008, as a result of the reorganization of Affinity Mobile, LLC ("Affinity Mobile"), a related company by common ownership, certain assets and liabilities relating to the mobile application delivery services of Affinity Mobile were transferred to the Company on a net carry-over basis amounting to $527,587 in accordance with a Contribution Agreement in exchange for 24,420,022 Class A Membership Units of the Company. The membership units of the Company were distributed to Affinity Mobile's parent company, Affinity Holding, LLC ("Affinity Holding" or "Parent Company") which became the ultimate parent company of both Affinity Mobile and the Company.

The Company is engaged in the business of providing platforms and solutions to integrate and deliver secure transactions over multiple channels such as mobile phones, point-of-sale retail terminals and the internet. Services they provide include mobile phone remittance services, multichannel financial services and top-up solutions to mobile carriers. As of December 31, 2011, the Company is still in the development stage and is in the process of negotiating with potential customers.  As a result, planned principal operations have commenced but there has been no significant revenue therefrom.

On May 2, 2011, Mozido Jamaica Limited (Mozido Jamaica) was incorporated to provide the Company's services in the country of Jamaica.  Mozido, LLC owns 60% of Mozido Jamaica's equity.

The Company is dependent on obtaining capital for its working capital requirements.  The Parent Company received funding through notes issued by the Parent Company and the Company jointly as co-obligors to third parties (see Notes 5 and 8).  As noted in Note 10 to the consolidated financial statements, the Company entered into a Subordinated Note Purchase Agreement providing for sale and purchase of convertible promissory notes totaling $5 million at designated funding dates throughout 2012.    Management believes that the funding provided from the agreement is sufficient to sustain the Company's operations through 2012.  The Company is currently negotiating with potential customers to increase revenues and plans to obtain additional funding, if necessary, to sustain operations.  While management of the Company believes that it will continue to be successful in obtaining future capital and in executing planned operating activities, there can be no assurance that the Company will be able to raise additional capital, or be successful in the development and sale of its planned product, or will be able to generate sufficient revenues to sustain its operations in the future.

## 2.   Summary of Significant Accounting Policies

### Principles of Consolidation

The consolidated financial statements include the accounts of Mozido, LLC and Mozido Jamaica, its 60% owned subsidiary.

All material intercompany balances and transactions have been eliminated in consolidation.

### Use of Estimates

The preparation of financial statements, in accordance with accounting principles generally accepted in the United States of America, requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, and disclosure of contingent assets and liabilities and the reported amounts of revenues and expenses at the date of the financial statements.  Actual results could differ from those estimates.

### Cash and Cash Equivalents

The Company considers all highly liquid investments with original maturities of three months or less when purchased to be cash equivalents.

### Financial Instruments

The carrying amounts for cash and cash equivalents, advances to affiliates, accounts payable and accrued expenses approximate fair value because of the short-term nature of these items.

### Property and Equipment

Computer equipment and furniture and fixtures are recorded at cost with depreciation provided on a straight-line basis over the estimated useful lives of the assets of 2 to 5 years. Expenditures for additions and improvements are capitalized and costs for repairs and maintenance are charged to operations as incurred.

### Capitalized Software Costs

Costs associated with software developed for internal-use are capitalized.  Capitalized costs include internal and external direct-costs of materials and services consumed in developing or obtaining internal-use software.  Costs incurred in development and enhancement of software that do not meet the capitalization criteria, such as costs of activities performed during the preliminary and post-development stages, are expensed as incurred.  Subsequent additions, modifications or upgrades to internal-use software are capitalized only to the extent that they allow the software to perform a task it previously did not perform.  Software maintenance and training costs are expensed in the period in which they are incurred.  Capitalized internal-use software costs are amortized using the straight-line method over a period of three years. Total software costs incurred and capitalized in property and equipment during each of the years 2011, 2010 amounted to $1,256,350 and $420,359, respectively.

The Company also capitalizes interest cost on borrowings incurred during the development phase of the internal-use software.  Total interest capitalized during 2008 amounted to $24,062.  No interest was capitalized during 2010, 2011 or 2009.

Amortization expense related to capitalized software costs amounted to $776,612, $784,557 and $2,407,068 for 2011, 2010, and from April 7, 2008 (inception) to December 31, 2011, respectively.

*Impairment*

Long lived assets such as property and equipment, including capitalized software costs, are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Recoverability of assets is measured by a comparison of the carrying amount of an asset to estimated undiscounted future cash flows expected to be generated by the asset. If the carrying amount of an asset exceeds its estimated cash flows, an impairment charge is recognized by the amount by which the carrying amount of the asset exceeds the fair value of the asset.

*Revenue Recognition*

The Company recognizes revenue when services are provided. Commissions on mobile phone money transfer agreements are recognized as transactions are processed.

*Income Taxes*

As a limited liability company, the earnings and losses of the Company pass through to its member's individual tax returns and therefore no income tax provision or benefit has been included in these financial statements. The Company's tax return and the amounts of allocable profits or losses are subject to examination by taxing authorities.   Accordingly, if such examinations result in changes in the profits or losses, the tax liability of the member could change.

The accounting records of the Company are maintained on the accrual basis of accounting in accordance with accounting principles generally accepted in the United States of America.  Net loss reflected in the accompanying statement of operations and changes in member's equity differ from amounts reported in the federal income tax returns because of differences in accounting policies adopted for financial and tax reporting purposes.

Beginning January 1, 2009, the Company adopted the guidance in Accounting Standards Codification ("ASC") 740, *Income Taxes*, related to recognizing and measuring uncertain tax positions.   The guidance requires the Company to use judgments and make estimates and assumptions related to evaluating the probability of uncertain income tax positions. The Company bases estimates and assumptions on the potential liability related to an assessment of whether the income tax position will "more likely than not" be sustained in an income tax audit. The adoption did not have a material effect on the financial statements.

*Share Based Compensation*

Compensation expense relating to share-based payments is recognized in net loss as part of salaries and wages using a fair-value measurement method.  The Company has elected to use the straight-line attribution method of recognizing compensation expense over the vesting period. The fair value of each new share award is estimated using the Black-Scholes-Merton option-pricing model.

*Advertising expenses*

Advertising costs are charges to operations as incurred. Advertising costs amounted to $123,475, $34,152 and $322,499 for 2011, 2010, and from April 7, 2008 (inception) to December 31, 2011, respectively.

