## UNITED STATES DISTRICT COURT
### DISTRICT OF MAINE

|  |  |  |
|---|---|---|
| | : | |
| SECURITIES AND EXCHANGE COMMISSION, | : | |
| | : | CIVIL ACTION |
| Plaintiff | : | |
| | : | Case No.: 2:18-139-JBL |
| v. | : | |
| | : | |
| MICHAEL A. LIBERTY, et.al., | : | |
| | : | |
| Defendants | : | |
| | : | |
| and | : | |
| | : | |
| XANADU PARTNERS, LLC, | : | |
| | : | |
| Relief Defendant | : | |
| | : | |

## MOTION AND INCORPORATED MEMORANDUM OF LAW UNDER RULE 11, FED. R. CIV. P. OF DEFENDANT GEORGE J. MARCUS FOR IMPOSITION OF SANCTIONS UPON PLAINTIFF, SECURITIES AND EXCHANGE COMMISSION, AND ITS ATTORNEYS

NOW COMES the Defendant, George J. Marcus, by and through undersigned counsel, and moves under Rule 11, Fed. R. Civ. P.,[1] for the imposition of sanctions upon the Plaintiff and its attorneys by reason of their failure to comply with the truthfulness and candor requirements of that Rule, and for the further reasons set forth herein. [2]

---

[1] Pursuant to Fed. R. Civ. P.11, Defendant Marcus served this Motion and Incorporated Memorandum of Law on Plaintiff's counsel on September 22, 2020.  Mr. Marcus's counsel and the Plaintiff's counsel subsequently discussed the motion by telephone and email.  On October 13, 2020, Plaintiff's counsel wrote to Mr. Marcus's counsel stating that the Plaintiff did not see the need to withdraw or correct any allegations in the Complaint, providing the Plaintiff's reasons for that position as to four categories of the numerous allegations questioned by Mr. Marcus, and contending that this Motion should not be filed. Having carefully reviewed those explanations, and in keeping with Mr. Marcus's own duty of candor to the Court and duties of counsel under Rule 11, in this Motion, Mr. Marcus will briefly note his responses regarding the issues that Plaintiff has addressed, in order to demonstrate that this Motion is filed in good faith after consideration of matters addressed by Plaintiff in the 21-day period preceding this filing.

[2] Mr. Marcus is aware that this Memorandum of Law exceeds the page limits of Local Rule 7(d).  However, Mr. Marcus respectfully requests that, pursuant to Rule 1(a) of the Local Rules of the District of Maine, that the Court consider the following reasons for the length of this Motion and accept the same.  First, the Complaint filed by the Plaintiff contains 155 separate paragraphs, many with subparts, spanning some 65 pages.  Twenty-two allegations are specific to Mr. Marcus [ECF No. 82, at 14, n. 6] and 49 allegations in the Complaint's Statement of

## INTRODUCTION

Following up on the sanctions request in Mr. Marcus's Motion for Judgment on the Pleadings [ECF 82] (the "Rule 12(c) Motion" or "Mot."), this Motion is made pursuant to Rule 11(c)(1), Fed. R. Civ. P.  As the Memorandum of Law and Exhibits [3] supporting the Rule 12(c) Motion demonstrate, the Complaint's claims against Mr. Marcus are factually unfounded and contradicted in all material respects by the documents underlying and referred to in the Complaint, documents that the SEC possessed, and presumably read, when it filed the Complaint.  And, of course, there is one other inevitable presumption: the SEC concealed these documents from the Court because they entirely undermined its case.  Further, it cannot be denied that the SEC had opened an investigation of the matters described in the Complaint not fewer than six years before it filed the Complaint.  As such, its consistent misrepresentation of the facts of the case – misrepresented facts refuted by the content of the very documents cited by the SEC (but not disclosed to the Court) – can only be described as knowing, intentional, and motivated by deception, in pursuit of overzealous regulatory zeal.  This conduct violates the

---

Facts mention Mr. Marcus.  [ECF NO. 82, at 15, n. 8].  Virtually all of the material allegations specifically referring to Mr. Marcus, or mentioning Mr. Marcus are the subject of this Motion.  These numerous allegations of the Plaintiff required substantial additional pages in order to address the Rule 11 implications of those allegations. Second, for the convenience of the Court and the parties, and to avoid the need for Court and parties continually to cross-reference this Motion and Memorandum against the Complaint, this Memorandum of Law specifically describes and quotes from the Complaint the allegations that Mr. Marcus challenges under Rule 11, on a paragraph by paragraph basis,  followed by the reasons each such allegation fails to satisfy Rule 11.  While referring to the allegation of the Complaint, rather than repeating it, would have saved pages, it would have made it difficult for the Court and parties to read this Memorandum of Law.  Third, Mr. Marcus and his counsel are not unmindful of the seriousness of this Motion and Memorandum of Law.  Detailing the challenged allegations and following each allegation with specific reasons for the Rule 11 challenge does not prejudice the Plaintiff, but, rather, permits the Plaintiff to frame more specific arguments as to why the challenged allegations satisfy Rule 11 and will assist the Court in ruling on the challenged allegations.  Fourth, Local Rule 1(a) authorizes the Court to "relax these rules in exceptional circumstances when justice so requires."  This Rule 11 Motion is just such an exceptional circumstance, and justice to all the parties requires that the challenged allegations, and the bases for the Rule 11 challenges, be set forth in full.

[3] Reference is made to the exhibits filed with the Court in support of the Rule 12(c) Motion [ECF Nos. 82-85]. Those exhibits are separately referred to as "Ex_____." and, with the Index to those exhibits, are incorporated by reference in this Motion.

SEC's own Enforcement Manual (*see* § 1.4.1 Mission Statement; "values integral" to SEC's mission are "Integrity: acting honestly, forthrightly and impartially in every aspect of our work"). The SEC and its attorneys have, in this case, failed to live up to the SEC's own standards, and this has harmed Mr. Marcus, the Court, and the public in general. Its conduct can neither be overlooked nor tolerated.

"Rule 11 permits a court to impose sanctions on a party or lawyer for advocating a frivolous position, pursuing an unfounded claim, or filing a lawsuit for some improper purpose." *CQ Intern. Co., Inc. v. Rochem Intern., Inc.*, 659 F. 3d 53, 60 (1st Cir. 2011)). Analysis of the Complaint and the underlying documents referred to therein that contradict virtually every allegation of the Complaint against Mr. Marcus, shows that the Complaint's inclusion of Mr. Marcus as a defendant was wrongful, and likely done for an improper purpose, namely, to seek leverage against Mr. Marcus's client, the defendant Michael Liberty. However, this Motion focuses primarily on the facts and the Plaintiff's knowing misrepresentation of those facts in the Complaint. Simply put, the Complaint's "factual contentions" allegations against Mr. Marcus lack the required "evidentiary support." Fed. R. Civ. P. 11(b)(3) (to say the least), and the SEC knew or should have known that those allegations were false and unfounded and were not in compliance with Rule 11(b)(3) when it filed the Complaint.

The SEC's false factual allegations against Mr. Marcus could not have resulted from the SEC's lack of information, or even any lack of opportunity to obtain information. No allegations are specifically so qualified pursuant to Fed. R. Civ. P. 11(b)(3). The SEC had begun investigating the securities offerings that were the subject of the Complaint by no later than 2012. *See* Ex. 7. The Complaint was filed in March of 2018. Subpoenae were issued by February of 2016. *See* Ex. 13. Mr. Liberty's accountant was subpoenaed in April of 2016. *See*

3

Ex. 14.  As the Rule 12(c) Motion states, the only plausible inference is that the Complaint

deliberately, or at least recklessly, mischaracterized Mr. Marcus's role in the challenged

transactions.

In a meeting with SEC counsel in July 2019, Mr. Marcus's counsel identified many of the

Complaint's factually incorrect allegations concerning Mr. Marcus.  Since then, and after

substantial review of additional documents produced to the SEC in its pre-filing investigation,

numerous other significant falsehoods in the Complaint have surfaced.  Some are clear factual

untruths, about which the SEC knew or should have known before filing the Complaint.  In many

other places, the Complaint seeks the unwarranted drawing of culpable inferences based on

alleged facts that are untruthful and known to be so.  In sum, the Complaint is false and seriously

and culpably misleading as to Mr. Marcus, both as to the general impression the Complaint seeks

to create of Mr. Marcus's role in the challenged Offerings, and in the particulars of that role.

One clear and overarching example of the Complaint's distortion of Mr. Marcus's role is

the conspicuous omission of the substantial roles played by numerous securities lawyers and law

firms in the challenged securities offerings – Morse, Brown-Barnes Pendleton; Lowndes

Drosdick; Brownstein Hyatt.  These law firms are widely known to have substantial and

distinguished practices in securities law, at least Lowndes Drosdick and Brownstein Hyatt were

clearly identified as Issuer counsel in  various securities offerings for which the SEC had all

relevant documentation, and the SEC knew, or should have known all of this.  The SEC's

knowing failure to recognize and acknowledge the role of these securities lawyers for the Issuers,

when combined with its knowing misrepresentations of the content of material documents, can

only be explained by its desire to create the false impression that (i) the Offerings were

deceptive, (ii) Mr. Marcus played a central securities lawyer role in those Offerings, (iii)

Mr. Marcus was responsible for the alleged violations of the securities laws and regulations, and (iv) Mr. Marcus was a major player in the alleged "scheme."  (As our Rule 12(c) Motion demonstrates, no "scheme" existed anyway.)  The truth of the matter, evident from the documents the SEC had and cited, but chose not to reveal to the Court, is that Mr. Marcus never acted or purported to act as securities counsel – other, highly qualified securities counsel did that work, and Mr. Marcus relied on them.[4]  Mr. Marcus advised Mr. Liberty and Mr. Liberty's affiliates, the Issuers, on corporate matters.

