## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

SECURITIES AND EXCHANGE COMMISSION,

          Plaintiff,

   v.

MICHAEL A. LIBERTY; BRITTANY LIBERTY;
PAUL HESS; RICHARD LIBERTY; GEORGE MARCUS,
ESQ.; MOZIDO INVESCO, LLC; FAMILY MOBILE,
LLC; BRTMDO INVESTMENTS, LLC; BRENTWOOD
FINANCIAL, LLC; and, TL HOLDINGS GROUP, LLC,

          Defendants,

   and

XANADU PARTNERS, LLC,

          Relief Defendant

Case No. 2:18-cv-00139-JBL

## OPPOSITION TO DEFENDANT MARCUS'
## MOTION FOR IMPOSITION OF SANCTIONS

The Commission opposes Marcus' motion for sanctions.  Despite 45 pages of heated rhetoric attacking the integrity of the Commission and its attorneys, Marcus fails to disprove even one of the Commission's allegations, let alone establish that such allegations were so baseless as to justify dismissal or sanctions.  As the Commission demonstrated in its opposition to Marcus' Rule 12(c) motion and demonstrates further below, its allegations are based on sound legal principles and an ample record, well exceeding the Rule 11 standard.

Marcus' motion rehashes his Rule 12(c) arguments, arguments which have no place in a Rule 11 motion.  A Rule 11 motion should not:

> requir[e] a district court to analyze the reasonableness of legal and factual contentions that it would otherwise not have to ascertain … not invite full-scale satellite litigation in the area of sanctions, nor … require district

> courts to spend valuable judicial resources in punctiliously analyzing the
> reasonableness of each and every legal and factual contention made by a
> party where, as here, such analysis is not necessary to resolve the merits of
> the central claim in dispute.

*CQ Intn'l Co. Inc. v. Rochem Intn'l, Inc., USA*, 659 F.3d 53, 62 (1st Cir. 2011).  Yet, that is

exactly what Defendant Marcus and his counsel have filed—a no-holds-barred attempt to drag

the Court into an adjudication of the merits of the Commission's complaint.  That attempt is

based on little to no record, except Marcus' unsworn assertions (after refusing to testify under an

assertion of his Fifth Amendment rights) and his contested interpretation of certain transaction

documents.  To be sure, Defendant Marcus has adorned his Rule 11 Motion with many

expressions of moral indignation.  But, in the end, his Motion merely asserts that he has a

defense to the allegations, and concludes from that fact that the Commission must have acted

improperly to have accused him in the first place.  One certainly does not follow from the other,

or every unsuccessful plaintiff would be sanctionable.

    To make matters worse, in their rush to accuse the Commission and its attorneys, Marcus

and his counsel failed to correct even basic errors in their motion (such as inaccurately

summarizing records in an exhibit to the Court), despite the Commission notifying them of the

problems before they filed.  For these reasons, and others below, Marcus' motion should be

denied.

## I.      FACTUAL BACKGROUND

### A.  Summary of Allegations

    From 2010 to 2018, Marcus, Michael Liberty ("Liberty"), and the other Defendants,

tricked investors into believing that they were funding a fast-growing financial technology

startup called MDO, LLC (originally named Mozido, LLC) and induced them to buy or retain

securities in connection with six fraudulent unregistered securities offerings.  *See* Complaint,

Docket No. 1, ¶135 ("¶__").[1]  The Complaint charges that, in truth, Liberty, Marcus, and the other defendants were fundraising for their own personal benefit.  ¶¶1, 18, 45, 48, 95, 98, 108.  To defraud investors, Defendants inserted shell companies between MDO, which desperately needed cash for its operations, and investors who sought to invest in MDO.  ¶¶2, 44, 95. Liberty's shell companies bought equity interests in MDO cheaply based upon MDO's actual valuation.  ¶¶68(a), 85(c), 107(c,e), 118.  Masquerading as MDO's fundraisers, Defendants then lied to investors about the value of MDO so they could grossly inflate the price of the securities they sold to investors.  ¶¶45, 46(a,c), 83, 95, 107.  The fraudulent securities offerings raised approximately $50 million; Defendants diverted more than $33 million for themselves, and Marcus received fees from the proceeds.  ¶¶18, 91, 114, 145.

### B.  The Commission's Investigation

The Commission built its Complaint on a solid investigatory record drawn from document subpoenas (including to Marcus' law firm), extensive review of those documents, interviews of potential witnesses, and investigative testimonies.  As part of the investigation, the Commission took Marcus' testimony, asking him detailed questions about the fraudulent scheme and the facts that underpin specific allegations in the Complaint.  In response to every one of these questions, Marcus invoked his Fifth Amendment right not to be a witness against himself and refused to answer.  *See* Ex. 2 (Investigative Testimony of George Marcus (Jan. 18, 2018)).[2]

---

[1] The Commission incorporates herein by reference its arguments and discussions of facts from its Opposition to Marcus' Motion for Judgment on the Pleadings.  Dkt. No. 92.

[2] Marcus' Fifth Amendment concerns appear well-founded.  In the indictment charging Defendants Liberty and Hess with conspiracy to commit wire fraud, wire fraud, securities fraud, conspiracy to commit money laundering (Liberty only), and money laundering (Liberty only), Marcus is the unindicted co-conspirator described as "Individual-1."  *See United States v. Liberty*, 2:19-cr-00030-GZS (Dkt. No. 1, Indictment); *United States v. Liberty*, No. 2:19-cr-00030-GZS, 2020 WL 5540193, at *1 (D. Me. Feb. 12, 2020) (identifying Marcus as "Individual-1" in order abrogating claimed attorney-client privilege between Liberty and Marcus under the "crime-fraud exception").

## II.    LEGAL STANDARDS

Fed. R. Civ. P. 11(b)(3) requires a pleading's "factual contentions" to "have evidentiary support" or a "likely" prospect of it.  *See Eldridge v. Gordon Brothers Grp., LLC,* 863 F.3d 66, 87-88 (1st Cir. 2017).  The Rule does not require "perfect research or utter prescience," *id.* at 88, or that an "investigation into the facts be carried to the point of absolute certainty…." *CQ Inn'l Co.*, 659 F.3d at 63 (*quoting Dubois v. U.S. Dep't. of Agric.*, 270 F.3d 77, 82 (1st Cir. 2001)). Inferences, which are commonly described as "circumstantial evidence," are as capable of providing evidentiary support as "direct evidence."  *See U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714 n. 3 (1983) ("As in any lawsuit, the plaintiff may prove his case by direct or circumstantial evidence.").  Rule 11 merely obligates the plaintiff to act reasonably under the totality of the circumstances.  *Eldridge*, 863 F.3d at 87-88.

