**EXHIBIT 2**

# B-03044

# *MARCUS_GEORGE_20180118*

### *1/18/2018 10:04 AM*

**Condensed Transcript**

**Prepared by:**

B-03044

Wednesday, November 04, 2020

Page 1

1 THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION

2

3 In the Matter of:   )

4                     ) File No. B-03044-A

5 MOZIDO            )

6

7 WITNESS:  George Marcus

8 PAGES:   1 through 114

9 PLACE:    Securities and Exchange Commission

10        33 Arch Street

11        Boston, Massachusetts 02110

12 DATE:    Thursday, January 18, 2018

13

14     The above-entitled matter came on for hearing

15 pursuant to notice at 10:04 a.m.

16

17

18

19

20

21

22

23

24        Diversified Reporting Services, Inc.

25          (202) 467-9200

Page 2

1 APPEARANCES:

2

3 On behalf of the Securities and Exchange Commission:

4     PETER MOORES

5     MARC JONES

6     Securities and Exchange Commission

7     33 Arch Street

8     Boston, Massachusetts 02110

9

10 On behalf of the Witness

11     DAN O'CONNOR

12     CATHERINE HARRIS

13     Ropes and Gray

14     Prudential Tower

15     800 Boylston Street

16     Boston, MA 02199

17

18

19

20

21

22

23

24

25

Page 3

1            C O N T E N T S

2

3 WITNESS:                EXAMINATION

4 George Marcus               3

5

6 EXHIBITS:    DESCRIPTION        IDENTIFIED

7 91        Subpoena              5

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1          P R O C E E D I N G S

2     MR. MOORES:  We are on the record at 10:04

3 a.m. on January 18, 2018.  I will now administer the

4 oath to George Marcus.

5        Do you swear to tell the truth, the whole

6 truth and nothing but the truth?

7     MR. MARCUS:  I do.

8 Whereupon,

9            GEORGE MARCUS

10 was called as a witness and, having been first duly

11 sworn, was examined and testified as follows:

12            EXAMINATION

13   BY MR. MOORES:

14   Q   Please state your full name and spell the

15 last name for the record.

16   A   George Jacob Marcus.

17   Q   Good morning again.  As you know, my name

18 is Peter Moores.  Along with me today is Marc Jones.

19 We are officers of the Commission for the purposes of

20 this proceeding.  Also here today is Jameson Calitri

21 who is not an officer for the purposes of today's

22 proceeding but is here without objection, if I

23 understand that correctly?

24     MR. O'CONNOR:  That's correct.

25     MR. MOORES:  This is an investigation by

Page 5

1 the United States Securities and Exchange Commission
2 in the matter of Mozido to determine whether there
3 have been violations of certain provision of the
4 federal securities laws. However, the facts
5 developed in this investigation might constitute
6 violations of other federal or state civil or
7 criminal laws.
8     Prior to the opening of the record, you
9 were provided with a copy the Formal Order of
10 Investigation dated December 21, 2015 in this matter.
11 It will be available for your examination during the
12 course of this proceeding. Mr. Marcus, have you had
13 an opportunity to review the Formal Order?
14    A   Yes, I have.
15    Q    Prior to the opening of the record, your
16 were provided with a copy of the Commission's
17 Supplemental Information Form. A copy of that notice
18 has been marked as Exhibit 1. Mr. Marcus, have you
19 had the opportunity to read Exhibit 1?
20    A   Yes, I have.
21    Q    Do you have any questions concerning this
22 notice?
23    A   I do not.
24    Q    Mr. Marcus, are you represented by counsel
25 today?

Page 6

1    A   Yes, I am.
2       MR. MOORES:  Would counsel please identify
3 themselves for the record.
4       MR. O'CONNOR:  Good morning. Dan O'Connor
5 from Ropes and Gray.
6       MS. HARRIS:  I'm Catherine Harris from
7 Ropes and Gray.
8       MR. MOORES:  Mr. O'Connor and Ms. Harris,
9 are you representing George Marcus as his counsel
10 today?
11       MR. O'CONNOR:  We are.
12          (SEC Exhibit No. 91 was marked
13           for identification.)
14       BY MR. MOORES:
15    Q    Mr. Marcus, handing you a document which
16 has been marked as Exhibit 91. Is this a copy of the
17 subpoena pursuant to which you're appearing here
18 today?
19    A   It appears to be.
20    Q    Mr. Marcus, I believe that you're probably
21 fairly well versed in depositions and testimony.
22 However, I'm just going to go through sort of the
23 litany of things to make sure we are all on the same
24 page today. I will ask you a series of questions or
25 Marc will ask a series of questions. Your answers to

Page 7

1 those questions will be transcribed by the
2 stenographer, Pat. She is excellent, but she can only
3 record spoken answers. It's important that you
4 answer our questions with a verbal yes or no or
5 otherwise applicable answer. She cannot record a head
6 nod or grunt or some other guttural response. Do you
7 understand that?
8    A   I do.
9    Q    She also cannot record your answer if she
10 cannot hear you. I know you're about 3 feet away,
11 but please keep your voice loud enough for everyone
12 in the room to hear. Will you do that, please?
13    A   Yes, I will.
14    Q    She also cannot record both of our words if
15 we talk at the same time. Please wait until I'm
16 finished asking the question before you begin
17 answering. We will do our best not to cut you off
18 and just ask that you wait until we're finished
19 asking the question before you start answering. Will
20 you do that?
21    A   I will.
22    Q    You have just taken an oath that requires
23 you to tell the truth and nothing but the truth.
24 That's the same oath you would take as if you were to
25 testify in court. Do you understand that?

Page 8

1    A   I do.
2    Q    If you don't understand one of our
3 questions, please state that you do not understand it
4 and we will attempt to rephrase the question. If you
5 answer a question, we will all understand by your
6 answer that you understood the question. Okay?
7    A   All right.
8    Q    Today we will be using various terms and
9 names. If you believe that there's any ambiguity
10 with a term or name that we use, please ask us to
11 clarify.
12    A   I will.
13    Q    In general, we will use the name MDO to
14 refer to the entity MDO, LLC, formerly known as
15 Mozido, LLC. Does that make sense?
16    A   I think it does.
17    Q    In contrast, we'll try to refer to Mozido,
18 Inc. using either Inc. or Mozido, Inc. to refer to
19 the current operating company Mozido, Inc. Does that
20 make sense?
21    A   It does.
22    Q    Similarly, we will be referring to various
23 entities that have the word Brentwood in them. We
24 will try to be precise and refer to one of the
25 entities by Brentwood Financial, which is referring

1 to Brentwood Financial, LLC, and the other one we'll
2 try to refer to BRTMDO, formerly known as Brentwood
3 Investments, LLC. Does that make sense?
4    A   Yes.
5    Q   Again, if there's any ambiguity with the
6 names or entities, please just ask for clarity.
7    A   I will.
8    Q   There are also a number of people with the
9 last name of Liberty.  If I or Marc just use the name
10 Liberty, we are going to be referring to Michael
11 Liberty.  We will try to use Rick Liberty to refer to
12 him.  Again, if there's any ambiguity, let us know.
13 Similarly, to try to avoid that, Brittany Liberty I'm
14 going to refer to as Brittany Abbass or Abbass.  Does
15 that make sense?
16    A   It does.
17    Q   Am I pronouncing that anywhere close to
18 what it's supposed to be?
19    A   I believe you have it right.
20    Q   I know there's Eric Abbass as well.  So if
21 there's any confusion, please let us know.  I will
22 try to use Eric Abbass if I'm referring to him as
23 opposed to just Abbass.
24    A   Yes.
25    Q   If you feel that you need a break at any

1 time, to use the restroom, speak to your counsel, or
2 for any other reason, please let me or your counsel
3 know and we will decide whether or not we should go
4 off the record.  As a general rule, we do not take
5 breaks while the question is pending.  Do you
6 understand?
7    A   Yes.
8    Q   Sometimes it happens that you will give an
9 answer as fully as you can, and subsequently, maybe
10 five minutes later an hour later, you remember
11 some additional information or perhaps some
12 clarification in response to that earlier question.
13 If that happens, would you please tell us that you
14 would like to add something to an earlier answer and
15 we'll do that right then while it's fresh in your
16 mind, will you do that?
17    A   Yes.
18    Q   In addition, sometimes it appears to people
19 that a previous answer is not completely accurate.
20 If that happens, will you tell us and make any
21 necessary corrections to your answers?
22    A   Yes.
23    Q   Are you taking any medication or
24 experiencing any health issue today that would impair
25 your ability to listen carefully to our questions and

1 answer them completely and truthfully?
2    A   No.
3    Q   Is there any other reason that would impair
4 your ability to listen carefully to our questions and
5 answer them completely and truthfully today?
6    A   No.
7       MR. O'CONNOR:  I would note that, as you
8 know, Mr. Marcus is a lawyer for Michael Liberty and
9 a number of entities you mentioned before.  Our
10 understanding at this point is there is no waiver of
11 privilege.  And so in terms of answering fully, there
12 may be times when that might otherwise require
13 discussion of attorney/client communication, but at
14 this point we are not able to do that.
15       MR. MOORES:  Thank you.
16    BY MR. MOORES:
17    Q   Mr. Marcus, how old are you?
18    A   66.
19    Q   Where do you currently live?
20    A   Cumberland, Maine.
21    Q   Did you attend college?
22    A   I did.
23    Q   When and where?
24    A   I attended the University of Pennsylvania
25 in Philadelphia and graduated in 1973.

1    Q   Did you attend any graduate school?
2    A   I did.
3    Q   When and where?
4    A   I attend the University of Chicago Law
5 School in Chicago and graduated in 1976.
6    Q   Have you taken any other graduate classes
7 since law school?
8    A   I participated in continuing legal
9 education. I don't know if you include that within
10 graduate.  I haven't taken any graduate classes
11 affiliated with the university.
12    Q   With reference to the continuing legal
13 education classes you've taken, have you taken any in
14 the last ten years?
15    A   Yes.
16    Q   Can you give us the general topics of those
17 classes?
18    A   Business corporation, bankruptcy,
19 reorganizations.
20    Q   Anything else?
21    A   Ethics.
22    Q   Anything else?
23    A   I think what I described covers the
24 waterfront.
25    Q   Have you ever taught any continuing legal

Page 13

1 education classes?
2    A   Yes, I have.
3    Q   Can you just give us the general topics of
4 those classes?
5    A   I have participated as a panelist or
6 teacher, if you would, on a variety of topic in the
7 area of Chapter 11 reorganizations.
8    Q   Anything else?
9    A   I don't recall anything else.
10    Q   Have you taught any other types of courses
11 that are legally related?
12    A   I believe I taught an undergraduate class
13 in business law at the University of Southern Maine
14 many, many years ago.
15    Q   More than ten?
16    A   Many more than ten.
17    Q   Are you a member of any bar associations?
18    A   I am.  I'm a member of the Maine Bar
19 Association, the Federal District of Maine Bar, the
20 First Circuit Bar, and I believe I'm a member of
21 other circuits where I've been admitted to present
22 oral argument, such as the Third and the Fifth and
23 the Ninth. However, those may have expired for time
24 reasons, if they expire.
25    Q   Just to be clear, was the first

Page 14

1 organization you identified the bar association and
2 then subsequent to that were the actual bars that you
3 were a member of?
4    A   What I meant to say is I belong to the
5 Maine bar, there's a separate entity called the Maine
6 Bar Association for members of the bar.  If I
7 confused those two, I apologize.  I'm a member of the
8 Maine bar, and I also belong to the association.
9    Q   Where do you currently work?
10    A   In Portland, Maine.
11    Q   Are you affiliated with any law firm?
12    A   Yes, Marcus Clegg.
13    Q   Has that firm gone by any other name since
14 you were a member?
15    A   It began as Marcus, Clegg & Mistretta.  And
16 Marcus Clegg today is an abbreviation of the full
17 legal name, which is Marcus, Clegg, Bals and
18 Rosenthal.
19    Q   Is that the same firm as the Marcus, Clegg
20 & Mistretta?
21    A   Yes, it is.
22    MR. JONES:  Are you the Marcus of Marcus
23 Clegg?
24    THE WITNESS:  I am.
25    BY MR. MOORES:

Page 15

1    Q   How many partners are there of Marcus
2 Clegg?
3    A   Five.
4    Q   How many associates are there at Marcus
5 Clegg?
6    A   At this time, two.
7    Q   What is the structure or the corporate
8 formation of Marcus Clegg?
9    A   It is a corporation.
10    Q   How many officers are there in Marcus
11 Clegg?
12    A   I need clarification.  Do you mean how many
13 lawyer officers are there or officers of the
14 corporation?
15    Q   How many officers are there in the
16 corporation?
17    A   I believe there are three or four.  We have
18 the president, treasurer, we have a clerk.
19    Q   What position do you hold?
20    A   I'm the president.
21    Q   How many addresses are there for Marcus
22 Clegg?
23    A   Our office address is One Canal Plaza.
24    Q   You just have one office?
25    A   Yes.  I think that's the only address.

Page 16

1    Q   Is there a firm committee?
2    A   I'm not sure I know what you mean by firm
3 committee.
4    Q   You mentioned there are a number of
5 officers to Marcus Clegg?
6    A   Correct.
7    Q   Is that the firm governing structure as
8 well?
9    A   As a corporation, there's a Board of
10 Directors.
11    Q   Who serves on the Board of Directors?
12    A   Myself, Jenny Clegg, Lee Bals and Daniel
13 Rosenthal.
14    MR. JONES:  For the Board of Directors,
15 does each of the directors get an equal vote in
16 making the governance decisions of the firm?
17    THE WITNESS:  Each of the directors does,
18 yes.
19    BY MR. MOORES:
20    Q   What is the process for accepting new
21 clients?
22    A   Well, first it would be a request by the
23 client for legal representation.  Then there would be
24 a determination of the person to whom the request was
25 made, whether it's within our field of competence.

Page 17

1  And then we would check for conflicts of interest.
2  If all those tests pass, we accept the
3  representation.
4      Q   Does someone need to, does some committee
5  need to approve new clients?
6      A   We do not have a formal committee for
7  approval of clients.  The proposal to accept a new
8  client is circulated among all the lawyers to make
9  sure there isn't some reason that's being overlooked
10 regarding retention of the client.
11     Q   What is the process for opening up new
12 matters for new clients, if any?
13     A   We send an e-mail to our office manager who
14 checks for conflicts.  And assuming the matter gets
15 open, the office manager will establish an account
16 for that client in our software.
17     Q   Do you use different numbers for the
18 account, like billing numbers?
19     A   Yes, each account is assigned a number.
20     Q   Is there a billing attorney associated with
21 each account?
22     A   There is what is called a responsible
23 attorney.  Generally the responsible attorney is the
24 billing attorney.
25     Q   What is the responsibility of the

Page 18

1  responsible attorney?
2      A   To make sure that the matters for the
3  client are being properly handled and billed.
4      Q   Where do receivables from the clients go at
5  the firm?
6      A   You mean when they are paid?
7      Q   Correct.
8      A   They are deposited into the firm's
9  operating account.
10     MR. JONES:  Mr. Marcus, did I hear that
11 part of the firm's decision making process of whether
12 to take on a new matter is a check whether it was
13 with, I think the term you used was within the field
14 of competence for the firm, did I get that right?
15     THE WITNESS:  Yes.  We want to make sure
16 the client is making a request for services that are
17 within our wheelhouse, so to speak.
18     MR. JONES:  Am I right in thinking that the
19 firm's field of competence is essentially an amalgam
20 of all the individual attorneys' field of competence?
21     THE WITNESS:  Probably a fair statement.
22     MR. JONES:  Could you tell us what are your
23 fields of competence as we've been using that term
24 just now?
25     MR. O'CONNOR:  At this point, and I told

Page 19

1  you this ahead of time coming in, given the fact that
2  you are so far ahead of the criminal authorities of
3  where they are, they haven't been able to give us any
4  assurances as to where they are in their
5  investigation.  So for substantive questions going
6  forward, Mr. Marcus is going to be asserting his
7  rights under the Fifth Amendment.
8      BY MR. MOORES:
9      A   On the advice of my lawyer, I respectfully
10 decline to answer at this time on the basis of the
11 Fifth Amendment, which, according to the United
12 States Supreme Court, protects even innocent people
13 from the need to answer questions if the truth might
14 be used to help create a misleading impression that
15 they were somehow involved in misconduct.
16     Q   Mr. Marcus, I'm not authorized to compel
17 you to give evidence or testimony as to which you
18 assert your privilege against self-incrimination.  I
19 have no intention of doing so.  In addition, I do not
20 have the authority to compel your testimony by
21 granting you immunity from prosecution.  Any
22 questions that I ask hereafter will be with the
23 understanding if you wish to assert your privilege,
24 you need merely state that you refuse to answer on
25 the grounds that your answer might incriminate you.

Page 20

1  In other words, you are not compelled to answer any
2  further questions if you believe that a truthful
3  answer to the question might show that you committed
4  a crime and you wish to assert your privilege against
5  self-incrimination.  Accordingly, if you answer any
6  questions, you will be doing so voluntarily.  Do you
7  understand this?
8      MR. O'CONNOR:  I don't agree with that
9  formulation of the rights under the Fifth Amendment.
10 I don't think the Fifth Amendment that requires
11 someone be incriminated or guilty of a crime in order
12 for them to assert their rights and refuse to answer
13 under the Fifth Amendment.  The formulation that
14 George noted earlier in terms -- the courts, I think,
15 are clear having allowed innocent people to assert
16 their Fifth Amendment rights if they are concerned
17 the information they provide might be misconstrued.
18 So with the understanding we won't agree probably as
19 to what that means, I think what we would suggest and
20 what George will do is basically on a going forward
21 basis instead of reading the longer statement that we
22 went through will say on the advice of counsel I
23 respectfully decline to answer at that time this time
24 on the basis of my Fifth Amendment rights.  If we
25 need to at a later discuss argue what that means, but

Page 21

1 I think that's the formulation we are going to use.
2       MR. MOORES:  The fundamental problem we
3 have with that is that it doesn't articulate what
4 Fifth Amendment right he's invoking.  It's the Fifth
5 Amendment right against self-incrimination which I
6 believe is being imposed.  I understand your position
7 that you don't need to be a criminal in order to
8 invoke that Fifth Amendment right against
9 self-incrimination.  My only sort of problem with
10 that sort of short version is that it doesn't
11 identify it's the Fifth Amendment right against
12 self-incrimination.
13       MR. O'CONNOR:  I think the Fifth Amendment
14 right to be compelled to provide testimony against
15 one's self.  It's not the Fifth Amendment right to
16 prevent self-incrimination.  And I don't think in the
17 cases, and we've looked at this, and I'm sure you
18 have as well, that there is any formulation that's
19 required other than to say the Fifth Amendment and
20 I'm refusing to talk.  I think from our point of
21 view, because the concept of what we are concerned
22 about here, I think you made a fairly clear
23 articulation of why he's asserting his Fifth
24 Amendment rights, is that if at some point, George
25 very much would rather testify here today and I've

Page 22

1 asserted that with you, but we are concerned because
2 of the other proceeding, not this, the other
3 proceeding.  If at some point at a later date this
4 were to be used in another proceeding, the
5 formulation is important to us.  I understand why it
6 might be important to you.  But I think for those
7 reasons we will stick with the formulation that we
8 have here.
9       MR. MOORES:  So at the beginning of your
10 statement, and maybe we can have it read back, but
11 you said something about Fifth Amendment right not to
12 be compelled to testify?
13       MR. O'CONNOR:  Yes.
14       MR. MOORES:  So perhaps there's a slight
15 edit to this based upon the language that you just
16 said.  I'm just trying to remember what it was.  It
17 was something like the Fifth Amendment right not to
18 be compelled to testify?
19       MR. O'CONNOR:  Yes.  The Fifth Amendment
20 has a lot of difference pieces in it.  If we want, I
21 can have him read the big, long formulation every
22 time.
23       MR. MOORES:  That doesn't get to it either.
24       MR. O'CONNOR:  I think it does.  It
25 protects --

Page 23

1       MR. JONES:  If I may?  Do we have agreement
2 that when Mr. Marcus asserts his Fifth Amendment as
3 you have shorthanded it here, that he is invoking the
4 testimonial right or that is under the Fifth
5 Amendment and not some other part of the Fifth
6 Amendment?
7       MR. O'CONNOR:  That's correct.
8       MR. JONES:  So as the court has defined
9 that testimony, that is what he is invoking?
10       MR. O'CONNOR:  That's right.
11       BY MR. MOORES:
12    Q   Is that your understanding too, Mr. Marcus?
13    A   Yes, it is.
14    Q   Mr. Marcus, you should be aware if you
15 refuse to answer a question based upon your Fifth
16 Amendment privilege, a judge or a jury may take an
17 adverse inference against you in a civil action that
18 the SEC may determine to bring against you.  That
19 means that the judge or jury would be permitted to
20 infer that your answer to the question might
21 incriminate you.  Do you understand this?
22    A   On the advice of my lawyer, I respectfully
23 decline to answer at this time on the basis of my
24 Fifth Amendment rights.
25       MR. MOORES:  The question I posed was about

Page 24

1 the actual Fifth Amendment and the negative inference
2 that can be drawn.  I'm not sure if invoking the
3 Fifth Amendment to whether or not he understands what
4 I just warned him about makes much sense.
5       MR. O'CONNOR:  I understand what you're
6 saying.  George, can you confirm that you heard the
7 words that he said?
8       THE WITNESS:  I heard the words that he
9 said.
10       MR. JONES:  Mr. Marcus, do you understand
11 that courts are permitted to draw a negative
12 inference in times when a witness asserts a Fifth
13 Amendment privilege against testimony?
14       THE WITNESS:  I'm not familiar with this
15 area of law.  I don't know what a court is permitted
16 to do or not.  I heard what you said and I understood
17 what you said.
18       MR. JONES:  Okay.
19       BY MR. MOORES:
20    Q   Mr. Marcus, when did you first meet Michael
21 Liberty?
22    A   On the advice of my lawyer, I respectfully
23 decline to answer at this time on the basis of my
24 Fifth Amendment rights.
25    Q   Mr. Marcus, you provided legal services to

Page 25

1 Michael Liberty for at least the last ten years,
2 correct?
3    A   On the advice of my lawyer, I respectfully
4 decline to answer at this time on the basis of my
5 Fifth Amendment rights.
6    Q   Would you please describe the nature of the
7 services provided to Michael Liberty and any
8 affiliated entities since 2008?
9    A   On the advice of my lawyer, I respectfully
10 decline to answer at this time on the basis of my
11 Fifth Amendment rights.
12    Q   You were involved in representing Michael
13 Liberty at the same time that the Securities and
14 Exchange Commission brought an action against Michael
15 Liberty in 2006, correct?
16    A   On the advice of my lawyer, I respectfully
17 decline to answer on the basis of my Fifth Amendment
18 rights.
19    Q   Going forward, I will refer to that case as
20 the Keystone matter.  Do you understand that?
21    A   Yes.
22    Q   What involvement did you have in the
23 Keystone matter?
24    A   On the advice of my lawyer, I respectfully
25 decline to answer at this time on the basis of my

Page 26

1 Fifth Amendment rights.
2    Q   What involvement did Marcus Clegg have in
3 the Keystone matter?
4    A   On the advice of my lawyer, I respectfully
5 decline to answer at this time on the basis of my
6 Fifth Amendment rights.
7      MR. JONES:  Mr. O'Connor, can we agree on a
8 going forward basis that if your client were to say
9 something like I assert my Fifth Amendment rights, he
10 could be essentially short-handing the statement as
11 he has been answering so that Mr. Marcus is not
12 forced to say that long sentence every time?
13      MR. O'CONNOR:  That's fine.
14      MR. JONES:  Whatever formulation you wish.
15 We will assume that when you go forward, Mr. Marcus,
16 that if you say, "I assert my Fifth Amendment
17 rights," it will be equivalent to the statement that
18 you've been saying, that on the basis of advice of
19 your lawyer, you have declined to answer as you have
20 been stating thus far?
21      THE WITNESS:  Okay.
22   BY MR. MOORES:
23    Q   Who is James Stanley?
24    A   I assert my Fifth Amendment rights.
25    Q   What involvement did you have in a legal

Page 27

1 dispute between James Stanley and Michael Liberty?
2    A   I assert my Fifth Amendment rights.
3    Q   When did you first become involved with
4 MDO, LLC?
5    A   I assert my Fifth Amendment rights.
6    Q   Did you serve as counsel for MDO?
7    A   I assert my Fifth Amendment rights.
8    Q   You participated in Board of Directors
9 meetings as counsel of MDO, correct?
10    A   I assert my Fifth Amendment rights.
11    Q   You maintained certain documents for MDO,
12 correct?
13    A   I assert my Fifth Amendment rights.
14    Q   You maintained MDO's capital tables,
15 correct?
16    A   I assert my Fifth Amendment rights.
17    Q   You were involved in the negotiations over
18 MDO's amended and restated limited liability company
19 agreement dated August 27, 2010, correct?
20    A   I assert my Fifth Amendment rights.
21    Q   You were involved in drafting MDO's amended
22 and restated limited liability company agreement
23 dated August 27, 2010, correct?
24    A   I assert my Fifth Amendment rights.
25    Q   Going forward, I'm going to refer to that

Page 28

1 company agreement as MDO's operating agreement.  Is
2 that okay?
3    A   Yes.
4    Q   You read MDO's operating agreement dated
5 August 27, 2010, correct?
6    A   I assert my Fifth Amendment rights.
7    Q   As counsel to MDO, it was your
8 responsibility to advise MDO concerning its operating
9 agreement, correct?
10    A   I assert my Fifth Amendment rights.
11    Q   As counsel of MDO, it was your
12 responsibility to provide MDO whether it was
13 operating consistent with its operating agreement,
14 correct?
15    A   I assert my Fifth Amendment rights.
16      MR. JONES:  Mr. Marcus, is it your
17 intention to assert your Fifth Amendment as you have
18 previously described it as to all questions regarding
19 your representation of Michael Liberty or entities
20 affiliated with him?
21      THE WITNESS:  Yes.
22      MR. JONES:  Is it your intention to assert
23 your Fifth Amendment rights as you described them as
24 to any questions regarding the services that you have
25 provided to Michael Liberty or to any entity

Page 29

1 affiliated with him at any time?
2       THE WITNESS:  Yes.
3       MR. O'CONNOR:  I also note that there are a
4 lot of questions that you could ask that he couldn't
5 answer because it would require him to get into
6 attorney/client communications.
7       MR. JONES:  Understood.  To the extent that
8 Mr. Marcus is asserting his Fifth Amendment rights as
9 to those questions, if Mr. Marcus wishes to delineate
10 where the attorney/client privilege is as well,
11 that's fine.  We'll assume that assertion of the
12 Fifth is solely about that and not about the
13 attorney/client communication.  Mr. Marcus is it your
14 intention to assert your Fifth Amendment rights as
15 you described them as to all questions regarding
16 litigation, so to speak, with a James Stanley?
17       THE WITNESS:  Yes.
18       MR. JONES:  Is it your intention to assert
19 your Fifth Amendment rights as you described them as
20 to any involvement you may or may not have had with
21 an entity known as MDO, LLC?
22       THE WITNESS:  Yes.
23       BY MR. MOORES:
24   Q   Mr. Marcus, you drafted Board meeting
25 minutes for MDO, correct?

