

Message

| | |
|---|---|
| **From:** | George Marcus [GJM@mcm-law.com] |
| **Sent:** | 1/9/2013 7:23:23 PM |
| **To:** | Richard E. Petershack [RPetershack@axley.com]; 'Steve Hovde' [SHovde@hovde.com] |
| **CC:** | Rick Liberty [rliberty@gmail.com]; libmmg@yahoo.com |
| **Subject:** | RE: Brentwood M Investments |
| **Attachments:** | Note.Brentwood M. $1,115mm.1.9.13.pdf; Guaranty. Brentwood M. $115mm.1.9.13.pdf; Note Purchase Agreement Brentwood M investments, LLC $1.115mm.1.9.13..pdf; Mozido B.D Resolution re Pledge.pdf |

Rick, Mozido Note, Note Purchase Agreement, Guaranty and form of Mozido Board of Director Resolution attached. I hope to have the signed version of the resolution soon and will forward it as soon as I do.  Geo.

---

**From:** Richard E. Petershack [mailto:RPetershack@axley.com]
**Sent:** Wednesday, January 09, 2013 4:38 PM
**To:** 'Steve Hovde'; George Marcus
**Cc:** Rick Liberty; libmmg@yahoo.com
**Subject:** RE: Brentwood M Investments

Steve,

I'm not aware of the change you are referring to.

Rick

Richard E. Petershack, Esq.
Axley Brynelson, LLP
P.O. Box 1767
Madison, WI 53701-1767
Direct Dial: 608-283-6726
Fax: 608-257-5444
Cell: 608-239-6726
Toll Free: 800-368-5661
Email: rpetershack@axley.com

---

**From:** Steve Hovde [mailto:SHovde@hovde.com]
**Sent:** Wednesday, January 09, 2013 3:26 PM
**To:** George Marcus
**Cc:** Richard E. Petershack; Rick Liberty; libmmg@yahoo.com
**Subject:** Re: Brentwood M Investments

Before anybody goes to final, did the change I had requested in the pledge for the property sale get made regarding the escrow? I haven't had a chance to review the documents yet and will do so on the plane. George, you know what change I'm talking about in the property pledge agreement

Sent from my iPhone

On Jan 9, 2013, at 3:06 PM, "George Marcus" <GJM@mcm-law.com> wrote:

> Mr. Petershack, I have reviewed the edits you made today to the two Pledge and Security Agreements and I accept all of them.  As such, I am treating your clean versions, dated today, as the final versions.  I have labeled them as such and attach them here.
>
> One note: in the Mozido Notes Pledge and Security Agreement, there is  representation that the resolution from the Mozido Board has been obtained.  Actually, its in circulation now and should be available shortly.  Most likely, it will have been obtained once the documents are signed.

Anything further on the note, note purchase agreement and guaranty?

Many thanks. Geo.

---

**From:** Richard E. Petershack [mailto:RPetershack@axley.com]
**Sent:** Wednesday, January 09, 2013 3:06 PM
**To:** 'Rick Liberty'
**Cc:** SHovde@hovde.com; George Marcus
**Subject:** RE: Brentwood C Investments

Have you forwarded the documents to Attorney Marcus or should I?

Rick Petershack

Richard E. Petershack, Esq.
Axley Brynelson, LLP
P.O. Box 1767
Madison, WI 53701-1767
Direct Dial: 608-283-6726
Fax: 608-257-5444
Cell: 608-239-6726
Toll Free: 800-368-5661
Email: rpetershack@axley.com

**From:** Rick Liberty [mailto:rliberty@gmail.com]
**Sent:** Wednesday, January 09, 2013 2:04 PM
**To:** Richard E. Petershack
**Cc:** SHovde@hovde.com; George J. Marcus
**Subject:** Re: Brentwood C Investments

Mr. Petershack,

To avoid further confusion and to expedite things, I would prefer that you speak with Michael Liberty's attorney, George Marcus, on these final document related questions. Business related questions should be answered by Michael Liberty direct or through me if George does not already have the answers at his fingertips..

His name is George Marcus  http://www.mcm-law.com/

His number is  (207) 828-8000

Thanks,

Rick Liberty, Liberty Family Trustee

207-415-8674

On Wed, Jan 9, 2013 at 2:08 PM, Richard E. Petershack <RPetershack@axley.com> wrote:
Mr. Liberty:

Attached please find a clean and a compared version of the Pledge and Security Agreement relating to the Mozido Notes.  The changes noted are those made to the draft agreement I received from Steve Hovde this morning.

Also attached please find a clean and compared version of the Pledge and Security Agreement relating to the distributions from the limited partnerships.  The changes noted are to the version I sent out Monday and are essentially clean up items.

**Please note that for my client to obtain the highest level of perfection of his security interest in the Mozido Notes, the originals of those notes must be delivered to and held by him.**

At your convenience, please send Exhibits A and B to the Pledge and Security Agreement for the Mozido Notes.

Additionally, let me know if you have any questions or comments.  If you prefer that I deal with your attorney, please let me know and provide me with his or her contact information.

Rick Petershack

Richard E. Petershack, Esq.
Axley Brynelson, LLP
P.O. Box 1767
Madison, WI 53701-1767
Direct Dial: 608-283-6726
Fax: 608-257-5444
Cell: 608-239-6726
Toll Free: 800-368-5661
Email: rpetershack@axley.com

Unless otherwise indicated or obvious from the nature of this transmittal, the information contained in this transmission is confidential and protected from disclosure by the attorney-client privilege, or by attorney work-product doctrine, or by various privacy laws, or by virtue of it being proprietary in nature. This transmission is intended for the exclusive use of the named recipient. If you are not the named recipient, or the employee or agent responsible to deliver it to the named recipient, you are hereby notified that any use, copying, disclosure, dissemination, or other distribution of the information transmitted herewith is strictly prohibited and you may be subject to legal restrictions or sanctions. If you have received this communication in error or are not sure whether it is confidential, please immediately notify us by telephone (collect) at (608) 257-5661; and return the original message to us at the above address or destroy all copies. Thank you.

To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including
any attachments) is not intended to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

--
Regards,

Rick Liberty

Florida-Winter: 408 SW 52nd Street
Cape Coral, FL 33914

Maine-Summer: 23 North Raymond Rd
Gray, ME 04039

Cell: 207-415-8674
FAX: 877-518-2803

Unless otherwise indicated or obvious from the nature of this transmittal, the information contained in this transmission is confidential and protected from disclosure by the attorney-client privilege, or by attorney work-product doctrine, or by various privacy laws, or by virtue of it being proprietary in nature. This transmission is intended for the exclusive use of the named recipient. If you are not the named recipient, or the employee or agent responsible to deliver it to the named recipient, you are hereby notified that any use, copying, disclosure, dissemination, or other distribution of the information transmitted herewith is strictly prohibited and you may be subject to legal restrictions or sanctions. If you have received this communication in error or are not sure whether it is confidential, please immediately notify us by telephone (collect) at (608) 257-5661; and return the original message to us at the above address or destroy all copies. Thank you.

To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including
any attachments) is not intended to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

<Pledge and Security Agreement.Colo. (Axley rev 1-9-13). GJM Final. DOCX.DOCX>

<Pledge and Security Agreement (Mozido Notes)(Axley rev 1-9-13) .GJM Final..DOCX>

Unless otherwise indicated or obvious from the nature of this transmittal, the information contained in this transmission is confidential and protected from disclosure by the attorney-client privilege, or by attorney work-product doctrine, or by various privacy laws, or by virtue of it being proprietary in nature. This transmission is intended for the exclusive use of the named recipient. If you are not the named recipient, or the employee or agent responsible to deliver it to the named recipient, you are hereby notified that any use, copying, disclosure, dissemination, or other distribution of the information transmitted herewith is strictly prohibited and you may be subject to legal restrictions or sanctions. If you have received this communication in error or are not sure whether it is confidential, please immediately notify us by telephone (collect) at (608) 257-5661; and return the original message to us at the above address or destroy all copies. Thank you.

To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

THIS NOTE AND THE SECURITIES ISSUABLE UPON THE CONVERSION HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY U.S. STATE SECURITIES LAWS, AND, UNLESS SO REGISTERED, MAY BE OFFERED OR SOLD, DIRECTLY OR INDIRECTLY, IN THE UNITED STATES OR TO U.S. PERSONS IN ACCORDANCE WITH THE PROVISIONS OF THE SECURITIES ACT, OR PURSUANT TO AN AVAILABLE EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND IN EACH CASE ONLY IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAW.

## MOZIDO, LLC
## CONVERTIBLE PROMISSORY NOTE

$1,115,000                                                                January 4, 2013

FOR VALUE RECEIVED, **MOZIDO, LLC**, a Delaware limited liability company (the "**Issuer**"), with its principal executive office located at 1950 Stemmons Freeway, Suite 6040, Dallas, TX 75207 (the "**Principal Office**"), promises to pay to the order of **BRENTWOOD M INVESTMENTS, LLC** a Florida Limited Liability Company (together with its permitted successors, assigns and designees, the "**Purchaser**"), in lawful money of the United States of America the principal sum of **One Million, One Hundred Fifteen Thousand, One Hundred Fifteen Dollars ($1,115,000.00)**, or such lesser amount as shall equal the outstanding principal amount advanced hereunder and outstanding from time to time, together with interest from the date of this Note on the unpaid principal balance at a rate equal to 8% per annum, simple interest, computed on the basis of a 360 day year consisting of twelve 30-day months (the "**Interest**"). All unpaid principal, together with any then unpaid and accrued Interest and other amounts payable hereunder, shall be due and payable on the earlier of: (i) the close of business on the date that is ten (10) years from the date of this Note, or (ii) when, upon or after the occurrence of an Event of Default (as defined below), such amounts become due and payable to the Purchaser in accordance with the terms hereof (the earliest of such dates being hereinafter referred to as the "**Maturity Date**"). This Convertible Promissory Note (this "**Note**") is a "Note" issued pursuant to the Note Purchase Agreement, dated as of even date herewith(as may be amended, restated, modified, or supplemented from time to time, the "**Note Purchase Agreement**"), by and among the Issuer, Affinity Holding, LLC, as Guarantor, and the Purchaser.

The following is a statement of the rights of the Purchaser and the conditions to which this Note is subject, and to which the Purchaser, by the acceptance of this Note, agrees:

1.      **Definitions**. As used in this Note, the following capitalized terms have the following meanings:

(a) "**Additional Notes**" means each of the "Notes" as such term is defined in the Note Purchase Agreement, other than this Note.

1

CONFIDENTIAL TREATMENT REQUESTED
EXEMPT FROM FOIA

(b) "**Event of Default**" has the meaning given in <u>Section 4</u> hereof.

(c) "**Interest**" has the meaning given in the introductory paragraph hereof.

(d) "**Maturity Date**" has the meaning given in the introductory paragraph hereof.

(e) "**Obligations**" means and includes all loans, advances, debts, liabilities and obligations, howsoever arising, owed by the Issuer to the Purchaser of every kind and description (whether or not evidenced by any note or instrument and whether or not for the payment of money), now existing or hereafter arising under or pursuant to the terms of this Note, including, all interest, fees, charges, expenses, attorneys' fees and costs and accountants' fees and costs chargeable to and payable by the Issuer hereunder and thereunder, in each case, whether direct or indirect, absolute or contingent, due or to become due, and whether or not arising after the commencement of a proceeding under Title 11 of the United States Code (11 U. S. C. Section 101 *et seq.*), as amended from time to time (including post-petition interest) and whether or not allowed or allowable as a claim in any such proceeding.

(f) "**Material Adverse Effect**" means, as reasonably determined by Purchaser, a material adverse effect on (i) the business, assets, operations, prospects or financial or other condition of the Guarantor or the Issuer; (ii) the ability of the Issuer or the Guarantor to pay or perform the Obligations in accordance with the terms of this Agreement, any Note, and any other Transaction Document and to avoid an Event of Default, or an event which, with the giving of notice or the passage of time or both, would constitute an Event of Default, under this Agreement, any Note, and any other Transaction Document; or (iii) the rights and remedies of the Purchaser under this Agreement, any Note, and any other Transaction Document or any related document, instrument or agreement.

