UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) 2:18-cv-00139-JDL ) |
| MICHAEL A. LIBERTY, et al., | ) ) |
| Defendants. | ) |

### ORDER ON DEFENDANT GEORGE MARCUS'S MOTION FOR JUDGMENT ON THE PLEADINGS

The United States Securities and Exchange Commission (SEC) commenced this enforcement action against several individuals and business entities associated with Defendant Michael A. Liberty—among them George Marcus—alleging various securities violations arising from Liberty's promotion of a business operating under the name Mozido.[1]  Marcus has moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) (ECF No. 82).  For the following reasons, I deny the motion.

### I.  FACTUAL BACKGROUND

The SEC's Complaint asserts the following facts, which I treat as true on a motion for judgment on the pleadings.  *See Kando v. R.I. State Bd. of Elections*, 880 F.3d 53, 58 (1st Cir. 2018).  It bears emphasis, however, that the Complaint's allegations of financial fraud committed by Marcus and his codefendants remain unproven.

---

[1] The Defendants are Liberty; Marcus; Paul Hess; Liberty's brother Richard Liberty; Liberty's wife, Brittany Liberty; and the entities Mozido Invesco, LLC; Family Mobile, LLC; BRTMDO, LLC; Brentwood Financial, LLC; TL Holdings Group, LLC; and Xanadu Partners, LLC.

The SEC alleges that between 2010 and 2018, the Defendants "engaged in a long-running fraudulent scheme using multiple fraudulent securities offerings." ECF No. 1 ¶ 1. The alleged scheme revolved around Mozido, LLC ("MDO"), of which Liberty was an executive and promoter. Marcus, who is an attorney, had provided legal representation to Liberty and Liberty-affiliated companies since at least 2010 in various matters.

According to the Complaint, Liberty and the other Defendants "raise[d] money from hundreds of investors" by selling them securities in the form of convertible promissory notes[2] issued by Liberty-controlled shell companies, ostensibly as a vehicle to invest in MDO—but at grossly inflated valuations, with the Defendants pocketing the difference. *Id.* ¶ 2. The SEC also asserts that the Defendants made various false representations to induce the sales. Specifically, the SEC alleges that the Defendants, including Marcus, falsely represented that:

> (1) the investors' money was going to MDO to develop its technology and expand its markets; (2) Liberty's shell companies owned interests in MDO or had the authority to sell them; [and] (3) MDO's value was high and its financial situation was very strong . . . .

*Id.* ¶ 4. To facilitate the scheme, the Defendants allegedly hid these sales from MDO's Board of Directors "and failed to register the securities issued by [the] shell companies." *Id.* The SEC also alleges that the "shell companies filed Form Ds with the SEC that contained material misrepresentations and omissions." *Id.*

---

[2] A convertible promissory note, "as the name suggests, is a debt instrument that may be converted into equity." John F. Coyle & Joseph M. Green, *Contractual Innovation in Venture Capital*, 66 Hastings L.J. 133, 151 (2014).

As to Marcus specifically, the SEC's Complaint alleges that his participation included the following conduct:

- drafting convertible promissory notes that "he knew misrepresented material facts," such as MDO's value, the shell companies' authority to transfer membership units in MDO as provided in the notes, and the use of the investment proceeds, *id.* ¶ 43;

- communicating to an investor's representative that further fundraising "would not be dilutive on a value basis," even though he knew that the investors were paying substantially more for MDO membership units than Liberty had paid, *id.* ¶ 50(f);

- forwarding to potential investors a balance sheet for one of the shell companies, which stated that the shell company possessed "Investments" in MDO, despite knowing that that the shell company did not possess MDO membership units, *id.* ¶ 100; and

- informing a lawyer who represented two other investors that MDO was presently valued at $100 million, despite knowing that the previous month, MDO's board "had valued [the company] at $25 million," *id.* ¶ 107(c)-(d).