### 3.   Property and Equipment

Property and equipment consist of the following:

| December 31, | | 2011 | | 2010 |
|---|---|---|---|---|
| Internal-use software | $ | 3,858,964 | $ | 2,602,614 |
| Computer equipment | | 147,134 | | 105,878 |
| Furniture and fixtures | | 172,564 | | 105,193 |
| | | 4,178,662 | | 2,813,685 |
| Less accumulated depreciation and amortization | | 2,558,256 | | 1,722,257 |
| Property and equipment, net | $ | 1,620,406 | $ | 1,091,428 |

### 4.   Accrued Expenses

Accrued expenses consist of the following:

| December 31, | | 2011 | | 2010 |
|---|---|---|---|---|
| Accrued payroll costs | $ | 46,088 | $ | 92,637 |
| Accrued interest payable | | 491,416 | | 69,444 |
| Others | | 236,392 | | 45,633 |
| | $ | 773,896 | $ | 207,714 |

## 5.     Indebtedness and Guarantees

Guarantees

On January 1, 2008 Affinity Mobile issued convertible notes of up to $25 million ("Affinity Mobile Notes"). The notes including any accrued interest at LIBOR plus 500 basis points per annum were payable in four equal semi-annual installments beginning January 1, 2010. Upon written notice of the note holder, the outstanding balance of the notes was convertible to membership units of Affinity Mobile at a specified conversion rate. On May 27, 2008, the Affinity Mobile Notes were assigned to the Parent Company provided that the Company and Affinity Mobile served as guarantors of the notes under separate guarantee agreements.  As of December 31, 2008, total amounts drawn by Affinity Mobile amounted to $22,500,000.

On March 26, 2009, the Parent Company settled the outstanding principal balance and accrued interest of the Affinity Mobile Notes totaling $24,561,869 through the issuance of 6,057,777 Parent Company membership units.

Indebtedness

On June 11, 2008, the Company issued a series of convertible redeemable notes of up to $9,660,000 ("AGS Notes") to the same note holders of the Affinity Mobile Notes. The notes bear interest at 10% per annum.  The notes, including any accrued interest, are payable in four equal semi-annual installments beginning July 1, 2010.  The notes were granted with the expectation that the Company shall obtain external capital by December 31, 2008.  In the event no external capital is obtained, the AGS Notes shall be redeemed at anytime, by notice from the note holders, through payment of the outstanding balance and accrued interest or conversion of the note to membership units of the Company so that the note holders shall own to up to 90% of outstanding membership units of the Company after conversion.   The notes rank pari-passu with other unsecured liabilities of the Company.

On March 26, 2009, in conjunction with the settlement of the Affinity Mobile Notes as described above, the Parent Company settled the outstanding principal balances and accrued interest of the AGS Notes on the Company's behalf through the issuance of 1,855,534 membership units of the Parent Company for $7,523,452 of the AGS Notes. In addition to the Parent Company issuing membership units to settle the AGS Notes, the Parent Company and the Company jointly issued a preferred convertible bridge loan for $300,000. These notes and the corresponding interest are recorded by the Parent Company as these notes are convertible to membership units of the Parent Company. Accordingly, the Company reclassified the AGS Notes and accrued interest of $7,823,452 to Advances from Parent Company on the December 31, 2009 balance sheet.

On March 26, 2009, in addition to the $300,000 preferred convertible bridge notes issued to holders of the AGS Note, the Parent Company and the Company also issued $300,000 preferred convertible bridge notes to a third party.  These notes (collectively "$600,000 Notes") bear interest at 8% per annum. The $600,000 Notes have a first ranking pledge on assets of the Parent Company and the Company.  Upon 15 day notice from the note holder, the $600,000 Notes are convertible to up to 12% equity interest in the Parent Company after conversion. Provided the notes have not been converted, the notes and any accrued interest are due and payable upon 30 day notice from the note holders. Provided that notes have not been paid or converted, the notes shall be redeemed at four times the principal amount ($2,400,000) to be paid from first cash distributions of the Company or from proceeds from the sale or liquidation of the Company and a right to receive an additional 6% of the net proceeds from the sale or divestiture of the Company.

On June 17, 2009, the Parent Company and the Company jointly issued a preferred convertible bridge note of up to $1,200,000 ("Brentwood Note"). Interest on the note is computed at 8% per annum. The Brentwood Note has a second ranking pledge on assets of the Parent Company and the Company.  Upon 15 day notice from the note holder, the loan is convertible to up to 28% equity interest in the Parent Company after conversion.  The note and related accrued interest are due and payable upon 30 day notice from the note holder. Provided that the note has not been paid or converted, the note shall be redeemed at two times the outstanding principal balance and accrued interest amount to be paid from first cash distributions of the Company or from proceeds from the sale or liquidation of the Company and a right to receive an additional 12% of the net proceeds from the sale or divestiture of the Company for an amount equal to or in excess of $52,400,000. The principal amount outstanding from the Brentwood Note in the amount of $1,200,000 as of December 31, 2009 was recorded in the Parent Company accounting records.

On November 5, 2009, the Parent Company and the Company jointly issued a preferred convertible bridge note of up to $1,200,000 in principal amount with an option to provide an additional $400,000 in optional draw downs ("Affinity Investments Note").   The notes have essentially the same rights as the Brentwood Note except that it has a third ranking pledge on the assets of the Parent Company. The principal amount of the note is convertible to up to 20% equity interest in the Parent Company and the optional draw downs are convertible to up to 6.66% interest in the Parent Company after conversion. Total principal amount outstanding from the Affinity Investment Note amounting to $803,000 as of December 31, 2009 and additional draw downs of $397,000 during 2010 was recorded in the Parent Company accounting records.

Total cash proceeds received by the Company through the Parent Company from these notes issued during 2010 amounting to $397,000, was recorded as non-interest bearing advances from the Parent Company.

On June 11, 2010, the Parent Company and the Company entered into a Term Sheet ("June 11, 2010 Term Sheet") for the provision of additional advances of up to $1,200,000 to the Parent Company from an existing unit holder of the Parent Company.  Such advances to the Parent Company were in turn intended to be advanced to and used by the Company.  The June 11, 2010 Term Sheet provided that promissory notes would be issued by the Parent Company and the Company, in exchange for such advances, such promissory notes to be secured notes, and convertible into Class A Membership Units of the Parent Company, sufficient to provide the holder of such promissory notes a 22% equity interest in the Parent Company. The Promissory Notes to be issued by the Parent Company pursuant to the June 11, 2010 Term Sheet were not issued; however, by Resolution of the Board of Directors of the Parent Company, and all of the unit holders thereof (the "July 29, 2010 Resolution"), on or about July 29, 2010, the advances made pursuant to the June 11, 2010 Term Sheet were converted into Class A Membership Units of the Parent Company, in accordance with the terms of the June 11, 2010 Term Sheet.