A second overarching example of the Complaint's misrepresentation of Mr. Marcus's role and the nature of the securities offerings in question is the mischaracterization of the investment by a "large institutional investor."  Cplt. ¶¶ 120-121.  Carefully avoiding disclosing the identity of that investor, the SEC nevertheless knew who it was because the identity of the investor was revealed in the documents to which the SEC referred: Wellington Management Company, the largest private investment company in the world.  Wellington's huge investment in Mozido, which massively increased Mozido's valuation to the benefit of all investors in the securities offerings in question, showed that no "scheme" whatsoever was afoot, and certainly not one involving Mr. Marcus.  The SEC knew all of this, knew that the Wellington investment redounded to the benefit of all investors, and yet made allegations squarely contrary to the documentary record concerning the Wellington investment.

---

[4] The Plaintiff misconstrues this, and other references in this Motion to securities counsel, as an "advice of counsel" defense that Plaintiff claims is unsupported because Mr. Marcus has not demonstrated any reliance on such advice. Mr. Marcus is not making such a defense.  He is not "relying" on any advice of these other attorneys.  He is stating a different fact, a fact known to the SEC and misrepresented in the Complaint: these other securities attorneys, not Mr. Marcus, were retained to provide advice and counsel regarding the numerous securities offerings in question and to prepare the applicable documentation.  The Plaintiff was fully knowledgeable of the fact that Mr. Marcus was not responsible for documents the Plaintiff finds false or misleading, which in turn supports the lack of scienter that Mr. Marcus contends was known to the Plaintiff before it filed the Complaint.  All are Rule 11 issues.

Wellington's intensive due diligence, followed by substantial cash investment in Mozido, about which the SEC was fully aware, belies the Complaint's theories that anything was amiss with Mozido and prior fundraising.  The documentation of Wellington's investment shows the knowing falsity of the Complaint's allegation that the Wellington investment somehow cheated other investors and that Mr. Marcus was complicit in that cheating.  The Wellington investment, not to mention the roster of prominent law firms involved in that investment – Mintz Levin of Boston, Wilson Sonsini of Washington, D.C. and others – gave Mr. Marcus and every other person involved in Mozido sound reason to believe that nothing at all was amiss; indeed, that things were going very well for Mozido and its investors.  The Wellington transactions (one in November of 2013, and a second in October of 2014), completely validated the investment propositions for which the investors signed up and were an enormous boon to the investors. There is no reasonable doubt about this.  The SEC could not possibly have misinterpreted this – no knowledgeable investment professional could have done so.  There is only one plausible explanation for the SEC's conduct – a desire to deceive the Court.  Making matters worse, in service of this intent to deceive, the Complaint seriously and knowingly misrepresents the structure and impact of the Wellington transaction, as revealed by the very documents to which the SEC refers.  *See* Mot. at 12-14.

A third clear example of the SEC's duplicity is its recitation of snippets of an email exchange between Mr. Marcus and Richard Braddock, Mozido's Executive Chairman, on January 3 and 6, 2013. (*See* ECF # 1, ¶¶ 116-118).  The SEC recites these snippets in support of allegations that Mr. Marcus was aware that his client's fundraising program was actually a fraudulent scheme and failed to take any action to stop it.  In its typically deceptive fashion, the

SEC omits Mr. Marcus's response to Mr. Braddock's claims.  That response, which included the following, shows exactly the opposite of the SEC's contentions:

> I have advised Michael [Liberty] on the corporate side – i.e. his entities and the documentation, while Brownstein Hyatt, a major law firm in Denver, has advised Michael on the securities side.  The Brownstein firm and I are satisfied that what Michael is doing is entirely legal. At my instigation, we had a conference call among myself, Jeff Knetsch of Brownstein, and Layne Deutscher and his partner [Mozido counsel] to answer questions and be sure the Mozido legal counsel was up to speed on how Michael [Liberty] was raising funds...the upshot of this conference is that while there might be some debate about 'best practices' – there always is – Michael's fund raising program has been blessed by competent securities counsel and is in compliance with the law.
> Mr. Marcus's Rule 12(c) Motion itself, which describes the foregoing deceptions and

many others, serves as sufficient notice that the Complaint's factual contentions had no evidentiary support when they were alleged, were false, and knowingly false.  But, to ensure the record is clear about just which allegations were factually unfounded and in violation of Rule 11 when they were included in the Complaint, they are detailed below.

## THE COMPLAINT'S ALLEGATIONS WITHOUT EVIDENTIARY SUPPORT AND THAT ARE OTHERWISE MISLEADING

The Rule 12(c) Motion describes in detail the falsity of the Complaint's allegations in reference to the documentary record of the case, a documentary record about which the SEC knew long before filing the Complaint, and then concealed from the Court in making these allegations.  We now know why the SEC concealed the content of the documentary record – it refutes virtually every allegation of the Complaint, belies the conclusory inferences of misconduct drawn by the SEC in the Complaint and reveals the SEC's startling lack of candor. The Rule 12(c) Motion is incorporated by reference herein in support of this Motion.  But SEC misconduct did not stop with misrepresenting and concealing the documentary record.  Based upon its platform of documentary falsehoods, the Complaint proceeded to make conclusory, unfounded, and false allegations against Mr. Marcus.  Based on no factual record, other than the

contrived and false record created by the Complaint itself, these conclusory allegations are equally dishonest and equally violative of Rule 11.  We address the Rule 11 violations with respect to these conclusory and false allegations here[5]:

**Complaint Para.**        **Description of Allegation and Inaccuracy**

10        **Allegation**: "proceeds of the scheme" flowed through the IOLTA account of the Maine law firm Marcus Clegg and were disbursed to fund Liberty lifestyle, not to Mozido as allegedly promised.

**Inaccuracy**: As Exhibit 8 shows, the IOLTA record shows that all the funds that came into that account from investors *did* go into Mozido, plus another $3,227,856 from sources other than the investors.  That is what Mr. Marcus saw, and that flow of funds supports no claim of any scienter or any "scheme," particularly where, as here, the transaction documents expressly stated the funds could be used as the Issuer deemed appropriate, without stating any requirement for disbursement to Mozido.  *See* Exs. 1/00013, 00018; 2/00040-44; 3 /00066; 4/00096.  The SEC had the controlling transaction documents and the IOLTA records.  It could (and clearly should) have done the arithmetic itself.  Perhaps it did, which is even more disturbing.  The arithmetic shows that the flow of investor funds into the IOLTA account and out to Mozido in the Brentwood Offerings was not a "red flag" of any kind for Mr. Marcus.[6]

---

[5] We will deal here only with the allegations that specifically identify or otherwise can be discerned to involve Mr. Marcus.  For example, we will not address generalized allegations such as "Liberty and his accomplices" (Cplt. ¶ 1), "Liberty and his associates" (Cplt. ¶ 2), or the many allegations referring generically to "Defendants."  Of course, Mr. Marcus was neither an "accomplice" or an "associate" of Mr. Liberty.  Rather, as the Complaint recognizes, Mr. Marcus represented Mr. Liberty and certain "Liberty-affiliated" entities (Cplt. ¶ 18) as a corporate lawyer in the ordinary course of a lawyer-client relationship, in some but certainly not all legal matters involving Mr. Liberty and his affiliated entities.
[6] Responding to the challenged "flow of funds from IOLTA" allegations, the Plaintiff has noted what it believes are mathematical errors in Mr. Marcus's IOLTA analysis and computations.  As Rule 11 and his duty of candor to the Court require, Mr. Marcus has reviewed the Plaintiff's position and has concluded that any such errors do not have

43    **Allegation**: Mr. Marcus "knew" that the "Mozido Invesco promissory notes, note
purchase agreements and Liberty's personal guarantee" "misrepresented material facts and
made material omissions."

**Inaccuracy**: To the contrary, the Mozido Invesco documents expressly disclaim making
any representation of any material facts, imposing a duty of inquiry on the Accredited
Investors, a duty each investor accepted by signing the documents.  No factual basis
exists to assert that these transaction documents, replete with disclaimers of any
representations, full of risk disclosures and representations by investors that they had
done their own due diligence, misrepresented or omitted anything, or that Mr. Marcus
knew of any such misrepresentations or omissions.[7]  As noted above and as the Rule
12(c) Motion makes clear, to the extent the alleged misrepresentation or omission deals
with the use of proceeds from the investments, the underlying documents expressly stated
that the funds raised could be used for such purposes as the Issuer saw fit, with no
covenant restricting the use of funds to Mozido only.  *See* Exs. 1/00013, 00018; 2/00040-
44; 3/00066; 4/00096.  In any event, for the investment funds that went into Mr. Marcus's
IOLTA account, all of those funds, and more, *did* go to Mozido.  *See* Ex. 8.  The SEC
knew all of this before making its contrary allegations.

---

any material impact on the conclusions that must be drawn from an analysis of the IOLTA records.  Among other
things, the Plaintiff's contention that the "dollars out to Mozido" were not the same dollars as the dollars received
from a particular investor makes absolutely no difference.  Commingled with other client funds as a matter of legal
requirement, IOLTA funds generated from investor deposits are not "earmarked;" no clients funds are "earmarked."
Instead, they are accurately accounted for.  Simply put, it is pointless to suggest that dollars deposited in the IOLTA
account for an investor have to be "earmarked" in some fashion, and, to avoid fraud, those exact same dollars have
to be the ones disbursed to Mozido – other, not earmarked, dollars just won't do.  Yet this is precisely what Plaintiff
argued in  refusing to withdraw or amend any of its allegations on this subject..

[7] Mr. Marcus has, as required, considered the SEC's contention that disclaimers, integration clauses and anti-
reliance provisions are irrelevant to an SEC civil enforcement action.  Mr. Marcus understands that the SEC, unlike
a private plaintiff, is not required to prove reliance, economic loss and loss causation.  But the point is that the
documents containing disclaimers, integration clauses and anti-reliance provisions, particularly given the paucity of
allegations of any direct communication with investors, go directly to Mr. Marcus's understanding of the underlying
transactions, his "scienter,", and the lack of a good faith basis for alleging intent to defraud.

45     **Allegation**: Mr. Marcus "assist[ed]" lies or concealments by Liberty and Hess concerning

the Mozido Invesco Offering.

**Inaccuracy**: Not a single fact is alleged that supports this conclusory claim of

"assistance."  No facts in the underlying documentary record or anywhere else show that

Mr. Marcus either had any role in promoting the Mozido Invesco offering to investors, or

that he knew about or was otherwise involved in any alleged "lies or concealments."