Because sanctions can "chill vigorous but legitimate advocacy . . . a judge should resort to [sanctions] only when reasonably necessary—and then with due circumspection."  *United States v. Figueroa-Arenas*, 292 F.3d 276, 279 (1st Cir. 2002).  Even a court's dismissal of a complaint cannot support the imposition of Rule 11 sanctions without something more.  As the First Circuit has noted, "[t]he mere fact that a claim ultimately proves unavailing, without more, cannot support the imposition of Rule 11 sanctions."  *Protective Life Ins. Co. v. Dignity Viatical Settlement Partners, L.P.*, 171 F.3d 52, 58 (1st Cir. 1999).  Rule 11 "is not a strict liability provision – a filer must, at the very least, be culpably careless to get whacked with a sanctions order."  *Eldridge*, 863 F.3d at 88 (citations and internal quotation marks omitted).  "Indeed, to warrant sanctions, it is not enough that the filer's claim lacked merit – it must be so *plainly unmeritorious* as to warrant the imposition of sanctions."  *Zell v. Ricci*, 957 F.3d 1, 19 (1st Cir. 2020) (citation and internal quotations omitted).

Marcus bears the burden of submitting competent evidence that the Complaint's three

4

counts against him are so *plainly unmeritorious* that the Court should sanction the Commission
and dismiss the Complaint with prejudice.  That is a high standard for a very rare sanction, which
is only imposed only in extreme circumstances.  *See Allscripts Healthcare, LLC v. DR/Decision
Res., LLC*, No. 19-cv-11-038, -- F.Supp.3d --, 2020 WL 5821987, at *3 (D. Mass. Sept. 30,
2020).  The court in *Allscripts Healthcare* concluded that no court in the First Circuit has ordered
a dismissal solely on the basis of a Rule 11 motion.  *Id.*

    As described below, Marcus fails to adhere to or even acknowledge these standards, and
fails to provide any proof that the Commission has been culpably careless.

## III.  MARCUS FAILS TO PRESENT A FACTUAL OR LEGAL CASE FOR SANCTIONS

### A.  Marcus' Motion Is Really an Improper Continuation and Repetition of His Rule 12(c) Motion Challenging the Sufficiency of the Pleadings

    The Court should deny Marcus' motion because he uses it for an improper purpose:  to
rehash and extend his Rule 12(c) motion.  A Rule 11 motion is not to be used to "test the legal
sufficiency or efficacy of allegations in the pleadings; other motions are available for those
purposes."  Fed. R. Civ. P. 11, advisory committee's notes to 1993 amendment; *see also* 5A
Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure*, § 1336.3 (Rule 11
motions "should not be used to raise issues as to the legal sufficiency of a claim or defense that
more appropriately can be disposed of by a motion to dismiss, a motion for judgment on the
pleadings, a motion for summary judgment, or a trial on the merits.").

    This case is currently stayed.  Docket No. ("D.") 73.  Marcus moved for relief from the
stay "solely to permit Marcus to file his Rule 12(c) Motion."  D. 75 at 8.  He asked the Court to
extend the page limit to 90 pages, based on his claim that he needed to do a "statement-by-
statement analysis" of the allegations.  *Id*. at 7.  The Court granted Marcus' motion, but allowed
only 40 pages.  D. 81 (granting "solely for the purpose of Marcus filing a motion for judgment

on the pleadings").  Marcus then filed his 40-page Rule 12(c) Motion on September 3, 2020.  D. 82.  Before the Commission could respond to the Rule 12(c) Motion, Marcus served on the Commission this 45-page Motion for Sanctions, containing that previously promised "statement-by-statement analysis" on pages 8 to 44.[3]

Because the sanctions motion largely repeated the arguments from the Rule 12(c) motion, the Commission invited Marcus to delay filing the sanctions motion until after the Court decided his Rule 12(c) motion.  Marcus declined.  The Commission responded by letter on October 13, 2020 (Ex. 1), summarizing some of Marcus's errors of fact and law, including arithmetic errors, misrepresentations of cited documents, and mischaracterizations of the various securities at issue.  But Marcus filed the Motion for Sanctions the next day, acknowledging some of his errors in footnotes, but declining to correct them before filing.[4]

Although cloaked in more strenuous assertions of misconduct this time, Marcus' motion once again: (1) attacks the sufficiency of the pleadings; (2) focuses on certain transaction documents as potentially exculpatory, while ignoring other oral and written statements and fraudulent omissions and ignoring legal precedent holding that boilerplate contract language does not erase fraudulent misrepresentations; and (3) previews his potential defense themes regarding valuation, advice-of-counsel, and intent.  As Marcus covered all of this ground in the pending Rule 12(c) Motion, the Court should deny this motion as duplicative.  *See, e.g.*, *Seeman v. Coastal Envt'l. Grp., Inc.*, No. 15-cv-2065, 2016 WL 7388537, at *7-8 (E.D.N.Y. July 2, 2016) (denying sanctions motion because its arguments were "duplicative" of arguments in its

---

[3] Marcus filed this motion without seeking leave by this Court to do so, and without asking for leave to file a brief in excess of the page limits under Local Rule 7(d), even though, with no deadline to submit this motion, he had ample time to do so.

[4] Including failing to correct obvious errors in the summary exhibit he submitted to the Court, or to recognize the effect of those errors on his assertions in the Motion.

motion to dismiss); *Jawbone v. Donohue*, No. 01–cv–8066, 2002 WL 1424587, at \*6 (S.D.N.Y. June 28, 2002) (denying sanctions motion because defendants' Rule 11 motion arguments were "substantially identical to the arguments made … in support of their motion to dismiss").

As in his 12(c) Motion, Marcus attacks the Commission by asserting that the Commission has failed to plead particularized facts sufficient to support its allegations.  Marcus argues various formulations of this criticism:  "No facts whatsoever describe the nature, dates, places or any other specifics …" (Mot at 9); "The Complaint fails to allege any fact that would support …" (*id*. at 13); "No alleged facts show that Mr. Marcus …" (*id.* at 18); "No facts show that Mr. Marcus …" (*id.* at 20); "No allegation in the Complaint states any fact supporting this allegation" (*id.* at 25); and "the Complaint contains not one fact showing …" (*id.* at 30-31).  In this way, he attacks the sufficiency of the Complaint's allegations at paragraphs 45-46, 46(a), 52, 53, 55, 58, 62(d), 68(b), 71, 100 (failing to attach documents in support), 103, 106, 108, 111(a), 113, 114, 114(b), 114(c), 115, 127, 129, 129(a), 129(e) (failing to attach documents in support), and 129(f).[5]  This criticism of the Complaint is wrong on the merits, for the reasons shown the Commission's opposition to the Rule 12(c) Motion.[6]  *See United Fish Co. v. Barnes*, 627 F. Supp. 732, 734 (D. Me. 1986); (plaintiff must allege circumstances of the fraud, but "is not required to allege 'evidentiary details'…."); *see also SEC v. Collins & Aikman Corp.*, 524 F. Supp. 2d 477, 493 (S.D.N.Y. 2007) ("Rule 9(b) … does not demand that a plaintiff plead every

---

[5] Marcus repeatedly alleges that "no facts show" an allegation in the Complaint to be true.  Because he made this allegation numerous times in his Rule 12(c) Motion, the Commission understands Marcus to be contending that the Commission has not pled sufficient facts in support of a particular allegation.  *See* D. 82 (*passim*) (stating "no facts show" or substantively similar language).  This is an attack on the sufficiency of the pleading and is without merit for the reasons set forth in this Section.  To the extent that Marcus is suggesting that no facts exist anywhere in the Commission's evidence to support its allegations, he is wrong for the reasons described in Section IV.