Page 30

1   A   I assert my Fifth Amendment rights.
2   Q   You drafted Board of Directors resolutions
3 for MDO?
4   A   I assert my Fifth Amendment rights.
5   Q   You maintained a file of MDO Board of
6 Directors meeting materials, correct?
7   A   I assert my Fifth Amendment rights.
8   Q   You participated in the negotiations of the
9 amended commissions agreement, correct?
10   A   I assert my Fifth Amendment rights.
11   Q   You understood that the amended commissions
12 agreement limited the purchase, transfer or sale of
13 MDO membership units, correct?
14   A   I assert my Fifth Amendment rights.
15   Q   If I were to ask you any other questions
16 concerning the amended commissions agreement, would
17 you similarly assert your Fifth Amendment rights?
18   A   Yes.
19   Q   What is Mozido Invesco, LLC?
20   A   I assert my Fifth Amendment rights.
21   Q   I will refer to Mozido Invesco going
22 forward as Invesco.  Do you understand that?
23   A   I do.
24   Q   Did you represent Invesco?
25   A   I assert my Fifth Amendment rights.

Page 31

1   Q   Did Invesco conduct any operations?
2   A   I assert my Fifth Amendment rights.
3   Q   Did it sell any products?
4   A   I assert my Fifth Amendment rights.
5   Q   Did Invesco sell any services?
6   A   I assert my Fifth Amendment rights.
7   Q   Did Invesco generate revenue?
8   A   I assert my Fifth Amendment rights.
9   Q   Did Invesco have employees?
10   A   I assert my Fifth Amendment rights.
11   Q   Do you know who Paul Hess is?
12   A   I assert my Fifth Amendment rights.
13   Q   I'm going to refer to him as Hess going
14 forward.  Do you understand that?
15   A   Yes.
16   Q   Hess was not an employee of Invesco,
17 correct?
18   A   I assert my Fifth Amendment rights.
19   Q   Invesco was utilized to raise money for
20 investors, correct?
21   A   I assert my Fifth Amendment rights.
22   Q   You knew that Invesco started issuing
23 convertible promissory notes in September 2010,
24 correct?
25   A   I assert my Fifth Amendment rights.

Page 32

1   Q   You drafted the original convertible
2 promissory note for Invesco to issue to investors?
3   A   I assert my Fifth Amendment rights.
4   Q   You drafted the original note purchase
5 agreement for Invesco to use to sell the promissory
6 notes, correct?
7   A   I assert my Fifth Amendment rights.
8   Q   Liberty personally guaranteed the Invesco
9 convertible promissory notes, correct?
10   A   I assert my Fifth Amendment rights.
11   Q   You drafted the original personal guaranty
12 for Liberty to give to investors, correct?
13   A   I assert my Fifth Amendment rights.
14   Q   The Invesco notes were convertible into
15 membership units of Mozido Investments, correct?
16   A   I assert my Fifth Amendment rights.
17   Q   The $55,000 Invesco note was convertible
18 into one unit of Mozido Investments, correct?
19   A   I assert my Fifth Amendment rights.
20   Q   You participated in the design or the
21 structure of the Invesco offering, correct?
22   A   I assert my Fifth Amendment rights.
23   Q   At the time, you understood that Mozido
24 Investments held interest in Affinity Holding, LLC,
25 correct?

Page 33

1    A    I assert my Fifth Amendment rights.
2    Q    You understood that Affinity Holding was a
3  member of MDO, correct?
4    A    I assert my Fifth Amendment rights.
5    Q    You understood that investors were being
6  told that an investment through Mozido Invesco was a
7  way for them to invest in MDO, correct?
8    A    I assert my Fifth Amendment rights.
9    Q    You understood in 2010 that the implied
10 value of MDO based upon the cost of the Invesco
11 securities was $85 million, correct?
12   A    I assert my Fifth Amendment rights.
13   Q    From approximately January 2011 through
14 approximately May 2012, accounts controlled by Marcus
15 Clegg received approximately $1.3 million of money
16 from Mozido Invesco, correct?
17   A    I assert my Fifth Amendment rights.
18   Q    Was the money payment for services?
19   A    I assert my Fifth Amendment rights.
20   Q    If any, what services?
21   A    I assert my Fifth Amendment rights.
22   Q    How much money did Invesco raise from
23 investors?
24   A    I assert my Fifth Amendment rights.
25   Q    Did the money transferred to Marcus Clegg

Page 34

1  from the Invesco account come from the proceeds of
2  noteholders' investments in Invesco?
3    A    I assert my Fifth Amendment rights.
4    Q    In 2010, you knew that Hess was soliciting
5  investors for the Invesco offering, correct?
6    A    I assert my Fifth Amendment rights.
7    Q    You knew that Liberty was paying Hess a 5
8  percent commission on every dollar he raised through
9  the sale of Invesco securities, correct?
10   A    I assert my Fifth Amendment rights.
11   Q    You knew that Hess considered that his
12 receipt of commissions was improper, correct?
13   A    I assert my Fifth Amendment rights.
14   Q    You drafted a consulting agreement to
15 conceal Hess was receiving commissions, correct?
16   A    I assert my Fifth Amendment rights.
17   Q    The consulting agreement was between Mozido
18 Investments and Hess, correct?
19   A    I assert my Fifth Amendment rights.
20   Q    You backdated the consulting agreements
21 that appeared was executed on March 1, 2010, correct?
22   A    I assert my Fifth Amendment rights.
23   Q    You knew that Liberty and Hess were
24 characterizing Hess's 5 percent commissions as
25 advances on the consulting agreement you drafted,

Page 35

1  correct?
2    A    I assert my Fifth Amendment rights.
3    Q    You knew that Hess also received payments
4  for raising money through the sale of BRTMDO
5  securities later beginning in 2012, correct?
6    A    I assert my Fifth Amendment rights.
7    Q    You knew the payments to Hess for his fund
8  raising for BRTMDO was paid by your law firm's IOLTA
9  account, correct?
10   A    I assert my Fifth Amendment rights.
11   Q    On September 29, 2010, you sent an e-mail
12 to Tom Hallet, correct?
13   A    I assert my Fifth Amendment rights.
14   Q    You sent him investment contracts on behalf
15 of Invesco, correct?
16   A    I assert my Fifth Amendment rights.
17   Q    Did you make any representations how the
18 proceeds of the investment were to be used?
19   A    I assert my Fifth Amendment rights.
20   Q    Did you perform any due diligence to
21 ascertain whether Mr. Hallet was an investor?
22   A    I assert my Fifth Amendment rights.
23   Q    You knew that Mobile Tech Investments, LLC
24 invested in August 2010 into MDO at a valuation of
25 MDO of $13.5 million, correct?

Page 36

1    A    I assert my Fifth Amendment rights.
2    Q    You did not disclose to Mr. Hallet that the
3  last investment in MDO was at a $13.5 million
4  valuation, correct?
5    A    I assert my Fifth Amendment rights.
6    Q    You knew the proceeds from the sale of
7  Invesco securities was going to be used by Liberty
8  for his own personal benefit, correct?
9        MR. O'CONNOR:  I instruct the witness not
10 to answer to the extent that involves information
11 conveyed during the course of attorney/client
12 communication.
13       BY MR. MOORES:
14   Q    Mr. Marcus, outside of protected
15 attorney/client communication, did you know what the
16 intent was for the sale of the use of proceeds from
17 the sale of Invesco securities?
18       MR. O'CONNOR:  Objection.
19       BY MR. MOORES:
20   A    I assert my Fifth Amendment rights.
21   Q    You did not disclose to Mr. Hallet that the
22 proceeds from the sale of Invesco securities were
23 intended to be used by Mr. Liberty for his personal
24 benefit, correct?
25       MR. O'CONNOR:  Objection.

Page 37

1    BY MR. MOORES:
2    A    I assert my Fifth Amendment rights.
3        MR. MOORES:  The question just asked
4  whether or not he told someone who was a third party
5  a certain piece of information.
6        MR. O'CONNOR:  That's why I didn't tell him
7  not to answer on attorney/client privilege.  I still
8  think there's an objection.
9        MR. MOORES:  What's the objection?
10       MR. O'CONNOR:  I'm not sure there was
11 foundation if he would know that.
12       MR. MOORES:  That's not --
13       MR. JONES:  There's no foundation that he
14 would know if he told someone?
15       MR. O'CONNOR:  With respect to the question
16 did he tell, I think he answered the question.  That's
17 all.
18       MR. MOORES:  Right.  I'm just saying that a
19 foundation is not a bases of an objection here in
20 investigative testimony.
21       MR. O'CONNOR:  I understand that.  For
22 example, if at some point later down the road this
23 testimony goes beyond the use of the administrative
24 proceeding, I want to make sure the objections are
25 preserved, that's all.

Page 38

1        MR. MOORES:  My understanding is that's
2  still not a basis for objecting.
3        MR. O'CONNOR:  Well, if you agree you'll
4  never use the testimony outside of the administrative
5  proceeding, I don't have to make the objection.
6        MR. JONES:  We are not going to agree to
7  that.
8        MR. O'CONNOR:  He's answering the question.
9  We had can deal with the objection later at the
10 appropriate time.
11       BY MR. MOORES:
12  Q    You did not disclose to any other Invesco
13 investor with whom you communicated in 2010, '11, '12
14 that the proceeds of their investment did not go to
15 MDO, correct?
16       MR. O'CONNOR:  Objection.
17       BY MR. MOORES:
18  A    I assert my Fifth Amendment rights.
19       MR. MOORES:  What's the basis for the
20 objection?
21       MR. O'CONNOR:  This is the same question
22 and answer.
23       MR. MOORES:  No, it was a different
24 question.  It was formulated not to have anything to
25 do with the communication.  It was about whether or

Page 39

1  not he had the knowledge of where the money went.
2        MR. O'CONNOR:  Okay.
3        BY MR. MOORES:
4   Q    Mr. Marcus, in 2010, you knew that the
5  proceeds from the sale of Invesco's securities was
6  not planned to be used for Invesco working capital?
7        MR. O'CONNOR:  To the extent you have
8  information that is covered under the attorney/client
9  communication, I instruct you not to answer.
10       MR. JONES:  In this circumstance, I think
11 it's important that to the extent he would have
12 information that is not from attorney/client
13 privilege that he would otherwise assert his Fifth
14 Amendment privilege.
15       MR. O'CONNOR:  I agree.  I'm not saying it
16 was an inappropriate question but it was a broad
17 question.
18       MR. MOORES:  I'm saying outside of any
19 attorney/client communication.
20       BY MR. MOORES:
21  Q    You knew the proceeds from the sale of
22 Invesco securities were not planned to be used for
23 Invesco working capital?
24  A    I assert my Fifth Amendment rights.
25  Q    Who is George Denney?

Page 40

1   A    I assert my Fifth Amendment rights.
2   Q    Was George Denney ever a client of Marcus
3  Clegg?
4   A    I assert my Fifth Amendment rights.
5   Q    You knew that the proceeds from sale of
6  Invesco securities was not planned to be used for any
7  business purpose of Invesco?
8   A    I assert my Fifth Amendment rights.
9   Q    After Invesco received proceeds from the
10 sale of securities beginning in 2010, you knew that
11 the money was not used for Invesco's working capital
12 or other business purposes, correct?
13  A    I assert my Fifth Amendment rights.
14  Q    You understood that MDO's operating
15 agreement limits the transfers of membership or other
16 equity interests in Mozido Investments and BRTMDO,
17 correct?
18  A    I assert my Fifth Amendment rights.
19  Q    You understand that any such transfers and
20 violations of the operating agreements "are wholly
21 void and shall not effectuate the transfer and
22 issuance contemplated thereby" for MDO's operating
23 agreement, correct?
24  A    I assert my Fifth Amendment rights.
25  Q    You did not report transfers in violation

Page 41

1 of the MDO operating agreement to MDO's Board of
2 Directors, correct?
3     A   I assert my Fifth Amendment rights.
4     Q   You did not report transfers in violation
5 of MDO's operating agreement to MDO's management,
6 correct?
7     A   I assert my Fifth Amendment rights.
8     Q   You did not report transfers in violation
9 of MDO's operating agreement in Mobile Tech
10 Investments, LLC, correct?
11     A   I assert my Fifth Amendment rights.
12     Q   You did not withdraw from representing MDO
13 when you knew that Liberty was violating MDO's
14 operating agreement, correct?
15     A   I assert my Fifth Amendment rights.
16     Q   You did not inform investors that the
17 purported transfer of membership interests in Mozido
18 Investments was void, correct?
19     A   I assert my Fifth Amendment rights.
20     Q   For example, you did not tell Mr. Hallet
21 that the purchase of Invesco notes which were
22 convertible into Mozido Investment units was void,
23 correct?
24     A   I assert my Fifth Amendment rights.
25     Q   You continued to participate directly and

Page 42

1 indirectly in the sales of securities in violation of
2 MDO's operating agreement, correct?
3     A   I assert my Fifth Amendment rights.
4     Q   Marcus Clegg received tens of thousands of
5 dollars in legal fees relating to the void transfers
6 of interest in Mozido Investments, correct?
7     A   I assert my Fifth Amendment rights.
8     Q   In connection with advising MDO concerning
9 the 2002 exchange offer between Family Mobile and
10 investors in Mozido Invesco, you never advised MDO,
11 including its Board of Directors, that involved void
12 transfers of interests in Mozido Investments that
13 violated MDO's operating agreement, correct?
14     A   I assert my Fifth Amendment rights.
15     Q   You concealed that critical piece of
16 information from your client MDO, right?
17     A   I assert my Fifth Amendment rights.
18     Q   You did so knowingly and intentionally,
19 correct?
20     A   I assert my Fifth Amendment rights.
21     Q   You did it to benefit Michael Liberty and
22 yourself, correct?
23     A   I assert my Fifth Amendment rights.
24     Q   You knew that if the transfer of interest
25 in Mozido Investments were void, your firm would have

Page 43

1 to have returned the tens of thousands of dollars it
2 received in connection with the offering, correct?
3     A   I assert my Fifth Amendment rights.
4     Q   You were aware of the Securities and
5 Exchange Commission's investigation into Mozido
6 Invesco in 2012, correct?
7     A   I assert my Fifth Amendment rights.
8     Q   If you had advised MDO or Mobile Tech in
9 2012 that transfers were void and in violation of the
10 operating agreement, you were concerned that the SEC
11 may bring an action for securities fraud, right?
12         MR. O'CONNOR:  Objection.
13         BY MR. MOORES:
14     A   I assert my Fifth Amendment rights.
15     Q   If I were to ask you questions concerning
16 the limitations and transfer of membership or other
17 equity interest from MDO's operating agreement, you
18 would similarly invoke your Fifth Amendment rights.
19 Is that correct?
20     A   Yes.
21     Q   During 2011 and 2012, you participated in
22 the negotiations of additional fund raising by MDO,
23 correct?
24     A   I assert my Fifth Amendment rights.
25     Q   At that time, you knew what the valuation

Page 44

1 was of what those additional rounds of investment
2 were at, correct?
3     A   I assert my Fifth Amendment rights.
4     Q   During 2011 and 2012, you kept a cap table
5 for MDO, correct?
6     A   I assert my Fifth Amendment rights.
7     Q   In 2011, 2012, you knew that MDO was
8 struggling financially, correct?
9     A   I assert my Fifth Amendment rights.
10     Q   You knew that MDO issued convertible
11 promissory notes in 2011 based on a consent decree
12 and the valuation of MDO of less than $50 million,
13 correct?
14     A   I assert my Fifth Amendment rights.
15     Q   You knew MDO issued convertible promissory
16 notes in 2012 based upon a contemporaneous valuation
17 of $8 million, correct?
18     A   I assert my Fifth Amendment rights.
19     Q   If I asked you any other additional
20 questions concerning your knowledge of the valuation
21 of additional investments in MDO from 2010 through
22 2011, would you similarly invoke your Fifth Amendment
23 rights?
24     A   Yes.
25     Q   You knew in 2011 that Invesco investors

Page 45

1 were concerned about being diluted, correct?
2    A   I assert my Fifth Amendment rights.
3    Q   You knew that Liberty had promised Invesco
4 investors antidilution protection in 2011, correct?
5    A   I assert my Fifth Amendment rights.
6    Q   You assisted Michael Liberty in drafting a
7 letter to investors discussing the antidilution
8 protection that he was offering to them, correct?
9    A   I assert my Fifth Amendment rights.
10    Q   You knew that Mr. Liberty was offering
11 antidilution protection based upon the valuation or
12 added valuation of Mozido of approximately $110
13 million, correct?
14    A   I assert my Fifth Amendment rights.
15    Q   You participated in the amendment of the
16 Family Mobile operating agreement to incorporate Mr.
17 Liberty's offered antidilution protection of Invesco
18 investors, correct?
19    A   I assert my Fifth Amendment rights.
20    Q   During 2010 and 2011, you never informed
21 any Invesco investors that Mr. Liberty was acquiring
22 units of MDO at valuations of less than $108 million,
23 correct?
24    A   I assert my Fifth Amendment rights.
25    Q   You understood that the antidilution

Page 46

1 protection that Mr. Liberty was offering to investors
2 was of little value when the company was actually
3 worth significantly less than the trigger point of
4 the antidilution protection, correct?
5    A   I assert my Fifth Amendment rights.
6    Q   You knew that Michael Liberty had not
7 disclosed to investors that he was acquiring units of
8 MDO at valuations of less than $108 million, correct?
9    A   I assert my Fifth Amendment rights.
10       MR. O'CONNOR:  So I won't keep jumping in,
11 can we agree that you're not asking him to disclose
12 attorney privilege?
13       MR. MOORES:  Correct.  But there are times
14 when Mr. Marcus was --
15       MR. JONES:  While we are stopped, I think
16 it's important on those questions to get the
17 assertion. It is possible later that there would be a
18 waiver or a finding that the privilege didn't exist.
19       MR. O'CONNOR:  Okay.
20       BY MR. MOORES:
21    Q   Mr. Marcus, if I asked you any other
22 questions concerning Mr. Liberty's offer of
23 antidilution protection to Invesco investors, would
24 you similarly invoke your Fifth Amendment rights
25 against self-incrimination?

Page 47

1    A   I would.
2    Q   Mr. Marcus you participated in Invesco's
3 second rescission offer, correct?
4    A   I assert my Fifth Amendment rights.
5    Q   That second rescission offer occurred in
6 January 2012.  Is that correct?
7    A   I assert my Fifth Amendment rights.
8    Q   At the time, Invesco filed a Form D with
9 the Securities and Exchange Commission, correct?
10    A   I assert my Fifth Amendment rights.
11    Q   And in advance of the Form D being filed
12 with the Securities and Exchange Commission, you
13 reviewed the draft Form D.  Is that correct?
14    A   I assert my Fifth Amendment rights.
15    Q   After the Invesco Form D was filed, you
16 received an e-mail from Paul Hess attaching the Form
17 D, correct?
18    A   I assert my Fifth Amendment rights.
19    Q   That Form D had been forwarded to Mr. Hess
20 from an investor, correct?
21    A   I assert my Fifth Amendment rights.
22    Q   At that point, you understood that
23 investors were reading the Form D filed with the
24 Commission, correct?
25    A   I assert my Fifth Amendment rights.

Page 48

1    Q   The Form D that was filed with Invesco had
2 stated that no commissions or finder fees had been
3 paid to anyone in connection with the offering,
4 correct?
5    A   I assert my Fifth Amendment rights.
6    Q   And you understood that Mr. Hess had been
7 receiving commissions of 5 percent in connection with
8 the offering, correct?
9    A   I assert my Fifth Amendment rights.
10    Q   The Form D filed by Invesco in 2012 stated
11 that no payments had been made to related persons.
12 Is that correct?
13    A   I assert my Fifth Amendment rights.
14    Q   In fact, it said zero dollars had been paid
15 to related persons, correct?
16    A   I assert my Fifth Amendment rights.
17    Q   At the time, you understood that was false,
18 correct?
19    A   I assert my Fifth Amendment rights.
20    Q   Invesco filed an amended Form D later in
21 2012. Is that correct?
22    A   I assert my Fifth Amendment rights.
23    Q   You reviewed the draft Form D before it was
24 filed.  Is that correct?
25    A   I assert my Fifth Amendment rights.

Page 49

1   Q   And you understood that there were false
2   statements on the amended Form D before it was filed.
3   Is that correct?
4   A   I assert my Fifth Amendment rights.
5   Q   Following the second rescission offer from
6   Invesco, you knew that Invesco continued to offer
7   convertible promissory notes, correct?
8   A   I assert my Fifth Amendment rights.
9   Q   Following the second rescission offer in
10  2012, you continued to assist Invesco and Liberty
11  with offering the notes, correct?
12  A   I assert my Fifth Amendment rights.
13  Q   Mr. Marcus, you reviewed the second
14  rescission offer made by Invesco, correct?
15  A   I assert my Fifth Amendment rights.
16  Q   The second rescission offer did not
17  disclose that Michael Liberty was obtaining MDO units
18  at valuations of less than $108 million, correct?
19  A   I assert my Fifth Amendment rights.
20  Q   You reviewed the draft second rescission
21  offer before it was sent to investors, correct?
22  A   I assert my Fifth Amendment rights.
23  Q   You knew that the second rescission offer
24  did not identify where the proceeds of the Invesco
25  offering went, correct?

Page 50

1   A   I assert my Fifth Amendment rights.
2   Q   The second rescission offer did not
3   identify that Mr. Hess was receiving commissions in
4   connection with the offering, correct?
5   A   I assert my Fifth Amendment rights.
6   Q   The second rescission, you understood that
7   it contained material omissions.  Is that correct?
8   A   I assert my Fifth Amendment rights.
9   Q   Mr. Marcus, if I ask you any other
10  questions concerning the second rescission offer by
11  Invesco, would you similarly invoke your Fifth
12  Amendment rights against self-incrimination?
13  A   Yes.
14  Q   Lowndes, Drosbick, Doster, Kantor and Leed,
15  the law firm in Florida, provided securities
16  law-related legal services to Invesco and Liberty, is
17  that correct?
18  A   I assert my Fifth Amendment rights.
19  Q   Going forward, I'm going refer to them as
20  Lowndes Drosbick.  Is that okay?
21  A   Yes.
22  Q   The relationship with Lowndes Drosbick and
23  Invesco began by at least December 2011.  Is that
24  correct?
25  A   I assert my Fifth Amendment rights.

Page 51

1   Q   You were involved in communications with
2   attorneys from Lowndes Drosbick and Liberty and
3   Abbass in December 2011, correct?
4   A   I assert my Fifth Amendment rights.
5   Q   On April 30, 2012, Lowndes Drosbick
6   withdrew from representing Invesco, correct?
7   A   I assert my Fifth Amendment rights.
8   Q   Peter Reinhart from Lowndes Drosbick
9   notified Liberty and Abbass of their withdrawal via
10  e-mail, correct?
11  A   I assert my Fifth Amendment rights.
12  Q   Liberty forwarded that e-mail to you on
13  April 30, 2012, correct?
14  A   I assert my Fifth Amendment rights.
15  Q   As of April 30, 2012, you knew why Lowndes
16  Drosbick withdrew, correct?
17  A   I assert my Fifth Amendment rights.
18  Q   Lowndes Drosbick communicated that it
19  withdrew because Invesco had continued to offer
20  securities after the second rescission offer in
21  violation of securities law, correct?
22  A   I assert my Fifth Amendment rights.
23  Q   Invesco continued to offer securities after
24  April 30, 2012, correct?
25  A   I assert my Fifth Amendment rights.