(g) "**Material Agreement**" means any agreement to which the Issuer, Guarantor or any of their respective Affiliates becomes a party after the date hereof, the termination of which could reasonably be expected to result in a Material Adverse Effect.

Additional capitalized terms used herein and not otherwise defined herein shall have the meanings given to such terms in the Note Purchase Agreement.

2.     <u>**Interest**</u>.  Accrued Interest on this Note shall be payable on the Maturity Date.

3.     <u>**Events of Default**</u>. The occurrence of any of the following shall constitute an "**Event of Default**" under this Note and the other Transaction Documents:

(a)     *Failure to Pay.*  The Issuer shall fail to pay when due any principal payment or any interest or other payment required under the terms of this Note on the date due and such payment shall not have been made within five days of the due date; or

(b)     *Representations and Warranties.*  Any representation or warranty made in this Note or in connection with this Note, any of the other Transaction Documents, or the Obligations,

CONFIDENTIAL TREATMENT REQUESTED
EXEMPT FROM FOIA

shall prove to have been false or misleading when made (or, if applicable, when reaffirmed) in any material respect; or

(c)     *Covenants.* The Issuer or the Guarantor fails to timely and properly observe, keep or perform, any term, covenant, agreement or condition in this Note or in any of the other Transaction Documents (including without limitation any Additional Note); or

(d)     *Cross Default.* The Issuer or the Guarantor is in breach or default under any Indebtedness or other obligations (other than those evidenced by this Note), which default is not cured within any applicable cure period set forth in the agreement with respect to the Indebtedness or other obligations and which would cause or permit the holder of such Indebtedness or other obligations to accelerate the maturity thereof; or

(e)     *Validity of Transaction Documents.* The Issuer or the Guarantor shall challenge the validity and binding effect of any provision of any of the Transaction Documents or shall state its intention to make such a challenge of any of the Transaction Documents or any of the Transaction Documents shall for any reason (except to the extent permitted by its express terms) cease to be; or

(f)     *Inability to Pay Debts.* The Issuer or the Guarantor admits in writing its present inability generally to pay its debts as they mature or shall make any assignment for the benefit of any of its creditors; or

(g)     *Judgments.* The entry of a final judgment for the payment of money involving more than $100,000 against the Issuer or the Guarantor, and the failure by the Issuer or the Guarantor to discharge the same, or cause it to be discharged, within thirty (30) days from the date of the order, decree or process under which or pursuant to which such judgment was entered; or

(h)     *Suspension of Business.* The Issuer or the Guarantor suspends for more than ten (10) Business Days or terminates its business operations, or liquidates, dissolves or terminates its existence; or

(i)     *Voluntary Bankruptcy or Insolvency Proceedings.* The Issuer or the Guarantor shall (i) apply for or consent to the appointment of a receiver, trustee, liquidator or custodian of itself or of all or a substantial part of its property, (ii) be unable, or admit in writing its present inability, to pay its debts generally as they mature, (iii) make a general assignment for the benefit of its or any of its creditors, (iv) be dissolved or liquidated, (v) become insolvent (as such term may be defined or interpreted under any applicable statute) as determined by a court of competent jurisdiction, (vi) commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or consent to any such relief or to the appointment of or taking possession of its property by any official in an involuntary case or other proceeding commenced against it, or (vii) take any action for the purpose of effecting any of the foregoing; or

CONFIDENTIAL TREATMENT REQUESTED
EXEMPT FROM FOIA

(j)  *Involuntary Bankruptcy or Insolvency Proceedings.* Proceedings for the appointment of a receiver, trustee, liquidator or custodian of the Issuer or the Guarantor or of all or a substantial part of the property thereof, or an involuntary case or other proceedings seeking liquidation, reorganization or other relief with respect to the Issuer or the Guarantor or the debts thereof under any bankruptcy, insolvency or other similar law now or hereafter in effect shall be commenced and an order for relief entered or such proceeding shall not be dismissed or discharged within 30 days of commencement; or

(k)  *Default or Termination of Material Agreements.* The Issuer or the Guarantor (i) shall materially default or breach the terms of such Material Agreement, and shall fail to cure such default or breach within any applicable grace period set forth therein, or (ii) any such Material Agreement shall be terminated by reason of the default or breach of the Issuer or Guarantor; or

(l)  *Material Adverse Effect.* The occurrence of a Material Adverse Effect.

4.  **Rights of Purchaser upon Default**. Upon the occurrence or existence of any Event of Default (other than an Event of Default described in Sections 4(i) or 4(j)) and at any time thereafter during the continuance of such Event of Default, the Purchaser may, by written notice to the Issuer, declare all outstanding Obligations payable by the Issuer hereunder to be immediately due and payable without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived. Upon the occurrence or existence of any Event of Default described in Sections 4(i) and 4(j), immediately and without notice, all outstanding Obligations payable by the Issuer hereunder shall automatically become immediately due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived. In addition to the foregoing remedies, upon the occurrence or existence of any Event of Default, the Purchaser may, exercise any other right, power or remedy granted to it by the Transaction Documents or otherwise permitted to it by law, either by suit in equity or by action at law, or both.

5.  **Conversion Rights**. The Purchaser shall have the right to convert this Note and accrued and unpaid Interest due under this Note into Preferred Units, as set forth in this Section 5.

(a)  *Conversion into Issuer's Preferred Units.* The Purchaser shall have the right, from and after the Conversion Right Commencement Date, and then at any time until the Maturity Date, to convert any outstanding and unpaid principal portion of this Note, and any accrued but unpaid Interest on such portion, at the election of the Purchaser (the date of such conversion being a "**Conversion Date**") into Preferred Units at the Conversion Price (as hereinafter defined). Upon delivery to the Issuer of a completed Notice of Conversion, a form of which is attached hereto as Exhibit A, the Issuer shall issue and deliver to the Purchaser within five (5) business days from the Conversion Date (such day being the "**Delivery Date**") that number of units for the portion of the Note and any accrued but unpaid Interest on such portion converted in accordance with the following sentence. The number of Preferred Units to be issued upon each conversion of this Note shall be determined by dividing that portion of the principal of the Note to be converted and any accrued but unpaid Interest on such portion, by the Conversion Price. The "**Conversion Price**" as of the date of this Note is $.0205 per unit and shall be subject to adjustment as provided hereafter in this Section 5.

(b)      *Manner of Conversion*.  This Note may be converted by the Purchaser by presentment of this Note, accompanied by written notice stating that Purchaser elects to convert all or a portion of the principal amount thereof, and any accrued but unpaid Interest on such portion, and stating the name or names, together with addresses, in which the Preferred Units are to be issued. Each conversion shall be deemed to have been effected immediately prior to the close of business on the date on which this Note shall have been so surrendered to Issuer; and at such time the rights of the Purchaser as to that portion of this Note so converted shall cease, and the person in whose name or names the Preferred Units shall be issuable upon such conversion shall be deemed to have become the holder or holders of record thereof.  If this Note is converted in part only, upon conversion of such part hereof, the Issuer shall execute and deliver to the Purchaser upon surrender of this Note a new Note in the aggregate principal amount equal to the then unconverted portion of the principal amount of this Note plus any accrued but unpaid and unconverted Interest and in all other respects identical to this Note.

(c)      *Distributions, Splits, Combinations, Reclassifications*.  In the event the Issuer shall hereafter (i) make a distribution of Preferred Units or Common Units with respect to the Preferred Units or the Common Units, (ii) subdivide its outstanding Preferred Units or Common Units into a greater amount of Preferred Units or Common Units, as applicable, or (iii) combine its outstanding Preferred Units or Common Units into a smaller amount of Preferred Units or Common Units, as applicable, the Conversion Price in effect immediately prior to such action shall be adjusted so that the Purchaser shall be entitled to receive the amount of Preferred Units that it would have owned immediately following such action had this Note or any remaining portion hereof been converted in full immediately prior thereto.  All adjustments made pursuant to this Section 6(c) shall become effective immediately after the earlier of the record date or the payment date in the case of a distribution and shall become effective immediately after the effective date in the case of a subdivision or combination.

(d)      *Recapitalizations, Reorganizations, etc*.  In the event of any recapitalization, reorganization, consolidation or merger of the Issuer with or into another Person or the sale, transfer or other disposition of all or substantially all of the assets of the Issuer and its Subsidiaries (viewed as a whole) to another Person, this Note shall thereafter be convertible (at the option of the Purchaser) into the kind and amount of limited liability company interests or other securities or property that a holder of the number of Preferred Units deliverable upon conversion of this Note would have been entitled upon such recapitalization, reorganization, consolidation, merger or sale; and, in such case, appropriate adjustment (as determined in good faith by the Board of Directors and such determination is agreed upon by the Purchaser) shall be made in the application of the provisions set forth in this Section 5 with respect to the rights and interests thereafter of the Purchaser, to the end that the provisions set forth in this Section 5 shall thereafter be applicable, as nearly as reasonably may be, in relation to any limited liability company interests or other securities or property thereafter deliverable upon conversion of this Note.

(e)      *De Minimis Adjustments*.  No adjustment to the Conversion Price shall be made if such adjustment would result in a change in the Conversion Price of less than $.01.  Any adjustment of less than $.01 that is not made shall be carried forward and shall be made at the time of

and together with any subsequent adjustment that, on a cumulative basis, amounts to an adjustment of $.01 or more in the Conversion Price.

(f)     *Certificate as to Adjustments; Dispute*.   Upon the occurrence of each adjustment or readjustment of the Conversion Price pursuant to this Section 5, the Issuer at its expense shall promptly compute such adjustment or readjustment in accordance with the terms hereof and prepare and furnish to the Purchaser a certificate setting forth such adjustment or readjustment and showing in detail the facts upon which such adjustment or readjustment is based.  The Issuer shall, upon the written request at any time of the Purchaser, furnish or cause to be furnished to the Purchaser a like certificate setting forth (i) such adjustments and readjustments, (ii) the Conversion Price at that time in effect, and (iii) the number of Preferred Units and the amount, if any, of other property that at that time would be received upon the conversion of this Note.

(g)     *Notices of Record Date*.  In the event of any taking by the Issuer or Guarantor of a record of the holders of any class of securities for the purpose of determining the holders thereof who are entitled to receive any distribution, any Convertible Securities or any right to subscribe for, purchase or otherwise acquire any limited liability company interests or any other securities or property, or to receive any other right, the Issuer shall mail to the Purchaser, at least twenty (20) days prior to the date specified therein, a notice specifying the date on which any such record is to be taken for the purpose of such distribution or rights, and the amount and character of such distribution or rights.

6.     **Right of Redemption**.  This Note may not be redeemed or prepaid prior to the Maturity Date without the prior written consent of Purchaser, which may be granted or refused in the Purchaser's sole discretion.

7.     **Successors and Assigns**.  Subject to the restrictions on transfer described in Sections 9 and 10 below, the rights and obligations of the Issuer and the Purchaser shall be binding upon and benefit the permitted successors, assigns, heirs, administrators and transferees of the parties.

8.     **Waiver and Amendment**.  No waiver, termination or discharge of this Note, or any of the terms or provisions hereof, shall be binding upon any party hereto unless confirmed set forth in writing and signed by the Issuer, the Purchaser.  Any waiver of any term or condition shall not be construed as a waiver of any subsequent breach or a subsequent waiver of the same term or condition, or a waiver of any term or condition of this Note.  No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Note shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

9.     **Transfer of this Note or Securities Issuable on Conversion Hereof**.  Purchaser may not assign this Note or its interests and obligations hereunder, by operation of law or otherwise, in whole or in part or sell participations in this Note and its interests in the Obligations hereunder, without the prior written consent of the Issuer, which consent will not be unreasonably withheld or delayed; provided, however, that Purchaser may assign this Note or its interests and obligations hereunder, in whole or in part or sell participations in this Note to an Affiliate, as that term is defined

CONFIDENTIAL TREATMENT REQUESTED
EXEMPT FROM FOIA

in the Note Purchase Agreement, without the written consent of the Issuer. With respect to any permitted offer, sale or other disposition of this Note or securities into which such Note may be converted, the Purchaser will give written notice to the Issuer prior thereto, describing briefly the manner thereof, together with representations to the Issuer, to the effect that such offer, sale or other disposition may be effected without registration or qualification under any federal or state law then in effect. Each Note thus transferred and each certificate representing the securities thus transferred shall bear a legend as to the applicable restrictions on transferability in order to ensure compliance with the Securities Act, unless in the opinion of counsel for the Issuer such legend is not required in order to ensure compliance with the Securities Act. The Issuer may issue stop transfer instructions to its transfer agent in connection with such restrictions. Subject to the foregoing, transfers of this Note shall be registered upon registration books maintained for such purpose by or on behalf of the Issuer. Prior to presentation of this Note for registration of transfer, the Issuer shall treat the registered holder hereof as the owner and holder of this Note for the purpose of receiving all payments of principal and interest hereon and for all other purposes whatsoever.