The SEC also alleges that Marcus aided the scheme by allowing the other Defendants to channel the investment proceeds through his law firm's IOLTA bank account. Marcus allegedly received compensation for his role in the scheme "in the form of legal fees." *Id.* ¶ 18.

The SEC filed its Complaint in March 2018, alleging, as relevant here, violations of Section 10(b) of the Exchange Act, 15 U.S.C.A. 78j(b) (West 2021), and its implementing regulation, 17 C.F.R. § 240.10b-5 ("Rule 10b-5") (Count One); Section 17(a) of the Securities Act, 15 U.S.C.A. § 77q(a) (West 2021) (Count Two); and Section 5(a) and (c) of the Securities Act, 15 U.S.C.A. § 77e(a), (c) (West 2021) (Count Three).

3

In August 2019, the case was ordered stayed pending resolution of a related criminal proceeding against Liberty and Paul Hess.³ In March 2020, Marcus moved to lift the stay to allow him to file a motion for judgment on the pleadings. In August 2020, I granted Marcus's motion, and on September 3, 2020, Marcus filed a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) (ECF No. 82).⁴

## II.  LEGAL STANDARDS

### A.  Federal Rule of Civil Procedure 12(c)

In resolving a motion for judgment on the pleadings under Rule 12(c), a court must "take the well-pleaded facts and the reasonable inferences therefrom in the light most favorable to the nonmovant." *Kando*, 880 F.3d at 58. This standard, much like the standard for resolving a motion to dismiss under Rule 12(b)(6), requires the court to "separate the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited)." *Id.* (quoting *Morales-Cruz v. Univ. of P.R.*, 676 F.3d 220, 224 (1st Cir. 2012)). The analysis "may include facts drawn from documents 'fairly incorporated' in the pleadings and 'facts susceptible to judicial notice.'" *Id.* (quoting *R.G. Fin. Corp. v. Vergara-Nuñez*, 446 F.3d 178, 182 (1st Cir. 2006)). However, Rule 12(c) "does not allow for any resolution of contested facts; rather, a court may enter judgment on the pleadings only if the

---

³ The criminal case against Liberty was terminated on February 2, 2021, but remains pending as to Hess. *See United States v. Liberty*, 2:19-cr-00030-GZS, ECF No. 176 (D. Me. Feb. 2, 2021).

⁴ On October 14, 2020, Marcus also filed a Motion for Sanctions against the SEC and its attorneys under Fed. R. Civ. P. 11, asserting that the allegations in the Complaint lacked any evidentiary support. At the conclusion of the hearing on Marcus's Rule 12(c) motion on January 5, 2021, I denied the motion for sanctions orally on the record.

uncontested and properly considered facts conclusively establish the movant's entitlement to a favorable judgment." *Aponte-Torres v. Univ. of P.R.*, 445 F.3d 50, 54 (1st Cir. 2008).

## B. Federal Rule of Civil Procedure 9(b)

Because two of the counts against Marcus charge him with fraud, the allegations underlying those counts are subject to Rule 9(b), which requires that a complaint "state with particularity the circumstances constituting fraud." To satisfy Rule 9(b), the complaint "must set out the 'time, place, and content of the alleged misrepresentation with specificity.'" *SEC v. Tambone* (*Tambone II*), 597 F.3d 436, 442 (1st Cir. 2010) (en banc) (quoting *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 193 (1st Cir. 1999)).

Under Rule 9(b), "[m]alice, intent, knowledge, and other conditions of a person's mind," such as scienter, "may be alleged generally." Marcus argues, however, that under the Private Securities Litigation Reform Act of 1995 (PSLRA), 15 U.S.C.A. § 78u-4(b)(2) (West 2021), the SEC must state with particularity facts giving rise to a strong inference of scienter. Contrary to this argument, the First Circuit has adopted the nearly universal[5] stance that the PSLRA's heightened