At the same time, by virtue of the July 29, 2010 Resolution, (i) the $600,000 Notes were converted to Class A Membership Units of the Parent Company, and (ii) the Brentwood Note and the Affinity Investment Note were each converted into Class A Membership Units of the Parent Company, in accordance with their respective terms.

As a result of the conversion of these notes to Class A Membership Units in the Parent Company records, the Parent Company adopted a board resolution to convert the outstanding receivable balance from the Company representing principal proceeds from these notes advanced to the Company to equity in the Company without the issuance of additional units.   Accordingly, Advances from Parent Company amounting to $11,220,455 were reclassified to paid-in capital as of December 31, 2010.

The June 11, 2010 Term Sheet also granted warrants to certain unit holders of the Parent Company to purchase Class A Membership Units in the Parent Company without consideration. The unit holders exercised these warrants for 7,448,999 Class A Membership Units to effectively own 16% of the Company through its ownership of the Parent Company.

## 6.     Advances to Related Party

Advances to an affiliate represent advances made to Affinity Mobile for working capital requirements. In 2010, the Company provided a full allowance on the outstanding advances to Affinity Mobile amounting to $616,766 as the affiliate subsequently experienced financial difficulty and management believes that the balance is uncollectible.

## 7.     Share Based Compensation

On May 27, 2008, in connection with the Contribution Agreement with Affinity Mobile, Affinity Mobile transferred most of its employees and their related employment agreements to the Company.  Employees of the Company retained their options to buy Class B non-voting units of Affinity Mobile consistent with their employment agreements. Options had a vesting period of four years, 25% of the options vest after one year from the date of grant and vest equally on a quarterly basis for the succeeding three years.  The Company accounted for the employee options to buy units of an affiliate at fair value at the time of transfer which management estimated to be nominal.

On September 12, 2008, the Parent Company passed a resolution to allow employees to exchange current options to buy Class B non-voting Affinity Mobile Units into options to buy Class B non-voting Parent Company Class B Units on a unit-per-unit basis retaining the exercise price and vesting provisions of the original grants.   The Company accounted for the exchange as a modification of the original grant and the incremental cost representing the difference between the fair value of the replacement options and the fair value of options replaced at the date of the exchange was recognized as expense over the remaining vesting period.

The fair value of the options granted during 2008 is estimated at the date of the grant with the following assumptions:

| | |
|---|---|
| Dividend yield | 0% |
| Risk-free interest rate | 3.15% |
| Option term (years) | 6.12 |
| Volatility | 60.33% |

On October 20, 2009, the Parent Company filed a resolution that effectively cancelled all options outstanding. Accordingly, the Company recognized the remaining unrecognized compensation cost in 2009 amounting to $96,567.

The following table summarizes the option award activity of the Company:

| | Affinity Mobile Options | | Parent Company Options | |
|---|---|---|---|---|
| | Options | Weighted Average Exercise Price | Options | Weighted Average Exercise Price |
| Outstanding at December 31, 2008 | - | - | 683,500 | 4.14 |
| Forfeited | - | - | (394,000) | 4.85 |
| Cancelled | - | - | (289,500) | 3.18 |
| Outstanding at December 31, 2009 | - | - | - | - |
| Forfeited | - | - | - | - |
| Cancelled | - | - | - | - |
| Outstanding at December 31, 2010 | - | - | - | - |
| Forfeited | - | - | - | - |
| Cancelled | - | - | - | - |
| Outstanding at December 31, 2011 | - | - | - | - |

## 8. Notes Payable

On August 27, 2010, the Company entered into a Note Purchase Agreement ("NPA") with Mobile Tech Investments, LLC ("MTI"). Under the NPA, the Company issued $2,500,000 secured convertible promissory notes ("August 2010 Note"). Proceeds of the note were used for working capital requirements. Under separate security and guaranty agreements, the August 2010 note is guaranteed by the Parent Company and secured by substantially all the assets of the Company and the Parent Company. The total outstanding balance of the notes will be due on August 31, 2020 and bear interest at 8% per annum payable on a quarterly basis. The notes and accrued interest are convertible at any time prior to maturity to voting Preferred Membership Units of the Company at $0.46 per unit (subsequently amended to $0.02 per unit in relation to the February 2012 round of funding discussed in Note 10). The conversion price is adjusted for certain events relating to the Company's ability to obtain qualified customer contracts from certain customers.

From January 2011 to March 2011, the Company issued a series of bridge notes to MTI and Family Mobile, LLC and totaling $1,500,000. Effective January 28, 2011, these bridge notes were consolidated to a 10-year $1,500,000 Convertible Promissory Note ("January 2011 Note"). The January 2011 Note carries 8% interest. The January 2011 Note is convertible by the noteholder at

any time prior to maturity to voting Preferred Membership Units of the Company at $0.39 per unit (subsequently amended to $0.02 per unit in relation to the February 2012 round of funding discussed in Note 10). The conversion price is adjusted for certain events relating to the Company's ability to obtain qualified customer contracts from certain customers. Accordingly the related security and guaranty agreements were amended and restated to reflect the additional notes issued. The January 2011 note is guaranteed by the Parent Company and secured by substantially all the assets of the Company and the Parent Company and the NPA was amended to permit the issuance of the January 2011 Note.

As an inducement for MTI to amend and restate the NPA, on January 28, 2011, the Company entered in to a Commissions Agreement with MTI, Mozido Investments, LLC and a certain unit holder. Under the Commissions Agreement, MTI and/or Mozido Investments, LLC receive an aggregate of 1,285,264 Class A Membership Units of the Company if the Company enters into an agreement with certain 'qualified customers' and generate a certain amount of net income before tax from these customers during the measurement period as defined. In addition, the unit holder and MTI will receive 2.5% of net revenues received by the Company each quarter from qualified customers as defined in the Commissions Agreement.

From April to August 2011, the Company issued a series of bridge notes to MTI and Family Mobile LLC totaling $2,000,000. On August 8, 2011, these bridge notes were consolidated into a 10-year $2,000,000 Convertible Promissory Note ("August 2011 Note"). The August 2011 Note carries 8% interest per annum and payable to MTI (Family Mobile, LLC assigned its rights on the bridge notes to MTI). The August 2011 Note is convertible at any time prior to maturity to voting Preferred Membership Units of the Company at $0.32 per unit (subsequently amended to $0.02 per unit in relation to the February 2012 round of funding discussed in Note 10). The conversion price is adjusted for certain events relating to the Company's ability to obtain qualified customer contracts from certain customers. Accordingly the related security and guaranty agreements were amended and restated to reflect the additional notes issued. The August 2011 note is guaranteed by the Parent Company and secured by substantially all the assets of the Company and the Parent Company and the NPA was amended to permit the issuance of the August 2011 Note.