46     **Allegation**: Mr. Marcus "assist[ed]" misrepresentations and omissions by Hess and

Liberty "about the valuations of MDO during the Mozido Invesco Offering."

**Inaccuracy**: No facts whatsoever describe the nature, dates, places or any other specifics

of this supposed "assistance."  No underlying documents show Mr. Marcus providing any

such "assistance" at all.  No facts show that Mr. Marcus played any role in promoting the

investment. Further, as the Rule 12(c) Motion describes at pp. 8-11, the Complaint's

allegation of a "valuation deception" is fundamentally incorrect.  The "strike price" for

exercising a voluntary option[8] to convert investor promissory notes into ownership units

of Mozido was simply a contractual obligation of the issuer to sell at a predetermined

price, not a representation of the value of the underlying asset.[9]  The investor had no

obligation; rather it had a choice: if the investor considered the option strike price to be

---

[8] Mr. Marcus has considered, as Rule 11 requires, the SEC's contention that Mr. Marcus has mischaracterized the securities and ignored that the Convertible Promissory Notes were immediately convertible and did not require expiration of the Notes' 3-year term.  That is true – the Notes were immediately convertible – but at the same time, unless there is some extraordinary capital event, no rational investor exercises an option with  a fixed strike price, until near the expiration of the option period.  There is no financial incentive to making an early election, yet there is considerable financial risk to doing so.  In short, the SEC's observation that the conversion options were exercisable anytime within a three year period, not just at the end of the period, is irrelevant and makes no difference to the analysis.

[9] Mr. Marcus has reviewed the SEC's contention on this "valuation" point, as Rule 11 requires, but remains convinced that the Plaintiff's "valuation deception" claims are unfounded and were known to be so when they were made.  At bottom, the Complaint's assertion is that providing a three year conversion option in the Promissory Notes constituted a misrepresentation of the value of the security into which the Notes could be converted, as of the date of issuance of the Note.  That is a contrived valuation claim, and entirely wrong as a matter of economic logic.  This was known to be so when the allegation was made.

greater than the value of the Mozido securities offered, the investor could get all of the investor's money back with interest. If the option strike price seemed to be less than the value of the Mozido securities, the investor had the right to buy the securities. This was a one-way street favoring the investor, not a fraud. The SEC should know better and probably does.

46(a)   **Allegation**: Mr. Marcus had "knowledge" of Hess's valuation statements to prospective investors.

**Inaccuracy**: No facts show any such "knowledge" by Mr. Marcus, and no underlying documents show that Mr. Marcus was involved in any way, shape or form in Hess's statements to investors. Indeed, the Complaint itself alleges "Liberty directed Hess to tout MDO." Cplt. ¶ 34. Besides, the "valuation deception" premise is incorrect.

46(a)   **Allegation**: Mr. Marcus "knew that MDO's Board of Directors had valued the company at no more than $16 million at that time."

**Inaccuracy**: as the Motion describes in detail, the "valuation" of Mozido was a very different thing from the "valuation" of the conversion option. *See* Mot. at 8-11.

49   **Allegation**: Mr. Marcus "intentionally concealed that [the] transfer of 120 Mozido Investments units to Mozido Invesco and any subsequent transfer of those units to the Mozido Invesco Investors were void under MDO's Amended Operating Agreement."

**Inaccuracy**: As the Motion and its Exhibits make clear, the transfer of the 120 Mozido Investments Units to Mozido Invesco was made *before* MDO's Operating Agreement was amended to regulate transfers of that nature. *See* Ex. 15. This claim of a void transfer is plainly factually incorrect, as the SEC knew or should have known from the documents it possessed before filing its Complaint.

50(f)   **Allegation**: "On September 4, 2012, Marcus wrote to an investor's representative, 'it is clearly in Mike's and everyone's interest to make sure that further equity raises…would not be dilutive on a value basis' and that there was 'a commonality of interest with Mike and every other investor.'"  Further, that Mr. Marcus "knew" this statement "was misleading, and omitted material information."

**Inaccuracy**: Apparently intended to create the false inference that Mr. Marcus somehow misled this investor's "representative" – John Geismar, an experienced lawyer representing a sophisticated and Accredited Investor – this allegation not only insults Mr. Geismar but ignores that Mr. Marcus's communication simply and accurately states an economic truth about the difference between value dilution and percentage dilution. The SEC knows full well that an investor's ownership or entitlement to equity in a company can be diluted on a percentage basis, but such dilution could nevertheless be accompanied by an increase in the total value of the "diluted" ownership.  This happens when subsequent investors in a company pay a premium for their investment – as Wellington did.  This allegation also deceptively omits crucial text in Mr. Marcus's communication: "…there is no anti-dilution protection for the sales of equity at a later date…To be sure, if further equity has to be raised, it will be dilutive on a percentage basis."  *See* Ex. 18.  Omission of crucial text of documents – text that entirely undercuts SEC contentions – a constant in the Complaint, reflects the SEC's pattern of deception in trying to conjure claims against Mr. Marcus.

52   **Allegation:** Mr. Marcus "knew about Liberty's financial problems."

**Inaccuracy**: No facts support this allegation.  Beyond the lack of factual support, as Ex. 8 shows, all Mr. Marcus saw was a substantial flow of funds from investors, investments

from Mozido's astute and experienced Board members, and strong interest in Mozido

from many sophisticated blue-chip investors, who came to include Wellington

Management and Tiger Fund.

53    **Allegation**: "During the Mozido Invesco Offering...Marcus did not disclose the prior

[*Keystone*] fraud case or the settlement [of that case] in any document or discussion about

the *Keystone* case."

**Inaccuracy**: The Complaint fails to allege any facts that would support any duty of

Mr. Marcus to disclose anything to any investor.  Absent such a duty, as to which no facts

are alleged, Mr. Marcus had no legal requirement to say anything to anyone.  Indeed, his

duties as an attorney required that he refrain from affirmatively disclosing anything to

non-clients.  The Complaint itself shows that Mr. Marcus was not promoting the Mozido

Invesco Offering, when any such disclosure duty might have been triggered.  *See, e.g.,*

Cplt. ¶¶ 34 ("Liberty directed Hess to tout MDO, but actually had him sell securities

issued by the shell companies that Liberty controlled."); 50 ("Liberty and Hess continued

to promote Mozido Invesco"); 54 ("Hess and Liberty provided information to potential

investors...Liberty and Hess solicited and sold to hundreds of potential Mozido Invesco

Offering investors").

Further, the *Keystone* case, as the SEC surely knew before filing the Complaint in this

case, was settled with no admission of liability by Mr. Liberty.  *See* Ex. 17.  It would

have been misleading to disclose it as evidence of fraud.  Further, the *Keystone* case and

settlement was a matter of public record, available to any investor – all of whom

expressly agreed, as Accredited Investors, that they were relying on their own due

diligence – with a single Google search.  Still further, the subsequent Exchange Offer

(Ex. 7) described the *Keystone* matter (although not by name,) stating, among other

things, "the SEC alleged that Mr. Liberty had engaged in violations of the federal

securities laws" and that "Mr. Liberty settled the action by consent without admitting or

denying the allegations in the SEC's complaint…[and] agreed to pay disgorgement and

pre-judgment interest."

53    **Allegation**: "On June 26, 2012, Marcus wrote to an investor regarding Liberty's 'past

issue with the SEC' and asserted that the SEC's allegations were 'entirely false.'"

**Inaccuracy**: Seriously misleading, this allegation seeks to create the inference that

Mr. Marcus misled an unwitting investor.  But the writing described is a cover email

(referring to the "past issue with the SEC") and an attached memorandum from

Mr. Marcus to Rick Braddock, requested by Mr. Liberty, containing the "entirely false"

phrase.  Mr. Braddock was then a highly sophisticated executive and investor.  A Google

search reveals that Mr. Braddock was a founder of the highly successful tech start-up

"Priceline" (www.priceline.com).  He became an investor in Mozido, sat on Mozido's

Board of Directors and worked closely with Mr. Liberty.  Mr. Braddock had countless

opportunities to speak to Mr. Liberty about the *Keystone* case, which prompted the

memorandum, and he had the sophistication to evaluate that case.

In any event, as difficult as it would have been to mislead an investor as astute as

Mr. Braddock – and no facts or documents anywhere support any such intention – the full

text of the memorandum, omitted by the SEC, shows that Mr. Marcus expressed an

opinion he was fully entitled to have, and that was based on known facts.  Nothing

whatsoever is misleading in Mr. Marcus's stated opinion describing the *Keystone* matter

to Mr. Braddock.  Nor does the Complaint allege that any fact relied upon by Mr. Marcus

in forming his opinion was untrue and known by him to be untrue (the predicates of any

claim of misleading conduct). The full text of Mr. Marcus's opinion, omitted by the

SEC, and entirely unaddressed in the facts the SEC chose to include in its Complaint, is

as follows:

> Unbeknownst to Mike and Joe O'Donnell, Kerry Dale [Keystone's principal] was apparently playing fast and loose with Keystone's funds…Civil proceedings were brought against Kerry Dale and others at Keystone; all of them entered into consent judgments
>
> In March of 2006, the SEC commenced a civil proceeding against Mike Liberty, alleging that he conspired with Kerry Dale to divert funds from Keystone into investments that were not bona fide investments for the fund. Of course, this was entirely false, and it was clear from the SEC pleadings that the SEC failed to understand the business transactions in question. Mike, at all times, relied both on his counsel, Joe O'Donnell's counsel, and the fact that Keystone had Ballard Spahr overseeing all transactions. He got ensnared in Keystone's internal problems.
>
> Mike retained securities counsel and on advice of counsel, and in order to avoid a costly and distracting proceeding, negotiated a Consent Decree in 2008 in order to resolve the case. The Consent Decree admits no liability. It called for payment of a civil fine over a period of years, and to date, Mike has fully complied, and of course intends to fully comply to completion. It contained no prohibition regarding Mike's participation or involvement in entities which are issuers of securities.
>
> In a nutshell, Mike got involved with a misguided equity fund manager, who hid his misdeeds not only from Mike but from other managers of the fund, and from the fund's own legal counsel. Mike got ensnared in the fallout. The SEC brought a weak civil case against him, which was settled, without admission of liability, for entirely practical reasons.