[6] See generally D. 90 at p. 4 (pleading standards), 8-18 (specific allegations of Marcus' participation in a fraudulent scheme), 19-22 (Marcus' misrepresentations and omissions), 24-25 (Marcus' aiding and abetting), 25-28 (scienter), 28-30 (Marcus' offer or sale of unregistered securities).

fact that forms the alleged violations … a defendant cannot defeat a claim by pointing to facts that are omitted if the allegations as pled meet the requisite standard.").

Rule 11 cannot be used for a second bite at the Rule 12 apple.  These arguments have no bearing on whether the Commission had "evidentiary support" for its allegations under Rule 11(b)(3), and thus are not properly raised in a motion for sanctions under Rule 11.[7]

## B.  Marcus Supports His Motion with Unsworn Claims

In many of the arguments in his Motion, Marcus asks this Court to accept his narrative of what happened or what he was thinking—unsworn and unsupported—as truth, and to sanction the Commission and its attorneys for failing to agree with it.  But unsworn self-serving statements made in briefs through counsel are not evidence, and cannot be used to meet Marcus' burden here.  *Florida v. Georgia*, 138 S. Ct. 2502, 2545 (2018) ("statements in briefs are not evidence"); *Jones v. Fairbank Reconstruction Corp.,* No. 2:11-cv-437-GZS, 2013 WL 6019294, at *3 n.2 (D. Me. Nov. 13, 2013) ("statements by counsel do not provide the Court with evidence of material facts because statements by lawyers are not evidence … admissible at a trial"); *see also* Fed. R. Civ. P. 43(c) ("When a motion relies on facts outside the record, the court may hear the matter on affidavits or may hear it wholly or partly on oral testimony or on depositions.").

Below are a few examples of these self-serving narratives, from a brief replete with them:

- Regarding Mr. Liberty's financial problems, "all Mr. Marcus saw was a substantial flow of funds from investors, investments from Mozido's astute and experienced Board members, and strong interest in Mozido from many sophisticated blue-chip investors." Mot. at 12-13 (about ¶ 52); *see also* Mot. at 30 (about ¶108) (concerning "what Mr. Marcus saw come through his IOLTA account").

-  "Mr. Marcus had no knowledge of any falsity in the [Brentwood Financial] balance sheet – it was not false anyway." Mot. at 25 (about ¶100).

- "Mr. Marcus's opinion that Mr. Liberty had been a 'victim' in the Keystone matter was

---

[7] Rule 11(b)(3) is the only part of Rule 11 that Marcus cites as grounds for his Motion.

an honestly held opinion, contradicted by no facts then available to him – or available now, for that matter." Mot. at 34 (about ¶113).

No evidence currently before the Court supports any of these assertions.[8]

What is instead before the Court is Marcus' refusal to answer questions about many of the allegations he now contests.  For instance, when Marcus was asked, under oath, what he saw from the IOLTA account, Marcus asserted his Fifth Amendment rights to questions such as:

> "You knew that millions of dollars were being transferred into the Marcus Clegg IOLTA account as proceeds of the sales of securities of BRTMDO and Brentwood Financial in the fall of 2012, correct?" Ex. 2 at 66:6-9;

> "You knew that the proceeds from the Brentwood Financial offering was not used for working capital of Brentwood Financial, correct?" *Id.* at 67:15-17;

> "You knew at the time that the proceeds from the Brentwood Financial offering had been used by Mr. Liberty for his personal benefit, correct?" *Id*. at 72:1-3.

On whether Marcus knew parts of Brentwood Financial balance sheet were false, Marcus' asserted his Fifth Amendment rights to each of these questions:

> "In August 2012, you sent to an attorney for an investor a balance sheet for Brentwood Financial, correct?"

> "That balance sheet for Brentwood Financial stated that it had an investment in MDO, correct?"

> "You knew at the time that Brentwood Financial was not invested in MDO, correct?"

> "You knew that MDO had not issued any convertible promissory notes to Brentwood Financial, correct?"

> "You knew at the time that Brentwood Financial had not acquired preferred units of MDO in accordance with any investment contracts, correct?"

> "You knew the balance sheet was false when you sent it to the attorney for the investor, correct?"

---

[8] To be clear, the Commission does not believe these statements are true, and will refute them at a later stage in the litigation if necessary.

*Id.* at 62:4-62:25 (excerpts).  To be clear, the Commission does not question Marcus' right to assert his privilege.  But he may not turn around now and assert facts through his counsel.[9]  And he may not simply ignore the adverse inference the Commission was entitled to draw in forming its allegations, and that the Court may draw in deciding those allegations are well-founded.  *See SEC v. Andrade*, 157 F. Supp. 3d 124, 129 (D.R.I. 2016) (in denying motion to dismiss, "the Court may and does consider Defendants' invocation of the Fifth Amendment in conjunction with the rest of the SEC's allegations").

### C.  Marcus Claims No Evidence Exists to Support the Complaint, When He Doesn't Even Have the Evidentiary Record

As in his Rule 12(c) Motion, Marcus repeatedly claims that the "documentary record" fails to support the Commission's allegations (*e.g.*, Mot. at 6) and that the Complaint does not contain the evidence to prove each allegation.  In this way, Marcus suggests there is no evidentiary support for the allegations in Complaint paragraphs 43, 45, 46, 46(a), 52, 55, 68(b), 71, 111(a), 114, 114(b), 127, 129, 129(a), and 129(e).  Marcus hopes to draw the Court into a factual dispute for which there is no developed record.

Discovery in this matter has been stayed, and therefore Marcus has neither propounded document requests nor received a production of documents from the Commission's investigation files.  So the "documentary record of the case" that Marcus refers to is not the thousands of records, along with witness interviews and sworn testimonies, obtained by the Commission in the course of its multi-year investigation.  Instead, it is just an ill-defined and misleading shorthand for whatever documents Marcus claims happens to possess.  That Marcus may not possess documents supporting certain allegations at this pre-discovery stage of the litigation does

---

[9] In fact, one reason this Court stayed this proceeding was the difficulty of litigating this case amidst both self-incrimination concerns and attorney-client privilege issues. D. 73 at 5.

not establish that the Commission lacked evidence to support the allegations.