Page 52

1   Q   You knew that Invesco still was offering
2   securities after April 30, 2012, correct?
3   A   I assert my Fifth Amendment rights.
4   Q   Mr. Marcus, if I ask you any other
5   questions concerning the withdrawal of Lowndes
6   Drosbick, would you similarly invoke your Fifth
7   Amendment rights?
8   A   Yes.
9   Q   In May 2012, you attended a Board of
10  Directors meeting of MDO, correct?
11  A   I assert my Fifth Amendment rights.
12  Q   At the meeting, you acted as secretary pro
13  tem, correct?
14  A   I assert my Fifth Amendment rights.
15  Q   You drafted the meeting minutes for the May
16  2012 meeting, correct?
17  A   I assert my Fifth Amendment rights.
18  Q   After the meeting, did you circulate a
19  draft of the meeting minutes for edits or comment?
20  A   I assert my Fifth Amendment rights.
21  Q   Did you receive any edits or comments?
22  A   I assert my Fifth Amendment rights.
23  Q   Did you amend any of the meeting minutes to
24  reflect any requested changes?
25  A   I assert my Fifth Amended rights.

Page 53

1    Q    At the May 2012 MDO Board of Directors
2 meeting, you informed the Board about Family Mobile's
3 request to convert some of its notes into Class B
4 units instead of converting into preferred membership
5 units, correct?
6    A    I assert my Fifth Amendment rights.
7    Q    Did Marcus Clegg represent Family Mobile in
8 May 2012?
9    A    I assert my Fifth Amendment rights.
10    Q    Why did you inform the Board about Family
11 Mobile's request?
12    A    I assert my Fifth Amendment rights.
13    Q    Family Mobile was requesting to convert
14 into Class B membership units because it did not want
15 to provide voting units to Invesco investors,
16 correct?
17    A    I assert my Fifth Amendment rights.
18    Q    Class B membership units were less valuable
19 than preferred membership units, correct?
20    A    I assert my Fifth Amendment rights.
21    Q    Family Mobile did not receive any benefit
22 from converting into Class B membership units instead
23 of preferred membership units, correct?
24    A    I assert my Fifth Amendment rights.
25    Q    I'm going to refer to the offer from Family

Page 54

1 Mobile to the Invesco noteholders that occurred
2 between May and July of 2012 as the exchange offer.
3 Does that make sense to you, Mr. Marcus?
4    A    Yes.
5    Q    How would the exchange offer simplify the
6 capital structure and ownership of MDO?
7    A    I assert my Fifth Amendment rights.
8    Q    What note did Family Mobile decide to
9 convert?
10    A    I assert my Fifth Amendment rights.
11    Q    Family Mobile decided to convert part of
12 the February 2012 note.  Is that correct?
13    A    I assert my Fifth Amendment rights.
14    Q    Why did Family Mobile decide to convert
15 part of its 2012 note?
16    A    I assert my Fifth Amendment rights.
17    Q    Family Mobile had acquired a note in
18 February 2012 from MDO at a valuation of MDO of $8
19 million.  Is that correct?
20    A    I assert my Fifth Amendment rights.
21    Q    At the May 2012 MDO Board of Directors
22 meeting, was there any discussion about the valuation
23 of MDO at that time?
24    A    I assert my Fifth Amendment rights.
25    Q    The Board of Directors had agreed that the

Page 55

1 fair and reasonable value of MDO in May of 2012 was
2 $17.5 million, correct?
3    A    I assert my Fifth Amendment rights.
4    Q    And you knew that because you were at the
5 Board meeting, correct?
6    A    I assert my Fifth Amendment rights.
7    Q    In connection with the exchange offer,
8 Family Mobile converted approximately $1.9 million of
9 its $3 million February 2012 convertible promissory
10 note issued by MDO, correct?
11    A    I assert my Fifth Amendment rights.
12    Q    With $1.9 million, Family Mobile was able
13 to acquire all of the necessary units to exchange
14 with Invesco noteholders, correct?
15    A    I assert my Fifth Amendment rights.
16    Q    And you knew this at the time, correct?
17    A    I assert my Fifth Amendment rights.
18    Q    You were representing MDO in connection
19 with the conversion, correct?
20    A    I assert my Fifth Amendment rights.
21    Q    You were also representing Family Mobile in
22 connection with the conversion, correct?
23    A    I assert my Fifth Amendment rights.
24    Q    You were representing Invesco in connection
25 with the exchange offer, right?

Page 56

1    A    I assert my Fifth Amendment rights.
2    Q    You were representing Michael Liberty in
3 connection with the exchange offer?
4    A    I assert my Fifth Amendment rights.
5    Q    Do you perceive any conflict of interest
6 between all of parties you were representing in 2012?
7    A    I assert my Fifth Amendment rights.
8    Q    The exchange offer involved the exchange of
9 over $18 million worth of promissory notes by Invesco
10 investors, correct?
11    A    I assert my Fifth Amendment rights.
12    Q    The Invesco noteholders gave up $18 million
13 worth of notes in exchange for $1.9 million worth of
14 non-voting Class B units, correct?
15    A    I assert my Fifth Amendment rights.
16    Q    In connection with the exchange offer,
17 Invesco investors received an offering memorandum,
18 correct?
19    A    I assert my Fifth Amendment rights.
20    Q    You received a copy of the offering
21 memorandum before it was sent to investors, correct?
22    A    I assert my Fifth Amendment rights.
23    Q    The offering memorandum for the exchange
24 offer did not inform investors that their $18 million
25 worth of notes in the aggregate was going to be

Page 57

1 exchanged for $1.9 million worth of units, correct?
2    A   I assert my Fifth Amendment rights.
3    Q   In connection with the exchange offer,
4 Family Mobile sent to investors a note exchange and
5 subscription agreement, correct?
6    A   I assert my Fifth Amendment rights.
7    Q   The note exchange and subscription
8 agreement stated that the parties agree that the fair
9 market value of each 6.26 Class B unit exchange under
10 this agreement is equal to $1. Is that correct?
11    A   I assert my Fifth Amendment rights.
12    Q   That equates to a fair market value of each
13 Class B unit of approximately 16 cents. Is that
14 correct?
15    A   I assert my Fifth Amendment rights.
16    Q   What was the cost that Family Mobile paid
17 for each of those Class B units?
18    A   I assert my Fifth Amendment rights.
19    Q   You knew that the cost was approximately
20 1.7 cents per Class B unit, correct?
21    A   I assert my Fifth Amendment rights.
22    Q   In the exchange offering memorandum or any
23 other documentation provided to investors, it did not
24 state that a Class B unit cost Family Mobile 1.7
25 cents, correct?

Page 58

1    A   I assert my Fifth Amendment rights.
2    Q   You knew that the cost of the Class B units
3 was important because it would determine what the
4 capital account was for each of those investors,
5 correct?
6    A   I assert my Fifth Amendment rights.
7    Q   The capital account was based upon the
8 amount of money that was paid for those units by
9 Family Mobile, correct?
10    A   I assert my Fifth Amendment rights.
11    Q   A Class B member who accepted the exchange
12 offer, their capital accounts would reflect less than
13 10 percent of the principal investment that they had
14 made into Mozido Invesco, correct?
15    A   I assert my Fifth Amendment rights.
16    Q   And you knew this at this time?
17    A   I assert my Fifth Amendment rights.
18    Q   But you didn't disclose it to any of the
19 Invesco investors, correct?
20    A   I assert my Fifth Amendment rights.
21    Q   You did not ensure that the offering,
22 memorandum stated that, correct?
23    A   A assert my Fifth Amendment rights.
24    Q   If I ask you any other questions relating
25 to the exchange offer, would you similarly invoke

Page 59

1 your Fifth Amendment rights against
2 self-incrimination?
3    A   Yes.
4    MR. O'CONNOR:  Is now a good place to take
5 a break?
6    MR. MOORES:  Yes, let's do that.  We are
7 off the record at 11:10.
8    (A brief recess was taken.)
9    MR. MOORES:  It's 11:15 and we are back on
10 the record.
11    BY MR. MOORES:
12    Q   Mr. Marcus, did Marcus Clegg represent
13 Mobile Money Partners, LLC?
14    A   I assert my Fifth Amendment rights.
15    Q   What work did you provide or what legal
16 services did you provide to Mobile Money Partners?
17    A   I assert my Fifth Amendment rights.
18    Q   You knew that in July of 2012 MDO issued to
19 Mobile Money Partners a convertible promissory note,
20 right?
21    A   I assert my Fifth Amendment rights.
22    Q   The valuation for that convertible
23 promissory note was $17.5 million of MDO, correct?
24    A   I assert my Fifth Amendment rights.
25    Q   And that was consistent with the Board of

Page 60

1 Directors determination that MDO's value at that time
2 was $17.5 million, correct?
3    A   I assert my Fifth Amendment rights.
4    Q   You drafted the convertible promissory note
5 issued to Mobile Money Partner, correct?
6    A   I assert my Fifth Amendment rights.
7    Q   And you were keeping the cap table for MDO
8 at that time, correct?
9    A   I assert my Fifth Amendment rights.
10    Q   You drafted the note purchase agreement
11 that was provided along with the convertible
12 promissory note to Mobile Money Partners, correct?
13    A   I assert my Fifth Amendment rights.
14    Q   You knew that the investment contracts for
15 the Mobile Money Partners $5 million investment in
16 MDO contained a prohibition of Mobile Money Partners
17 to transfer any of their rights in MDO units without
18 authority, correct?
19    A   I assert my Fifth Amendment rights.
20    Q   In August 2012, Michael Liberty began
21 offering investors convertible promissory notes that
22 were to be issued by BRTMDO, correct?
23    A   I assert my Fifth Amendment rights.
24    Q   And you knew that Michael Liberty was doing
25 that, correct?

Page 61

1    A   I assert my Fifth Amendment rights.
2    Q   In August 2012, Mr. Liberty began offering
3  to investors convertible promissory notes issued by
4  Brentwood Financial, correct?
5    A   I assert my Fifth Amendment rights.
6    Q   Investors weren't told that the reason for
7  a switch between offering the notes from Brentwood
8  Financial instead of BRTMDO was because BRTMDO did
9  not own any preferred units in MDO, correct?
10   A   I assert my Fifth Amendment rights.
11   Q   And investors were told that in August 2012
12 Brentwood Financial did own preferred units or had
13 interest in preferred units of MDO, correct?
14   A   I assert my Fifth Amendment rights.
15   Q   You authorized those communications to
16 investors that stated that BRTMDO did not own units
17 of MDO but that Brentwood Financial did own units of
18 MDO, correct?
19       MR. O'CONNOR:  I instruct the witness not
20 to answer to the extent doing so would involve
21 revealing attorney/client communications.
22       BY MR. MOORES:
23   A   I assert my Fifth Amendment rights.
24   Q   You were copied on communication to
25 investors in August 2012 that stated that Brentwood

Page 62

1  Financial owned units or had interest in units of
2  MDO, correct?
3    A   I assert my Fifth Amendment rights.
4    Q   In August 2012, you sent to an attorney for
5  an investor a balance sheet for Brentwood Financial,
6  correct?
7    A   I assert my Fifth Amendment rights.
8    Q   That balance sheet for Brentwood Financial
9  stated that it had an investment in MDO, correct?
10   A   I assert my Fifth Amendment rights.
11   Q   You knew at the time that Brentwood
12 Financial was not invested in MDO, correct?
13   A   I assert my Fifth Amendment rights.
14   Q   You knew that MDO had not issued any
15 convertible promissory notes to Brentwood Financial,
16 correct?
17   A   I assert my Fifth Amendment rights.
18   Q   You knew at the time that Brentwood
19 Financial had not acquired preferred units of MDO in
20 accordance with any investment contracts, correct?
21   A   I assert my Fifth Amendment rights.
22   Q   You knew the balance sheet was false when
23 you sent it to the attorney for the investor,
24 correct?
25   A   I assert my Fifth Amendment rights.

Page 63

1    Q   In September 2012, you communicated with
2  either investors or attorneys for investors who were
3  interested in acquiring convertible promissory notes
4  issued by Brentwood Financial, correct?
5    A   I assert my Fifth Amendment rights.
6    Q   During your communications, you did not
7  disclose to any of those investors what MDO had set
8  as its current valuation, correct?
9    A   I assert my Fifth Amendment rights.
10   Q   You knew that in early September 2012 that
11 the MDO Board had set a valuation of itself or of MDO
12 of $25 million for the purpose of investment,
13 correct?
14   A   I assert my Fifth Amendment rights.
15   Q   After September 25, 2012, you did not
16 disclose to investors that MDO's Board had set a
17 valuation for itself of $25 million, correct?
18   A   I assert my Fifth Amendment rights.
19   Q   You in communication with investors told
20 them that the contemporaneous value of MDO was $100
21 million, correct?
22   A   I assert my Fifth Amendment rights.
23   Q   You knew that to be false, correct?
24   A   I assert my Fifth Amendment rights.
25   Q   You knew that to be misleading, correct?

Page 64

1    A   I assert my Fifth Amendment rights.
2    Q   In September, in the fall of 2012, you
3  communicated with a prospective investor concerning
4  the triple liquidation preference of the preferred
5  units of MDO, correct?
6    A   I assert my Fifth Amendment rights.
7    Q   In explaining the triple liquidation
8  preference to the investor, you failed to tell him
9  that the face value, which would have been tripled,
10 was based upon the value of the unit when it was
11 issued by MDO, correct?
12   A   I assert my Fifth Amendment rights.
13   Q   You knew that it was misleading to explain
14 the triple liquidation preference to the investor
15 without identifying for him that the face value of
16 the units was at least one fourth the amount that he
17 was investing?
18   A   I assert my Fifth Amendment rights.
19   Q   You knew that the triple liquidation
20 preference was important to investors, correct?
21   A   I assert my Fifth Amendment rights.
22   Q   You knew that Michael Liberty was directing
23 investors to wire the proceeds of the investment to
24 your firm's IOLTA account, correct?
25   A   I assert my Fifth Amendment rights.

Page 65

1    Q    You agreed with Michael Liberty to receive
2  the proceeds of the investments from Brentwood
3  Financial and BRTMDO into your firm's IOLTA account,
4  correct?
5    A    I assert my Fifth Amendment rights.
6    Q    Marcus Clegg is responsible for maintaining
7  records as to client funds in the firm's IOLTA
8  accounts, correct?
9    A    I assert my Fifth Amendment rights.
10   Q    Marcus Clegg was responsible for tracking
11 money that came in and out of its IOLTA accounts,
12 correct?
13   A    I assert my Fifth Amendment rights.
14   Q    Marcus Clegg was responsible for
15 maintaining balances for each client in its IOLTA
16 accounts, correct?
17   A    I assert my Fifth Amendment rights.
18   Q    For example, Marcus Clegg was responsible
19 for maintaining account balance for Brentwood
20 Financial, correct?
21   A    I assert my Fifth Amendment rights.
22   Q    Marcus Clegg was responsible for
23 maintaining an account balance for monies received
24 from BRTMDO, correct?
25   A    I assert my Fifth Amendment rights.

Page 66

1    Q    So at any point in time, Marcus Clegg was
2  responsible to identify monies coming in from
3  particular clients and monies going out for those
4  clients, correct?
5    A    I assert my Fifth Amendment rights.
6    Q    You knew that millions of dollars were
7  being transferred into the Marcus Clegg IOLTA account
8  as proceeds of the sales of securities of BRTMDO and
9  Brentwood Financial in the fall of 2012, correct?
10   A    I assert my Fifth Amendment rights.
11   Q    You received legal fees in connection with
12 the BRTMDO offering, correct?
13   A    I assert my Fifth Amendment rights.
14   Q    And you received legal fees in connection
15 with the Brentwood Financial offering, correct?
16   A    I assert my Fifth Amendment rights.
17   Q    You had read the operating agreement for
18 Family Mobile, correct?
19   A    I assert my Fifth Amendment rights.
20   Q    You had read the operating agreement for
21 Mobile Money Partners, correct?
22   A    I assert my Fifth Amendment rights.
23   Q    As of August 2012, you knew what the
24 ownership percentages were of Michael Liberty in
25 Family Mobile, correct?

Page 67

1    A    I assert my Fifth Amendment rights.
2    Q    As of August 2012, you knew what the
3  percentage ownership of Mobile Money Partners was
4  with Michael Liberty, correct?
5    A    I assert my Fifth Amendment rights.
6    Q    You understood that Brentwood Financial and
7  BRTMDO were issuing securities with a conversion
8  price of approximately 6.2 cents per unit, correct?
9    A    I assert my Fifth Amendment rights.
10   Q    You knew that the conversion price for
11 Mobile Money Partners in the acquisition of its note
12 in July of 2012 was approximately 1.85 cents per
13 preferred unit of MDO, correct?
14   A    I assert my Fifth Amendment rights.
15   Q    You knew that the proceeds from the
16 Brentwood Financial offering was not directed to MDO,
17 correct?
18   A    I assert my Fifth Amendment rights.
19   Q    You knew that the proceeds from the
20 Brentwood Financial offering was not used for working
21 capital of Brentwood Financial, correct?
22   A    I assert my Fifth Amendment rights.
23   Q    You knew that the proceeds from the BRTMDO
24 offering was not directed toward MDO, correct?
25   A    I assert my Fifth Amendment rights.

Page 68

1    Q    In your communications with investors for
2  BRTMDO, you did not inform them that their money was
3  not being used for MDO's business purposes, correct?
4    Q    In communications with Brentwood Financial
5  Q    In communications with Brentwood Financial
6  investors, you did not inform them that their money
7  was not being used for MDO's business purposes,
8  correct?
9    A    I assert my Fifth Amendment rights.
10   Q    In the communications with investors for
11 BRTMDO, you did not inform them that Michael Liberty
12 was using the money for his personal benefit, did
13 you?
14   A    I assert my Fifth Amendment rights.
15   Q    In communications with investors for
16 Brentwood Financial, you did not communicate to them
17 that Michael Liberty was using proceeds from their
18 investments for his personal benefit, correct?
19   A    I assert my Fifth Amendment rights.
20   Q    In communications with investors for
21 Brentwood Financial, you did not tell them that
22 Brentwood Financial did not possess any rights in the
23 fall of 2012 to MDO preferred units, correct?
24   A    I assert my Fifth Amendment rights.
25   Q    In communications with BRTMDO investors,

Page 69

1 you did not inform them that BRTMDO did not possess
2 rights to MDO preferred units in the fall of 2012,
3 correct?
4    A   I assert my Fifth Amendment rights.
5    Q   On October 29, 2012, you e-mailed Richard
6 Bradick a cap table.  Is that correct?
7    A   I assert my Fifth Amendment rights.
8    Q   Who is Richard Bradick?
9    A   I assert my Fifth Amendment rights.
10   Q   In October 2012, Bradick was affiliated
11 with MDO.  Is that correct?
12   A   I assert my Fifth Amendment rights.
13   Q   The cap table that listed investors that
14 you sent to Bradick in October of 2012 did not list
15 Brentwood Financial.  Is that correct?
16   A   I assert my Fifth Amendment rights.
17   Q   It was your understanding in October of
18 2012 that Brentwood Financial did not possess any
19 interest in MDO, correct?
20   A   I assert my Fifth Amendment rights.
21   Q   In communications with an investor in
22 September 2012, you indicated that the proposed
23 promissory note contained antidilution protections.
24 What antidilution protections were you referring to?
25   A   I assert my Fifth Amendment rights.

Page 70

1    Q   Do you assert your Fifth Amendment rights
2 against self-incrimination as to all questions
3 concerning the initiation of the Brentwood Financial
4 offering in the fall and winter of 2012?
5       MR. O'CONNOR:  I note again we have talked
6 about that.
7       BY MR. MOORES:
8    A   I reserve those rights.
9    Q   Do you assert your testimony on the Fifth
10 Amendment rights as to all questions concerning the
11 initial stage of the BRTMDO offering in the fall and
12 winter 2012?
13   A   Yes.
14   Q   In January 2013, BRTMDO filed a Form D with
15 the Commission, correct?
16   A   I assert my Fifth Amendment rights.
17   Q   You reviewed a draft of that Form D prior
18 to its filing, correct?
19   A   I assert my Fifth Amendment rights.
20   Q   The BRTMDO Form D stated that no
21 commissions or finder's fee was paid in connection
22 with the offering, correct?
23   A   I assert my Fifth Amendment rights.
24   Q   At the time, you knew that Hess was
25 receiving commissions in connection with the BRTMDO

Page 71

1 offering, correct?
2    A   I assert my Fifth Amendment rights.
3    Q   You knew that there was a false statement
4 on the Form D filed by BRTMDO, correct?
5    A   I assert my Fifth Amendment rights.
6    Q   The Form D for BRTMDO stated that no
7 payments were made to any related persons, correct?
8    A   I assert my Fifth Amendment rights.
9    Q   At the time, you knew that Michael Liberty
10 was receiving the proceeds for his personal benefit
11 of the BRTMDO offering, correct?
12   A   I assert my Fifth Amendment rights.
13   Q   You knew that was a false statement at the
14 time, correct?
15   A   I assert my Fifth Amendment rights.
16   Q   In January 2013, Brentwood Financial filed
17 a Form D with the Commission, correct?
18   A   I assert my Fifth Amendment rights.
19   Q   You received a copy of the Form D before it
20 was filed, correct?
21   A   I assert my Fifth Amendment rights.
22   Q   The Form D as filed by Brentwood Financial
23 stated that zero dollars in payments had been made to
24 related persons, correct?
25   A   I assert my Fifth Amendment rights.

Page 72

1    Q   You knew at the time that the proceeds from
2 the Brentwood Financial offering had been used by Mr.
3 Liberty for his personal benefit, correct?
4    A   I assert my Fifth Amendment rights.
5    Q   You understood that the Form D was false as
6 filed in 2013, correct?
7    A   I assert my Fifth Amendment rights.
8    Q   In communications with investors in 2013 in
9 connection with the Brentwood Financial and BRTMDO
10 offerings, you never informed investors that the
11 proceeds of their investment would be used by Michael
12 Liberty personally, correct?
13   A   I assert my Fifth Amendment rights.
14   Q   In July of 2013, you e-mailed counsel for
15 Real Whale, LLC about how funds were being used.  Is
16 that correct?
17   A   I assert my Fifth Amendment rights.
18   Q   You stated that Brentwood uses its
19 substantial position in Mozido to raise additional
20 liquidity to invest funds back into Mozido.  Is that
21 correct?
22   A   I assert my Fifth Amendment rights.
23   Q   And you understood at that time that
24 statement was false, correct?
25   A   I assert my Fifth Amendment rights.

Page 73

1    Q    In January 2013, you communicated with
2 Richard Bradick concerning the transfer of preferred
3 units by Michael Liberty, correct?
4    A    I assert my Fifth Amendment rights.
5    Q    In those communications with Mr. Bradick,
6 you stated that investors to Brentwood Financial and
7 Brentwood offering knew that they were purchasing
8 units at a higher valuation than Mr. Liberty could
9 acquire them, correct?
10    A    I assert my Fifth Amendment rights.
11    Q    What is the basis of your understanding
12 that all the investors knew about that?
13    A    I assert my Fifth Amendment rights.
14    Q    In communications with Mr. Bradick in 2013,
15 you stated that all investors were accredited.  Is
16 that true?
17    A    I assert my Fifth Amendment rights.
18    Q    You knew that investors in the Invesco
19 offering and the BRTMDO offering were not accredited,
20 correct?
21    A    I assert my Fifth Amendment rights.
22    Q    You understood that, first in connection
23 with the Invesco offering and then later with the
24 BRTMDO offering, investors grouped together and
25 formed LLC's. Is that correct?

Page 74

1    A    I assert my Fifth Amendment rights.
2    Q    And that LLCs, such as Maniac, Newman
3 Brotherhood, contained nonaccredited investors.  Is
4 that correct?
5    A    I assert my Fifth Amendment rights.
6    Q    You understood that the intent of forming
7 the LLCs was to decrease the total number of
8 investors, correct?
9    A    I assert my Fifth Amendment rights.
10    Q    And that was done in an effort to
11 circumvent the securities regulations, correct?
12    A    I assert my Fifth Amendment rights.
13    Q    What is the 99 Investor Rule?
14    A    I assert my Fifth Amendment rights.
15    Q    You knew in connection with the Invesco
16 offering and the BRTMDO offering that those issuers
17 were in violation of the 99 Investor Rule, correct?
18    A    I assert my Fifth Amendment rights.
19    Q    In communication with Mr. Bradick in 2013,
20 Mr. Bradick stated that he was not going to authorize
21 the transfer of preferred units by Michael Liberty
22 from entities that he owned to downstream investors,
23 correct?
24    A    I assert my Fifth Amendment rights.
25    Q    At that time, there was a draft Board

Page 75

1 resolution that was circulated which would have
2 authorized BRTMDO and Brentwood M Investments, LLC to
3 transfer units that it acquired to other investors,
4 right?
5    A    I assert my Fifth Amendment rights.
6    Q    And that Board resolution was never passed
7 by the MDO Board of Directors, correct?
8    A    I assert my Fifth Amendment rights.
9    Q    BRTMDO did not have any authority to
10 transfer any of the units that it possessed or had
11 rights to, correct?
12    A    I assert my Fifth Amendment rights.
13    Q    After January, after the communications
14 with Mr. Bradick, you continued to assist Michael
15 Liberty in the BRTMDO offering, correct?
16    A    I assert my Fifth Amendment rights.
17    Q    You continued to communicate with investors
18 concerning BRTMDO's offering, correct?
19    A    I assert my Fifth Amendment rights.
20    Q    And you never disclosed to BRTMDO investors
21 that the transfer of units to them by BRTMDO was not
22 authorized by MDO, correct?
23    A    I assert my Fifth Amendment rights.
24    Q    At some point during 2013, Mr. Bradick was
25 no longer the executive chairman of MDO, correct?