10.   **Assignment by the Issuer**.  Neither this Note nor any of the rights, interests or obligations hereunder may be assigned, by operation of law or otherwise, in whole or in part, by the Issuer without the prior written consent of the Purchaser.

11.   **Notices**.  All notices, requests, demands, consents, instructions or other communications required or permitted hereunder shall in writing and faxed, mailed or delivered to each party at the respective addresses of the parties set forth in the Note Purchase Agreement, or at such other address, e-mail address or facsimile number as each party shall have furnished to the other party in writing. All such notices and communications will be deemed effectively given the earlier of (i) when received, (ii) when delivered personally, (iii) one Business Day after being delivered by facsimile (with receipt of appropriate confirmation), (iv) one Business Day after being deposited with an overnight courier service of recognized standing or (v) four days after being deposited in the U.S. mail, first class with postage prepaid.

12.   **Usury**.  In the event any interest is paid on this Note which is deemed to be in excess of the then legal maximum rate, then that portion of the interest payment representing an amount in excess of the then legal maximum rate shall be deemed a payment of principal and applied against the principal of this Note.

13.   **Waivers**.  The Issuer hereby waives notice of acceptance, default, presentment or demand for payment, protest or notice of nonpayment or dishonor and all other notices or demands relative to this instrument.

14.   **Governing Law**.  This Note and all actions arising out of or in connection with this Note shall be governed by and construed in accordance with the laws of the State of Texas, without regard to the conflicts of law provisions of the State of Texas or of any other state.

15.   **WAIVER OF JURY TRIAL**.  THE ISSUER, AND, BY ITS ACCEPTANCE HEREOF, THE PURCHASER, EACH IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF THIS NOTE

CONFIDENTIAL TREATMENT REQUESTED
EXEMPT FROM FOIA

OR ANY OTHER TRANSACTION DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). THE ISSUER, AND, BY ITS ACCEPTANCE HEREOF, THE PURCHASER, EACH (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES TO THE TRANSACTION DOCUMENTS HAVE BEEN INDUCED TO ENTER INTO THIS NOTE AND THE OTHER TRANSACTION DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

16.     **Time Is of the Essence**.   Time is of the essence of this Note, and of each provision hereof.

17.     **Characterization as Indebtedness**.   It is the express intent of the Issuer, the Guarantor and the Purchaser that, prior to conversion of this Note as contemplated in Section 6 above, the obligations of the Issuer hereunder shall constitute indebtedness for borrowed money, and not equity.   In furtherance of the foregoing, each of the Issuer, the Guarantor and the Purchaser shall reflect their rights and obligations hereunder in their books and records as indebtedness for borrowed money, and not as equity.

*[Signature Page Follows]*

The Issuer has caused this Note to be issued as of the date first written above.

**MOZIDO, LLC**
a Delaware limited liability company

By: _____
Name:
Title:

CONFIDENTIAL TREATMENT REQUESTED
EXEMPT FROM FOIA

## EXHIBIT A

## FORM OF

## NOTICE OF CONVERSION

(To be executed by the Purchaser in order to convert the Note)

The undersigned hereby elects to convert $_____ of the Principal and accrued but unpaid Interest with respect to the Convertible Promissory Note issued by MOZIDO, LLC on [_____] into Preferred Units of MOZIDO, LLC according to the conditions set forth in such Convertible Promissory Note, as of the date written below.

Date of Conversion: _____

Conversion Price: _____

Preferred Units To Be Delivered: _____

Signature: _____

Print Name: _____

Address: _____

_____

1

CONFIDENTIAL TREATMENT REQUESTED
EXEMPT FROM FOIA

## GUARANTY AGREEMENT

**THIS GUARANTY AGREEMENT,** dated as of December January 4, 2013 (this "Guaranty"), is made by Affinity Holding, LLC, a Delaware limited liability company (the "Guarantor"), in favor of Brentwood M Investments, LLC, a Florida limited liability company (the "Purchaser").

## W I T N E S S E T H:

**WHEREAS,** pursuant to that certain Note Purchase Agreement, dated as of January 4, 2013, (the "Note Purchase Agreement"), by and among the Purchaser, Mozido, LLC, a Delaware limited liability company (the "Issuer"), and the Guarantor, the Issuer sold (or agreed to sell) to the Purchaser, and the Purchaser purchased (or agreed to purchase) from the Issuer, certain Convertible Promissory Notes, described more particularly therein.

**WHEREAS,** the obligations of the Issuer under the Note Purchase Agreement and Note(s) (as defined in the Note Purchase Agreement) are to be guaranteed by the Guarantor, pursuant to this Guaranty. The Note Purchase Agreement, the Note(s) and this Guaranty are to be referred to herein as the "Transaction Documents").

**NOW, THEREFORE,** in consideration of the foregoing, and in order to induce the Purchaser to enter into the Note Purchase Agreement and to purchase a Note thereunder from time to time in its discretion, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Guarantor hereby agrees with Purchaser as follows:

Section 1.    **Guarantee of Payment.**    The Guarantor unconditionally and irrevocably guarantees to the Purchaser the punctual payment of all sums now owing or which may in the future be owing by the Issuer under the Note Purchase Agreement, the Note(s), and the other Transaction Documents, when the same are due and payable, whether on demand, at stated maturity, by acceleration or otherwise, and whether for principal, interest, attorney's fees, costs, fees, expenses, indemnification or otherwise, and the performance of all obligations of the Issuer under the Note Purchase Agreement, the Notes, and the other Transaction Documents (all of the foregoing sums and other obligations being the "Guaranteed Obligations"). The Guaranteed Obligations include, without limitation, interest accruing after the commencement of a proceeding under bankruptcy, insolvency or similar laws of any jurisdiction at the rate or rates provided in the Transaction Documents. Upon the failure by the Issuer to pay punctually any Guaranteed Obligation when due, the Guarantor agrees that it shall forthwith pay to the Purchaser the amount not so paid at the place and in the manner specified in the relevant Transaction Document. This Guaranty is a guarantee of payment and performance and not of collection only. The Purchaser shall not be required to exhaust any right or remedy or take any action against the Issuer or any other person or entity or any collateral. The Guarantor agrees that, as between the Guarantor and the Purchaser, the Guaranteed Obligations may be declared to be due and payable in accordance with and for the purposes of this Guaranty notwithstanding

any stay, injunction or other prohibition which may prevent, delay or vitiate any declaration as regards to the Issuer and that in the event of a declaration or attempted declaration in accordance with the terms hereof, the Guaranteed Obligations shall immediately become due and payable by the Guarantor for the purposes of this Guaranty, notwithstanding the ineffectiveness of any such declaration as against the Issuer.

Section 2.   **Guarantee Absolute**.   The Guarantor guarantees that the Guaranteed Obligations shall be paid strictly in accordance with the terms of the Transaction Documents.   The liability of the Guarantor under this Guaranty is absolute and unconditional irrespective of:  (a) any change in the time, manner or place of payment of, or in any other term of, all or any of the Transaction Documents or any of the Guaranteed Obligations, or any other amendment or waiver of or any consent to departure from any of the terms of any Transaction Document or Guaranteed Obligation, including any increase or decrease in the rate of interest thereon;  (b) any release or amendment or waiver of, or consent to departure from, any other guarantee or support document, or any exchange, release or non-perfection of any collateral, for all or any of the Transaction Documents or Guaranteed Obligations; (c) any present or future law, regulation or order of any jurisdiction (whether of right or in fact) or of any agency thereof purporting to reduce, amend, restructure or otherwise affect any term of any Transaction Document or Guaranteed Obligation; (d) without being limited by the foregoing, any lack of validity or enforceability of any Transaction Document or Guaranteed Obligation; and (e) any other setoff, defense or counterclaim whatsoever (in any case, whether based on contract, tort or any other theory) with respect to the Transaction Documents or the transactions contemplated thereby which might constitute a legal or equitable defense available to, or discharge of, either the Issuer or the Guarantor.

Section 3.   **Guarantee Irrevocable**.   This Guaranty is a continuing guarantee of the payment and performance of all Guaranteed Obligations now or hereafter existing under the Transaction Documents and shall remain in full force and effect until payment and performance in full of all Guaranteed Obligations arising under the Note Purchase Agreement, the Notes, and the other Transaction Documents and any other amounts payable under this Guaranty and until the Notes and the other Transaction Documents have been terminated.

Section 4.   **Reinstatement**.   This Guaranty shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Guaranteed Obligations is rescinded or must otherwise be returned by the Purchaser on the insolvency, bankruptcy or reorganization of the Issuer or otherwise, all as though the payment had not been made.

Section 5.   **Subrogation**.   The Guarantor shall not exercise any rights which it may acquire by way of subrogation, by any payment made under this Guaranty or otherwise, until all the Guaranteed Obligations have been paid in full and the Transaction Documents are no longer in effect.   If any amount is paid to the Guarantor on account of subrogation rights under this Guaranty at any time when all the Guaranteed Obligations have not been paid in full, the amount shall be held in trust by the Guarantor for the benefit of the Purchaser and shall be promptly paid to the Purchaser to be credited and applied to the Guaranteed Obligations, whether matured or unmatured or absolute or contingent, in accordance with the terms hereof and of the Transaction Documents.

CONFIDENTIAL TREATMENT REQUESTED
EXEMPT FROM FOIA

In-Re-Mozido (B3004)_SEC_010_011526

Section 6.    **Subordination**.  Without limiting the Purchaser's rights under any other agreement, any liabilities owed by the Issuer to the Guarantor in connection with any extension of credit or financial accommodation by the Guarantor to or for the account of the Issuer, including but not limited to interest accruing at the agreed contract rate after the commencement of a bankruptcy or similar proceeding, are hereby subordinated to the Guaranteed Obligations, and such liabilities of the Issuer to the Guarantor, if the Purchaser so requests when an Event of Default has occurred and is continuing, shall be collected, enforced and received by the Guarantor as trustee for the Purchaser and shall be paid over to the Purchaser on account of the Guaranteed Obligations but without reducing or affecting in any manner the liability of the Guarantor under the other provisions of this Guaranty.

Section 7.    **Representations and Warranties**.  The Guarantor represents and warrants that in executing and delivering this Guaranty, the Guarantor has (i) without reliance on Purchaser or any information received from Purchaser and based upon such documents and information it deems appropriate, made an independent investigation of the transactions contemplated hereby and the Issuer, the Issuer's business, assets, operations, prospects and condition, financial or otherwise, and any circumstances which may bear upon such transactions, the Issuer or the obligations and risks undertaken herein with respect to the Guaranteed Obligations; (ii) adequate means to obtain from the Issuer on a continuing basis information concerning the Issuer; (iii) has full and complete access to the Transaction Documents and any other documents executed in connection with the Transaction Documents; and (iv) not relied and will not rely upon any representations or warranties of the Purchaser not embodied herein or any acts heretofore or hereafter taken by any Guaranteed Party (including but not limited to any review by any Guaranteed Party of the affairs of the Issuer).

Section 8.    **Formalities**.    The Guarantor waives presentment, notice of dishonor, protest, notice of acceptance of this Guaranty or incurrence of any Guaranteed Obligation and any other formality with respect to any of the Guaranteed Obligation or this Guaranty.

Section 9.    **Amendments and Waivers**.   No amendment or waiver of any provision of this Guaranty, nor consent to any departure by the Guarantor therefrom, shall be effective unless it is in writing and signed by the Purchaser, and then the waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.  No failure on the part of Purchaser to exercise, and no delay in exercising, any right under this Guaranty shall operate as a waiver or preclude any other or further exercise thereof or the exercise of any other right.