---

[5] *E.g.*, *SEC v. Carroll*, No. 3:11-CV-165-H, 2011 WL 5880875, at *9 (W.D. Ky. Nov. 23, 2011); *SEC v. Betta*, No. 09-80803-Civ., 2010 WL 963212, at *5 (S.D. Fla. Mar. 15, 2010); *SEC v. Sandifur*, No. C05-1631C, 2006 WL 538210, at *7 (W.D. Wash. Mar. 2, 2006); *SEC v. Lucent Techs., Inc.*, 363 F. Supp. 2d 708, 717 (D.N.J. 2005); *U.S. SEC v. ICN Pharm., Inc.*, 84 F. Supp. 2d 1097, 1099 (C.D. Cal. 2000); 5A Arthur R. Miller et al., Federal Practice and Procedure § 1301.1 (4th ed., Oct. 2020 Update). *But see SEC v. Durgarian*, 477 F. Supp. 2d 342, 353 (D. Mass. 2007) (applying, albeit without explanation, the "strong inference" standard in an SEC enforcement action); *SEC v. Druffner*, 353 F. Supp. 2d 141, 150 (D. Mass. 2005) (exercising the same "strong inference" standard). Although the rule is basically unanimous at the district court level, *see SEC v. Patel*, No. 07-cv-39-SM, 2008 WL 781914, at *5 (D.N.H. Mar. 24, 2008) (explaining why *Durgarian* and *Druffner* lack persuasive force), it does not appear that any circuit courts other than the First Circuit have directly addressed the question.

5

pleading standard does not apply to SEC enforcement actions, and Marcus fails to explain why that precedent does not control here. *See SEC v. Papa*, 555 F.3d 31, 35 n.1 (1st Cir. 2009); *SEC v. Tambone*, 550 F.3d 106, 119-20 (*Tambone I*) (1st Cir. 2008), *reinstated by* 597 F.3d at 450. Accordingly, the usual pleading requirements under Rule 9(b) apply to the SEC's allegations of scienter.

### III. DISCUSSION

Marcus makes several discrete legal arguments in support of his motion, which I will address, but I turn first to consider the overriding argument, developed throughout his 41-page motion, that the Complaint's factual allegations of fraud against him are, as he puts it, "fiction, entirely refuted by the documentary record." ECF No. 82 at 2. Marcus attached twenty-two exhibits to his motion, including copies of the allegedly fraudulent promissory notes, purchase agreements, relevant emails, and the like. Marcus argues that the only correct findings to be drawn from these documents are his own, exculpatory interpretations, and he suggests that the SEC lacks additional evidence to support the Complaint's allegations.

Marcus's argument misconstrues the Rule 12(c) standard. At this stage, the court must "take the well-pleaded facts and the reasonable inferences therefrom in the light most favorable to the nonmovant." *Kando*, 880 F.3d at 58. The analysis "may include facts drawn from documents 'fairly incorporated' in the pleadings and 'facts susceptible to judicial notice.'"[6] *Id.* (quoting *R.G. Fin. Corp.*, 446 F.3d at 182).

---

[6] Because none of Marcus's documentary submissions unequivocally establishes his right to judgment, I do not differentiate between the documents that are properly considered on a Rule 12(c) motion—i.e., the documents that are "expressly linked" to the factual allegations so that they "effectively merge[] into the pleadings," *Trans-Spec Truck Serv., Inc. v. Caterpillar Inc.*, 524 F.3d 315, 321 (1st Cir. 2008) (quoting *Beddall v. State St. Bank & Tr. Co.*, 137 F.3d 12, 16-17 (1st Cir. 1998)),

However, "Rule 12(c) does not allow for any resolution of contested facts; rather, a court may enter judgment on the pleadings only if the uncontested and properly considered facts conclusively establish the movant's entitlement to a favorable judgment." *Aponte-Torres*, 445 F.3d at 54. Marcus's argument that the documents he's collected "flatly contradict [the SEC's] allegations" cannot be dispositive; after all, at trial, the SEC may offer additional exhibits, witness testimony and other evidence to prove its allegations.[7] ECF No. 82 at 40. This conclusion is illustrated by the convertible promissory notes which are among the documents Marcus cites.