On August 8, 2011, the Commissions Agreement was amended specifically providing who are 'qualified customers' and a point system for the grant of the shares under the agreement due to MTI. No amounts have been paid or Class A Membership Units were issued from the Commissions Agreement for 2011.

From August to December 2011, the Company has also issued a series of bridge notes to Family Mobile, LLC and Xanadu Partners, LLC (a Family Mobile, LLC Affiliate). The bridge notes carry an interest of 8% per annum and due on the Company's next round of financing or December 31, 2011. The funding received from such series of bridge notes as of December 31, 2011 amounted to $2,685,101. On November 18, 2011 the Company entered into a Subordinated Note Agreement consolidating the bridge notes into four separate promissory notes to be issued from November 8, 2011 to January 12, 2012 totaling $3,000,000. The Notes carry 8% interest per annum and are convertible to the Company's preferred shares at a conversion rate of $0.08 per unit (subsequently amended to $0.02 per unit in relation to the February 2012 round of funding discussed in Note 10). In January 2012, the Company received $314,899 fully funding the promissory notes.

The Preferred Membership Units these notes are convertible to earn a preferred dividend return rate of 8% and is cumulative and participating and have liquidation preferences over common membership units. As of December 31, 2011, these notes have not been converted; as a result, no Preferred Membership Units have been issued.

## 9.    Commitments and Contingencies

The Company is obligated under an operating lease for office spaces through 2015.   Future minimum lease payments under this operating lease as of December 31, 2011 are as follows:

| Fiscal Year | | Amount |
|---|---|---|
| 2012 | $ | 202,308 |
| 2013 | | 144,423 |
| 2014 | | 58,846 |
| 2015 | | 40,517 |
| | $ | 446,094 |

The leases are subject to termination on July 31, 2011 or July 31, 2012 subject to payment of certain termination fees as defined in the agreement. The Company did not exercise the termination option on July 31, 2011.

Rent expense during 2011 and 2010 amounted to $184,170 and $108,121, respectively, and is included as part of other general and administrative expenses in the statements of operations.

## 10.    Subsequent Events

On February 8, 2012, the Company entered into a Subordinated Note Purchase Agreement with Family Mobile, LLC, MTI and certain unit holder providing for the sale and issuance of convertible promissory notes totaling $5 million at designated funding dates throughout 2012.  The notes are convertible into Preferred Units of the Company at varying rates from $0.03 to $0.05 depending on the amount of funding provided by the each purchaser/lender.  The notes will be guaranteed by the Parent Company and secured by substantially all the assets of the Company and the Parent Company.

On March 31, 2012, the Company entered into a Software License and Services Agreement and Strategic Alliance Framework with Tata America International Corporation and Tata Consultancy Services, Ltd, (the "Agreement").  The Agreement imposes certain payment obligations upon the Company in exchange for the provision of licensing and other strategic services.

The Company has evaluated subsequent events from the date of the balance sheet through April 10, 2012.  During this period, no other material recognizable subsequent events were identified.

Exhibit B

Mozido Invesco, LLC
Balance Sheet Standard
As of December 31, 2011

| | |
|---|---:|
| **ASSETS** | |
| Current Assets | |
| Checking/Savings | |
| Chase Business Checking - 4119 | 4,491.40 |
| TD Bank - 1301 | 100.00 |
| Total Checking/Savings | 4,591.40 |
| Total Current Assets | 4,591.40 |
| Other Assets | |
| Investment-Mozido Investments | 14,470,811.19 |
| Total Other Assets | 14,470,811.19 |
| TOTAL ASSETS | 14,475,402.59 |
| LIABILITIES & EQUITY | |
| Liabilities | |
| Long Term Liabilities | |
| Convertible Notes | 14,580,520.55 |
| Total Long Term Liabilities | 14,580,520.55 |
| Total Liabilities | 14,580,520.55 |
| Equity | |
| Retained Earnings | -559.51 |
| Net Income | -104,558.45 |
| Total Equity | -105,117.96 |
| TOTAL LIABILITIES & EQUITY | 14,475,402.59 |

Rule 12(c) Motion 00234

Mozido Invesco, LLC
Profit and Loss Standard
January 1, 2011 through December 2011

| | |
|---|---:|
| **Ordinary Income/Expense** | |
|   Income | |
|     Interest Earned | 30.29 |
|   Total Income | 30.29 |
|   Expense | |
|     Advertising and Promotion | 2,299.50 |
|     Bank Service Charges | 4,947.00 |
|     Executive Business Travel | 2,793.38 |
|     Investor Relations | 46,450.09 |
|     Office Supplies | 68.89 |
|     Professional Fees | 48,029.88 |
|   Total Expense | 104,588.74 |
|   Net Ordinary Income | -104,558.45 |
| Net Income | -104,558.45 |

Exhibit C

**Mozido Investments, LLC**
# Balance Sheet Standard
### As of December 31, 2011

| | |
|---|---:|
| **ASSETS** | |
| **Current Assets** | |
| **Checking/Savings** | |
| **BofA NY - 2329** | 11,029.15 |
| **Total Checking/Savings** | 11,029.15 |
| **Other Current Assets** | |
| **Other Receivables** | 1,655,166.91 |
| **Total Other Current Assets** | 1,655,166.91 |
| **Total Current Assets** | 1,666,196.06 |
| **Other Assets** | |
| **Investment in Mozido LLC** | 4,480,105.72 |
| **Total Other Assets** | 4,480,105.72 |
| **TOTAL ASSETS** | 6,146,301.78 |
| **LIABILITIES & EQUITY** | |
| **Liabilities** | |
| **Current Liabilities** | |
| **Credit Cards** | |
| **Business Credit Cards-0582** | 6,961.77 |
| **Total Credit Cards** | 6,961.77 |
| **Total Current Liabilities** | 6,961.77 |
| **Long Term Liabilities** | |
| **Long Term Loans** | 8,106,806.22 |
| **Total Long Term Liabilities** | 8,106,806.22 |
| **Total Liabilities** | 8,113,767.99 |
| **Equity** | |
| **Retained Earnings** | -958,175.69 |
| **Net Income** | -1,009,290.52 |
| **Total Equity** | -1,967,466.21 |
| **TOTAL LIABILITIES & EQUITY** | 6,146,301.78 |