To seek to create an inference of deception by Mr. Marcus by quoting a snippet of this

memorandum is fundamentally dishonest and, regrettably, consistent with the SEC's

practice in this case. This memorandum shows Mr. Marcus had excellent reasons to

believe that the SEC's "conspiracy" allegations were "entirely false." Nowhere does the

Complaint hint at, let alone mention, any of those reasons, nor make any allegation that

15

the facts underlying the reasons were false or known to be false.  To label this as "fraud" goes beyond overreaching into dishonesty.  Officers of the Court are obligated to do better, much better, than that.

55      **Allegation**: Describing a "backdated" contract for Hess "to sell MDO products," this allegation claims Mr. Marcus "well understood [that] Hess was unable to generate revenue for MDO; he was in fact paid a 5% commission for selling Mozido Invesco promissory notes."

**Inaccuracy**: No facts show any involvement whatsoever by Mr. Marcus in this alleged backdated contract or in Hess's alleged sales activities.  The Complaint itself makes no mention of Mr. Marcus when it states: "[I]n 2011, Hess arranged with Liberty and Abbass to fabricate a 'contract' under which Hess would receive a referral fee for selling MDO products."  Cplt. ¶ 55.  Further, the First Rescission Offer, which went to at least 66 Mozido Invesco investors (*see* Cplt. 59), disclosed the issue of potentially improper commissions.  *See* Ex. 5.

56      **Allegation**: With Messrs. Hess and Liberty, Mr. Marcus was "concerned that there were too many investors participating in the Mozido Invesco Offering because the number approached or exceeded regulatory limits."

**Inaccuracy**: This allegation seems aimed at creating the impressions that Mr. Marcus was acting in concert with Messrs. Hess and Liberty, was acting as securities counsel, and that he was somehow complicit in a non-compliant offering.  None of these impressions are accurate.  Mr. Marcus had no role in identifying which investors received the Mozido Invesco Offering, or any responsibility for ensuring that Offering complied with all securities laws and regulations.

By 2011 Mr. Liberty had retained the Waltham, Massachusetts securities law firm of Morse, Barnes-Brown, Pendleton to advise Mr. Liberty and his affiliates about securities law compliance for the Mozido Invesco Offering.  The Complaint refers obliquely to "other counsel" in connection with the Mozido Invesco Offering (Cplt. ¶ 58), implying that the SEC knew about the work of the Morse, Barnes-Brown, Pendleton firm on the First Rescission Offer.  But the Complaint nowhere mentions Morse, Barnes-Brown, Pendleton, or describes that firm's central role in advising Mr. Liberty about, drafting and implementing the First Rescission Offer.

58   **Allegation**: "Marcus (and other counsel) reviewed and approved the First Rescission Offer.

**Inaccuracy**: Apart from the absence of any facts describing the nature and extent of this "review and approval," or whether there was anything incorrect about this "approval," as described in connection with Paragraph 56, Mr. Marcus was acting only as corporate counsel in connection with the First Rescission Offer.  Seeking to put Mr. Marcus into the proverbial frame, the Complaint nowhere acknowledges and it conceals what the SEC knew or should have known from its investigation: Carl Barnes and his colleagues at Morse, Barnes-Brown, Pendleton – apparently the "other counsel" referred to – were securities counsel and advising Mr. Liberty – and Mr. Marcus, for that matter – on the need for and method for implementing the First Rescission Offer.

58   **Allegation**: Mr. Marcus, with Messrs. Liberty and Hess, "offered the First Rescission Offer knowing the Mozido Invesco Offering had been in violation of various securities laws and in an effort to avoid possible regulatory scrutiny of the Mozido Invesco Offering."

**Inaccuracy**: Mr. Marcus, as the SEC knew or should have known, is not a securities lawyer, never acted or purported to act as a securities lawyer in any of the Offerings, and had no knowledge about any securities violations when the Mozido Invesco Offering was made. As Ex. 12 shows, when questions arose about Mr. Liberty's method of raising money for Mozido, Mr. Marcus initiated a review of the fundraising program, with Mozido's counsel Layne Deutscher and his partner, and Jeff Knetsch of Brownstein Hyatt, a prominent securities law firm based in Denver, to determine whether Mr. Liberty's fundraising program was proper. As the Plaintiff knows from Ex. 12, which the SEC had before filing its Complaint (*see* Cplt. ¶¶ 116-118) (but never disclosed), Mr. Knetsch, the securities attorney consulted by Mr. Marcus, was satisfied that "what Michael is doing is entirely legal." Further, that the conference between Mr. Marcus, Mozido's counsel and Mr. Knetsch concluded that the "fundraising program…is in compliance with the law." Ex. 18.

62(d)  **Allegation**: Mr. Marcus, with other Defendants, "knew Hess received the 5% commission to sell securities."

**Inaccuracy**: No alleged facts show that Mr. Marcus knew that Hess was receiving improper commission payments. The Complaint fails to allege any fact that would have put Mr. Marcus on notice regarding improper commissions. The Complaint itself alleges other Defendants, not Mr. Marcus, were involved in the claimed commission arrangement. *See, e.g.,* Cplt. ¶¶ 34-36, 55. And, as Paragraph 62(d) itself acknowledges, the First Rescission Offer disclosed the consulting payments to the Mozido Invesco Offering investors.

62(a)  **Allegation**: Not expressly mentioning Mr. Marcus, this allegation states that "the First Rescission Offer falsely represented that Mozido Invesco owned 150 units of Mozido Investments.  It didn't.  It owned only 120 units."  Because the Complaint alleges Mr. Marcus "provided legal assistance to form Mozido Invesco" (Cplt. ¶ 40), drafted the Mozido Invesco Offering documents (*see* Cplt. ¶ 43), and "reviewed and approved the First Rescission Offer," however, this allegation concerns Mr. Marcus.

**Inaccuracy**: The First Recission Offer was the responsibility of the "other counsel" to whom the Complaint refers (Cplt. ¶ 58), namely, securities counsel, Carl Barnes.  Further, the documentary record shows that contrary to the SEC's allegation, Mozido Invesco possessed more than enough interests in Mozido Investments to satisfy the Mozido Invesco Offering; and, in fact, it did satisfy them.  The SEC knew all of this but still falsely claimed that Mr. Marcus was involved in some kind of fraud.  *See* Ex. 5/00120 (if all Mozido Invesco investors made conversion election, they would own only 14.6% of Mozido Investments, showing that more than enough Mozido Investment units existed to satisfy all Invesco investors); Ex. 5/00121 (reasons for offer did not include insufficiency of Mozido Investment interests to fund conversion rights).

63(a)  **Allegation**: Also not expressly mentioning Mr. Marcus, this allegation states that "the Mozido Invesco Offering violated MDO's Operating Agreement."  Because the Complaint alleges Mr. Marcus "provided legal assistance to form Mozido Invesco" (Cplt. ¶ 40) and drafted the Mozido Invesco Offering documents (*see* Cplt. ¶ 43), however, this allegation also concerns Mr. Marcus.

**Inaccuracy**: As described above concerning Paragraph 49, this allegation is factually wrong, and the SEC knew or should have known it was.  The Mozido Invesco Offering

did not violate MDO's Operating Agreement.  *See* Exhibit 15.  The SEC had the relevant documents and needed only to look at the date of the Amended Operating Agreement to see that the purported restriction did not take effect until after the transfer of interests in question.

68(b)   **Allegation**: Mr. Marcus gave "assistance" to Mr. Liberty when Mr. Liberty "promised investors that he would prevent them from being diluted beyond a valuation of MDO of approximately $115 million, and, if necessary, give them interests from Family Mobile to limit their dilution to that valuation."

**Inaccuracy**: No facts show of what the alleged "assistance" consisted.  No such facts exist.  Read as a whole, the Complaint shows Mr. Marcus was not involved in pitches to investors; indeed, the Complaint repeatedly alleges that such work was done by the other Defendants.  Further, as the Motion explains, the "dilution deception" premise of this allegation is economically baseless.

68(b)   **Allegation**: "Liberty, Marcus, and Hess concealed that Liberty had only invested in MDO at levels below $15 million and that investors were buying at artificially inflated valuations."

**Inaccuracy**: No facts show that Mr. Marcus had a general disclosure duty to investors and the law cited in the Rule 12(c) Motion shows that he did not.  No facts are alleged that show that Mr. Marcus was in any way involved in promoting any investment to any investor.  In any event, the investment documents, signed by every investor, expressly disclaimed any representation of value.  Further, as the Motion explains and as discussed above, the "valuation deception" predicate for this assertion is wrong as well.

71      **Allegation**: "Liberty, Abbass, Hess and Marcus, knowing that they had violated the securities laws, had caused Mozido Invesco to offer the Second Rescission Offer in an attempt to, once again, avoid regulatory consequences from their Mozido Invesco Offering."

**Inaccuracy**: No facts show that Mr. Marcus knew of any violation of the securities laws by anyone.  No facts show that Mr. Marcus was acting, or purporting to act, as securities counsel for the offerings.  To the contrary, the facts show that Mr. Marcus relied upon advice from securities counsel retained, at his suggestion, by his client.  As the SEC was aware from its pre-suit investigation (*see* Cplt. ¶ 58), after the extensive work by Morse, Brown-Barnes Pendleton on the First Rescission Offer, Mr. Liberty retained Lowndes Drosdick, a Florida firm, to advise on securities issues and handle the Second Rescission Offer.  This allegation, which seeks to create the impression that Mr. Marcus was centrally involved in securities compliance, or, as the Complaint alleges, knowing non-compliance, is factually baseless.  What Mr. Marcus knew about the Mozido Invesco Offerings' compliance or possible non-compliance is what he was told by securities counsel, Carl Barnes and his colleagues and then the Lowndes Drosdick team.  While the Complaint refers to "new [securities] counsel]" (Cplt. ¶ 73) for the Second Rescission Offer, the Complaint fails to name that counsel, Lowndes Drosdick, or recognize the central role Lowndes Drosdick played in the Second Rescission Offer.  *See* Ex. 6.  These omissions appear intended to create the impression that Mr. Marcus played a bigger role than he did in the Second Rescission offer and for securities compliance issues in general. That is seriously inaccurate.