Beyond a handful of transactional documents and a bank account ledger referenced in the Complaint—documents he has misconstrued, as discussed below—Marcus has offered no actual *evidence* that the complaint allegations lack evidentiary support.  As the moving party, Marcus bears the burden to prove the predicate facts giving rise to the Rule 11 violation.  *See e.g., Anaqua, Inc. v. Schroeder*, 12-CV-10710, 2014 WL 1795310, *3 (D. Mass. May 5, 2014); *see also Rodick v. City of Schenectady*, 1 F.3d 1341 (2d Cir. 1993) (ruling that all doubts resolve in favor of non-moving party on a Rule 11 motion).  But nowhere does in his motion and memorandum does Marcus even acknowledge that he has this burden.  He simply ignores it.  Marcus moved under Rule 11(b)(3), so Marcus must show that the Complaint's allegations lack evidentiary support by introducing affirmative evidence into the record to show the Commission did not have had evidentiary support when it filed the Complaint.  His mere disagreement with the inferences the Commission draws from the evidence, or the Commission's interpretation of the evidence, does not satisfy his burden or give rise to a Rule 11 violation.  *Biomedino, LLC v. Waters Corp.*, No. C05–0042L, 2005 WL 2211374, 1, 2005 U.S. Dist. LEXIS 33629, 4–6 (W.D. Wash. Sept. 9, 2005) ("that defendant and its expert disagree with plaintiff's proposed interpretation [of the patent-in-suit] ... does not establish that plaintiff's claims are frivolous or legally unreasonable").

Marcus uses his Rule 11 motion, in effect, to force the Commission to answer contention interrogatories, suggesting that unless the Commission identifies documents that support each allegation in the Complaint, it should be sanctioned.  A Rule 11 motion, however, "should not be employed as a discovery device … other motions are available for those purposes."  Fed. R. Civ. P. 11, 1993 advisory committee notes.

Marcus wants to draw the Court into an adjudication of the merits of the complaint before discovery has even started.  *CQ Intern. Co.*, 659 F.3d at 62 (R. 11 motion not for that purpose).  The First Circuit has stated, however, that courts "should, and often do, defer consideration of certain kinds of sanctions motions until the end of trial to gain a full sense of the case … [t]his is a sensible practice where the thrust of the sanctions motion is that institution of the case itself was improper."  *Lichtenstein v. Consol. Servs. Grp., Inc.*, 173 F.3d 17, 23 (1st Cir.1999); *see also* Fed. R. Civ. P. 11 advisory committee's notes on 1983 Amendment ("it is anticipated that in the case of pleadings the sanctions issue under Rule 11 normally will be determined at the end of the litigation").  The reasoning in *Lichtenstein* applies here.  At this stage of the litigation, the Court does not have the benefit of the case's normal factual development through summary judgment or trial.  The Court should not accept Marcus' invitation to adjudicate the merits of this case based on the very limited evidence he has submitted.

While the Court need not, and should not, accept Marcus' invitation to pre-try this case, the Commission submits with this filing a detailed appendix, to allay any concerns about whether a factual contention in the Complaint challenged by Marcus has evidentiary support.  Appendix 1 is a table listing examples of evidentiary support, citing materials previously filed with the Court as exhibits and additional exhibits (Ex. 2-56) filed along with this opposition.  The listed evidence is, of course, neither complete nor exhaustive.  Nor does it account for interviews and testimony that discuss Marcus' conduct, the adverse inferences that can be drawn from Marcus' Fifth Amendment assertion, and a privilege log produced by Liberty that establishes Marcus' involvement in many of the transactions discussed in the Complaint.  Instead, it provides a sample of the documentary evidence for instances where Marcus erroneously claims that "no facts in the documentary record show" or that "no facts show" something the Commission

alleged to be true.

IV.  **MARCUS MISREPRESENTS THE DOCUMENTS HE SAYS UNDERMINE THE COMPLAINT'S ALLEGATIONS, AND IGNORES OTHER DOCUMENTS THAT DISPROVE HIS ASSERTIONS**

Marcus repeats his Rule 12(c) argument that a handful of documents referenced in the Complaint somehow disprove the Commission's central allegations against him.  The Commission refuted this claim in its opposition to the Rule 12(c) Motion.  *See* D. 90 at 22-24 (disclaimers and anti-reliance clauses in offering documents); 34-36 (IOLTA records); 38-40 (MDO's Amended Operating Agreement).  Here, the Commission will focus on Marcus's misrepresentations of the documents on which he relies, starting with his claim that his IOLTA account records show that he was unaware of any diversion of the investor funds that Liberty routed through that account.

**A.  Marcus Misrepresented the Content of His Own IOLTA Records**

Marcus argues that the Commission should be sanctioned because it either did not read Marcus Clegg's IOLTA records or misrepresented them in its Complaint.  Marcus says it was impossible for him to have known that Liberty was diverting Brentwood Offering funds as alleged because:  (1) the IOLTA records constituted the only information Marcus had about the disposition of the investor funds (*e.g.*, Mot. at 30); and (2) his IOLTA account records showed approximately $19 million received from investors and $22 million transferred to MDO, which, he claims, show funds went where they were supposed to go.  *See, e.g.*, Mot. at 8 (discussing ¶10), 9 (discussing ¶43), 30-31 (discussing ¶108), and 35-36 (discussing ¶¶114, 114(b)).

Marcus' first argument is false.  It ignores other documents that show that Marcus knew Liberty was taking large amounts from the funds he supposedly raised for MDO.  For instance, in an email exchange with MDO Executive Chairman Richard Braddock, Marcus tried to justify Liberty's self-dealing through his "fundraising."  D. 82-12 (Marcus:  "it is entirely reasonable for

[Liberty] to cap the upside at some place below his upside");[10] *see also* Ex. 33 (copying Marcus in discussion of Liberty's efforts to "enrich himself" through the fundraising).  And, Marcus ignores what the transactional records show.  The documents from the November 2013 asset sale show only $13.4 million attributed to MDO from Brentwood Financial and BRTMDO for convertible notes.  D. 82-9 at 521-2, 525-6.  Even if the IOLTA account had received only $19.4 million of the $31 million in investor money (which was not true, as shown below), Marcus knew in November 2013 that only $13.4 million of it went to MDO for convertible notes, and that Liberty had pocketed nearly $6 million.[11]

Marcus' second argument about the flow of funds is knowingly false too; the summary exhibit he relies on inaccurately summarizes the evidence.  In that summary (D. 82-8), Marcus overstates the amount of money that was disbursed from his IOLTA account to MDO by at least $4.7 million.  The source of the error:  Marcus appears to have added an extra zero to one transaction, describing a $500,000 wire transfer to MDO as a $5 million wire.  Marcus also appears to have transposed two digits in another wire transfer, leading him to report an additional $200,000 in transfers to MDO that never occurred.  Just based on these errors (and there are others discussed below), Marcus' summary shows a $3.2 million surplus, when it should show at least a $1.47 million deficit in investor funds transferred to MDO.

Marcus' summary exhibit also includes "amounts disbursed from IOLTA account to Mozido" totalling $7.5 million that: (1) did not come from investors in the Brentwood Financial Offering; and (2) occurred years after the Brentwood Offering.  Marcus ignores these

---

[10] In this email, Marcus also threatens that Liberty will remove Braddock and three other board members, if the Board even raises the possibility of Liberty's removal for self-dealing.