Page 76

1    A    I assert my Fifth Amendment rights.
2    Q    In June 2013, MDO issued for the first time
3 since at least August of 2010 a convertible
4 promissory note to BRTMDO, correct?
5    A    I assert my Fifth Amendment rights.
6    Q    In June 2013, MDO for the first time issued
7 a convertible promissory note to Brentwood Financial,
8 correct?
9    A    I assert my Fifth Amendment rights.
10    Q    The promissory note issued by MDO to BRTMDO
11 was convertible into preferred units of MDO at a
12 valuation of $25 million, correct?
13    A    I assert my Fifth Amendment rights.
14    Q    The promissory note issued by MDO to
15 Brentwood Financial was convertible into preferred
16 membership units of MDO at a valuation of $25
17 million, correct?
18    A    I assert my Fifth Amendment rights?
19    Q    The approximate price or conversion price
20 for those notes was 1.8 cents, correct?
21    A    I assert my Fifth Amendment rights.
22    Q    The notes issued by MDO to BRTMDO and
23 Brentwood Financial in June of 2013 precluded the
24 transfer, pledge, sale or assignment of the preferred
25 units to third parties without MDO's approval,

Page 77

1  correct?
2      A    I assert my Fifth Amendment rights.
3      Q    Following the issuance of those notes,
4  BRTMDO and Brentwood Financial did not seek the
5  approval to transfer any preferred units during 2013,
6  correct?
7      A    I assert my Fifth Amendment rights.
8      Q    You knew that the units that were connected
9  to these notes from June of 2013 were
10  non-transferrable, correct?
11      A    I assert my Fifth Amendment rights.
12      Q    And yet you never disclosed to any investor
13  that the units they were attempting to purchase were
14  non-transferrable and they couldn't receive them?
15      A    I assert my Fifth Amendment rights.
16      Q    BRTMDO and Brentwood Financial filed
17  amended Form D's with the Commission.  Is that
18  correct?
19      A    I assert my Fifth Amendment rights.
20      Q    And you reviewed before they were filed the
21  draft amended Form D's for BRTMDO, correct?
22      A    I assert my Fifth Amendment rights.
23      Q    Before they were filed, you reviewed the
24  Form D's for Brentwood Financial that were filed with
25  the Commission, correct?

Page 78

1      A    I assert my Fifth Amendment rights.
2      Q    You knew those draft Form D's contained
3  false information, correct?
4      A    I assert my Fifth Amendment rights.
5      Q    In connection with the Brentwood Financial
6  and BRTMDO offerings, Mr. Liberty provided personal
7  guaranties to investors, correct?
8      A    I assert my Fifth Amendment rights.
9      Q    You knew that he offered personal
10  guaranties. Is that correct?
11      A    I assert my Fifth Amendment rights.
12      Q    You had originally drafted personal
13  guaranty documents for the BRTMDO and Brentwood
14  Financial offerings, correct?
15      A    I assert my Fifth Amendment rights.
16      Q    In fact, you drafted the original
17  convertible promissory note for the BRTMDO and
18  Brentwood Financial offerings, correct?
19      A    I assert my Fifth Amendment rights.
20      Q    You had drafted the note purchase
21  agreements for the BRTMDO and Brentwood Financial
22  offerings, correct?
23      A    I assert my Fifth Amendment rights.
24      Q    What information was provided to investors
25  concerning Mr. Liberty's financial wherewithal in

Page 79

1  connection with the personal guaranties?
2      A    I assert my Fifth Amendment rights.
3      Q    You knew that in the Keystone matter
4  Michael Liberty had sworn that his net worth as of at
5  least June of 2009 was less than negative $25
6  million, correct?
7      A    I assert my Fifth Amendment rights.
8      Q    You never observed Mr. Liberty or any other
9  of his agents disclose his financial statement to
10  investors in connection with his personal guaranty,
11  correct?
12      A    I assert my Fifth Amendment rights.
13      Q    In your communication with investors
14  receiving personal guaranties from Michael Liberty,
15  you never communicated with them or provided
16  information concerning his financial statement filed
17  with or provided to the SEC in the Keystone matter,
18  correct?
19      A    I assert my Fifth Amendment rights.
20      Q    Mr. Liberty didn't always pay his bills on
21  time to Marcus Clegg, did he?
22      A    I assert my Fifth Amendment rights.
23      Q    At different points in time, Mr. Liberty's
24  financial situation was very poor, correct?
25      A    I assert my Fifth Amendment rights.

Page 80

1      Q    And you knew this based upon all of your
2  work with him, correct?
3      A    I assert my Fifth Amendment rights.
4      Q    You knew that Michael Liberty had defaulted
5  on numerous loans since 2008, correct?
6      A    I assert my Fifth Amendment rights.
7      Q    What is Go-Mo Investments?
8      A    I assert my Fifth Amendment rights.
9      Q    Did Go-Mo sue Michael Liberty?
10      A    I assert my Fifth Amendment rights.
11      Q    When did Go-Mo Investments sue Michael
12  Liberty?
13      A    I assert my Fifth Amendment rights.
14      Q    You knew that Go-Mo Investments was an
15  investor in Mozido Investments, correct?
16      A    I assert my Fifth Amendment rights.
17      Q    And it had invested in Mozido Investments
18  as a way to invest in MDO, correct?
19      A    I assert my Fifth Amendment rights.
20      Q    There was a personal guaranty in connection
21  with the loan involving Go-Mo Investments, correct?
22      A    I assert my Fifth Amendment rights.
23      Q    You knew Michael Liberty defaulted on the
24  personal guaranty to Go-Mo Investments, correct?
25      A    I assert my Fifth Amendment rights.

Page 81

1    Q    You knew that the action filed by Go-Mo
2  Investments involving Michael Liberty was settled in
3  September of 2013, correct?
4    A    I assert my Fifth Amendment rights.
5    Q    And in connection with that settlement,
6  $1.2 million was paid to Go-Mo Investments, correct?
7    A    I assert my Fifth Amendment rights.
8    Q    You knew because you were involved in that
9  litigation or Marcus Clegg was involved in that
10  litigation, correct?
11    A    I assert my Fifth Amendment rights.
12    Q    The $1.2 million to settle the Go-Mo
13  Investments was paid from Marcus Clegg's IOLTA
14  account, right?
15    A    I assert my Fifth Amendment rights.
16    Q    The default on the loans occurred in May of
17  2010. Is that correct?
18    A    I assert my Fifth Amendment rights.
19    Q    Why didn't you disclose the Go-Mo
20  investment to any of the BRTMDO and Brentwood
21  Financial investors?
22    A    I assert my Fifth Amendment rights.
23    Q    You never disclosed the Go-Mo investment
24  and default on the loans to a MDO investor and any of
25  the other investors, correct?

Page 82

1    A    I assert my Fifth Amendment rights.
2    Q    Who is Herbert Zieben?
3    A    I assert my Fifth Amendment rights.
4    Q    Michael Liberty had provided a personal
5  guaranty on loans.  Is that correct?
6    A    I assert my Fifth Amendment rights.
7    Q    And there had been a default on a loan by
8  Mr. Liberty on the personal guaranty, correct?
9    A    I assert my Fifth Amendment rights.
10    Q    In approximately December 26, 2011, Michael
11  Liberty entities agreed to pay approximately $3.6
12  million, plus interest.  Is that correct?
13    A    I assert my Fifth Amendment rights.
14    Q    Where did Michael Liberty get the money to
15  pay that settlement?
16    A    I assert my Fifth Amendment rights.
17    Q    Did Michael Liberty use proceeds from
18  Invesco investors to pay for that settlement?
19    A    I assert my Fifth Amendment rights.
20    Q    Do you know what a Ponzi scheme is?
21    A    I assert my Fifth Amendment rights.
22    Q    You never observed Mr. Liberty disclose to
23  any investors for which he was offering personal
24  guaranty that he defaulted on loans relating to Mr.
25  Zieben, correct?

Page 83

1    A    I assert my Fifth Amendment rights.
2    Q    You never disclosed to any BRTMDO,
3  Brentwood Financial or Invesco investors that Mr.
4  Liberty had defaulted on a personal guaranty to Mr.
5  Zieben, correct?
6    A    I assert my Fifth Amendment rights.
7    Q    You never communicated to Invesco investors
8  that proceeds of their investments were paid to
9  settle that case, correct?
10    A    I assert my Fifth Amendment rights.
11    Q    Did Mobile Money Partners ever borrow money
12  from Mr. Geier or any of his affiliated entities?
13    A    I assert my Fifth Amendment rights.
14    Q    You knew that Geier or one of affiliated
15  entities loaned Mobile Money Partners $3 million,
16  correct?
17    A    I assert my Fifth Amendment rights.
18    Q    You understood that Michael Liberty
19  personally guaranteed that $3 million loan from Geier
20  or one of his affiliated entities, correct?
21    A    I assert my Fifth Amendment rights.
22    Q    You knew there was a demand that was made
23  on Liberty to perform on the guaranty, correct?
24    A    I assert my Fifth Amendment rights.
25    Q    You knew that Liberty defaulted on the

Page 84

1  personal guaranty, correct?
2    A    I assert my Fifth Amendment rights.
3    Q    You know that on approximately December 3,
4  2012, the Geier Group, LLC and the Philip I. Geier,
5  Junior Irrevocable Trust filed for summary judgment
6  without a complaint against Liberty and others in New
7  York State Court concerning this loan, correct?
8    A    I assert my Fifth Amendment rights.
9    Q    Was that ever disclosed to investors
10  contemporaneously?
11    A    I assert my Fifth Amendment rights.
12    Q    Why not?
13    A    I assert my Fifth Amendment rights.
14    Q    You knew that Mr. Liberty completed an
15  affidavit for confession of judgment on or about
16  January 18, 2013 in connection with this loan,
17  correct?
18    A    I assert my Fifth Amendment rights.
19    Q    You knew that in the affidavit, Liberty
20  swore that he executed an unconditional guaranty
21  under which he agreed to individually guaranty the
22  debts of Mobile Money Partners to the Geier entities,
23  correct?
24    A    I assert my Fifth Amendment rights.
25    Q    You knew that in the affidavit, Liberty

Page 85

1 swore he had failed to make the required payments
2 under the promissory note in order to guaranty the
3 total of $3.37 million, correct?
4     A   I assert my Fifth Amendment rights.
5     Q   You never disclosed this to any of the
6 BRTMDO, Brentwood Financial or Invesco investors
7 contemporaneously with this affidavit, correct?
8     A   I assert my Fifth Amendment rights.
9     Q   Why not?
10    A   I assert my Fifth Amendment rights.
11    Q   You knew that on approximately April 5,
12 2013, a judgment was entered by the New York State
13 Court in favor of the Geier entities against Liberty
14 in the amount of $3.37 million, correct?
15    A   I assert my Fifth Amendment rights.
16    Q   And you never disclosed any of that to the
17 BRTMDO or Brentwood Financial investors or Class B
18 unit holders contemporaneously, correct?
19    A   I assert my Fifth Amendment rights.
20    Q   Why not?
21    A   I assert my Fifth Amendment rights.
22    Q   You wanted to conceal that from investors,
23 correct?
24    A   I assert my Fifth Amendment rights.
25    Q   You knew that was material, correct?

Page 86

1     A   I assert my Fifth Amendment rights.
2     Q   In fact, investors identified this in
3 advance of investing and decided not to invest on
4 such grounds, correct?
5     A   I assert my Fifth Amendment rights.
6     Q   Mr. Marcus, do you assert your Fifth
7 Amendment testimonial rights as to all questions
8 concerning defaults on loans or personal guaranties
9 involving Michael Liberty and their disclosure to
10 investors?
11    A   Yes.
12        MR. MOORES:  Its approximately 12:03 p.m.
13 Let's go off the record.
14        (Whereupon, at 12:03 p.m., a luncheon
15 recess was taken.)
16        A F T E R N O O N   S E S S I O N
17        MR. MOORES:  It's 1:05 p.m. and we are back
18 on the record.
19        BY MR. MOORES:
20    Q   Mr. Marcus, before lunch, we had talked
21 about a communication with Mr. Bradick in January of
22 2013. During that communication, you referred to a
23 "spread." Is that true?
24    A   I assert my Fifth Amendment rights.
25    Q   You knew in January of 2013 that investors

Page 87

1 had not been informed of a spread.  Is that correct?
2     A   I assert my Fifth Amendment rights.
3     Q   With respect to the BRTMDO and Brentwood
4 Financial offerings, you knew that no offering
5 memorandum was provided in connection with those
6 offerings, correct?
7     A   I assert my Fifth Amendment rights.
8     Q   In connection with the BRTMDO and Brentwood
9 Financial offerings, you knew that no financial
10 statements were provided to investors, correct?
11    A   I assert my Fifth Amendment rights.
12    Q   Have you ever loaned money to Michael
13 Liberty?
14    A   I assert my Fifth Amendment rights.
15    Q   Has Marcus Clegg ever loaned money to
16 Michael Liberty?
17    A   I assert my Fifth Amendment rights.
18    Q   In the BRTMDO convertible promissory notes,
19 when does the purchaser's right to convert expire?
20    A   I assert my Fifth Amendment rights.
21    Q   You knew that the purchaser's right to
22 convert in the BRTMDO convertible promissory notes
23 terminated at the maturity of the note, right?
24    A   I assert my Fifth Amendment rights.
25    Q   With respect to Brentwood Financial's

Page 88

1 convertible promissory notes, you knew that a
2 purchaser's right to convert expired at the maturity
3 date of the note, correct?
4     A   I assert my Fifth Amendment rights.
5     Q   Did you communicate with investors relating
6 to MDO concerning Liberty's past experience with the
7 SEC?
8     A   I assert my Fifth Amendment rights.
9     Q   Did you communicate to investors relating
10 to MDO about the Keystone case?
11    A   I assert my Fifth Amendment rights.
12    Q   Did you make any representations to
13 investors about the Keystone case on behalf of
14 Michael Liberty?
15    A   I assert my Fifth Amendment rights.
16    Q   On June 26, 2012, you sent a memo that you
17 had drafted to Richard Bradick, correct?
18    A   I assert my Fifth Amendment rights.
19    Q   And you copied Michael Liberty in your
20 cover e-mail for that memo, right?
21    A   I assert my Fifth Amendment rights.
22    Q   Michael Liberty had asked you to prepare a
23 brief memo regarding past issues with the SEC,
24 correct?
25    A   I assert my Fifth Amendment rights.

Page 89

1    Q    In the memorandum dated June 26, 2012, you
2    stated that the allegations against Michael Liberty
3    in the SEC's complaint in the Keystone case were
4    "entirely false." Is that correct?
5    A    I assert my Fifth Amendment rights.
6    Q    You stated that it was clear from the SEC
7    pleadings that the SEC failed to understand the
8    business transactions in question, correct?
9    A    I assert my Fifth Amendment rights.
10   Q    You drafted this memorandum knowingly and
11   intentionally, correct?
12   A    I assert my Fifth Amendment rights.
13   Q    In the Keystone case, had you read the
14   consent decree?
15   A    I assert my Fifth Amendment rights.
16   Q    In the memorandum to Bradick, you stated
17   that, "Mike has fully complied with the consent
18   decree." Is that correct?
19   A    I assert my Fifth Amendment rights.
20   Q    In the consent decree that was entered in
21   federal court in 2010, Liberty agrees not to take any
22   action or make or commit to be made any public
23   statement denying directly or indirectly any
24   allegation in the complaint or creating the
25   impression that the complaint is without factual

Page 90

1    basis. Is that correct?
2    A    I assert my Fifth Amendment rights.
3    Q    In other circumstances in communications
4    with investors, you deny the allegations to the SEC
5    complaints in the Keystone matter on behalf of
6    Michael Liberty, correct?
7    A    I assert my Fifth Amendment rights.
8    Q    Did you ever observe any denials made by
9    Michael Liberty to investors of the allegations in
10   the SEC complaint in the Keystone matter?
11   A    I assert my Fifth Amendment rights.
12   Q    If so, when did he make those denials?
13   A    I assert my Fifth Amendment rights.
14   Q    And to whom did he make those denials?
15   A    I assert my Fifth Amendment rights.
16   Q    Did you ever observe anyone else deny the
17   allegations in the SEC complaint in the Keystone case
18   on Liberty's behalf?
19   A    I assert my Fifth Amendment rights.
20   Q    Did you ever observe Liberty disclose to
21   investors in writing that he was "a bad actor?"
22   A    I assert my Fifth Amendment rights.
23   Q    You are familiar with the term bad actor
24   from Rule 506, correct?
25   A    I assert my Fifth Amendment rights.

Page 91

1    Q    You've communicated with various parties
2    concerning the term bad actor, correct?
3    A    I assert my Fifth Amendment rights.
4    Q    And those parties have included Wellington,
5    correct?
6    A    I assert my Fifth Amendment rights.
7    Q    Did you ever observe Liberty deny to
8    investors he was a bad actor?
9    A    I assert my Fifth Amendment rights.
10   Q    What was your view of whether Liberty was
11   required to disclose to investors that he was a bad
12   actor as of September 2013?
13   A    I assert my Fifth Amendment rights.
14   Q    You knew that Liberty did not disclose to
15   BRTMDO investors that he was a bad actor subsequent
16   to September 2013, correct?
17   A    I assert my Fifth Amendment rights.
18   Q    You understood that the 506 B exemption
19   would not apply if a bad actor failed to disclose
20   such status following September 2013, correct?
21   A    I assert my Fifth Amendment rights.
22   Q    In connection with investments in DaVincian
23   Holdings or TL Holdings, LLC, you opined that Mr.
24   Liberty did not disclose in writing that he was a bad
25   actor, correct?

Page 92

1    A    I assert my Fifth Amendment rights.
2    Q    You knew that Mr. Liberty did not disclose
3    to investors in TL Holdings, LLC that he was a bad
4    actor, correct?
5    A    I assert my Fifth Amendment rights.
6    Q    Do you assert your Fifth Amendment
7    testimonial rights concerning all questions
8    concerning disclosures about the Keystone case?
9    A    I do.
10   Q    Do you assert your Fifth Amendment
11   testimonial rights concerning any questions about
12   disclosures of bad actor?
13   A    I do.
14   Q    In November 2013, MDO sold substantially
15   all of its assets to Mozido, Inc., correct?
16   A    I assert my Fifth Amendment rights.
17   Q    And you were involved in the negotiations
18   with Wellington for its investment in the formation
19   of Mozido, Inc., correct?
20   A    I assert my Fifth Amendment rights.
21   Q    You understood that Wellington was
22   investing in Mozido, Inc. as a preferred shareholder,
23   correct?
24   A    I assert my Fifth Amendment rights.
25   Q    You understood that in any liquidity

Page 93

1 events, preferred shareholders would receive a
2 liquidity preference for Mozido, Inc., correct?
3    A   I assert my Fifth Amendment rights.
4    Q   Did you ever disclose to BRTMDO, Brentwood
5 Financial investors that MDO substantially sold all
6 of its assets to Mozido, Inc.?
7    A   I assert my Fifth Amendment rights.
8    Q   Did you ever disclose to BRTMDO or
9 Brentwood Financial investors the impact on their
10 investment of the sale of the asset?
11    A   I assert my Fifth Amendment rights.
12    Q   You knew that in August of 2015 Pioneer
13 loaned Mozido, Inc. $30 million, correct?
14    A   I assert my Fifth Amendment rights.
15    Q   You understood that the annualized interest
16 rate of the Pioneer loan was 36 percent?
17    A   I assert my Fifth Amendment rights.
18    Q   You understood that the Pioneer loan was
19 cured by many of Mozido's assets, including payees of
20 subsidiaries?
21    A   I assert my Fifth Amendment rights.
22    Q   You understood in the fall of 2015 that
23 Mozido, Inc. was experiencing financial difficulties,
24 correct?
25    A   I assert my Fifth Amendment rights.

Page 94

1    Q   You knew in the fall of 2015 that Mozido,
2 Inc. would need to borrow money in order to make
3 payroll, correct?
4    A   I assert my Fifth Amendment rights.
5    Q   You were involved in the formation of BHLT
6 Funding, LLC in the fall of 2015, correct?
7    A   I assert my Fifth Amendment rights.
8    Q   You knew that BHLT loaned MDO money in the
9 fall and winter of 2015, 2016, correct?
10    A   I assert my Fifth Amendment rights.
11    Q   You understood that MDO did not have any
12 operations as of 2015, correct?
13    A   I assert my Fifth Amendment rights.
14    Q   You understood that MDO had no independent
15 ability to repay the loan to BHLT, correct?
16    A   I assert my Fifth Amendment rights.
17    Q   You understood that to secure the loan, MDO
18 pledged its common stock in Mozido, Inc. to BHLT,
19 correct?
20    A   I assert my Fifth Amendment rights.
21    Q   On behalf of BHLT, you filed a lien against
22 MDO's common stock, correct?
23    A   I assert my Fifth Amendment rights.
24    Q   What was the interest rate on BHLT's loan
25 to MDO?

Page 95

1    A   I assert my Fifth Amendment rights.
2    Q   You knew that the proceeds of the loan from
3 BHLT went to Mozido, Inc. to repay MDO's debts to
4 Mozido, Inc., correct?
5    A   I assert my Fifth Amendment rights.
6    Q   In connection with the asset sale in 2013,
7 you knew that MDO kept many of its liabilities,
8 including debt, to BRTMDO and Brentwood Financial?
9    A   I assert my Fifth Amendment rights.
10    Q   In October of 2015, you possessed the cap
11 tables and requisite documents to calculate the value
12 of investments in Mozido, Inc., correct?
13    A   I assert my Fifth Amendment rights.
14    Q   In October 2015, you e-mailed Michael
15 Liberty and a person by the last name Saleh and
16 calculated the value of Saleh's investments in
17 Mozido, Inc., correct?
18    A   I assert my Fifth Amendment rights.
19    Q   The cap table that you used to make your
20 calculations showed that MDO owned approximately 39
21 percent of Mozido, Inc. on a fully diluted basis,
22 correct?
23    A   I assert my Fifth Amendment rights.
24    Q   The cap table that you used in October of
25 2015 showed that the preferred shareholders of

Page 96

1 Mozido, Inc. maintained an approximately $890 million
2 liquidation preference, correct?
3    A   I assert my Fifth Amendment rights.
4    Q   In 2016, you understood that Mozido, Inc.
5 remained in financial difficulty, correct?
6    A   I assert my Fifth Amendment rights.
7    Q   You understood in April of 2016 that
8 Pioneer's debt was due April 15, 2016, correct?
9    A   I assert my Fifth Amendment right.
10    Q   On April 8, 2016, you wrote to people at
11 Wellington and Mozido, Inc. and stated that, "Mozido
12 has only one week to pay off the Pioneer debt, avoid
13 the default and avoid the Draconian outcome of loss
14 of Mozido's stake in paying it.  Of course, there are
15 also urgent working capital needs." Correct?
16    A   I assert my Fifth Amendment rights.
17    Q   You knew that as of April 8, 2016, Pioneer
18 had informed Mozido, Inc. that it would not grant an
19 extension to its April 15, 2016 repayment deadline,
20 correct?
21    A   I assert my Fifth Amendment rights.
22    Q   By April 8, 2016, you had formed the
23 opinion that another possible investor, KIA, would
24 not invest before April 15, correct?
25    A   I assert my Fifth Amendment rights.

Page 97

1    Q    You knew that on April 11, 2016, Wellington
2  informed Mozido, Inc. and yourself that it would not
3  be funding additional money because the KIA financing
4  will not be happening, correct?
5    A    I assert my Fifth Amendment rights.
6    Q    You knew that on Friday, April 15, 2016,
7  Mozido, Inc. defaulted on its loan to Pioneer,
8  correct?
9    A    I assert my Fifth Amendment rights.
10    Q    On April 28, 2016, you received a letter
11  from Wellington addressed to Mozido, Inc.'s Board of
12  Directors, correct?
13    A    I assert my Fifth Amendment rights.
14    Q    That letter stated that Wellington had met
15  with the management team at Pioneer and that it was
16  expecting a comprehensive restructuring plan from
17  Mozido, Inc. or that it would be moving forward with
18  foreclosing on the payees, correct?
19    A    I assert my Fifth Amendment rights.
20    Q    The letter stated that Wellington
21  understood that the cash levels at Mozido, Inc. were
22  low, which may impair the ability to make payroll and
23  therefore undermine the viability of Mozido, Inc.
24  going forward, right?
25    A    I assert my Fifth Amendment rights.