Section 10.    **Expenses**.    The Guarantor shall reimburse the Purchaser on demand for all costs, expenses and charges (including without limitation fees and charges of external legal counsel and costs allocated by internal legal counsel) incurred by Purchaser in connection with the enforcement of this Guaranty and/or upon the occurrence of any event of default.  The obligations of the Guarantor under this Section 10 shall survive the termination of this Guaranty.

Section 11.    **Assignment**.  This Guaranty shall be binding on, and shall inure to the benefit of, the Guarantor, Purchaser and their respective successors and assigns; provided

3

CONFIDENTIAL TREATMENT REQUESTED
EXEMPT FROM FOIA

that the Guarantor may not assign or transfer its rights or obligations under this Guaranty. Without limiting the generality of the foregoing, Purchaser may assign, sell participations in or otherwise transfer its rights under the Transaction Documents in accordance with the terms thereof to any other person or entity, and the other person or entity shall then become vested with all the rights granted to the Purchaser in this Guaranty or otherwise.

Section 12. **Captions**. The headings and captions in this Guaranty are for convenience only and shall not affect the interpretation or construction of this Guaranty.

Section 13. **Integration; Effectiveness**. This Guaranty alone sets forth the entire understanding of the Guarantor and the Purchaser relating to the guaranty of the Guaranteed Obligations and constitutes the entire contract between the parties relating to the subject matter hereof and supersedes any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. This Guaranty shall become effective when it shall have been executed and delivered by the Guarantor to the Purchaser. Delivery of an executed signature page of this Guaranty by telecopy shall be effective as delivery of a manually executed signature page of this Guaranty.

Section 14. **Notices**. All communications and notices hereunder shall be in writing and given as provided in the Subordinated Note Purchase Agreement.

Section 15. **GOVERNING LAW; SUBMISSION TO JURISDICTION**.

**THIS GUARANTY, AND ALL MATTERS RELATING HERETO OR ARISING HEREFROM (WHETHER SOUNDING IN CONTRACT LAW, TORT LAW OR OTHERWISE) SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES. GUARANTOR HEREBY CONSENTS TO THE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED WITHIN THE STATE OF TEXAS AND IRREVOCABLY AGREES THAT, SUBJECT TO PURCHASER'S ELECTION, ALL ACTIONS OR PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT SHALL BE LITIGATED IN SUCH COURTS. GUARANTOR EXPRESSLY SUBMITS AND CONSENTS TO THE JURISDICTION OF THE AFORESAID COURTS AND WAIVES ANY DEFENSE OF FORUM NON CONVENIENS. GUARANTOR HEREBY WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE UPON GUARANTOR BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, ADDRESSED TO GUARANTOR IN ACCORDANCE WITH THE PROVISIONS OF SECTION 14 HEREOF AND SERVICE SO MADE SHALL BE COMPLETE TEN (10) DAYS AFTER THE SAME HAS BEEN POSTED.**

Section 16. **WAIVER OF JURY TRIAL**.

**GUARANTOR AND PURCHASER EACH HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS GUARANTY OR THE**

4

CONFIDENTIAL TREATMENT REQUESTED
EXEMPT FROM FOIA

TRANSACTIONS CONTEMPLATED HEREBY AND AGREES THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.

Section 17.    **Rights and Remedies Cumulative**. Subject to the Subordination Agreement, all rights and remedies of any party hereto or hereunder are cumulative of each other and of every other right or remedy such party may otherwise have at law or in equity, and the exercise of one or more rights or remedies shall not prejudice or impair the concurrent or subsequent exercise of other rights or remedies.

Section 18.    **Further Assurances**.  Upon the reasonable request of Purchaser, Guarantor agrees to take any and all actions, including, without limitation, the execution of certificates, documents or instruments, necessary or appropriate to give effect to the transactions described herein or contemplated by this Guaranty.

[Signature page follows]

5

CONFIDENTIAL TREATMENT REQUESTED
EXEMPT FROM FOIA

**IN WITNESS WHEREOF**, each of the undersigned has caused this Guaranty Agreement to be duly executed and delivered by its authorized officer as of the date first above written.

**GUARANTOR:**

**AFFINITY HOLDING, LLC**

By: _____
Name: Ira D. Levy
Title: Executive Vice President, Chief Financial Officer and Secretary

**PURCHASER:**
**BRENTWOOD M INVESTMENTS, LLC**

By: _____
Name:
Title:

[Signature Page to Guaranty Agreement]

CONFIDENTIAL TREATMENT REQUESTED
EXEMPT FROM FOIA

In-Re-Mozido (B3004)_SEC_010_011530

## MOZIDO, LLC

## NOTE PURCHASE AGREEMENT

THIS NOTE PURCHASE AGREEMENT dated as of January 4, 2013 (this "**Agreement**"), is entered into by and among **MOZIDO, LLC**, a Delaware limited liability company (the "**Issuer**"), with its principal executive office at 1950 Stemmons Freeway, Suite 6040 Dallas, TX 75207 (the "**Principal Office**"), **AFFINITY HOLDING, LLC**, a Delaware limited liability company and the sole member of the Issuer (the "**Guarantor**"; the Issuer and the Guarantor are hereinafter sometimes referred to individually as an "**Issuer**" and collectively as the "**Issuer**"), and **BRENTWOOD M INVESTMENTS, LLC**, a Florida limited liability company ("**Purchaser**").

## RECITALS

WHEREAS, the Issuer desires to issue to the Purchaser its Secured Convertible Promissory Note (a "Note" as defined below) and Purchaser desires to purchase such Note, in each case subject to the terms and conditions hereof.

## AGREEMENT

NOW THEREFORE, in consideration of the foregoing, and the representations, warranties, and conditions set forth below, the parties hereto, intending to be legally bound, hereby agree as follows:

1.      **Definitions.** In addition to the other terms defined herein, the following terms used herein shall have the meanings herein specified:

"**Affiliate**" shall mean, as to any Person, any other Person that directly, or indirectly through one or more intermediaries, Controls, is Controlled by, or is under common Control with, such Person. For the purposes of this definition, "Control" shall mean the power, directly or indirectly, either to (i) vote 5% or more of the securities having ordinary voting power for the election of directors (or persons performing similar functions) of a Person or (ii) direct or cause the direction of the management and policies of a Person, whether through the ability to exercise voting power, by control or otherwise. The terms "Control", "Controlled by", and "under common Control with" have the meanings correlative thereto.

"**Board of Directors**" means the board of directors of the Issuer or Guarantor, as applicable.

"**Business Day**" means any day other than a Saturday, a Sunday or a day on which banking institutions in New York, New York are authorized or obligated to close.

"**Common Units**" means, as applicable, (i) the Issuer's Class A Membership Units, Class B Membership Units, Series A Participating Preferred, or any other securities issued by Issuer, all as more fully described in the Issuer's Operating Agreement, and/or (ii) the Guarantor's Class A Membership Units, Class B Membership Units, Series A Participating Preferred, or any other securities issued by Guarantor, all as more fully described in the Guarantor's Operating Agreement.

2342434v4

CONFIDENTIAL TREATMENT REQUESTED
EXEMPT FROM FOIA

"**Effective Date**" means the date of this Agreement.

"**Event of Default**" has the meaning given in the **Note**.

"**Guaranty**" means that certain Guaranty Agreement, dated as of the date hereof, between the Guarantor and the Purchaser, as the same may be further amended, restated, supplemented or otherwise modified from time to time.

"**Indebtedness**" of any Person shall mean, (i) all obligations of such Person for borrowed money, (ii) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (iii) all obligations of such Person in respect of the deferred purchase price of property or services (other than trade payables incurred in the ordinary course of business; provided, that trade payables overdue by more than 120 days shall be included in this definition except to the extent that any of such trade payables are being disputed in good faith and by appropriate measures), (iv) all obligations of such Person under any conditional sale or other title retention agreement(s) relating to property acquired by such Person, (v) all factoring agreements, equipment leases, and the like, and capital lease obligations of such Person, (vi) all obligations, contingent or otherwise, of such Person in respect of letters of credit, acceptances or similar extensions of credit, (vii) all guarantees of such Person of the type of Indebtedness described in clauses (i) through (vi) above, (viii) all Indebtedness of a third party secured by any lien or security interest on property owned by such Person, whether or not such Indebtedness has been assumed by such Person, and (ix) all obligations of such Person, contingent or otherwise, to purchase, redeem, retire or otherwise acquire for value any capital stock or other equity interests of such Person.  The Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture in which such Person is a general partner or a joint venturer, except to the extent that the terms of such Indebtedness provide that such Person is not liable therefor.

"**Material Adverse Effect**" means, as reasonably determined by Purchaser, a material adverse effect on (i) the business, assets, operations, prospects or financial or other condition of the Guarantor or the Issuer; (ii) the ability of the Issuer or the Guarantor to pay or perform the Obligations in accordance with the terms of this Agreement, any Note, and any other Transaction Document and to avoid an Event of Default, or an event which, with the giving of notice or the passage of time or both, would constitute an Event of Default, under this Agreement, any Note, and any other Transaction Document; or (iii) the rights and remedies of the Purchaser under this Agreement, any Note, and any other Transaction Document or any related document, instrument or agreement.

"**Material Agreement**" means any agreement to which the Issuer, Guarantor or any of their respective Affiliates becomes a party after the date hereof, the termination of which could reasonably be expected to result in a Material Adverse Effect.

"**Note**" means a Convertible Promissory Note, dated as of a Funding Date, issued by the Issuer to the Purchaser pursuant to this Note Purchase Agreement.

"**Operating Agreement**" means, as applicable, (i) that certain Amended and Restated Limited Liability Company Agreement, dated as of August 27, 2010, of the Issuer, as amended by that certain First Amendment, dated as of January 28, 2011, as the same may be further amended, restated, supplemented or otherwise modified from time to time, or (ii) that certain Amended and Restated

CONFIDENTIAL TREATMENT REQUESTED
EXEMPT FROM FOIA

Limited Liability Company Agreement, dated as of August 27, 2010, of the Guarantor, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"**Person**" means and includes an individual, a partnership, a corporation (including a business trust), a joint stock company, a limited liability company, an unincorporated association, a joint venture or other entity or a governmental authority.

"**Preferred Units**" means the Issuer's Series A Participating Preferred Units, as more fully described in the Operating Agreement of Issuer.

"**Purchase Price**" means the amount of $1,115,000 being the amount to be paid for the issuance of a Note pursuant to this Note Purchase Agreement.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Subsidiary**" means, as to any Person, any corporation, partnership, limited liability company or other entity of which more than fifty percent (50%) of the outstanding capital stock or other ownership interests having ordinary voting power to elect a majority of the board of directors or other managers of such corporation, partnership, limited liability company or other entity is at the time, directly or indirectly, owned by such Person (irrespective of whether, at the time, capital stock or other ownership interests of any other class or classes of such corporation or other entity shall have or might have voting power by reason of the happening of any contingency).

"**Transaction Documents**" means this Agreement, the Note, the Guaranty, the Operating Agreement of each of Issuer and Guarantor, and each related agreement, document and instrument executed in connection herewith or therewith from time to time.

Capitalized terms not otherwise defined herein shall have the meaning set forth in the form of Note (as defined below) attached hereto as Exhibit A or in the applicable Note.

2.    **The Note**.

(a)    Issuance of the Note.  At each Closing (as defined below), the Issuer agrees to issue and sell to Purchaser, and, subject to all of the terms and conditions hereof, Purchaser shall purchase a Note for the Purchase Price

(b)    Delivery of the Note.  The sale and purchase of each Note shall take place at a closing (each, a "**Closing**") to be held at such place and time as the Issuer and Purchaser may determine and on the Funding Dates set forth herein (each such date, including the date hereof, a "**Closing Date**").  At the applicable Closing, the Issuer will deliver such Note to the Purchaser, and the Purchaser will advance the Purchase Price of such Note to Issuer by wire transfer of immediately available funds to an account designated by the Issuer by 2:00 P.M. (prevailing Eastern Time) on the applicable Funding Date.  The Purchaser's obligation to fund the Purchase Price of each Note shall be absolute and unconditional, notwithstanding the occurrence of any default or Event of Default hereunder or under any Transaction Document.  Upon the issuance thereof, each Note will be registered in Purchaser's name in the Issuer's records.