Relying on the text of the convertible promissory notes, Marcus argues that the allegedly inflated conversion option price stated in the notes—the price at which an investor would be able to convert the notes to MDO equity in three years[8]—could not have been material to individual investors' decisions to acquire the notes. He contends that it is an "inescapable conclusion that no logical inference about the present value of an asset can be made by the grant of an option to purchase the asset at a given price three years later." ECF No. 82 at 9. Marcus does not, however, cite to any documents, affidavits, or authority in support of this "inescapable conclusion."

---

such as the notes and note purchase agreements—and those that are not, such as the copies of emails that Marcus has submitted.

[7] An example of the sort of document that might "conclusively establish" a defendant's entitlement to judgment on the pleadings, notwithstanding the sufficiency of the complaint, is a record of a prior judicial decision in the defendant's favor on the exact same claims. In such a case, the "uncontested and properly considered facts" might "conclusively establish" that a plaintiff's claims are barred by res judicata. *Aponte-Torres*, 445 F.3d at 54; *see R.G. Fin. Corp.*, 446 F.3d at 182 (affirming Rule 12(c) judgment based on res judicata). But here, the documents submitted by Marcus represent no more than a portion of the possible exhibits and evidence in this case. The meaning and legal significance of this partial record is impossible to assess divorced, as it is, from a fully-developed record consisting of both exhibits and testimony from which all of the necessary facts can be found.

[8] The SEC disputes that the conversion option was not immediately exercisable; for purposes of illustrating the point, however, I accept Marcus's premise.

7

More importantly, materiality is a quintessentially factual question. *See, e.g., Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824, 829 (8th Cir. 2003). The documents relied on by Marcus in support of his motion do not on their face disprove the SEC's assertion that the conversion option price, which the Complaint alleges was inflated as much as 500% greater than the actual value of MDO, was material to at least some investors when they decided to purchase the notes.

Accordingly, Marcus's overarching argument in support of his Motion for Judgment on the Pleadings—that the partial documentary record he has submitted in support of his motion "entirely refutes the Complaint's allegations"—is unfounded. ECF No. 82 at 2. This is reason enough for the Motion for Judgment on the Pleadings to be denied.

Marcus also challenges (A) the sufficiency of the Complaint generally, and raises three related, discrete arguments: that the Complaint (B) does not adequately allege scienter; (C) does not adequately allege that Marcus "obtained money or property by means of" the alleged fraud, as required for liability under § 17(a)(2); and (D) is untimely.

### A. Sufficiency of the Complaint Generally

The SEC's Complaint charges Marcus in three counts with alleged violations of § 10(b) of the Exchange Act and Rule 10b-5, § 17(a) of the Securities Act, and § 5(a) and (c) of the Securities Act.[9]

---

[9] The SEC also brings aiding-and-abetting claims under Sections 10(b) and 17(a) and Rule 10b-5. Because I conclude that the Complaint states a claim of primary liability under these provisions, it suffices to plead aiding-and-abetting liability as well. *See Lorenzo v. SEC*, 139 S. Ct. 1094, 1103-04 (2019).