**Mozido Investments, LLC**

C-1

# Profit and Loss Standard
## January 31, 2011 through December 2011

| | |
|---|---:|
| **Ordinary Income/Expense** | |
| **Expense** | |
| Automobile Expense | 163.76 |
| Bank Service Charges | 599.14 |
| Business Conference | 3,022.25 |
| Executive Business Travel | 107,986.15 |
| Executive Personal | 321.43 |
| General and Administrative | 170.00 |
| Interest Expense | 258.28 |
| Office Supplies | 482.52 |
| Payroll | 112,719.52 |
| Postage and Delivery | 941.85 |
| Professional Fees | 781,831.20 |
| Utilities | 794.42 |
| **Total Expense** | 1,009,290.52 |
| **Net Ordinary Income** | -1,009,290.52 |
| **Net Income** | **-1,009,290.52** |

## NOTE EXCHANGE AND SUBSCRIPTION AGREEMENT

**THIS NOTE EXCHANGE AND SUBSCRIPTION AGREEMENT** (this "Agreement") is made and entered into as of June 15, 2012 (the "Signing Date"), by and between Family Mobile, LLC ("Family Mobile") and the undersigned holder ("Noteholder") of Convertible Promissory Notes issued by Mozido Invesco, LLC ("Invesco") as set forth on Schedule I hereto.   Family Mobile and the Noteholder are sometimes referred to herein individually as a "Party" or collectively as the "Parties."

## BACKGROUND

A.      Mozido, LLC ("Mozido") is a Delaware limited liability company formed on April 7, 2008.

B.      From May 2010 to May, 2012, certain investors purchased Convertible Promissory Notes issued by Invesco (the "Notes").

C.      Family Mobile wishes to exchange the Notes for Class B Membership Units ("Class B Units") in Mozido, as defined in the Mozido, LLC Amended and Restated Limited Liability Company Agreement dated as of August 27, 2010 (the "Company Agreement"), as set forth herein (the "Exchange") pursuant to the terms and conditions of the Exchange Offer as set forth in the Confidential Offering Memorandum dated May 16, 2012 ("Offering Memorandum").

F.      The Noteholder owns one or more Notes having a principal balance as set forth on Schedule I hereto, and has agreed to exchange all of such Notes at the Exchange Rate set forth below, and upon the additional terms and conditions set forth in this Agreement.

## AGREEMENT

**NOW, THEREFORE,** in consideration of the foregoing and of the mutual premises, covenants, representations, warranties and agreements set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

## ARTICLE I
## EXCHANGE OF SERIES A PREFERRED STOCK

(a)      Exchange.   Subject to the terms and conditions hereof, and in reliance on the respective representations, warranties and covenants of the Parties contained herein, on a date determined by Family Mobile after the expiration of the Exchange Offer as defined in the Offering Memorandum (the "Exchange Date"), and conditioned upon the conditions set forth herein, the Notes of the Noteholder automatically shall be exchanged for Class B Units (the "Exchange Securities") as set forth below.   The number of Exchange Securities to be issued to the Noteholder pursuant to the Exchange Offer shall calculated by multiplying the sum of (i) the outstanding principal balance on each Note and (ii) any accrued and unpaid interest thereon through May 18, 2012 by 6.26 (the "Exchange Rate").   Subject to receipt of a fully executed copy

of this Agreement, the attached Note Assignment and Joinder to the Mozido Limited Liability Company Agreement and the original Note(s), on the Exchange Date, Family Mobile shall issue the Exchange Securities to each Noteholder. For purposes of this Agreement, "Business Day" means any day other than Saturday, Sunday or other day on which commercial banks in the City of New York are authorized or required by law to remain closed.

(b)     Fractional Shares.  No fractional units of Class B Units shall be issued upon exchange of the Notes.  In lieu of any fractional units to which the holder would otherwise be entitled, Family Mobile shall pay cash equal to the value of such fractional unit, based on the Conversion Rate.

(c)     Delivery and Return of Notes.  The original Note should be sent to:

Family Mobile, LLC
5373 Isleworth CC Drive
Windermere FL 34786
Attention: Brittany Abbass

On the Exchange Date, and conditioned on the conditions set forth herein, Family Mobile shall issue, as applicable, the Exchange Securities to the Noteholder.  On the Exchange Date, the Noteholder shall be deemed to be the holder of record of the Exchange Securities issuable to the Noteholder in the Exchange, notwithstanding that certificates evidencing such Exchange Securities shall not then be actually delivered to the Noteholder.  All original Notes that are required to be delivered for exchange in accordance with the provisions of this Agreement, from and after the Exchange Date shall be deemed to have been transferred to Family Mobile and exchanged for the applicable Exchange Securities for all purposes, notwithstanding the failure of the holder or holders thereof to surrender such original Notes on or prior to such date.  No Exchange will be consummated and Family Mobile will return all original Notes to the Noteholders if the Exchange Date has not occurred on or before September 17, 2012

(d)     Transaction Documents.  On the Exchange Date, Family Mobile and the Noteholder shall execute and deliver, as applicable, such additional instruments and documents as may be necessary or prudent, in the reasonable discretion of Family Mobile and the Noteholder to consummate the transactions contemplated herein (collectively with this Agreement, and the Notes, the "Transaction Documents").

1.02     Consent and Waiver.  The Noteholder hereby consents to (a) the exchange of all or any part of the outstanding Notes (whether held by the Noteholder or any other person), upon the terms and conditions set forth in this Agreement, and (b) the payment in full in cash to any person or entity owning Notes who is not participating in the Exchange Offer of an amount up to the outstanding principal amount together with accrued and unpaid interest on such person's Notes through the date of payment; provided that such payment is made within thirty days after the Exchange Date.

1.03     Fair Market Values for Tax Reporting.  The Parties agree that the fair market value of each Note exchanged under this Agreement is its principal amount plus accrued interest

through May 18, 2012, and that the fair market value of each 6.26 Class B Units exchanged under this Agreement is equal to $1.00. Each Party agrees that all federal, state and local tax filings and reportings made by such Party in connection with the transactions contemplated by this Agreement shall be consistent with the foregoing agreed-upon fair market values.

## ARTICLE II
## REPRESENTATIONS, WARRANTIES AND UNDERSTANDINGS OF THE NOTEHOLDER

The Noteholder hereby represents and warrants to Family Mobile as follows:

2.01     Ownership.  The Noteholder is the sole record holder and beneficial owner of the Note set forth opposite the name of such Noteholder on Schedule I hereto.  The Noteholder owns his, her or its Note(s) free and clear of all liens, pledges, mortgages, charges, security interests or encumbrances of any kind whatsoever.  The Noteholder is not a party to any agreement or arrangement which will impose any such encumbrance upon the Notes as a result of the transactions contemplated hereby.