72    **Allegation**: "From September through December 2011, Liberty, Abbass, and Marcus worked to edit, finalize, and approve the Second Rescission Offer.  Abbass was the principal point of contact for the law firms, and Hess and Marcus for their input."

**Inaccuracy**: As discussed above concerning Paragraph 71, despite the unexplained plural reference to "law firms," the Complaint incorrectly creates the impression that Mr. Marcus was the lawyer primarily responsible for the Second Rescission Offer.  As the SEC knew from the documentary record, Lowndes Drosdick was retained to prepare the Second Rescission Offer and to assure securities law compliance.  That firm appeared by name on the Second Rescission Offer (*see* Ex. 6).  Mr. Marcus was involved solely as the corporate lawyer for the Issuer.  The SEC knew this.

86    **Allegation**: "In May and June 2012, Liberty, Hess, Abbass, and Marcus engineered a trade whereby [investors in] Mozido Invesco exchanged their Mozido Invesco promissory notes…for non-voting ownership units in MDO."

**Inaccuracy**: As the underlying documents show, Mr. Marcus "engineered" nothing.  Mr. Marcus was not securities counsel.  The Exchange Offer was handled by Brownstein Hyatt, which, although named in the Exchange Offer itself (*see* Ex. 7/00255), is nowhere mentioned by name in the Complaint.  The Exchange Offer nowhere even mentions Mr. Marcus and his firm.  Further, the Complaint does not disclose the express disclaimer of reliance by recipients of the Exchange Offer.  The implementing  Note Exchange and Subscription Agreement provided that "the Noteholder has relied solely and completely upon his, her, or its own judgment in executing this Agreement…has had the opportunity to seek the advice of his her or its own legal counsel and financial and tax advisors…has acted voluntarily…is not acting under duress…this Agreement is the result of arms'-

length negotiations…the Noteholder acknowledges that the law firm of Brownstein Hyatt Farber Schreck LLP has been retained by Family Mobile, Invesco and Mozido to prepare this Agreement as legal counsel for them, that Brownstein Hyatt does not represent the Noteholder in connection with the preparation or execution of this Agreement, and that Brownstein Hyatt has not given any legal, investment or tax advice to the Noteholder regarding this Agreement."

Making false allegations against Mr. Marcus, the SEC fails to disclose this part of the documentary record. Once again, the Complaint paints a knowingly misleading picture of Mr. Marcus's role.

86    **Allegation**: "In connection with the Exchange Offer, Liberty, Hess, Abbass and Marcus falsely represented that MDO was valued at over $108 million dollars, thereby tricking the investors into accepting securities that were, at best, worth a fraction of the face value of the Mozido Invesco promissory notes."

**Inaccuracy**: As described above, Mr. Marcus was not responsible for the Exchange Offer; Brownstein Hyatt handled the Exchange Offer. *See* Ex. 7/00255. Mr. Marcus "falsely represented" nothing to anyone. Mr. Marcus's dealings with investors and their lawyers or other representatives were few and far between, as the Complaint itself reflects.

The "valuation deception" alleged is baseless, as the Rule 12(c) Motion explains. *See* Mot. at 8-11. Moreover, the Exchange Offer itself (never disclosed by the SEC to the Court) makes that clear, stating: "The conversion rate in the Notes of $55,000 per unit of Investments was determined *arbitrarily*, and, thus, the Exchange Rate *bears no relationship to Mozido's book or asset values, or to any other criteria for valuing Class B*

*units.  Because the Exchange Rate is not based upon any independent valuation, the Exchange Rate may not be indicative of the proceeds that a Class B member would receive upon sale of Class B units, liquidation of Mozido, or otherwise.* (Emphasis added.) Ex. 7/00203

Further, as set forth above, the Exchange Offer recipients expressly disclaimed reliance on counsel, stating that the negotiations were at "arm's length" and that the investors "had the opportunity to seek the advice of his, her or its own legal counsel and financial and tax advisors before executing this Agreement."  Ex. 7/00253-55.  Once again, a knowing deception by the SEC.

88    **Allegation**: "Marcus had never informed his client, the MDO Board, that Liberty had violated the Amended Operating Agreement.  Instead, to obtain the non-voting shares of MDO, on or about May 2012, Liberty and Marcus persuaded the MDO board to authorize the conversion of Family Mobile's interests in MDO into MDO non-voting Class B membership units."

**Inaccuracy**: Mr. Marcus's client was not the MDO board.  Nor, as explained above, had "Liberty violated the Amended Operating Agreement."  Another knowing falsehood.

99    **Allegation**: "During August 2012, Marcus, at Liberty's request, drafted investment contracts and convertible promissory notes using BRTMDO as the issuer.  The BRTMDO promissory notes were convertible into MDO preferred membership units, even though, at that time, BRTMDO did not possess rights to those units, which Liberty and Marcus knew but fraudulently omitted from their offering documents and communications.  On August 15, 2012, Marcus sent drafts of the notes to potential investors."

**Inaccuracy**: Mr. Marcus did not draft all the BRTMDO documents.  Indeed, the Complaint's immediately preceding Paragraph contradicts this allegation, stating that "Rick Liberty drafted agreements and got them executed."  Mr. Marcus drafted only one or two documents at the specific request of Mr. Liberty with respect to two investors, located in Maine, and represented by prominent Maine legal counsel, John Geismar. Further, contrary to the allegation, BRTMDO did possess "rights to those [MDO preferred membership] units."  *See* Ex. 9/00521.  This fact is revealed by numerous documents that the SEC had, presumably reviewed, but never revealed to the Court.

100    **Allegation**: Mr. Marcus forwarded a "false [Brentwood Financial] balance sheet," "created" by Abbass, "to potential investors in Maine…Liberty and Marcus knew and Rick Liberty knew or should have known the balance sheet was false."  The allegation of falsity is that "[t]he balance sheet stated Brentwood Financial possessed 'Investments' in MDO," but was "intentionally false" because "Brentwood Financial had no MDO preferred membership units either directly from MDO or from another source."

**Inaccuracy**: Mr. Marcus had no knowledge of any falsity in the balance sheet – it was not false, anyway.  Brentwood Financial did possess absolute and unencumbered legal rights to transferable MDO preferred membership units.  *See* Ex 9/00521.  Specifically, Brentwood Financial held the right to convert promissory notes from MDO that it held into preferred units in MDO, at any time, and to receive a number of preferred units greatly in excess of the number needed to satisfy Brentwood Financial's own conversion obligations.  The SEC knew this, or should have known this, and the Complaint's contrary allegations are knowingly false and designed to deceive the Court.  The

Complaint fails to attach the document showing Mr. Marcus forwarded any balance sheet to any investor.

103 **Allegation**: "Together, Liberty and Marcus created the structure of the Brentwood Offering and communicated about it with investors."

**Inaccuracy**: Mr. Marcus did not "create[ ] the structure of the Brentwood Offering" and his only communications about it with investors were actually communications with legal counsel for the investors, on the few occasions he was asked questions about the meaning of terms of the documentation by investor legal counsel or other representative. As written, the allegation creates the impression that Mr. Marcus was involved in promoting the investment. Nothing could be farther from the truth and no factual allegations substantiate this claim. *See, e.g.,* Ex. 20. To the contrary, the Complaint itself alleges that "Liberty, Hess and Rick Liberty solicited investors via email, phone calls, and in-person meetings," nowhere – correctly – mentioning Mr. Marcus doing any of these things. Cplt. ¶ 104.

103 **Allegation**: "Marcus drafted the original [Brentwood Offering] investment documents."

**Inaccuracy**: As stated above concerning Paragraph 99, Mr. Marcus drafted only a few select Brentwood Offering documents. The Complaint itself alleges that Rick Liberty "drafted agreements and got them executed." Cplt. ¶ 99. Mr. Marcus's role in the Brentwood Offering was highly circumscribed, contrary to the impression this allegation seeks to create.

106 **Allegation**: "In touting the Brentwood Offering, Liberty, Marcus and Rick Liberty frequently lied about or concealed critical facts about the investment, including about the current valuation of MDO, the use of the proceeds of the Brentwood Offering, their lack

26

of authorization to sell units, Liberty's personal investment, Liberty's defaults on loans, and the meaning of what was referred to as the 'triple liquidation preference.'  For example:"

**Inaccuracy**: No allegation in the Complaint states any fact supporting this allegation. The alleged "valuation deception" is incorrect (*see* Rule 12(c) Motion at 8-11), and no allegations show Mr. Marcus actually communicated with *any* investor concerning use of proceeds and authorization for transfer of the units.  The allegation that Mr. Marcus "tout[ed]" the Brentwood Offering is entirely unsupported by allegation of any fact showing that ever happened; there is nothing but unsupported conclusory statements to this effect.  Moreover, other allegations of the Complaint contradict this allegation.  *See, e.g.*, Cplt. ¶¶ 96 ("Liberty enlisted the help of an MDO employee…to send various internal MDO documents to potential investors…"); 98 ("Rick Liberty promoted the investments, identified and solicited investors, answered their questions…."); 104 ("Liberty, Hess and Rick Liberty solicited investors").  *See also* Ex. 20 (two Brentwood investors – who are representative of all the Brentwood investors – acknowledge that they never communicated with Mr. Marcus or even knew who he was).  Beyond that, the Brentwood Offering documents show the investors declared themselves Accredited Investors, agreed they relied on their own due diligence (*see, e.g.,* Ex. 3/00071, Ex. 4/00101) and disclaimed any reliance on anyone else, including the Marcus Clegg firm in particular.  *See, e.g.*, Ex. 3/00071; Ex. 4/00101.  The "use of proceeds" claim is wrong. *See* Ex. 8.  Similarly, erroneous is the claim of "lack of authorization to sell units."  No restriction applied to the transfer of MDO preferred membership units; the only regulation was of two different classes of membership units, Class A and Class B units.