[11] Moreover, Marcus totally ignores the many red flags on the face of those IOLTA records – red flags like the millions of dollars that Marcus wired to Liberty's family members and Liberty-controlled entities.

inconvenient facts, which reduce the Brentwood investor money sent to MDO to about $10.4 million (i.e. a little more than *half* of the more than $19.4 million Marcus says he received from investors from September 2012 through November 2013).  D. 82-8, at 2.  This deficit is consistent with the allegations in the Complaint that large amounts of investor funds were diverted to Liberty after they reached Marcus' IOLTA account, and that Marcus was aware of that fact.  The Commission informed Marcus of these summary exhibit errors in its October 13, 2020 letter.  *See* Ex. 1 at 2-3.  Instead of correcting the errors, Marcus ignored them, filing a motion that repeatedly misrepresented the contents of his own exhibit.  *See, e.g.*, Mot. at 8, 9, 27, 30, 35-36.  Marcus' failure to correct his own numbers cannot be squared with his attempt to chastise the *Commission* for failing to draw the same conclusions he does from the IOLTA records.  *See* Mot. at 8.  The Commission presumes that Marcus' initial errors in summarizing the IOLTA records resulted from a simple mistake.  But he deliberately filed those inaccuracies after the Commission pointed them out.  And yet he continues to impugn the Commission's good faith and candor.

Since the Commission's October 13 letter, Commission counsel has identified further errors in Marcus' summary exhibit.  The Brentwood Exchange Offer records, which Marcus received, show that BRTMDO and Brentwood Financial raised more than $31 million from investors (Ex. 49).  But Marcus' summary only reflect $19.4 million.  The exhibit simply leaves out some of the investor contributions that appear in the IOLTA and bank records.  The bank records show, for instance, that in September 2012, an additional $2.85 million came from investors for investments in Brentwood Financial.  But Marcus' summary makes no mention of those investments, which further undermine his argument that he was somehow unaware of the extent to which Liberty was pocketing investor money.

Accurately summarized, the IOLTA records do not show what Marcus says they do. These records, together with the email and records discussed above and other emails and financial records from that time, show that the allegations about Marcus' IOLTA account and his knowledge of the scheme—including Marcus and Liberty's diversion of fundraised investor dollars to Liberty's personal expenses—are supported by evidence.

**B.    Marcus Mischaracterized the Evidentiary Support for the Allegations about Transfer Rights under MDO's Amended Operating Agreement**

As in his Rule 12(c) motion, Marcus claims there was no evidentiary basis to allege that transfers of MDO interests violated of the MDO Amended Operating Agreement (the "Agreement"). D. 82 at 11-12; Mot at 11, 19-20, 24, 31, 36-37. Marcus claims that all transfers were authorized by the Agreement, and claims that as a result, no evidence existed to support the Complaint allegations at paragraphs 49, 63(a), 88, 109(a), 115. The Commission refutes this claim in full in its Rule 12(c) opposition. D. 91 at 38-40.

Simply put:  Marcus focuses on *one* transfer and ignores all the others that violated the Agreement. Mot. at 11-12. Marcus knew the Agreement restricted the transfer of units from Mozido Investments to Mozido Invesco (and, importantly, from Mozido Invesco to investors), because Marcus himself negotiated it. D. 82-15, at §15.2. Marcus does not contest that transfers by Mozido Investments to Mozido Invesco after the initial 120 units in 2010 or that transfers by Mozido Invesco to investors violated the Agreement.

In particular, the Complaint properly alleges that the September 10, 2010 transfer of units from Mozido Investments to Mozido Invesco, through an instrument that was backdated to reflect an "effective date" of August 26, 2010 (i.e. the day before the Agreement took effect (D. 82-15 at 2), violated the Amended Operating agreement. *See* D. 82 at 38-40. In his Rule 12(c) reply brief, Marcus has the temerity to suggest to the Court—albeit without any evidentiary

16

support—that the agreement transferring the 120 units was "executed and delivered on August 26, 2010." D. 93 at 14.  This representation is false.  The draft agreement was not even presented to one of the parties to sign until August 27, 2010.  *See* Ex. 4 (email from Abbass to Denney, dated August 27, 2010, attaching unsigned draft for signature).  Whatever legal arguments might be made about the operation of an instrument that purports to be effective on an earlier date, the facts amply support the allegations.

In the same vein, Marcus repeats his Rule 12(c) arguments that no evidence existed to support the allegations that the Brentwood Offering violated the Agreement.  *See* Mot. at 24-25, 27-28, and 31 (claiming no basis for Complaint allegations at ¶¶ 106, 109(a)).  Marcus claims "no restriction applied to the transfer of MDO preferred membership units."  Mot. at 27-28.  The amended operating agreement, however, restricts transfers of those units unless a prescribed process was followed.  *See* D. 82-15, § 6.1(b).  The reasonable inference is that Liberty, Marcus, and the other Defendants avoided satisfying the requirements of Section 6.1(b) of the Agreement because the required disclosures would have revealed to MDO's backers and Brentwood investors that they were being defrauded.  In any case, Marcus neglects to inform the Court that the notes issued by MDO to Brentwood Financial and to BRTMDO included express terms that precluded assignment or resale.  Ex. 28 at 24100; 29 at 21485.  It appears that Marcus was fully aware of this provision since Marcus himself drafted a MDO board resolution which would have given BRTMDO that authority.  Ex. 23 at 11556.  Even after MDO's Executive Chairman Richard Braddock informed Marcus that Braddock would block the proposed resolution, Marcus still reassured an investor that he expected MDO's board would approve the resolution.  Exs. 33 ("I am not going to [sign agreements/Resolution], and of course I forbid anyone in the company to do so."); 23 at 11511 ("[Board Resolution] in circulation now and should be available

shortly").  The Board never did, and the Brentwood Offering remained unauthorized.

### C.  Marcus' Email Exchange with Braddock Supports the Complaint's Allegations

Marcus argues at length that the Commission violated Rule 11(b)(3) with its allegations

in Complaint paragraph 118 concerning his email exchange with MDO's Executive Chairman

Richard Braddock.  In paragraph 118, the Complaint alleges that Marcus represented in an email

to Braddock:

> that Liberty had only raised funds 'from investors in his circle of friends.'
> Marcus also claimed that the investors were 'universally accredited,
> sophisticated and fully aware of the existence of the spread…Marcus
> falsely claimed that all BRTMDO and Brentwood Financial investors had
> been told that Liberty acquired MDO units at a $25 million valuation and
> sold it to them at a $100 million valuation.  Marcus lied:  the Mozido
> Invesco and Brentwood Offerings had included unaccredited and
> unsophisticated investors, most of whom were strangers to Liberty who
> did not know of the spread.  Liberty, Abbass, Marcus, Rick Liberty, and
> Hess suppressed MDO's actual valuations.