Page 98

1    Q    The letter that you received stated that
2  Wellington was expecting Mozido, Inc. to deliver an
3  appropriate restructuring plan over the next few days
4  to secure the extension of Wellington's loan,
5  correct?
6    A    I assert my Fifth Amendment rights.
7    Q    The letter that you received stated that
8  Mozido, Inc. was in default on the March 2015 and
9  April 2016 loans from Wellington of approximately 15
10  million and 1.8 million respectively, correct?
11    A    I assert my Fifth Amendment rights.
12    Q    The letter stated that Wellington
13  understood that Mozido, Inc. was in default of its
14  $30 million loan from Pioneer, correct?
15    A    I assert my Fifth Amendment rights.
16    Q    During April of 2016, you were involved in
17  developing an exchange offer on behalf of BRTMDO and
18  Brentwood Financial, correct?
19    A    I assert my Fifth Amendment rights.
20    Q    The exchange offer would be that BRTMDO and
21  Brentwood Financial would provide preferred
22  membership units in MDO for investors whose notes had
23  expired?
24    A    I assert my Fifth Amendment rights.
25    Q    You knew that by April of 2016, a

Page 99

1  significant number of investors no longer had the
2  rights to convert their notes to units, correct?
3    A    I assert my Fifth Amendment rights.
4    Q    In addition to the offer to exchange their
5  notes for units, the offer would also facilitate the
6  conversion of investors' notes to preferred units of
7  MDO, correct?
8    A    I assert my Fifth Amendment rights.
9    Q    You reviewed drafts of the notice e-mail in
10  advance of the offer being made at the end of April
11  of 2016, correct?
12    A    I assert my Fifth Amendment rights.
13    Q    You were involved in the decision that a
14  tax accounting firm, Berry Dunn, send the
15  communication out to investors, correct?
16    A    I assert my Fifth Amendment rights.
17    Q    The 2016 exchange offer -- I will call it
18  an exchange offer.  Does that make sense?
19    A    That's fine.
20    Q    The 2016 exchange offer did not include an
21  offering memorandum, correct?
22    A    I assert my Fifth Amendment rights.
23    Q    The 2016 exchange offer did not provide
24  investors with any financial statements, correct?
25    A    I assert my Fifth Amendment rights.

Page 100

1    Q    The notice of the exchange offer was sent
2  by Berry Dunn to investors on or about April 28,
3  2016, correct?
4    A    I assert my Fifth Amendment rights.
5    Q    At that time, you knew that Mozido, Inc.
6  was in default of over $45 million in debt, correct?
7    A    I assert my Fifth Amendment rights.
8    Q    At that time, you knew that payees were
9  subject to foreclosure, correct?
10    A    I assert my Fifth Amendment rights.
11    Q    At that time, you understood that there was
12  proposals to restructure Mozido, Inc., correct?
13    A    I assert my Fifth Amendment rights.
14    Q    You knew that on April 19, 2016, in
15  Pioneer's proposal to restructure Mozido, Inc., MDO
16  would receive no more than 10 percent of the common
17  share in Mozido, Inc., right?
18    A    I assert my Fifth Amendment rights.
19    Q    You knew that no disclosures were made to
20  investors in the exchange offer or afterwards
21  concerning Mozido, Inc.'s default of loans to Pioneer
22  and Wellington and others, correct?
23    A    I assert my Fifth Amendment rights.
24    Q    You were involved in the decision not to
25  provide updated financial information from Mozido,

Page 101

1  Inc. to investors in connection with the exchange
2  offer of 2016, correct?
3      A   I assert my Fifth Amendment rights.
4      Q   In communication with an attorney from
5  Brownstein, you understood it was his position that
6  no rational investor could make a decision about the
7  exchange offer without valuation information,
8  correct?
9      A   I assert --
10      MR. O'CONNOR:  I instruct the witness not
11  to answer that question.
12      BY MR. MOORES:
13      Q   In communication with Brownstein and third
14  parties, you understood that it was Brownstein's
15  attorney's position that no rational investor could
16  make a decision as to the exchange offer without
17  information as to the value of Mozido, Inc., correct?
18      MR. O'CONNOR:  What are the third parties?
19      MR. MOORES:  It is 1:30 p.m.  We are going
20  off the record.
21      (A discussion was held off the record.)
22      MR. MOORES:  It is 1:33 p.m. and we are
23  back on the record.  I believe the last question I am
24  going to withdraw.
25      BY MR. MOORES:

Page 102

1      Q   Mr. Marcus, you were involved in
2  communications with investors about the exchange
3  offer of 2016, correct?
4      A   I assert my Fifth Amendment rights.
5      Q   Those investors had communicated to BRTMDO
6  and Brentwood Financial that they needed to know the
7  valuation of Mozido, Inc. in order to make a decision
8  as to whether or not they were converting, correct?
9      A   I assert my Fifth Amendment rights.
10      Q   In connection with the exchange offer, you
11  communicated with an investor about the triple
12  liquidation process, correct?
13      A   I assert my Fifth Amendment rights.
14      Q   And you explained to that investor how that
15  triple liquidation process worked, correct?
16      A   I assert my Fifth Amendment rights.
17      Q   During your communications and explanation
18  with the investor as to the triple liquidation
19  preference, you did not inform the investor that the
20  capital account that was attached or associated with
21  the units would have been approximately 25 percent of
22  the principal amount that he had purchased the note
23  for, correct?
24      A   I assert my Fifth Amendment rights.
25      Q   You intentionally and knowingly failed to

Page 103

1  disclose that to an investor, correct?
2      A   I assert my Fifth Amendment rights.
3      Q   You understood that without informing him
4  of that it was a misleading statement, correct?
5      A   I assert my Fifth Amendment rights.
6      Q   You had a copy of Mozido, Inc.'s cap table
7  as of May 20, 2016, correct?
8      A   I assert my Fifth Amendment rights.
9      MR. JONES:  Mr. M<arcus, when we say cap
10  table, meaning capitalization table as you might
11  understand that term, does that change your answer to
12  the question you just gave?
13      THE WITNESS:  No.
14      BY MR. MOORES:
15      Q   Mr. Marcus, in 2016, you had a copy of
16  Mozido Inc.'s cap table which showed that as of May
17  20, 2016, there was an approximate aggregate
18  liquidation preference for preferred shareholders of
19  more than $970 million.  Is that correct?
20      A   I assert my Fifth Amendment rights.
21      Q   You understood that the liquidation
22  preference meant that in the event of a liquidity
23  event, the preferred shareholders would take the
24  first $970 million before any money was distributed
25  to common shareholders, correct?

Page 104

1      A   I assert my Fifth Amendment rights.
2      Q   At that time, you understood that any
3  investor in MDO in the event of a liquidity would
4  only be receiving money through MDO's common stock
5  ownership, correct?
6      A   I assert my Fifth Amendment rights.
7      Q   And you knew that MDO did not possess any
8  preferred shares of Mozido, Inc., correct?
9      A   I assert my Fifth Amendment rights.
10      Q   You never disclosed to any BRTMDO or
11  Brentwood Financial investor at the time of the
12  exchange offer or afterwards the liquidation
13  preference held by preferred shareholders in Mozido,
14  Inc., correct?
15      A   I assert my Fifth Amendment rights.
16      Q   You knew that at a June 21, 2016 special
17  meeting of Mozido, Inc.'s Board of Directors, the
18  Board approved the retention of an investment bank to
19  sell payees, correct?
20      A   I assert my Fifth Amendment rights.
21      Q   You had attended that special Board of
22  Directors meeting with Mozido, Inc., correct?
23      A   I assert my Fifth Amendment rights.
24      Q   In connection with the exchange offer, you
25  never disclosed to any BRTMDO or Brentwood Financial

Page 105

1 investors that Mozido, Inc. was trying to sell
2 payees, correct?
3     A    I assert my Fifth Amendment rights.
4     Q    In connection with the exchange offer, you
5 never informed any BRTMDO or Brentwood Financial
6 investors what the bids or the estimates were for the
7 sale of payees, correct?
8     A    I assert my Fifth Amendment rights.
9     Q    Throughout 2016, in connection with the
10 exchange offer, you did not provide updated or
11 accurate financial information concerning Mozido,
12 Inc. to BRTMDO or Brentwood Financial investors,
13 correct?
14     A    I assert my Fifth Amendment rights?
15     Q    Did the exchange offer ever close, Mr.
16 Marcus?
17     A    I assert my Fifth Amendment rights.
18     Q    Have the BRTMDO and Brentwood Financial
19 investors who elected to exchange or convert their
20 notes ever received information from MDO that they
21 were members of the LLC?
22     A    I assert my Fifth Amendment rights.
23     Q    You knew in 2012 that the MDO operating
24 agreement required that financial information be sent
25 to members at least on a monthly basis, correct?

Page 106

1     A    I assert my Fifth Amendment rights.
2     Q    You knew that MDO members were not
3 receiving the updated financial information from MDO,
4 correct?
5     A    I assert my Fifth Amendment rights.
6     Q    At the time of the exchange offer, you knew
7 that a number of the BRTMDO investors were also Class
8 B unit holders, correct?
9     A    I assert my Fifth Amendment rights.
10     Q    At the time of the exchange offer, you knew
11 that they had not been receiving the financial
12 information from MDO since 2012, correct?
13     A    I assert my Fifth Amendment rights.
14     Q    You never disclosed to BRTMDO or Brentwood
15 Financial investors in connection with the exchange
16 offer or otherwise that BHLT Funding, LLC held a lien
17 on MDO's common shares of Mozido, Inc., correct?
18     A    I assert my Fifth Amendment rights.
19     Q    You knew that in connection with the
20 exchange offer that BRTMDO and Brentwood Financial or
21 its agents did not disclose the true and accurate
22 financial situation of Mozido, Inc. to the investors,
23 correct?
24     A    I assert my Fifth Amendment rights.
25     Q    You knew that BRTMDO and Brentwood

Page 107

1 Financial or any of its agents did not disclose to
2 the investors in connection with the exchange offer
3 that BHLT held a lien on the common shares held by
4 MDO of Mozido, Inc, right?
5     A    I assert my Fifth Amendment rights.
6     Q    You knew that as of the beginning of 2017,
7 the exchange offer had not closed, correct?
8     A    I assert my Fifth Amendment rights.
9     Q    In connection with the exchange offer, you
10 never disclosed to BRTMDO or Brentwood Financial
11 investors that there was an on-going investigation by
12 the Securities and Exchange Commission into Mozido,
13 correct?
14     A    I assert my Fifth Amendment rights.
15     Q    You knew that BRTMDO or Brentwood Financial
16 or its agents did not disclose the on-going
17 Securities and Exchange Commission investigation to
18 investors in connection with the exchange offer,
19 correct?
20     A    I assert my Fifth Amendment rights.
21     Q    Do you assert your Fifth Amendment
22 testimonial rights as to all questions concerning the
23 2016 exchange offer?
24     A    Yes.
25     Q    Do you assert your Fifth Amendment

Page 108

1 testimonial rights as to all questions concerning
2 Mozido, Inc.'s financial status since 2015?
3     A    Yes.
4     Q    Mr. Marcus, do you know what TL Holdings
5 Group, LLC is?
6     A    I assert my Fifth Amendment rights.
7     Q    Have you ever provided any legal services
8 to TL Holdings Group, LLC?
9     A    I assert my Fifth Amendment rights.
10     Q    TL Holdings Group, LLC filed a Form D with
11 the Commission, correct?
12     A    I assert my Fifth Amendment rights.
13     Q    In advance of that Form D being filed with
14 the Commission, you reviewed the draft Form D,
15 correct?
16     A    I assert my Fifth Amendment rights.
17     Q    The Form D that was ultimately filed with
18 the Commission stated that zero payments were made to
19 any related persons, correct?
20     A    I assert my Fifth Amendment rights.
21     Q    You understood at the time that Mr. Liberty
22 received all of the monies that TL Holdings Group had
23 raised in connection with its offering, correct?
24     A    I assert my Fifth Amendment rights.
25     Q    You understood at the time that the Form D

Page 109

1 filed with the Commission by TL Holdings was false,
2 correct?
3     A   I assert my Fifth Amendment rights.
4     Q   Mr. Marcus, do you assert your Fifth
5 Amendment testimonial rights as to all questions
6 concerning TL Holdings?
7     A   Yes.
8         MR. JONES:  Mr. Marcus, I'm going to ask
9 you a series of questions designed to make clear for
10 all of us here what the scope of your assertion of
11 privilege is as to the topics that we are talking
12 about.  I'm going to ask you about a bunch of topics
13 at a high level, most of which we have covered, and
14 ask you whether you assert your Fifth Amendment
15 testimonial privileges as to all questions regarding
16 that topic.
17        MR. O'CONNOR:  That doesn't really work for
18 me.  It's just kind of -- at some point someone will
19 have to prove some of these issues.  Just saying are
20 you going to assert your Fifth Amendment testimonial
21 rights to every crime that's occurred in the last
22 century --  At some point, it gets to be a bit much.
23 I think that Peter has done that with respect to
24 every topic that he has covered today.
25        MR. JONES:  In that case, Mr. O'Connor, are

Page 110

1 you willing to have your client be asked generally if
2 there is any topic that we have covered today that
3 he's willing to testify about and not assert his
4 testimonial privileges?
5         MR. O'CONNOR:  That's fine.
6         MR. JONES:  We will agree at this point
7 that if I were to ask him generally about the topics
8 we have covered today and the questions we discussed,
9 it will cover all the topic we covered today?
10        MR. O'CONNOR:  Again, with the
11 understanding that at an appropriate point in time
12 all the issues about foundation -- for example, you
13 asked questions did he disclose this to investors,
14 and that question implies he had conversations with
15 investors or that he had an obligation to --
16        MR. JONES:  We understand that if in fact
17 there is a case brought and if it involved Mr.
18 Marcus, there would be an obligation to prove certain
19 things by the standard rules of evidence and taking
20 into account all the law that goes along with it.
21 Understood.  I want to make sure before we leave here
22 there's not the possibility of saying there were
23 questions he would have answered about topic X, Y or
24 Z but weren't asked.
25        MR. O'CONNOR:  There's no intention to

Page 111

1 answer any questions with respect to Michael Liberty
2 or his activities as it relates to Brentwood, Mozido,
3 any of the other entities which I think has been
4 covered by Peter every time he moved from subject A
5 to B to C to D to E.
6         MR. JONES:  So, Mr. Marcus, is there any
7 topic we covered today in Mr. Moore's questioning
8 that in hearing about that topic you would answer
9 questions and not assert your testimonial privileges?
10        THE WITNESS:  No.
11        MR. JONES:  As to all the topics covered
12 today, for any question about that topic, you would
13 assert your Fifth Amendment testimonial privilege?
14        THE WITNESS:  Yes.
15        MR. JONES:  We are about to conclude the
16 testimony.  At the conclusion of SEC testimony, there
17 is the chance, Mr. Marcus, for your counsel to ask
18 any clarifying questions or for you to add or
19 supplement any answer or provide any additional
20 information.  Mr. O'Connor, do you intend to ask any
21 questions of the witness?
22        MR. O'CONNOR:  No.
23        MR. JONES:  Mr. Marcus, is there anything
24 you would like to add, supplement, change, amend, at
25 this time?

Page 112

1         THE WITNESS:  No.
2         MR. JONES:  If in fact there is in the
3 future, please through your counsel let us know.
4         MR. O'CONNOR:  We'll do that.
5         MR. MOORES:  With that, I have no further
6 questions of you today.  If there happens to be a
7 need to speak with you again, we will contact your
8 counsel and go from there.  Thank you very much.
9         MR. JONES:  We are going off the record at
10 1:50.
11        (Whereupon, at 1:50 p.m., the examination
12 was concluded.)
13                 * * * * *
14
15
16
17
18
19
20
21
22
23
24
25

Page 113

```
1              PROOFREADER'S CERTIFICATE
2
3  In The Matter of:   MOZIDO
4  Witness:       George Marcus
5  File Number:       B-03044-A
6  Date:          Thursday, January 18, 2018
7  Location:       Boston, MA
8
9        This is to certify that I, Maria E.
10 Paulsen, (the undersigned), do hereby swear and
11 affirm that the attached proceedings before the U.S.
12 Securities and Exchange Commission were held
13 according to the record and that this is the
14 original, complete, true and accurate transcript that
15 has been compared to the reporting or recording
16 accomplished at the hearing.
17
18 _____        _____
19 (Proofreader's Name)       (Date)
20
21
22
23
24
25
```

# Transcript Word Index

## &

**&**
14:15,20

## 0

**02110**
1:11 2:8
**02199**
2:16
**03044**
1:4 113:5

## 1

**1**
1:8 5:18,19 34:21 57:10
**1.2**
81:6,12
**1.3**
33:15
**1.7**
57:20,24
**1.8**
76:20 98:10
**1.85**
67:12
**1.9**
55:8,12 56:13 57:1
**1:05**
86:17
**1:30**
101:19
**1:33**
101:22
**1:50**
112:10,11
**10**
58:13 100:16
**10:04**
1:15 4:2
**100**
63:20
**108**
45:22 46:8 49:18
**11**
13:7 38:13 97:1
**11:10**
59:7
**11:15**
59:9
**110**
45:12
**114**
1:8
**12**
38:13
**12:03**
86:12,14

**13.5**
35:25 36:3
**15**
96:8,19,24 97:6 98:9
**16**
57:13
**17.5**
55:2 59:23 60:2
**18**
1:12 4:3 56:9,12,24 84:16
113:6
**19**
100:14
**1973**
11:25
**1976**
12:5

## 2

**20**
103:7,17
**2002**
42:9
**2006**
25:15
**2008**
25:8 80:5
**2009**
79:5
**2010**
27:19,23 28:5 31:23 33:9
34:4,21 35:11,24 38:13
39:4 40:10 44:21 45:20
76:3 81:17 89:21
**2011**
33:13 43:21 44:4,7,11,22
44:25 45:4,20 50:23 51:3
82:10
**2012**
33:14 35:5 43:6,9,21 44:4,7
44:16 47:6 48:10,21 49:10
51:5,13,15,24 52:2,9,16
53:1,8 54:2,12,15,18,21
55:1,9 56:6 59:18 60:20
61:2,11,25 62:4 63:1,10,15
64:2 66:9,23 67:2,12 68:23
69:2,5,10,14,18,22 70:4,12
84:4 88:16 89:1 105:23
106:12
**2013**
70:14 71:16 72:6,8,14 73:1
73:14 74:19 75:24 76:2,6
76:23 77:5,9 81:3 84:16
85:12 86:22,25 91:12,16,20
92:14 95:6
**2015**
5:10 93:12,22 94:1,6,9,12

**2015 (cont.)**
95:10,14,25 98:8 108:2
**2016**
94:9 96:4,7,8,10,17,19,22
97:1,6,10 98:9,16,25 99:11
99:17,20,23 100:3,14 101:2
102:3 103:7,15,17 104:16
105:9 107:23
**2017**
107:6
**2018**
1:12 4:3 113:6
**202**
1:25
**21**
5:10 104:16
**25**
63:12,15,17 76:12,16 79:5
102:21
**26**
82:10 88:16 89:1
**27**
27:19,23 28:5
**28**
97:10 100:2
**29**
35:11 69:5

## 3

**3**
3:4 7:10 55:9 83:15,19 84:3
**3.37**
85:3,14
**3.6**
82:11
**30**
51:5,13,15,24 52:2 93:13
98:14
**33**
1:10 2:7
**36**
93:16
**39**
95:20

## 4

**45**
100:6
**467-9200**
1:25

## 5

**5**
3:7 34:7,24 48:7 60:15
85:11
**50**
44:12

**506**
90:24 91:18
**55,000**
32:17

## 6

**6.2**
67:8
**6.26**
57:9
**66**
11:18

## 8

**8**
44:17 54:18 96:10,17,22
**800**
2:15
**85**
33:11
**890**
96:1

## 9

**91**
3:7 6:12,16
**970**
103:19,24
**99**
74:13,17

## a

**a.m.**
1:15 4:3
**abbass**
9:14,14,20,22,23 51:3,9
**abbreviation**
14:16
**ability**
10:25 11:4 94:15 97:22
**able**
11:14 19:3 55:12
**accept**
17:2,7
**accepted**
58:11
**accepting**
16:20
**accomplished**
113:16
**account**
17:15,18,19,21 18:9 34:1
35:9 58:4,7 64:24 65:3,19
65:23 66:7 81:14 102:20
110:20
**accounting**
99:14

**[accounts - appropriate]**

**accounts**
33:14 58:12 65:8,11,16
**accredited**
73:15,19
**accurate**
10:19 105:11 106:21
113:14
**acquire**
55:13 73:9
**acquired**
54:17 62:19 75:3
**acquiring**
45:21 46:7 63:3
**acquisition**
67:11
**acted**
52:12
**action**
23:17 25:14 43:11 81:1
89:22
**activities**
111:2
**actor**
90:21,23 91:2,8,12,15,19
91:25 92:4,12
**actual**
14:2 24:1
**add**
10:14 111:18,24
**added**
45:12
**addition**
10:18 19:19 99:4
**additional**
10:11 43:22 44:1,19,21
72:19 97:3 111:19
**address**
15:23,25
**addressed**
97:11
**addresses**
15:21
**administer**
4:3
**administrative**
37:23 38:4
**admitted**
13:21
**advance**
47:11 86:3 99:10 108:13
**advances**
34:25
**adverse**
23:17
**advice**
19:9 20:22 23:22 24:22

**advice (cont.)**
25:3,9,16,24 26:4,18
**advise**
28:8
**advised**
42:10 43:8
**advising**
42:8
**affidavit**
84:15,19,25 85:7
**affiliated**
12:11 14:11 25:8 28:20
29:1 69:10 83:12,14,20
**affinity**
32:24 33:2
**affirm**
113:11
**agents**
79:9 106:21 107:1,16
**aggregate**
56:25 103:17
**ago**
13:14
**agree**
20:8,18 26:7 38:3,6 39:15
46:11 57:8 110:6
**agreed**
54:25 65:1 82:11 84:21
**agreement**
23:1 27:19,22 28:1,1,4,9,13
30:9,12,16 32:5 34:14,17
34:25 40:15,23 41:1,5,9,14
42:2,13 43:10,17 45:16
57:5,8,10 60:10 66:17,20
105:24
**agreements**
34:20 40:20 78:21
**agrees**
89:21
**ahead**
19:1,2
**allegation**
89:24
**allegations**
89:2 90:4,9,17
**allowed**
20:15
**amalgam**
18:19
**ambiguity**
8:9 9:5,12
**amend**
52:23 111:24
**amended**
27:18,21 30:9,11,16 48:20
49:2 52:25 77:17,21

**amendment**
19:7,11 20:9,10,13,16,24
21:4,5,8,11,13,15,19,24
22:11,17,19 23:2,5,6,16,24
24:1,3,13,24 25:5,11,17
26:1,6,9,16,24 27:2,5,7,10
27:13,16,20,24 28:6,10,15
28:17,23 29:8,14,19 30:1,4
30:7,10,14,17,20,25 31:2,4
31:6,8,10,12,18,21,25 32:3
32:7,10,13,16,19,22 33:1,4
33:8,12,17,19,21,24 34:3,6
34:10,13,16,19,22 35:2,6
35:10,13,16,19,22 36:1,5
36:20 37:2 38:18 39:14,24
40:1,4,8,13,18,24 41:3,7,11
41:15,19,24 42:3,7,14,17
42:20,23 43:3,7,14,18,24
44:3,6,9,14,18,22 45:2,5,9
45:14,15,19,24 46:5,9,24
47:4,7,10,14,18,21,25 48:5
48:9,13,16,19,22,25 49:4,8
49:12,15,19,22 50:1,5,8,12
50:18,25 51:4,7,11,14,17
51:22,25 52:3,7,11,14,17
52:20,22 53:6,9,12,17,20
53:24 54:7,10,13,16,20,24
55:3,6,11,15,17,20,23 56:1
56:4,7,11,15,19,22 57:2,6
57:11,15,18,21 58:1,6,10
58:15,17,20,23 59:1,14,17
59:21,24 60:3,6,9,13,19,23
61:1,5,10,14,23 62:3,7,10
62:13,17,21,25 63:5,9,14
63:18,22,24 64:1,6,12,18
64:21,25 65:5,9,13,17,21
65:25 66:5,10,13,16,19,22
67:1,5,9,14,18,22,25 68:4,9
68:14,19,24 69:4,7,9,12,16
69:20,25 70:1,10,16,19,23
71:2,5,8,12,15,18,21,25
72:4,7,13,17,22,25 73:4,10
73:13,17,21 74:1,5,9,12,14
74:18,24 75:5,8,12,16,19
75:23 76:1,5,9,13,18,21
77:2,7,11,15,19,22 78:1,4,8
78:11,15,19,23 79:2,7,12
79:19,22,25 80:3,6,8,10,13
80:16,19,22,25 81:4,7,11
81:15,18,22 82:1,3,6,9,13
82:16,19,21 83:1,6,10,13
83:17,21,24 84:2,8,11,13
84:18,24 85:4,8,10,15,19
85:21,24 86:1,5,7,24 87:2,7
87:11,14,17,20,24 88:4,8
88:11,15,18,21,25 89:5,9

**amendment (cont.)**
89:12,15,19 90:2,7,11,13
90:15,19,22,25 91:3,6,9,13
91:17,21 92:1,5,6,10,16,20
92:24 93:3,7,11,14,17,21
93:25 94:4,7,10,13,16,20
94:23 95:1,5,9,13,18,23
96:3,6,9,16,21,25 97:5,9,13
97:19,25 98:6,11,15,19,24
99:3,8,12,16,22,25 100:4,7
100:10,13,18,23 101:3
102:4,9,13,16,24 103:2,5,8
103:20 104:1,6,9,15,20,23
105:3,8,14,17,22 106:1,5,9
106:13,18,24 107:5,8,14,20
107:21,25 108:6,9,12,16,20
108:24 109:3,5,14,20
111:13
**amount**
58:8 64:16 85:14 102:22
**annualized**
93:15
**answer**
7:4,5,9 8:5,6 10:9,14,19
11:1,5 19:10,13,24,25 20:1
20:3,5,12,23 23:15,20,23
24:23 25:4,10,17,25 26:5
26:19 29:5 36:10 37:7
38:22 39:9 61:20 101:11
103:11 111:1,8,19
**answered**
37:16 110:23
**answering**
7:17,19 11:11 26:11 38:8
**answers**
6:25 7:3 10:21
**antidilution**
45:4,7,11,17,25 46:4,23
69:23,24
**apologize**
14:7
**appearances**
2:1
**appeared**
34:21
**appearing**
6:17
**appears**
6:19 10:18
**applicable**
7:5
**apply**
91:19
**appropriate**
38:10 98:3 110:11