(c)     Form and Terms of Note.  The Note shall be substantially in the Form of Note attached as Exhibit A, with the Purchase Price of such Note filled in, and shall otherwise contain the terms set forth in Exhibit A.  Each Note shall be guaranteed by the Guarantor, pursuant to the Guaranty, and entitled to the benefit of the Guaranty.

(d)     Conversion Rights Under Notes.  The Note shall be convertible into Preferred Units of the Issuer upon the terms and conditions set forth therein, subject to automatic adjustment of the Conversion Price with respect to each such Note as set forth therein.

(e)     Use of Proceeds. The proceeds of the sale and issuance of each Note will be used for working capital and for general purposes of the Issuer.

(f)     Payments. The Issuer will make all cash payments due under each Note in immediately available funds by 2:00 P.M. (prevailing Eastern Time) on the date such payment is due in such manner as Purchaser may direct in writing from time to time.

**3.     Representations and Warranties of the Issuer**.  The Issuer, jointly and severally, represent and warrant to Purchaser, as of the date hereof, that:

(a)     Due Organization, Qualification, etc.  Each Issuer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware.  Each Issuer (i) has the power and authority to own, lease and operate its properties and carry on its business as now conducted and to execute, deliver and perform its obligations under this Agreement and each of the other Transaction Documents to which it is a party; and (ii) is duly qualified, licensed to do business and in good standing in each jurisdiction in which the failure to be so qualified, licensed or in good standing could reasonably be expected to have a Material Adverse Effect.  Each Issuer has caused to be delivered to Purchaser correct and complete copies of its Organization Documents (as defined below), which documents reflect all amendments made thereto at any time prior to the Effective Date or any subsequent Closing Date.  Neither Issuer is in default under or in violation of any provision of its Organizational Documents.

(b)     Authority.  The execution, delivery and performance by each Issuer of each Transaction Document to which it is a party, and the consummation of the transactions contemplated thereby (i) are within the power of such Issuer and (ii) have been duly authorized by all necessary company action on the part of such Issuer.

(c)     Enforceability.  Each Transaction Document executed, or to be executed, by each Issuer has been, or will be, duly executed and delivered by such Issuer and constitutes a legal, valid and binding obligation of such Issuer, enforceable against such Issuer in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

(d)     Non-Contravention.  The execution and delivery by each Issuer of the Transaction Documents to which it is a party and the performance and consummation of the transactions contemplated thereby do not and will not: (i) violate such Issuer's certificate of formation or Operating Agreement (collectively, the **"Organizational Documents"**) or any judgment, order, writ, decree, statute, rule or regulation applicable to such Issuer; (ii) violate any provision of, or result in the breach or the acceleration of, or entitle any other Person to accelerate (whether after the giving

of notice or lapse of time or both), any indebtedness, mortgage, indenture, agreement, instrument or contract to which such Issuer is a party or by which it is bound; or (iii) result in the creation or imposition of any lien upon any property, asset or revenue of such Issuer or the suspension, revocation, impairment, forfeiture, or nonrenewal of any material permit, license, authorization or approval applicable to such Issuer, its business or operations, or any of its assets or properties.

(e)     Approvals.  Except as set forth in the Organizational Documents, no consent, approval, order or authorization of, or registration, declaration or filing with, any governmental authority or other Person (including, without limitation, the stockholders or other equity holders of any Person) is required in connection with the execution, delivery and performance of the Transaction Documents executed by each Issuer and the performance and consummation of the transactions contemplated thereby.

(f)     Compliance with Laws.  Each Issuer and each of its directors and officers have complied with and are in compliance, in all material respects, with all laws, statutes, rules, regulations, judgments, or orders which are applicable to it and its business, and within the three (3) years prior to the Effective Date and any subsequent Closing Date, no claims have been filed against any such Persons alleging any such violations and no such Person has received any written notice of any such violations.

(g)     Capitalization.  All of the issued and outstanding membership units of the Issuer have been duly authorized and are validly issued, fully paid and nonassessable.  Except as set forth in this Agreement (including the Notes), there are no options, warrants, conversion privileges, preemptive rights or other rights presently outstanding to purchase or otherwise acquire any authorized but unissued membership units or other securities of either Issuer, or any other written agreements of the Issuer to issue any such securities or rights.  Other than Guarantor's interest in Slugger, LLC and in Mozido, LLC, neither Issuer owns, nor has it owned at any time, any subsidiaries.  Other than Guarantor's interests in Slugger, LLC and in Mozido, LLC, neither Issuer owns or holds the right to acquire any shares of stock or any other security or interest in any other Person.

(h)     Absence of Undisclosed Liabilities and Obligations.  Neither Issuer has any liability or obligation, either accrued, absolute, direct, or to either such Issuer's knowledge, contingent or indirect, or otherwise, whether as principal, agent, partner, co-venturer, guarantor or in any capacity whatsoever other than (i) as set forth on the Latest Balance Sheet (as defined below), and (ii) obligations and liabilities since the date of the Latest Balance Sheet that are not individually or in the aggregate material.

(i)     Litigation.  There is no pending or, to the best knowledge of either Issuer, threatened action, suit, proceeding or investigation before any court, governmental agency or body, or arbitrator having jurisdiction over either Issuer, or any of their Affiliates, that could affect the execution by the Issuer or the performance by either Issuer of its obligations under the Transaction Documents.  Except as separately disclosed to Purchaser, there is no pending, or to the best of knowledge of either Issuer, basis for a threatened action, suit, proceeding or investigation before any court, governmental agency or body, or arbitrator having jurisdiction over either Issuer or any of their respective Affiliates, except for possible claims and demands by the Trustee in Bankruptcy of Slugger, LLC.

CONFIDENTIAL TREATMENT REQUESTED
EXEMPT FROM FOIA

(j)     Financial Statements.

(i)     The Issuer have delivered to the Purchaser copies of: (A) the unaudited balance sheet of each Issuer as of the month-end for the month preceding the Closing (the "**Latest Balance Sheet**") and the related unaudited statement of income for the most recent 12-month period then ended for each Issuer, and (B) balance sheets and statements of income, cash flows and retained earnings of each Issuer for the two most recent fiscal years for which the same are available (collectively, the "**Financial Statements**").

(ii)     Each of the Financial Statements (A) is consistent with such Issuer's books and records and presents fairly in all material respects the financial condition and results of operations for such Issuer as of the times and for the periods referred to therein, and (B) has been prepared in accordance with generally accepted accounting principles, subject to the absence of footnote disclosure.

(k)     Stop Transfer. Each Note and the securities into which any Note is convertible (collectively, the "**Securities**"), when issued, will be restricted securities. The Issuer will not issue any stop transfer order or other order impending the sale, resale or delivery of any of the Securities, except as may be required by any applicable federal or state securities laws and unless contemporaneous notice of such instruction is given to Purchaser.

(l)     No Integrated Offering. Neither the Issuer nor any of its Affiliates, nor any Person acting on their behalf, has directly or indirectly made any offers or sales of any security or solicited any offers to buy any security under circumstances that would cause the offer of the Securities pursuant to this Agreement to be integrated with prior offerings by the Issuer for purposes of the Securities Act or any applicable stockholder approval provisions. The Issuer will not take any action or steps that would cause the offer or issuance of the Securities to be integrated with other offerings. The Issuer will not conduct any offering other than the transactions contemplated hereby that will be integrated with the offer or issuance of the Securities.

(m)     No General Solicitation; Private Placement. Neither the Issuer, the Guarantor nor, to its knowledge, any Person acting on behalf of either Issuer has engaged in any form of general solicitation or general advertising (within the meaning of Regulation D under the Securities Act) in connection with the offer or sale of the Securities. Assuming the accuracy of the Purchaser's representations and warranties set forth in Section 4(b), no registration under the Securities Act is required for the offer and sale of the Securities by the Issuer to the Purchaser under the Transaction Documents.

(n)     Acknowledgement Regarding Purchaser's Purchase of the Securities. Each Issuer acknowledges and agrees that the Purchaser is acting solely in the capacity of an arm's length purchaser with respect to this Agreement, the other Transaction Documents and the transactions contemplated hereby and thereby. Each Issuer further acknowledges that the Purchaser is not acting as a financial advisor or fiduciary of either Issuer (or in any similar capacity) with respect to the Agreement, the other Transaction Documents and the transactions contemplated hereby and thereby and any advice given by the Purchaser or any of their respective representative or agents in connection with this Agreement, the other Transaction Documents and the transactions contemplated hereby and thereby is merely incidental to Purchaser's purchase of the Securities. Each Issuer further represents

to the Purchaser that each Issuer's decision to enter into this Agreement and the other Transaction Documents has been based solely on the independent evaluation by such Issuer and its representatives.

(o) <u>Investment Company</u>.  Neither Issuer is an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

(p) <u>Regulatory Permits</u>.   Each Issuer possesses all material certificates, authorizations and permits issued by the appropriate federal, state or foreign regulatory authorities necessary to conduct its business, and neither Issuer has received any notice of proceedings relating to the revocation or modification of any such certificate, authorization or permit.

(q) <u>Tax Status</u>.  Each Issuer has made and filed through the date hereof (and has valid extensions for applicable period thereafter) all federal and state income and all other tax returns, reports, and declarations required by any jurisdiction to which it is subject and (unless and only to the extent that such Issuer has set aside on its books provisions reasonably adequate for the payment of all unpaid and unreported taxes) has paid all taxes and other governmental assessments and charges that are material in amount, shown or determined to be due on such returns, reports and declarations, except those being contested in good faith and has set aside on its books provision reasonably adequate for the payment of all taxes for periods subsequent to the periods to which such returns, reports or declarations apply.  There are no unpaid taxes claimed to be due by the taxing authority of any jurisdiction, and the managers and officers of each Issuer know of no basis for any such claim.

(r) <u>Assets</u>.

(i) Each Issuer has good and marketable title to, or a valid leasehold interest in, the properties and assets used by it or located on its premises, free and clear of all liens and encumbrances.  Guarantor has no assets other than its membership interests in Issuer and Slugger, LLC.  Each Issuer's leased premises, equipment and other tangible assets are in good operating condition (normal wear and tear excepted) and are fit for use in the ordinary course of business. Neither Issuer owns, or has ever owned, any real property, and neither Issuer is a party to any agreement or option to purchase any real property or interest therein.

(s) <u>Contracts</u>.

(i)  For purposes of this Section 3(s), "Company Contract" shall mean each of the following contracts, agreements or commitments to which either Issuer is a party or by which it or its assets or its business is bound or affected, whether written or oral:  (A) any bonus, pension, revenue sharing, profit sharing, retirement plan or deferred compensation plan; (B) any contract relating to employment, confidentiality, non-competition and/or proprietary rights, and any agreement providing for severance or change of control benefits; (C) any agreement, indenture or other arrangement relating to Indebtedness or to mortgaging, pledging or otherwise placing a lien or encumbrance on any of its assets; (D) any contract under which such entity has advanced or loaned any other Person amounts in the aggregate exceeding $10,000; (E) any contract relating to lending or investing of funds; (F) any license or royalty agreement; (G) any guaranty of any obligation, other than endorsements made for collection; (H) any material management, consulting, advertising, marketing, promotion, technical services, advisory or other similar contract or arrangement; (I) agreement with any material customer or material supplier; (J) contract or group of related contracts

with the same party continuing over a period of more than six (6) months from the date or dates thereof, not terminable by it on thirty (30) days or less notice without penalties, or involving more than $10,000; (K) contract which prohibits either Issuer or any of their respective officers or employees from freely engaging in business anywhere in the world; (L) joint venture agreement or agreement relating to the acquisition or sale of any company, business, division or other enterprise, whether in the form of stock purchase, asset acquisition or otherwise; or (M) agreement, contract or commitment for the purchase or sale of any goods or services at rates or terms which are materially different from generally available rates or terms, including purchase or sale commitments entered into in settlement of claims or prior obligations.