8

### 1.    Section 10(b) of the Exchange Act, Rule 10b-5, and Section 17(a) of the Securities Act

Rule 10b-5[10] makes it illegal, in connection with the purchase or sale of any security, to (a) "employ devices, schemes or artifices to defraud"; (b) "directly or indirectly . . . make any untrue statement of a material fact"; or (c) "engage in any act, practice, or course of business which operates . . . as a fraud or deceit upon any person."  17 C.F.R. § 240.10b-5 (West 2021).  Scienter is a required element of all three provisions.  *See SEC v. Ficken*, 546 F.3d 45, 47 (1st Cir. 2008).  With two exceptions, "[t]he elements of a violation under Section 17(a)(1)-(3) are essentially the same as those of [Rule 10b-5]."  *SEC v. Garber*, 959 F. Supp. 2d 374, 379 (S.D.N.Y. 2013).  The exceptions are that (1) "no showing of scienter is required . . . under subsections (a)(2) or (a)(3)," *id.*; *see Ficken*, 546 F.3d at 47, and (2) to establish a violation of § 17(a)(2), the SEC must show that the defendant has "obtain[ed] money or property by means of" the allegedly untrue statement, 15 U.S.C.A. 77q(a)(2); *see Tambone II*, 597 F.3d at 444.  I discuss the "obtain money or property" element of § 17(a)(2) in greater detail below, but because a claim under Rule 10b-5 otherwise satisfies the elements of § 17(a), I address only Rule 10b-5 in this section.

A complaint adequately states a defendant's involvement in a fraudulent scheme, for purposes of Rule 10b-5(a) and (c), when it "has pled that [the defendant] did more than perform ministerial actions while in the dark about the goals of the scheme," and "has pled that [the defendant] was an active, aware, and essential participant" in the scheme.  *SEC v. China Ne. Petroleum Holdings Ltd.*, 27 F. Supp.

---

[10] Because "Rule 10b-5 encompasses only conduct already prohibited by § 10(b)," *Stoneridge Inv. Partners v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008), I do not address § 10(b) separately.

3d 379, 392-93 (S.D.N.Y. 2014). To be primarily liable for making a material misrepresentation or omission under Rule 10b-5(b), a person must have "authority over the content of the statement and whether and how to communicate it." *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 144 (2011).

The Complaint alleges, among other things,[11] that Marcus knowingly:

- drafted several convertible promissory notes and note purchase agreements that misrepresented material facts, such as the value of MDO, the transferability of the membership units that the notes could be converted into, and the use of the investment proceeds;

- wrote to investors' representatives that additional fundraising "would not be dilutive on a value basis," despite knowing that the investors were paying substantially more for MDO membership units than Liberty had paid, ECF No. 1 ¶ 50(f);

- forwarded a shell company's balance sheet to potential investors, despite knowing that the document falsely represented that the shell company possessed assets it did not have;

- wrote to other investors' legal counsel that MDO was valued at $100 million, despite knowing that the previous month, MDO's board had valued the company at $25 million; and

- omitted to inform the manager of another group of investors that MDO had recently defaulted on debts and was in "precarious financial condition," despite the manager's request for recent financial statements and guidance, *id.* ¶ 129(e).

These assertions are sufficient to plausibly allege, for purposes of Rule 10b-5 and, therefore, also § 17(a) of the Securities Act, that Marcus was an active and knowing

---

[11] Marcus also argues that many of the SEC's allegations against him are vague or conclusory, and that he is often lumped into undifferentiated allegations of group conduct. Marcus is literally correct—the Complaint contains broad statements—but these conclusory allegations are fairly characterized as narrative aids to guide the reader. In assessing the sufficiency of the SEC's Complaint, I have disregarded these conclusory statements and have relied solely upon its specific factual allegations.

participant in, and made material misrepresentations in furtherance of, the alleged fraudulent scheme.

### 2. Sections 5(a) and (c) of the Securities Act

To state a claim under § 5(a) and (c) of the Securities Act, the SEC must show that "(1) no registration statement was in effect as to the securities; (2) the defendant directly or indirectly offered to sell the securities; and (3) the offer or sales were made in connection with the use of interstate transportation, communication, or the mails." *SEC v. Wall*, No. 2:19-cv-00139-JHR, 2020 WL 1539919, at *8 (D. Me. Mar. 31, 2020) (quoting *SEC v. Tropikgadget FZE*, 146 F. Supp. 3d 270, 280 (D. Mass. 2015)). A showing of scienter is not required. *See id.* Liability under these provisions will only attach to a person who "play[s] a significant role" in the transaction. *SEC v. CMKM Diamonds, Inc.*, 729 F.3d 1248, 1255 (9th Cir. 2013).