2.02     Power and Authority; Enforceability.  The Noteholder has the power and authority to execute and deliver this Agreement, to perform his, her or its obligations hereunder and to consummate the transactions contemplated hereby.  This Agreement constitutes a legal, valid, and binding obligation of the Noteholder, and is enforceable against the Noteholder in accordance with its terms.

2.03     Approvals.  No consent, approval, authorization or order of any person, entity, court, administrative agency or governmental authority is required for the execution, delivery or performance of this Agreement by the Noteholder.

2.04     Conflicts.  The execution, delivery and performance of this Agreement by the Noteholder will not (a) conflict with, or result in a breach of, or constitute a default under, or result in violation of, any agreement or instrument to which the Noteholder is a party or by which the property of the Noteholder is bound or (b) result in the violation of any applicable law or order, judgment, writ, injunction, decree or award of any court, administrative agency or governmental authority.

2.05     Acquiring for Investment.  The Noteholder is acquiring the Exchange Securities for his or its own account, for investment purposes only and not with a view towards or in connection with the public sale or distribution thereof in violation of the Securities Act of 1933, as amended (the "Securities Act").  The Noteholder will not, directly or indirectly, offer, sell, pledge or otherwise transfer his, her or its Exchange Securities, or any interest therein, except pursuant to transactions that are exempt from the registration requirements of the Securities Act and/or sales registered under the Securities Act.  The Noteholder understands and acknowledges that there is no public market for the Exchange Securities and there can be no assurance that any public market will ever develop.  There can be no assurance that the Noteholder will be able to sell or otherwise dispose of the Exchange Securities.  The Noteholder acknowledges that he, she or it must bear the economic risk of the Noteholder's investment in the Exchange Securities

indefinitely, unless the Exchange Securities are registered pursuant to the Securities Act and any applicable state securities laws or an exemption from such registration is available, and that Mozido has no present intention of registering any such Securities or any obligation to do so in the future.

2.06     Accredited Investor Status.  The Noteholder is: (a) an "accredited investor" within the meaning of Rule 501 of Regulation D under the Securities Act and as set forth under "SUITABILITY STANDARDS" in the Offering Memorandum; (b) experienced in making investments of the kind contemplated by this Agreement; and (c) capable, by reason of its business and financial experience, of evaluating the relative merits and risks of an investment in the Securities.

2.07     Access to Information.  The Noteholder has received a copy of the Offering Memorandum, together with all exhibits and schedules thereto, including the Company Agreement, has had the opportunity to discuss the transactions contemplated hereby with the management of Mozido, Family Mobile and Invesco and has had the opportunity to obtain such information pertaining to Mozido, Family Mobile and Invesco and the Exchange Securities as has been requested.  The Noteholder understands that an investment in Mozido involves substantial risks.  The Noteholder (a) can bear the economic risk of losing its entire investment in Mozido and has adequate means for providing for its current financial needs and contingencies and (b) has the financial acumen and sophistication to make an informed investment decision with respect to the transactions contemplated hereby and the Exchange Securities to be issued hereunder, understands that such Exchange Securities are restricted and not freely tradable, and has had the opportunity to make inquiry to Mozido regarding its operations and financial condition and has received answers to all of such questions.

2.08     Advice.  The Noteholder has carefully considered and has, to the extent that the Noteholder deems necessary, discussed with his or its professional legal, tax and financial advisers the suitability of an investment in Mozido and has determined that an investment in Mozido is suitable for the Noteholder.  The Noteholder is relying solely upon the advice of his or its own legal, tax and financial advisers with respect to the tax and other legal aspects of an investment in the Exchange Securities.

2.09     Survival.  The foregoing representations and warranties are true and correct as of the date hereof and shall be true and accurate as of the date of acceptance of this Agreement by Family Mobile and shall survive thereafter.  If any of such representations or warranties are not true and correct in any respect, the Noteholder shall, prior to such acceptance, give written notice of such fact to Family Mobile specifying in reasonable detail which representations and/or warranties are not true and correct and the reasons therefore.

2.10     Exemption of Offering.  The Noteholder understands that the Exchange Securities are being issued by Family Mobile in reliance upon an exemption from the registration requirements of the Securities Act, and applicable state securities laws, and that Family Mobile is relying upon the accuracy of, and the Noteholder's compliance with, the Noteholder's representations, warranties and covenants set forth in this Agreement to determine the availability of such exemption.

2.11   Exchange Subject to Acceptance by Family Mobile.  The Noteholder understands, acknowledges and agrees with Family Mobile that this Agreement and the Noteholder's subscription hereunder may be rejected in whole or in party by Family Mobile, in its sole discretion, at any time prior to acceptance of the Noteholder's subscription under this Agreement.

**ARTICLE III**
**REPRESENTATIONS AND WARRANTIES OF FAMILY MOBILE**

Family Mobile hereby represents and warrants to the Noteholder as follows:

3.01   Organization; Good Standing.  Family Mobile is a limited liability company duly organized and existing in good standing under the laws of the state of Florida and has the requisite limited liability company power to own its properties and to carry on its business as now being conducted.  Family Mobile is duly qualified as a foreign corporation to do business and is in good standing in every jurisdiction where the failure so to qualify or be in good standing could reasonably be expected to have a Material Adverse Effect.  "Material Adverse Effect" means any effect which, individually or in the aggregate with all other effects, reasonably would be expected to be materially adverse to the business, operations, properties, financial condition, operating results or prospects of Family Mobile taken as a whole, or on the transactions contemplated hereby.

3.02   Power and Authority; Enforceability.  Family Mobile has the limited liability company power and authority to execute and deliver this Agreement and each of the other Transaction Documents to which it is a party, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  This Agreement and the other Transaction Documents to which Family Mobile is a party constitute the legal, valid, and binding obligation of Family Mobile, and is enforceable against Family Mobile in accordance with their respective terms.

3.03   Approvals.  Except for filings pursuant to applicable state and federal securities laws, no consent, approval, authorization or order of any person, entity, court, administrative agency or governmental authority is required for the execution, delivery or performance of this Agreement by Family Mobile.