*See* Mot. at 11-12, Ex. 15 (Art. VI/00775-79), Ex. 16.  Nor was there any insufficiency of the MDO preferred membership units.  *See* Ex. 0/00521.  All this information was known, or at least available, to the SEC before it filed the Complaint, yet the SEC proceeded knowingly to make false, misleading and unsupported allegations.

107(a)  **Allegation**: "Marcus drafted BRTMDO notes that expressly stated that the 'initial conversion price is based upon a valuation of MDO of One Hundred Million Dollars ($100,000,000) as of the date of this Note.'"

**Inaccuracy**: Mr. Marcus did not draft the great majority of BRTMDO notes; the Complaint appears, albeit obliquely and therefore misleadingly, to acknowledge this.  *See* Cplt. ¶ 98 ("Rick Liberty…drafted agreements and got them executed…").  The underlying "valuation deception" claim is a false and intentionally misleading contrivance, as noted above and in the Rule 12(c) Motion.  *See* Mot. at 8-11.

107(d)  **Allegation**: "On September 10, 2012, Marcus wrote to legal counsel for two other investors to explain the proposed offer.  Though he knew the company had valued itself as $25 million, he false wrote about 'today's valuation of [MDO], which determines the pricing at issuance of the note.  That value was set at $100,000,000.'"

**Inaccuracy**: The "valuation deception" predicate for this allegation is wrong.  MDO's valuation and the conversion option strike price are, as a matter of basic economics, two different things.  *See* Rule 12(c) Motion at 8-11.  Indeed, the "was set at" language of the quoted email reflects that very point.  The transaction documents themselves reveal that the only thing "set at" the time of note issuance was the conversion option strike price.  That is not a "valuation" and the transaction documents say absolutely nothing about MDO valuation.  The SEC can read and knows this and knows better than to make the

allegations it made.  In any event, this email in question was sent to John Geismar, an experienced attorney, who no doubt fully understood the difference between setting an option strike price for a conversion option, and the valuation of the underlying asset. And if an Accredited Investor, relying on such investor's own due diligence and relying on no other representations (*see* Ex. 3/00071, Ex. 4/00101) wanted to know the valuation of the underlying asset, it was up to the Accredited Investor to ask for that information as they agreed to do in their documents.

107(f)  **Allegation**: "On February 8, 2013, Marcus wrote an email for Liberty to send to an investor, which Liberty forwarded that day.  Marcus wrote that the $3 million BRTMDO convertible promissory note carried a conversion price based on a "100,000,000 valuation of [MDO] today.'  Marcus also knowingly misrepresented that the $3 million note, if converted, would give the investor 'approximately 3%' of Mozido."

**Inaccuracy**: The inherent "valuation deception" premise of this allegation is wrong.  In addition, Mr. Marcus's February 8, 2013 email to Mr. Liberty nowhere reflects that Mr. Marcus intended this initially privileged communication, which "summarize[d]…in plain English" the "legal documents" that "are no doubt confusing to the non-lawyer," to be sent to the investor, Joshua Lee.  The full text of the email shows Mr. Marcus explaining to Mr. Liberty the basics of the transaction.  And that full text shows, among other things, that Mr. Marcus did not say the investor would get "3% of Mozido" upon conversion, which could occur, if conversion were elected, three years down the road:

…What does JLC [Joshua Lee & Company] get for 48,387,096 preferred units of Mozido?  It gets approximately 3% of Mozido, *today*…This example assumes conversion *immediately*, and *no dilution* of ownership interests by reason of further corporate financings.  *As an equity interest, no guaranties can be made as to its ultimate value*…." (Emphasis added)

The Complaint's description of this email is blatantly and knowingly deceptive.  Indeed, a subsequent, February 24, 2013 email from Mr. Marcus concerning this investor stated: "I trust someone has set Lee straight on what these documents mean.  He was clueless last I saw, and he needs to be set straight – for his sake and ours."  This is not a message from a lawyer trying to pull the wool over the eyes of an investor.  The SEC knew this when it made its deceptive allegation.

108   **Allegation**: "Liberty, Abbass, and Marcus knew how the investors' money was being used, but misled investors into believing the money was being used for MDO.  In order to conceal the disposition of the proceeds of the Brentwood Offering, Liberty arranged for investors to send their money to Marcus Clegg's IOLTA account, where it was commingled with other money received by Marcus' law firm.  This allowed Liberty not to hold the proceeds of the offerings in identifiable bank accounts in the name of the issuing entities or Liberty."

**Inaccuracy**: The investment documents that the investors executed stated that the funds could be used as the Issuer saw fit.  *See* Ex. 3/00066, Ex. 4/00096-101.  Even though the funds were not required to go to MDO, what Mr. Marcus saw come through his IOLTA account for the Brentwood Offerings was $19,388,720.24 of investment proceeds, and $22,616,576.61 go out to MDO.  *See* Ex. 8.  The SEC could and should have done that arithmetic before making its central "diversion of funds" claim.  Perhaps it did but did not like the answer it got.  Further, Mr. Marcus nowhere misled any investor about the use of funds – the Complaint contains not one fact showing Mr. Marcus ever even spoke to an investor about the use of funds.  *See* Ex. 20.  Indeed, as the SEC knows, the transaction documents themselves provided that the Issuers could use investment proceeds as they

saw fit.  Insinuating wrongdoing through its "commingling" accusation, the Complaint

ignores that IOLTA funds are commingled in a single IOLTA account as is required by

law.  *See* Maine Bar Rule 6(c)(1).

109(a)  **Allegation**: "Emails approved by Marcus and Liberty that were sent to investors on

August 30, 2012, falsely claimed that Brentwood Financial owned 'stock.'  It didn't.

Brentwood Financial did not own any MDO 'stock' at that time, or any membership

units, as Liberty, Marcus, and Abbass knew."

**Inaccuracy**: The documentary record, known to the SEC, shows that the Brentwood

possessed sufficient preferred membership units in MDO, or prepaid, unconditional rights

to acquire the same, to satisfy all investor conversion options.  *See* Ex. 9/00521.  Further,

MDO's Amended and Restated Operating Agreement, pursuant to which the preferred

membership units at issue were created, and which governed their terms, nowhere

restricted the transfer of these units; only the different, Class A and B membership

interests, were subject to any transfer restrictions.  This would have been evident to the

SEC upon review of that document.  Nor is it clear that Mr. Marcus "approved" the

August 30, 2012 email, which was written by Joe Bedard, forwarded to Mr. Liberty, who

then forwarded it to Mr. Marcus.

111(a)  **Allegation**: "Liberty, Marcus and Rick Liberty hid a lawsuit brought against Liberty by a

MDO board member for failing to honor a personal guarantee on an MDO-related loan.

Liberty, Marcus, and Rick Liberty knew that the default and the resulting litigation would

negatively impact their fundraising efforts.  They knew that at least one potential investor

had balked because of the litigation, so they concealed it from potential investors (and

members of the MDO board)."

**Inaccuracy**: No facts show Mr. Marcus "hid" or "concealed" this lawsuit – a matter of public record – from anyone, or that he had a duty to disclose it to anyone, or that anyone ever asked Mr. Marcus about it.  No facts show Mr. Marcus was aware of what any other defendants were or were not saying to any investors about that lawsuit until Mozido's Executive Chairman informed Mr. Marcus in a January 6, 2013 email.  *See* Ex. 12. Mr. Marcus was not part of the "fundraising effort," and no allegation of the Complaint states otherwise, other than as a conclusory generality.  He promoted the investments to no one, and simply served in the role as corporate counsel to Mr. Liberty and the Issuers. As the Complaint makes clear through the bulk of its allegations, the "fundraising" was done by others.  And the claim that a lawsuit against Mr. Liberty by an MDO board member was unknown to other board members is not just highly implausible but is contradicted by the Complaint itself.  *See* Cplt. ¶ 117 ("MDO's Executive Chairman [Rick Braddock] emailing Mr. Marcus to tell him that Mr. Liberty was "not disclosing" to investors "that he is being sued by a DIRECTOR for the failure of [Mr. Liberty's] guarantee…"  *See* Ex. 12 (emphasis in original).

112    **Allegation**: "Marcus and Liberty misled investors about the meaning of the 'triple liquidation preference' of the preferred membership units an important point in the Brentwood Offering.  Liberty repeatedly touted the '3x liquidation preference,' which Marcus described to investors and their legal counsel as providing significant benefits in the event MDO was sold or offered publicly, including in a September 10, 2012 email. Specifically, Marcus described this feature as providing for a payout of three-times the investors' purchase price for Brentwood Offering promissory notes, plus a pro rata share of additional available funds.  Under the terms of the relevant documents, however,

instead of an investor getting three times their investment or more, the preference payment would be less than the purchase price of those notes.  This difference was material to investors."

**Inaccuracy**: This allegation implies that Mr. Marcus was out on the hustings, describing the triple liquidation preference to investors.  He was not and the SEC makes no allegation that Mr. Marcus ever actually communicated to any investor the desirability of investing due to the triple liquidation preference.  As the SEC knew from the documents it possessed, Mr. Marcus responded, when asked, to technical questions about the operation of the triple liquidation preference, with references to the relevant documents. Importantly, the email messages in the possession of the SEC make no such statement as investors would be entitled to "a payout of three-times the investors' purchase price for Brentwood Offering promissory notes."  This is an impermissible and dishonest "spin" on what Mr. Marcus said to the lawyer for an investor.

The September 10, 2012 email referred to was Mr. Marcus emailing John Geismar, an experienced attorney for an investor, stating:

> John, there seems to be some confusion; the 'triple' promise to which you refer relates to the triple liquidation preference applicable to preferred units of Mozido. This is contained in the operating agreement for Mozido  What is means is that when Mozido is sold, all of the issued and outstanding preferred units get 3 times the face amount of the *preferred units*, and then they share in the remaining upside on a pro rata basis. So, for example, if one holds a preferred unit in Mozido with a face amount of $1,000,000, then on sale, the preferred unit holder gets $2,000,000 [sic]  and then it will share pro rata in the proceeds of sale after every preferred holder gets their liquidation preference.

> Now that is a different matter from today's valuation of Mozido, which determines the pricing at the issuance of the note.  That value was set at $100,000,000.  Based on the number of units outstanding, this translates to $ .074 per unit.