In his motion, Marcus accuses the Commission of bad faith in charging that "Marcus lied."  To

support his accusation Marcus provides an unsworn testimonial purporting to describe his

thought processes when he wrote the email and refers to "the documents he had seen,"

documents that are neither identified nor known to the Commission.  Marcus offers neither

affidavits nor documents to support his assertion that he (or others) explained the "spread" in

communications with investors who bought the Mozido Invesco or Brentwood offerings.

The Commission has charged, based on ample evidentiary support (*see, e.g.,* Ex. 19, 20,

and 21), that—contrary to what he represented to Braddock—Marcus had concealed from

investors the critical facts about the valuations of MDO.  For example, on November 2, 2012,

just two months before he wrote to Braddock, Marcus answered questions posed by a potential

investor from Canada.  Ex. 22.  The investor's comments and questions show the investor was

not, as Marcus claimed in his email to Braddock, "fully aware of the spread."  The investor

expressed concern and requested more information about the structure of the investment, which was based upon a $100 million valuation of MDO.  *Id.*  In his answers to the investor, Marcus wrote that "Brentwood owns, directly and indirectly" convertible notes that will "create a fund of [MDO] preferred units, to satisfy conversion rights…"  *Id.* at 2225.  In response to a question about BRTMDO's ability to repay the note, Marcus wrote that "Brentwood's assets are convertible notes of [MDO]."  *Id.*  Both these statements were false.  BRTMDO did not possess any MDO convertible notes then.  *See* D. 82-9 at 17-18 (listing notes and dates).  Marcus explained that if MDO succeeds, the investor would be able to convert into MDO equity, and if MDO does not succeed, then the investor has Liberty's personal guaranty.  Ex. 22 at 2224.  After receipt of Marcus' answers, the investor and his group decided to invest and forwarded the money in tranches to Marcus' IOLTA account.  *See* D. 82-8, at 276-79, 281, 284.  In all of his answers, Marcus never disclosed that Liberty was acquiring the same MDO equity at one-fourth the valuation.  Marcus never disclosed the "spread."  The same is true for all his communications with investors, including those in which he declared that MDO's valuation was $100 million "today."  *See*, *e.g.*, Ex. 19, 20, and 21.

More evidence supporting the Commission's allegation that Marcus suppressed MDO's actual valuation is found an email Marcus sent in July 2013.  Marcus sent an investor a copy of a note issued to BRTMDO by MDO on June 11, 2013 in an apparent effort to reassure the investor that BRTMDO possessed preferred units.  Ex. 21.  The copy of the note, however, had been altered to "white-out" or eliminate the price BRTMDO would pay to convert the note into MDO units.  *Compare id.* at 24077 *with* Ex. 28 at 24098.  The whited-out information would have revealed that BRTMDO's conversion price was only $0.018 whereas BRTMDO charged investors the "spread" price of $0.062.  D. 82-4 at 88 (BRTMDO note to an investor, dated May

7, 2013).  The reasonable inference is that Marcus (or someone at his direction) knowingly suppressed the price (and thus MDO's true valuation) by altering the pdf.

Marcus also accuses the Commission of acting unreasonably by not quoting the entirety of his email to Braddock because, he contends, the unquoted language supports his defense that he relied on other "securities counsel" regarding the legality of Liberty's fundraising.  Even assuming there's any substance to this purported defense, "Rule 11 normally does not require one party to uncover and set forth the facts that support the other side's position."  *Navarro-Ayala v. Hernandez-Colon*, 3 F.3d 464, 467 (1st Cir. 1993); *cf. Cont'l Air Lines, Inc. v. Grp. Sys. Int'l Far East, Ltd.*, 109 F.R.D. 594, 598 (C.D. Cal. 1986) (Rule 11 does not impose general duty to call all important facts to court's attention).  Marcus cites no precedent to the contrary, yet he asks this Court to sanction the Commission for not pleading how he says it should plead.  The Commission did not act unreasonably or deceive the Court by not including language from Marcus' email about a discussion with counsel.  It did what a pleading party is supposed to do; it filed a Complaint that outlines the facts that support its case.  The contention that the Commission was somehow required to anticipate Marcus' defense seems particularly misplaced in light of his claim that he is not asserting an advice of counsel defense.  Mot. at 5 n.4.

Marcus is also being disingenuous about the language not quoted from his email.  Marcus did write to Braddock that "Michael's fund raising program has been blessed by competent securities counsel and is in compliance with the law."  But when he wrote that to Braddock in 2013, Marcus knew that counsel at Morse, Barnes-Brown, Pendleton and at Lowndes Drosdick, two of the "highly qualified securities counsel" he says he relied upon, had concluded that the Mozido Invesco Offering was not in compliance with the securities laws.  *See* Exs. 55, 56.  This is predictable since Mozido Invesco conducted *two* rescission offers, which are often attempts to

cure securities law violations.  Unwilling to represent the co-defendants, Lowndes Drosdick withdrew from representing Mozido Invesco in 2012.  Ex. 56.  In its withdrawal notice addressed to Liberty, the firm wrote, "when [we] met with [Abbass] and you last December at our offices we explained that if Mozido Invesco, LLC continued to sell notes after the [second] rescission offer it would be in violation of the securities laws." *Id.* at 1.  After Liberty forwarded the notice to Marcus, Marcus called Lowndes Drosdick and they told him that "the firm had lost confidence that they were getting the whole or accurate story." *Id.*  Despite learning from two sets of "securities counsel" that the Mozido Invesco Offering violated the securities laws, Marcus and the other co-defendants conducted the Brentwood Offering in the same manner.  The upshot here is that Marcus now asks the Court to sanction the Commission for not quoting more of the lies he made in his email.  All while testifying via brief that that he "had no knowledge about any securities violations when the Mozido Invesco Offering was made."  Mot. at 18.

Marcus counters the Complaint's quotes and descriptions of his emails to investors about dilution, the triple liquidation preference, and valuation by either proffering alternative interpretations on his communications or trying to misdirect the Court to language in his emails unrelated to the allegations.  Mot. at 12 (unrelated "percentage dilution"), 33 (assuming investor could not have been misled by triple liquidation explanation); 41-42 (inference from quote concerning "Effective Preferred Unit Price").  Marcus, however, does not claim the Commission misquoted an email or fabricated an email that he did not in fact send.  The inferences Marcus proposes the Court draw from his emails do not change the words he wrote, nor prove that the Commission's inferences are so irrational or unreasonable to have been alleged in bad faith.  *See also* Dkt. No. 92 at 21 (discussing triple liquidation preference).

## V.     MARCUS' MOTION ASSERTS TRIAL DEFENSES AND NARRATIVES, NOT A CAUSE FOR SANCTIONS

In large part, Marcus' motion simply asserts defenses to the allegations—it offers no evidence that the Commission's allegations themselves lack evidentiary support or were made frivolously.  Marcus asks the Court to side with him on his interpretation of the evidence, and to sanction the Commission for not agreeing with him.  No Rule 11 motion can rest on such grounds.  While a full presentation of the applicable case law and the Commission's evidence concerning the points below will wait until the appropriate time (summary judgment or trial), the Commission here shows how Marcus' trial defenses fail to establish that the allegations are without support or otherwise improper.