[approval - beginning]

**approval**
17:7 76:25 77:5
**approve**
17:5
**approved**
104:18
**approximate**
76:19 103:17
**approximately**
33:13,14,15 45:12 55:8
57:13,19 67:8,12 82:10,11
84:3 85:11 86:12 95:20
96:1 98:9 102:21
**april**
51:5,13,15,24 52:2 85:11
96:7,8,10,17,19,22,24 97:1
97:6,10 98:9,16,25 99:10
100:2,14
**arch**
1:10 2:7
**arcus**
103:9
**area**
13:7 24:15
**argue**
20:25
**argument**
13:22
**articulate**
21:3
**articulation**
21:23
**ascertain**
35:21
**asked**
37:3 44:19 46:21 88:22
110:1,13,24
**asking**
7:16,19 46:11
**assert**
19:18,23 20:4,12,15 26:9
26:16,24 27:2,5,7,10,13,16
27:20,24 28:6,10,15,17,22
29:14,18 30:1,4,7,10,14,17
30:20,25 31:2,4,6,8,10,12
31:18,21,25 32:3,7,10,13
32:16,19,22 33:1,4,8,12,17
33:19,21,24 34:3,6,10,13
34:16,19,22 35:2,6,10,13
35:16,19,22 36:1,5,20 37:2
38:18 39:13,24 40:1,4,8,13
40:18,24 41:3,7,11,15,19
41:24 42:3,7,14,17,20,23
43:3,7,14,24 44:3,6,9,14,18
45:2,5,9,14,19,24 46:5,9
47:4,7,10,14,18,21,25 48:5

**assert (cont.)**
48:9,13,16,19,22,25 49:4,8
49:12,15,19,22 50:1,5,8,18
50:25 51:4,7,11,14,17,22
51:25 52:3,11,14,17,20,22
52:25 53:6,9,12,17,20,24
54:7,10,13,16,20,24 55:3,6
55:11,15,17,20,23 56:1,4,7
56:11,15,19,22 57:2,6,11
57:15,18,21 58:1,6,10,15
58:17,20,23 59:14,17,21,24
60:3,6,9,13,19,23 61:1,5,10
61:14,23 62:3,7,10,13,17
62:21,25 63:5,9,14,18,22
63:24 64:1,6,12,18,21,25
65:5,9,13,17,21,25 66:5,10
66:13,16,19,22 67:1,5,9,14
67:18,22,25 68:4,9,14,19
68:24 69:4,7,9,12,16,20,25
70:1,9,16,19,23 71:2,5,8,12
71:15,18,21,25 72:4,7,13
72:17,22,25 73:4,10,13,17
73:21 74:1,5,9,12,14,18,24
75:5,8,12,16,19,23 76:1,5,9
76:13,18,21 77:2,7,11,15
77:19,22 78:1,4,8,11,15,19
78:23 79:2,7,12,19,22,25
80:3,6,8,10,13,16,19,22,25
81:4,7,11,15,18,22 82:1,3,6
82:9,13,16,19,21 83:1,6,10
83:13,17,21,24 84:2,8,11
84:13,18,24 85:4,8,10,15
85:19,21,24 86:1,5,6,24
87:2,7,11,14,17,20,24 88:4
88:8,11,15,18,21,25 89:5,9
89:12,15,19 90:2,7,11,13
90:15,19,22,25 91:3,6,9,13
91:17,21 92:1,5,6,10,16,20
92:24 93:3,7,11,14,17,21
93:25 94:4,7,10,13,16,20
94:23 95:1,5,9,13,18,23
96:3,6,9,16,21,25 97:5,9,13
97:19,25 98:6,11,15,19,24
99:3,8,12,16,22,25 100:4,7
100:10,13,18,23 101:3,9
102:4,9,13,16,24 103:2,5,8
103:20 104:1,6,9,15,20,23
105:3,8,14,17,22 106:1,5,9
106:13,18,24 107:5,8,14,20
107:21,25 108:6,9,12,16,20
108:24 109:3,4,14,20 110:3
111:9,13
**asserted**
22:1
**asserting**
19:6 21:23 29:8

**assertion**
29:11 46:17 109:10
**asserts**
23:2 24:12
**asset**
93:10 95:6
**assets**
92:15 93:6,19
**assigned**
17:19
**assignment**
76:24
**assist**
49:10 75:14
**assisted**
45:6
**associated**
17:20 102:20
**associates**
15:4
**association**
13:19 14:1,6,8
**associations**
13:17
**assume**
26:15 29:11
**assuming**
17:14
**assurances**
19:4
**attached**
102:20 113:11
**attaching**
47:16
**attempt**
8:4
**attempting**
77:13
**attend**
11:21 12:1,4
**attended**
11:24 52:9 104:21
**attorney**
11:13 17:20,23,23,24 18:1
29:6,10,13 36:11,15 37:7
39:8,12,19 46:12 61:21
62:4,23 101:4
**attorneys**
18:20 63:2
**attorney's**
101:15
**attornies**
51:2
**august**
27:19,23 28:5 35:24 60:20
61:2,11,25 62:4 66:23 67:2

**august (cont.)**
76:3 93:12
**authorities**
19:2
**authority**
19:20 60:18 75:9
**authorize**
74:20
**authorized**
19:16 61:15 75:2,22
**available**
5:11
**avoid**
9:13 96:12,13
**aware**
23:14 43:4

**b**

**back**
22:10 59:9 72:20 86:17
101:23
**backdated**
34:20
**bad**
90:21,23 91:2,8,11,15,19
91:24 92:3,12
**balance**
62:5,8,22 65:19,23
**balances**
65:15
**bals**
14:17 16:12
**bank**
104:18
**bankruptcy**
12:18
**bar**
13:17,18,19,20 14:1,5,6,6,8
**bars**
14:2
**based**
22:15 23:15 33:10 44:11,16
45:11 58:7 64:10 80:1
**bases**
37:19
**basically**
20:20
**basis**
19:10 20:21,24 23:23 24:23
25:4,10,17,25 26:5,8,18
38:2,19 73:11 90:1 95:21
105:25
**began**
14:15 50:23 60:20 61:2
**beginning**
22:9 35:5 40:10 107:6

**behalf**
2:3,10 35:14 88:13 90:5,18
94:21 98:17
**believe**
6:20 8:9 9:19 13:12,20
15:17 20:2 21:6 101:23
**belong**
14:4,8
**benefit**
36:8,24 42:21 53:21 68:12
68:18 71:10 72:3
**berry**
99:14 100:2
**best**
7:17
**beyond**
37:23
**bhlt**
94:5,8,15,18,21 95:3
106:16 107:3
**bhlt's**
94:24
**bids**
105:6
**big**
22:21
**billed**
18:3
**billing**
17:18,20,24
**bills**
79:20
**bit**
109:22
**board**
16:9,11,14 27:8 29:24 30:2
30:5 41:1 42:11 52:9 53:1,2
53:10 54:21,25 55:5 59:25
63:11,16 74:25 75:6,7
97:11 104:17,18,21
**borrow**
83:11 94:2
**boston**
1:11 2:8,16 113:7
**boylston**
2:15
**bradick**
69:6,8,10,14 73:2,5,14
74:19,20 75:14,24 86:21
88:17 89:16
**break**
9:25 59:5
**breaks**
10:5
**brentwood**
8:23,25 9:1,2 61:4,7,12,17

**brentwood (cont.)**
61:25 62:5,8,11,15,18 63:4
65:2,19 66:9,15 67:6,16,20
67:21 68:5,16,21,22 69:15
69:18 70:3 71:16,22 72:2,9
72:18 73:6,7 75:2 76:7,15
76:23 77:4,16,24 78:5,13
78:18,21 81:20 83:3 85:6
85:17 87:3,8,25 93:4,9 95:8
98:18,21 102:6 104:11,25
105:5,12,18 106:14,20,25
107:10,15 111:2
**brief**
59:8 88:23
**bring**
23:18 43:11
**brittany**
9:13,14
**broad**
39:16
**brotherhood**
74:3
**brought**
25:14 110:17
**brownstein**
101:5,13
**brownstein's**
101:14
**brtmdo**
9:2 35:4,8 40:16 60:22 61:8
61:8,16 65:3,24 66:8,12
67:7,23 68:2,11,25 69:1
70:11,14,20,25 71:4,6,11
72:9 73:19,24 74:16 75:2,9
75:15,20,21 76:4,10,22
77:4,16,21 78:6,13,17,21
81:20 83:2 85:6,17 87:3,8
87:18,22 91:15 93:4,8 95:8
98:17,20 102:5 104:10,25
105:5,12,18 106:7,14,20,25
107:10,15
**brtmdo's**
75:18
**bunch**
109:12
**business**
12:18 13:13 40:7,12 68:3,7
89:8

**c**

**calculate**
95:11
**calculated**
95:16
**calculations**
95:20

**calitri**
4:20
**call**
99:17
**called**
4:10 14:5 17:22
**canal**
15:23
**cap**
44:4 60:7 69:6,13 95:10,19
95:24 103:6,9,16
**capital**
27:14 39:6,23 40:11 54:6
58:4,7,12 67:21 96:15
102:20
**capitalization**
103:10
**carefully**
10:25 11:4
**case**
25:19 83:9 88:10,13 89:3
89:13 90:17 92:8 109:25
110:17
**cases**
21:17
**cash**
97:21
**catherine**
2:12 6:6
**cents**
57:13,20,25 67:8,12 76:20
**century**
109:22
**certain**
5:3 27:11 37:5 110:18
**certificate**
113:1
**certify**
113:9
**chairman**
75:25
**chance**
111:17
**change**
103:11 111:24
**changes**
52:24
**chapter**
13:7
**characterizing**
34:24
**check**
17:1 18:12
**checks**
17:14

**chicago**
12:4,5
**circuit**
13:20
**circuits**
13:21
**circulate**
52:18
**circulated**
17:8 75:1
**circumstance**
39:10
**circumstances**
90:3
**circumvent**
74:11
**civil**
5:6 23:17
**clarification**
10:12 15:12
**clarify**
8:11
**clarifying**
111:18
**clarity**
9:6
**class**
13:12 53:3,14,18,22 56:14
57:9,13,17,20,24 58:2,11
85:17 106:7
**classes**
12:6,10,13,17 13:1,4
**clear**
13:25 20:15 21:22 89:6
109:9
**clegg**
14:12,15,16,17,19,23 15:2
15:5,8,11,22 16:5,12 26:2
33:15,25 40:3 42:4 53:7
59:12 65:6,10,14,18,22
66:1,7 79:21 81:9 87:15
**clegg's**
81:13
**clerk**
15:18
**client**
11:13 16:23 17:8,10,16
18:3,16 26:8 29:6,10,13
36:11,15 37:7 39:8,12,19
40:2 42:16 61:21 65:7,15
110:1
**clients**
16:21 17:5,7,12 18:4 66:3,4
**close**
9:17 105:15

[closed - correct]

**closed**
107:7
**college**
11:21
**coming**
19:1 66:2
**comment**
52:19
**comments**
52:21
**commission**
1:1,9 2:3,6 4:19 5:1 25:14
34:8 47:9,12,24 70:15
71:17 77:17,25 107:12,17
108:11,14,18 109:1 113:12
**commissions**
30:9,11,16 34:12,15,24
48:2,7 50:3 70:21,25
**commission's**
5:16 43:5
**commit**
89:22
**committed**
20:3
**committee**
16:1,3 17:4,6
**common**
94:18,22 100:16 103:25
104:4 106:17 107:3
**communicate**
68:16 75:17 88:5,9
**communicated**
38:13 51:18 63:1 64:3 73:1
79:15 83:7 91:1 102:5,11
**communication**
11:13 29:13 36:12,15 38:25
39:9,19 61:24 63:19 74:19
79:13 86:21,22 99:15 101:4
101:13
**communications**
29:6 51:1 61:15,21 63:6
68:1,5,10,15,20,25 69:21
72:8 73:5,14 75:13 90:3
102:2,17
**company**
8:19 27:18,22 28:1 46:2
**compared**
113:15
**compel**
19:16,20
**compelled**
20:1 21:14 22:12,18
**competence**
16:25 18:14,19,20,23
**complaint**
84:6 89:3,24,25 90:10,17

**complaints**
90:5
**complete**
113:14
**completed**
84:14
**completely**
10:19 11:1,5
**complied**
89:17
**comprehensive**
97:16
**conceal**
34:15 85:22
**concealed**
42:15
**concept**
21:21
**concerned**
20:16 21:21 22:1 43:10
45:1
**concerning**
5:21 28:8 30:16 42:8 43:15
44:20 46:22 50:10 52:5
64:3 70:3,10 73:2 75:18
78:25 79:16 84:7 86:8 88:6
91:2 92:7,8,11 100:21
105:11 107:22 108:1 109:6
**conclude**
111:15
**concluded**
112:12
**conclusion**
111:16
**conduct**
31:1
**confession**
84:15
**confirm**
24:6
**conflict**
56:5
**conflicts**
17:1,14
**confused**
14:7
**confusion**
9:21
**connected**
77:8
**connection**
42:8 43:2 48:3,7 50:4 55:7
55:18,22,24 56:3,16 57:3
66:11,14 70:21,25 72:9
73:22 74:15 78:5 79:1,10
80:20 81:5 84:16 87:5,8

**connection (cont.)**
91:22 95:6 101:1 102:10
104:24 105:4,9 106:15,19
107:2,9,18 108:23
**consent**
44:11 89:14,17,20
**considered**
34:11
**consistent**
28:13 59:25
**constitute**
5:5
**consulting**
34:14,17,20,25
**contact**
112:7
**contained**
50:7 60:16 69:23 74:3 78:2
**contemplated**
40:22
**contemporaneous**
44:16 63:20
**contemporaneously**
84:10 85:7,18
**continued**
41:25 49:6,10 51:19,23
75:14,17
**continuing**
12:8,12,25
**contracts**
35:14 60:14 62:20
**contrast**
8:17
**controlled**
33:14
**conversations**
110:14
**conversion**
55:19,22 67:7,10 76:19
99:6
**convert**
53:3,13 54:9,11,14 87:19
87:22 88:2 99:2 105:19
**converted**
55:8
**convertible**
31:23 32:1,9,14,17 41:22
44:10,15 49:7 55:9 59:19
59:22 60:4,11,21 61:3
62:15 63:3 76:3,7,11,15
78:17 87:18,22 88:1
**converting**
53:4,22 102:8
**conveyed**
36:11

**copied**
61:24 88:19
**copy**
5:9,16,17 6:16 56:20 71:19
103:6,15
**corporate**
15:7
**corporation**
12:18 15:9,14,16 16:9
**correct**
4:24 16:6 18:7 23:7 25:2,15
27:9,12,15,19,23 28:5,9,14
29:25 30:6,9,13 31:17,20
31:24 32:6,9,12,15,18,21
32:25 33:3,7,11,16 34:5,9
34:12,15,18,21 35:1,5,9,12
35:15,25 36:4,8,24 38:15
40:12,17,23 41:2,6,10,14
41:18,23 42:2,6,13,19,22
43:2,6,19,23 44:2,5,8,13,17
45:1,4,8,13,18,23 46:4,8,13
47:3,6,9,13,17,20,24 48:4,8
48:12,15,18,21,24 49:3,7
49:11,14,18,21,25 50:4,7
50:17,24 51:3,6,10,13,16
51:21,24 52:2,10,13,16
53:5,16,19,23 54:12,19
55:2,5,10,14,16,19,22
56:10,14,18,21 57:1,5,10
57:14,20,25 58:5,9,14,19
58:22 59:23 60:2,5,8,12,18
60:22,25 61:4,9,13,18 62:2
62:6,9,12,16,20,24 63:4,8
63:13,17,21,23,25 64:5,11
64:20,24 65:4,8,12,16,20
65:24 66:4,9,12,15,18,21
66:25 67:4,8,13,17,21,24
68:3,8,18,23 69:3,6,11,15
69:19 70:15,18,22 71:1,4,7
71:11,14,17,20,24 72:3,6
72:12,16,21,24 73:3,9,20
73:25 74:4,8,11,17,23 75:7
75:11,15,18,22,25 76:4,8
76:12,17,20 77:1,6,10,18
77:21,25 78:3,7,10,14,18
78:22 79:6,11,18,24 80:2,5
80:15,18,21,24 81:3,6,10
81:17,25 82:5,8,12,25 83:5
83:9,16,20,23 84:1,7,17,23
85:3,7,14,18,23,25 86:4
87:1,6,10 88:3,17,24 89:4,8
89:11,18 90:1,6,24 91:2,5
91:16,20,25 92:4,15,19,23
93:2,13,24 94:3,6,9,15,19
94:19,22 95:4,12,17,22
96:2,5,8,15,20,24 97:4,8,12

[correct - drafting]

**correct (cont.)**
97:18 98:5,10,14,18 99:2,7
99:11,15,21,24 100:3,6,9
100:12,22 101:2,8,17 102:3
102:8,12,15,23 103:1,4,7
103:19,25 104:5,8,14,19,22
105:2,7,13,25 106:4,8,12
106:17,23 107:7,13,19
108:11,15,19,23 109:2
**corrections**
10:21
**correctly**
4:23
**cost**
33:10 57:16,19,24 58:2
**counsel**
5:24 6:2,9 10:1,2 20:22
27:6,9 28:7,11 72:14
111:17 112:3,8
**course**
5:12 36:11 96:14
**courses**
13:10
**court**
7:25 19:12 23:8 24:15 84:7
85:13 89:21
**courts**
20:14 24:11
**cover**
88:20 110:9
**covered**
39:8 109:13,24 110:2,8,9
111:4,7,11
**covers**
12:23
**create**
19:14
**creating**
89:24
**crime**
20:4,11 109:21
**criminal**
5:7 19:2 21:7
**critical**
42:15
**cumberland**
11:20
**cured**
93:19
**current**
8:19 63:8
**currently**
11:19 14:9
**cut**
7:17

**d**

**dan**
2:11 6:4
**daniel**
16:12
**date**
1:12 22:3 88:3 113:6,19
**dated**
5:10 27:19,23 28:4 89:1
**davincian**
91:22
**days**
98:3
**deadline**
96:19
**deal**
38:9
**debt**
95:8 96:8,12 100:6
**debts**
84:22 95:3
**december**
5:10 50:23 51:3 82:10 84:3
**decide**
10:3 54:8,14
**decided**
54:11 86:3
**decision**
18:11 99:13 100:24 101:6
101:16 102:7
**decisions**
16:16
**decline**
19:10 20:23 23:23 24:23
25:4,10,17,25 26:5
**declined**
26:19
**decrease**
74:7
**decree**
44:11 89:14,18,20
**default**
81:16,24 82:7 96:13 98:8
98:13 100:6,21
**defaulted**
80:4,23 82:24 83:4,25 97:7
**defaults**
86:8
**defined**
23:8
**delineate**
29:9
**deliver**
98:2
**demand**
83:22

**denials**
90:8,12,14
**denney**
39:25 40:2
**deny**
90:4,16 91:7
**denying**
89:23
**deposited**
18:8
**depositions**
6:21
**describe**
25:6
**described**
12:23 28:18,23 29:15,19
**description**
3:6
**design**
32:20
**designed**
109:9
**determination**
16:24 60:1
**determine**
5:2 23:18 58:3
**developed**
5:5
**developing**
98:17
**difference**
22:20
**different**
17:17 38:23 79:23
**difficulties**
93:23
**difficulty**
96:5
**diligence**
35:20
**diluted**
45:1 95:21
**directed**
67:16,24
**directing**
64:22
**directly**
41:25 89:23
**directors**
16:10,11,14,15,17 27:8
30:2,6 41:2 42:11 52:10
53:1 54:21,25 60:1 75:7
97:12 104:17,22
**disclose**
36:2,21 38:12 46:11 49:17
58:18 63:7,16 79:9 81:19

**disclose (cont.)**
82:22 90:20 91:11,14,19,24
92:2 93:4,8 103:1 106:21
107:1,16 110:13
**disclosed**
46:7 75:20 77:12 81:23
83:2 84:9 85:5,16 104:10
104:25 106:14 107:10
**disclosure**
86:9
**disclosures**
92:8,12 100:19
**discuss**
20:25
**discussed**
110:8
**discussing**
45:7
**discussion**
11:13 54:22 101:21
**dispute**
27:1
**distributed**
103:24
**district**
13:19
**diversified**
1:24
**document**
6:15
**documentation**
57:23
**documents**
27:11 78:13 95:11
**doing**
19:19 20:6 60:24 61:20
**dollar**
34:8
**dollars**
42:5 43:1 48:14 66:6 71:23
**doster**
50:14
**downstream**
74:22
**draconian**
96:13
**draft**
47:13 48:23 49:20 52:19
70:17 74:25 77:21 78:2
108:14
**drafted**
29:24 30:2 32:1,4,11 34:14
34:25 52:15 60:4,10 78:12
78:16,20 88:17 89:10
**drafting**
27:21 45:6

[drafts - fifth]

drafts
99:9
draw
24:11
drawn
24:2
drosbick
50:14,20,22 51:2,5,8,16,18
52:6
d's
77:17,21,24 78:2
due
35:20 96:8
duly
4:10
dunn
99:14 100:2

**e**

earlier
10:12,14 20:14
early
63:10
edit
22:15
edits
52:19,21
education
12:9,13 13:1
effectuate
40:21
effort
74:10
either
8:18 22:23 63:2
elected
105:19
employee
31:16
employees
31:9
ensure
58:21
entered
85:12 89:20
entirely
89:4
entities
8:23,25 9:6 11:9 25:8 28:19
74:22 82:11 83:12,15,20
84:22 85:13 111:3
entitled
1:14
entity
8:14 14:5 28:25 29:21
equal
16:15 57:10

equates
57:12
equity
40:16 43:17
equivalent
26:17
eric
9:20,22
essentially
18:19 26:10
establish
17:15
estimates
105:6
ethics
12:21
event
103:22,23 104:3
events
93:1
evidence
19:17 110:19
examination
3:3 4:12 5:11 112:11
examined
4:11
example
37:22 41:20 65:18 110:12
excellent
7:2
exchange
1:1,9 2:3,6 5:1 25:14 42:9
43:5 47:9,12 54:2,5 55:7,13
55:25 56:3,8,8,13,16,23
57:3,4,7,9,22 58:11,25
98:17,20 99:4,17,18,20,23
100:1,20 101:1,7,16 102:2
102:10 104:12,24 105:4,10
105:15,19 106:6,10,15,20
107:2,7,9,12,17,18,23
113:12
exchanged
57:1
executed
34:21 84:20
executive
75:25
exemption
91:18
exhibit
5:18,19 6:12,16
exhibits
3:6
exist
46:18

expecting
97:16 98:2
experience
88:6
experiencing
10:24 93:23
expire
13:24 87:19
expired
13:23 88:2 98:23
explain
64:13
explained
102:14
explaining
64:7
explanation
102:17
extension
96:19 98:4
extent
29:7 36:10 39:7,11 61:20

**f**

face
64:9,15
facilitate
99:5
fact
19:1 48:14 78:16 86:2
110:16 112:2
facts
5:4
factual
89:25
failed
64:8 85:1 89:7 91:19
102:25
fair
18:21 55:1 57:8,12
fairly
6:21 21:22
fall
64:2 66:9 68:23 69:2 70:4
70:11 93:22 94:1,6,9
false
48:17 49:1 62:22 63:23
71:3,13 72:5,24 78:3 89:4
109:1
familiar
24:14 90:23
family
42:9 45:16 53:2,7,10,13,21
53:25 54:8,11,14,17 55:8
55:12,21 57:4,16,24 58:9
66:18,25

far
19:2 26:20
favor
85:13
february
54:12,18 55:9
federal
5:4,6 13:19 89:21
fee
70:21
feel
9:25
fees
42:5 48:2 66:11,14
feet
7:10
field
16:25 18:13,19,20
fields
18:23
fifth
13:22 19:7,11 20:9,10,13
20:16,24 21:4,4,8,11,13,15
21:19,23 22:11,17,19 23:2
23:4,5,15,24 24:1,3,12,24
25:5,11,17 26:1,6,9,16,24
27:2,5,7,10,13,16,20,24
28:6,10,15,17,23 29:8,12
29:14,19 30:1,4,7,10,14,17
30:20,25 31:2,4,6,8,10,12
31:18,21,25 32:3,7,10,13
32:16,19,22 33:1,4,8,12,17
33:19,21,24 34:3,6,10,13
34:16,19,22 35:2,6,10,13
35:16,19,22 36:1,5,10 37:2
38:18 39:13,24 40:1,4,8,13
40:18,24 41:3,7,11,15,19
41:24 42:3,7,14,17,20,23
43:3,7,14,18,24 44:3,6,9,14
44:18,22 45:2,5,9,14,19,24
46:5,9,24 47:4,7,10,14,18
47:21,25 48:5,9,13,16,19
48:22,25 49:4,8,12,15,19
49:22 50:1,5,8,11,18,25
51:4,7,11,14,17,22,25 52:3
52:6,11,14,17,20,22,25
53:6,9,12,17,20,24 54:7,10
54:13,16,20,24 55:3,6,11
55:15,17,20,23 56:1,4,7,11
56:15,19,22 57:2,6,11,15
57:18,21 58:1,6,10,15,17
58:20,23 59:1,14,17,21,24
60:3,6,9,13,19,23 61:1,5,10
61:14,23 62:3,7,10,13,17
62:21,25 63:5,9,14,18,22
63:24 64:1,6,12,18,21,25