       (ii)    Each Company Contract was entered into in the ordinary course of business consistent with past practices, is in full force and effect, is valid and enforceable in accordance with its terms, and constitutes a legal and binding obligation of the applicable Issuer(s) and to the knowledge of each Issuer, each other party thereto. Neither Issuer has given or received, and, to the knowledge of each Issuer, no fact or circumstance exists which could reasonably be expected to give rise to, with the passage of time or the giving of notice or both, any material breach, notice of material default, termination or partial termination under any Company Contract, and there is no existing or continuing default by either Issuer or, to its knowledge, any other party in the performance or payment of any obligation under any such contract, agreement or commitment, and each Issuer is in compliance in all material respects with the provisions of each such Company Contract. Neither Issuer has any knowledge of any anticipated breach or expectation or intention on the part of any party to not fully perform any obligation under any such Company Contract.

      (t)    Intellectual Property.

       (i)    Neither Issuer is using, or reasonably anticipates it will need to use in the future, any intellectual property that is owned by any Affiliate of either Issuer, any member of either Issuer or any Affiliate of any member of an Issuer.

       (ii)    Neither Issuer has any proprietary or confidential information that is owned or claimed by third parties and that is not rightfully in the possession of either Issuer, and each Issuer has complied in all material respects with all contracts governing the disclosure and use of proprietary or confidential information.

      (u)    Disclosure. All information furnished to the Purchaser or the Purchaser's counsel by or on behalf of the Issuer in connection with the transactions contemplated hereby or thereby does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements herein or therein not misleading. There is no fact of which either Issuer is aware that has not been disclosed to the Purchaser and that is or could reasonably be expected to have a Material Adverse Effect.

    **4.**    **Representations and Warranties of Purchaser**. The Purchaser represents and warrants to each Issuer upon the acquisition of each Note as follows:

      (a)    Binding Obligation. The Purchaser has full legal capacity, power and authority to execute and deliver this Agreement and to perform the Purchaser's obligations hereunder. Each of this Agreement and each Note issued to the Purchaser is a valid and binding obligation of the

Purchaser, enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

(b)     Securities Law Compliance. The Purchaser has been advised that the Securities have not been registered under the Securities Act, or any state securities laws and, therefore, cannot be resold unless they are registered under the Securities Act and applicable state securities laws or unless an exemption from such registration requirements is available. The Purchaser is aware that the Issuer is under no obligation to effect any such registration with respect to the Securities or to file for or comply with any exemption from registration. The Purchaser is purchasing the Securities for the Purchaser's own account for investment, not as a nominee or agent, and not with a view to, or for resale in connection with, the distribution thereof. The Purchaser has such knowledge and experience in financial and business matters that the Purchaser is capable of evaluating the merits and risks of such investment, is able to incur a complete loss of such investment and is able to bear the economic risk of such investment for an indefinite period of time. The Purchaser is an "accredited investor" as such term is defined in Rule 501 of Regulation D under the Securities Act.

5.     **Covenants of the Issuer**. Each Issuer, jointly and severally, hereby covenants that from and after the date of this Agreement and so long as any of the obligations under any Note are outstanding:

(a)     Use of Proceeds. The Issuer will use the proceeds of the sale of each Note solely to fund the working capital and general purpose needs of the Issuer. No portion of the proceeds of the sale of any Note shall be used by the Issuer to purchase or carry "margin stock", as such term is defined in Regulation U of the Board of Governors of the Federal Reserve, or otherwise in violation of such Regulation U or other applicable law. The Issuer will supply to the Purchaser such additional information and documents that the Purchaser may reasonably request with respect to the use of proceeds and will permit the Purchaser to have access to any and all records and information and personnel as the Purchaser deems necessary to verify such use of proceeds.

(b)     Notice of Events of Default. Each Issuer shall immediately provide written notice to the Purchaser of the occurrence of any Event of Default, or any event or condition which, with the passage of time or giving of notice or both, would constitute an Event of Default.

(c)     Reporting. The Issuer shall cause to be prepared and delivered the following to the Purchaser:

(i)     As soon as available and in any event no later than sixty (60) days after the end of each fiscal year of the Issuer, unaudited financial statements for each Issuer (which shall be prepared in accordance with generally accepted accounting principles, other than the omission of footnotes and normal year end adjustments), including a balance sheet and statements of income and cash flows showing the cash distributed in such fiscal year and the balance of each of the Issuer's member's capital account at the end of such fiscal year and the manner of its calculation. If requested by the Purchaser, the Issuer shall cause, at the cost and expense of Issuer, such financial statements to be audited by an accounting firm reasonably acceptable to the Purchaser.

(ii)      As soon as available and in any event no later than thirty (30) days after the end of each fiscal quarter of the Issuer, unaudited financial statements for each Issuer (which shall be prepared in accordance with generally accepted accounting principles, other than the omission of footnotes and normal year end adjustments), including a balance sheet and statements of income and cash flows showing the cash distributed in such fiscal quarter and the balance of each of the Issuer's member's capital account at the end of such fiscal quarter and the manner of its calculation.

In addition, each Issuer shall, promptly following the Purchaser's request, provide the Purchaser with such records, reports and other information that the Purchaser may reasonably request from time to time.

6.      **No Conditions to Each Closing by the Purchaser**.  Upon the effectiveness of this Agreement, the purchase of the Note hereunder by the Purchaser on a Closing Date shall not be subject to satisfaction of any conditions other than the delivery to the Purchaser of the applicable Note, Guaranty and Security Agreements, duly executed.

7.      **Conditions to Obligations of the Issuer**. The Issuer's obligation to issue and sell any Note at a Closing is conditioned upon the Purchaser's delivery to Issuer the Purchase Price in respect of such Note in accordance with Section 2 hereof.

8.      **Miscellaneous.**

(a)      Waivers and Amendments. Any provision of this Agreement may be amended, waived or modified only upon the written consent of all of the parties hereto.

(b)      Application of Payments.  The Purchaser may apply any payments collected pursuant to this Agreement or any Note, whether by exercise of remedies or otherwise, to such of the Obligations as may then be due and payable as it may determine in its sole discretion.

(c)      Governing Law; Jurisdiction.

(i)      This Agreement and all actions arising out of or in connection with this Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to the conflicts of law provisions of the State of Delaware or of any other state.

(ii)      Each of the parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the non-exclusive jurisdiction of the United States District Court for the District of Delaware, and of the State Courts located in Delaware and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or any other Transaction Document or the transactions contemplated hereby or thereby, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such Delaware state court or, to the extent permitted by applicable law, such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement or any other Transaction Document shall affect any right that Purchaser  may otherwise have to bring any action or proceeding relating to this Agreement or any

other Transaction Document against either Issuer or any other Person or its properties in the courts of any jurisdiction.

(iii)    Each of the parties hereto irrevocably and unconditionally waives any objection which it may now or hereafter have to the laying of venue of any such suit, action or proceeding described in paragraph (ii) of this Section 9(c) and brought in any court referred to in paragraph (ii) of this Section 9(c). Each of the parties hereto irrevocably waives, to the fullest extent permitted by applicable law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(iv)    Each party to this Agreement irrevocably consents to the service of process in the manner provided for notices in Section 9(j). Nothing in this Agreement or in any other Transaction Document will affect the right of any party hereto to serve process in any other manner permitted by law.

(d)    Survival.    The representations, warranties, covenants and agreements made herein shall survive the execution and delivery of this Agreement.

(e)    Successors and Assigns.    Subject to the restrictions on transfer described in Sections 9(f) and 9(g) below, the rights and obligations of each of the parties hereto shall be binding upon and benefit the respective successors, assigns, heirs, administrators and transferees of such party.

(f)    Registration, Transfer and Replacement of the Notes.    The Issuer will keep, at its Principal Office, books for the registration and registration of transfer of each Note. Prior to presentation of any Note for registration of transfer, the Issuer shall treat the Person in whose name such Note is registered as the owner and holder of such Note for all purposes whatsoever, whether or not such Note shall be overdue, and the Issuer shall not be affected by notice to the contrary. Subject to any restrictions on or conditions to transfer set forth in a Note, the holder of a Note, at such Holder's option, may in person or by duly authorized attorney surrender the same for exchange at the Principal Office, and promptly thereafter and at the Issuer's expense, except as provided below, receive in exchange therefor one or more new Note(s), which shall be for the same principal amount as the then unpaid principal amount of the Note so surrendered and shall be dated the date to which interest shall have been paid on the Note so surrendered or, if no interest shall have yet been so paid, dated the date of the Note so surrendered, and registered in the name of such Person or Persons as shall have been designated in writing by such holder or its attorney. Upon receipt by the Issuer of evidence reasonably satisfactory to it of the ownership of and the loss, theft, destruction or mutilation of any Note and (i) in the case of loss, theft or destruction, of indemnity reasonably satisfactory to it; or (ii) in the case of mutilation, upon surrender thereof, the Issuer, at its expense, will execute and deliver in lieu thereof a new Note executed in the same manner as the Note being replaced, and in the case of a lost, stolen or destroyed Note, in the same principal amount as the unpaid principal amount of such Note and dated the date to which interest shall have been paid on such Note or, if no interest shall have yet been so paid, dated the date of such Note.

(g)    Assignment.    The rights, interests and obligations hereunder may not be assigned, by operation of law or otherwise, in whole or in part, by either Issuer without the prior written consent of the Purchaser. Purchaser may not assign this Agreement or its interests and obligations hereunder, by operation of law or otherwise, in whole or in part or sell participations in

any Note and its interests in the Obligations thereunder, without the prior written consent of the Issuer, which consent will not be unreasonably withheld or delayed.

(h)     Entire Agreement.   This Agreement, together with the other Transaction Documents, constitutes and contains the entire agreement among the parties hereto and supersedes any and all prior agreements, negotiations, correspondence, understandings and communications between the parties, whether written or oral, respecting the subject matter hereof.

(i)     Notices.   All notices, requests, demands, consents, instructions or other communications required or permitted hereunder shall be in writing and faxed, mailed or delivered to each party as follows: (i) if to the Purchaser at such party's address or facsimile number set forth on the signature page below or at such other address as such shall have furnished the Issuer and the other parties in writing, or (ii) if to either Issuer, at the Principal Office, Attention: Chief Financial Officer, or at such other address or facsimile number as such Issuer shall have furnished to the Purchaser in writing. All such notices and communications will be deemed effectively given the earlier of (i) when received, (ii) when delivered personally, (iii) one Business Day after being delivered by facsimile (with receipt of appropriate confirmation), (iv) one Business Day after being deposited with an overnight courier service of recognized standing, or (v) four days after being deposited in the U.S. mail, first class with postage prepaid.

(j)     Expenses; Broker.   Each party shall pay the fees and expenses of its respective counsel with respect to the negotiation, execution, delivery, performance and enforcement of the Agreement and the Transaction Documents. Each of Purchaser and Issuer represent and warrant that he/it has not engaged the services of a broker in connection with this Agreement or the transactions contemplated hereby, and that no broker is or may become entitled to any payment or other consideration on account of the transactions contemplated hereby and the closing and consummation thereof.

(k)     Further Assurances.   Upon the reasonable request of any party hereto, each other party hereto, as applicable, agrees to take any and all actions, including, without limitation, the execution of certificates, documents or instruments, necessary or appropriate to give effect to the transactions contemplated by this Agreement

(l)     Remedies.   Upon the occurrence or existence of any Event of Default, the Purchaser may exercise any other right, power or remedy granted to it by any Transaction Document or otherwise permitted to it by law, either by suit in equity or by action at law, or both.  Subject to the Subordination Agreement, each Issuer acknowledges that violation of any one or more of the terms of this Agreement or any other Transaction Document would immeasurably and irreparably damage the Purchaser, and, accordingly, each Issuer agrees that for any violation or threatened violation of any of such terms, the Purchaser shall and in addition to any other rights and remedies available to it, at law or otherwise (including, without limitation, the recovery of damages from the Issuer), be entitled to specific performance and an injunction to be issued by any court of competent jurisdiction enjoining and restraining the Issuer, or either of them, from committing any violation or threatened violation of the terms hereof.

CONFIDENTIAL TREATMENT REQUESTED
EXEMPT FROM FOIA

(m)　Waivers and Consents. No waiver, termination or discharge of this Agreement, or any of the terms or provisions hereof, or any consent hereunder shall be binding upon any party hereto unless set forth in writing and signed by each party hereto. Any waiver of any term or condition shall not be construed as a waiver of any subsequent breach or a subsequent waiver of the same term or condition, or a waiver of any term or condition of this Agreement. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

(n)　Severability of this Agreement. If any provision of this Agreement shall be judicially determined to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

(o)　Titles and Subtitles. The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

(p)　Counterparts. This Agreement may be executed in any number of counterparts (including by way of electronic transmission), each of which shall be an original, but all of which together shall be deemed to constitute one instrument.