The SEC alleges that Marcus drafted the unregistered securities and purchase agreements and performed work to form the shell companies; communicated with investors and their representatives, which included making representations about the investments' value; and drafted emails for Liberty to send to investors regarding the same. These allegations are sufficient to state a claim that Marcus played a significant role in the allegedly unlawful transactions.

### B. Scienter

Marcus argues that the Complaint does not plead scienter, which is a required element for liability under § 10(b) of the Exchange Act and Rule 10b-5, as well as § 17(a)(1) of the Securities Act. *See Ficken*, 546 F.3d at 47.

"Scienter is 'a mental state embracing intent to deceive, manipulate, or defraud.'" *SEC v. Fife*, 311 F.3d 1, 9 (1st Cir. 2002) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)). To show scienter under the securities laws, "[t]he plaintiff must demonstrate that the defendants acted with a high degree of recklessness or consciously intended to defraud." *Id.* "Recklessness is 'a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious the actor must have been aware of it.'" *Id.* (alteration omitted) (quoting *Greebel*, 194 F.3d at 198).

Although scienter "is a subjective inquiry," the "objective unreasonableness of a defendant's conduct may give rise to an inference of scienter." *Gebhart v. SEC*, 595 F.3d 1034, 1041-42 (9th Cir. 2010). At the pleading stage, "[c]ourts have found allegations of recklessness sufficient where a defendant had knowledge of facts or access to information that contradicts [his] public statements, or 'failed to review or check information that [he] had a duty to monitor, or ignored obvious signs of fraud.'" *SEC v. Sayid*, No. 17 Civ. 2630 (JFK), 2018 WL 357320, at *5 (S.D.N.Y. Jan. 10, 2018) (quoting *SEC v. Czarnik*, No. 10 CIV. 745 (PKC), 2010 WL 4860678, at *6 (S.D.N.Y. Nov. 29, 2010)); *accord Chill v. Gen. Elec. Co.*, 101 F.3d 263, 269 (3d Cir. 1996) ("An egregious refusal to see the obvious, or to investigate the doubtful, may . . . give rise to an inference of . . . recklessness." (quotation marks omitted)). Similarly, "a defendant's publication of statements when that defendant 'knew facts suggesting the statements were inaccurate or misleadingly incomplete is classic evidence of

12

scienter.'" *SEC v. Johnston*, --- F.3d ---, 2021 WL 222037, at *7 (1st Cir. Jan. 22, 2021) (quoting *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002)). As previously discussed, the SEC—unlike a private plaintiff—need not plead scienter with particularity, nor satisfy the Private Securities Litigation Reform Act's "strong inference" standard. *See Papa*, 555 F.3d at 35 n.1.

Taking the Complaint's factual allegations as true, Marcus had access to—and sometimes personally authored—many of the materially false, investor-facing statements and representations that the Complaint alleges the Defendants made. He also allegedly had access to other information, such as details about MDO's financial situation, that directly contradicted the representations made to investors. Given his professional expertise and experience, the Complaint plausibly alleges that Marcus either knew that he was participating in a fraud or that his conduct was an "egregious refusal to see the obvious." *Chill*, 101 F.3d at 269 (quotation marks omitted). Many of Marcus's arguments to the contrary simply mirror the same factual disputes about the allegedly deceptive nature of the transactions raised in regards to the general sufficiency of the Complaint. For the reasons I have explained above, these arguments are not properly raised through a Rule 12(c) motion.

Marcus also makes a series of other arguments in support of his motion. First, Marcus suggests that the SEC does not adequately allege scienter because the Complaint contains no "factual allegations of any admissions, documents showing Mr. Marcus was aware of any wrongdoing, and Mr. Marcus's participation in communications reflecting knowledge of any deception." ECF No. 82 at 17. However, the SEC is not required to plead that Marcus affirmatively acknowledged that he

13

knew or suspected that the securities transactions in which he allegedly participated were fraudulent. *See Gebhart*, 595 F.3d at 1041 ("the objective unreasonableness of a defendant's conduct may give rise to an inference of scienter"). The fact that Marcus professed his commitment to lawfulness and truth when communicating with persons not involved in the alleged scheme does not undermine the plausible inference that, in fact, he knew or should have known that he was participating in fraudulent sales.