3.04   Conflicts.  The execution, delivery and performance of this Agreement by Family Mobile will not (a) conflict with, or result in a breach of, or constitute a default under, or result in violation of, any agreement or instrument to which Family Mobile is a party or by which the property of Family Mobile is bound or (b) result in the violation of any applicable law or order, judgment, writ, injunction, decree or award of any court, administrative agency or governmental authority.

**ARTICLE IV**
**TRANSFER RESTRICTIONS**

4.01   Transfer of Restricted Securities.  The Noteholder acknowledges that the Exchange Securities are restricted securities and subject to limitations on transfer as set forth in

5

the Company Agreement and may be transferred only pursuant to: (a) an effective registration statement under the Securities Act and applicable state securities laws pertaining to such securities or an available exemption therefrom; (b) Rule 144 of the SEC (or any similar rule or rules then in force) if such rule or rules are available; and (c) compliance with the terms and conditions of the Company Agreement.

4.02    Restrictive Legend.   The Noteholder acknowledges and agrees that, upon issuance pursuant to this Agreement, the Securities shall have endorsed thereon a legend in substantially the following form:

> "THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR THE SECURITIES LAWS OF ANY STATE, AND ARE BEING OFFERED AND SOLD PURSUANT TO AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND SUCH LAWS. THESE SECURITIES MAY NOT BE SOLD OR TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT OR SUCH OTHER LAWS.   TRANSFER OR THESE SECURITIES IS FURTHER RESTRICTED BY THE TERMS OF THE MOZIDO, LLC AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT DATED AS OF AUGUST 27, 2010."

## ARTICLE V
## CONDITIONS TO NOTEHOLDER'S OBLIGATION TO EXCHANGE

5.01     The obligation of the Noteholder hereunder to exchange his, her or its Notes is subject to the satisfaction of each of the following conditions, provided that these conditions are for the Noteholder's sole benefit and may be waived by the Noteholder at any time in the Noteholder's sole discretion:

(a)    Family Mobile shall have accepted the Noteholder's subscription by execution and delivery of this Agreement and the other Transaction Documents to which it is a party;

(b)    Family Mobile shall deliver the applicable Exchange Securities to the Noteholder against delivery by the Noteholder of his, her or its Notes, together with a duly endorsed assignment in blank for transfer to Family Mobile, free and clear of any and all security interests or transfer, voting or other restrictions or encumbrances of any kind;

(c)    No statute, rule, regulation, executive order, decree, ruling or injunction shall have been enacted, entered, promulgated or endorsed by any court or governmental authority of competent jurisdiction or any self-regulatory organization having authority over the matters contemplated hereby which prohibits the consummation of any of the transactions contemplated by this Agreement; and

(d)     There shall be no injunction, restraining order or decree of any nature of any court or governmental authority of competent jurisdiction that is in effect that restrains or prohibits the consummation of the transactions contemplated hereby and by the other Transaction Documents.

## ARTICLE VI
## CONDITIONS TO FAMILY MOBILE'S OBLIGATION TO EXCHANGE

6.01     The obligation of Family Mobile hereunder to deliver Exchange Securities for the Noteholder's Notes is subject to the satisfaction, with respect to the Noteholder, of each of the following conditions, provided that these conditions are for Family Mobile's sole benefit and may be waived by Family Mobile at any time in its sole discretion:

(a)     The Noteholder shall have executed and delivered this Agreement and the other Transaction Documents to which it is a party;

(b)     The Noteholder shall have delivered his, her or its Notes to Family Mobile, together with a duly endorsed assignment in blank for transfer to Family Mobile, free and clear of any and all security interests or transfer, voting or other restrictions or encumbrances of any kind;

(c)     No statute, rule, regulation, executive order, decree, ruling or injunction shall have been enacted, entered, promulgated or endorsed by any court or governmental authority of competent jurisdiction or any self-regulatory organization having authority over the matters contemplated hereby which restricts or prohibits the consummation of any of the transactions contemplated by this Agreement;

(d)     Family Mobile shall have determined to accept the Noteholder's subscription for the Exchange Securities hereunder by execution and delivery to the Noteholder of this Agreement;

(e)     There shall be no injunction, restraining order or decree of any nature of any court or governmental authority of competent jurisdiction that is in effect that restrains or prohibits the consummation of the transactions contemplated hereby and by the other Transaction Documents;

(f)     Noteholders of at least 75% of the aggregate principal amount of the Notes shall have agreed to the Exchange Offer; and

(g)     Mobile Tech Investments, LLC and each holder of Class A or preferred membership units of Affinity Holdings, LLC shall each have waived or declined its right of first refusal and tag-along rights under Mozido's Amended and Restated Limited Liability Agreement dated as of August 27, 2010 with respect to the Exchange Offer.

## ARTICLE VII
## MISCELLANEOUS PROVISIONS

7.01    <u>Survival of Representations; Entire Agreement</u>.   All representations and warranties made by the Parties pursuant to this Agreement shall survive the execution and delivery of this Agreement.  This Agreement and the other Transaction Documents constitute the entire understanding between the Parties with respect to the subject matter contained herein and therein and supersede any prior or contemporaneous understandings and agreements among them respecting such subject matter.  Except as specifically set forth herein or therein, neither Family Mobile nor the Noteholder makes any representation, warranty, covenant or undertaking with respect to such matters.

7.02    <u>Governing Law; Jurisdiction</u>.   This Agreement shall be governed by and construed in accordance with the Delaware General Corporation Law (in respect of matters of corporation law) and the laws of the State of Delaware (in respect of all other matters) applicable to contracts made and to be performed in the State of Delaware.  The Parties irrevocably consent to the jurisdiction of the United States federal courts and state courts located in the State of Delaware in any suit or proceeding based on or arising under this Agreement or the transactions contemplated hereby and irrevocably agree that all claims in respect of such suit or proceeding may be determined in such courts.  The Parties irrevocably waive the defense of an inconvenient forum to the maintenance of such suit or proceeding in such forum.  The Parties further agree that service of process upon Family Mobile or the Noteholder, as applicable, mailed by first class mail in accordance with Section 7.08 shall be deemed in every respect effective service of process upon Family Mobile or the Noteholder in any suit or proceeding arising hereunder.  Nothing herein shall affect the right of a Party to serve process in any other manner permitted by law.  The Parties agree that a final non-appealable judgment in any such suit or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on such judgment or in any other lawful manner.  The Parties irrevocably waive any right to a trial by jury under applicable law

7.03    <u>Amendments; Counterparts</u>.   Except as set forth in Section 7.04 below, this Agreement may be amended only by a written instrument duly executed by each of the Parties.  This Agreement may be executed in counterparts, each of which when executed and delivered shall be deemed to be an original and all of which counterparts taken together shall constitute but one and the same instrument.  It shall not be necessary in making proof of this Agreement or any counterparts hereof to produce or account for any of the other counterparts.  In order to facilitate execution of this Agreement, this Agreement may be duly executed and delivered by facsimile or other electronic transmission.