> Please call if we should discuss further.

The email said precisely what the Mozido Operating Agreement said: an investor holding a preferred unit issued by Mozido was, on liquidation of Mozido, entitled to three (3) times the face amount *of that preferred unit*.  Nowhere did Mr. Marcus say or imply that purchasers of convertible notes would be entitled to three times *the amount of their notes*.  This is nothing but SEC deception through "spin."  Moreover, the statement was made to a lawyer for an investor who presumably understood what was said.  It is highly unlikely that this lawyer put the same dishonest spin on this when talking to his client that the SEC puts on it.

113    **Allegation**: "In 2013, Liberty again denied the allegations in the SEC's prior *Keystone* complaint.  Later in 2013, Marcus told an investor that Liberty was a 'victim' of the SEC.  Liberty's and Marcus' denials violated Liberty's prior settlement agreement with the SEC and were materially misleading."

**Inaccuracy**: As detailed above concerning Paragraph 53, Mr. Marcus's opinion that Mr. Liberty had been a "victim" in the *Keystone* matter was an honestly held opinion, contradicted by no facts then available to him – or available now, for that matter.  Nor did this statement of opinion violate Mr. Liberty's settlement agreement.  *See* Ex. 17.  Mr. Marcus was not a signatory to that Agreement, nor was he counsel for Mr. Liberty in the proceeding in which the settlement agreement was reached.  While Mr. Liberty agreed "not to take any action or to make or permit to be made any public statement denying, directly or indirectly, any allegation in the complaint or creating the impression that the complaint is without factual basis" (Ex. 20, ¶ 11), Mr. Marcus made no such agreement, was not counsel for Mr. Liberty in that matter, and was not so bound by any agreement.  He was free to state his honest opinion based on the facts as he knew them.  No doubt the SEC knows that nothing in the prior agreement, to which Mr. Marcus was

neither a party nor counsel to a party, restricted Mr. Marcus's freedom of speech. Even if Mr. Marcus were somehow bound by the strictures of a document with which he never had any involvement, no factual allegation shows that the alleged private communication with an investor qualifies as a "public statement." Further, no factual allegation of the Complaint alleges that Mr. Marcus's statement was untrue.

114     **Allegation**: "Liberty, Abbass and Marcus hid Liberty and Abbas's misappropriation of the investors' money through false statements and omissions in the Form Ds filed with the SEC."

**Inaccuracy**: As discussed at length above, Mr. Marcus was aware of no such misappropriation. As Ex. 8 demonstrates, the claimed "misappropriation" of investor money never occurred. The SEC knows better than to make these false allegations about Mr. Marcus, having seen all of Mr. Marcus's IOLTA records. It knew, before making these statements, that they were in fact false. Nor do any facts show Mr. Marcus knew what investors were told about how their funds would be used, or that any such statements differed from the documents the investors executed. These documents, absent from the Complaint, are what Mr. Marcus was aware of, and the story they tell entirely contradicts the Complaint's false narrative of wrongdoing by Mr. Marcus.

114(b)   **Allegation**: "On November 22, 2013, Brentwood Financial and BRTMDO amended their Form Ds (Form D/A). Abbass signed the Form D/As, after working with Marcus and Liberty to complete them. The Form D/As repeated that Liberty and Abbass received no money from the proceeds of the investment and that all the investors were accredited.

**Inaccuracy**: Apart from the failure to provide any facts showing of what Mr. Marcus's supposed "work" on Form D/A consisted, all Mr. Marcus saw was that all the Brentwood

Financial and BRTMDO funds that came into the IOLTA account went out to Mozido, plus millions more; that is, none of the investor money was retained by Mr. Liberty, as the IOLTA records showed. *See* Ex. 8. Nothing shows Mr. Marcus was aware, or should have been aware, of any diversion of investor funds – even though the Note Purchase Agreements permitted the Issuer to use the funds as it saw fit, as discussed above. *See* Ex. 3/00066, Ex. 4/00096-101.

114(c)   **Allegation**: "On January 24, 2014, BRTMDO filed a second amended Form D, again signed by Abbass, who again had worked with Marcus to complete it. This Form D/A contained the same false statements as the previously amended Form D.

**Inaccuracy**: *See* the inaccuracy described concerning Paragraph 114(b), above. For all the Complaint shows, Mr. Marcus simply said, if anything, "looks good to me."

115   **Allegation**: "After selling units for months in violation of MDO's Amended Operating Agreement and the non-assignment provision of MDO notes, Liberty, Marcus and others sought to legitimize the sales. Between December 2012 and January 2013, Marcus drafted an MDO board resolution that would grant BRTMDO permission to transfer interests in preferred membership units of MDO to third parties."

**Inaccuracy**: The allegation is that Mr. Marcus "drafted" an MDO Board resolution. There is no allegation that he presented the resolution to anyone, or that anyone acted on it or that anyone relied on it. Doing so would have been unnecessary, as no such resolution would have been required. As discussed above, MDO's Amended Operating Agreement did not restrict the transfer of preferred membership units. This, of course, was known to the SEC, which also knew or should have known that any such alleged board resolution would have been entirely superfluous. Unsurprisingly, of course, the

Complaint nowhere alleges that any investor in any of the Offerings ever faced a claim from anyone that the interests they had received had been improperly transferred to such investor. The entire matter is a red herring, and the SEC knows this – at least if it had read any of the documents in its possession, it would have known it. In yet another effort to deceive the Court, it alleges this red herring as some kind of evidence of fraud.

118   **Allegation**: "Marcus tried to defend Liberty and the scheme [to MDO's Executive Chairman, Rick Braddock]. On January 6, 2013, he wrote that Liberty had only raised funds 'from investors in his circle of friends.' Marcus also claimed that the investors were 'universally accredited, sophisticated and fully aware of the existence of a spread.' The 'spread' referred to the difference between what an investor directly investing in MDO (like Liberty) would pay and what an investor investing through BRTMDO or Brentwood Financial would pay for the same equity. Marcus falsely claimed that all BRTMDO and Brentwood Financial investors had been told that Liberty acquired MDO units at a $25 million valuation and sold it to them at a $100 million valuation. Marcus lied; the Mozido Invesco and Brentwood Offerings had included unaccredited and unsophisticated investors, most of whom were strangers to Liberty, and who did not know of the spread. Liberty, Abbass, Marcus, Rick Liberty, and Hess suppressed MDO's actual valuations."

**Inaccuracy**: Mr. Marcus's briefing seeking relief from the stay to permit the filing of the Rule 12(c) Motion [ECF Nos. 75, 78] and the content of that brief itself [ECF 82] has already demonstrated why these allegations demonstrate "the SEC's extraordinary lack of candor." *See* Mot, at p. 19. The allegation "Marcus lied" is flat out false and known by the SEC to be so. In his email responding to Mr. Braddock's email, Mr. Marcus stated

only what he believed to be the truth based on the documents he had seen: that the investors were "universally accredited, sophisticated and fully aware of the existence of a spread."

Not to belabor a point already made in two previous filings with the Court and detailed in the Introduction to this Motion, but the Complaint's perniciously selective and false recitation of this email exchange completely omits the portion in which Mr. Marcus describes the review, done at his instigation, of Mr. Liberty's fundraising program, by Mozido's counsel and by Brownstein Hyatt.  This review concluded that Mr. Liberty's fundraising program was fully compliant with the law.

Read in its entirety, this email exchange shows, among many other exculpatory facts nowhere disclosed in the Complaint: (i) Mr. Marcus fulfilling his legal duty to defend his client against an unfounded accusation; (ii) Mr. Marcus was not responsible for securities law advice or the Offerings' compliance with securities laws and regulations, but "had advised Michael on the corporate side – i.e. his entities and the documentation, while Brownstein Hyatt, a major law firm in Denver, has advised Michael on the securities side;" (iii) experienced and competent counsel, including Brownstein Hyatt's Jeff Knetsch and Mozido's outside counsel Layne Deutscher and his partner, at Mr. Marcus's "instigation," had reviewed Mr. Liberty's fundraising program and "blessed" it as "in compliance with the law;" (iv) Mr. Braddock himself was "involved in the Turner investment into Brentwood Financial, which was structured on exactly" the same basis as the other Brentwood investors' transactions; (v) Mr. Marcus had to be told, by Mr. Braddock, of Mr. Liberty's supposed misstatements while raising funds – Mr. Marcus was not involved in promoting any of the investments to anyone and

38

had no personal knowledge concerning the same; and (vi) the so-called "spread" was a perfectly legitimate form of compensation to Mr. Liberty for raising money for Mozido "with personal guaranties, and with the pledge of assets to secure the guaranties," thereby "put[ting] a floor on the downside for these investors."  The SEC's allegations in this regard go to the very heart of its pervasive dishonesty with the Court.

126    **Allegation**: "So, in 2016, Liberty, Marcus, Abbass, Rick Liberty and Hess conducted another exchange offer: Brentwood Financial and BRTMDO noteholders could exchange their notes – expired or not – for preferred units of MDO."

**Inaccuracy**: As discussed above, and as the pre-Complaint documents the SEC possessed clearly showed, Mr. Marcus did not "conduct" the "Brentwood Exchange Offer."  The Brownstein Hyatt firm, prominent securities lawyers, structured the transaction and drafted all the pertinent documents.  Mr. Marcus acted, as always, only as corporate counsel to the Issuer.  Depicting Mr. Marcus as the sole lawyer engaged in this transaction, omitting any mention of the substantial role Brownstein Hyatt played, although the SEC knew full well about that role, was apparently calculated intentionally to mischaracterize Mr. Marcus's work.

127    **Allegation**: "… On April 27, 2016, Liberty, Abbass and Marcus caused Liberty's tax accountant to email solicitations of the Brentwood Exchange Offer to investors for which the tax accountant received remuneration."

**Inaccuracy**: No facts show Mr. Marcus "causing" any such thing.  The tax accountant was a member of the regional accounting and consulting firm, Berry Dunn.  That firm is the largest accounting and management consulting firm in Northern New England, a firm highly unlikely to be knowingly manipulated into doing something wrong.  *See*

39

https://www.berrydunn.com/about.  Beyond that, the "solicitations" that Mr. Marcus

allegedly put Berry Dunn up to sending were entirely benign and honest, on their face.