### A.     Disclaimers and Anti-Reliance Provisions of Transaction Documents Fail to Prove the Complaint Allegations Lacked Evidentiary Support

Marcus repeats his Rule 12(c) claims that various anti-reliance provisions, integration clauses, and disclaimers contained in the transaction documents shield him from liability for any of his misrepresentations and omissions, and further disprove that Marcus was aware of any diversion of investor funds.  *See* Mot. at 22 (disclaimer of reliance in Exchange Offer), 23-24 (conversion rate disclaimer), 27 (anti-reliance clauses in Brentwood Offering); 28-29 (same); 30-31 (use-of-funds clauses in Brentwood Offering); 35-36 (use-of-funds clauses in Brentwood Offering); 41-42 (disclaimers in Brentwood Exchange Offer).  Based on these contract clauses, Marcus challenges the evidentiary basis for allegations in Complaint paragraphs 106, 107(d), 107(f), 108, 114(b), 114(c), 129(e).

As the Commission explained to Marcus first in its October 13, 2020 letter, and again in opposition his Rule 12(c) Motion, such boilerplate clauses do not confer a license to lie, and they certainly do not negate well-pled allegations that Marcus repeatedly misled investors with specific misrepresentations and omissions.  *See generally*, D. 90 at 22-24; Ex. 1 at 2.  Nor do

representations that the investor funds would be used, for example, "solely to fund the general working capital needs of the Issuer" (D. 82 at 6-7 (collecting provisions regarding use of funds in transaction documents)), confer a license to give away investors' money to Liberty's family and friends or to spend it to fund Liberty's lifestyle.

Marcus has since pivoted to a new claim.  He now contends that the provisions in the transactions documents "go directly to Mr. Marcus's understanding of the underlying transactions, his 'scienter,' and the lack of a good faith basis for alleging intent to defraud." Mot. at 9 n.7.  Marcus is of course entitled to argue he lacked.  But simply asserting that position does not prove that the Complaint allegations lack evidentiary support.  The Commission has charged Marcus with participating in a fraud scheme in which he drafted, reviewed, and approved many of these transaction documents, knowing that they contained material misrepresentations and omissions.  The Commission has also charged that Marcus himself misled investors and assisted others in doing so.  Whether Marcus "relied" on the documents he drafted in the manner he suggests is, at best, a factual dispute that Marcus improperly asks the Court to resolve in his favor under Rule 11.

### B.  Marcus' Narrative About the Wellington Investment Does Not Prove the Allegations About the Asset Sale Lack Evidentiary Support

Marcus fixates on what he has termed the "Wellington transaction Fraud."  *See* 12(c) Reply Br. at 2.  He labels it a "basic building block of the Complaint."  *Id.*  Marcus argues for sanctions on the basis of his contention that the Wellington's investment documents show the "knowing falsity of the Complaint's allegation that the Wellington investment somehow cheated other investors …."  Mot. at 6.  This contention is simply misplaced.  Not a single line in the complaint alleges the Wellington investment cheated investors.

The Complaint does allege pertinent facts about MDO's asset sale to Mozido, Inc. and

the related omissions about that asset sale at the time of the Wellington investment.  Those

omissions by Marcus and the other Defendants concern the impact of the restructuring and

MDO's *relative* position in the Mozido enterprise.  *See* ¶¶120-121.  Marcus does not try to prove

that these allegations lack evidentiary support.  Nor could he.  *See* D. 82-9 at 436, 442-43, 512,

520-22, 525-28; D. 82-10 at 695-98.  There is, in short, nothing to suggest any inaccuracy—let

alone bad faith—in the Commission's allegations about the asset sale (or in its reference to the

Wellington investment in Mozido).

### C.  The Presence of Securities Counsel Does Not Shield Marcus from Liability or Prove that Any Allegation in the Complaint Lacked Evidentiary Support

In his motion, Marcus claims that the Commission violated Rule 11 by failing to allege

that during some of the fraudulent offerings other "securities counsel" was present or involved.

*E.g.*, Mot. at 4-5, 16-17, 19, 21-22, and 43-44.  He claims the Commission somehow deceived

the Court by silently casting him as "securities counsel" in the scheme.  Marcus misconstrues the

allegations.  The Complaint does not label him as "securities counsel," whatever Marcus

significance Marcus may attribute to that term.  Instead, the Complaint alleges what *Marcus did*,

such as draft the offering documents in both initial offerings (Mozido Invesco and Brentwood),

communicate with investors, and structure offerings.  These allegations have evidentiary support.

*See*, *e.g.*, Ex. 45.

It is not clear precisely what Marcus' legal position is.  He contends that he is not relying

on an advice-of-counsel defense (Mot. at 4) while arguing that his reliance on counsel somehow

vitiates any showing of scienter.  Mot. at 5, 21 ("other, highly qualified securities counsel did

that work, and Mr. Marcus relied on them"; Marcus "relied upon advice from securities

counsel").  In any event, legal arguments about whether the presence of other counsel is

significant are not the stuff of Rule 11 motions.  Nothing in Marcus' contentions supports a

claim that the Commission's factual allegations were made in bad faith.

Whether "securities counsel" was involved or not does not change what Marcus allegedly did.  For example, the Complaint alleges that in April 2016, Marcus and others "caused Liberty's tax accountant to email solicitations of the Brentwood Exchange Offer to investors, for which the tax accountant received remuneration."  ¶127.  That other counsel may have been involved does not change this.  An email that Marcus sent in April 2016 to tax accountant Dave Erb, shows that Marcus edited the Brentwood Exchange Offer after speaking with Abbass and Jeff Knetsch, a "securities counsel" at the Brownstein Hyatt.  Ex. 46; *see also* Exs. 47, 48 (emails between Marcus, Abbass, and Erb planning and executing Brentwood Exchange Offer).  Marcus then sent the revised notice to Erb and directed him to send the offer to investors.  *Id.*  The emails support the factual contention in Complaint paragraph 127 about Marcus' role. [12]

Similarly, Marcus' actions with respect to the two rescission offers do not change if the law firms are specifically described (the firms Morse Barnes-Brown, Pendleton and Lowndes Drosdick are both referenced in the Complaint).  The Commission does not allege Marcus created the first draft or "prepared" the rescissions' offering documents.  On the contrary, the Commission alleges that Marcus provided necessary information for the offers and reviewed, edited, and/or approved them as, in Marcus' parlance, "corporate counsel."  ¶58, 72.  As an agent for the issuer, Marcus had a duty to ensure that the offering documents he edited, reviewed, and/or approved did not contain misstatements and were not knowingly misleading.