**[fifth - guaranty]**

**fifth (cont.)**
65:5,9,13,17,21,25 66:5,10
66:13,16,19,22 67:1,5,9,14
67:18,22,25 68:4,9,14,19
68:24 69:4,7,9,12,16,20,25
70:1,9,16,19,23 71:2,5,8,12
71:15,18,21,25 72:4,7,13
72:17,22,25 73:4,10,13,17
73:21 74:1,5,9,12,14,18,24
75:5,8,12,16,19,23 76:1,5,9
76:13,18,21 77:2,7,11,15
77:19,22 78:1,4,8,11,15,19
78:23 79:2,7,12,19,22,25
80:3,6,8,10,13,16,19,22,25
81:4,7,11,15,18,22 82:1,3,6
82:9,13,16,19,21 83:1,6,10
83:13,17,21,24 84:2,8,11
84:13,18,24 85:4,8,10,15
85:19,21,24 86:1,5,6,24
87:2,7,11,14,17,20,24 88:4
88:8,11,15,18,21,25 89:5,9
89:12,15,19 90:2,7,11,13
90:15,19,22,25 91:3,6,9,13
91:17,21 92:1,5,6,10,16,20
92:24 93:3,7,11,14,17,21
93:25 94:4,7,10,13,16,20
94:23 95:1,5,9,13,18,23
96:3,6,9,16,21,25 97:5,9,13
97:19,25 98:6,11,15,19,24
99:3,8,12,16,22,25 100:4,7
100:10,13,18,23 101:3
102:4,9,13,16,24 103:2,5,8
103:20 104:1,6,9,15,20,23
105:3,8,14,17,22 106:1,5,9
106:13,18,24 107:5,8,14,20
107:21,25 108:6,9,12,16,20
108:24 109:3,4,14,20
111:13

**file**
1:4 30:5 113:5

**filed**
47:8,11,15,23 48:1,10,20
48:24 49:2 70:14 71:4,16
71:20,22 72:6 77:16,20,23
77:24 79:16 81:1 84:5
94:21 108:10,13,17 109:1

**filing**
70:18

**financial**
8:25 9:1 61:4,8,12,17 62:1
62:5,8,12,15,19 63:4 65:3
65:20 66:9,15 67:6,16,20
67:21 68:5,16,21,22 69:15
69:18 70:3 71:16,22 72:2,9
73:6 76:7,15,23 77:4,16,24
78:5,14,18,21,25 79:9,16

**financial (cont.)**
79:24 81:21 83:3 85:6,17
87:4,9,9 93:5,9,23 95:8
96:5 98:18,21 99:24 100:25
102:6 104:11,25 105:5,11
105:12,18,24 106:3,11,15
106:20,22 107:1,10,15
108:2

**financially**
44:8

**financial's**
87:25

**financing**
97:3

**finder**
48:2

**finder's**
70:21

**finding**
46:18

**fine**
26:13 29:11 99:19 110:5

**finished**
7:16,18

**firm**
14:11,13,19 16:1,2,7,16
18:5,14 42:25 50:15 99:14

**firm's**
18:8,11,19 35:8 64:24 65:3
65:7

**first**
4:10 13:20,25 16:22 24:20
27:3 73:22 76:2,6 103:24

**five**
10:10 15:3

**florida**
50:15

**following**
49:5,9 77:3 91:20

**follows**
4:11

**forced**
26:12

**foreclosing**
97:18

**foreclosure**
100:9

**form**
5:17 47:8,11,13,15,16,19
47:23 48:1,10,20,23 49:2
70:14,17,20 71:4,6,17,19
71:22 72:5 77:17,21,24
78:2 108:10,13,14,17,25

**formal**
5:9,13 17:6

**formation**
15:8 92:18 94:5

**formed**
73:25 96:22

**formerly**
8:14 9:2

**forming**
74:6

**formulated**
38:24

**formulation**
20:9,13 21:1,18 22:5,7,21
26:14

**forward**
19:6 20:20 25:19 26:8,15
27:25 30:22 31:14 50:19
97:17,24

**forwarded**
47:19 51:12

**foundation**
37:11,13,19 110:12

**four**
15:17

**fourth**
64:16

**fraud**
43:11

**fresh**
10:15

**friday**
97:6

**full**
4:14 14:16

**fully**
10:9 11:11 89:17 95:21

**fund**
35:7 43:22

**fundamental**
21:2

**funding**
94:6 97:3 106:16

**funds**
65:7 72:15,20

**further**
20:2 112:5

**future**
112:3

**g**

**geier**
83:12,14,19 84:4,4,22
85:13

**general**
8:13 10:4 12:16 13:3

**generally**
17:23 110:1,7

**generate**
31:7

**george**
1:7 3:4 4:4,9,16 6:9 20:14
20:20 21:24 24:6 39:25
40:2 113:4

**give**
10:8 12:16 13:3 19:3,17
32:12

**given**
19:1

**go**
6:22 10:3 18:4 26:15 38:14
80:7,9,11,14,21,24 81:1,6
81:12,19,23 86:13 112:8

**goes**
37:23 110:20

**going**
6:22 9:10,14 19:5,6 20:20
21:1 25:19 26:8 27:25,25
30:21 31:13,13 36:7 38:6
50:19,19 53:25 56:25 66:3
74:20 97:24 101:19,24
107:11,16 109:8,12,20
112:9

**good**
4:17 6:4 59:4

**governance**
16:16

**governing**
16:7

**graduate**
12:1,6,10,10

**graduated**
11:25 12:5

**grant**
96:18

**granting**
19:21

**gray**
2:13 6:5,7

**grounds**
19:25 86:4

**group**
84:4 108:5,8,10,22

**grouped**
73:24

**grunt**
7:6

**guaranteed**
32:8 83:19

**guaranties**
78:7,10 79:1,14 86:8

**guaranty**
32:11 78:13 79:10 80:20,24
82:5,8,24 83:4,23 84:1,20

[guaranty - investors]

**guaranty (cont.)**
84:21 85:2
**guilty**
20:11
**guttural**
7:6

**h**

**hallet**
35:12,21 36:2,21 41:20
**handing**
6:15 26:10
**handled**
18:3
**happening**
97:4
**happens**
10:8,13,20 112:6
**harris**
2:12 6:6,6,8
**head**
7:5
**health**
10:24
**hear**
7:10,12 18:10
**heard**
24:6,8,16
**hearing**
1:14 111:8 113:16
**held**
32:24 101:21 104:13
106:16 107:3,3 113:12
**help**
19:14
**herbert**
82:2
**hess**
31:11,13,16 34:4,7,11,15
34:18,23 35:3,7 47:16,19
48:6 50:3 70:24
**hess's**
34:24
**high**
109:13
**higher**
73:8
**hold**
15:19
**holders**
85:18 106:8
**holding**
32:24 33:2
**holdings**
91:23,23 92:3 108:4,8,10
108:22 109:1,6

**hour**
10:10

**i**

**identification**
6:13
**identified**
3:6 14:1 86:2
**identify**
6:2 21:11 49:24 50:3 66:2
**identifying**
64:15
**immunity**
19:21
**impact**
93:9
**impair**
10:24 11:3 97:22
**implied**
33:9
**implies**
110:14
**important**
7:3 22:5,6 39:11 46:16 58:3
64:20
**imposed**
21:6
**impression**
19:14 89:25
**improper**
34:12
**inappropriate**
39:16
**inc.'s**
97:11 100:21 103:6,16
104:17 108:2
**include**
12:9 99:20
**included**
91:4
**including**
42:11 93:19 95:8
**incorporate**
45:16
**incriminate**
19:25 23:21
**incriminated**
20:11
**incrimination**
19:18 20:5 21:5,9,12,16
46:25 50:12 59:2 70:2
**independent**
94:14
**indicated**
69:22
**indirectly**
42:1 89:23

**individual**
18:20
**individually**
84:21
**infer**
23:20
**inference**
23:17 24:1,12
**inform**
41:16 53:10 56:24 68:2,6
68:11 69:1 102:19
**information**
5:17 10:11 20:17 36:10
37:5 39:8,12 42:16 78:3,24
79:16 100:25 101:7,17
105:11,20,24 106:3,12
111:20
**informed**
45:20 53:2 72:10 87:1
96:18 97:2 105:5
**informing**
103:3
**initial**
70:11
**initiation**
70:3
**innocent**
19:12 20:15
**instruct**
36:9 39:9 61:19 101:10
**intend**
111:20
**intended**
36:23
**intent**
36:16 74:6
**intention**
19:19 28:17,22 29:14,18
110:25
**intentionally**
42:18 89:11 102:25
**interest**
17:1 32:24 42:6,24 43:17
56:5 61:13 62:1 69:19
82:12 93:15 94:24
**interested**
63:3
**interests**
40:16 41:17 42:12
**invesco**
30:19,21,22,24 31:1,5,7,9
31:16,19,22 32:2,5,8,14,17
32:21 33:6,10,16,22 34:1,2
34:5,9 35:15 36:7,17,22
38:12 39:6,22,23 40:6,7,9
41:21 42:10 43:6 44:25

**invesco (cont.)**
45:3,17,21 46:23 47:8,15
48:1,10,20 49:6,6,10,14,24
50:11,16,23 51:6,19,23
52:1 53:15 54:1 55:14,24
56:9,12,17 58:14,19 73:18
73:23 74:15 82:18 83:3,7
85:6
**invesco's**
39:5 40:11 47:2
**invest**
33:7 72:20 80:18 86:3
96:24
**invested**
35:24 62:12 80:17
**investigation**
4:25 5:10 19:5 43:5
107:11,17
**investigative**
37:20
**investing**
64:17 86:3 92:22
**investment**
33:6 35:14,18 36:3 38:14
41:22 44:1 58:13 60:14,15
62:9,20 63:12 64:23 72:11
81:20,23 92:18 93:10
104:18
**investments**
9:3 32:15,18,24 34:2,18
35:23 40:16 41:10,18 42:6
42:12,25 44:21 65:2 68:18
75:2 80:7,11,14,15,17,21
80:24 81:2,6,13 83:8 91:22
95:12,16
**investor**
35:21 38:13 47:20 62:5,23
64:3,8,14 69:21 74:13,17
77:12 80:15 81:24 96:23
101:6,15 102:11,14,18,19
103:1 104:3,11
**investors**
31:20 32:2,12 33:5,23 34:5
41:16 42:10 44:25 45:4,7
45:18,21 46:1,7,23 47:23
49:21 53:15 56:10,17,21,24
57:4,23 58:4,19 60:21 61:3
61:6,11,16,25 63:2,2,7,16
63:19 64:20,23 68:1,6,10
68:15,20,25 69:13 72:8,10
73:6,12,15,18,24 74:3,8,22
75:3,17,20 78:7,24 79:10
79:13 81:21,25 82:18,23
83:3,7 84:9 85:6,17,22 86:2
86:10,25 87:10 88:5,9,13
90:4,9,21 91:8,11,15 92:3

[investors - loan]

**investors (cont.)**
93:5,9 98:22 99:1,6,15,24
100:2,20 101:1 102:2,5
105:1,6,12,19 106:7,15,22
107:2,11,18 110:13,15
**invoke**
21:8 43:18 44:22 46:24
50:11 52:6 58:25
**invoking**
21:4 23:3,9 24:2
**involve**
61:20
**involved**
19:15 25:12 27:3,17,21
42:11 51:1 56:8 81:8,9
92:17 94:5 98:16 99:13
100:24 102:1 110:17
**involvement**
25:22 26:2,25 29:20
**involves**
36:10
**involving**
80:21 81:2 86:9
**iolta**
35:8 64:24 65:3,7,11,15
66:7 81:13
**irrevocable**
84:5
**issuance**
40:22 77:3
**issue**
10:24 32:2
**issued**
44:10,15 55:10 59:18 60:5
60:22 61:3 62:14 63:4
64:11 76:2,6,10,14,22
**issuers**
74:16
**issues**
88:23 109:19 110:12
**issuing**
31:22 67:7

**j**

**jacob**
4:16
**james**
26:23 27:1 29:16
**jameson**
4:20
**january**
1:12 4:3 33:13 47:6 70:14
71:16 73:1 75:13 84:16
86:21,25 113:6
**jenny**
16:12

**jones**
2:5 4:18 14:22 16:14 18:10
18:18,22 23:1,8 24:10,18
26:7,14 28:16,22 29:7,18
37:13 38:6 39:10 46:15
103:9 109:8,25 110:6,16
111:6,11,15,23 112:2,9
**judge**
23:16,19
**judgment**
84:5,15 85:12
**july**
54:2 59:18 67:12 72:14
**jumping**
46:10
**june**
76:2,6,23 77:9 79:5 88:16
89:1 104:16
**junior**
84:5
**jury**
23:16,19

**k**

**kantor**
50:14
**keep**
7:11 46:10
**keeping**
60:7
**kept**
44:4 95:7
**keystone**
25:20,23 26:3 79:3,17
88:10,13 89:3,13 90:5,10
90:17 92:8
**kia**
96:23 97:3
**kind**
109:18
**knew**
31:22 34:4,7,11,23 35:3,7
35:23 36:6 39:4,21 40:5,10
41:13 42:24 43:25 44:7,10
44:15,25 45:3,10 46:6 49:6
49:23 51:15 52:1 55:4,16
57:19 58:2,16 59:18 60:14
60:24 62:11,14,18,22 63:10
63:23,25 64:13,19,22 66:6
66:23 67:2,10,15,19,23
70:24 71:3,9,13 72:1 73:7
73:12,18 74:15 77:8 78:2,9
79:3 80:1,4,14,23 81:1,8
83:14,22,25 84:14,19,25
85:11,25 86:25 87:4,9,21
88:1 91:14 92:2 93:12 94:1
94:8 95:2,7 96:17 97:1,6

**knew (cont.)**
98:25 100:5,8,14,19 104:7
104:16 105:23 106:2,6,10
106:19,25 107:6,15
**know**
4:17 7:10 9:12,20,21 10:3
11:8 12:9 16:2 24:15 31:11
36:15 37:11,14 82:20 84:3
102:6 108:4 112:3
**knowingly**
42:18 89:10 102:25
**knowledge**
39:1 44:20
**known**
8:14 9:2 29:21

**l**

**language**
22:15
**law**
12:4,7 13:13 14:11 24:15
35:8 50:15,16 51:21 110:20
**laws**
5:4,7
**lawyer**
11:8 15:13 19:9 23:22
24:22 25:3,9,16,24 26:4,19
**lawyers**
17:8
**leave**
110:21
**lee**
16:12
**leed**
50:14
**legal**
12:8,12,25 14:17 16:23
24:25 26:25 42:5 50:16
59:15 66:11,14 108:7
**legally**
13:11
**letter**
45:7 97:10,14,20 98:1,7,12
**level**
109:13
**levels**
97:21
**liabilities**
95:7
**liability**
27:18,22
**liberty**
9:9,10,11,11,13 11:8 24:21
25:1,7,13,15 27:1 28:19,25
32:8,12 34:7,23 36:7,23
41:13 42:21 45:3,6,10,21
46:1,6 49:10,17 50:16 51:2

**liberty (cont.)**
51:9,12 56:2 60:20,24 61:2
64:22 65:1 66:24 67:4
68:11,17 71:9 72:3,12 73:3
73:8 74:21 75:15 78:6 79:4
79:8,14,20 80:4,9,12,23
81:2 82:4,8,11,14,17,22
83:4,18,23,25 84:6,14,19
84:25 85:13 86:9 87:13,16
88:14,19,22 89:2,21 90:6,9
90:20 91:7,10,14,24 92:2
95:15 108:21 111:1
**liberty's**
45:17 46:22 78:25 79:23
88:6 90:18
**lien**
94:21 106:16 107:3
**limitations**
43:16
**limited**
27:18,22 30:12
**limits**
40:15
**liquidation**
64:4,7,14,19 96:2 102:12
102:15,18 103:18,21
104:12
**liquidity**
72:20 92:25 93:2 103:22
104:3
**list**
69:14
**listed**
69:13
**listen**
10:25 11:4
**litany**
6:23
**litigation**
29:16 81:9,10
**little**
46:2
**live**
11:19
**llc**
8:14,15 9:1,3 27:4 29:21
30:19 32:24 35:23 41:10
59:13 72:15 75:2 84:4
91:23 92:3 94:6 105:21
106:16 108:5,8,10
**llcs**
74:2,7
**llc's**
73:25
**loan**
80:21 82:7 83:19 84:7,16

**[loan - moores]**

**loan (cont.)**
93:16,18 94:15,17,24 95:2
97:7 98:4,14
**loaned**
83:15 87:12,15 93:13 94:8
**loans**
80:5 81:16,24 82:5,24 86:8
98:9 100:21
**location**
113:7
**long**
22:21 26:12
**longer**
20:21 75:25 99:1
**looked**
21:17
**loss**
96:13
**lot**
22:20 29:4
**loud**
7:11
**low**
97:22
**lowndes**
50:14,20,22 51:2,5,8,15,18
52:5
**lunch**
86:20
**luncheon**
86:14

**m**

**ma**
2:16 113:7
**mail**
17:13 35:11 47:16 51:10,12
88:20 99:9
**mailed**
69:5 72:14 95:14
**maine**
11:20 13:13,18,19 14:5,5,8
14:10
**maintained**
27:11,14 30:5 96:1
**maintaining**
65:6,15,19,23
**making**
16:16 18:11,16
**management**
41:5 97:15
**manager**
17:13,15
**maniac**
74:2
**marc**
2:5 4:18 6:25 9:9

**march**
34:21 98:8
**marcus**
1:7 3:4 4:4,7,9,16 5:12,18
5:24 6:9,15,20 11:8,17
14:12,15,16,17,19,22,22
15:1,4,8,10,21 16:5 18:10
19:6,16 23:2,12,14 24:10
24:20,25 26:2,11,15 28:16
29:8,9,13,24 33:14,25
36:14 39:4 40:2 42:4 46:14
46:21 47:2 49:13 50:9 52:4
53:7 54:3 59:12,12 65:6,10
65:14,18,22 66:1,7 79:21
81:9,13 86:6,20 87:15
102:1 103:15 105:16 108:4
109:4,8 110:18 111:6,17,23
113:4
**maria**
113:9
**marked**
5:18 6:12,16
**market**
57:9,12
**massachusetts**
1:11 2:8
**material**
50:7 85:25
**materials**
30:6
**matter**
1:3,14 5:2,10 17:14 18:12
25:20,23 26:3 79:3,17 90:5
90:10 113:3
**matters**
17:12 18:2
**maturity**
87:23 88:2
**mdo**
8:13,14 27:4,6,9,11 28:7,8
28:11,12 29:21,25 30:3,5
30:13 33:3,7,10 35:24,25
36:3 38:15 41:1,12 42:8,10
42:16 43:8,22 44:5,7,10,12
44:15,21 45:22 46:8 49:17
52:10 53:1 54:6,18,18,21
54:23 55:1,10,18 59:18,23
60:7,16,17 61:9,13,17,18
62:2,9,12,14,19 63:7,11,11
63:20 64:5,11 67:13,16,24
68:23 69:2,11,19 75:7,22
75:25 76:2,6,10,11,14,16
76:22 80:18 81:24 88:6,10
92:14 93:5 94:8,11,14,17
94:25 95:7,20 98:22 99:7
100:15 104:3,7 105:20,23

**mdo (cont.)**
106:2,3,12 107:4
**mdo's**
27:14,18,21 28:1,4 40:14
40:22 41:1,5,5,9,13 42:2,13
43:17 60:1 63:16 68:3,7
76:25 94:22 95:3 104:4
106:17
**mean**
15:12 16:2 18:6
**meaning**
103:10
**means**
20:19,25 23:19
**meant**
14:4 103:22
**medication**
10:23
**meet**
24:20
**meeting**
29:24 30:6 52:10,12,15,16
52:18,19,23 53:2 54:22
55:5 104:17,22
**meetings**
27:9
**member**
13:17,18,20 14:3,7,14 33:3
58:11
**members**
14:6 105:21,25 106:2
**membership**
30:13 32:15 40:15 41:17
43:16 53:4,14,18,19,22,23
76:16 98:22
**memo**
88:16,20,23
**memorandum**
56:17,21,23 57:22 58:22
87:5 89:1,10,16 99:21
**mentioned**
11:9 16:4
**merely**
19:24
**met**
97:14
**michael**
9:10 11:8 24:20 25:1,7,12
25:14 27:1 28:19,25 42:21
45:6 46:6 49:17 56:2 60:20
60:24 64:22 65:1 66:24
67:4 68:11,17 71:9 72:11
73:3 74:21 75:14 79:4,14
80:4,9,11,23 81:2 82:4,10
82:14,17 83:18 86:9 87:12
87:16 88:14,19,22 89:2

**michael (cont.)**
90:6,9 95:14 111:1
**mike**
89:17
**million**
33:11,15 35:25 36:3 44:12
44:17 45:13,22 46:8 49:18
54:19 55:2,8,9,12 56:9,12
56:13,24 57:1 59:23 60:2
60:15 63:12,17,21 76:12,17
79:6 81:6,12 82:12 83:15
83:19 85:3,14 93:13 96:1
98:10,14 100:6 103:19
103:24
**millions**
66:6
**mind**
10:16
**minutes**
10:10 29:25 52:15,19,23
**misconduct**
19:15
**misconstrued**
20:17
**misleading**
19:14 63:25 64:13 103:4
**mistretta**
14:15,20
**mo**
80:7,9,11,14,21,24 81:1,6
81:12,19,23
**mobile**
35:23 41:9 42:9 43:8 45:16
53:7,13,21 54:1,8,11,14,17
55:8,12,21 57:4,16,24 58:9
59:13,16,19 60:5,12,15,16
66:18,21,25 67:3,11 83:11
83:15 84:22
**mobile's**
53:2,11
**money**
31:19 33:15,18,22,25 35:4
39:1 40:11 58:8 59:13,16
59:19 60:5,12,15,16 65:11
66:21 67:3,11 68:2,6,12
82:14 83:11,11,15 84:22
87:12,15 94:2,8 97:3
103:24 104:4
**monies**
65:23 66:2,3 108:22
**monthly**
105:25
**moores**
2:4 4:2,13,18,25 6:2,8,14
11:15,16 14:25 16:19 19:8
21:2 22:9,14,23 23:11,25

**[moores - paid]**

**moores (cont.)**
24:19 26:22 29:23 36:13,19
37:1,3,9,12,18 38:1,11,17
38:19,23 39:3,18,20 43:13
46:13,20 59:6,9,11 61:22
70:7 86:12,17,19 101:12,19
101:22,25 103:14 112:5
**moore's**
111:7
**morning**
4:17 6:4
**moved**
111:4
**moving**
97:17
**mozido**
1:5 5:2 8:15,17,18,19 30:19
30:21 32:15,18,23 33:6,16
34:17 40:16 41:17,22 42:6
42:10,12,25 43:5 45:12
58:14 72:19,20 80:15,17
92:15,19,22 93:2,6,13,23
94:1,18 95:3,4,12,17,21
96:1,4,11,11,18 97:2,7,11
97:17,21,23 98:2,8,13
100:5,12,15,17,21,25
101:17 102:7 103:6,16
104:8,13,17,22 105:1,11
106:17,22 107:4,12 108:2
111:2 113:3
**mozido's**
93:19 96:14

**n**

**name**
4:14,15,17 8:10,13 9:9,9
14:13,17 95:15 113:19
**names**
8:9 9:6
**nature**
25:6
**necessary**
10:21 55:13
**need**
9:25 15:12 17:4,5 19:13,24
20:25 21:7 94:2 112:7
**needed**
102:6
**needs**
96:15
**negative**
24:1,11 79:5
**negotiations**
27:17 30:8 43:22 92:17
**net**
79:4

**new**
16:20 17:5,7,11,12 18:12
84:6 85:12
**newman**
74:2
**ninth**
13:23
**nod**
7:6
**non**
56:14 77:10,14
**nonaccredited**
74:3
**note**
11:7 29:3 32:2,4,17 54:8,12
54:15,17 55:10 57:4,7
59:19,23 60:4,10,12 67:11
69:23 70:5 76:4,7,10,14
78:17,20 85:2 87:23 88:3
102:22
**noted**
20:14
**noteholders**
34:2 54:1 55:14 56:12
**notes**
31:23 32:6,9,14 41:21
44:11,16 49:7,11 53:3 56:9
56:13,25 60:21 61:3,7
62:15 63:3 76:20,22 77:3,9
87:18,22 88:1 98:22 99:2,5
99:6 105:20
**notice**
1:15 5:17,22 99:9 100:1
**notified**
51:9
**november**
92:14
**number**
9:8 11:9 16:4 17:19 74:7
99:1 106:7 113:5
**numbers**
17:17,18
**numerous**
80:5

**o**

**oath**
4:4 7:22,24
**objecting**
38:2
**objection**
4:22 36:18,25 37:8,9,19
38:5,9,16,20 43:12
**objections**
37:24
**obligation**
110:15,18