(q)　Time Is of the Essence. Time is of the essence of this Agreement, and of each provision hereof.

(r)　**WAIVER OF JURY TRIAL.** EACH PARTY HERETO IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF THIS AGREEMENT OR ANY OTHER TRANSACTION DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER TRANSACTION DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

*[Signature page follows]*

CONFIDENTIAL TREATMENT REQUESTED
EXEMPT FROM FOIA

IN WITNESS WHEREOF, the parties have caused this Note Purchase Agreement to be duly executed and delivered by their proper and duly authorized officers as of the date and year first written above.

**ISSUER:**

**MOZIDO, LLC**
a Delaware limited liability company

By: _____
Name: _____
Title: _____

**GUARANTOR:**

**AFFINITY HOLDING, LLC**
a Delaware limited liability company

By: _____
Name: _____
Title: _____

**PURCHASER:**
**BRENTWOOD M INVESTMENTS, LLC**

By: _____
Name:
Title:

Address for Notices:

5373 Isleworth CC Drive
Windermere, FL, 34786

CONFIDENTIAL TREATMENT REQUESTED
EXEMPT FROM FOIA

**EXHIBIT A**

**FORM OF NOTE**

Attached

I

CONFIDENTIAL TREATMENT REQUESTED
EXEMPT FROM FOIA

In-Re-Mozido (B3004)_SEC_010_011545

THIS NOTE AND THE SECURITIES ISSUABLE UPON THE CONVERSION HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY U.S. STATE SECURITIES LAWS, AND, UNLESS SO REGISTERED, MAY BE OFFERED OR SOLD, DIRECTLY OR INDIRECTLY, IN THE UNITED STATES OR TO U.S. PERSONS IN ACCORDANCE WITH THE PROVISIONS OF THE SECURITIES ACT, OR PURSUANT TO AN AVAILABLE EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND IN EACH CASE ONLY IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAW.

## MOZIDO, LLC
## CONVERTIBLE PROMISSORY NOTE

$1,115,000                                                                January 4, 2013

FOR VALUE RECEIVED, **MOZIDO, LLC**, a Delaware limited liability company (the "**Issuer**"), with its principal executive office located at 1950 Stemmons Freeway, Suite 6040, Dallas, TX 75207 (the "**Principal Office**"), promises to pay to the order of **BRENTWOOD M INVESTMENTS, LLC** a Florida Limited Liability Company (together with its permitted successors, assigns and designees, the "**Purchaser**"), in lawful money of the United States of America the principal sum of **One Million, One Hundred Fifteen Thousand, One Hundred Fifteen Dollars ($1,115,000.00)**, or such lesser amount as shall equal the outstanding principal amount advanced hereunder and outstanding from time to time, together with interest from the date of this Note on the unpaid principal balance at a rate equal to 8% per annum, simple interest, computed on the basis of a 360 day year consisting of twelve 30-day months (the "**Interest**"). All unpaid principal, together with any then unpaid and accrued Interest and other amounts payable hereunder, shall be due and payable on the earlier of: (i) the close of business on the date that is ten (10) years from the date of this Note, or (ii) when, upon or after the occurrence of an Event of Default (as defined below), such amounts become due and payable to the Purchaser in accordance with the terms hereof (the earliest of such dates being hereinafter referred to as the "**Maturity Date**"). This Convertible Promissory Note (this "**Note**") is a "Note" issued pursuant to the Note Purchase Agreement, dated as of even date herewith(as may be amended, restated, modified, or supplemented from time to time, the "**Note Purchase Agreement**"), by and among the Issuer, Affinity Holding, LLC, as Guarantor, and the Purchaser.

The following is a statement of the rights of the Purchaser and the conditions to which this Note is subject, and to which the Purchaser, by the acceptance of this Note, agrees:

1.      **Definitions**. As used in this Note, the following capitalized terms have the following meanings:

(a) "**Additional Notes**" means each of the "Notes" as such term is defined in the Note Purchase Agreement, other than this Note.

CONFIDENTIAL TREATMENT REQUESTED
EXEMPT FROM FOIA

(b) "**Event of Default**" has the meaning given in <u>Section 4</u> hereof.

(c) "**Interest**" has the meaning given in the introductory paragraph hereof.

(d) "**Maturity Date**" has the meaning given in the introductory paragraph hereof.

(e) "**Obligations**" means and includes all loans, advances, debts, liabilities and obligations, howsoever arising, owed by the Issuer to the Purchaser of every kind and description (whether or not evidenced by any note or instrument and whether or not for the payment of money), now existing or hereafter arising under or pursuant to the terms of this Note, including, all interest, fees, charges, expenses, attorneys' fees and costs and accountants' fees and costs chargeable to and payable by the Issuer hereunder and thereunder, in each case, whether direct or indirect, absolute or contingent, due or to become due, and whether or not arising after the commencement of a proceeding under Title 11 of the United States Code (11 U. S. C. Section 101 *et seq.*), as amended from time to time (including post-petition interest) and whether or not allowed or allowable as a claim in any such proceeding.

(f) "**Material Adverse Effect**" means, as reasonably determined by Purchaser, a material adverse effect on (i) the business, assets, operations, prospects or financial or other condition of the Guarantor or the Issuer; (ii) the ability of the Issuer or the Guarantor to pay or perform the Obligations in accordance with the terms of this Agreement, any Note, and any other Transaction Document and to avoid an Event of Default, or an event which, with the giving of notice or the passage of time or both, would constitute an Event of Default, under this Agreement, any Note, and any other Transaction Document; or (iii) the rights and remedies of the Purchaser under this Agreement, any Note, and any other Transaction Document or any related document, instrument or agreement.

(g) "**Material Agreement**" means any agreement to which the Issuer, Guarantor or any of their respective Affiliates becomes a party after the date hereof, the termination of which could reasonably be expected to result in a Material Adverse Effect.

Additional capitalized terms used herein and not otherwise defined herein shall have the meanings given to such terms in the Note Purchase Agreement.

2.     **Interest**. Accrued Interest on this Note shall be payable on the Maturity Date.

3.     **Events of Default**. The occurrence of any of the following shall constitute an "**Event of Default**" under this Note and the other Transaction Documents:

(a)     *Failure to Pay.* The Issuer shall fail to pay when due any principal payment or any interest or other payment required under the terms of this Note on the date due and such payment shall not have been made within five days of the due date; or

(b)     *Representations and Warranties.* Any representation or warranty made in this Note or in connection with this Note, any of the other Transaction Documents, or the Obligations,

shall prove to have been false or misleading when made (or, if applicable, when reaffirmed) in any material respect; or

(c)     *Covenants*. The Issuer or the Guarantor fails to timely and properly observe, keep or perform, any term, covenant, agreement or condition in this Note or in any of the other Transaction Documents (including without limitation any Additional Note); or

(d)     *Cross Default*. The Issuer or the Guarantor is in breach or default under any Indebtedness or other obligations (other than those evidenced by this Note), which default is not cured within any applicable cure period set forth in the agreement with respect to the Indebtedness or other obligations and which would cause or permit the holder of such Indebtedness or other obligations to accelerate the maturity thereof; or

(e)     *Validity* of *Transaction Documents*. The Issuer or the Guarantor shall challenge the validity and binding effect of any provision of any of the Transaction Documents or shall state its intention to make such a challenge of any of the Transaction Documents or any of the Transaction Documents shall for any reason (except to the extent permitted by its express terms) cease to be; or

(f)     *Inability to Pay Debts*. The Issuer or the Guarantor admits in writing its present inability generally to pay its debts as they mature or shall make any assignment for the benefit of any of its creditors; or

(g)     *Judgments*. The entry of a final judgment for the payment of money involving more than $100,000 against the Issuer or the Guarantor, and the failure by the Issuer or the Guarantor to discharge the same, or cause it to be discharged, within thirty (30) days from the date of the order, decree or process under which or pursuant to which such judgment was entered; or

(h)     *Suspension of Business*. The Issuer or the Guarantor suspends for more than ten (10) Business Days or terminates its business operations, or liquidates, dissolves or terminates its existence; or

(i)     *Voluntary Bankruptcy or Insolvency Proceedings*. The Issuer or the Guarantor shall (i) apply for or consent to the appointment of a receiver, trustee, liquidator or custodian of itself or of all or a substantial part of its property, (ii) be unable, or admit in writing its present inability, to pay its debts generally as they mature, (iii) make a general assignment for the benefit of its or any of its creditors, (iv) be dissolved or liquidated, (v) become insolvent (as such term may be defined or interpreted under any applicable statute) as determined by a court of competent jurisdiction, (vi) commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or consent to any such relief or to the appointment of or taking possession of its property by any official in an involuntary case or other proceeding commenced against it, or (vii) take any action for the purpose of effecting any of the foregoing; or

CONFIDENTIAL TREATMENT REQUESTED
EXEMPT FROM FOIA

(j) *Involuntary Bankruptcy or Insolvency Proceedings.* Proceedings for the appointment of a receiver, trustee, liquidator or custodian of the Issuer or the Guarantor or of all or a substantial part of the property thereof, or an involuntary case or other proceedings seeking liquidation, reorganization or other relief with respect to the Issuer or the Guarantor or the debts thereof under any bankruptcy, insolvency or other similar law now or hereafter in effect shall be commenced and an order for relief entered or such proceeding shall not be dismissed or discharged within 30 days of commencement; or

(k) *Default or Termination of Material Agreements.* The Issuer or the Guarantor (i) shall materially default or breach the terms of such Material Agreement, and shall fail to cure such default or breach within any applicable grace period set forth therein, or (ii) any such Material Agreement shall be terminated by reason of the default or breach of the Issuer or Guarantor; or

(l) *Material Adverse Effect.* The occurrence of a Material Adverse Effect.

4.  **Rights of Purchaser upon Default**. Upon the occurrence or existence of any Event of Default (other than an Event of Default described in <u>Sections 4(i)</u> or <u>4(j)</u>) and at any time thereafter during the continuance of such Event of Default, the Purchaser may, by written notice to the Issuer, declare all outstanding Obligations payable by the Issuer hereunder to be immediately due and payable without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived. Upon the occurrence or existence of any Event of Default described in <u>Sections 4(i)</u> and <u>4(j)</u>, immediately and without notice, all outstanding Obligations payable by the Issuer hereunder shall automatically become immediately due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived. In addition to the foregoing remedies, upon the occurrence or existence of any Event of Default, the Purchaser may, exercise any other right, power or remedy granted to it by the Transaction Documents or otherwise permitted to it by law, either by suit in equity or by action at law, or both.

5.  **Conversion Rights**.  The Purchaser shall have the right to convert this Note and accrued and unpaid Interest due under this Note into Preferred Units, as set forth in this <u>Section 5</u>.

(a) *Conversion into Issuer's Preferred Units.* The Purchaser shall have the right, from and after the Conversion Right Commencement Date, and then at any time until the Maturity Date, to convert any outstanding and unpaid principal portion of this Note, and any accrued but unpaid Interest on such portion, at the election of the Purchaser (the date of such conversion being a "**Conversion Date**") into Preferred Units at the Conversion Price (as hereinafter defined). Upon delivery to the Issuer of a completed Notice of Conversion, a form of which is attached hereto as <u>Exhibit A</u>, the Issuer shall issue and deliver to the Purchaser within five (5) business days from the Conversion Date (such day being the "**Delivery Date**") that number of units for the portion of the Note and any accrued but unpaid Interest on such portion converted in accordance with the following sentence. The number of Preferred Units to be issued upon each conversion of this Note shall be determined by dividing that portion of the principal of the Note to be converted and any accrued but unpaid Interest on such portion, by the Conversion Price. The "**Conversion Price**" as of the date of this Note is $.0205 per unit and shall be subject to adjustment as provided hereafter in this <u>Section 5</u>.