Second, Marcus argues that the involvement of other experienced securities counsel in the transactions resulting from the allegedly fraudulent offerings precludes an inference that he acted with scienter. Marcus has expressly disavowed that he is raising an advice-of-counsel defense; instead, the premise of this argument is that because the other lawyers advising the Defendants apparently did not see any fraud, it was not possible for Marcus to see any. The Complaint does not suggest, however, that the other attorneys shared Marcus's knowledge about the circumstances surrounding the Defendants' actions and the offerings. This knowledge included information that Marcus would have gained from his participation in meetings of MDO's Board of Directors. Indeed, the SEC alleges that in December 2011, "Hess wrote to Liberty, '. . . I think we want your [new] securities attorneys to know the whole story[;] they need to know everything so they can protect us.'" ECF No. 1 ¶ 73. This allegation suggests, at least for Rule 12(c) purposes, that the other attorneys participating in the offerings knew less of the "whole story" than did Marcus, who appears to have been the only attorney who represented Liberty throughout the relevant time period.

Marcus also argues that the very ordinariness of the offerings—the boilerplate language, the nonreliance clauses, the representations of compliance with applicable law—precludes any inference that he could have known that the offerings were fraudulent. But this is not an accurate statement of the law. A lawyer in a business transaction who has reason to believe that one or more parties is being unlawfully duped has an ethical obligation to ensure that he is not facilitating a fraud. *See, e.g.*, Me. R. Prof. Conduct 1.2(e), 4.1; Restatement (Third) of the Law Governing Lawyers § 94 & cmt. c (Am. Law Inst. 2000). That a document uses only "conventional legal terms," ECF No. 82 at 18, does not absolve an attorney who creates or approves it while knowing or recklessly disregarding that the document is unlawfully deceptive.

Finally, Marcus contends that the SEC has not alleged a strong motive for him to participate in the fraudulent scheme. However, the absence of an obvious motive does not diminish the Complaint's plausible assertions that Marcus knew that he was participating in fraud or acted with a high degree of recklessness, and that he was motivated by his ongoing professional relationship with his codefendants.

For these reasons, the Complaint sufficiently alleges that Marcus acted with scienter for the relevant claims.

### C.   "Obtain Money or Property"

Marcus also argues that the claim under § 17(a)(2) of the Securities Act should be dismissed because the allegation that he "obtained money (in the form of legal fees) from the" alleged fraud, ECF No. 1 ¶ 18, is insufficient to show that he received any "money or property by means of" his alleged misrepresentations, 15 U.S.C.A. § 77q(a)(2).

15

Section 17(a)(2) does not require proof that a defendant "obtained" the money directly; rather, "the proceeds of the fraud may make their way to the defendant in a 'highly roundabout,' or indirect, manner." *SEC v. DiMaria*, 207 F. Supp. 3d 343, 358 (S.D.N.Y. 2016) (quoting *SEC v. Syron*, 934 F. Supp. 2d 609, 639 (S.D.N.Y. 2013)). Some courts have held that a defendant whose compensation is not increased specifically because of the misrepresentation may not be liable under § 17(a)(2). *See, e.g.*, *SEC v. Ustian*, No. 16 C 3885, 2019 WL 7486835, at *41 (N.D. Ill. Dec. 13, 2019) ("[T]here . . . must be money obtained by the defendant, not just lost by the investor or gained by the defendant's employer."); *SEC v. Wey*, 246 F. Supp. 3d 894, 915 (S.D.N.Y. 2017) (noting a split in authority, and concluding that "[i]t is not sufficient that a materially untrue statement was made and the person also made money, such as the incidental payment of a scheduled salary and bonus"). Other courts, however, have concluded that a defendant's receipt of a salary that is "partially funded" by his misrepresentations may satisfy the "obtain money or property" requirement. *SEC v. SeeThruEquity, LLC*, 18 Civ. 10374 (LLS), 2019 WL 1998027, at *5 (S.D.N.Y. Apr. 26, 2019); *see also SEC v. Tourre*, No. 10 Civ. 3229 (KBF), 2014 WL 61864, at *4 (S.D.N.Y. Jan. 7, 2014) ("Section 17(a)(2) does not require the SEC to show that [the defendant banker] received some sort of additional 'fraud bonus' on top of his base salary in order to establish liability."); *SEC v. Stoker*, 865 F. Supp. 2d 457, 462-64 (S.D.N.Y. 2012).