7.04    <u>Further Assurances</u>.  The Parties agree (a) to furnish upon request to each other such further information, (b) to execute and deliver to each other such other documents, and (c) to do such other acts and things, all as any other Party may reasonably request for the purpose of carrying out the intent of this Agreement and the transactions contemplated by this Agreement.

7.05    <u>Arm's Length Negotiations; Counsel for Family Mobile, Invesco and Mozido</u>.  The Noteholder expressly represents and warrants to Family Mobile that (a) before executing this Agreement, the Noteholder has fully informed himself or itself of the terms, contents, conditions

and effects of this Agreement; (b) the Noteholder has relied solely and completely upon his, her or its own judgment in executing this Agreement; (c) the Noteholder has had the opportunity to seek the advice of his, her or its own legal counsel and financial and tax advisors before executing this Agreement; (d) the Noteholder has acted voluntarily and of his, her or its own free will in executing this Agreement; (e) the Noteholder is not acting under duress, whether economic or physical, in executing this Agreement; (f) this Agreement is the result of arm's length negotiations conducted by and among the Parties; and (g) the Noteholder acknowledges that the law firm of Brownstein Hyatt Farber Schreck, LLP ("Brownstein Hyatt") has been retained by Family Mobile, Invesco and Mozido to prepare this Agreement as legal counsel for them, that Brownstein Hyatt does not represent the Noteholder in connection with the preparation or execution of this Agreement, and that Brownstein Hyatt has not given any legal, investment or tax advice to the Noteholder regarding this Agreement. Brownstein Hyatt is expressly intended as a beneficiary of the representations and warranties of the Noteholder contained in this Section 7.05.

7.06    <u>Confidential Material Non-Public Information</u>.  The United States securities laws prohibit any person who has received from an issuer material, non-public information, including the information that is the subject matter of this Agreement and the other Transaction Documents, from purchasing or selling securities of the issuer or from communicating such information to any other person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell securities.  The undersigned Noteholder agrees to keep and hold all such material, non-public information in strict confidence and trust and not to use or disclose any such material, non-public information.

7.07    Any notice herein required or permitted to be given shall be in writing and may be personally served or delivered by nationally-recognized overnight courier or by confirmed facsimile, and shall be deemed given and effective on the earliest of (a) the date of transmission if such notice or communication is delivered by fax prior to 5:30 p.m. (Eastern Time) on a Business Day, (b) the next Business Day after the date of transmission if such notice or communication is delivered via facsimile on a day that is not a Business Day or later than 5:30 p.m. (Eastern Time) on a Business Day, or (c) upon actual receipt by the Party to whom such notice is required to be given. The addresses for such communications shall be:

If to Family Mobile:    Family Mobile, LLC
                        5373 Isleworth CC Drive
                        Windermere FL 34786
                        Attention: Brittany Abbass
                        Facsimile: 407-217-5274

with a copy to:

                        Brownstein Hyatt Farber Schreck, LLP
                        410 17th Street, 22nd Floor
                        Denver CO 80202
                        Attention: Jeff Knetsch
                        Facsimile: 303-223-1111

Rule 12(c) Motion 00255

If to the Noteholder, to such address set forth under the Noteholder's name on the Signature Page executed by the Noteholder. Each Party shall provide notice to the other parties of any change in address in the manner set forth in this Section 7.07.

7.08     Headings.   The headings of this Agreement are for convenience of reference and shall not form part of, or affect the interpretation of, this Agreement.

7.09     Severability.   If any provision of this Agreement shall be invalid or unenforceable in any jurisdiction, such invalidity or unenforceability shall not affect the validity or enforceability of the remainder of this Agreement or the validity or enforceability of this Agreement in any other jurisdiction.

7.10     Joinder to Company Agreement.   By execution of this Agreement and upon acceptance thereof by Family Mobile, the Noteholder acknowledges and agrees that the Class B Units acquired by the Noteholder shall be governed by the terms of the Company Agreement and agrees to be bound by all of the terms and conditions, covenants and obligations of the Company Agreement applicable thereof to holders of Class B Units. The Noteholder further acknowledges and agreements that his or its execution of this Agreement also constitutes the Noteholder's execution of the Company Agreement, the form of which is attached as Annex A to the Offering Memorandum.

**(Signature Page Follows)**

10

**IN WITNESS WHEREOF**, the Parties have duly executed this Agreement as of the date first above written.

"**FAMILY MOBILE**"

FAMILY MOBILE, LLC,

By:_____

"**NOTEHOLDER**"

_____

Name of the Noteholder

By:_____

Its:_____

Address of the Noteholder:

_____

_____

_____

11

## SCHEDULE 1
## TO EXCHANGE AGREEMENT

**Noteholder Name**

**Principal
Amount of Note**

## NOTE ASSIGNMENT

**FOR VALUE RECEIVED,** _____ (the "Assignor") does hereby sell, assign, grant and convey to Family Mobile, LLC, free and clear of all liens and encumbrances, all Convertible Promissory Notes issued by Mozido Invesco, LLC to the Assignor.

Dated: June 18, 2012

_____

[print name of registered holder]

By: _____

**MOZIDO, LLC**
**JOINDER TO**
**AMENDED AND RESTATED**
**LIMITED LIABILITY COMPANY AGREEMENT**
**DATED AS OF AUGUST 27, 2010**

### JOINDER

Joinder, dated as of June 18, 2012, by _____ ("New Member") and Mozido, LLC (the "Company").

Reference is made to the Amended and Restated Limited Liability Company Agreement (the "Agreement"), dated as of August 27, 2010, among the Company and the Members (as defined in the Agreement). Capitalized terms used but not otherwise defined herein shall have the meanings ascribed thereto in the Agreement.

WHEREAS, New Member is entitled to receive Class B Membership Units pursuant to an Exchange Offer and wishes to be bound by the Agreement;

NOW, THEREFORE, in consideration of the foregoing premises and for other good and valuable consideration, by executing this Joinder:

New Member hereby agrees to be bound by the terms of the Agreement as if it were an original signatory to the Agreements and shall be deemed to be a Class B Member under the Agreement.

IN WITNESS WHEREOF, the Company and New Member have executed this Joinder as of the date first above written.

_____

[print name of registered holder]

By: _____

MOZIDO, LLC

By:_____