They expressly stated, among other things,

> "Please note that this correspondence is intended solely to forward the Notice of
> Conversion provided by Brentwood and to communicate the total amount of
> principal and interest related to the Convertible Promissory Notes available for
> conversion into Preferred Units of MDO, LLC. …This correspondence is not
> advice regarding the conversion.  Neither we nor Brentwood make any
> recommendation and offer no opinion regarding the terms or value of the Notes,
> the terms or value of the MDO Preferred Units, or the advisability of converting
> the Notes…We recommend each Noteholder contact that Noteholder's
> professional advisors for any advice with respect to whether or not to proceed
> with conversion."

This is not the language of anyone setting out to defraud.  The SEC knew this,

misrepresented the nature and significance of the Berry Dunn involvement to the Court, and

deceptively and dishonestly alleged that Mr. Marcus put Berry Dunn up to no good.

129   **Allegation**: "Defendants intentionally concealed the valuation and financial state of

Mozido.  Liberty, Marcus, Abbass, and Rick Liberty actively concealed Mozido's dire

financial situation, though they were well aware of it.  For example:

**Inaccuracy**: Mr. Marcus, as the corporate lawyer for Mr. Liberty and the Issuers, had no

general disclosure duty to investors and no facts show Mr. Marcus "conceal[ing]"

anything from anyone.  As the Brentwood Exchange Offer notices stated, investors were

encouraged to consult their own advisors.  Moreover, that Exchange Offer had express

disclaimers of investor reliance on representations made by anyone.

129(a)  **Allegation**: "…[O]n April 8, 2016 Marcus described how Mozido had only one week to

pay off a creditor, avoid a default, and 'avoid the draconian outcome of the loss of

Mozido's stake' in the only revenue-generating part of its business.  Despite these

problems, Mozido's grave financial condition was not disclosed to investors."

**Inaccuracy**: This allegation nowhere specifies to whom Mr. Marcus was writing, or why, or provides any meaningful context or specifics as to the situation, purportedly described. More specifically, no facts show Mr. Marcus had any affirmative duty to disclose to anyone the situation described in this email, which, as the SEC knows, involved Mr. Marcus's communications with Wellington concerning Mozido's liquidity problem, not uncommon to tech startup companies. As our Rule 12(c) brief makes clear, the law is unambiguous: Absent special circumstances that appear nowhere in this allegation, nor alleged anywhere else in the Complaint, nor contained in the documentary record, Mr. Marcus's sole duty is to his client; not his client's business counter-parties. *See* Rule 12(c) Motion at 28.

129(e) **Allegation**: "On May 9, 2016, the manager of an investor group emailed Marcus that investors were asking questions about the valuation of the Preferred Units, so they could decide whether to convert. He told Marcus that without 2016 financial statements or guidance, investors would not be able to make an informed decision whether to convert. Despite this request, Marcus did not tell them of Mozido's defaults and precarious financial information or provide any other financial information. In addition, on May 10, Marcus perpetuated Defendants' prior lies about valuation when he misled investors about the 'triple liquidation preference' of the MDO membership units.

**Inaccuracy**: This allegation neither attaches the alleged documents nor provides any context for the allegations. As the SEC knows, this "manager" was in fact Douglas M. Smith, a lawyer and retired Maine judge who was, among other things, fully aware that the transaction documents permitted the Issuer to use the funds raised as the Issuer saw fit and who regarded his investment as a high risk start up investment.

41

The actual email chain, which the SEC characteristically omits, shows Mr. Marcus providing numerous and detailed responses to Mr. Smith's earlier 2015 questions, with Mr. Smith thanking Mr. Marcus on September 14, 2015 for the "very helpful" information Mr. Marcus had "provided on the conference call on 9/11[2015.]" Further the Complaint omits Mr. Marcus's detailed May 10, 2016 response to Mr. Smith's remaining Mr. Smith's question concerning the "Effective Preferred Unit Price," a defined term in the Mozido, LLC Operating Agreement.  Mr. Smith asked Mr. Marcus, by email, whether the value of Mozido could be inferred from the "Effective Preferred Unit Price." Mr. Marcus responded, in language omitted by the SEC, by providing a detailed explanation of this provision, which concluded with the following: "I don't see a meaningful connection between the Effective Preferred Unit Price and a present day valuation inference, but perhaps you can see something in it that I don't.  Feel free to call me with any questions."  The SEC knows full well that this is not fraud; it is honest and competent corporate law practice, and it is telling (although the SEC would never tell) that a respected former member of the Maine judiciary, Mr. Smith, who was the lead investor for a Maine investor group, placed his trust in Mr. Marcus by engaging in a dialogue about complicated transaction documents.  If the SEC were forthcoming, it would also reveal the facts revealed from the interview with Mr. Smith.  These plainly demonstrate two things: (1) the total lack of any deceptive conduct by Mr. Marcus; and (2) the pervasively deceptive conduct of the SEC.  Further, as stated above, the documents sent to investors regarding the 2016 Exchange Offer were prepared by Brownstein Hyatt, not by Mr. Marcus.  They expressly disclaimed any representation of the value of MDO.  The documents expressly told investors to make their own decisions

and not to rely on statements made by anyone.  Investors, having been admonished by the written documents to do just that, were free to decline to invest if they chose not to.  No facts show that Mr. Marcus undertook to ignore or contradict or override the terms of the Exchange Offer documents.  No facts show that Mr. Marcus chose to get involved in conversations with investors about their decisions, or to promote the exchange.  No facts show how Mr. Marcus is supposed to have "misled investors" about the value of MDO, or the workings of the triple liquidation preference, which was spelled out in Mozido's Amended and Restated Operating Agreement.  Mr. Marcus misled no investor, ever, about the triple liquidation preference, the terms of which were available for any investor to review.

129(f): **Allegation**: "In May 2016, Marcus omitted to tell investors that MDO had defaulted on a large loan and its creditor could seize and sell MDO's stock of Mozido to satisfy the debt. And he concealed that the investors' holdings were significantly diluted and Mozido's preferred shareholders possessed a nearly $ 1 billion liquidation preference (that is, that the preferred shareholders were entitled to be paid the first $1 billion of value, before other shareholders received anything.)"

**Inaccuracy**: This allegation is about facts *not* communicated by Mr. Marcus to any investor in connection with the May 2016 Exchange Offer.  The documentary record pertaining to the 2016 Exchange Offer makes it clear that Mr. Marcus was not securities counsel and was not charged with creating the terms of this Exchange Offer.  The documentary record shows that he was neither expected to, nor asked to, say anything to investors.  Indeed, no factual allegation establishes that Mr. Marcus was under a duty to speak up, and contradict the disclaimers contained in the transaction documents prepared

by retained securities counsel.  No factual allegation shows that Mr. Marcus was in communication with any investor about any remotely related subject and failed to make these disclosures.  In short, without a complete distortion of the documentary record, the SEC alleges and can allege no facts that support this claim.

Beyond the utter failure to tie this allegation with any known fact, and the SEC's pattern in this case of knowingly distorting the documentary record, the foregoing claim is preposterous.  SEC handwringing about a $1 billion liquidation preference is entirely meaningless.  As a stand-alone statement, it fails to disclose anything.  There is nothing inherently bad about a liquidating preference.  This is a central feature of a preferred equity security, and there is nothing inherently bad about a preferred equity security.  Preferred equity securities are issued when financial investment is made.  There is nothing inherently wrong with this, or harmful to anyone.  True, common equity holders are subordinate in liquidation to preferred equity holders, but the common equity holders reap the benefit of preferred investment into the enterprise.  The SEC knows all of this.  What we have here is yet another effort by the SEC to deceive the Court – this time to deceive the Court into believing that some king of fraud is inevitably implicated by a preferred equity investment carrying a liquidation preference.  This is nonsense, and dishonest.  It cannot be tolerated.

## **<u>CONCLUSION</u>**

For the reasons discussed above, the Complaint is seriously and intentionally misleading in general and in particular as to Mr. Marcus.  The SEC knew or should have known that before filing the Complaint – after all, the SEC possessed the very documents which belie its allegations.  Moreover, the SEC knows that its assertions of fraud, inferred from the

44

documentary record, are nonsense, and made for no purpose other than to deceive the Court. The Complaint necessarily violates Rule 11 because it is based on facts that the SEC knew, or should have known, contradicted its claims.

This is not a case in which isolated unfounded allegations can be "withdrawn or appropriately corrected." Fed. R. Civ. P. 11(c)(2). In its entirety, the Complaint against Mr.Marcus is unfounded, and based on deception, which has now been exposed by revealing the documentary record that the SEC had in its possession, and knowingly concealed from the Court. Mr. Marcus respectfully requests that the Court issue an Order sanctioning the SEC and its attorneys, including dismissal with prejudice of the Complaint in its entirety against Mr. Marcus, requiring the SEC and/or its attorneys' to reimburse Mr. Marcus for his attorneys' fees and costs in defending against the Complaint, reporting the SEC's conduct to appropriate bar authorities, and ordering such other and further relief as the Court deems appropriate. These sanctions are necessary not only to do justice to Mr. Marcus, but to sanction those responsible for knowing deception, and to preserve the integrity of this Court.


Dated: October 14, 2020                           /s/ Stephen G. Grygiel
                                                  Stephen G. Grygiel (ME Bar 003427)
                                                  Grygiel Law, LLC
                                                  301 Warren Ave., #405
                                                  Baltimore, MD 21230
                                                  407-505-9463
                                                  410-617-8945 (fax)
                                                  stephengrygiel22@gmail.com

## <u>CERTIFICATE OF SERVICE</u>

I, Stephen G. Grygiel, hereby certify that on this 14th day of October, 2020, I caused the foregoing ***Motion And Incorporated Memorandum Of Law Of Defendant George J. Marcus Under Fed. R. Civ. P. 11 for Sanctions*** to be served by electronic mail to all counsel of record for all parties.

Dated: October 14, 2020                    /s/ Stephen G. Grygiel
                                           _____
                                           Stephen G. Grygiel, Esq.
                                           *Counsel for Defendant George J. Marcus*