---

[12] In his motion, Marcus argues that the SEC violated Rule 11 by misrepresenting in paragraph 127 the "nature and significance" of the tax accountant's involvement.  To support his position, he provides an unsworn testimonial about the tax accountant's reputation and characterizes the emails offering investors securities as "benign and honest."  The firm's reputation and competence, however, is irrelevant to the allegation in the complaint, which was that Marcus "caused" or directed Berry Dunn to send the offer to investors.  Once again, Marcus does not claim the written allegation lacks evidentiary support -- which he knows he cannot -- but disingenuously argues an irrelevant tangent.

Marcus' invokes "securities counsel" as a magic bullet, but he presents no trustworthy evidence that disproves the allegations or precludes reasonable inferences of his scienter. Marcus does not detail his interactions with "securities counsel," or delineate what tasks securities counsel specifically did, what he told them, and whether he adhered to their advice or recommendations. One interaction with securities counsel from 2016 provides evidentiary support that Marcus knowingly omitted to disclose important financial information to investors. Within days of Marcus causing the Brentwood Exchange Offer to be made, numerous investors asked Hess questions about MDO, including about the value of MDO's units. Ex. 44. Hess relayed those questions to Knetsch. *Id.* at 3-5. In response, Knetsch suggested answering their questions and passing along a valuation of MDO. Knetsch wrote, "[u]nless we include an estimate of what a Preferred Unit is worth today, a Noteholder cannot make a rational decision." *Id.* at 3. He asked Abbass and Marcus their thoughts on providing the information. *Id.* Marcus directed Hess not to speak to any investor to answer their questions. *Id.* at 1. He stated that Hess was no longer authorized to communicate with investors on behalf of BRTMDO. *Id.* In rebuttal, Knetsch again pointed out that noteholders cannot evaluate their options without more information from either MDO or Brentwood. *Id.* In the end, it appears Marcus' decision trumped the advice from securities' counsel, and no account of MDO's valuation or the true value of its units was provided in connection with the Brentwood Exchange Offer. This type of evidence supports the Complaint's allegations.

### D. Marcus' Convertible Note Theory Does Not Show That the Allegations about His Valuation Misstatements Lack Evidentiary Support

Throughout his motion, Marcus attacks many of the Complaint's allegations about the pricing "spread" that he and his co-defendants created by misrepresenting MDO's valuation. Nowhere, however, does Marcus challenge the accuracy of the Commission's allegations about

what Marcus said and what he knew about MDO's valuation.  The following examples amply

support the allegations that Marcus knew the valuations that MDO's board used in issuing

convertible notes to Liberty:

- "[MDO's President] then asked the Board to consider a proposed financing of $5,000,000 for the Company, and asked Mr. Marcus to describe the proposed financing.  Mr. Marcus reported that the Company proposed to borrow $5,000,000 from Michael A. Liberty…. The conversion rights of the proposed promissory note would be based upon a pre-money valuation of $17,500,000.  It was noted that this would be the highest valuation that the Company has used to date for the establishment of conversion rights under convertible notes heretofore issued."  Ex. 17 (5/15/2012 MDO Board Meeting Notes drafted by Marcus as MDO counsel and secretary *pro tem*)

- "We are completing the necessary documentation in connection with the next round of funding from [Liberty].  I propose we use a $25 million pre-money valuation for this round, i.e. the previous pre-money valuation of $17.5 million plus the $7.5 million of funding completed."  Ex. 43 (8/24/2012 email from MDO President to MDO Executive Chairman copying Marcus)

- "[T]his spreadsheet tells the story of Mozido Capitalization from pre-[Mobiletech] days to the present, and then it continues *pro forma* based on an expected $2.5mm round this fall at a pre-money value assumed to be $25 million." Ex. 25 (8/27/2012 email Marcus to Braddock attaching MDO's capitalization table, copying Liberty)

Nor could Marcus dispute that one of Liberty's fundraisers introduced Marcus to investors as

*MDO'*s counsel to answer questions about Liberty's solicitation.  This helped created the false

appearance that Marcus was representing MDO in the deals and that the fundraising was on

behalf of MDO.  *See, e.g.,* Exs. 26 ("See below from [MDO] counsel George Marcus the

answers to your questions"), 27 ("I have cc'd Michael Liberty and [MDO's] Attorney George

Marcus to this email so you have his email address for any questions you may have.").

On the other side of the coin, the Commission had ample evidentiary support to charge

Marcus with misrepresenting to investors that MDO was contemporaneously valued at $100

million (emphasis added):

- "Now that is a different matter from today's valuation of [MDO], which determines the pricing at issuance of the note.  That value was set at $100,000,000. Based on the

number of units that are outstanding, this translates to $.074 per unit." Ex. 19 (9/10/2012 email).

- "The 'Conversion Price' shall initially be $ .062 per unit, and shall be subject to adjustment as provided hereafter in this Section 5. The initial conversion price is based upon a <u>valuation</u> of [MDO] of One Hundred Million Dollars ($100,000,000) <u>as of the date of this Note</u>." *See* D. 82-4 at 88 (BRTMDO note).

- "For every dollar of principal and interest outstanding that JLC chooses to convert, it acquires Mozido preferred membership units at a price of $.062 per unit. This pricing reflects a $100,000,000 <u>valuation</u> of [MDO] <u>today</u>, so, for example, if JLC were to convert its $3,000,000 of principal <u>today</u>, it would get 48,387,096 preferred units ($3,000,000 divided by $.062)." Ex. 20 (2/8/2013 email).

Instead, of contesting the factual basis for the Commission's allegations, Marcus offers a legal argument to the effect that MDO's valuation was immaterial. He is essentially arguing for a particular legal gloss on facts that he contends can be explained away. But at this stage of the case the key point is that the Commission has ample evidence to charge that Marcus misled investors by describing "a valuation $100,000,000 as of this date," when he knew the highest valuations that had proposed by MDO's own board had not exceeded $17,500,000.

## CONCLUSION

Marcus bears the burden of submitting competent evidence that the Complaint's three counts against him are so *plainly unmeritorious* that the Court should sanction the Commission and dismiss the Complaint with prejudice. His motion does not come close to meeting that extraordinarily high standard. In fact, as outlined above, it is Marcus whose arguments and allegations are without foundation and evidentiary support. For all those, and the reasons stated above, the Court should deny Marcus' motion.

Dated:  November 4, 2020

Respectfully submitted,

SECURITIES AND EXCHANGE COMMISSION
By its attorneys,

/s/ Marc Jones
Marc J. Jones (Mass. Bar No. 645910)
Peter Bryan Moores (Mass. Bar No. 658033)
David D'Addio (Mass. Bar No. 665790)
33 Arch Street, 24th Floor
Boston, MA  02110
(617) 573-8947
jonesmarc@sec.gov

## CERTIFICATE OF SERVICE

I, Marc J. Jones, hereby certify that on November 4, 2020, I electronically filed this Opposition with the Clerk of Court using the CM/ECF system which will send notification of this filing to all counsel of record.

/s/ Marc Jones
Marc J. Jones
Securities and Exchange Commission