**observe**
90:8,16,20 91:7
**observed**
79:8 82:22
**obtaining**
49:17
**occurred**
47:5 54:1 81:16 109:21
**o'connor**
2:11 4:24 6:4,4,8,11 11:7
18:25 20:8 21:13 22:13,19
22:24 23:7,10 24:5 26:7,13
29:3 36:9,18,25 37:6,10,15
37:21 38:3,8,16,21 39:2,7
39:15 43:12 46:10,19 59:4
61:19 70:5 101:10,18
109:17,25 110:5,10,25
111:20,22 112:4
**october**
69:5,10,14,17 95:10,14,24
**offer**
42:9 46:22 47:3,5 49:5,6,9
49:14,16,21,23 50:2,10
51:19,20,23 53:25 54:2,5
55:7,25 56:3,8,16,24 57:3
58:12,25 98:17,20 99:4,5
99:10,17,18,20,23 100:1,20
101:2,7,16 102:3,10 104:12
104:24 105:4,10,15 106:6
106:10,16,20 107:2,7,9,18
107:23
**offered**
45:17 78:9
**offering**
32:21 34:5 43:2 45:8,10
46:1 48:3,8 49:11,25 50:4
52:1 56:17,20,23 57:22
58:21 60:21 61:2,7 66:12
66:15 67:16,20,24 70:4,11
70:22 71:1,11 72:2 73:7,19
73:19,23,24 74:16,16 75:15
75:18 82:23 87:4 99:21
108:23
**offerings**
72:10 78:6,14,18,22 87:4,6
87:9
**office**
15:23,24 17:13,15
**officer**
4:21
**officers**
4:19 15:10,13,13,15 16:5
**okay**
8:6 24:18 26:21 28:2 39:2
46:19 50:20

**old**
11:17
**omissions**
50:7
**one's**
21:15
**open**
17:15
**opening**
5:8,15 17:11
**operating**
8:19 18:9 28:1,4,8,13,13
40:14,20,22 41:1,5,9,14
42:2,13 43:10,17 45:16
66:17,20 105:23
**operations**
31:1 94:12
**opined**
91:23
**opinion**
96:23
**opportunity**
5:13,19
**opposed**
9:23
**oral**
13:22
**order**
5:9,13 20:11 21:7 85:2 94:2
102:7
**organization**
14:1
**original**
32:1,4,11 78:16 113:14
**originally**
78:12
**outcome**
96:13
**outside**
36:14 38:4 39:18
**overlooked**
17:9
**owned**
62:1 74:22 95:20
**ownership**
54:6 66:24 67:3 104:5

**p**

**p.m.**
86:12,14,17 101:19,22
112:11
**page**
6:24
**pages**
1:8
**paid**
18:6 35:8 48:3,14 57:16

**[paid - prosecution]**

paid (cont.)
58:8 70:21 81:6,13 83:8
panelist
13:5
part
18:11 23:5 54:11,15
participate
41:25
participated
12:8 13:5 27:8 30:8 32:20
43:21 45:15 47:2
particular
66:3
parties
56:6 57:8 76:25 91:1,4
101:14,18
partner
60:5
partners
15:1 59:13,16,19 60:12,15
60:16 66:21 67:3,11 83:11
83:15 84:22
party
37:4
pass
17:2
passed
75:6
pat
7:2
paul
31:11 47:16
paulsen
113:10
pay
79:20 82:11,15,18 96:12
payees
93:19 97:18 100:8 104:19
105:2,7
paying
34:7 96:14
payment
33:18
payments
35:3,7 48:11 71:7,23 85:1
108:18
payroll
94:3 97:22
pending
10:5
pennsylvania
11:24
people
9:8 10:18 19:12 20:15
96:10

perceive
56:5
percent
34:8,24 48:7 58:13 93:16
95:21 100:16 102:21
percentage
67:3
percentages
66:24
perform
35:20 83:23
permitted
23:19 24:11,15
person
16:24 95:15
personal
32:11 36:8,23 68:12,18
71:10 72:3 78:6,9,12 79:1
79:10,14 80:20,24 82:4,8
82:23 83:4 84:1 86:8
personally
32:8 72:12 83:19
persons
48:11,15 71:7,24 108:19
peter
2:4 4:18 51:8 109:23 111:4
philadelphia
11:25
philip
84:4
piece
37:5 42:15
pieces
22:20
pioneer
93:12,16,18 96:12,17 97:7
97:15 98:14 100:21
pioneer's
96:8 100:15
place
1:9 59:4
plan
97:16 98:3
planned
39:6,22 40:6
plaza
15:23
pleadings
89:7
please
4:14 6:2 7:11,12,15 8:3,10
9:6,21 10:2,13 25:6 112:3
pledge
76:24
pledged
94:18

plus
82:12
point
11:10,14 18:25 21:20,24
22:3 37:22 46:3 47:22 66:1
75:24 109:18,22 110:6,11
points
79:23
ponzi
82:20
poor
79:24
portland
14:10
posed
23:25
position
15:19 21:6 72:19 101:5,15
possess
68:22 69:1,18 104:7
possessed
75:10 95:10
possibility
110:22
possible
46:17 96:23
precise
8:24
precluded
76:23
preference
64:4,8,14,20 93:2 96:2
102:19 103:18,22 104:13
preferred
53:4,19,23 61:9,12,13
62:19 64:4 67:13 68:23
69:2 73:2 74:21 76:11,15
76:24 77:5 92:22 93:1
95:25 98:21 99:6 103:18,23
104:8,13
prepare
88:22
present
13:21
preserved
37:25
president
15:18,20
prevent
21:16
previous
10:19
previously
28:18
price
67:8,10 76:19,19

principal
58:13 102:22
prior
5:8,15 70:17
privilege
11:11 19:18,23 20:4 23:16
24:13 29:10 37:7 39:13,14
46:12,18 109:11 111:13
privileges
109:15 110:4 111:9
pro
52:12
probably
6:20 18:21 20:18
problem
21:2,9
proceeding
4:20,22 5:12 22:2,3,4 37:24
38:5
proceedings
113:11
proceeds
34:1 35:18 36:6,16,22
38:14 39:5,21 40:5,9 49:24
64:23 65:2 66:8 67:15,19
67:23 68:17 71:10 72:1,11
82:17 83:8 95:2
process
16:20 17:11 18:11 102:12
102:15
products
31:3
prohibition
60:16
promised
45:3
promissory
31:23 32:2,5,9 44:11,15
49:7 55:9 56:9 59:19,23
60:4,12,21 61:3 62:15 63:3
69:23 76:4,7,10,14 78:17
85:2 87:18,22 88:1
pronouncing
9:17
proofreader's
113:1,19
properly
18:3
proposal
17:7 100:15
proposals
100:12
proposed
69:22
prosecution
19:21

[prospective - returned]

prospective
64:3
protected
36:14
protection
45:4,8,11,17 46:1,4,23
protections
69:23,24
protects
19:12 22:25
prove
109:19 110:18
provide
20:17 21:14 28:12 53:15
59:15,16 98:21 99:23
100:25 105:10 111:19
provided
5:9,16 24:25 25:7 28:25
50:15 57:23 60:11 78:6,24
79:15,17 82:4 87:5,10
108:7
provision
5:3
prudential
2:14
public
89:22
purchase
30:12 32:4 41:21 60:10
77:13 78:20
purchased
102:22
purchaser's
87:19,21 88:2
purchasing
73:7
purported
41:17
purpose
40:7 63:12
purposes
4:19,21 40:12 68:3,7
pursuant
1:15 6:17

**q**

question
7:16,19 8:4,5,6 10:5,12
20:3 23:15,20,25 37:3,15
37:16 38:8,21,24 39:16,17
89:8 101:11,23 103:12
110:14 111:12
questioning
111:7
questions
5:21 6:24,25 7:1,4 8:3
10:25 11:4 19:5,13,22 20:2

questions (cont.)
20:6 28:18,24 29:4,9,15
30:15 43:15 44:20 46:16,22
50:10 52:5 58:24 70:2,10
86:7 92:7,11 107:22 108:1
109:5,9,15 110:8,13,23
111:1,9,18,21 112:6

**r**

raise
31:19 33:22 72:19
raised
34:8 108:23
raising
35:4,8 43:22
rate
93:16 94:24
rational
101:6,15
read
5:19 22:10,21 28:4 66:17
66:20 89:13
reading
20:21 47:23
real
72:15
really
109:17
reason
10:2 11:3 17:9 61:6
reasonable
55:1
reasons
13:24 22:7
recall
13:9
receipt
34:12
receivables
18:4
receive
52:21 53:21 65:1 77:14
93:1 100:16
received
33:15 35:3 40:9 42:4 43:2
47:16 56:17,20 65:23 66:11
66:14 71:19 97:10 98:1,7
105:20 108:22
receiving
34:15 48:7 50:3 70:25
71:10 79:14 104:4 106:3,11
recess
59:8 86:15
record
4:2,15 5:8,15 6:3 7:3,5,9,14
10:4 59:7,10 86:13,18
101:20,21,23 112:9 113:13

recording
113:15
records
65:7
refer
8:14,17,18,24 9:2,11,14
25:19 27:25 30:21 31:13
50:19 53:25
reference
12:12
referred
86:22
referring
8:22,25 9:10,22 69:24
reflect
52:24 58:12
refuse
19:24 20:12 23:15
refusing
21:20
regarding
17:10 28:18,24 29:15 88:23
109:15
regulations
74:11
reinhart
51:8
related
13:11 48:11,15 50:16 71:7
71:24 108:19
relates
111:2
relating
42:5 58:24 82:24 88:5,9
relationship
50:22
remained
96:5
remember
10:10 22:16
reorganizations
12:19 13:7
repay
94:15 95:3
repayment
96:19
rephrase
8:4
report
40:25 41:4,8
reporting
1:24 113:15
represent
30:24 53:7 59:12
representation
16:23 17:3 28:19

representations
35:17 88:12
represented
5:24
representing
6:9 25:12 41:12 51:6 55:18
55:21,24 56:2,6
request
16:22,24 18:16 53:3,11
requested
52:24
requesting
53:13
require
11:12 29:5
required
21:19 85:1 91:11 105:24
requires
7:22 20:10
requisite
95:11
rescission
47:3,5 49:5,9,14,16,20,23
50:2,6,10 51:20
reserve
70:8
resolution
75:1,6
resolutions
30:2
respect
37:15 87:3,25 109:23 111:1
respectfully
19:9 20:23 23:22 24:22
25:3,9,16,24 26:4
respectively
98:10
response
7:6 10:12
responsibility
17:25 28:8,12
responsible
17:22,23 18:1 65:6,10,14
65:18,22 66:2
restated
27:18,22
restroom
10:1
restructure
100:12,15
restructuring
97:16 98:3
retention
17:10 104:18
returned
43:1

[revealing - software]

**revealing**
61:21
**revenue**
31:7
**review**
5:13
**reviewed**
47:13 48:23 49:13,20 70:17
77:20,23 99:9 108:14
**richard**
69:5,8 73:2 88:17
**rick**
9:11
**right**
8:7 9:19 10:15 18:14,18
21:4,5,8,11,14,15 22:11,17
23:4,10 37:18 42:16 43:11
55:25 59:20 75:4 81:14
87:19,21,23 88:2,20 96:9
97:24 100:17 107:4
**rights**
19:7 20:9,12,16,24 21:24
23:24 24:24 25:5,11,18
26:1,6,9,17,24 27:2,5,7,10
27:13,16,20,24 28:6,10,15
28:23 29:8,14,19 30:1,4,7
30:10,14,17,20,25 31:2,4,6
31:8,10,12,18,21,25 32:3,7
32:10,13,16,19,22 33:1,4,8
33:12,17,19,21,24 34:3,6
34:10,13,16,19,22 35:2,6
35:10,13,16,19,22 36:1,5
36:20 37:2 38:18 39:24
40:1,4,8,13,18,24 41:3,7,11
41:15,19,24 42:3,7,14,17
42:20,23 43:3,7,14,18,24
44:3,6,9,14,18,23 45:2,5,9
45:14,19,24 46:5,9,24 47:4
47:7,10,14,18,21,25 48:5,9
49:12,15,19,22 50:1,5,8,12
50:18,25 51:4,7,11,14,17
51:22,25 52:3,7,11,14,17
52:20,22,25 53:6,9,12,17
53:20,24 54:7,10,13,16,20
54:24 55:3,6,11,15,17,20
55:23 56:1,4,7,11,15,19,22
57:2,6,11,15,18,21 58:1,6
58:10,15,17,20,23 59:1,14
59:17,21,24 60:3,6,9,13,17
60:19,23 61:1,5,10,14,23
62:3,7,10,13,17,21,25 63:5
63:9,14,18,22,24 64:1,6,12
64:18,21,25 65:5,9,13,17
65:21,25 66:5,10,13,16,19
66:22 67:1,5,9,14,18,22,25
**rights (cont.)**
68:4,9,14,19,22,24 69:2,4,7
69:9,12,16,20,25 70:1,8,10
70:16,19,23 71:2,5,8,12,15
71:18,21,25 72:4,7,13,17
72:22,25 73:4,10,13,17,21
74:1,5,9,12,14,18,24 75:5,8
75:11,12,16,19,23 76:1,5,9
76:13,18,21 77:2,7,11,15
77:19,22 78:1,4,8,11,15,19
78:23 79:2,7,12,19,22,25
80:3,6,8,10,13,16,19,22,25
81:4,7,11,15,18,22 82:1,3,6
82:9,13,16,19,21 83:1,6,10
83:13,17,21,24 84:2,8,11
84:13,18,24 85:4,8,10,15
85:19,21,24 86:1,5,7,24
87:2,7,11,14,17,20,24 88:4
88:8,11,15,18,21,25 89:5,9
89:12,15,19 90:2,7,11,13
90:15,19,22,25 91:3,6,9,13
91:17,21 92:1,5,7,11,16,20
92:24 93:3,7,11,14,17,21
93:25 94:4,7,10,13,16,20
94:23 95:1,5,9,13,18,23
96:3,6,16,21,25 97:5,9,13
97:19,25 98:6,11,15,19,24
99:2,3,8,12,16,22,25 100:4
100:7,10,13,18,23 101:3
102:4,9,13,16,24 103:2,5,8
103:20 104:1,6,9,15,20,23
105:3,8,14,17,22 106:1,5,9
106:13,18,24 107:5,8,14,20
107:22 108:1,6,9,12,16,20
108:24 109:3,5,21
**road**
37:22
**room**
7:12
**ropes**
2:13 6:5,7
**rosenthal**
14:18 16:13
**rounds**
44:1
**rule**
10:4 74:13,17 90:24
**rules**
110:19

**s**

**sale**
30:12 34:9 35:4 36:6,16,17
36:22 39:5,21 40:5,10
76:24 93:10 95:6 105:7
**saleh**
95:15

**saleh's**
95:16
**sales**
42:1 66:8
**saying**
24:6 26:18 37:18 39:15,18
109:19 110:22
**scheme**
82:20
**school**
12:1,5,7
**scope**
109:10
**sec**
6:12 23:18 43:10 79:17
88:7,23 89:6,7 90:4,10,17
111:16
**second**
47:3,5 49:5,9,13,16,20,23
50:2,6,10 51:20
**secretary**
52:12
**sec's**
89:3
**secure**
94:17 98:4
**securities**
1:1,9 2:3,6 5:1,4 25:13
33:11 34:9 35:5 36:7,17,22
39:5,22 40:6,10 42:1 43:4
43:11 47:9,12 50:15 51:20
51:21,23 52:2 66:8 67:7
74:11 107:12,17 113:12
**seek**
77:4
**self**
19:18 20:5 21:5,9,12,15,16
46:25 50:12 59:2 70:2
**sell**
31:3,5 32:5 104:19 105:1
**send**
17:13 99:14
**sense**
8:15,20 9:3,15 24:4 54:3
99:18
**sent**
35:11,14 49:21 56:21 57:4
62:4,23 69:14 88:16 100:1
105:24
**sentence**
26:12
**separate**
14:5
**september**
31:23 35:11 63:1,10,15
64:2 69:22 81:3 91:12,16

**september (cont.)**
91:20
**series**
6:24,25 109:9
**serve**
27:6
**serves**
16:11
**services**
1:24 18:16 24:25 25:7
28:24 31:5 33:18,20 50:16
59:16 108:7
**set**
63:7,11,16
**settle**
81:12 83:9
**settled**
81:2
**settlement**
81:5 82:15,18
**share**
100:17
**shareholder**
92:22
**shareholders**
93:1 95:25 103:18,23,25
104:13
**shares**
104:8 106:17 107:3
**sheet**
62:5,8,22
**short**
21:10 26:10
**shorthanded**
23:3
**show**
20:3
**showed**
95:20,25 103:16
**significant**
99:1
**significantly**
46:3
**similarly**
8:22 9:13 30:17 43:18
44:22 46:24 50:11 52:6
58:25
**simplify**
54:5
**situation**
79:24 106:22
**slight**
22:14
**software**
17:16

[sold - total]

**sold**
92:14 93:5
**solely**
29:12
**soliciting**
34:4
**sort**
6:22 21:9,10
**southern**
13:13
**speak**
10:1 18:17 29:16 112:7
**special**
104:16,21
**spell**
4:14
**spoken**
7:3
**spread**
86:23 87:1
**stage**
70:11
**stake**
96:14
**standard**
110:19
**stanley**
26:23 27:1 29:16
**start**
7:19
**started**
31:22
**state**
4:14 5:6 8:3 19:24 57:24
84:7 85:12
**stated**
48:2,10 57:8 58:22 61:16
61:25 62:9 70:20 71:6,23
72:18 73:6,15 74:20 89:2,6
89:16 96:11 97:14,20 98:1
98:7,12 108:18
**statement**
18:21 20:21 22:10 26:10,17
71:3,13 72:24 79:9,16
89:23 103:4
**statements**
49:2 87:10 99:24
**states**
1:1 5:1 19:12
**stating**
26:20
**status**
91:20 108:2
**stenographer**
7:2

**stick**
22:7
**stock**
94:18,22 104:4
**stopped**
46:15
**street**
1:10 2:7,15
**structure**
15:7 16:7 32:21 54:6
**struggling**
44:8
**subject**
100:9 111:4
**subpoena**
3:7 6:17
**subscription**
57:5,7
**subsequent**
14:2 91:15
**subsequently**
10:9
**subsidiaries**
93:20
**substantial**
72:19
**substantially**
92:14 93:5
**substantive**
19:5
**sue**
80:9,11
**suggest**
20:19
**summary**
84:5
**supplement**
111:19,24
**supplemental**
5:17
**supposed**
9:18
**supreme**
19:12
**sure**
6:23 16:2 17:9 18:2,15
21:17 24:2 37:10,24 110:21
**swear**
4:5 113:10
**switch**
61:7
**swore**
84:20 85:1
**sworn**
4:11 79:4

| t |
|---|

**table**
44:4 60:7 69:6,13 95:19,24
103:6,10,10,16
**tables**
27:14 95:11
**taken**
7:22 12:6,10,13,13 59:8
86:15
**talk**
7:15 21:20
**talked**
70:5 86:20
**talking**
109:11
**taught**
12:25 13:10,12
**tax**
99:14
**teacher**
13:6
**team**
97:15
**tech**
35:23 41:9 43:8
**tell**
4:5 7:23 10:13,20 18:22
37:6,16 41:20 64:8 68:21
**tem**
52:13
**ten**
12:14 13:15,16 25:1
**tens**
42:4 43:1
**term**
8:10 18:13,23 90:23 91:2
103:11
**terminated**
87:23
**terms**
8:8 11:11 20:14
**testified**
4:11
**testify**
7:25 21:25 22:12,18 110:3
**testimonial**
23:4 86:7 92:7,11 107:22
108:1 109:5,15,20 110:4
111:9,13
**testimony**
6:21 19:17,20 21:14 23:9
24:13 37:20,23 38:4 70:9
111:16,16
**tests**
17:2

**thank**
11:15 112:8
**things**
6:23 110:19
**think**
8:16 12:23 15:25 18:13
20:10,14,19 21:1,13,16,20
21:22 22:6,24 37:8,16
39:10 46:15 109:23 111:3
**thinking**
18:18
**third**
13:22 37:4 76:25 101:13,18
**thousands**
42:4 43:1
**three**
15:17
**thursday**
1:12 113:6
**time**
7:15 10:1 13:23 15:6 19:1
19:10 20:23,23 22:22 23:23
24:23 25:4,10,13,25 26:5
26:12 29:1 32:23 38:10
43:25 47:8 48:17 54:23
55:16 58:16 60:1,8 62:11
62:18 66:1 70:24 71:9,14
72:1,23 74:25 76:2,6 79:21
79:23 100:5,8,11 104:2,11
106:6,10 108:21,25 110:11
111:4,25
**times**
11:12 24:12 46:13
**tl**
91:23 92:3 108:4,8,10,22
109:1,6
**today**
4:18,20 5:25 6:10,18,24 8:8
10:24 11:5 14:16 21:25
109:24 110:2,8,9 111:7,12
112:6
**today's**
4:21
**told**
18:25 33:6 37:4,14 61:6,11
63:19
**tom**
35:12
**topic**
13:6 109:16,24 110:2,9,23
111:7,8,12
**topics**
12:16 13:3 109:11,12 110:7
111:11
**total**
74:7 85:3

**[tower - working]**

tower
2:14
tracking
65:10
transactions
89:8
transcribed
7:1
transcript
113:14
transfer
30:12 40:21 41:17 42:24
43:16 60:17 73:2 74:21
75:3,10,21 76:24 77:5
transferrable
77:10,14
transferred
33:25 66:7
transfers
40:15,19,25 41:4,8 42:5,12
43:9
treasurer
15:18
trigger
46:3
triple
64:4,7,14,19 102:11,15,18
tripled
64:9
true
73:16 86:23 106:21 113:14
trust
84:5
truth
4:5,6,6 7:23,23 19:13
truthful
20:2
truthfully
11:1,5
try
8:17,24 9:2,11,13,22
trying
22:16 105:1
types
13:10

**u**

u.s.
113:11
ultimately
108:17
unconditional
84:20
undergraduate
13:12
undermine
97:23

undersigned
113:10
understand
4:23 7:7,25 8:2,3,5 10:6
20:7 21:6 22:5 23:21 24:5
24:10 25:20 30:22 31:14
37:21 40:19 89:7 103:11
110:16
understanding
11:10 19:23 20:18 23:12
38:1 69:17 73:11 110:11
understands
24:3
understood
8:6 24:16 29:7 30:11 32:23
33:2,5,9 40:14 45:25 47:22
48:6,17 49:1 50:6 67:6 72:5
72:23 73:22 74:6 83:18
91:18 92:21,25 93:15,18,22
94:11,14,17 96:4,7 97:21
98:13 100:11 101:5,14
103:3,21 104:2 108:21,25
110:21
unit
32:18 57:9,13,20,24 64:10
67:8,13 85:18 106:8
united
1:1 5:1 19:11
units
30:13 32:15 41:22 45:22
46:7 49:17 53:4,5,14,15,18
53:19,22,23 55:13 56:14
57:1,17 58:2,8 60:17 61:9
61:12,13,16,17 62:1,1,19
64:5,16 68:23 69:2 73:3,8
74:21 75:3,10,21 76:11,16
76:25 77:5,8,13 98:22 99:2
99:5,6 102:21
university
11:24 12:4,11 13:13
updated
100:25 105:10 106:3
urgent
96:15
use
8:10,13 9:9,11,22 10:1
17:17 21:1 32:5 36:16
37:23 38:4 82:17
uses
72:18
utilized
31:19

**v**

valuable
53:18

valuation
35:24 36:4 43:25 44:12,16
44:20 45:11,12 54:18,22
59:22 63:8,11,17 73:8
76:12,16 101:7 102:7
valuations
45:22 46:8 49:18
value
33:10 46:2 55:1 57:9,12
60:1 63:20 64:9,10,15
95:11,16 101:17
variety
13:6
various
8:8,22 91:1
verbal
7:4
versed
6:21
version
21:10
viability
97:23
view
21:21 91:10
violated
42:13
violating
41:13
violation
40:25 41:4,8 42:1 43:9
51:21 74:17
violations
5:3,6 40:20
voice
7:11
void
40:21 41:18,22 42:5,11,25
43:9
voluntarily
20:6
vote
16:15
voting
53:15 56:14

**w**

wait
7:15,18
waiver
11:10 46:18
want
18:15 22:20 37:24 53:14
110:21
wanted
85:22

warned
24:4
waterfront
12:24
week
96:12
wellington
91:4 92:18,21 96:11 97:1
97:11,14,20 98:2,9,12
100:22
wellington's
98:4
went
20:22 39:1 49:25 95:3
we've
18:23 21:17
whale
72:15
wheelhouse
18:17
wherewithal
78:25
wholly
40:20
willing
110:1,3
winter
70:4,12 94:9
wire
64:23
wish
19:23 20:4 26:14
wishes
29:9
withdraw
41:12 101:24
withdrawal
51:9 52:5
withdrew
51:6,16,19
witness
1:7 2:10 3:3 4:10 14:24
16:17 18:15,21 24:8,12,14
26:21 28:21 29:2,17,22
36:9 61:19 101:10 103:13
111:10,14,21 112:1 113:4
word
8:23
words
7:14 20:1 24:7,8
work
14:9 59:15 80:2 109:17
worked
102:15
working
39:6,23 40:11 67:20 96:15

**[worth - zieben]**

**worth**
  46:3 56:9,13,13,25 57:1
  79:4
**writing**
  90:21 91:24
**wrote**
  96:10

### y

**years**
  12:14 13:14 25:1
**york**
  84:7 85:12

### z

**zero**
  48:14 71:23 108:18
**zieben**
  82:2,25 83:5