(b) *Manner of Conversion.* This Note may be converted by the Purchaser by presentment of this Note, accompanied by written notice stating that Purchaser elects to convert all or a portion of the principal amount thereof, and any accrued but unpaid Interest on such portion, and stating the name or names, together with addresses, in which the Preferred Units are to be issued. Each conversion shall be deemed to have been effected immediately prior to the close of business on the date on which this Note shall have been so surrendered to Issuer; and at such time the rights of the Purchaser as to that portion of this Note so converted shall cease, and the person in whose name or names the Preferred Units shall be issuable upon such conversion shall be deemed to have become the holder or holders of record thereof. If this Note is converted in part only, upon conversion of such part hereof, the Issuer shall execute and deliver to the Purchaser upon surrender of this Note a new Note in the aggregate principal amount equal to the then unconverted portion of the principal amount of this Note plus any accrued but unpaid and unconverted Interest and in all other respects identical to this Note.

(c) *Distributions, Splits, Combinations, Reclassifications.* In the event the Issuer shall hereafter (i) make a distribution of Preferred Units or Common Units with respect to the Preferred Units or the Common Units, (ii) subdivide its outstanding Preferred Units or Common Units into a greater amount of Preferred Units or Common Units, as applicable, or (iii) combine its outstanding Preferred Units or Common Units into a smaller amount of Preferred Units or Common Units, as applicable, the Conversion Price in effect immediately prior to such action shall be adjusted so that the Purchaser shall be entitled to receive the amount of Preferred Units that it would have owned immediately following such action had this Note or any remaining portion hereof been converted in full immediately prior thereto. All adjustments made pursuant to this Section 6(c) shall become effective immediately after the earlier of the record date or the payment date in the case of a distribution and shall become effective immediately after the effective date in the case of a subdivision or combination.

(d) *Recapitalizations, Reorganizations, etc.* In the event of any recapitalization, reorganization, consolidation or merger of the Issuer with or into another Person or the sale, transfer or other disposition of all or substantially all of the assets of the Issuer and its Subsidiaries (viewed as a whole) to another Person, this Note shall thereafter be convertible (at the option of the Purchaser) into the kind and amount of limited liability company interests or other securities or property that a holder of the number of Preferred Units deliverable upon conversion of this Note would have been entitled upon such recapitalization, reorganization, consolidation, merger or sale; and, in such case, appropriate adjustment (as determined in good faith by the Board of Directors and such determination is agreed upon by the Purchaser) shall be made in the application of the provisions set forth in this Section 5 with respect to the rights and interests thereafter of the Purchaser, to the end that the provisions set forth in this Section 5 shall thereafter be applicable, as nearly as reasonably may be, in relation to any limited liability company interests or other securities or property thereafter deliverable upon conversion of this Note.

(e) *De Minimis Adjustments.* No adjustment to the Conversion Price shall be made if such adjustment would result in a change in the Conversion Price of less than $.01. Any adjustment of less than $.01 that is not made shall be carried forward and shall be made at the time of

CONFIDENTIAL TREATMENT REQUESTED
EXEMPT FROM FOIA

and together with any subsequent adjustment that, on a cumulative basis, amounts to an adjustment of $.01 or more in the Conversion Price.

(f)     *Certificate as to Adjustments; Dispute.*   Upon the occurrence of each adjustment or readjustment of the Conversion Price pursuant to this Section 5, the Issuer at its expense shall promptly compute such adjustment or readjustment in accordance with the terms hereof and prepare and furnish to the Purchaser a certificate setting forth such adjustment or readjustment and showing in detail the facts upon which such adjustment or readjustment is based.  The Issuer shall, upon the written request at any time of the Purchaser, furnish or cause to be furnished to the Purchaser a like certificate setting forth (i) such adjustments and readjustments, (ii) the Conversion Price at that time in effect, and (iii) the number of Preferred Units and the amount, if any, of other property that at that time would be received upon the conversion of this Note.

(g)     *Notices of Record Date.*  In the event of any taking by the Issuer or Guarantor of a record of the holders of any class of securities for the purpose of determining the holders thereof who are entitled to receive any distribution, any Convertible Securities or any right to subscribe for, purchase or otherwise acquire any limited liability company interests or any other securities or property, or to receive any other right, the Issuer shall mail to the Purchaser, at least twenty (20) days prior to the date specified therein, a notice specifying the date on which any such record is to be taken for the purpose of such distribution or rights, and the amount and character of such distribution or rights.

6.     **Right of Redemption**.  This Note may not be redeemed or prepaid prior to the Maturity Date without the prior written consent of Purchaser, which may be granted or refused in the Purchaser's sole discretion.

7.     **Successors and Assigns**.  Subject to the restrictions on transfer described in Sections 9 and 10 below, the rights and obligations of the Issuer and the Purchaser shall be binding upon and benefit the permitted successors, assigns, heirs, administrators and transferees of the parties.

8.     **Waiver and Amendment**.  No waiver, termination or discharge of this Note, or any of the terms or provisions hereof, shall be binding upon any party hereto unless confirmed set forth in writing and signed by the Issuer, the Purchaser.  Any waiver of any term or condition shall not be construed as a waiver of any subsequent breach or a subsequent waiver of the same term or condition, or a waiver of any term or condition of this Note.  No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Note shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

9.     **Transfer of this Note or Securities Issuable on Conversion Hereof**.  Purchaser may not assign this Note or its interests and obligations hereunder, by operation of law or otherwise, in whole or in part or sell participations in this Note and its interests in the Obligations hereunder, without the prior written consent of the Issuer, which consent will not be unreasonably withheld or delayed; provided, however, that Purchaser may assign this Note or its interests and obligations hereunder, in whole or in part or sell participations in this Note to an Affiliate, as that term is defined

in the Note Purchase Agreement, without the written consent of the Issuer. With respect to any permitted offer, sale or other disposition of this Note or securities into which such Note may be converted, the Purchaser will give written notice to the Issuer prior thereto, describing briefly the manner thereof, together with representations to the Issuer, to the effect that such offer, sale or other disposition may be effected without registration or qualification under any federal or state law then in effect. Each Note thus transferred and each certificate representing the securities thus transferred shall bear a legend as to the applicable restrictions on transferability in order to ensure compliance with the Securities Act, unless in the opinion of counsel for the Issuer such legend is not required in order to ensure compliance with the Securities Act. The Issuer may issue stop transfer instructions to its transfer agent in connection with such restrictions. Subject to the foregoing, transfers of this Note shall be registered upon registration books maintained for such purpose by or on behalf of the Issuer. Prior to presentation of this Note for registration of transfer, the Issuer shall treat the registered holder hereof as the owner and holder of this Note for the purpose of receiving all payments of principal and interest hereon and for all other purposes whatsoever.

10.   **Assignment by the Issuer**. Neither this Note nor any of the rights, interests or obligations hereunder may be assigned, by operation of law or otherwise, in whole or in part, by the Issuer without the prior written consent of the Purchaser.

11.   **Notices**.   All notices, requests, demands, consents, instructions or other communications required or permitted hereunder shall in writing and faxed, mailed or delivered to each party at the respective addresses of the parties set forth in the Note Purchase Agreement, or at such other address, e-mail address or facsimile number as each party shall have furnished to the other party in writing. All such notices and communications will be deemed effectively given the earlier of (i) when received, (ii) when delivered personally, (iii) one Business Day after being delivered by facsimile (with receipt of appropriate confirmation), (iv) one Business Day after being deposited with an overnight courier service of recognized standing or (v) four days after being deposited in the U.S. mail, first class with postage prepaid.

12.   **Usury**. In the event any interest is paid on this Note which is deemed to be in excess of the then legal maximum rate, then that portion of the interest payment representing an amount in excess of the then legal maximum rate shall be deemed a payment of principal and applied against the principal of this Note.

13.   **Waivers**. The Issuer hereby waives notice of acceptance, default, presentment or demand for payment, protest or notice of nonpayment or dishonor and all other notices or demands relative to this instrument.

14.   **Governing Law**. This Note and all actions arising out of or in connection with this Note shall be governed by and construed in accordance with the laws of the State of Texas, without regard to the conflicts of law provisions of the State of Texas or of any other state.

15.   **WAIVER OF JURY TRIAL**.   THE ISSUER, AND, BY ITS ACCEPTANCE HEREOF, THE PURCHASER, EACH IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF THIS NOTE

CONFIDENTIAL TREATMENT REQUESTED
EXEMPT FROM FOIA

OR ANY OTHER TRANSACTION DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). THE ISSUER, AND, BY ITS ACCEPTANCE HEREOF, THE PURCHASER, EACH (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES TO THE TRANSACTION DOCUMENTS HAVE BEEN INDUCED TO ENTER INTO THIS NOTE AND THE OTHER TRANSACTION DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

16.     **Time Is of the Essence**.    Time is of the essence of this Note, and of each provision hereof.

17.     **Characterization as Indebtedness**.     It is the express intent of the Issuer, the Guarantor and the Purchaser that, prior to conversion of this Note as contemplated in <u>Section 6</u> above, the obligations of the Issuer hereunder shall constitute indebtedness for borrowed money, and not equity. In furtherance of the foregoing, each of the Issuer, the Guarantor and the Purchaser shall reflect their rights and obligations hereunder in their books and records as indebtedness for borrowed money, and not as equity.

*[Signature Page Follows]*

CONFIDENTIAL TREATMENT REQUESTED
EXEMPT FROM FOIA

The Issuer has caused this Note to be issued as of the date first written above.

**MOZIDO, LLC**
a Delaware limited liability company

By:_____
Name:
Title:

CONFIDENTIAL TREATMENT REQUESTED
EXEMPT FROM FOIA

## EXHIBIT A

### FORM OF

### NOTICE OF CONVERSION

(To be executed by the Purchaser in order to convert the Note)

The undersigned hereby elects to convert $_____ of the Principal and accrued but unpaid Interest with respect to the Convertible Promissory Note issued by MOZIDO, LLC on [_____] into Preferred Units of MOZIDO, LLC according to the conditions set forth in such Convertible Promissory Note, as of the date written below.

Date of Conversion: _____

Conversion Price: _____

Preferred Units To Be Delivered: _____

Signature: _____

Print Name: _____

Address: _____
_____
_____

CONFIDENTIAL TREATMENT REQUESTED
EXEMPT FROM FOIA

## MOZIDO, LLC

### RESOLUTION OF MEMBERS OF BOARD OF DIRECTORS OF MOZIDO, LLC

Pursuant to Article VIII, Section 8.3 of the Amended and Restated Limited Liability Company Agreement of Mozido, LLC, dated August 27, 2010, as amended, (Mozido, LLC referred to hereafter as the "Company"), the undersigned, being duly appointed and acting members of the Board of Directors of the Company, hereby adopt the following resolutions, as of the date set forth below:

RESOLVED, That Brentwood Investments, LLC, and Brentwood M Investments, LLC, (each a "Pledgor") being affiliates of Company founder Michael A. Liberty, are hereby authorized to pledge and grant security interests in and to Convertible Promissory Notes and related documents and instruments issued by the Company (such Notes and all related documents and instruments, referred to herein as the "Mozido Notes"), in accordance with the terms of such Mozido Notes, and held by one or both of Pledgor as security for obligations of each or both of Pledgor incurred in order to acquire funding; and it is further

RESOLVED, that the holder of any pledge or security interest granted by a Pledgor in and to one or more Mozido Notes shall, upon the enforcement of such pledge or security interest, have the right to transfer and assign the Mozido Notes pursuant to such pledge or security interest, and each transferee and/or assignee thereof shall be entitled to exercise any and all rights and privileges pertaining to the holder of such Mozido Notes, without the necessity of any further consent or authorization of the Company; and it is further,

RESOLVED, that the Chairman, President and Chief Executive Officer, Treasurer, Chief Financial Officer, any Vice President, or any other Officer of the Company is authorized and directed to take such actions as he shall deem reasonably necessary in order to implement and effectuate the aforesaid Resolution, and it is further,

RESOLVED, that these Resolutions may be executed in any number of counterparts, each of which shall be an original but all of which together shall constitute one and the same instrument.

Dated:  January 8, 2013


_____                    _____
Gregory J. Corona                          Michael Blum


_____                    _____
Richard Braddock                           Peter Smith


_____                    _____
Philip H. Geier                            Robert W. Selander


_____                    _____
Ellen Merram                               Henry C. Duques


MHDocs 4188690_1 13313.1