Under either standard, the SEC has stated a claim that Marcus "obtain[ed] money or property by means of" his alleged misrepresentations. First, because the SEC has plausibly alleged that the Defendants' entire business model was

16

fraudulent, it is also plausible that the legal fees Marcus earned for the work he performed would never have been paid if, as the Complaint alleges, Marcus had not participated in and therefore enabled the fraud.  Second, it is reasonable to infer from the Complaint that at least some of the payments for the legal fees paid to Marcus are traceable to investments made by investors in response to Marcus's alleged misrepresentations.

Therefore, the Complaint properly states a claim that Marcus "obtain[ed] money or property by means of" his alleged misrepresentations for purposes of § 17(a)(2).

**D.     Timeliness**

Finally, Marcus asserts that any claims based on his conduct before November 27, 2012,[12] are untimely.  The catch-all statute of limitations applicable to government actions "for the enforcement of any civil fine, penalty, or forfeiture," 28 U.S.C.A. § 2462 (West 2021), bars any such action unless it is "commenced within five years from the date when the claim first accrued."  However, the statute does not apply to the SEC's requests for injunctive relief or disgorgement, each of which are subject to a ten-year statute of limitations.  *See* National Defense Authorization Act for Fiscal Year 2021, P.L. 116-283, § 6501, 134 Stat. 3388, 4626 (slip copy, Jan. 1, 2021).  The parties do not dispute that (1) every count against Marcus is based entirely on conduct occurring within the ten-year limitations period for injunctive relief and disgorgement, and (2) that some of the conduct underlying the SEC's claims

---

[12] Marcus entered into a tolling agreement with the SEC on November 27, 2017, which tolled the statute of limitations from November 27, 2017, to March 31, 2018.  The SEC filed the Complaint in this action on March 30, 2018.  Thus, for purposes of § 2462, the five-year mark is November 27, 2012.

occurred within the five-year limitations period for a fine or monetary penalty. They disagree about whether the SEC may seek a monetary penalty for claims based, at least in part, on conduct occurring outside the limitations date.

Because, as I have explained, the Complaint adequately states a claim for violations of Section 10(b) of the Exchange Act, as well as Sections 17(a) and 5(a) and (c) of the Securities Act, and all of the conduct underlying those claims falls within the ten-year period, the SEC may proceed on its claims for injunctive relief and disgorgement. And on the limited record before me, delimiting the temporal scope of a fine or monetary penalty based on those same claims would be an exercise in speculation. I therefore do not address the timeliness issue at this point, which is a question better reserved for a more fact-intensive stage of the proceeding, whether it be summary judgment, trial, or a potential penalty phase. Accordingly, I deny this aspect of Marcus's motion without prejudice to him reasserting the timeliness issue in the future.

## IV.  CONCLUSION

For the reasons explained above, it is **ORDERED** that Marcus's motion for judgment on the pleadings (ECF No. 82) is **DENIED**.

**SO ORDERED.**

**Dated this 19th day of February, 2021.**

                                                                 _____/s/ JON D. LEVY_____  
                                                                  **CHIEF U.S. DISTRICT JUDGE**